# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

CONGREGATION JESHUAT ISRAEL,

       Plaintiff,

v.

CONGREGATION SHEARITH ISRAEL,

       Defendant.

C.A. NO. 12-822-M (LDA)

**<u>CONGREGATION JESHUAT ISRAEL'S POST-TRIAL MEMORANDUM</u>**

## Table of Contents

Page

Preliminary Statement...................................................................................................... 1

I.     JESHUAT ISRAEL OWNS THE RIMONIM ............................................................ 4

    A.     The Rimonim Were Made for CYI or Gifted to CYI ............................................ 4

    B.     Jeshuat Israel owns the Rimonim as successor to CYI......................................... 6

    C.     Shearith Israel cannot overcome the strong presumption of ownership
        created by Jeshuat Israel's century-long possession of the Rimonim.................... 9

        1.     A "strong presumption" of ownership attaches to possession ................... 9

        2.     The circumstances here mandate a particularly strong presumption
            of ownership........................................................................................... 10

        3.     Shearith Israel cannot overcome the strong presumption of
            ownership in Jeshuat Israel's favor......................................................... 12

        4.     The Deeds, Leases and 1945 Agreement Do Not Cover the
            Rimonim ............................................................................................... 16

        5.     Shearith Israel is barred by doctrines of waiver, estoppel and
            laches from asserting any purported rights with respect to the
            Rimonim ............................................................................................... 18

    D.     Dr. Mann's Spoliation of a Critical Document Merits An Adverse
        Inference that (i) CYI Originally Owned the Rimonim, and (ii) CYI
        Transferred Its Silver – Including the Rimonim – to CSI for Safekeeping
        Only, for Later Re-Delivery to the Congregation in Newport............................. 23

II.    SHEARITH ISRAEL OWNS THE TOURO SYNAGOGUE BUILDING  AND
      LAND IN TRUST.................................................................................................... 25

    A.     The Touro Synagogue Trust Is a Valid Trust Under Rhode Island Law ............. 25

        1.     The Will of Rivera, 1894 Deeds, 1903 Settlement, 1903 and 1908
            Leases  and the 1945 Agreement All Reiterate the Existence of a
            Valid Charitable Trust............................................................................ 25

        2.     Any Lessor-Lessee Relationship Between Shearith Israel and
            Jeshuat Israel Does Not Undercut the Existence of the Trust.................. 29

        3.     There is no "Triple Net" Language in the 1903 and 1908 Leases,
            And the Language of the Leases Does Not Negate Shearith Israel's
            Obligations Towards Jeshuat Israel ........................................................ 30

B.    Shearith Israel is Estopped from Denying the Existence of the Trust .................. 32

III.    IF SHEARITH ISRAEL OWNS THE RIMONIM, IT OWNS THEM IN TRUST ........ 33

IV.    THE BENEFICIARY OF THE TOURO SYNAGOGUE TRUST IS JESHUAT ISRAEL............................................................................................................. 34

A.    The Current Incarnation of the "Jewish Society of Newport" is Jeshuat Israel, Which is Therefore the Beneficiary of the Trust ....................................... 34

B.    Even if the "Jewish Society of Newport" Referred Only to CYI, Under the *Cy Pres* Doctrine the Court Should Name Jeshuat Israel as the Beneficiary of the Trust ............................................................................................................... 36

V.    THE COURT SHOULD REMOVE SHEARITH ISRAEL AS TRUSTEE.................... 38

A.    Shearith Israel Should Be Removed Because  It Has Breached Its Duty of Loyalty ................................................................................................................ 38

B.    Shearith Israel Should Be Removed Because It Has Breached Its Duty of Care ...................................................................................................................... 40

C.    Shearith Israel Should Be Removed Because It Has Repudiated The Trust ........ 42

D.    Shearith Israel Should Be Removed Because It Has Created a Relationship of Ill-Feeling With the Beneficiary, Jeshuat Israel ......................... 44

VI.    THE COURT SHOULD PERMIT THE SALE OF THE RIMONIM EVEN IF THEY ARE HELD IN TRUST .......................................................................................... 45

VII.    THE COURT SHOULD NOT GIVE ANY WEIGHT TO THE OPINIONS OF SHEARITH ISRAEL'S EXPERTS ................................................................................. 48

A.    The Exercise Undertaken By CSI's Experts was  Fundamentally Flawed ........... 48

B.    Dr. Mann and Prof. Fisher Did Not Rely  Upon Any Recognized Methodology ......................................................................................................... 51

VIII.    RES JUDICATA DOES NOT BAR THE COURT'S CONSIDERATION OF ANY ASPECT OF THIS CASE ......................................................................................... 52

A.    The 1901 Replevin Action .................................................................................. 52

B.    The 1903 Litigation............................................................................................. 53

1.    Personal property issues.......................................................................... 53

2.    Ownership issues ..................................................................................... 54

3.    Trust Issues ............................................................................................. 55

4.    Subsequent agreements between the parties ............................................... 58

IX.    RELIGIOUS AND GOVERNANCE ISSUES ..................................................................... 59

A.    Religious Practices ................................................................................................ 59

B.    Governance ............................................................................................................ 60

Conclusion ................................................................................................................................ 62

## Table of Authorities

**Page(s)**

**Cases**

*Estate of Abraham v. Comm'r,*
  408 F.3d 26 (1st Cir.)...................................................................................................31

*Ahuna v. Dep't of Hawaiian Home Lands,*
  640 P.2d 1161 (Haw. 1982)...................................................................................29, 30

*Aptix Corp. v. Quickturn Design Sys., Inc.,*
  269 F.3d 1369 (Fed. Cir. 2001)...................................................................................54

*Ardito v. City of Providence,*
  263 F. Supp. 2d 358 (D.R.I. 2003)...............................................................................31

*Arena v. City of Providence,*
  919 A.2d 379 (R.I. 2007)...............................................................................................19

*Blackstone Canal Nat'l Bank v. Oast,*
  45 R.I. 218 (1923).........................................................................................................26

*Blinzler v. Marriott Int'l, Inc.,*
  81 F.3d 1148 (1st Cir. 1996).........................................................................................24

*Bliven v. Borden,*
  185 A. 239 (R.I. 1936)...................................................................................................36

*In re Bond & Mortg. Guarantee Co.,*
  103 N.E.2d 721 (N.Y. 1952).........................................................................................39

*Brault v. Bigham,*
  493 S.W.2d 576 (Tex. Civ. App. 1973)...................................................................42, 43

*Brown v. Meeting St. Baptist Soc'y,*
  9 R.I. 177 (1869)...........................................................................................................46

*Buchanan v. Bank of Am.,*
  2011 R.I. Super. LEXIS 115 (R.I. Super. Aug. 17, 2011)............................................46

*In re Clark's Will,*
  150 N.Y.S.2d 65 (N.Y. Sur. 1956)...............................................................................36

*Clyde Dye & Print Works, Inc. v. Craig,*
  52 R.I. 65 (1931)...........................................................................................................52

*Commercial Union Ins. Co. v. Seven Provinces Ins. Co.,*
  217 F.3d 33 (1st Cir. 2000)...........................................................................................50

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v.
     Hodel,*
     830 F.2d 374 (D.C. Cir. 1987) ...................................................................58

*D.T.P., Inc. v. Red Bridge Props., Inc.,*
     576 A.2d 1377 (R.I. 1990) .........................................................................17

*Daubert v. Merrill Dow Pharm,*
     43 F.3d 1311 (9th Cir. 1995) .....................................................................50

*Daubert v. Merrill Dow Pharm,*
     509 U.S. 579 (1993) ...................................................................................51

*Dennis v. R.I. Hosp. Tr. Nat'l Bank,*
     571 F. Supp. 623 (D.R.I. 1983) .............................................................38, 44

*Dennis v. R.I. Hosp. Tr. Nat'l Bank,*
     744 F.2d 893 (1st Cir. 1984) .....................................................................44

*Dodge v. Stone,*
     69 A.2d 632 (R.I. 1949) .............................................................................38

*Don-Lin Jewelry Co. v. Westin Hotel Co.,*
     877 A.2d 621 (R.I. 2005) ........................................................................6, 12

*In re Estate of Ryan,*
     294 N.Y. 85 (1945) ...............................................................................29, 31

*Exch. Tr. Co. v. Doudera,*
     270 Mass. 227 (1930) ................................................................................41

*Glover v. BIC Corp.,*
     6 F.3d 1318 (9th Cir. 1993) .......................................................................24

*Hammond v. Halsey,*
     336 S.E.2d 495 (S.C. Ct. App. 1985) .......................................................9, 14

*Hughes v. Insley,*
     845 A.2d 1 (Md. Ct. Spec. App. 2003) ......................................................58

*Ingersoll Milling Mach. Co. v. M/V Bodena,*
     829 F.2d 293 (2d. Cir. 1987) .....................................................................19

*Integrated Cards, L.L.C. v. McKillip Indus., Inc.,*
     2008 WL 3286981 (N.D. Ill. Aug. 8, 2008) ...............................................19

*Jackson v. Axton,*
     25 F.3d 884 (9th Cir. 1994) .......................................................................61

*Keystone Driller Co. v. Nw. Eng'g Corp.*,
   294 U.S. 42 (1935) ...........................................................................54

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp.*,
   14 F. Supp. 2d 391 (S.D.N.Y. 1992) ...............................................48

*Lake Caryonah Improvement Ass'n v. Pulte Home Corp.*,
   903 F.2d 505 (7th Cir. 1990) .....................................................22, 33

*Lima v. Holder*,
   758 F.3d 72 (1st Cir. 2014) ...........................................................4, 12

*Lippe v. Bairnco Corp.*,
   288 B.R. 678 (S.D.N.Y. 2003) .........................................................49

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
   2015 WL 1499449 (S.D.N.Y. Mar. 31, 2015) ...............................50

*Maine v. Adams*,
   672 S.E.2d 862 (Va. 2009) .........................................9, 10, 14, 15

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
   514 U.S. 52 (1995) ...........................................................................17

*In re Matthew W.T. Goodness Trust*,
   2009 WL 3328364 (R.I. Super. May 14, 2009) .............25, 35, 38, 39, 42

*MediaCom Corp. v. Rates Tech., Inc.*,
   4 F. Supp. 2d 17 (D. Mass. 1998) ...................................................48

*O'Keeffe v. Snyder*,
   416 A.2d 862 (N.J. 1980) ................................................................18

*OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Canada*,
   804 F. Supp. 2d 77 (D. Mass. 2011) ...............................................49

*Oscar A. Samos, M.D., Inc. v. Dean Witter Reynolds, Inc.*,
   772 F. Supp. 715 (D.R.I. 1991) .......................................................40

*Pacheco v. Nationwide Mut. Ins. Co.*,
   337 A.2d 240 (R.I. 1975) .................................................................33

*Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l
   Presbyterian Church*,
   393 U.S. 440 (1968) .........................................................................59

*Primavera Familienstifung v. Askin*,
   130 F. Supp. 2d 450 (S.D.N.Y. 2001) .............................................48

*Rahn v. Hawkins,*
    464 F.3d 813 (8th Cir. 2006) ...................................................................13, 21

*Random v. Edstrom,*
    307 N.E.2d 347 (Mass. App. Ct. 1974) ...................................................21

*In re Rezulin Prods. Liab. Litig.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................48

*Riley v. Metro. Life Ins. Co.,*
    744 F.3d 241 (1st Cir. 2014)......................................................................17

*Sch. Comm. of Cranston v. Bergin-Andrews,*
    984 A.2d 629 (R.I. 2009)...................................................................18, 60

*Schiavulli v. Sch. Comm. of N. Providence,*
    334 A.2d 416 (R.I. 1975) ..........................................................19, 22, 60

*Shulton, Inc. v. Apex, Inc.,*
    103 R.I. 131 (1967) ...................................................................................53

*Sinclair v. Indus. Nat'l Bank of Providence,*
    153 A.2d 547 (R.I. 1959) ..........................................................................38

*South Kingstown v. Wakefield Tr. Co.,*
    134 A. 815 (R.I. 1926) ..............................................................................46

*St. Pierre v. Dyer,*
    208 F.3d 394 (2d Cir. 2000).......................................................................56

*In re Statter,*
    275 A.2d 272 (R.I. 1971) ..........................................................................44

*Sturm v. Boker,*
    150 U.S. 312 (1893).............................................................................6, 12

*Tillinghast v. Council at Narragansett Pier, Boy Scouts of Am.,*
    133 A. 662 (R.I. 1926) ....................................................................25, 26, 36

*United States v. Taylor,*
    166 F.R.D. 356 (M.D.N.C. 1996) ..............................................................5

*United States v. Zajanckauskas,*
    441 F.3d 32 (1st Cir. 2006).......................................................................48

*Vineberg v. Bissonnette,*
    548 F.3d 50 (1st Cir. 2008)................................................................19, 22

*Vodusek v. Bayliner Marine Corp.*,
   71 F.3d 148 (4th Cir. 1995) ....................................................................24

*Webster v. Wiggin*,
   31 A. 824 (R.I. 1895) ............................................................................25

*In re Will of Crabtree*,
   865 N.E.2d 1119 (Mass. 2007) .............................................................41

*Willcox v. Stroup*,
   467 F.3d 409 (4th Cir. 2006) .............................9, 10, 11, 14, 15, 18

*Wood v. Trs. of Fourth Baptist Church*,
   61 A. 279 (1905) ...........................................................................3, 25, 28

*Woonsocket Neighborhood Dev. Corp. v. Hoyceanyls*,
   1999 WL 191696 (R.I. Super. Ct. Mar. 26, 1999)..............19, 22, 23, 33

*Woonsocket Teachers' Guild, Local 951 v. Sch. Comm. of Woonsocket*,
   367 A.2d 203 (1976) .............................................................................18

**Statutes**

R.I. Gen. Laws § 7-6-22 (West 2015).....................................................60

R.I. Gen. Laws § 18-4-1 (West 2015).....................................................36

R.I. Gen. Laws § 18-9-4 (West 2015).....................................................28

R.I. Gen. Laws § 19-22-1 (1896).............................................................52

R.I. Gen. Laws § 34-21-1 (1896).............................................................52

R.I. Gen. Laws § 35-9-1 (West 2015).................................................7, 58

R.I. Gen. Laws § 38-387-1 (1923)...........................................................52

R.I. Pub. Laws Jan. Session 1929, Ch. 1410 ..........................................7

R.I. Pub. Laws Jan. Session 1995, Ch. 204 ............................................7

**Other Authorities**

Am. Jur. 2d Bailment (2015) .............................................................................................6

Am. Jur. 2d Evidence (2015) ............................................................................................9

George G. Bogert et al., Bogert's Trusts and Trustees (2014) ...........................................39, 40, 42

George T. Bogert, Trusts (6th ed. 1987)............................................................................40

Friedman on Contracts and Conveyances of Real Property (7th ed. 2010)...................................16

Principles of the Law of Nonprofit Organizations§ 315(a) (4th tentative draft,
   Am. Law Inst. 2013)....................................................................................................61

Restatement (Second) Judgments (1982).........................................................................58

Restatement (Third) of Trusts (2003) ................................................................... *passim*

Austin Wakeman Scott & William Franklin Fratcher,
   Scott on Trusts (4th ed. 1987)....................................................................................38, 40, 46

Weinstein's Federal Evidence (2d ed. 2014) ...............................................................49

Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* (2005) ...................48

**Preliminary Statement**

Plaintiff and counterclaim-defendant Congregation Jeshuat Israel ("Jeshuat Israel" or "CJI") respectfully submits this post-trial memorandum in support of its claims and in opposition to the counterclaims of defendant and counterclaim-plaintiff Congregation Shearith Israel of New York ("Shearith Israel" or "CSI").

As set forth in Jeshuat Israel's Proposed Findings of Fact, Jeshuat Israel has presented an overwhelming record establishing that (i) Jeshuat Israel owns the Rimonim at issue, (ii) a trust relationship exists between CSI and Jeshuat Israel with respect to the Touro Synagogue building and real estate, (iii) CSI has breached its obligations as trustee in multiple ways, and should be removed as Trustee, and (iv) a new trustee should be appointed, in consultation with the Attorney General of the State of Rhode Island.

Below, we apply the law to these facts.  More specifically:

- **Jeshuat Israel owns the Rimonim**.  As Shearith Israel has admitted several times in three separate pleadings and as all independent authorities have concluded, the Rimonim were originally owned and possessed by the Congregation Yeshuat Israel, Jeshuat Israel's predecessor.  When in the late 18th and early 19th centuries the Newport Jewish community migrated to other parts of the United States leaving Newport without any Jews, their Torahs and silver, including the Rimonim, were given to Shearith Israel -- to hold in "safe keeping" only, with acknowledged direction that the property be returned to whatever congregation was later formed and worshipping in Touro Synagogue. When the Jewish community of Newport revived in the late 19th century, Shearith Israel complied with the

direction by returning the Rimonim to Jeshuat Israel. That alone is enough to show that Jeshuat Israel owns the Rimonim.

Also establishing ownership, Jeshuat Israel has possessed the Rimonim for more than 100 years, and during that time has borne all indicia of ownership -- giving rise under the law to a strong presumption of ownership. Shearith Israel, which has done nothing with respect to the Rimonim during that time period, has not rebutted that presumption. And Shearith Israel's silence during the hundred-plus years in which Jeshuat Israel controlled and openly claimed to own the Rimonim legally bars Shearith Israel from pursuing any purported rights it might ever have had.

- **Shearith Israel owns Touro Synagogue in a charitable trust for the benefit of Jeshuat Israel**. The Touro Synagogue building and real estate are held in a charitable trust for the benefit of the "Jewish Society of Newport." The 1894 deeds, 1903 settlement agreement, 1903 lease, 1908 lease, and 1945 tri-partite agreement all make that clear. These documents are consistent with the will of Jacob Rodrigues Rivera, an original owner and trustee of the Synagogue who declared that the Synagogue be held in "Trust only, to and for the sole use, Benefit and Behoof of the Jewish Society of Newport, to be for them reserved as a Place of Public Worship forever." Jeshuat Israel, the permanent congregation worshipping in Touro Synagogue for over a century, represents and embodies the "Jewish Society of Newport" and therefore is the trust beneficiary. Shearith Israel is the trustee.

- **Shearith Israel should be removed as trustee**. *First*, Shearith Israel has abandoned and disowned its role, not even acknowledging that it is trustee and instead claiming outright ownership—a failure that cuts to the core of a trustee's obligations. *Second*, CSI has breached its duty of loyalty, acting for its own interests rather than in the interests of the

beneficiary, seeking to claim ownership for itself as well as a piece of the proceeds of any monetization of the Rimonim. CSI has also undermined attempts to sustain the subject of the trust, Touro Synagogue, as a place of worship and evict the Congregation. *Third*, CSI has breached its duty of care, neglecting its responsibilities as trustee and as set out in the 1945 Agreement, requiring that Shearith Israel "preserve, protect, maintain, and, when necessary, restore . . ." Touro Synagogue. *Fourth*, CSI's conduct has generated a poisoned relationship with Jeshuat Israel, culminating in this litigation in which CSI seeks among other things to evict Jeshuat Israel from the only synagogue it has ever occupied. A new trustee should be appointed, in consultation with the Attorney General of Rhode Island.

- **There is no basis in law or in fact for the Court to order any change in Jeshuat Israel's religious practices or governance**. With CSI's full knowledge, Jeshuat Israel has been praying a certain way and following certain rites and rituals for over 100 years. In any event, the Establishment Clause precludes this Court from entangling itself in a dispute over religion, practices and doctrines and thus as a matter of First Amendment law cannot order the relief that CSI seeks.

CSI has also abandoned any role in the governance of Jeshuat Israel. With the full knowledge of CSI, Jeshuat Israel has changed its bylaws, and has been governing itself without any input from CSI for at least the last 70 years.

I.  **JESHUAT ISRAEL OWNS THE RIMONIM**

Based on the evidence presented at trial, Jeshuat Israel owns the Rimonim.

*First*, Jeshuat Israel owns the Rimonim because CYI originally owned the Rimonim (which were made for or gifted to CYI), and Jeshuat Israel is the successor to CYI.

*Second*, even putting aside the issue of original ownership and possession, under the law Jeshuat Israel is entitled to a strong presumption that it owns the Rimonim because it has possessed the objects for over a century.  Shearith Israel has not come close to rebutting that presumption.

*Third*, even if Shearith Israel could rebut the presumption by showing superior title, Shearith Israel is barred from asserting its ownership rights under the doctrines of laches, estoppel, and waiver.

A.  The Rimonim Were Made for CYI or Gifted to CYI

Before Shearith Israel held the Rimonim for safekeeping for a sixty-year period out of their 250-year existence, CYI was the original owner and possessor of the Rimonim.  *See generally* Plaintiff's Proposed Findings of Fact ("Proposed Findings") ¶¶ 41-65.

In addition to the evidence set out in Jeshuat Israel's Proposed Findings of Fact, Shearith Israel has made repeated and binding judicial admissions that CYI was the owner and "original possessor" of the Rimonim.  For example, CSI has averred in its amended answer and counterclaim that "by 1822, Jeshuat Israel, *original possessor of the rimonim*, ceased to exist." (P241 at 11, ¶ 15) (emphasis added).  *See also id.* 2, ¶ 8; 10-11, ¶ 12; 11, ¶ 16).  CSI has also averred in its pleading that at some point in the early 1800's "ownership of the Synagogue and real and personal property, including the Rimonim, were conveyed to Shearith Israel" (P241 at

11, ¶ 16) – meaning that CYI was the original owner of the Rimonim.  As set forth in Jeshuat Israel's proposed findings, CSI has admitted at least ten times in three separate pleadings that CYI was the original owner and/or possessor of the Rimonim.  "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding."  *Lima v. Holder*, 758 F.3d 72, 79 (1st Cir. 2014).

CSI's Rule 30(b)(6) witness made the same admissions at his deposition and in a memorandum submitted to Court.  (Edinger Dep. Tr. 92 (CSI 30(b)(6) witness concerning "ownership, use, possession, control and maintenance" of the Rimonim admitting it was his understanding that the congregation occupying Touro Synagogue was the original possessor of the Rimonim); *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996) (a 30(b)(6) witness is "speaking for the corporation" and "presents the corporation's 'position' on the topic.").  *See also* Angel Dep. Tr. 15, 77 (CSI's rabbi, "familiar with those Rimonim" at issue in this case, acknowledged that Rimonim were made "for the synagogue in Newport, as far as I know" and agreeing that "there is no dispute that what you called Jeshuat Israel was the original possessor of the rimonim.").

As likewise set forth in Jeshuat Israel's Proposed Findings, the primary and secondary source evidence accords with CSI's admissions.  Myer Myers, who crafted the Rimonim, had significant connections to CYI, which explains why a New York silversmith would have made Rimonim for a Rhode Island congregation.  *See* Proposed Findings ¶ 46. And although there is no document directly addressing the creation of the Rimonim, the oldest documentation from CYI that does exist shows that in the 1780's CYI paid Myers to repair rimonim – even though there were silversmiths in Newport, Providence and Boston to whom CYI could have turned.  P30; P79; P93; June 10 (Mann) Tr. 109.  *See* Proposed Findings ¶ 47.

The logical conclusion from these facts  – that the Rimonim were made for CYI – comports with the conclusions of every scholar who has opined on the issue over the past hundred years.  *See* Proposed Findings ¶¶ 51-60.  And even if CYI did not itself pay for the Rimonim, the Rimonim could have been a gift to CYI from a private individual, including wealthy congregants of CYI – a possibility that Shearith Israel's expert Dr. Vivian Mann well recognized.  (June 10 (Mann) Tr. 200-01).  CSI's engraving of "Newport" on one of the Rimonim's shafts during the period of safe keeping is also highly significant.  Why engrave the word "Newport" unless to indicate Newport's origin and ownership?

      B.      <u>Jeshuat Israel owns the Rimonim as successor to CYI</u>

In 1833, CYI's Torahs and silver were given to Shearith Israel for "safe keeping," with the direction that those items be "redelivered when duly required for the use of the Congregation hereafter worshipping in the Synagogue at New Port Rhode Island."  (P38).  *See* Proposed Findings ¶¶ 66-83.  This agreement was in the nature of a gratuitous bailment: possession but not ownership was conveyed to Shearith Israel, and the bailment terminated upon re-delivery of the personalty pursuant to the directions given to Shearith Israel in the first place.

Bailment is "a delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be."  *Don-Lin Jewelry Co. v. Westin Hotel Co.*, 877 A.2d 621, 624 (R.I. 2005).  *See also Sturm v. Boker*, 150 U.S. 312, 329 (1893) (bailment and not sale exists when identical item is to be returned); 8A Am. Jur. 2d Bailment § 1 (2015) (bailment may be created by agreement or implied when personal property is acquired under circumstances in which principles of justice require return).

That is precisely our case.  The items were given to CSI for safekeeping only, and with the direction that they be returned once a new or re-established congregation occupied Touro Synagogue.  Shearith Israel complied with that direction, delivering the Rimonim to Jeshuat Israel over a century ago, for Jeshuat Israel was then and is now "the Congregation hereafter worshipping in the Synagogue at New Port Rhode Island."  (P38).  Shearith Israel's redelivery comports with Jeshuat Israel's status as successor to the colonial-era CYI.  *See* Proposed Findings ¶¶ 84-119.  Jeshuat Israel is the only Jewish congregation in the city of Newport.  Jeshuat Israel is and has been the only congregation worshipping in Touro Synagogue. *Id.* ¶ 89.

Indeed, more than a century ago the Rhode Island legislature rejected CSI's arguments that Jeshuat Israel was not the successor to CYI; over CSI's strenuous objections the General Assembly allowed the Congregation in Newport to incorporate under the Jeshuat Israel name.  (P47, P48, P284).  The Touro Fund laws likewise recognize Jeshuat Israel's historic role and have been amended to expressly reference Jeshuat Israel.  *See* (P292: R.I. Gen. Laws § 35-9-1 (current law); P291: R.I. Pub. Laws, Jan. Session 1995, Ch. 204 ( "Congregation Jeshuat Israel" may directly draw from the fund up to 4.5% of its value each year); P286: R.I. Pub. Laws, Jan. Session 1929, Ch. 1410 (all expenditures on repairs to Touro Synagogue must be approved by "Congregation Jeshuat Israel.")).

Since that time, Shearith Israel has itself acknowledged Jeshuat Israel's status as CYI's successor.  In 1945, during negotiations for the tri-partite agreement between Jeshuat Israel, Shearith Israel and the United States, Jeshuat Israel suggested to Shearith Israel amendments to Article I(f) of the agreement.  The changes were deliberately intended to ensure that  "Congregation Jeshuat Israel will not be prevented from presenting in any future Legal

action the full story of the trusts originally established for the Jewish Society of Newport." (P86 at CJI 507; P87; P88). Shearith Israel did not disagree, and the changes were incorporated into the final signed agreement. (P90). Moreover, in 1947 the United States Department of Interior erected a plaque designating the Touro Synagogue as a National Shrine with these words: "Touro Synagogue of Jeshuat Israel Congregation / Founded 1658." (P261). Jeshuat Israel's connection to CYI is thus clearly announced in this plaque; the year 1658 can only refer to the founding of CYI, as the Touro Synagogue building itself was not erected until at least 1759. And in or about 1946 Shearith Israel approved the language in the plaque. *See* Proposed Findings ¶¶ 91-95.

Shearith Israel has also sat on its hands for decades as Jeshuat Israel identified itself as the successor to CYI – and when others did so as well. (P271, P318 (Jeshuat Israel representing itself as successor); P150 at CJI 3248; P125 at JHA 48, 72; P81 at CJI 3120 (scholars equating CYI and Jeshuat Israel)). CSI's vice president and Rule 30(b)(6) witness himself acknowledged that Jeshuat Israel is "the current incarnation" of the "Jews of Newport." (Lustig Dep. Tr. 73). *See also* P162 at CJI 3225; P167 at 2; Angel Dep. Tr. 6-7; 30-31 (Shearith Israel's rabbi, while employed as rabbi by Shearith Israel, identifying Jeshuat Israel as dating back to colonial period).

Particularly in light of Shearith Israel's approval of the Department of Interior plaque (P261) and the language in the 1945 Agreement, Shearith Israel is now estopped from denying Jeshuat Israel's successorship. Jeshuat Israel has arranged its affairs based on the understanding that it is the successor to CYI – an understanding confirmed by Shearith Israel. *See* pages 18-22 below (discussing law of equitable estoppel and laches).

  C.  Shearith Israel cannot overcome the strong presumption of ownership created by Jeshuat Israel's century-long possession of the Rimonim

   There is no dispute that Jeshuat Israel has possessed and controlled the Rimonim for over 100 years.  *See generally* Proposed Findings ¶¶ 120-160.  Shearith Israel has not overcome the well-settled presumption of ownership that (i) arises from Jeshuat Israel's possession, and (ii)  is strengthened by Jeshuat Israel having continually and solely borne the indicia of ownership during this extended period.

   1.  A "strong presumption" of ownership attaches to possession

   Possession creates a "strong presumption" of ownership in the possessor.  *Willcox v. Stroup*, 467 F.3d 409, 412, 417 (4th Cir. 2006) (long possession of historical Civil War-era documents created "strong presumption" of ownership in possessor); *Maine v. Adams*, 672 S.E.2d 862, 867 (Va. 2009) (possession of printed copy of Declaration of Independence created presumption of ownership in possessor).

   To rebut this strong presumption, the party not in possession has the burden of proving title superior to that of the possessor.  *Willcox*, 467 F.3d at 413, 417.  *See also* 29 Am. Jur. 2d Evidence § 295 (2015).  The party out of possession may not rebut the presumption simply by demonstrating the insufficiency of the possessor's title.  Rather, that party must prove its own ownership in the property; the burden on the party out of possession "may not be met by challenging the sufficiency of the possessor's title but only by proving the superior strength of its claim."  *Willcox*, 467 F.3d at 415.  *See also Hammond v. Halsey*, 336 S.E.2d 495, 497 (S.C. Ct. App. 1985) ("The [party not in possession] must recover on the strength of his own title, not on the alleged weakness of the [possessor's].").

The principles underlying the presumption resonate loudly in this case. In *Willcox* the Court explained that "the common law, through the presumption of ownership in the possessor, resolves otherwise insoluble historical puzzles in favor of longstanding distributions and long-held expectations. Such a rule both protects the private interests of longtime possessors and increases social utility." *Willcox*, 467 F.3d at 414. That is, the presumption "promotes stability" by "protect[ing] the expectations of those in possession, thus encouraging them to make improvements that increase social wealth" and "favor[ing] status-quo distributions over great upsets in property rights." *Id.* at 413. Furthermore, "the presumption recognizes and averts the possibility of a court's presiding over a historical goose chase." *Id.*

As amply demonstrated at trial, this dispute presents a classic case for application of the presumption. We are dealing here with a 250-year history, an incomplete and murky documentary record scattered over two cities, and no living witnesses to the underlying events. As set forth in its Proposed Findings, Jeshuat Israel has the far better of the record. But even assuming *arguendo* that the documentary record was more even, the presumption would require that the Court should find that Jeshuat Israel is the owner. The presumption was meant for cases just like this one, where anything approaching absolute certainty simply is not possible.

> 2.   The circumstances here mandate a particularly strong presumption of ownership

The Rimonim have been physically located at Jeshuat Israel for a long time -- more than one hundred years. *See* Proposed Findings at ¶ 121. Combined with the "time of possession" of Jeshuat Israel's predecessor CYI, the Newport congregations have held the Rimonim for 190 out of 250 years. Given this lopsided history, Jeshuat Israel is entitled to a "strong presumption" of ownership. *See Willcox*, 467 F.3d at 414-15 (party in possession possessed Civil War documents for over 140 years and party out of possession could not rebut

presumption of ownership since "[t]here is no documentary evidence of the State's title, nor is there evidence of its *recent* possession") (emphasis added); *Maine*, 672 S.E.2d at 867 (party not in possession could not rebut presumption even though it had possession of the document at issue 200 years ago).

Importantly, Jeshuat Israel has borne all indicia of ownership during its longstanding possession, further buttressing the presumption. *See generally* Proposed Findings ¶¶ 120-152. Jeshuat Israel has possessed and exercised dominion and control over the Rimonim ever since Shearith Israel returned them to Newport over 100 years ago. (P124 at CJIB 4111; P81 at CJI 1088). The Rimonim have been located with Jeshuat Israel or other places designated by Jeshuat Israel, including its safe deposit box. June 1 (Bazarsky) Tr. 133-134; June 3 (Ross) Tr. 198-200. Jeshuat Israel has loaned the exhibitions throughout the country at least seven times since 1953. *See* Proposed Findings ¶¶ 125-133. Jeshuat Israel has borne all the expenses for the Rimonim – insurance, storage, refurbishing. *Id.* ¶¶ 151-152, 179, 183. CSI has paid nothing. Jeshuat Israel has been publicly and repeatedly held out as owner of the Rimonim – without any objection by CSI. *Id.* ¶¶ 136, 150, 170-176. *See, e.g.*, P150 at CJI 3248 (catalogue for 2001 Yale exhibition noting "PROVENANCE [is] with Congregation Yeshuat (now Jeshuat) Israel by about 1780 and probably earlier.").

The presumption of ownership is meant to promote exactly the type of conscientious possession that Jeshuat Israel has exhibited for the last century. *Willcox*, 467 F.3d at 413. And the importance of the presumption is underscored when the property to be cared for and maintained bears great historical and symbolic significance to the nation. Without the courts' enforcement of the presumption of ownership in circumstances like ours, parties in possession of historical property will be discouraged from protecting, restoring and maintaining

- 11 -

such important property -- which Jeshuat Israel has done here without any help from Shearith Israel.

The precedent set by reversing the presumption of ownership in such circumstances as those presented here – uncertainty in which no historical goose chase could ever be resolved with absolute precision – would be unsettling and bad public policy.

> 3. Shearith Israel cannot overcome the strong presumption of ownership in Jeshuat Israel's favor

As noted above, Shearith Israel is bound by it pleadings, in which CSI has stated at least ten times that CYI was the original possessor of the Rimonim.  *See Lima*, 758 F.3d at 79. On that ground alone, CSI cannot overcome the presumption.  Moreover, no document shows that ownership of the Rimonim ever resided in or was conveyed to Shearith Israel.  And no document shows that Shearith Israel loaned the Rimonim to Jeshuat Israel or CYI.  *See* Proposed Findings ¶¶ 184-185.  The absence of documentation by Shearith Israel, which has kept meticulous records for hundreds of years, (June 10 (Mann) Tr. 38-40) speaks volumes.

Beyond the absence of documents showing that Shearith Israel ever owned the Rimonim, even when the Rimonim were located with Shearith Israel during some part of the 19th Century – just 60 years out of the 250-year history of the Rimonim – that Congregation held the objects in safekeeping and upon the condition that Shearith Israel return them to "the Congregation hereafter worshipping in the Synagogue at New Port Rhode Island" – which Shearith Israel did.  *See* Proposed Findings ¶¶ 68-86.  Shearith Israel could not and never did obtain ownership under such a bailment.  *Don-Lin Jewelry Co.*, 877 A.2d at 624; *Sturm*, 150 U.S. at 329.  Beyond that, sometime before 1869 the word "Newport" was engraved on the

detachable bases of the Rimonim, likely to indicate that Shearith Israel did not own the Rimonim. (D34-036). Why inscribe "Newport" if not to designate ownership?

Equally significant, Shearith Israel's actions – and inactions – affirmatively demonstrate that CSI does not own the Rimonim. Until the events leading to this lawsuit, Shearith Israel never claimed to own the Rimonim. Shearith Israel never objected when Jeshuat Israel loaned the Rimonim to third parties for long periods without obtaining Shearith Israel's permission – even though Shearith Israel had a policy that board approval was necessary before objects that it owned like its Rimonim could be loaned out. *See* Proposed Findings ¶¶ 166-169. Shearith Israel never claimed ownership or objected despite the numerous occasions that Jeshuat Israel held itself out or was represented as the owner of the Rimonim, including at exhibitions and in published works where Shearith Israel's own rimonim appeared. *See* Proposed Findings ¶¶ 170-176; *Rahn v. Hawkins*, 464 F.3d 813, 821 (8th Cir. 2006) ("a statement is attributable to a person when he or she stands silent in the face of its utterance if the natural response would be to deny it if untrue. . . .") *overruled on other grounds by Rivera v. Illinois*, 556 U.S. 148, 160 (2009).

Shearith Israel also knew that in 2001 Jeshuat Israel restored the Rimonim without obtaining Shearith Israel's permission. (June 8 (Katz) Tr. 51; June 1 (Bazarsky) Tr. 148). CSI never objected, even though CSI required a Board vote to restore its own rimonim. (P151). Shearith Israel also knew that Jeshuat Israel and others were expending money and effort to restore the Rimonim. (June 8 (Katz) Tr. 51; June 1 (Bazarsky) Tr. 148). In 1937 Shearith Israel learned that Jeshuat Israel supposedly was not taking appropriate care of the Rimonim, but CSI took no action. (P83 at CSI 11121; D221A-003; June 10 (Mann) Tr. 138). And in 2009, Jeshuat Israel announced to the world that it was considering selling the Rimonim

– in a front page article in a prominent New York Jewish newspaper to which Shearith Israel subscribes. Shearith Israel took no action, even though its vice president, Michael Katz, read the article and spoke to a Jeshuat Israel representative Bea Ross about it – in a discussion during which Ms. Ross confirmed that Jeshuat Israel was considering selling the Rimonim. Shearith Israel took no action even though Mr. Katz communicated to the Shearith Israel board the full extent of his conversation with Ms. Ross. *See* Proposed Findings ¶¶ 149, 153, 175. And Shearith Israel over the years has not expended even a penny to maintain the Rimonim.

The case of *Hammond v. Halsey* is instructive. In *Hammond*, the trustee of the late Senator James Hammond sued to recover possession of an 1857 Spanish cannon barrel formerly in Hammond's possession. The court acknowledged that Hammond had owned the cannon, but because Hammond transferred possession of the cannon during his lifetime and "[p]ossession carries a presumption of ownership," the burden was on "the Trustee to prove his superior title and right to possession." 336 S.E.2d at 497. "The only evidence he adduced, however, [was] that Senator Hammond had possession of the cannon until 1965." The trustee, therefore, had "not met his burden of proving that Senator Hammond retained title after he transferred possession of the cannon." This, the court held, was sufficient to find in favor of the possessor. *Id.* at 497-98.

The reasoning of *Hammond* applies *a fortiori* here, because Shearith Israel was not even the owner of the Rimonim before it returned them to Newport. *See also Willcox*, 467 F.3d at 415 (party out of possession failed to show "recent possession" of property at issue); *Maine*, 672 S.E.2d at 867 (possession 200 years ago did not prove superior title).

The *Hammond* court further found a "reasonable inference" that Hammond gave "possession *and* title" to the possessor, because among other things (i) Hammond was aware that

the possessor expended "money and effort" to restore the cannon, (ii) the possessor believed it owned the cannon, (iii) "[t]he cannon was moved, displayed, and fired on several occasions under the control of other persons," and (iv) the trustee offered "no evidence that Senator Hammond ever attempted to regain custody of or exercise control over the cannon after it left his possession in 1965." *Id.* at 497-98.

Each of these factors applies in this case as well to show that Shearith Israel does not own the Rimonim.  Shearith Israel was aware that Jeshuat Israel expended effort to restore the Rimonim and that Shearith Israel was not paying for that restoration.  (June 8 (Katz) Tr. 51; June 1 (Bazarsky) Tr. 148).  Jeshuat Israel officers and board members testified that they believe Jeshuat Israel owns the Rimonim.  Jeshuat Israel loaned the Rimonim to museums for public display without Shearith Israel's permission – which Shearith Israel knew about but did not object.  *See* Proposed Findings ¶¶ 161-166.  And in 1937 Shearith Israel took no action when informed that Jeshuat Israel supposedly was not properly caring for the Rimonim.  (P83 at CSI 11121; D221A-003; June 11 (Fisher) Tr. 152).  Yet again in 2009, when Jeshuat Israel went public with its intent to sell the Rimonim and Shearith Israel knew about it, Shearith Israel said nothing.  *See* Proposed Findings ¶¶ 158, 175-176.

Finally, the presumption in this case supports and does not frustrate the public interest.  *See Willcox*, 467 F.3d at 414 (taking into account public interest and noting that Civil War papers would still be available to scholars).  Here, Jeshuat Israel seeks to sell the Rimonim to sustain the Congregation and Touro Synagogue, one of Rhode Island's crown jewels – and an institution which holds great historical significance to Jews and the wider public as a symbol of American religious liberty.  Jeshuat Israel also seeks to sell the Rimonim to a museum that will

display them to the public, to educate the citizenry concerning the importance of religious liberty – all worthy causes.  (*Id.*).

In sum, when, as here, "the party not in possession fails to establish superior title to the property, the presumption of ownership based on possession prevails and relieves a court from having to preside over 'a historical goose chase.'"  *Maine*, 672 S.E.2d at 867.

### 4.    The Deeds, Leases and 1945 Agreement Do Not Cover the Rimonim

None of the legal documents in this case – including the 1894 deeds, the 1903 and 1908 leases, and the 1945 Agreement – reference the Rimonim.  Nor do those documents ascribe to Shearith Israel legal ownership of the Rimonim or other personal property.  And none of Shearith Israel's wordsmithing efforts with respect to the terms "appurtenances," "fixtures" and "paraphernalia" contained in some of those documents advance Shearith Israel's case.

• The 1894 deeds on their face do not cover personal property.  There is no reference to personal property in those deeds.  Rather, under the deeds descendants of Rivera and Levy purported to convey the Touro Synagogue "[t]ogether with the appurtenances . . . ."  (P50; P51; P53).  That language was not tailor-made for this synagogue deed, but rather was taken from a blank, pre-printed form.  (P274).  Additionally, the caselaw and treatises of the time clearly establish that  "appurtenances" did not include personal property.  *See* Proposed Findings ¶¶ 186-197.  And the rule is that the conveyance of real estate does not include the conveyance of personal property unless specifically indicated in the deed.  1 Friedman on Contracts and Conveyances of Real Property § 1A:5 (7th ed. 2010) ("Personal property is not included in a sale by implication, and if the purchaser expects to get personal property, it is up to him to see that this is mentioned in the contract.").  There is no such direction in the deeds.

- 16 -

• There is likewise no reference in the 1903 and 1908 nominal, one-dollar leases to "personal property." Nor is there a reference to Rimonim. The leases reference "appurtenances," but again this language was taken from a form book. *See* Proposed Findings at ¶ 229. And here too, the treatises and caselaw of that time make clear that the term did not refer to or include the Rimonim. *See id.* ¶ 227. Notably, CSI's expert Dr. Mann and ritual director Zachary Edinger testified that they have never referenced Rimonim as "paraphernalia." *Id.* ¶ 223. To the extent there is any ambiguity in the leases, it should be construed against CSI, the draftsman. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) ("respondents cannot overcome the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it").

• The 1945 Agreement, which reaffirmed the trust relationship between the parties, does not support CSI's claims either. There is no reference in that Agreement to any CSI ownership interest in the personal property. To the contrary, that Agreement elsewhere specifically references personal property and religious articles when discussing how certain rooms of the synagogue will be available for public access (P90 at CSI0096, Article I(f) (". . . excepting such rooms or space as may be reserved for the keeping of religious vestments, vessels, monies and historical or valuable personal properties . . . ."), but notably not in the section describing CSI's ownership. (P90 at CSI0097-98, Article IV(b) ("That the title to the Touro Synagogue . . .and its appurtenances, subject to the covenants above set forth and recorded deeds and declarations of Trusts, appertaining thereto . . . .")) That is legally significant. "Under the familiar principle of *expressio unius est exclusio alterius* . . . when parties list specific items in a document, any item not so listed is typically thought to be excluded." *Riley v. Metro. Life Ins. Co.*, 744 F.3d 241, 249 (1st Cir. 2014) (holding under *expressio unius* that failure to list

- 17 -

contractual right claimed by plaintiff "reflected the intention of the parties" not to establish such right).  This well-established rule of construction applies here.

Finally, perhaps the best extrinsic evidence of what the parties understood by the agreements and their terms is their conduct in performing those agreements.  *See D.T.P., Inc. v. Red Bridge Props., Inc.*, 576 A.2d 1377, 1382 (R.I. 1990) ("If the terms of a contract are ambiguous, the court will look to the construction placed upon such terms by the parties themselves as an aid in determining their intended meaning.") (quoting *Woonsocket Teachers' Guild, Local 951 v. Sch. Comm. of Woonsocket*, 367 A.2d 203, 205 (1976)).  During the past hundred plus years, CJI has borne all indicia of ownership, and CSI has borne none.  CJI has publicly held itself out as owner, and CSI has never done so.  More persuasive evidence of the meaning of these agreements would be hard to imagine.

5.    Shearith Israel is barred by doctrines of waiver, estoppel and laches from asserting any purported rights with respect to the Rimonim

Even if, against the clear weight of record evidence, Shearith Israel were somehow able to rebut the presumption of ownership by establishing superior title, its claims would nonetheless be estopped on any one of a number of grounds.

"After the party out of possession establishes superior title, the possessor may still raise a number of defenses, including the statute of limitations and equitable defenses such as staleness, laches, waiver, and abandonment."  *Willcox*, 467 F.3d at 414 n.1 (citing *O'Keeffe v. Snyder*, 416 A.2d 862 (N.J. 1980), which found owner-artist was barred from reclaiming stolen paintings where she did not diligently pursue recovery of the stolen works).  Given CSI's conduct over the past 100 plus years, these doctrines apply forcefully here.

There is considerable overlap among the doctrines of laches, estoppel, and waiver. For laches, "[f]irst, there must be negligence on the part of the plaintiff that leads to a delay in the prosecution of the case. Second, this delay must prejudice the defendant." *Sch. Comm. of Cranston v. Bergin-Andrews*, 984 A.2d 629, 644 (R.I. 2009) (internal quotation omitted). Similarly, the final two elements of estoppel are "first, an affirmative representation or equivalent conduct on the part of the person against whom the estoppel is claimed which is directed to another for the purpose of inducing the other to act in reliance thereon; and, secondly that such representation or conduct in fact did induce the other to act or fail to act to his injury." *Woonsocket Neighborhood Dev. Corp. v. Hoyceanyls*, 1999 WL 191696, at *4 (R.I. Super. Ct. Mar. 26, 1999). In addition, "[s]ilence . . . can be the basis for estoppel where there exists a duty not to remain silent where the circumstances require one to speak lest such silence would reasonably mislead another to rely thereon to his detriment." *Schiavulli v. Sch. Comm. of N. Providence*, 334 A.2d 416, 449-50 (R.I. 1975). The detrimental reliance factor for estoppel is substantially the same as the "prejudice" requirement for laches. *See Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (laches "involves not only delay but also a party's detrimental reliance on the status quo") (internal quotation omitted).

Laches applies when a party asserting its rights either knew *or* should have known of the conduct allegedly infringing on its rights. *See, e.g., Arena v. City of Providence*, 919 A.2d 379, 396 n.13 (R.I. 2007) ("[L]aches is unreasonable delay by the plaintiff in prosecuting a claim or protecting a right of which the plaintiff knew *or should have known*, and under circumstances causing prejudice to the defendant.") (quoting 1 Dan B. Dobbs, Law of Remedies, § 2.4(4) at 103 (2d ed. 1993)) (emphasis added). The same rule of constructive or imputed knowledge applies to both estoppel and waiver. *See, e.g., Integrated Cards, L.L.C. v. McKillip Indus., Inc.*,

2008 WL 3286981, at *6 (N.D. Ill. Aug. 8, 2008) (noting that hearing on estoppel would assess plaintiff's "actual or constructive knowledge" of the putatively infringing product – in other words, whether plaintiff "knew or should have known of [the defendant's] potentially infringing conduct prior" to issuing a cease and desist letter). *Cf. Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 300 (2d. Cir. 1987) (in assessing waiver, noting plaintiff's "silence after receiving constructive notice" and "fact that Ingersoll can be deemed to have been informed that its machinery was being shipped to Korea on deck . . . .")

Here, any Shearith Israel claim to ownership is independently barred by laches, estoppel and waiver.  As CSI's vice president Michael Katz testified concerning his June 25, 2012 e-mail to then-co-president of CJI Bea Ross four days before CSI issued its cease-and-desist letter (P231), CSI's assertions of ownership were developed only during this litigation:

> Q. And nowhere in that document did you say
> that Shearith Israel owned the rimonim, right?
> A. Correct.
> Q. Nowhere in that email did you write back
> to her that "you can't sell that;" right?
> A. **We weren't sure who owned them at
> that point**.

(June 8 (Katz) Tr. 153 (emphasis added)).

Mr. Katz's admission is consistent with the long history of Shearith Israel's inaction, effectively disavowing ownership of the Rimonim.  *See* Proposed Findings ¶¶ 153-183. Until Jeshuat Israel secured a deal to sell the Rimonim for $7.4 million, CSI never claimed ownership of the Rimonim or conducted itself as owner.  The Rimonim have not been physically located with Shearith Israel for over 100 years, and CSI has borne no costs or expenses of ownership.  *See* Proposed Findings ¶¶ 120-160.

- 20 -

Beyond that, even though CSI knew or should have known that Jeshuat Israel was regularly loaning the Rimonim to exhibitions nationwide, CSI never objected nor demanded that it be consulted before Jeshut Israel loaned the Rimonim. *See* Proposed Findings ¶¶ 161-169. This was so even when CSI decided that *its own* rimonim could not travel to certain exhibitions to which the Rimonim at issue in this case *were* lent. (P151). Indeed, it was Shearith Israel's practice to loan objects that it owns only after a board vote. (June 8 (Katz) Tr. 165-67). If Shearith Israel truly owned the Rimonim just as it owned its own Myer Myers rimonim, why the disparate treatment? And even when Shearith Israel was informed that Jeshuat Israel was purportedly mistreating the Rimonim, Shearith Israel did nothing. (P83 at CSI 11121; D221A-003). Likewise, Shearith Israel never objected when Jeshuat Israel was held out as the owner of the Rimonim at public exhibitions and in published works about which it was or should have been aware. *See* Proposed Findings ¶¶ 170-176; *Rahn*, 446 F.3d at 821.

In light of this record, even were Shearith Israel able to rebut the strong presumption of ownership attached to Jeshuat Israel's long-standing possession, Shearith Israel's claims are barred by laches, estoppel and waiver.

*Random v. Edstrom*, 307 N.E.2d 347 (Mass. App. Ct. 1974), is on all fours with this case. In *Edstrom*, a brother and sister disputed ownership of their family's one-third interest in real estate; the brother claimed that the deed held by the sister's husband was invalid. The trial court, however, found that the brother's claims were barred by laches. The appeals court affirmed. As the court explained, the sister had lived on the property from 1949 until the time of the lawsuit and during that time "bore the expenses of ownership, including mortgage payments, real estate taxes, insurance and water bills, and maintenance expenses." *Id.* at 349. For his part, the brother's contribution towards the expenses of ownership "was limited to 'irregular and small

payments toward his room and board.'" *Id.* And for twenty-two years, the brother had known that the "disputed property stood in the respondent's name to his exclusion but never made a claim to it." *Id.* The court thus found that the defense of laches had been made out because the sister had also "suffered substantial prejudice" from the brother's delay.

So too here. Shearith Israel has known or should have known for decades that Jeshuat Israel was holding itself out as owner of the Rimonim and lending the Rimonim out to exhibitions nationwide without permission from Shearith Israel. In at least one of those exhibitions, at Yale, CJI was noted as owner of the Rimonim and a CSI board member saw that statement of provenance. *See* Proposed Findings ¶¶ 173-174. During this time, Jeshuat Israel also bore the expenses of ownership, including maintenance and arranging for restoration of the Rimonim. *Id.* ¶¶ 179-183. Again, CSI paid nothing.

Jeshuat Israel has also been substantially prejudiced by Shearith Israel's long delay in asserting its rights. With no reason to believe that Shearith Israel claimed otherwise, Jeshuat Israel has paid for the insurance, arranged for restoration of the Rimonim, and staked its future on their sale. Shearith Israel's claims are thus barred by laches. *See Lake Caryonah Improvement Ass'n v. Pulte Home Corp.*, 903 F.2d 505, 509-10 (7th Cir. 1990) (barring suit for specific performance of contract where defendant "paid taxes on the property at issue, carried insurance on the property, and maintained the property for eleven years before the Association asserted its claim.")

The result is the same under the doctrine of equitable estoppel. If Shearith Israel claimed ownership, then Shearith Israel was under a clear duty not to remain silent in the circumstances described above. Jeshuat Israel continually held itself out as owner of the Rimonim – representations about which Shearith Israel either knew or should have known – in

circumstances that would have elicited an objection from any party that truly believed *it* owned the Rimonim.  (June 10 (Mann) Tr. 140-41).  *Schiavulli*, 334 A.2d at 449-50.  And as described above, Jeshuat Israel reasonably and detrimentally relied upon the silence that met CJI's consistent representations of ownership.  *Compare Vineberg*, 548 F.3d at 56 (1st Cir. 2008) (describing prejudice of laches as "party's detrimental reliance on the status quo") *with Hoyceanyls*, 1999 WL 191696, at *4 (describing second prong of estoppel as inducement of the "other to act or fail to act to his injury.").

CSI's belated appearance on the scene is too late under the law.

D.    Dr. Mann's Spoliation of a Critical Document Merits An Adverse Inference that (i) CYI Originally Owned the Rimonim, and (ii) CYI Transferred Its Silver – Including the Rimonim – to CSI for Safekeeping Only, for Later Re-Delivery to the Congregation in Newport

The Court should draw an adverse inference from Dr. Vivian Mann's spoliation of evidence and find that (i) CYI originally owned the Rimonim, and (ii) around 1833 CYI transferred the Rimonim to CSI for safekeeping only, and for later re-delivery to a Jewish congregation in Newport – since the late 1800's, CJI.

As noted in Jeshuat Israel's motion to compel (Dkt. 65 & exhibits thereto), five separate times during her December 31, 2014 deposition CSI's expert Dr. Mann testified to a specific document that she found, created "shortly after" 1833, that evidences the transfer of "the silver that had been used in Newport" from the family of Moses Seixas of CYI "to CSI for safekeeping."  (Dkt. 65-1 at 19:5-21:22, 96:16-97:4, 164:11-164:25 (and errata sheet at p.2), 209:8-211:11, 276:3-8).  Dr. Mann also testified that this record relates to silver rimonim.  (*Id.*).

After Jeshuat Israel learned at Dr. Mann's deposition of the existence of this potentially relevant – and unproduced – material, Jeshuat Israel immediately began asking CSI to

produce it.  (Dkt. 65-3).  CSI did not respond to Jeshuat Israel's repeated requests.  Ultimately, Jeshuat Israel filed a motion to compel the production of the document.  (Dkt. 65).

In opposition papers, CSI admitted that the document existed and that Dr. Mann reviewed it in connection with this litigation.  (Dkt. 66 at 2).  CSI also admitted that the document could not be found.  (Dkt. 66 at 1-3).  The Court ultimately denied Jeshuat Israel's motion to compel without prejudice and noted that it will "allow Plaintiff to make such an inquiry during the course of the bench trial and will decide on an adverse inference to be applied when and if one is requested at that time."  (May 11, 2015 Order).

At trial, Dr. Mann confirmed that she had lost the document – well after this litigation began.  Dr. Mann testified that the document disappeared while in her possession.  (June 10 (Mann) Tr. 121-24).  As Dr. Mann explained, "I could not retrieve --  I could not find it again, which I admit unfortunate."  (*Id.* at 124).  And given the content of the document as described by Dr. Mann, there can be no doubt that CSI and Dr. Mann were on notice of Jeshuat Israel's claims and the document's relevance.  Under these indeed unfortunate circumstances, an adverse inference against CSI is proper.

An adverse inference is warranted when the party who lost or destroyed a document had "notice both of the potential claim and of the document's potential relevance." *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1159 (1st Cir. 1996) (adverse inference held not an abuse of discretion).  More specifically, courts have found it appropriate to draw an adverse inference against a party when the party's expert was the one who lost or destroyed the evidence. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155-57 (4th Cir. 1995) (district court acted within its discretion by instructing the jury that it could draw an adverse inference from an expert's destruction of potentially relevant evidence, regardless of whether the expert acted in

- 24 -

bad faith); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329-30 (9th Cir. 1993) (trial court has discretion to permit a jury to draw an adverse inference from an expert's spoliation of evidence, and "a finding of 'bad faith' is not a prerequisite to this corrective procedure.").

The Court should weigh the significant prejudice to Jeshuat Israel arising from the loss of the document described by Dr. Mann. As demonstrated above, the missing document is highly relevant to a central dispute in this case. Ironically, in rendering his opinion CSI's other expert Dr. Fisher trumpeted the absence of a primary source document concerning the transfer of the silver by CYI to CSI for safekeeping. How can Jeshuat Israel be faulted for the absence of a primary source when CSI's own witness lost the key document?

More critically, and as demonstrated at trial, the continued vitality and perhaps survival of one of the country's most historic religious institutions hangs in the balance in this case. Is Jeshuat Israel supposed to suffer because CSI's expert lost a key piece of evidence?

## II.     SHEARITH ISRAEL OWNS THE TOURO SYNAGOGUE BUILDING AND LAND IN TRUST

The evidence at trial spoke with one voice: CSI owns the Touro Synagogue building and land only in trust, and not outright.

### A.     The Touro Synagogue Trust Is a Valid Trust Under Rhode Island Law

#### 1.     The Will of Rivera, 1894 Deeds, 1903 Settlement, 1903 and 1908 Leases and the 1945 Agreement All Reiterate the Existence of a Valid Charitable Trust

To constitute a charitable trust under Rhode Island law, (i) the trust must be for a perpetual charitable purpose, and (ii) the trust property must be administered by the trustee for a definite class of beneficiaries, the membership of which changes from time to time. *Tillinghast v. Council at Narragansett Pier, Boy Scouts of Am.*, 133 A. 662, 664 (R.I. 1926) (trust to benefit

Narragansett troop of Boys Scouts held charitable trust); *Wood v. Trs. of Fourth Baptist Church*, 61 A. 279, 281 (1905) (trust for benefit of Fourth Baptist Church in Providence held charitable trust); *Webster v. Wiggin*, 31 A. 824, 827-28 (R.I. 1895) (trust to establish housing for "laboring classes" in Providence held charitable trust).

A settlor's manifested intent establishes a trust.  A charitable trust is given effect if the testator's language makes clear his intent to make a gift in trust for a public charitable purpose and it is capable of execution.  *Tillinghast*, 133 A. at 664.  *See* Restatement on Trusts (Third) §13 cmt. b (2001) ("No particular manner of expression is necessary to manifest the trust intention.").

In addition, and as the Rhode Island Supreme Court has held, no conveyance is needed for the establishment of a trust.   In *Blackstone Canal Nat'l Bank v. Oast*, 45 R.I. 218, 223 (1923) the testator changed title of his bank account, initially held in his individual capacity, to reflect he was an "Agent" of uncle's wife.  The change of title was deemed sufficient to create a trust for the benefit of uncle's wife; "The form of the deposit is not conclusive. The test is the intention with which the deposit was made or was changed. The primary and natural proofs of intention are the statements in regard thereto made by the person the purpose of whose act is sought to be discovered."  *See* Restatement (Third) of Trusts  §10 (2001) ("a trust may be created by . . . (c) a declaration by an owner of property that he or she holds that property as trustee for one or more persons.")).

In light of the prevailing standards set out by the authoritative treatises and the Rhode Island Supreme Court, there can be no colorable dispute that Touro Synagogue is held in trust.  The 1787 Rivera Will, 1894 deeds, 1903 settlement agreement, 1903 lease, 1908 lease,

and 1945 tri-partite Agreement establish all the necessary elements for a charitable trust under Rhode Island law.

When Jacob Rodrgigues Rivera died, he left a will dated 1787, in which he declared the trust and its terms:

> Also I do hereby declare and make known unto all proper persons that I have no exclusive right or title, of, in, or to the Jewish Public Synagogue in Newport on account of the Deed thereof being made to myself, Moses Levy & Isaac Harte, *which the same was done, meant and intended in Trust only, to and for the sole Use, Benefit and Behoof of the Jewish Society of Newport, to be for them reserved as a Place of Public Worship forever*.  Therefore I do for myself and my Heirs hereby remise, release and forever quit claim to all exclusive right, Title or Interest therein or thereto and to every part and Parcel thereof, Always saving and excepting such right as I have by being a single member of that Society.

(P31 (emphasis added)).  *See also* P20, P80 at CJI 3319 (receipt from president of CYI  to president of CSI for donation to the Newport synagogue referring to Rivera and others as "trustees for building the synagogue.")

That the synagogue was held in trust was then echoed in the 1894 deeds, which purported to convey the property "IN TRUST."  And contemporaneous documents establish that Shearith Israel recognized that it held the property in trust only.  *See* Proposed Findings ¶¶ 338-345.  Shearith Israel again recognized itself as "Trustees" to the "synagogue building, premises and fixtures" in the settlement of the 1902-1903 litigation, *see* P68 and Proposed Findings ¶¶ 346-351, and as "trustees" of the building in the 1903 and 1908 leases between the parties.  *See* P71 (1903 lease), D150A-003 (1903 lease), P76 at CSI 1 (1908 lease).  CSI Board minutes repeatedly reference CSI as trustee for the building.  For example, in 1920 CSI in board minutes called Shearith Israel "the Trustees and owners of the Ancient Synagogue Property at Newport." (D423-004; D423A-004).

- 27 -

Shearith Israel again reiterated its assent to the existence of the Touro Synagogue Trust and its key elements when CSI signed the 1945 Agreement among CSI, CJI and the United States.  The 1945 Agreement recites that "Shearith Israel Trustees" are "holders of the fee simple title upon certain trusts in the Touro Synagogue. . . ." (P90 at CSI 93).  Echoing the 1787 Will of Rivera, the 1945 Agreement laid out contours of the Touro Synagogue Trust:

> It is mutually understood and agreed . . . (b) That the *title to the Touro Synagogue*, Newport, Rhode Island, and its appurtenances, *subject to the* covenants above set forth and *recorded deeds and declarations of Trusts*, appertaining thereto, shall remain in the Shearith Israel Trustees, to be used for religious purposes *as set forth in Article I(f)* of this Agreement.

(Article IV(b): P90 at CSI 97-98 (emphasis added)).

> . . . .

> That the public shall be admitted to all parts of the said Touro Synagogue . . . so far as consistent with the preservation of the Synagogue for the use, benefit and behoof of the Jewish Society in Newport as a place of public worship forever and for the maintenance of divine services in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed in the Synagogue of said Congregation Shearith Israel, and subject to such fees as may be mutually agreed upon between the parties.

(Article I(f): P90 at CSI 96 (emphasis added)).  Indeed, Article I(f) had been explicitly amended to its final form so that "Congregation Jeshuat Israel will not be prevented from presenting in any future Legal action the full story of the trusts originally established for the Jewish Society of Newport." (P86; P87, P88).  And CSI board minutes the day after it signed the 1945 Agreement acknowledged that Agreement was signed by "individual trustees and Clerk of this Congregation *who hold the property in trust*. . . ." (emphasis added).  *See also* P91 at CSI 11761.

Against this backdrop, the Touro Synagogue is held in trust only.  The trust property is the Touro Synagogue.  The trustees are members of Shearith Israel's Board of

Trustees, who own Touro Synagogue in trust.   The beneficiary is the "Jewish Society of Newport" – now Congregation Jeshuat Israel.   *See* Proposed Findings ¶¶ 371-409; Section IV below.  And the trust has an undeniable charitable purpose.  *Wood*, 61 A. at 282 ("[A] gift for the benefit of a particular Christian church or for the advancement of religion is charitable."); *cf.* R.I. Gen. Laws § 18-9-4 (West 2015) (charitable trust includes trust for "religious purposes")

> 2.    Any Lessor-Lessee Relationship Between Shearith Israel and Jeshuat Israel Does Not Undercut the Existence of the Trust

In its pre-trial memorandum and at trial, Shearith Israel has asserted that the 1903 and 1908 leases between Shearith Israel as landlord and Jeshuat Israel as tenant establish that there is no trustee-beneficiary relationship between the two parties.  *See, e.g.*, CSI Pretrial Br. at 4, 24; June 1 Tr. at 90 (opening statement of Shearith Israel: "There is no obligation on the landlord's part to preserve and protect, defend and maintain.").   This position is bottomed on a misunderstanding of the law.

A lessor-lessee relationship is *not* evidence that the parties do not also bear a trustee-beneficiary relationship.  That is particularly the case when, as here the lessee-beneficiary pays *de minimis* rent.  *See In re Estate of Ryan*, 294 N.Y. 85, 91 (1945) (annual rent due to trustee-landlord from beneficiary-tenant modified from $10,329.40 to $10 to avoid the "costly circuit[r]y" of beneficiary paying substantial sums into trust corpus).

Going in the exact opposite direction, courts will go so far as to order that a trustee lease land to a beneficiary when necessary to properly effectuate the purpose of a trust. In *Ahuna v. Dep't of Hawaiian Home Lands*, 640 P.2d 1161 (Haw. 1982), the Hawaii Supreme Court addressed the duty owed by the Department of Hawaiian Home Lands to native Hawaiians.  *Id.* at 1169.  As the  court explained, land owned by the state under the Hawaiian

Homes Commission Act was held in trust for the benefit of native Hawaiians "for the rehabilitation of the Hawaiian people." *Id.* at 1167. In light of the trust's purpose, the court held that the Department had given "undue weight to the interests" of third parties when it declined to lease a full 10-acre lot to a native Hawaiian and instead awarded him only 6.5 acres of that lot. The court thus ruled that "the commissioners breached their fiduciary duty to eligible native Hawaiian beneficiaries collectively and individually, *to wit*, appellee Wallace Beck, and that they violated the trust obligations imposed by the Hawaii Constitution." *Id.* at 1171.

In light of these authorities, a landlord-tenant relationship cannot negate the existence of a trust – especially since a lessor-lessee relationship might even be judicially *required* of the trustee for the benefit of the beneficiary.

> 3.    There is no "Triple Net" Language in the 1903 and 1908 Leases, And the Language of the Leases Does Not Negate Shearith Israel's Obligations Towards Jeshuat Israel

According to CSI, the 1903 and 1908 leases between the parties are a "triple net" leases, under which Jeshuat Israel bears *all* expenses concerning Touro Synagogue while Shearith Israel bears *no* expenses. In turn, CSI argues, the triple net nature of the leases establishes that the relationship between the parties is nothing more than landlord-tenant, in which Shearith Israel supposedly does "not have any other obligations" to Jeshuat Israel. *See* June 1 Tr. 92 (opening statement of Shearith Israel: "We have no obligation as lessor to CJI at all."); June 8 (Katz) Tr. 27 (testimony that "triple net lease" meant that Shearith Israel did "not have any other obligations" to Jeshuat Israel). CSI points to the following language supposedly establishing this "triple net" perspective:

> And at the expiration of the said term, the said party of the second part will quit and surrender the premises hereby demised in as good state and condition as reasonable use and wear thereof will permit, damages by the elements excepted.

(D148).  *See* June 9 (Katz) Tr. 21.

This language does not create establish a "triple net" lease between the parties, nor does it divest Shearith Israel of all obligations towards Jeshuat Israel or the Touro Synagogue building and land.  The lease language comes word-for-word from the form lease used by the parties in crafting the 1903 lease.  *See*  P58 at CSI 4536.  There is no evidence that form leases in 1903 were meant to establish that the landlord had no obligations with respect to the property or the lessee.  And again, any ambiguities in the lease should be construed against the draftsman, CSI.  *Ardito v. City of Providence*, 263 F. Supp. 2d 358, 367 (D.R.I. 2003) (construing letter against draftsman).

More importantly, even if there were a "triple net lease" between Shearith Israel and Jeshuat Israel, as set forth above that would not negate the existence of a trustee-beneficiary relationship.  A "triple net lease" simply requires the tenant to pay for "taxes, insurance, utilities and maintenance."  *See Estate of Abraham v. Comm'r*, 408 F.3d 26, 28 n.1 (1st Cir.), *partially amended on other grounds*, 429 F.3d 294 (2005).  Trustees and beneficiaries in a landlord-tenant relationship may agree to such arrangements.  *See In re Estate of Ryan*, 294 N.Y. at 91 (noting that beneficiary leasing property from trustee agreed to pay, in addition to "upkeep and maintenance," "all taxes, rates, charges and assessments which might be imposed upon the premises").

B.    <u>Shearith Israel is Estopped from Denying the Existence of the Trust</u>

As a legal matter, Shearith Israel cannot now be heard to claim it owns Touro Synagogue outright, because Shearith Israel waived the right to do so.

To begin with, since representatives of Shearith Israel in the 1890's obtained deeds from heirs to members of Rivera and Levy, those representatives signaled their belief that the Will of Rivera – containing the Trust language – was operative. *See* P50, P51, P53, P88 at CSI 1456. In addition, over the last century-plus Shearith Israel, represented by counsel, has negotiated and signed legal documents in which Shearith Israel directly acknowledged the existence of the Touro Synagogue Trust.

For example, CSI's president signed the 1903 settlement agreement as "Trustees" to the "synagogue building, premises and fixtures." (P68). The 1903 lease signed by CSI repeatedly referenced CSI as "trustees." (P71). The same goes for the 1908 lease. (P76 at CSI 1). The 1945 Agreement was signed by certain individuals who were members of "the Board of Trustees and Clerk of The Trustees of the Congregation Shearith Israel . . . *as Trustees under Deed of Trust* dated April 27, 1894 . . . hereinafter collectively referred to as the 'Shearith Israel Trustees.'" (Emphasis added). Shearith Israel assented to amendments to a draft of the 1945 Agreement proposed by Jeshuat Israel knowing those amendments were meant "[t]o perpetuate both recorded declarations of Trust" and to ensure that "Congregation Jeshuat Israel will not be prevented from presenting in any future Legal action the full story of the trusts originally established for the Jewish of Society of Newport." (P86 at CJI 506-7). *See also* P87, P88 (legal opinion sent by CSI president to former CSI president and receiving response acknowledging contents); P90 (signed agreement integrating Jeshuat Israel's suggested change).

Finally, based on its dealings with Jeshuat Israel in which Shearith Israel acknowledged the trust and signed documents as trustees to the property, Shearith Israel knew or must have known that Jeshuat Israel would rely on CSI's representations on this subject. Shearith Israel has never before this litigation claimed that its ownership is outright, and Jeshuat Israel has detrimentally and reasonably relied upon Shearith Israel's inaction and silence. The 1903 and 1908 leases between the parties affirmed the existence of the trust. In 1945, Shearith Israel accepted Jeshuat Israel's proposed changes to the tri-partite agreement which were meant to ensure that the trust's existence was clear. And to this day, Jeshuat Israel is the only congregation that uses Touro Synagogue. *See* Proposed Findings ¶¶ 11, 89. Shearith Israel cannot now claim there is no trust. *Pulte Home Corp.*, 903 F.2d at 509 (laches); *Hoyceanyls*, 1999 WL 191696, at *4 (estoppel).

In view of this robust documentary history establishing Touro Synagogue as being held in trust – memorialized in several legal documents signed by Shearith Israel – Shearith Israel has also intentionally waived the right to that claim it owns Touro Synagogue outright. *Pacheco v. Nationwide Mut. Ins. Co.*, 337 A.2d 240, 242 (R.I. 1975). (waiver is the "voluntary intentional relinquishment of a known right. It results from action or nonaction[.]").

## III. IF SHEARITH ISRAEL OWNS THE RIMONIM, IT OWNS THEM IN TRUST

If the Court were somehow to conclude, against the overwhelming record evidence, that Shearith Israel does own the Rimonim, then CSI would own them only to the extent it owns the Touro Synagogue: in trust.

Shearith Israel's own arguments would mandate this outcome. Shearith Israel contends that the terms "fixtures," "appurtenances," and "paraphernalia," found in the 1894

Deeds, 1903 and 1908 Leases and 1945 Agreement all are meant to encompass the Rimonim at issue in this case. *See* CSI Pretrial Br. at 42-45. But to the extent that Shearith Israel is correct that the Rimonim are covered by the various agreements to the parties, all that would mean is that Shearith Israel owns the Rimonim in the same manner the synagogue building and land is held – in trust. *See* Section II above.

## IV.    THE BENEFICIARY OF THE TOURO SYNAGOGUE TRUST IS JESHUAT ISRAEL

A.    The Current Incarnation of the "Jewish Society of Newport" is Jeshuat Israel, Which is Therefore the Beneficiary of the Trust

As set forth in Jeshuat Israel's proposed Findings of Fact, Jeshuat Israel is the successor to CYI, the colonial-era congregation of Newport for which Rivera left the Touro Synagogue in trust. Lustig Dep. Tr. 73: (CSI officer stating Jeshuat Israel is the "current incarnation" of the Jews of Newport). *See* Proposed Findings at ¶¶ 89, 495 & Section I.b above. Therefore, Jeshuat Israel is the beneficiary to the Touro Synagogue Trust. *See* Restatement (Third) of Trusts § 28 cmt. c ("A charitable trust can be created although it has no definite or definitely ascertainable beneficiary.")

Jeshuat Israel is plainly the "Jewish Society of Newport" set by Rivera's Will as the beneficiary of the trust. *See generally* Proposed Findings ¶¶ 335-338, 372-409. "Society" was at the time of Rivera's will a means of referring to Jewish congregations. (P81 at CJI 3145 n.11; 6/11/15 (Fisher) Tr. 205-206). *See also* P81 at CJI 3126 (will of Abraham Touro providing "to the Trustees of the Jewish Synagogue in New York Ten thousand dollars, for the purpose of paying the debts due by *that Society* . . . ."). Rivera was thus in his will leaving Touro Synagogue in trust to the "Jewish [congregation] of Newport," which was at the time CYI (to

which Rivera belonged as a member) but can now only be Jeshuat Israel: Jeshuat Israel is a Jewish congregation, in Newport, and worships in Touro Synagogue.

Jeshuat Israel is both the only congregation praying in the Touro Synagogue and the only congregation praying in Newport.  June 1 (Bazarsky) Tr. 104, 128; June 3 (Ross) Tr. 186-187).  At this juncture Jeshuat Israel has prayed in Touro Synagogue for longer than CYI itself, the original "Jewish Society of Newport."  Jeshuat Israel's identity is so closely intertwined with Touro Synagogue that the two names are used interchangeably.  CSI's rabbi has stated that Jeshuat Israel is "better known as the Touro Synagogue."  (P162 at CJI 3225).  *See also* (P168 at CSI 1031 (CSI minutes referring to "Touro Synagogue" as "active, alive Jewish congregation.").  Similarly, the plaque affixed to Touro Synagogue, approved by Jeshuat Israel, Shearith Israel and the United States, proclaims "Touro Synagogue *of* Jeshuat Israel Congregation / Founded 1658."  (P261) (emphasis added).  1658 is the date of *CYI*'s founding. *See* Proposed Findings ¶¶ 26, 92-94.

Jeshuat Israel's identity as the "Jewish Society of Newport" was even confirmed by the Rhode Island legislature.  In 1894, the General Assembly granted a charter to the congregation as "Jeshuat Israel" even though Shearith Israel claimed that the new congregation should not be allowed "to establish a relation between the ancient Congregation" of CYI and made then many of the same argument that it reiterates here.  (P47 & P48).

Any and all identifying characteristics of a "Jewish Society of Newport" point towards one conclusion:  Jeshuat Israel is that Jewish society of Newport.

B.    Even if the "Jewish Society of Newport" Referred Only to CYI, Under the *Cy Pres* Doctrine the Court Should Name Jeshuat Israel as the Beneficiary of the Trust

Even if the "Jewish Society of Newport" referred specifically to CYI only or some amorphous entity or group other than Jeshuat Israel, under the doctrine of *cy pres* the Court should name Jeshuat Israel as the beneficiary of the Trust.

Under Rhode Island law the identity of a beneficiary of a charitable trust may be modified when necessary to carry out the settlor's intent. That is so because "[c]haritable trusts are favored and are liberally construed so that a testator's clearly intended purpose may be carried into effect." *Bliven v. Borden*, 185 A. 239, 249 (R.I. 1936) ("Town Council" named in will was not an "apt body to act as trustee" for funds donated by will for use by library; court substituted "town of Portsmouth" as trustee so that "testator's object will best be attained").

For example, in *Tillinghast*, 133 A. at 662, the Rhode Island Supreme Court held that in naming "Council at Narragansett Pier, R.I. of the Boy Scouts of America" as recipient of the donation in grant, the testator had been "in error as to the name of the organization." The court thus construed the donation as intended for "Veteran Troop No. 1 of Narragansett Pier, Rhode Island of Boy Scouts of America," which was "the only organization carrying on Boy Scout work at Narragansett Pier" and in which testator "had shown an interest . . . and had contributed to its support." *Id.* at 663. As the court noted, "it is well settled that the misnomer of a legatee is immaterial if the person intended can be identified by the description in the will." *Id.*

This long-recognized power of courts applying Rhode Island trust law is buttressed by the doctrine of *cy pres*. Under that doctrine, if it becomes "unlawful, impossible or impracticable to carry out" the designated charitable purpose of a trust, then a court "will direct application of the property or appropriate portion thereof to a charitable purpose that *reasonably*

*approximates* the designated purpose." Restatement (Third) of Trusts § 67 (2003) (emphasis added). *See* R.I. Gen. Laws § 18-4-1 (West 2015) (availability of *cy pres* relief in Rhode Island). Even if a trust directs that its property be used "forever" or for "only" one purpose, *cy pres* may still be applied. *See id.* cmt b  Thus, under *cy pres* if the intended beneficiary of a charitable trust no longer exists, courts will reform the trust to best approximate the donor's intent. *See In re Clark's Will*, 150 N.Y.S.2d 65, 69-70 (N.Y. Sur. 1956) (money intended by settlor to benefit church that dissolved directed towards church of different denomination in that town; church was "the only other Church" in the town).

In the unlikely event that the Court finds that there technically is no longer any "Jewish Society of Newport," it was made clear at trial and admitted by Shearith Israel that the closest current incarnation of that organization is Congregation Jeshuat Israel in Newport, *see* Section IV.b above – whether or not there is any explicit successorship between the two organizations.   CJI is the only Jewish Congregation in Newport and the only Orthodox congregation on Aquidneck Island.  (June 1 (Bazarsky) Tr. 128; June 3 (Ross) Tr. 186-187). Moreover, Jeshuat Israel is the only congregation praying in Touro Synagogue.   (June 1 (Bazarsky) Tr. 104, 112; *see also* June 3 (Bazarsky) Tr. 43).  Shearith Israel at the very least recognized Jeshuat Israel as the closest approximation of the "Jewish Society of Newport" when it approved changes to the 1945 Agreement meant to ensure that  "Congregation Jeshuat Israel will not be prevented from presenting in any future Legal action the full story of the trusts originally established for the Jewish Society of Newport."  (P86, P87, P88, P90).

There can thus be no better approximation of the intent expressed in Rivera's will than to hold that the trust is for the benefit of Congregation Jeshuat Israel – the Congregation praying at and taking excellent care of Rivera's Touro Synagogue for more than a hundred years.

## V.  THE COURT SHOULD REMOVE SHEARITH ISRAEL AS TRUSTEE

The record establishes that Shearith Israel is no longer a suitable trustee for the Touro Synagogue Trust.  Shearith Israel should be removed as trustee for any one of the following reasons: CSI has (i) breached its duty of loyalty, (ii) breached its duty of care, (iii) repudiated the trust, and (iv) established a relationship replete with ill-feeling towards the beneficiary to the trust.  In combination, the case for Shearith Israel's removal is all the more compelling.

### A.    Shearith Israel Should Be Removed Because It Has Breached Its Duty of Loyalty

Shearith Israel should be removed as trustee of the Touro Synagogue Trust because it has breached its duty of loyalty and trust.  *See generally* Proposed Findings ¶¶ 443-448, 480-81.

A trustee has the "duty to administer the Trust solely in the interest of the beneficiaries . . . ."  *Dennis v. R.I. Hosp. Tr. Nat'l Bank*, 571 F. Supp. 623, 638 (D.R.I. 1983), *aff'd*, 744 F.2d 893 (1st Cir. 1984), *abrogated on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991).  A trustee breaches its duty of loyalty by acting "in its own interest." *Sinclair v. Indus. Nat'l Bank of Providence*, 153 A.2d 547, 551 (R.I. 1959) (upholding preliminary injunction barring transaction that was in the trustee's interest).

A trustee may be removed when it has breached its duty of loyalty to the beneficiary.  *In re Matthew W.T. Goodness Trust*, 2009 WL 3328364, at *5 (R.I. Super. May 14, 2009) (removing trustees because they had breached fiduciary duties to the trust).  Even without a breach, the Court may still fashion an appropriate remedy when there exists the mere possibility of a future conflict of interest.  *Dodge v. Stone*, 69 A.2d 632, 635 (R.I. 1949)

(reforming contract when there "might" have been a conflict of interest at "some future date"). Ultimately, "[a] court of equity, having jurisdiction over the administration of trusts, will give to the beneficiaries of a trust such remedies as are necessary for the protection of their interests." 3 Austin Wakeman Scott & William Franklin Fratcher, Scott on Trusts § 199 (4th ed. 1987).

*In re Matthew W.T. Goodness Trust*, 2009 WL 3328364, at *5 is instructive. There, the court removed trustees because their use of trust funds to pay personal expenses displayed "an obvious and continuing sense of personal entitlement" to the trust assets. By allowing their "individual personal interests to trump those of the Trust," the trustees demonstrated their "questionable loyalty and commitment to the terms and objectives of the Trust." *Id.* at *8.

Shearith Israel's aggressive actions in blocking the sale of the Rimonim to advance its own interests and frustrate those of Jeshuat Israel and the community it represents display the same "sense of personal entitlement" that caused the court in *Matthew W.T. Goodness Trust* to remove trustees who demonstrated "questionable loyalty" to the trust and its beneficiaries. Rather than work with Jeshuat Israel in its efforts to create an endowment to perpetuate the trust, Shearith Israel affirmatively worked to thwart a sale. And once CSI had done so, and once CSI had steered the discussions to the prospect of a lease rather than a sale, *Shearith Israel sought a cut of the financial pie for itself.* (*See* P238: "there will need to be a sharing of the income in a way that will favor Touro but is NOT as you describe it, which appears to be 100% to you; the principal belongs to CSI; and there will not be a partial settlement of anything – Touro will be confirming CSI's ownership of land, building, personalty, etc or there will be no compromise at all."). Indeed, in this litigation Shearith Israel seeks total, absolute ownership of the trust property.

To the extent CSI suggests that good faith is a defense to a finding of a breach of the duty of loyalty, CSI is wrong. When a trustee engages in conduct or a transaction that is disloyal, that conduct is forbidden regardless of the trustee's good faith or honest intentions. "Good faith on the party of the trustee is not a defense against a claim of disloyalty." George G. Bogert et al., Bogert's Trusts and Trustees §543 (2014). *See In re Bond & Mortg. Guarantee Co.*, 103 N.E.2d 721, 724-25 (N.Y. 1952) (attorneys for trustee found to have breached duty of loyalty even though there was "no claim of actual fraud, bad faith, or manipulation of the trust dealings by the attorneys"; "the question of bad faith or damage is irrelevant to our inquiry" concerning potential breach).

In any event, to provide some perspective on the issue of good faith, it is ironic that CSI belatedly claims to have taken a principled stand concerning the *sale* of the Rimonim – absolutely forbidden, according to CSI. Yet CSI had no problem monetizing the Rimonim through a lease – but only so long as CSI got a cut of the lease payments and ownership of any principal. (P238). That does not sound like good faith. To the contrary, that is a self-interested breach of fiduciary duty.

B.    Shearith Israel Should Be Removed Because It Has Breached Its Duty of Care

Shearith Israel should be removed as trustee as well because CSI has violated its duty of care with respect to the preservation of the corpus of the Touro Synagogue Trust. *See generally* Proposed Findings ¶¶ 449-479.

Trustees have a duty to use care, skill and caution to preserve the trust property. The standard applied to that duty is the same as the duty of care generally: the trustee must act as a person of ordinary prudence. 2A Scott on Trusts § 176; Restatement (Third) of Trusts § 77 (2001). *See Oscar A. Samos, M.D., Inc. v. Dean Witter Reynolds, Inc.*, 772 F. Supp. 715, 719

(D.R.I. 1991).  Trustees of a building have a duty to make repairs to the building as are necessary to prevent deterioration.  George G. Bogert et al., Bogert's Trusts and Trustees §§ 582, 600 (2014).

As with breach of the duty of loyalty or trust, the duty to exercise ordinary skill and prudence is an objective standard.  That a trustee acted in good faith or unintentionally in breaching that duty is no defense.  George T. Bogert, Trusts §93 at 335 (6th ed. 1987).  *See also Exch. Tr. Co. v. Doudera*, 270 Mass. 227, 229 (1930) (affirming trustee "failure to use proper care" when trustee "did not exercise proper diligence" in selling the property, even though there "was no evidence of bad faith").  And a trustee's failure to uphold its duty of care will serve as further evidence that it should be removed.  *In re Will of Crabtree*, 865 N.E.2d 1119, 1129 (Mass. 2007) (affirming decision to order removal of trustee because breaches of duty, taken together, "document a history of…the trustee's 'basic lack of understanding' of their obligations as fiduciaries.").

Here, and as established at trial, Shearith Israel has been missing in action with respect to preserving Touro Synagogue and the Rimonim.  *See generally* Proposed Findings ¶¶ 449-479.  Yet under the terms of the 1945 Agreement affirming CSI's role as trustee, CSI was and is required to "preserve, protect, maintain, and, when necessary, restore, so far as lies within their power, the Touro Synagogue."  (P90 at CSI 94).  Despite these contractual and fiduciary obligations, CSI has made no material contributions to the restoration of Touro Synagogue in the last half century.  CSI has repeatedly rejected Jeshuat Israel's pleas for funds, and assistance in raising funds, for the restoration of the Touro Synagogue, even when the building was critically in need of maintenance.  *See* Proposed Findings at¶¶ 452-472.  Shearith Israel trustees visit the synagogue only on rare occasions and do not inquire after its upkeep and status with

- 41 -

representatives of Jeshuat Israel.  (June 8 (Katz) Tr. 74-76; June 1 (Bazarsky) Tr. 122-23 & June 2 (Bazarsky) Tr. 142-43).  The president of Shearith Israel was not exaggerating when, in 2004, he "wondered out loud if we had been having a 'free ride'" with respect to Touro Synagogue. (P168 at CSI 1032).

CSI's abandonment of Jeshuat Israel is a breach of the terms of the Trust as set out in the 1945 Agreement, and thus a breach of the duty of care.

### C.    Shearith Israel Should Be Removed Because It Has Repudiated The Trust

Shearith Israel should be removed as trustee for the independent reason that it has repudiated the trust.  *See* Proposed Findings ¶¶ 426-432.

The very core of a trustee's duty is the trustee's understanding that it bears such duties in the first place.  For that reason "repudiation of the trust is a clear ground of removal even though the trust property has not yet been devoted to personal uses."  George G. Bogert et al., Bogert's Trusts and Trustees § 527 (2014).  As the Restatement of Trusts explains, "A breach of trust [involving mistakes as to the nature and extent of the trustee's duties and powers] may be found even though the trustee acted reasonably and in good faith, perhaps even in reliance on advice of counsel."  Restatement (Third) Trusts § 93 (2012).  And even if done in a good faith, "a person who sues to recover property for his own right repudiates a trust relation to such property." *Brault v. Bigham*, 493 S.W.2d 576, 579 (Tex. Civ. App. 1973) (cited approvingly in *In re Matthew W.T. Goodness Trust*, 2009 WL 3328364, at *5 (R.I. Super. May 14, 2009)).

Equally significant, and exactly applicable here, "a repudiation of the trust is a clear ground of removal." *In re Matthew W.T. Goodness Trust*,  2009 WL 3328364, at *5 (quoting *Brault*, 493 S.W.2d at 579).

In *Brault*, 493 S.W.2d at 576, the testator along with his wife and one of his daughters were killed in a plane crash. The wife's sister, who was the administrator of the husband and wife's estates and who had also taken the testator's remaining children in to her home sued in her individual capacity to recover the proceeds of the husband's life insurance. Even though she pleaded that she wished "recovery of the funds as designated beneficiary as 'custodian for the Brault children', but 'free from the control of any guardian, administratrix, probate court or other outside agency,'" *id.* at 577-78, the trial court removed the sister's wife as trustee of the life insurance proceeds. The appellate court affirmed.

> A trustee commits a breach of trust not only where he violates a duty in bad faith, or intentionally although in good faith, or negligently, but, also where he violates a duty because of a mistake. An intended or attempted appropriation is just as much an indication of danger as though it had been consummated, and hence is a ground for removal. Similarly a repudiation of the trust is a clear ground of removal. And a person who sues to recover property for his own right repudiates a trust relation to such property.

*Id.* at 579.

In *Brault* the trustee removed by the Court had shown significant concern for the well-being for the children – taking them into her home, and changing her pleadings to reflect that the funds would only be used for the children. Yet the court still ordered her removal as trustee because she repudiated the trust.

All the more so here. Despite repeatedly signing documents establishing that it owns the building only in trust and despite its minutes and other documents through the years acknowledging that role, Shearith Israel in this case claims outright ownership of Touro Synagogue and the Rimonim. Shearith Israel even sought to obtain for itself the proceeds of any lease of the Rimonim. (P238).

There can be no clearer repudiation of the trust than the testimony of CSI's vice president and sole live trial witness:

> Q. And so the words that were put in the agreement in 1945 about the trust for the Jewish Society of Newport had no meaning, is that your testimony? Yes or no, please. . . .
>
> A. Yes, that's my testimony.

(June 9 (Katz) Tr. 47-48).

D.      Shearith Israel Should Be Removed Because It Has Created a
Relationship of Ill-Feeling With the Beneficiary, Jeshuat Israel

Finally, the ill-feeling between Shearith Israel and Jeshuat Israel provides yet another basis for the removal of Shearith Israel as trustee. *See generally* Proposed Findings ¶¶ 482-85.

Even absent misconduct, a trustee may be removed if there is "friction" or "ill feeling" between the trustee and the beneficiaries that would disrupt the administration of the trust. *In re Statter*, 275 A.2d 272, 276 (R.I. 1971) (trustee may be removed "[w]hen friction between the trustee and beneficiary . . . impairs the proper administration of the trust . . . or if the trustees' continuing to act as such would be detrimental to the interest of the beneficiary"). Evidence of "ill feeling" that "might" interfere with the administration of the trust may arise from the "course of the litigation in this case itself . . . ." *Dennis v. R.I. Hosp. Tr. Nat'l Bank*, 744 F.2d 893, 901 (1st Cir. 1984), *abrogated on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991). And the trustee may be removed even when the ill feeling emanates solely from the beneficiary. *Dennis* 571 F. Supp. at 638-39.

This lawsuit and the ensuing trial are "Exhibit A" evidencing the friction and ill feeling between the two congregations. Highlighting the depths to which the parties'

relationship has sunk, Shearith Israel seeks the drastic remedy of evicting Jeshuat Israel from Touro Synagogue, where the Congregation has prayed continuously for well over a century. How can Jeshuat Israel ever work with or trust Shearith Israel in the future?

Against this backdrop, Shearith Israel should be removed as trustee and replaced by a trustee whose sole concern is the welfare of the beneficiary. *See In re Statter*, 275 A.2d at 276; *Dennis*, 744 F. 2d at 901. Based alone on this litigation, the parties need a divorce.

Jeshuat Israel respectfully requests that a new trustee be appointed in consultation with the Attorney General of the State of Rhode Island.

## VI.  THE COURT SHOULD PERMIT THE SALE OF THE RIMONIM EVEN IF THEY ARE HELD IN TRUST

If the Court finds that the Rimonim are held in trust, then it should nonetheless allow Jeshuat Israel to sell the Rimonim under "equitable deviation." This is so whether the Court finds that Jeshuat Israel is the "Jewish Society of Newport" or exercises its *cy pres* discretion to replace Jeshuat Israel as the beneficiary of the Touro Synagogue Trust.

Even if the Rimonim are part of the property of the Touro Synagogue Trust, under the doctrine of equitable deviation the Court should declare that Jeshuat Israel may sell the Rimonim to further the primary purpose of the trust – to support Touro Synagogue as a place of worship forever. The purpose of the Touro Synagogue Trust is clear from the 1787 Will of Rivera, reaffirmed in the 1945 Agreement. The Touro Synagogue is to be used

> for the sole Use, Benefit and Behoof of the Jewish Society of Newport, to be for them reserved as a Place of Public Worship forever

P31. *See also* P90 at CSI 96 (1945 Agreement). The primary purpose clearly set out by this language is that that the Touro Synagogue shall remain open "forever" as a place of "public

worship" for a Jewish congregation. Whatever the identity of that "Jewish Society of Newport," *see* Section IV above, the Touro Synagogue Trust's overriding purpose is that the synagogue be open for worship, used by a Jewish congregation.

Alternatively, and under the doctrine of "equitable deviation," a court may "permit deviation from the terms of a will or trust when there have been unforeseen circumstances and adherence to the instrument threatens to defeat or substantially impair the purpose of the trust." *Buchanan v. Bank of Am.*, 2011 R.I. Super. LEXIS 115, at *9 (R.I. Super. Aug. 17, 2011). The Restatement, cited approvingly by Rhode Island courts on this subject, explains that the standard for equitable deviation is lenient. Deviation may be permitted when it "will further the purposes of the trust." Restatement (Third) Trusts § 66 (2003) ("The court may modify an administrative or distributive provision of a trust . . . if because of circumstances not anticipated by the settlor the modification or deviation *will further the purposes of the trust*."). *See Buchanan*, 2011 BL 215655, at *4 (quoting §66) (emphasis added).

The Restatement's rule comports with the flexible approach of Rhode Island common law. *See Brown v. Meeting St. Baptist Soc'y*, 9 R.I. 177, 186 (1869) (suggesting that the standard for application of doctrine of equitable deviation for sale of trust property is when sale will be "beneficial to the charity"); *South Kingstown v. Wakefield Tr. Co.*, 134 A. 815, 817 (R.I. 1926) (suggesting that sale of land held in trust is appropriate if land not being "advantageously used.") Indeed, it "has been held in numerous cases that the court may authorize the sale of property held upon a charitable trust although such sale is not authorized or is forbidden by the terms of the trust." 4A Scott on Trusts § 381 (listing more than 75 cases from more than 20 states supporting the proposition).

The sale of the Rimonim to create a permanent endowment exactly aligns with the purpose of the Trust.  And as demonstrated at trial, Jeshuat Israel urgently needs to sell the Rimonim – the only way to create an endowment to carry out the terms of the Will of Rivera and the 1945 Agreement to insure that Touro Synagogue will be open "as a Place of Public Worship forever."  (P31).

Without an endowment raised by selling the Rimonim, the future of Touro Synagogue as an open and active house of worship for the Jews of Newport is uncertain.   Expenses have been cut as much as possible – "to the bone."  (June 3 (Pimental) Tr. 97; *see also* June 1 (Bazarsky) Tr. 176-177).   The Congregation no longer has a single paid administrator and must depend on a small group volunteers for all of its day-to-day operations. (June 1 (Bazarsky) Tr. 177-178; June 3 (Pimental) Tr. 67-69; P190 at CJI 1292).   During the winter the heat is turned off in its community center.  (June 3 (Ross) Tr. 192; June 1 (Bazarsky) Tr. 177; P190 at CJI 1292; P196 at CJI 1304).   Membership is declining.  (June 3 (Ross) Tr. 186; P244).   The congregation is only one significant expense away from insolvency – a disaster that could dissolve the only Jewish congregation of Newport.  (June 3 (Pimental) Tr. 78).

If Jeshuat Israel went under, Touro Synagogue would be only a museum for those many visitors and no longer "a place of public worship forever" – hardly a ringing endorsement for the history of American religious liberty that Touro has for so long symbolized.

## VII.    THE COURT SHOULD NOT GIVE ANY WEIGHT TO THE OPINIONS OF SHEARITH ISRAEL'S EXPERTS

At trial, CSI offered the expert testimony of Drs. Vivian Mann and Linford Fisher.  Jeshuat Israel's proposed Findings of Fact show that for many reasons, the opinions that the experts gave are of no help to CSI's case.  Below, we set out the legal principles bearing on their testimony.

### A.    The Exercise Undertaken By CSI's Experts was Fundamentally Flawed

As was amply demonstrated at trial, both Drs. Mann and Fisher undertook a fundamentally flawed and legally inappropriate exercise.

A party may not use experts to "argue the client's cause" rather than bring knowledge or expertise to bear on the issue.  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004).  Experts similarly cannot "lend their credentials and reputations to the party who calls them without bringing much if any relevant knowledge to bear on the facts actually at issue."  *Id.*

Nor is it the expert's job "to supplant the role of counsel in making argument at trial, and the role of the [fact-finder] in interpreting the evidence."  *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (excluding expert testimony), *amended on reconsideration on other grounds*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co. Inc.*, 653 F.3d 95, 100 (2d Cir. 2011).  *See also Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp.*, 14 F. Supp. 2d 391, 398 (S.D.N.Y. 1992) (excluding expert testimony that encroached upon the role of the fact-finder by opining as to what the parties "did, or what they said to each other.")

In addition, expert testimony interpreting documents is helpful to the trier of fact in narrow circumstances only, when specialized knowledge or experience is needed for such interpretation.  *See United States v. Zajanckauskas*, 441 F.3d 32, 39 (1st Cir. 2006) (quoting 29 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* § 6264 (2005)) ("Expert testimony does not assist where [the trier of fact] has no need for an opinion because it can easily be derived from common sense, common experience, the [trier of fact's] own perceptions, or simple logic.").  And "[e]ven the most learned expert cannot supplant the Court in its task of interpreting the written document." *MediaCom Corp. v. Rates Tech., Inc.*, 4 F. Supp. 2d 17, 24 (D. Mass. 1998).   The expert's role is limited to providing "information and explanations; the expert's role is not to be an advocate." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687  (S.D.N.Y. 2003) (excluding expert testimony), *aff'd*, 99 F. App'x 274 (2004).

In similar fashion, it is not for expert witnesses to opine as to state of mind.  *See OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Canada*, 804 F. Supp. 2d 77, 85 (D. Mass. 2011) (excluding expert testimony opining as to intent of parties in contract dispute ), *aff'd*, 684 F.3d 237 (1st Cir. 2012); 4 Weinstein's Federal Evidence § 702.03[3] (2d ed. 2014) ("State of mind of one of the parties" is "committed exclusively to the trier of fact.").

The testimony of Dr. Mann and Prof. Fisher fell squarely within these zones of exclusion:  the exercise they undertook was fundamentally flawed.  As Dr. Mann admitted, she "built a case for ownership" by CSI.  (June 10 (Mann) Tr. 26).  She read documents that were generated by the parties, reported on what people said and did, and drew factual conclusions.  In other words, as she acknowledged, she in effect weighed the evidence (*id*. at 32) – the role of the trier of fact, not the expert.

Prof. Fisher likewise did nothing more than offer running commentary on a selective portion of the record. Even putting aside the issue of Prof. Fisher's scant qualifications, he weighed the evidence, opined as to what parties believed, discussed or understood, and drew factual conclusions based on his reading of the documents and credibility determinations. He made hundreds of judgments about facts in this case (June 11 (Fisher) Tr. 155-56) – with all judgments in favor of his client. Throughout his testimony, Prof. Fisher opined on topics such as how words were "understood by other people and other places over time" including "within the global Jewish community." (*E.g.*, June 11 (Fisher) Tr. 120-21.) He opined as to parties' state of mind and what was in their heads. (*E.g.*, *id.* Tr. 91 (testifying that he acted "as a historian reading the record and trying to understand what people meant and what they thought was going on [on] the ground" and what "kind of relationship that CJI apparently thought it had" with Shearith Israel). Equally troubling, Dr. Fisher skipped over the documents that CSI did not like, made selective use of sources, and even cited sources for points that helped CSI but ignored the material within those same sources hurtful to CSI. Proposed Findings ¶¶ 299-331. *See Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 39 (1st Cir. 2000) (affirming district court decision in favor of plaintiff at bench trial in contract dispute; district court diminished credibility of defendant's expert because expert "might have developed a bias in favor" of his client).

Chief Judge Preska of the Southern District of New York recently reiterated the governing rules in *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 2015 WL 1499449, at *17 (S.D.N.Y. Mar. 31, 2015). There, the court excluded in part proposed expert testimony because "an expert may neither be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence, nor attributing subjective motivations to the

parties." *Id.  See also id.* ("It is well established . . .  that determining what motivated a particular person or entity is generally not an appropriate subject matter for expert testimony."). Under this and the settled authority cited above, the Court should accord little weight to the partisan spin on the facts offered by Drs. Mann and Fisher.

        B.      Dr. Mann and Prof. Fisher Did Not Rely
                 <u>Upon Any Recognized Methodology</u>

An important factor in *Daubert* analysis is whether an expert has relied upon recognized methodology in forming his or her opinion.  *See Daubert v. Merrill Dow Pharm*, 43 F.3d 1311, 1318 (9th Cir. 1995) (excluding expert witnesses who failed to "point to some objective source – a learned treatise, the policy statement of a professional association, a published article in a  reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.").

In this case, neither Dr. Mann nor Prof. Fisher pointed to any objective source to show that their opinions rest on "good grounds."  *See Daubert v. Merrill Dow Pharm*, 509 U.S. 579, 590 (1993).  Neither expert properly described their methodology or explained how they brought to bear that methodology to their opinions.  For example, Prof. Fisher admitted that he has never before performed the sort of contractual interpretation he did in this case regarding the meaning of "appurtenances" and "paraphernalia."  (June 11 (Fisher) Tr. 215-16).  And his use of sources supposedly bearing on those terms could not have been thinner.  Dr. Mann likewise cited no authority for the methodology she employed other than her review of the objects themselves.

For this reason too, the Court should accord little weight to the opinions of Dr. Mann and Prof. Fisher.

## VIII.  RES JUDICATA DOES NOT BAR THE COURT'S CONSIDERATION OF ANY ASPECT OF THIS CASE

In its Pretrial Memorandum, Shearith Israel asserts that "res judicata bars CJI" both "from litigating ownership of the Rimonim" (Dkt. 70 ("CSI Br.") at 33) and "from relitigating the trust issues." (*Id.* at 34).  Shearith Israel is wrong.  The two cases to which it points – a 1901 replevin action described only in a non-legal secondary source and for which CSI cannot cite to any judicial opinion or other court documents, and a 1903 dismissal on demurrer for unclean hands and lack of standing – did not decide any issues relevant to this dispute, and certainly not "on the merits."

### A.  The 1901 Replevin Action

Shearith Israel suggests that the Court's determination of the ownership of the Rimonim is precluded by a 1901 replevin action because that "litigation determined that Shearith Israel, not CJI, was entitled to possess personal property in the Touro Synagogue."  (CSI Pretrial Br. 32).  CSI's only source with respect to this replevin action is a single paragraph in a single secondary source.  (*Id.* at 18 (citing to D445); June 11 (Fisher) Tr. at 99-102 (expert relying on D445).  On its own terms, the secondary source reports that the replevin action concerned only one Torah – not any Rimonim.  It is unclear why CSI believes the case is controlling.

In any event, the secondary source does not cite to or quote from the court decision in question, identify the parties, note the exact legal issue or explain the court's reasoning.  (*See* D445-13-14).  Shearith Israel has not identified or produced documents from the relevant court proceedings, and Jeshuat Israel is itself not aware of any court documents or other contemporaneous documents that can illuminate the proceedings.  There can be no res judicata effect afforded to a court decision that the Court cannot even review for itself.

Even putting these failures to the side, a replevin action would not preclude "litigating ownership of the Rimonim." (CSI Br. 33). A replevin action did not in 1901 – and does not today – determine ownership, as CSI claims, but only the superior right of possession. *See* R.I. Gen. Laws § 19-22-1 (1896) (providing for a writ of replevin where goods and chattels are "unlawfully taken or unlawfully detained from the owner or from the person entitled to the possession thereof . . . ."); *Id.* § 34-21-1 (2014) (same) (last amended 1969). *See also id.* § 38-387-1 (1923) (same); *Clyde Dye & Print Works, Inc. v. Craig*, 52 R.I. 65, 65 (1931) (affirming nonsuit of replevin because "plaintiff failed to prove either title or right to possession").

B.    The 1903 Litigation

Shearith Israel also claims that the 1903 district court case *David v. Levy* (P67) determined ownership of the Rimonim and precludes litigation of that or the trust issue. (CSI Br. at 33). That too is incorrect.

1.    Personal property issues

The decision in *Levy* did not address personal property. On the contrary, Judge Brown specifically wrote that the case concerned "the land or building in question." (P67 at CSI 317). Shearith Israel's brief submitted to the court in that case made no mention of personal property. (P65). Though Shearith Israel makes much of the fact that in its complaint in that action Jeshuat Israel purportedly "sought to preclude" Shearith Israel from removing "embellishments" "of great historic value" from Touro Synagogue and claims the "embellishments" must have referred to the Rimonim (CSI Br. 33-34), Shearith Israel has selectively quoted the document. The complaint made clear that the "other embellishments" to which it referred were documents. (P62 at CSI 180 ("deeds, books, accounts letters, papers, writings, vellums, parchments, scrolls, *and other embellishments*") (emphasis added). *See*

*Shulton, Inc. v. Apex, Inc.*, 103 R.I. 131, 135 (1967) (recognizing "rule of construction that general words used in connection with and following an enumeration of particulars will, in the absence of a contrary intent, be confined to things ejusdem generis, that is, of the same general nature or use as those specifically enumerated").  Furthermore, the complaint could not have been referring to the Rimonim because the pleading described the property sought as of "no ascertainable value in money but are of great historic value."  (P62 at CSI 180).  The Rimonim, made out of silver, have always had significant monetary value.

    2.    <u>Ownership issues</u>

The court in *Levy* did not rule on the merits of whether or how Shearith Israel owns the Touro Synagogue.  A review of the details of the suit, carefully elided by CSI in its brief, makes that clear.

As complainants in the case, certain individuals and Jeshuat Israel sought among other things to enjoin a forcible entry and detainer action brought by Shearith Israel – in other words, to enjoin a separate lawsuit by Shearith Israel – and to enjoin Shearith Israel's interference with Jeshuat Israel's possession of Touro Synagogue.

The court rejected these claims not on the merits of the ownership dispute – not based on a finding of who owned the synagogue and the land – but rather based on perceived unclean hands at the time.  As the court held, because "the complainants' entry and possession were by forcible entry and detainer, which is a bar to the right of the complainants to seek the aid of a court of equity . . . ."  (P67 at CSI 319).

Judge Brown's 1903 decision in Levy thus has no preclusive effect on the present litigation concerning the ownership of Touro Synagogue.  The Supreme Court has recognized that because dismissal on unclean hands grounds does not go to the merits, such dismissals do

not preclude later litigation of the merits. *See Keystone Driller Co. v. Nw. Eng'g Corp.*, 294 U.S. 42, 44 n.2 (1935) (ruling on the merits of patent dispute even while noting that litigation of same patents had been previously dismissed for unclean hands). *See also Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1377 (Fed. Cir. 2001) (recognizing that while in *Keystone* the Supreme Court "acknowledge[d] the earlier unclean hands litigation, the Court nonetheless adjudicated *Keystone II* on the merits, with no indication that the prior fraud tainted the later case.") (internal citation omitted).

Against this backdrop, it is noteworthy that scholars have concluded that "This decision on demurrer did not decide the question of ownership but merely the right to possession." (P105 at CJI 586). *See also* P125 at JHA 69-70 (scholar in 1975 stating that "despite all that had happened, Judge Brown's decision in the demurrer did not decide the question of legal ownership, but only the rights to possession.").

3.    Trust Issues

The 1903 case likewise does not preclude this Court from determining the "trust issues" here. (*See* CSI Br. 34). CSI offers an expansive reading of Judge Brown's opinion, asserting that the court (i) "rejected [the] claim" that CSI trustees owned Touro Synagogue in a trust for which CJI was the beneficiary and (ii) "reasoned that if any trust was created, it would have been a trust for the 'Jewish Society, in Newport,' and held that CJI could not show that it was the Jewish Society . . . ." (*Id.*) (emphasis removed).

In fact, the decision did *not* "reject" the claim that Touro Synagogue is held in trust for CJI as beneficiaries, and the decision did *not* "hold" that CJI cannot be the "Jewish Society, in Newport." (*See* CSI Br. 34). In the complaint, certain individuals and CJI asked for a declaration that the Synagogue was held in trust for the "Jews of Newport." For Judge Brown,

this request reflected technical flaws in the pleadings: (i) the individual complainants had not pled that they were Jews, and (ii) Jeshuat Israel, as a corporate entity, could not be "regarded as having any right or interest in such a trust, since a domestic corporation of this State cannot be regarded as *a Jew of Newport*."  (P67 at CSI 317; emphasis added).

Furthermore, Judge Brown acknowledged that Rivera's Will very well may declare a trust by explaining that the "extract from [the Will] contains a recital *which may be interpreted* as declaring that the conveyance . . . was 'in trust only to and for the sole use benefit and behoof of the *Jewish Society*, in Newport."  (P67 at CSI 318; first emphasis added).  But the court found that the complaint did not ask for a declaration of trust for the benefit of the "Jewish Society" in or of Newport.  "So far as this tends to show a trust, it is a trust for a Jewish society, and not the trust set forth by the complainants, to wit a trust for the Jews of Newport." (*Id.*).  It is not surprising then that the court also found that the individual complainants had not properly alleged that they were that "Jewish Society, in Newport," since that claim had not been asserted. (*Id.*).

In other words, there was simply no way or occasion for Judge Brown to decide on the merits a claim concerning the identity of the beneficiary of the Touro Synagogue trust for a Jewish "Society" in or of Newport, because there was "no allegation that these complainants have any standing as members of a Jewish society, or as persons entitled to admission thereto, or even that they have the right to demand of such society or its trustees the right to attend worship." *Id.*  And significantly, the court's dicta here related to the individual complainants and not Jeshuat Israel.

In any event, as the complaint did not even seek a declaration of a trust for the benefit of the Jewish "Society" and also failed at the threshold of standing, Judge Brown never

addressed, or had occasion to address, (i) the meaning of "Society," (ii) whether Jeshuat Israel is, or represents or embodies, the "Jewish Society [in or of] Newport," and, more generally, (iii) whether Jeshuat Israel is, or represents or embodies, the beneficiary of the trust alleged in the current lawsuit.  There can be no *res judicata* on the merits in such circumstances.  *See St. Pierre v. Dyer*, 208 F.3d 394, 400 (2d Cir. 2000) (reversing summary judgment dismissal on *res judicata* grounds; "Since a dismissal for lack of Article III standing is a dismissal for lack of subject matter jurisdiction, the *St. Pierre I* judgment has no *res judicata* effect with respect to" those claims dismissed for lack of standing) (internal citations omitted).  In the final analysis, Judge Brown necessarily left open and for another day whether there is a trust for the benefit of the Jewish Society in or of Newport, and whether Jeshuat Israel is the beneficiary of that trust.

Shearith Israel's own actions after the 1903 decision severely undercut its current interpretation of *Levy*.  The parties' 1903 settlement agreement characterizes Shearith Israel as "Trustees."  (P68).  The lease executed in 1903 as a result of the settlement agreement also referenced Shearith Israel as "trustees."  (P71 & P76; *see also* P74).  In 1920, Shearith Israel minutes described its Board as "the Trustees and owners" of Touro Synagogue.  (P315 at CSI 09875).  Shearith Israel then re-acknowledged its trusteeship of a trust for the benefit of the "Jewish Society in Newport" in the 1945 agreement with Jeshuat Israel and the federal government.  (Dkt. 69 at 21-22; P90).  And that language had been specifically added to the agreement to clarify the trust relationship between Shearith Israel and Jeshuat Israel as well Jeshuat Israel's relationship to the colonial-era congregation.  (P86; P87; P88).

4.    <u>Subsequent agreements between the parties</u>

Had he ruled on the merits of ownership or trust issues, Judge Brown's decision still would have no bearing on the present dispute, on account of changed circumstances and subsequent events as well as agreements later executed by the parties.

Since Judge Brown's decision in 1903, Jeshuat Israel's rightful possession of the Touro Synagogue as beneficiaries of the trust in which the synagogue is held has been explicitly reaffirmed multiple times, including in the 1903 lease (P71:  members of board of CSI "as Trustees" "do grant, demise, and to farm let" the Touro Synagogue to Jeshuat Israel), and the 1945 Agreement (P90:  board of CSI "as Trustees under Deed of Trust" affirming that Touro Synagogue would be maintained "so far as consistent with the preservation of the Synagogue for the use, benefit and behoof of the Jewish Society in Newport as a place of public worship forever . . . .").   The Abraham Touro law also was amended after the 1903 decision to make "Congregation Jeshuat Israel" the permanent beneficiary of that fund, which "support[s]" Touro Synagogue.  R.I. Gen. Laws § 35-9-1.

On account of these changed circumstances, *David v. Levy* could not possibly preclude any part of the Court's consideration of the manner in which Touro Synagogue is owned – or any other issue.  *See Hughes v. Insley*, 845 A.2d 1, 10-15 (Md. Ct. Spec. App. 2003) (holding action to quiet title by adverse possession not barred by unsuccessful prior suit to quiet title in same parcel of land, even when evidence "was, in large measure, the same"; plaintiff's acquisition of quitclaim deed after first suit was "operative change," meaning second action not barred); Restatement (Second) Judgments § 24 cmt. f (1980) ("Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or

- 58 -

taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first").

*    *    *

The 1903 decision should not be accorded *res judicata* effect on yet another ground. As the Court will notice upon its review, *David v. Levy* is a cloudy decision. Even upon multiple readings it is difficult to discern Judge Brown's exact reasoning. A purportedly controlling decision that is ambiguous cannot serve as the basis for res judicata. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 830 F.2d 374, 380 (D.C. Cir. 1987) (affirming refusal to apply res judicata because decision "was ambiguous on its face with respect to ownership" of tract of land).

## IX.    RELIGIOUS AND GOVERNANCE ISSUES

### A.    Religious Practices

The Court recognized in its order granting Jeshuat Israel's motion to preclude the testimony of Rabbi Soloveichik and reiterated at the beginning of trial that this dispute, though involving religious organizations, is a civil dispute to be decided based on civil law. (Dkt No. 77 ("This Court will apply only the substantive laws of the State of Rhode Island and the United States to this case. The Court will not apply any 'foreign law' or 'religious law,' neither of which is relevant to this case."); June 1 Tr. 7 ("The Court is not applying religious law here. The Court is applying the law of the state of Rhode Island and of this country. To do otherwise, in this Court's opinion, would violate the First Amendment.") As such, the Court should apply only the secular law of Rhode Island and the United States. *See generally* Dkt. No. 68 at 7-11.

The Court should reject any Shearith Israel request that Jeshuat Israel be ordered to conduct its services in a certain manner. *Presbyterian Church in the United States v. Mary*

*Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 447, 450 (1968).  CSI did not press this issue at trial, nor could it even putting aside the Establishment Clause issues, given that CSI has not objected to the way services have been run at Jeshuat Israel for as long as a hundred years.  (Angel Dep. Tr. 13, 31-33, 34-37, 106-108; Groopman Dep. Tr. 25-26; P233 at CJI 389; June 1 (Bazarsky) Tr. 116; *see also* June 8 (Katz) Tr. 82-83).  As CSI's long-time Rabbi Marc Angel put it, CSI "didn't press [its] rights."  (Angel Dep. Tr. 32).

      B.    <u>Governance</u>

      Shearith Israel has for seventy years acquiesced in the manner of Jeshuat Israel's internal governance and is now estopped from contesting it.

      Following almost a half-century of Shearith Israel's lack of involvement in Jeshuat Israel governance, Jeshuat Israel's by-laws, as amended in 1945, created significant changes to CSI's involvement in Jeshuat Israel's governance.  *See* Proposed Findings ¶¶ 597-602.  There is no evidence that CSI appointed or attempted to appoint any trustees to the Jeshuat Israel board after 1899. CSI-appointed trustees could no longer vote by proxy; CSI-appointed trustees were no longer automatically members of CJI; and amendments affecting CSI-appointed trustees no longer required the affirmative vote of the CSI-appointed trustees.  (*Compare* P85 (1945 by-laws) *with* P46 (1897 by-laws)).  CSI knew about these changes in the bylaws, which were sent to CSI at the time and produced from CSI's files during the litigation.  *See* Proposed Findings ¶¶ 608-15.  CSI did nothing at the time and has done nothing since.  From 1945 forward, the by-laws have been amended at least thirteen times, without objection by CSI until this litigation.  *See* Proposed Findings ¶ 619.  Meanwhile, CSI has sporadically appointed "liaisons" to Jeshuat Israel, but not trustees.  (June 8 (Katz) Tr. 22-23, 106).

After such a long delay during which Shearith Israel knew (or, given their duties as board members, at the least should have known) that any purported rights were being altered, Shearith Israel's claims are now barred by laches and estoppel. *See Bergin-Andrews*, 984 A.2d at 644 (laches is negligence in the prosecution of a case working prejudice on the other party); *Schiavulli*, 334 A.2d at 449-50 (estoppel is action or inaction, "where there exists a duty not to remain silent," when the silence is relied upon to the other party's detriment).

Shearith Israel has acted negligently in any belated prosecution of its supposed rights. Any failure to perceive supposedly *ultra vires* or otherwise misguided acts was at minimum negligent. R.I. Gen. Laws § 7-6-22 (West 2015) (directors of nonprofit corporations must discharge duties "with the care of an ordinarily prudent person in a similar position would exercise under similar circumstances"); Principles of the Law of Nonprofit Organizations § 315(a) (4th tentative draft, Am. Law Inst. 2013) (duty of care for nonprofit board members includes keeping informed).

CSI's delay, furthermore, in prosecuting its claims now prejudices Jeshuat Israel. Jeshuat Israel has for decades conducted its board activities and business based on numerous successive amendments to which Shearith Israel never objected. Such prejudice means that CSI's claims concerning Jeshuat Israel's governance are now barred. *Jackson v. Axton*, 25 F.3d 884, 888-89 (9th Cir. 1994) (finding prejudice where "circumstances have changed in a way that would not have occurred had [plaintiff] sued earlier"), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).

## Conclusion

For these reasons, the Court should issue a final judgment (i) declaring that Jeshuat Israel is the owner of the Rimonim, (ii) declaring that Jeshuat Israel is the owner of the cemetery, (iii) issue a permanent injunction barring CSI from interfering with a sale of the Rimonim, (iv) declaring that Shearith Israel owns the Touro Synagogue building and land in trust for Congregation Jeshuat Israel, (v) removing Shearith Israel as trustee and putting in place a new trustee in consultation with the Attorney General of the State of Rhode Island, and (vi) dismissing CSI's counterclaims.

CONGREGATION JESHUAT ISRAEL,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

*/s/ Steven E. Snow*
Steven E. Snow (#1774)
40 Westminster Street, Suite 1100
Providence, RI  02903
(401) 861-8200 / (401) 861-8210 FAX
ses@psh.com

KRAMER LEVIN NAFTALIS & FRANKEL LLP

*/s/ Gary P. Naftalis*
Gary P. Naftalis (admitted *pro hac vice*)
Jonathan M. Wagner (admitted *pro hac vice*)
Tobias B. Jacoby (admitted *pro hac vice*)
Daniel P. Schumeister (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, NY  10036
(212) 715-9253 / (212) 715-9238 FAX
gnaftalis@kramerlevin.com
jwagner@kramerlevin.com
tjacoby@kramerlevin.com
dschumeister@kramerlevin.com

DATED:  June 29, 2015

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of June, 2015, I caused a true copy of the within document to be delivered through the ECF system to all counsel of record.


<u>/s/ Gary P. Naftalis</u>