UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

**CONGREGATION JESHUAT ISRAEL**
        Plaintiff

        v.                                                                                C.A. No. 12-822 M

**CONGREGATION SHEARITH ISRAEL**
        Defendant

**BRIEF OF ATTORNEY GENERAL**

**I.**       **INTRODUCTION**

Peter F. Kilmartin, Attorney General of the State of Rhode Island (the "Attorney General"), respectfully submits this Brief as *amicus curiae*.[1] The Attorney General, as Administrator of Charitable Trusts, has intervened as *amicus curiae* because this civil action draws into question whether the building known as Touro Synagogue ("Touro Synagogue" or "Touro") located in Newport, Rhode Island, and perhaps a set of colonial era finials or rimonim made by Myer Myers ("Myer Myers rimonim"), are held as part of a charitable trust under R.I. General Laws § 18-9-4. Under Rhode Island law, the Attorney General is charged with representing the public interests with respect to charitable trusts.[2] For the reasons set forth below, the Attorney General urges this Court to rule that Touro Synagogue is held as part of a charitable trust with Congregation Shearith Israel ("CSI") as Trustee and the Jewish Society of

---

[1] On April 22, 2015, this Court granted the Attorney General's motion to intervene only as *amicus curiae*. The Attorney General is not a full party in the action.

[2] It was not until trial that the Attorney General learned that CJI sought assistance from the Attorney General with respect to removing CSI as trustee and/or selecting a new trustee. See Plaintiff's Brief at 1, 3, 45, 62. To be clear, the Attorney General intervened only as *amicus curiae* and did not have the right to engage in discovery, examine witnesses or call his own witnesses at trial. For these reasons, the Attorney General takes no position with respect to removing CSI as Trustee or assisting this Court in selecting a new trustee if that is ultimately decided.

Newport as the beneficiary. The Attorney General does not believe the evidence at trial established that the Myer Myers rimonim is included as part of the corpus for the charitable trust.

## II. FACTS AT TRIAL

### i. *Colonial History.*

Jews from Portuguese and Spanish backgrounds, also referred to as Western Sephardic Jews, fleeing the persecution during the Spanish and Portuguese inquisitions first formed a small congregation in Newport in 1658. Plaintiff's Proposed Findings of Fact and Conclusions of Law ("FoF") ¶ 26; Defendant's FoF ¶¶ 11-13. The congregation was known as Congregation Yeshuat Israel ("CYI"). Id. In 1759, CYI began the construction of a Jewish synagogue in Newport – now known as Touro Synagogue.[3] Defendant's FoF ¶¶ 105-106. CSI and its members provided financial assistance to CYI to aid in the construction. Defendant's FoF ¶¶ 108-110. In December 1763, the Newport synagogue was completed and consecrated. Defendant's FoF ¶ 111. After the Newport synagogue was completed, CSI loaned religious objects to CYI. Defendant's FoF ¶¶ 112-113. CSI denies that it sent the Myer Myers rimonim at issue to CYI at that time. Defendant's FoF ¶ 114. Congregation Jeshuat Israel ("CJI") believes CYI was gifted the Myer Myers rimonim sometime between 1764 and 1818.[4]

At the time Touro Synagogue was constructed religious organizations could not own land outright. Plaintiff's FoF ¶ 336. Therefore, three members of CYI (Jacob Rodrigues Rivera, Isaac Hart and Moses Levy) purchased the land in their own names as joint owners of the land

---

[3] Until the late 1800's the building was known as the Newport Synagogue. In the late 1800's the Newport Synagogue became more commonly referred to as Touro Synagogue. Defendant's FoF ¶ 232.
[4] If the rimonim were gifted, it would have most likely happened prior to the 1780's.

2

and building. Plaintiff's FoF ¶ 335; Defendant's FoF ¶¶ 106-107.[5] The Jews practiced at Touro Synagogue until around the American Revolution. Defendant's FoF ¶¶ 164-168. During the revolution, the British occupied Newport and most Jews (and many non-Jews) fled Newport because of British policies. Id. After the war, most of the Jews did not return to Newport. Id. By 1791, services were no longer regularly held in Touro and by 1822 the last Jewish family left Newport for New York. Id. When the last Jewish family, the Seixas family, left Newport, it brought many of the religious objects to CSI for safekeeping (i.e. Torah scrolls). Plaintiff's FoF ¶ 30; Defendant's FoF ¶¶ 168-178. There is a dispute about whether the Myer Myers rimonim were brought to CSI at that time.

From approximately 1822 to 1881, the building was essentially vacant and CSI acted as the overseer of the Newport Synagogue. Plaintiff's FoF ¶¶ 30-31; Defendant's FoF ¶¶ 181-190. In 1822, Abraham Touro bequeathed $10,000 to the Newport Synagogue for its upkeep. Plaintiff's FoF ¶ 31; Defendant's FoF ¶¶ 191-192. In 1854, his brother, Judah Touro bequeathed $10,000 to the City of Newport for supporting a minister at the Newport Synagogue. Id. During the time the Newport Synagogue was vacant in the 19th century, CSI acted as overseer and guardian of the building. Plaintiff's FoF ¶ 31; Defendant's FoF ¶¶ 182-190. CSI was contacted by the City of Newport for permission to access the building and CSI performed various lifecycle events (i.e., funerals, weddings) as needed during that time period. Id.

### ii. *Congregation Jeshuat Israel is formed.*

In the late 1800's, Jews from Eastern Europe started to immigrate to the U.S. Plaintiff's FoF ¶¶ 84, 202. Although Jewish, they were Ashkenazi (not Sephardic) and had slightly different rituals and practices. Defendant's FoF ¶ 202. From the early 1880's to 1903, CSI

---

[5] There is some evidence that Isaac Hart later conveyed his 1/3 interest to Rivera. However, it is not entirely clear.

3

essentially acted as an overseer and mediator between various Jewish factions in Newport that wanted to pray in Touro. Defendant's FoF ¶¶ 203-217; 238-241. It was during this time that CSI became the legal title holder in Touro Synagogue. Defendant's FoF ¶¶ 243-253. In fact, in 1894 CSI located approximately 57 heirs of Jacob Rivera, Moses Levy and Isaac Hart to have them transfer whatever rights they had in Touro Synagogue to the Trustees of CSI. Defendant's FoF ¶ 245.

In 1894, the current congregation at Touro, known as CJI, became incorporated. Plaintiff's FoF ¶ 32; Defendant's FoF ¶ 16. CSI objected to the use of that name, but it was given over their objection. Defendant's FoF ¶ 230. CSI and CJI eventually compromised by essentially placing four CSI members on the CJI board and giving CSI power over who could become the rabbi. Plaintiff's FoF ¶ 594; Defendant's FoF ¶¶ 274-285. In 1899, when the rabbi at Touro passed away, a schism took place among the Jews in Newport. Defendant's FoF ¶ 293. In fact, there were two different factions – CJI and a group called Touro Congregation ("TC"). Defendant's FoF ¶¶ 293-296. TC physically broke into the building to pray. Id. CSI legally evicted the members and then locked the building until it was able to resolve the dispute. Id. Eventually, members of TC joined (or rejoined) CJI. Id. At another point, CSI ejected members of CJI from Touro Synagogue. Plaintiff's FoF ¶ 201; Defendant's FoF ¶¶ 299-300. In response, members of CJI brought a lawsuit that was eventually removed to federal court. Plaintiff's FoF ¶¶ 202-206; Defendant's FoF ¶¶ 309-317. The differences were eventually resolved and CSI entered into a lease with CJI in 1903 and 1908, respectively. Plaintiff's FoF ¶ 225; Defendant's FoF ¶ 363.

In 1945, CSI and CJI, as well as the United States Department of the Interior, signed an agreement ("1945 Agreement") to get the synagogue placed on the National Historic Registry.

Plaintiff's FoF ¶ 35; Defendant's FoF ¶ 403. In the 1945 Agreement, CSI and CJI agreed that they both had an obligation to maintain, preserve and restore Touro Synagogue. Id. CSI signed as "Trustees under Deed of Trust dated April 27, 1894." Plaintiff's Exhibit ("Pl. Ex.") 90. The 1945 Agreement also states that CSI trustees are "the holders of the fee simple title under certain trusts in the Touro Synagogue." Id. Finally, the 1945 Agreement also provides that the parties will preserve the synagogue "for the use, benefit and behoof of the Jewish Society in Newport as a place of public worship forever…" in the traditions of the Spanish/Portuguese Jews as practiced in CSI's congregation. Id.

### III. ARGUMENT

#### A. Touro Synagogue is held in a charitable trust for the benefit of the Jewish Society of Newport.

##### *i. Elements of a charitable trust.*

Rhode Island law defines a charitable trust as "…any fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it and subjecting the person by whom the property is held to equitable duties to deal with the property for charitable, educational, or religious purposes." R.I. Gen. Laws § 18-9-4; see also Restatement on Trusts (Third) §13 cmt. b (2001) ("No particular manner of expression is necessary to manifest the trust intention."). A trust may be created, among other ways, by the conveyance of property in a trust, a will, or by a declaration of the donor that he holds the property in trust for the benefit of another. See Ray v. Simmons, 11 R.I. 266, 268 (R.I. 1875). In creating a trust, no particular words are necessary; it is enough for the property to be conveyed by one to another, *in trust*. Id. (emphasis added); see also MacDonald v. Manning, 239 A.2d 640, 644 (R.I. 1968) ("…technical words such as trust, trustee or charity are not essential to the creation of a charitable trust, such a trust may be given effect if the testator's language makes clear his intent to make a gift in trust

5

for a public charitable purpose"). Creation of a trust simply requires "a present intent to make a trust or gift at the time," "an execution of the intent by some act…or a notice and acceptance of the trust," and such intent or act must "give a present right or benefit to the donee." Desnoyers v. Metropolitan Life Ins. Co., 272 A.2d 683, 688 (R.I 1971).

Moreover, equity is particularly favorable to charitable trusts. City of Providence v. Payne, 134 A. 276, 280 (R.I. 1926). Even where the "terms of a gift of property may be somewhat uncertain, if it appears to have been the purpose of the donor to limit property to a benevolent public use, it will be held to be a gift to public charity." Id. Charitable trusts that "cannot be upheld in ordinary cases, for various reasons, will be established and carried into effect when created to support a gift to a charitable use." Id. (*quoting* Jackson v. Phillips, 96 Mass. 539, 550 (1867)). "It is well settled that a gift … for the advancement of religion is charitable." Wood v. Trustees of Fourth Baptist Church, 61 A. 279, 282 (R.I. 1905).

Additionally, unlike private trusts, a charitable trust can be created despite lack of a definitive beneficiary. Restatement (Third) of Trusts § 28 cmt. c ("A charitable trust can be created although it has no definite or definitely ascertainable beneficiary."). Therefore, a trust creating a place of public worship for the benefit of an indefinite number of people where the membership may change from time to time, constitutes a valid charitable trust. See Tillinghast v. Council at Narragansett Pier, R.I. of Boy Scouts, 133 A. 662, 663 (R.I. 1926); Brice v. Trustees of All Saints Memorial Chapel, 76 A. 774, 781 (R.I. 1910). Such a trust does not later "fail either for nonuser or misuse; but a court of equity in the exercise of its powers will see that it is carried on in some form in order to carry out the general intent of the donor." Brice, 74 A. at 305; see also Buchanan v. McLyman, 153 A. 304, 305 (R.I. 1931).

6

*ii.    The totality of the evidence points to the existence of a charitable trust.*

In 1945, CSI and CJI signed an agreement with the United States Department of Interior to designate Touro Synagogue as a national historic site. See Pl. Ex. 90. In pertinent part, the 1945 Agreement was entered into by the Shearith Israel Trustees "as Trustees under Deed of Trust dated April 27, 1894[.]" Id. This agreement went on to describe the Trustees of CSI as "the holders of the fee simple title upon certain trusts in the Touro Synagogue[.]" Id. Article I(f) of the 1945 Agreement states:

> the public shall be admitted to all parts of said Touro Synagogue…**so far as consistent with the preservation of the Synagogue for the use, benefit and behoof of the Jewish Society in Newport as a place of public worship forever** and for the maintenance of divine services in accordance with the ritual, rites and custom of the Orthodox Spanish and Portuguese Jews as practiced and observed in the Synagogue of said Congregation Sherith Israel… Id. (Emphasis added)

Viewed in its totality, there is no doubt that the 1945 Agreement explicitly evinces a "…fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it and subjecting the person by whom the property is held to equitable duties to deal with the property for charitable, educational, or religious purposes." R.I. Gen. Laws § 18-9-4. Therefore, the Attorney General takes the position that the 1945 Agreement alone is sufficient to establish that Touro Synagogue is held in a charitable trust with CSI as the Trustee.

Although CSI disputes that the 1945 Agreement either created or affirmed a trust relationship, the Attorney General concludes that the overwhelming record at trial points to the existence of a charitable trust. For instance, there is evidence that as early as 1759 it was clear that the land in question was held in trust. See Pl. Ex. 81 at 82-83; Plaintiff's FoF ¶¶ 335-338. Perhaps one of the most revealing documents is the will of the Rivera dated 1787. In it, Rivera declared as follows:

7

> Also I do hereby declare and make known unto all proper persons that I have no exclusive right or title, of, in, or to the Jewish Public Synagogue in Newport on account of the Deed thereof being made to myself, Moses Levy & Isaac Harte, **which the same was done, meant and intended in Trust only, to and for the sole Use, Benefit and Behoof of the Jewish Society of Newport, to be for them reserved as a Place of Public Worship forever**. Therefore I do for myself and my Heirs hereby remise, release and forever quit claim to all exclusive right, Title or Interest therein or thereto and to every part and Parcel thereof, Always saving and excepting such right as I have by being a single member of that Society (emphasis added). Pl. Ex. 31.

The Rhode Island Supreme Court has held that its "primary objective when construing language in a will or trust is to ascertain and effectuate the intent of the testator or settlor as long as that intent is not contrary to law." Lazarus v. Sherman, 10 A.3d 456, 462 (R.I. 2011) (*citing* Steinhof v. Murphy, 991 A.2d 1028, 1033 (R.I. 2010)). In doing so, the court should initially examine the will or trust's "plain language." Id. However, the language of a phrase "should be interpreted with reference to the whole trust" or will. Steinhof, 991 A.2d at 1033 (*citing* Chile v. Beck, 452 A.2d 626, 628 (R.I. 1982)). Additionally, the Supreme Court "has stated many times in effect that each will must be considered in the light of its particular language and the circumstances surrounding its making." Rhode Island Hospital Trust Co. v. Thomas, 54 A.2d 432, 434 (R.I. 1947); see also Carpenter v. Smith, 89 A.2d 168, 171 (R.I. 1952) ("It is our duty in construing the will to throw our minds back to the time when it was made.").

Here, the language in the will of Rivera (Pl. Ex. 31) makes clear that the sole purpose of the Newport Synagogue is for the "Use, Benefit and Behoof of the Jewish Society of Newport, to be for them reserved as a Place of Public Worship forever." When Touro was vacant in the 19th century, CSI, either knowingly or by default, assumed the role of trustee of the trust. For example, CSI agreed to safekeep Torah scrolls for the Newport congregation. Defendant's FoF ¶ 178. Even more, CSI admits that from 1820 to 1880, CSI "acted as the ritual and cultural overseer of the Newport Synagogue." Defendant's FoF ¶ 182. CSI determined who would have

8

access to the Newport Synagogue. Defendant's FoF ¶¶ 183, 190. CSI continued its role as "ritual and cultural overseer" throughout the 1880s and 1890s, and recognized in 1893 that it had a role in protecting the "Jews of Newport and elsewhere" when it enumerated a list of stipulations regarding the use of Touro. Defendant's FoF ¶¶ 205, 238-239.

Although CSI disputes that Touro is held as part of a charitable trust, CJI recognizes that it has a special relationship with Touro and the Jews of Newport that could be *akin* to a trust relationship. Defendant's FoF ¶ 462. Respectfully, CSI's candid acknowledgment that it has a special relationship with Touro and the Jews of Newport for over 250 years is inconsistent with its argument that it owns the building outright as fee simple owner. Indeed, CSI's own declaration that it wishes that Touro remain open as an active place of worship for the Jews of Newport is entirely consistent with the purpose as first set forth in the will of Rivera in 1787 and reaffirmed as recently in 1945. Defendant's FoF ¶¶ 519-520, 551-552. Regardless of whether the relationship is referred to as trust or Trust, CSI has acted as Trustee for the Jewish Society of Newport since the 1820's.

      *iii.*    *CSI holds Touro Synagogue in trust for use, benefit and behoof of the Jewish Society in Newport as a place of public worship.*

The 1945 Agreement, which both specifically references the 1894 deed and encompasses language from both the deeds, as well as the 1787 Rivera will, make clear a trust relationship exists in which CSI, as trustees, hold Touro for the benefit of the Jewish Society of Newport as a place of public worship. First, the deed referenced in the 1945 Agreement, dated April 27, 1894 (Pl. Ex. 50) conveyed whatever rights the individuals had in Touro to the Trustees of CSI in trust. Next, in pertinent part, Article I(f) states the CSI and CJI agree that Touro shall be preserved "…for the use, benefit and behoof of the Jewish Society in Newport as a place of public worship forever…." This language is nearly identical to the language found in the will of

9

Jacob Rodriguez Rivera (Pl. Ex. 31) and makes clear the Touro is held in trust by the Trustees of CSI for the use, benefit and behoof of the Jewish Society of Newport as a place of public worship.

The beneficiary of the trust is the "Jewish Society of Newport." CSI has complied with the purpose of the trust by leasing Touro to a group that is the current incarnation of the Jewish Society of Newport. CJI is: 1) a Jewish congregation; 2) located in Newport and; 3) follows the Western Sephardic Jewish traditions as practiced by CYI and currently observed by CSI.[6] Indeed, the evidence at trial was clear that, at this time, there is no other "Jewish Society" or group existing in Newport that more closely resembles or represents the Jewish Society of Newport as intended by the original CYI congregants.[7] Moreover, CSI has conceded that it does not have contact with any other Jewish group in Newport. It is important to note, however, that the Attorney General does not take the position that CJI is the exclusive beneficiary under the trust. See Buchanan, 153 A.at 305 ("It is well established that a trust creating a place for public worship for the benefit of an indefinite number of persons is a good and valid trust to a charitable use"). In the event CJI is no longer able to function in the future, CSI as Trustee will be responsible for ensuring that Touro Synagogue remains a place of public worship for the Jewish Society of Newport.

   *iv.*  *No prior litigation between the parties has addressed whether Touro Synagogue is held as part of a charitable trust.*

---

[6] Per the terms of the 1894 deeds, the 1903 and 1908 lease agreements and the 1945 Agreement, CJI must conduct religious services in accordance with the rituals, rites and custom of the Orthodox Spanish and Portuguese Jews as practiced and observed at CSI.

[7] The only other Jewish groups referenced at trial were a conservative congregation in Middletown and perhaps a group of reform Jews that meet in Newport. Neither of these groups would meet CSI's own criteria, nevermind comply with the intent of CYI and the terms of the 1894 deeds and 1945 Agreement, necessary to lease Touro.

CJI and CSI have a long history of disputes, which began in the late 1800s. There is evidence of a replevin action brought by CSI in 1901 concerning a Torah. Plaintiff's FoF ¶¶ 198-199; Defendant's FoF ¶ 303. The parties do not agree on the existence of this matter given there are no records of the pleadings, a decision, etc. Plaintiff's FoF ¶¶ 198. In any event, even if this matter was heard and decided, it deals with personal property, and not Touro itself, therefore, it could not have reached the charitable trust issue.

Likewise, the decision in <u>David et al. v. Levy et al.</u>, 119 F. 799 (D.R.I. 1903) does not bar this Court from determining whether Touro Synagogue is held in a charitable trust. In <u>David</u>, Judge Brown essentially dismissed the action for procedural defects and never reached the merits of the parties' claims. <u>Id.</u> In its rule, the court held "the bill is fatally defective for its omission to set forth that any one of the complainants is a Jew." <u>Id.</u> The court went on to say "it is difficult to imagine how the "Congregation Jeshuat Israel, a corporation created by law" can be regarded as having any right or interest in such a trust, since a domestic corporation of this State cannot be regarded as a Jew of Newport." <u>Id.</u> Noting that to the extent the Rivera will creates a trust (which the judge ultimately did not make a decision on), "it is a trust for a Jewish Society," and "[t]here is no allegation that these complainants have any standing as members of a Jewish Society." <u>Id.</u> at 800. The court never reached the substantive issue of whether Touro Synagogue is held in trust and for whom. Judge Brown also noted that CSI had recently evicted the members from Touro after CJI's forcible entry into the building, so that CJI should be barred from seeking equity. <u>Id.</u>

Even assuming arguendo that the issue of whether a trust existed was decided in the 1903 litigation, this Court is not met with the same circumstances as existed at that time. Subsequent to that decision, the parties entered into two leases, in 1903 and 1908, respectively, as well as the

1945 Agreement with the U.S. Department of the Interior, some four decades after <u>David</u> was decided.  See Pl. Ex. 70; Pl. Ex. 76; Pl. Ex. 90.  Finally, as mentioned above, CSI has continued to act as Trustee, like it did in the 19th century, further affirming the existence of a charitable trust.

**B.      The Myer Myers rimonim are not held as part of a charitable trust.**

As to the Myer Myers rimonim which is the main focus of both parties in this litigation, the Attorney General believes that the evidence at trial failed to establish that it is held as part of the same charitable trust as Touro Synagogue.  As a starting point, both parties allege as part of their primary argument that the rimonim are private property, not held in trust.  The parties cannot agree, and it is not clear, whether the rimonim were ever in Newport prior to the late 1800's or early 1900's.  CSI claims that the rimonim were made for their congregation and it paid for the rimonim in 1765, as evidenced in a ledger book.  Defendant's FoF ¶ 128.  Thereafter, CSI claims the rimonim may have intermittently been loaned to Newport for special services while Touro Synagogue was closed, but always returned to New York, and ultimately have been on loan to CJI since it became incorporated, with the condition that CSI may request their return at any time.  Defendant's FoF ¶¶ 201, 263.

On the other hand, CJI claims that the Myer Myers rimonim were in fact originally possessed by and made for CYI, and either gifted to CYI by Myers Myer himself, or a CYI member who purchased and donated the rimonim to the congregation.  Plaintiff's FoF ¶¶ 41, 45, 48.  After the Jewish population in Newport diminished in the 1800s, CJI claims the rimonim were subsequently brought to CSI for safekeeping at the same time as the Torah scrolls. Plaintiff's FoF ¶ 67.  CJI claims the rimonim were returned sometime between the 1890s and

1910s, and CJI, as successors to CYI, became outright owners of the rimonim. Plaintiff's FoF ¶¶ 85, 87-88.

Although both parties allege as a secondary argument that the rimonim are held in trust (see Plaintiff's FoF ¶ 22; Defendant's FoF ¶¶ 500, 513), and as a result either the rimonim can or cannot be sold, this fallback position is not supported by the record at trial. For instance, it is not clear: 1) where the Myer Myers rimonim was located and when; 2) whether the rimonim was purchased by CSI and then subsequently loaned to CJI or; 3) whether the rimonim was gifted to CYI. All of these outstanding questions lead the Attorney General to conclude that the Myer Myers rimonim are not held in the same charitable trust as Touro Synagogue. Unlike the documented evidence spanning centuries supporting the position that Touro Synagogue is held in trust for the Jewish Society of Newport, there is no documentation supporting the same conclusion for the Myer Myers rimonim. Therefore, the Attorney General, as Administrator of Charitable Trusts, takes no position with respect to this private property dispute.

## IV. CONCLUSION

For the reasons set forth herein, the Attorney General respectfully requests that the Honorable Court grant such relief as the interests of justice and the public interest may require.

Respectfully submitted,

PETER F. KILMARTIN
ATTORNEY GENERAL

/s/ Adam J. Sholes
Adam J. Sholes, #7204
Assistant Attorney General
150 South Main Street
Providence, RI  02903
(401) 274-4400 ext. 2219
(401) 222-3016 Fax
ajsholes@riag.ri.gov

13

## CERTIFICATION

      I hereby certify that I filed the within Brief of the Amicus via the ECF filing system and that a copy is available for viewing and downloading.  I have also caused a copy to be sent via the ECF system to the following attorneys on this 10th day of July, 2015.

**Steven Snow, Esquire**
Partridge Snow & Hahn, LLP
40 Westminster St., #1100
Providence, RI   02903

**Louis M. Soloman,  Esquire**
Caldwalader, Wickersham & Taft, LLP
One World Financial Plaza
New York, NY 10281

**Deming Sherman, Esquire**
Locke Lord, LLP
2800 Financial Plaza
Providence, RI 02903

**Gary P. Naftalis, Esquire**
**Jonathan M. Wagner, Esquire**
**Tobias B. Jacoby, Esquire**
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036


                                              /s/ Adam J. Sholes