IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * * * * * * * * * * * * * *
CONGREGATION JESHUAT      *    CIVIL ACTION
ISRAEL                    *    12-822M
                          *
VS.                       *    JUNE 1, 2015
                          *
CONGREGATION SHEARITH     *
ISRAEL                    *    PROVIDENCE, RI
* * * * * * * * * * * * * * * * * * * * * * * * *
```


BEFORE THE HONORABLE JOHN J. McCONNELL

DISTRICT JUDGE

(Bench Trial)


VOLUME I



**APPEARANCES**:

FOR THE PLAINTIFF:    STEVEN E. SNOW, ESQ.
                      Partridge Snow & Hahn LLP
                      40 Westminster Street
                      Suite 1100
                      Providence, RI  02903

                      GARY P. NAFTALIS, ESQ.
                      JONATHAN M. WAGNER, ESQ.
                      TOBIAS B. JACOBY, ESQ.
                      DANIEL P. SCHUMEISTER, ESQ.
                      Kramer Levin Naftalis & Frankel LLP
                      1177 Avenue of the Americas
                      New York, NY  10036

```
FOR THE DEFENDANT:      DEMING E. SHERMAN, ESQ.
                         Locke Lord LLP
                         2800 Financial Plaza
                         Providence, RI  02903

                         LOUIS M. SOLOMON, ESQ.
                         COLIN UNDERWOOD, ESQ.
                         YAN GRINBLAT, ESQ.
                         JENNIFER CHAING, ESQ.
                         Cadwalader, Wickersham & Taft
                         One World Financial Center
                         New York, NY  10281

Court Reporter:          Denise P. Veitch, RPR
                         One Exchange Terrace
                         Providence, RI  02903
```

I N D E X

PLAINTIFF'S WITNESS                                      PAGE

David Bazarsky
        Direct Examination by Mr. Naftalis        102

1  1 JUNE 2015 -- 9:30 A.M.

2          THE COURT:  Good morning, everyone.  We're here

3  this morning to begin the trial in the case of

4  Congregation Jeshuat Israel versus Congregation

5  Shearith Israel, Civil Action Number 12-822.

6          Would counsel identify themselves for the

7  record, please.

8          MR. NAFTALIS:  Your Honor, for the Plaintiffs,

9  Gary Naftalis, for Kramer Levin Naftalis & Frankel.

10  And with me, from our law firm, is Jonathan Wagner on

11  my right, Toby Jacoby on my left, Dan Schumeister at

12  the far end there; and Steve Snow, from Partridge

13  Snow & Hahn, our co-counsel in the case.

14          And also at our table is Professor Louise Teitz

15  from the Roger Williams law school, who is the client

16  representative.  She's a longtime member of Jeshuat

17  Israel, and she's been nominated to be co-president

18  going forward.

19          THE COURT:  Okay.  Welcome, to our out-of-state

20  friends.

21          Mr. Snow is always welcomed back into our

22  courtrooms.

23          And to Professor Teitz, welcome and

24  congratulations.

25          MR. SOLOMON:  Good morning, your Honor.

1          THE COURT:  Good morning, Mr. Solomon.

2          MR. SOLOMON:  Louis Solomon from Cadwalader.  I

3    have the pleasure of introducing my colleagues after

4    Mr. Deming Sherman, who, of course, from Locke Lord,

5    who your Honor knows.

6          THE COURT:  Who we always love welcoming back.

7    Welcome back, Mr. Sherman.  How was your reunion

8    speech?

9          MR. SHERMAN:  Well, I was amazed that I was

10   actually at a reunion after 50 years.  Everything after

11   that was in order.  It was fine.  Thank you very much

12   for allowing me to do that.

13         THE COURT:  Of course.  Congratulations.

14         MR. SOLOMON:  My colleague, Colin Underwood, is

15   here, Mr. Grinblat, Jennifer Chaing.  Ani Fuoto and

16   Mr. Medinets will be assisting.

17         THE COURT:  Great.  And welcome to all of you as

18   well.  You've obviously been here before, but I think

19   this may be the first time that we've been in public,

20   in the courtroom, so I have a funny feeling that you

21   think you might not woo me with your arguments, so

22   you're wooing me with your numbers.  We'll see if it

23   works.

24         Let me also welcome -- we have an unusually

25   large number of members of the public here.  Much of

1    what the federal court does is oftentimes without folks

2    observing, and that's sad because we are a public body

3    that operates in the public for folks to see; and

4    occasionally we'll have fine reporters here that will

5    report it to you, but it always excites me and gets me

6    feeling the good juices of the judicial system when I

7    see members of the public coming to observe what takes

8    place.

9         So I want to welcome you all and just maybe fill

10   you in a little bit about what's happening here; that

11   what we have here is a civil dispute between two

12   entities.  It's a civil dispute that the parties were

13   not able to resolve themselves, and so under

14   fundamental principles of the state and this country,

15   they brought the dispute to court to be resolved.  It

16   happens every day.  It's what we do.  We resolve

17   disputes.  We resolve disputes by determining the

18   facts.

19        In this case the parties don't agree on the

20   facts, and the Court will determine the facts.  And the

21   parties don't agree on the law, and so the Court will,

22   as it always does, determine the law.  And then the

23   Court will apply the facts to the law to come to a

24   resolution of the parties' civil dispute.

25        I do want to be clear, because of the unusual

1    nature of this, the Court is not resolving a religious

2    dispute here.  While the two entities here are

3    religious entities, the Court is not resolving a

4    religious dispute.  I'm resolving a civil dispute.

5         The Court is not applying religious law here.

6    The Court is applying the law of the state of Rhode

7    Island and of this country.  To do otherwise, in this

8    Court's opinion, would violate the First Amendment.

9         So we have a civil dispute, facts in dispute,

10    law in dispute, and how you apply those facts to the

11    law in dispute, this Court will determine.

12         Some of you may wonder why there is no jury.

13    That's not a jury.  Those -- I'm very blessed and

14    fortunate to have first and second year law students

15    interning with me this summer; four of them from the

16    Roger Williams School of Law, and one is from the

17    University of California at Irvine, so I am incredibly

18    pleased to have them with me.  So, they are not the

19    jury; they merely get the expensive seats to watch the

20    proceedings.

21         There is no jury in this case because this case

22    is being decided in equity.  So, many years ago, some

23    of you may know that there used to be two kinds of

24    court.  There was a thing called a "court of law," and

25    there was a thing called a "court of equity."  The

1     court either sat in law, or it sat in equity.  Many

2     decades ago the two were merged, so the Court hears

3     both law and equity.

4           This is a case founded in equity because of the

5     claims that the parties have brought.  They're asking

6     this Court to order certain things, to issue

7     injunctions, and to order the rights between the

8     parties, the civil rights that exist between the

9     parties.  So the Court ultimately will determine facts,

10    apply the law and issue injunctions, or not issue

11    injunctions, depending how the case turns out.

12          There are no damages awarded in this case, like

13    you would have in a car accident case and perhaps

14    employment discrimination cases.  Those are considered

15    law cases.  Those cases are heard by a jury.  A jury

16    determines the facts in those kinds of cases.

17          In this case, you're stuck with me doing it all.

18    I will determine the facts based on the evidence that

19    the parties present, will determine the law, after

20    listening to arguments, and will apply the law.

21          Let me just, again, fill you in on a few

22    procedural matters.  We're going to proceed every

23    morning at nine; we begin at 9:30.  We take a break at

24    11 o'clock for 15 minutes.  We come back at 11:15 and

25    go to 12:30.  We'll take an hour break for lunch.

1    We'll come back at 1:30 and go until three, take a

2    15-minute break and proceed from 3:15 to 4:30.

3         It is an open courtroom.  You are welcome to

4    come and go as you please.  In the middle of any

5    matter, if you need to leave or come and go, you are

6    most welcome to do that.  I ask if you do it, that you

7    try and do it quietly so you don't disturb the

8    attorneys who are going to be presenting this matter.

9         I should also say you are in for a treat because

10   we have some of the finest attorneys that I know from

11   the state, Mr. Snow and Mr. Sherman, and, I have come

12   to learn, fine out-of-state attorneys as well; so

13   you're in for a treat.  We always get good attorneys,

14   today you're seeing some of the best; so you'll be

15   fortunate in that regard.

16        And the last thing that I'll offer you, if you

17   would like, if there are procedural questions you have

18   about how the court operates, you can tell I'm awfully

19   excited when the public appears in the courtroom.

20   Oftentimes people have a number of questions; there's

21   no where to turn.  If you have a question, a procedural

22   question -- not about the case or anything -- about how

23   the court operates or the courtroom or the courthouse,

24   write it down and give it to Officer Palumbo, the Court

25   Security Officer.  He'll give it to me at a break, and

1        I'll be glad to try and answer your questions.

2            One of you will ask me why we have an oar in the

3    courtroom.  Everyone who comes into the courtroom will

4    ask me why we have an oar in the courtroom.  It's not

5    to whack the attorneys if they get out of line.  It's

6    because the court has admiralty jurisdiction, and it's

7    a symbol that the court, in addition to its other

8    jurisdiction, has jurisdiction over anything that

9    occurs on the high seas.  In the old days they would

10   put the oar out in front of the courthouse.  It would

11   tell seamen or ships' captains that the court was

12   sitting in admiralty that day, and they could bring

13   their disputes to the court.  So, we've followed the

14   tradition in federal courts of having an oar in the

15   courtroom.

16           So we'll see if any other questions come up that

17   the jurors usually ask.  So if you do have any

18   questions like that, feel free to give it to Officer

19   Palumbo, and I'll try and answer it.

20           How the case will proceed is this morning both

21   sides will present opening arguments, and then the

22   Plaintiffs, on their claims, will begin calling

23   witnesses.  In this case -- and the defense will then

24   give their opening argument.

25           In this case both parties are, in effect,

1   Plaintiffs, and both parties are, in effect,

2   Defendants, because the Plaintiffs have brought claims

3   against the Defendant, and the Defendants have brought

4   claims against the Plaintiff, so each party bears the

5   burden of proving their particular claims.

6          So the procedure is that the Plaintiff in this

7   case will begin.  The defense will then give their

8   opening argument, and then the witnesses will begin.

9   And that order is like you see on television, although

10  it goes a lot slower and a lot less interesting than a

11  CSI trial.

12         The party presenting the witness will present

13  the witness.  The other side will have a chance to

14  cross-examine.  And then the proponent party will have

15  a chance to do some redirect.

16         So, with all that said, now that I've totally

17  bored the attorneys in the room, let me ask Plaintiff

18  if they're prepared to give an opening statement.

19         MR. NAFTALIS:  We are, your Honor.

20         THE COURT:  You may proceed.

21         MR. SNOW:  Your Honor, just one procedural item.

22  I know there are representatives of the

23  Attorney General's Office here, and I'd like the record

24  to reflect that.

25         THE COURT:  Thank you, Mr. Snow.  I should have

1    pointed that out.

2          Maybe about a month ago or so, I forget when it

3    was, the Attorney General that has certain

4    responsibilities, the Attorney General of this state

5    that has certain responsibilities concerning nonprofit

6    institutions, certain interests in nonprofit

7    institutions, asked the Court to allow them to file an

8    amicus brief, that's a friend-of-the-court's brief, to

9    present their perspective on it.  Those attorneys are

10   here, and I anticipate at the end of this trial that

11   they will submit something for the Court's

12   consideration.  Thanks, Mr. Snow.

13         MR. NAFTALIS:  Good morning, before I proceed,

14   we were going to use some slides in connection with the

15   opening, that will be on the monitors, but I have

16   copies which may or may not be helpful.

17         THE COURT:  Great.  Want to just hand them to

18   Ms. McGuire.

19         MR. NAFTALIS:  Are two enough for your Honor?

20         THE COURT:  Sure.

21         MR. NAFTALIS:  Good morning, your Honor.

22         THE COURT:  Good morning.

23         MR. NAFTALIS:  May it please the Court, last

24   night while I was rereading the pretrial memorandums

25   submitted by our opponents, Shearith Israel, the New

1    York congregation, I was struck by how differently we

2    see this case from how they see this case.

3        The New York congregation says this case is all

4    about documents, or at least certain documents from

5    about a hundred years ago.  But we say, and we will

6    prove here, that this case is about much, much more.

7    It is about a small historic Jewish congregation named

8    Jeshuat Israel whose home, the only home it has ever

9    known, is the Touro Synagogue in Newport, Rhode Island.

10   I have a picture on the monitor of the Touro Synagogue.

11       It is, the Touro Synagogue is the oldest

12   synagogue in the United States.  It is the most

13   historically important synagogue in the United States

14   and one of the most important synagogues in the world.

15       This synagogue has stood as a beacon of

16   religious freedom and tolerance in the state of Rhode

17   Island.

18       THE COURT:  Can you hold on one second.  Is it

19   up on people's monitors?  Everyone's but mine, and

20   unless you want to decide the facts of the case, I have

21   to get it.

22       MR. NAFTALIS:  Well, I'm off to a bad start;

23   right?

24       THE COURT:  Sorry about that.  Thank you.

25       They take way too good care of me, and the one

1   thing they require me to do is turn the monitor on, and

2   I didn't, so it's my fault.  I apologize.

3          MR. NAFTALIS:  So as I was saying, the Touro

4   Synagogue, which is on the monitor for everyone now,

5   is, it stood as a beacon of religious freedom and

6   tolerance in the state of Rhode Island and in this

7   country since it was dedicated way back in 1763, over

8   250 years ago.

9          In 1790 President George Washington famously

10  wrote a letter to the Jews worshiping in the Touro

11  Synagogue to declare that the United States would send

12  -- would extend equal citizenship to members of all

13  religions, and I'm quoting from George Washington's

14  famous letter, which is on the monitor, that "happily

15  the Government of the United States, which gives to

16  bigotry no sanction, to persecution no assistance,

17  requires only that those who live under its protection

18  should demean themselves as good citizens."

19         Every year my client, Jeshuat Israel, helps host

20  the reading of the George Washington historic letter at

21  a ceremony in the Touro Synagogue honoring our freedoms

22  as Americans, and it's an important event for the Touro

23  Synagogue and our congregation.

24         It's an important event for the state of Rhode

25  Island, and recent keynote speakers at this event have

1    included two sitting justices of the United States

2    Supreme Court, Ruth Bader Ginsburg, and, at the 250th

3    anniversary two years ago, Justice Elana Kagan was the

4    keynote speaker.  And last year the President of Brown

5    University, Christina Hull Paxson, was the keynote

6    speaker.

7         Now in 1787 -- I haven't talked this much about

8    ancient things since when I was a grad student up on

9    the hill in history.

10        In 1787 a man named Jacob Rodrigues Rivera, his

11   will came out and it was admitted, and what he said in

12   his will, which is quite important, it's one of the

13   seminal documents in this case, which was reiterated in

14   1945 in an agreement executed between the United States

15   of America, Congregation Jeshuat Israel and our

16   opponents, the New York congregation; that it said both

17   in that -- in Mr. Rivera's will he said that the Touro

18   Synagogue is held in trust only for the sole use,

19   benefit and behoof of the Jewish Society of Newport and

20   to be for them reserved as a place of public worship

21   forever.

22        The connection between my client, Jeshuat

23   Israel, and Touro Synagogue is quite profound and helps

24   to show why they embody them as the beneficiary of this

25   trust, which was set up way back in 1787, and recently

1    reaffirmed in a quite unambiguous document, which I

2    don't think anybody can take issue with fairly, in 1945

3    with the United States government.

4         Jeshuat Israel is a congregation made up of

5    congregants.  The vast majority of them, but not all,

6    are citizens of Rhode Island, most of whom live on

7    Aquidneck Island, which the city of Newport is.  And

8    these congregants from our client, Jeshuat Israel,

9    worship and have worshiped for years and years and

10   generations and generations in the Touro Synagogue.

11        The important events in their lives, both good

12   ones and less good ones, have been celebrated and

13   honored there.  They've been married there.  Their

14   children, when the young boys became 13, become men in

15   the Jewish faith, were bar mitzvahed there.  Their

16   daughters were named there.  Their sons' ritual

17   circumcisions were held there.  They were married,

18   people were married there in our congregation for

19   generations.  They mourn the loss of their loved ones,

20   mothers and fathers, there.  And not an insignificant

21   number of them honor the memories of numerous

22   generations who have prayed in the Touro Synagogue as

23   members of Congregation Jeshuat Israel.

24        The Touro Synagogue is the center of their

25   Jewish life.  It's their community.  It's their home.

1    It's what defines them as members of the Jewish faith.

2         The proof will show that Congregation Jeshuat

3    Israel and Touro Synagogue is the only Jewish

4    congregation in the city of Newport.

5         But they do much more, my client and the

6    synagogue, than serve the local Jewish community.

7    Because of the important historic significance and the

8    enduring significance of the Touro Synagogue, Jews from

9    all over Rhode Island, all over the United States, and

10   for that matter all over the world come to the Touro

11   Synagogue to learn of its importance and to connect

12   with its powerful legacy by praying there.

13        The evidence will show that our client, Jeshuat

14   Israel, has for a long, long time and continues to be

15   extraordinarily dedicated and devoted to the

16   preservation and legacy of the Touro Synagogue.

17   They've worked tirelessly to keep the Touro Synagogue

18   open as an active place of worship, with a rabbi in

19   residence and a congregation that fosters and supports

20   Jewish life in Newport.

21        The evidence will show that in recent, in the

22   recent years our client and the Touro Synagogue -- and

23   most people think of them quite synonymously and

24   interchangeably -- are now faced with an existential

25   crisis.  The congregation's financial condition is

1    quite precarious.  Besides efforts to raise revenue and

2    cost-cutting, there's really, except for the rabbi,

3    he's the only one who's paid there.  Everyone else is

4    working as a volunteer, including the executive

5    director, who used to be paid.  She's now working as a

6    volunteer, opening the mail, doing things that normally

7    someone would be paid to do.

8         The evidence will show that Jeshuat Israel is

9    just one and the Touro Synagogue is just one

10   unexpected, unforeseen expense away from financial

11   disaster.  That would leave the Touro Synagogue without

12   an active congregation and a rabbi.  It would then be

13   akin to some of the synagogues one can visit in Europe,

14   like in Prague or Poland, places where Jews once prayed

15   but no longer live there.

16        Congregation Jeshuat Israel is committed to

17   preventing that tragedy from happening.  They feel they

18   must do everything they possibly can that's appropriate

19   to keep Touro Synagogue as a living and active place of

20   Jewish worship; to keep the flame burning, to honor the

21   Jews of the past who blazed the trail in which they now

22   walk, and to preserve for the Jews of the future,

23   preserve, for that matter, for all Americans the

24   opportunity to connect with the synagogue's powerful

25   legacy as a beacon of religious freedom.

1          Out of this sense of duty and commitment and

2     duty, our client, Congregation Jeshuat Israel, took

3     upon itself, beginning after the financial crisis hit

4     in 2008, to seek to raise an endowment to secure the

5     future of the congregation and the synagogue it has

6     called home for so many years; that is, to keep the

7     Touro Synagogue, in the words of Rivera's will, which

8     we put up on the screen a while ago, and the tripartite

9     agreement with the United States of America, to keep

10    Touro Synagogue as a place of public worship forever.

11         Now to help raise the endowment, the

12    congregation, after difficult deliberations where they

13    considered all available options, decided to sell one

14    of two sets of silver bells, or finials, that they

15    own -- put it up on the screen -- called "rimonim" and

16    that they've owned since colonial times and have been

17    continuously in the congregation's custody, possession

18    and control for about the last hundred and 30 years.

19         These are the rimonim made by the colonial

20    silversmith Myer Myers.  And frankly, until this

21    dispute, this was, to their reckoning, gee, I think to

22    anybody's reckoning, the first time that the New York

23    congregation had made any claim of ownership over these

24    rimonim over the last hundred years.

25         So while the New York congregation focuses, we

1    respectfully submit, on a very thin slice of the past,

2    we say this case is about the past, it's about the

3    present and about the future.

4         Now, in this case our opponents, Shearith

5    Israel, the New York congregation, tries to disavow its

6    trustee status, and I think it says, in my view quite

7    boldly, that it claims absolute ownership of the Touro

8    Synagogue and the rimonim as well.  We suggest and we

9    submit that the proof will show that this is sheer

10   revisionist history and it is at odds with the facts

11   that will be proven in this courtroom.

12        The evidence will show that the New York

13   congregation is the trustee of the trust holding the

14   Touro Synagogue building; and, under the 1945 agreement

15   with the United States government, Shearith Israel, in

16   a tripartite agreement with us and the United States of

17   America, explicitly reaffirmed its trustee status and

18   pledged to, quote, "preserve, protect, maintain and

19   when necessary restore Touro Synagogue."

20        We submit to you, your Honor, that if you look

21   at the, I think it was 80 pages, but math is not my

22   strong suit, in their 80-page or so brief they spend a

23   great deal of time on a portion of the 1800s and the

24   first few years of the 1900s, but there's little or

25   nothing in their brief after 1908.  It's as if time

1    stood still.  And they spent scant little time on what

2    is perhaps -- I think it's more than perhaps -- what is

3    the most important document in the case:  The 1945

4    agreement between the U.S. government, with the U.S.

5    government, us and them, that reaffirms and creates

6    legal obligations.  And when our opponents do refer to

7    that agreement, they omit all the sections of that

8    agreement, all the language of that agreement which

9    shows that they are trustees of a trust holding the

10   Touro Synagogue.

11         And as a trustee, this is a position that

12   obligates the New York congregation to behave as a

13   fiduciary and to act not for their own interests, not

14   what's good for them, but they're supposed to act

15   solely in what is in the best interest of the

16   beneficiaries of the trust, which is the Jewish Society

17   of Newport as embodied in Congregation Jeshuat Israel.

18         We will show in this case that our opponents,

19   the New York congregation, have regrettably, and I say

20   it sadly, have been faithless fiduciaries.  They've

21   been faithless fiduciaries by acts of omission.

22   They've been faithless fiduciaries by acts of

23   comission.

24         For many decades -- that's why they'd like time

25   to stop in 1908 -- for many decades the New York

1    congregation, Shearith Israel, has been absent from the

2    scene.  They've been missing in action.

3         Despite their explicit promises to the federal

4    government and to us, the New York congregation, we

5    respectfully submit, has ignored their

6    responsibilities.  And I would say they've been

7    uninvolved for decades.  They've been uninterested for

8    decades.  They've been unhelpful for decades, and

9    they've been uncaring for decades.

10        Congregation Jeshuat Israel has been left,

11   regrettably, to fend for itself, without the New York

12   congregation lifting a finger to offer any tangible aid

13   or assistance to preserve, maintain and protect the

14   Touro Synagogue.

15        Indeed, when the United States Court of Appeals

16   for the Second Circuit awarded $475 in costs against

17   them -- for what we submit was a frivolous appeal of

18   their attempt to forum shop this case to New York,

19   which they then withdrew before oral argument -- that's

20   the largest check Congregation Jeshuat Israel has

21   received from the New York congregation for probably

22   close to 50 years.

23        But when the New York congregation finally got

24   involved in this matter, it acted, and we would

25   respectfully say, in the most disloyal way a fiduciary

1    can.  They sought to act, I think admittedly, I don't

2    think there's any dispute, to further their own

3    interests and punish the beneficiaries of the trust.

4         I would submit when you hear the evidence, your

5    Honor, you will find that their breach of fiduciary

6    duty is almost indisputable, indeed, almost undisputed.

7    They've not adhered to their duty of loyalty.

8         They claim now that they absolutely, and not in

9    trust, own the Touro Synagogue and everything in it,

10   including, but not limited to, the rimonim.  And if

11   someone is a trustee, what can be a greater breach of

12   your duty of loyalty than to claim that you own the

13   corpus of the trust, not the beneficiary, and you're

14   acting for your interests, not the beneficiary's

15   interests.  And they admit that they are guided in

16   their decision-making by their own interests and what's

17   best for them.

18        The Rule 30(b)(6) representative of the New York

19   congregation in his deposition testified, and this is

20   with respect to the rimonim, but it's a view that they

21   hold towards the whole shooting match, he said:  We own

22   the rimonim.  I own this pen; I paid for it; I own it.

23   Shearith Israel owns the rimonim.  Well, they think

24   they own everything.  They own the pen, but they

25   haven't put much ink in it.

1    It's hard to imagine anything more inconsistent

2    with being a trustee, anything more disloyal to the

3    beneficiary, than for the trustee to claim that it owns

4    the property outright and not in trust.  And this is

5    exactly their position, and we suggest the evidence

6    will show their position is a wrong one, an

7    indisputably wrong one.

8    But their failure to perform their fiduciary

9    duties did not end there.  They've taken, we

10    respectfully show that the evidence will show, punitive

11    and antagonistic positions designed solely to harm and

12    punish Congregation Jeshuat Israel, the beneficiaries

13    of the trust, the people to whom they owe a fiduciary

14    duty.

15    In their counterclaims the New York congregation

16    has sought to evict Congregation Jeshuat Israel from

17    Touro Synagogue, the only home we've known and where

18    the Jews of Newport have prayed for over 250 years.

19    Paragraph 63, which is on the top, says: (Reading)

20    Jeshuat Israel should be removed as the lessee of Touro

21    Synagogue.  And then further down, on Page 23,

22    paragraph five there, they say, they ask this Court to,

23    quote, order the eviction of the Plaintiff from the

24    Touro Synagogue.

25    What could be more punitive than that, than to

1    throw the congregation out on the street, a place they

2    prayed at for hundreds and hundreds of years?

3        And our opponents have steadfastly refused to

4    withdraw this request, despite explicit requests to do

5    so, stating, Well, we're only really kicking out the

6    congregation, not the congregants.  That was their

7    first -- we'll show that in the letters -- that was

8    their first position, so we're not withdrawing it.

9    Well, a congregation is made up of congregants.  It may

10   be a little metaphysical, that distinction.  Besides,

11   they didn't withdraw it anyway.

12       And now they're saying, Well, we really didn't

13   mean what we said; we really only want to kick out the

14   board, the people who run the synagogue.  Well, the

15   synagogue, our congregation only has a hundred 30

16   members, and there's about 30 plus on the board.  So

17   their new position is, We only want to throw out on the

18   street 25 percent of them.

19       But they haven't withdrawn this nasty

20   counterclaim.  So again, that's pretty inconsistent

21   behavior for a fiduciary towards its beneficiary.

22       And we suggest that their acts of omission and

23   comission means that they should be required -- this

24   Court should remove them as trustees in this case and

25   have an independent trustee appointed with the

1    assistance, I think, of the Attorney General's Office

2    of the State of Rhode Island.

3          I'd like now, if your Honor would please, to go

4    in broad strokes through some of the evidence that will

5    show that, one, Congregation Jeshuat Israel is the

6    owner of the rimonim, the issue in this lawsuit; two,

7    that the New York congregation owns the Touro Synagogue

8    building in trust for the benefit of Congregation

9    Jeshuat Israel; and thirdly, that they should be

10   removed as trustee because they've been a faithless

11   fiduciary.

12         Let me talk first about the rimonim and why we

13   suggest that the evidence shows that they are owned by

14   us, Congregation Jeshuat Israel.

15         Well, in their own pleadings, again I refer to

16   their pleadings, and pleadings are judicial admissions,

17   they admit the rimonim was made for the Newport

18   congregation.  There's no dispute that we were the

19   original owners and possessors of the rimonim.

20         In their counterclaim, paragraph 15, they say

21   that our predecessor, CYI, Congregation Yeshuat

22   Israel -- and, your Honor, I'm getting to be more of an

23   expert in Hebrew than I have for a long time.

24         Yeshuat and Jeshuat Israel are transliterations

25   of the same.  They mean "salvation" in Hebrew.  It's

1    Y-e-s-h-u-a-t, that was the original congregation, and

2    now we're J-e-s-h-u-a-t, but both of them mean

3    "salvation."

4           CYI, they admit, was the original possessor of

5    the rimonim.  Secondly, their own 30(b)(6) witness,

6    Mr. Edinger, admits it; yes, CYI, our predecessor

7    congregation, was the original possessor of the

8    rimonim, not the New York congregation.

9           And beyond that, and until this lawsuit,

10   everyone who ever addressed the issue found that the

11   rimonim were made for the Newport congregation.

12   Indeed, their own rabbi, their own prior -- he's not

13   the current one, but he was the one at the time

14   litigation started, in an address at Yale University

15   said Myer Myers made rimonim for the synagogues in New

16   York, Newport and Philadelphia.  I think he made five

17   sets, two of which we own, one of which Shearith Israel

18   owns, and two of which are owned by a Philadelphia

19   congregation called Mikveh Israel.  And scholars, every

20   scholar that's ever looked at this -- and we put that

21   on the slide there -- that the rimonim were made, these

22   rimonim were made for our congregation, our predecessor

23   congregation.  The Library of Congress said it.  All

24   these professors said it; everybody.  This has never

25   been a contested situation until this lawsuit.

1        Now, so we had these rimonim, and we had an

2   active congregation in Newport.  But what happened next

3   historically?  Well, there was a decline and ultimately

4   no more people of the Jewish faith in Newport, so by

5   1822 that was -- the last Jew left Newport.

6        And so in the 350, so I think in terms of time,

7   past, present, future, we begin 357 years ago, in 1658

8   when Congregation Yeshuat Israel was founded.  So the

9   357-year period since then, there was a period of

10  60 years or so between 1822 and 1883 when there were no

11  Jews in Newport.  And during that period of time, that

12  60-year thing, which is 16 or 17 percent of our

13  history, the New York congregation held for

14  safekeeping, and I emphasize the word "safekeeping,"

15  Touro Synagogue and the Newport congregation's personal

16  property, including its Torahs and its rimonim, which I

17  say is to their credit.

18        Indeed, its Rule 30(b)(6) witness testified that

19  it's likely the rimonim were brought to New York for

20  safekeeping in the 1820s and 30s.  Indeed, the New York

21  congregation's ritual director also wrote, in an

22  internal memo to the board of the New York

23  congregation, that it's likely the rimonim adorning

24  these scrolls were brought to New York for safekeeping

25  at this time.  Their own expert witness, Dr. Mann, said

1    the silver was transferred from Newport to CSI for

2    safekeeping.

3         So they had that; they had the rimonim sometime

4    in the 1820s and 1830s, and it's a good reason and it's

5    good reason that these witnesses testified that it was

6    likely, because their Minutes regarding the Torahs, the

7    five books of Moses, which are the scrolls with the --.

8         The Minutes from the New York congregation show

9    that they received -- I'm sorry -- did I say the New

10   York?  The Minutes from the New York congregation,

11   their own Minutes in the 1830s, and this I submit is --

12   I'm going to show you two documents which I

13   respectfully submit are very important documents, show

14   that the New York congregation received Newport's

15   Torahs in safekeeping, the word "safekeeping," with the

16   express direction that when a congregation was

17   reconstituted in Newport, worshiping in the Touro

18   Synagogue, the Torahs were to be returned -- I didn't

19   say returned -- to be redelivered to that congregation.

20        So they took the Torahs in safekeeping, not

21   absolute ownership, in safekeeping, because they're

22   personal property of the Newport synagogue.  And they

23   admitted in their own words, We hold them in

24   safekeeping and they are to be redelivered for the use

25   of whatever congregation is hereafter worshiping in the

1    synagogue at Newport, Rhode Island.

2         And of course it makes absolutely no sense that

3    they would take the Torahs for safekeeping, but the

4    other personal property from the Newport congregation,

5    they would take for themselves.  Because the rimonim

6    sit on top of the Torahs, they go along with them, you

7    know, it's like the safe --.

8         So to suggest otherwise, especially in the teeth

9    of their own admissions, is simply revisionist history.

10   And these documents I think are quite significant in

11   showing the facts in this case as they truly are.

12        Now, what happens next?  Well, after this

13   60-year hiatus, Jews began returning to Newport, and

14   the Jews returning to Newport in that period of time

15   were primarily from eastern Europe, Poland, Russia,

16   fleeing from persecutions, pogroms, the czar, fleeing

17   to the United States for freedom.

18        The Touro Synagogue was reconsecrated in 1883,

19   and Congregation Jeshuat Israel was incorporated in

20   1894.  And fulfilling the instructions that, given to

21   it and under the conditions in which it held the

22   personal property, the New York congregation

23   redelivered the Torahs; it redelivered the rimonim to

24   Congregation Jeshuat Israel, the rightful owner of that

25   property.

1          And as the Jewish congregation worshiping in

2     Touro Synagogue, Congregation Jeshuat Israel was the

3     intended recipient of the personal property, as we see

4     from the Minutes from the 1830s.  This, by itself,

5     establishes Jeshuat Israel as the proper owner of the

6     rimonim.

7          Indeed, their own 30(b)(6) witness said Jeshuat

8     Israel is the current incarnation of the Jews of

9     Newport.  What could be clearer?

10          But beyond this, Jeshuat Israel has been

11     recognized, left, right and center, as the continuation

12     of the congregation that started in 1658 and that built

13     the synagogue, the Touro Synagogue consecrated in 1763.

14          This is something that is recognized in the laws

15     of the state of Rhode Island.  In 1890 -- I put on the

16     law here -- the Rhode Island legislature permitted the

17     incorporation of Congregation Jeshuat Israel, over

18     Shearith Israel's objection that it wasn't connected to

19     CYI, the predecessor congregation.

20          And I think that's a seminal fact, because the

21     New York congregation did not want it to happen.

22     Indeed, they petitioned to the Rhode Island legislature

23     to prevent Congregation Jeshuat Israel from

24     incorporating under that name.  And, as a portion of

25     their petition, which is an exhibit in evidence, they

1    made arguments that, Well, we're not really properly

2    connected with the same congregation; We're not the

3    same kind of Jews, come from different parts of the

4    world; We're not of the same class or status.

5         Well, the Rhode Island legislature rejected the

6    New York congregation's contention that Jeshuat Israel

7    was not a proper continuation and successor, by

8    granting the charter and using the transliterated name

9    of the ancient congregation.  And Rhode Island law

10   recognizes Jeshuat Israel as the continuation of, or

11   successor to, the original congregation.

12        So, and indeed it's interesting that the

13   arguments, although maybe a little less flamboyant, are

14   very similar.  The arguments they lost in 1894 are very

15   similar to the ones they're making here.  As one of my

16   favorite baseball players, Yogi Berra, says, it's

17   *déjà vu* all over again.

18        But the Rhode Island legislature didn't simply

19   enshrine Jeshuat Israel as the proper successor of

20   Yeshuat Israel.  Sometime I'll get to pronounce it

21   right.  It also -- they did it in another way.  Abraham

22   Touro left $10,000 in his will for the purpose of

23   supporting the Jewish synagogue in Newport.

24        The Rhode Island law that administers the fund,

25   which is called the Abraham Touro Fund, expressly gives

1    Congregation Jeshuat Israel control over that fund and

2    expressly makes Congregation Jeshuat Israel the fund's

3    beneficiary.  We put up on the board here the Rhode

4    Island law that quotes from the Rhode Island law in

5    that respect.

6         Besides the state of Rhode Island, who else has

7    recognized Congregation Jeshuat Israel to be the

8    continuation of the original Newport congregation?

9    Let's try the federal government.

10        We have here a plaque, which I don't know if you

11   can read it, there is a plaque that the United States

12   Department of Interior put up which is prominently

13   displayed on the side of the Touro Synagogue.  It was

14   put up I think in 1946 or '47, shortly after the

15   tripartite agreement.  And it said on the very top:

16   National Historic Site, Touro Synagogue of Jeshuat

17   Israel Congregation, Founded 1658.

18        And we know that the date doesn't relate to the

19   building, because Touro Synagogue was only built in

20   1763.  The 1658 date is the date of the founding of the

21   original congregation there.

22        And this plaque, your Honor, the very first line

23   we put up had a picture of Touro, and you walk up to

24   it; it's the first thing you see when you walk up to

25   the Touro Synagogue.  It's right there on the, before

1   the gate.  It's right on your right.  Wow, look at that

2   arrow.  I started in the age of paper.

3          Anyhow, anyhow, what else?  Not only -- what

4   about the New York congregation itself?  Well, the

5   president and rabbi of the New York congregation

6   attended the unveiling of this plaque, and the New York

7   congregation consented to the language in this plaque

8   before him.  There was an exhibit in evidence you'll

9   see to that.

10          And, by the way, their longtime rabbi who was

11   rabbi at the time I think this case started, Rabbi

12   Angel, referred to us as a, in his speech, Congregation

13   Jeshuat Israel is a sister congregation which dates

14   back to the colonial period.  Scholars, we cite them,

15   also agree.

16          What all this shows, your Honor, most

17   respectfully, is prior to the revisionist historical

18   approach being propounded by our opponents, everybody

19   recognized Congregation Jeshuat Israel as the

20   continuation or successor to the Newport congregation

21   founded in 1658.  And so this is new, revisionist

22   arguments which cuts against the grain that everybody's

23   understandings, conduct, and what's right.

24          And now they rely on a couple of leases, which

25   you'll hear something about, from 1903 and 1908;

1    getting back to the rimonim.  That is -- and they say

2    that in addition to leasing the Touro Synagogue

3    building to us, they also leased the rimonim to us.

4    Well, at best, on an honest case basis, at best, their

5    claim could be that they could be trustees over the

6    rimonim, that they couldn't own them absolutely,

7    because the leases, they identified themselves as

8    trustees in the leases.  But, more than that, the

9    leases do not cover unaffixed personal property at all.

10    They only deal with real estate and things that are

11    affixed to it.

12          And the rimonim are not appurtenances.

13    They're not paraphernalia belonging to the real

14    property in terms that do not -- there's a term called

15    "personal property."  It's a term that's been around

16    for years and years and years.  It's a term that people

17    have been using for years and years and years.

18          There's no reference in those leases to personal

19    property, and those words are conspicuously absent.

20    And why is it?  Well, the New York congregation,

21    Shearith Israel, never owned the personal property, so

22    how could they lease it?  They never owned it.  They

23    only held it in safekeeping to be returned and

24    redelivered.

25          Secondly, apart from this historical record, we

1    have the fact that for over a hundred years we've --

2    Congregation Jeshuat Israel has borne all the indicia

3    of ownership and Shearith Israel has not.

4         What happened to the rimonim when they were

5    returned to us over a hundred years ago?  Well, we've

6    had possession, custody and control of those rimonim

7    for over a century.  We've held ourselves out

8    repeatedly as the owners of the rimonim for more than a

9    century.  In addition, we've stored them.  We've

10   restored them.  We've cleaned them.  We've insured

11   them.  Owners insure things.

12        They never insured any of these rimonim at all.

13        And we secured them; all the things an owner

14   does.  We've also determined -- not them -- when

15   they're used, where they're used, and how they're used.

16        And one of the things we did is we made, because

17   these are documents -- these are objects which are of

18   interest to the public.  They're of interest to people.

19   We've lent them out.  One -- we have two sets of

20   rimonim.  We have the set that's in dispute here, and

21   then we have another set that was donated to us, the

22   Caroline Cohen set, or Hays and Myers set, I guess they

23   call it.  We have lent one or both of those out to

24   numerous museums and philanthropic -- similar

25   organizations over the years because it was thought to

1   be a good thing to do for the public.

2       We've held them out to the Library of Congress,

3   to Yale University, to the Jewish Museum in New York,

4   to the Museum of Fine Arts in Boston, the Skirball

5   Center in Los Angeles.  They've been lent out all over

6   the place, and we've always been held out as the owner

7   of those rimonim when they were held, when they were

8   out there.

9       And not once did we ever hear a peep, a

10  complaint, during these many showings, these many loans

11  of:  Oh, what are you doing?  They belong to us.  Those

12  are our rimonim; How can you be lending them out?  You

13  never asked our permission.  You identified them as

14  yours; they really belong to us.

15      Indeed, we know in one, it was probably more

16  than one, but one prominent one was the loan to Yale,

17  because they loaned their own rimonim to Yale at the

18  same time we loaned both of our sets, and the catalogs

19  there indicate quite clearly from whence they cometh.

20      So they have their own rimonim, the one set they

21  truly own, on display at Yale at the same time we have

22  our two sets.  The catalog makes it clear where they

23  come and who owns it, and they don't complain, at least

24  until this lawsuit.

25      And where else did the rimonim -- we use them.

1    Let me tell you when we use them and where they are

2    when we don't use them.  The rimonim, because they're

3    valuable, and they're also precious, can get damaged.

4    We had to raise $25,000 to restore them a few years

5    ago.  They're kept in a safety box at the Bank of

6    Newport, and they come out of the safe deposit box on

7    two occasions:  One, the Jewish High Holy Days,

8    Yom Kipper and Rosh Hashanah they come out for, and

9    then they're put back in the box; or, they're lent out.

10   The only other time they leave the box is they're lent

11   out to the museums to be put on display.  And, as I

12   said, no objection, no complaint, no involvement by

13   them at all.

14        And, as we submitted in our brief to your Honor,

15   our longtime possession and control gives rise to a

16   strong presumption of ownership that the New York

17   congregation cannot overcome, and their silence over

18   all these many years supports our ownership position,

19   and we suggest their inaction bars them at this very

20   late date in the game from now challenging our rights

21   to the rimonim.

22        Now, let me now turn to why it is that the folks

23   at Jeshuat Israel felt it was necessary to sell the

24   rimonim, to sell one of the two sets of rimonim in

25   order to save the synagogue and the congregation.

1    Well, as I think I said earlier, they were in a

2    precarious financial situation.  They are a small

3    congregation.  There're only 130 members.  I think

4    their situation may have hit them most strongly with

5    the financial crisis in 2008, which it hit everybody.

6    They'd begun doing things which they prefer not

7    to.  They've cut expenses to the bone.  They deferred

8    maintenance.  They terminated their administer.  The

9    congregation, except for the rabbi, is run entirely by

10   volunteers.  The president answers the phone, opens the

11   mail, in addition to her other responsibilities.  We

12   pay to keep a rabbi in residence so we have an active

13   Jewish community there.

14   And the folks at Jeshuat Israel said we ought to

15   do something to make sure that this synagogue will be

16   here as a place of worship, and not a museum, forever.

17   So they thought about, What can we do?  Well, they've

18   had fundraising campaigns and they tried fundraising,

19   but that wouldn't raise enough to do this.  And

20   fundraising for an endowment is kind of, is, I think

21   most respectfully, difficult.  It's probably easier to

22   raise it for a building than it is for an endowment.

23   And they looked, Well, what do we own?  What do

24   we own that we could sell to help fund the endowment?

25   Well, we own the community center, but it wouldn't

1    raise enough money selling it, and we wouldn't be able

2    to function very well without a community center.

3    Well, we own the rabbi's house; we could sell that, but

4    where is the rabbi going to live?  We've got to find

5    housing for him, and that wouldn't raise enough money

6    anyway.

7         They thought they had a valuable painting, a

8    Gilbert Stuart painting.  Regrettably it wasn't the one

9    of Washington crossing the Delaware.  Maybe they

10   thought for a moment it could fetch; but it turned out

11   to really not be worth anything remotely close to what

12   they needed.  It was disappointing.

13        And what they were left with is they had the

14   rimonim, and they had two sets of them.  So the thought

15   was -- they didn't want to sell the rimonim, but they

16   thought that this may be the one asset -- we would

17   still have one set -- that we could sell to set up

18   enough money to fund an endowment to preserve the

19   synagogue.  And, in any event, you'll hear of evidence

20   about it.  They were able to have an arrangement with

21   the Museum of Fine Arts in Boston.

22        And, by the way, they had had -- the rimonim

23   were out on loan already to the Museum of Fine Arts.

24   They're out on loan since 2010 at the Museum of Fine

25   Arts.  As part of that, there's a room there, I think

1    it's a Newport Room and an early colonial room.  So

2    they were already out at the Museum of Fine Arts on

3    loan for a couple of years anyway, this set.  And the

4    Museum of Fine Arts was able to obtain an anonymous

5    donor, to make a longer story shorter, and was willing,

6    long story made short, that the Museum of Fine Arts

7    would be willing to pay $7.4 million for these rimonim;

8    which meant that after paying the commission to

9    Christie's, who had arranged the sale, we would be able

10   to put $7 million into a permanent endowment fund to

11   keep the synagogue forever.

12          And then, with the thought being that with the

13   income that could be, using three or four or some

14   percent, they'll tell you when they testify what the

15   percentages were, between that and the money from the

16   Isaac Touro Fund you have $350,000 a year, or some

17   number like that, which would be enough to keep the

18   synagogue going in terms of all of the expenses, and

19   the trust corpus would never be invaded; it would just

20   be there.

21          So this, they thought, was a win-win situation.

22   The rimonim would be at a place they're being displayed

23   at anyway, on a public display at one of the great

24   museums around, where they could be seen by people.

25   Better than sitting in a safe deposit box at the Bank

1    of Newport.  And the synagogue would be preserved.  It

2    was thought it would be a win-win situation.

3         But that's when the New York congregation, which

4    I submit hadn't paid much attention or any attention to

5    it for decades, came out of the woodwork and

6    effectively killed the deal.

7         And our folks, of course, couldn't understand

8    why they were doing that.  And to put the shock that we

9    felt by the New York congregation's attitude and

10   actions, we should talk a little bit about the trust on

11   the synagogue building and the relationship between the

12   two parties.

13        Going back to our friend Rivera's will from

14   1787, Rivera's will makes clear that he and his two

15   colleagues, Messrs. Levy and Hart, obtained the land

16   and synagogue in trust for the benefit of the Jews of

17   Newport.  I think the documents your Honor has seen or

18   the memos, I think in those days a synagogue couldn't

19   own land itself or property, so it had to be owned by

20   trustees and trusts.

21        So these three folks, Levy, Hart and Rivera, had

22   bought this, had the synagogue in trust.  And his will

23   declared, made it unequivocal that this -- he said the

24   same was meant and intended in trust only and for the

25   sole use and benefit and behoof of the Jewish society

1   of Newport and to preserve for them as a place of

2   public worship forever.

3        Now, I told you about the 60-year period when

4   there were no Jews in Newport.  The New York

5   congregation played a role in safeguarding the

6   synagogue.

7        Then in 1894, which is the same year we talked

8   about the Rhode Island assembly consecrating us and

9   incorporating us -- over their vociferous objections --

10  the New York congregation, which had no paperwork

11  giving them any rights in anything, scurried around in

12  1894 and procured deeds from the purported heirs of

13  Rivera and Levy.  And this happened at the same time

14  they were unsuccessful in lobbying the Rhode Island

15  legislature to deny a corporate charter to Congregation

16  Jeshuat Israel.

17       What's interesting about these deeds is they

18  were expressly in trust, if we look at the joint tenant

19  in trust.  And, of course, it should be in trust

20  because Rivera's will makes it clear that his ownership

21  was in trust and that he owned the real property in

22  trust, along with his colleagues, Levy and Hart.  They

23  didn't own it absolutely.

24       And if, in fact, what's being conveyed by the

25  heirs of Rivera or his ownership, well, you can't give

1    away more than you own.  If I own something in trust

2    for my friend Mr. Wagner, I can't say I'm the

3    absolute owner, and my heirs take over and they say,

4    well, I'm the absolute owner.  No.

5         The heirs can only own what Mr. Rivera owned.

6    He owned it in trust.  They can't become absolute

7    owners.  You can't give away more than you own.  They

8    can't give away to them more than they own.  And this

9    was real property owned in trust.

10        Now, I just want to pause for one moment.  They

11   make a to-do in their papers about a litigation in 1902

12   and 1903 and an opinion by Judge Brown.  Who owned the

13   rimonim was not an issue in that case and wasn't

14   decided in that case; number one.  That case didn't

15   determine whether the New York congregation owned the

16   synagogue, whether there was a trust or not.  And this

17   new -- and we can deal more with that with legal

18   submissions to your Honor, but I just wanted to make

19   that point now.

20        But what -- but let's look at how the parties

21   acted after that opinion and what other agreements they

22   made after that opinion, which are much more telling

23   and much more controlling than that.

24        Well, the New York congregation -- in the 1903

25   leases that we talked about, we entered into a -- there

1    was a settlement agreement.  The negotiation started

2    before the decision.  In fact, they were spurred by the

3    New York congregation's loss of a separate lawsuit

4    concerning legal possession of Touro Synagogue.  All

5    the documents relating to that settlement:  The

6    agreement, the resolution passed by Jeshuat Israel, and

7    the lease contemplated in the settlement, all made

8    clear that the owners, who were individuals from the

9    New York congregation were, quote, trustees, close

10   quote, of the synagogue.  And we put up here the leases

11   and we highlight in yellow, as trustees, as trustees,

12   as trustees, three times.

13        And indeed the New York -- so there's no

14   question what they understood to be their role with

15   respect to the real property, that they were trustees,

16   which is all they could be because that was all that

17   Rivera was.  And to the extent they got the chain of

18   rights through his heirs, all they could get was the

19   same rights Rivera had.  Couldn't get anything more.

20   And they acknowledge it.  I mean, they didn't put the

21   word "trustees" in there.  Indeed, in their own Minutes

22   they refer to themselves as trustees and owners of the

23   Touro Synagogue, the next line there.

24        And now -- and one wouldn't have thought that

25   there could have been any dispute or argument that they

1    were anything but trustees, based on all the history.

2    But to the extent anyone could have challenged it,

3    let's go to 1945, the most important document, I

4    submit, in the case.

5         The 1945 agreement, this is a tripartite

6    agreement with the United States of America, the New

7    York congregation, and Jeshuat Israel.

8         This defeats -- and to the extent there's even

9    any doubt as to their notion that they are anything

10   more than trustees -- this defeats it.  The agreement

11   is in -- makes clear in several places that the New

12   York congregation owns the Touro Synagogue in trust for

13   the benefit of the Jewish society in Newport.

14        Let's start with the preamble to it.  The CSI

15   board members are referred to as trustees under a deed

16   of trust dated April 27, 1894, and they are, as a

17   defined term, the Shearith Israel trustees.  This is as

18   clear as a bell, and how anyone can take the position

19   you're not a trustee, after signing a document with the

20   United States of America, holding yourself out as a

21   trustee, referencing the former documents where you

22   obtained this trustee status.

23        Then let's go to the fourth Whereas clause on

24   Page 1:  (Reading)  Whereas, the Shearith Israel

25   trustees, the holder of fee simple title under, upon

1    certain trusts in the Touro Synagogue.

2            Clear as day.  But there's more.  I mean, the

3    document repeats it and repeats it.

4            And as I said earlier, it's interesting; you can

5    look at every page of their 80-page submission, and

6    when they discuss this document, the most important

7    document, they leave out all the language.  They leave

8    out everything, all the stuff about being a trustee.

9    Isn't that coincidental.

10            Go on now to Article 4(b):  (Reading)  It is

11    mutually understood and agreed that the title to the

12    Touro Synagogue and its appurtenances, subject,

13    et cetera, et cetera, and declarations of trust,

14    appertaining thereto shall remain in the Shearith

15    Israel trustees.

16            The next paragraph, next on the right side, it

17    goes on and it has this language which is just

18    interesting: (Reading) For the use, benefit and behoof

19    of the Jewish society in Newport as a place of public

20    worship forever.

21            These words, which I'll show in a minute, come

22    exactly out of the Rivera will.  They are word for word

23    out of the Rivera will.  And when the New York

24    congregation signed the agreement, they signed as

25    trustees as aforesaid.

1      And finally, the agreement said that the New

2   York congregation, as well as us, undertook an

3   obligation to preserve, protect, maintain and when

4   necessary restore Touro Synagogue.

5      If we look at the next slide, comparing the

6   Rivera will to the 1945 agreement, you'll see that the

7   exact language, the one I just referred to, comes right

8   out of the Rivera will, the "use, benefit and behoof"

9   language.  And I'm a litigator, I'm not a draftsman,

10  but I haven't seen too many documents with "behoof"

11  recently.

12      And (Reading) Use, benefit and behoof of the

13  Jewish society of Newport as a place of public worship

14  forever.  And this sort of language, it's clearly from

15  the Rivera will.  You can see it by just seeing it.

16  And it's certainly not the language coming out of some

17  kind of form book, "behoof."

18      Indeed, we will show also that Jeshuat Israel

19  obtained a legal opinion, which they shared and was

20  accepted by Shearith Israel, that recommended adding

21  that language from Rivera's will to make clear that the

22  New York congregation owns the synagogue in trust and

23  for the benefit of the Jewish society of Newport, who

24  are we.

25      And even the New York congregation's Minutes

1    concerning the finalization of the agreement state that

2    the individuals who signed the agreement, who hold the

3    property in trust.

4    　　　　Now, this trust, as I said, is for the Jewish

5    society in and of Newport.  Jeshuat Israel is the

6    Jewish congregation in Newport worshiping in Touro

7    Synagogue.  If we weren't the right people, gotten

8    through all the history, why are they leasing to us?

9    Why are we signing this document with them?  We were

10   some strangers that came in off the street?

11   　　　　We worshiped there continuously since being

12   reestablished.  Even the Jewish, even the New York --

13   as I said before, even the New York congregation's

14   Rule 30(b)(6) witness testified that Jeshuat Israel is

15   the current incarnation of the Jews of Newport.  Rhode

16   Island law, as I've gone through, has recognized this.

17   　　　　And CSI, after losing in 1894 before the Rhode

18   Island legislature, has never -- has acquiesced in

19   this, never challenged this ever until this lawsuit.

20   　　　　I think, and finally, your Honor, I think just a

21   few words on why they should be removed as trustees.

22   Look, I think both by their words and their deeds

23   they've made it clear that they do not, have not and

24   cannot function as a fiduciary for our benefit.  Far

25   from acting as a fiduciary; they've actively stymied us

1   and put the existence of our congregation and the

2   existence of the Touro Synagogue as a place of worship

3   at risk, as opposed to a museum.

4        We were trying to secure the future of the

5   synagogue in what was a win-win situation.  After all,

6   the rimonim is still sitting at the Museum of Fine

7   Arts, on loan, on display.

8        And their responses to us continued to be

9   punitive.  They undermined the deal and killed it.

10  They want to -- no matter how they style it in their

11  various incarnations, they seek to kick us out of the

12  synagogue.  What could be more punitive than that?

13       The trustees claim they own the trust property.

14  They're admittedly considering their own interests in

15  making decisions, not that of ours.  That's the essence

16  of duty of loyalty.  I mean, you don't have to be a

17  total expert.  That's what duty of loyalty is all

18  about.  Your loyalty is to the beneficiary, not to

19  yourself.

20       This shows they can't be loyal to the trust and

21  its beneficiary.  After all this has happened, how can

22  they be trusted to guide, be guided solely by acting in

23  the best interest of the beneficiary?

24       And, you know, also they just haven't paid any

25  attention to us for years.  Prior, you know, trying to

1  nuke us recently, they hadn't paid any attention to us

2  for years.

3      The 1945 agreement obligated them as a trustee

4  to preserve, protect, maintain, and when necessary

5  restore so far as it lies within their power, the Touro

6  Synagogue.

7      Well, they've had little or no involvement with

8  Touro Synagogue and Jeshuat Israel in decades.  They've

9  provided no, virtually no support to Touro Synagogue

10  and Jeshuat Israel for the last 30 years.  I mentioned

11  the $475 cost that was awarded against them was the

12  biggest check we've gotten in decades, and looking back

13  we found a hundred dollar check from them in 1983.

14      You'll hear testimony that we asked for their

15  help when we had to go -- when the synagogue was in

16  terrible condition, needing restoration, and they

17  wouldn't even give us their list of members so we could

18  solicit them for donations.

19      We would welcome the appointment -- as I said to

20  your Honor, the rimonim I believe are ours, and we

21  should have the right to sell them and preserve our

22  synagogue and preserve one of the best and beautiful

23  places in Newport, maybe in the United States.

24      But the synagogue building, we'd welcome the

25  appointment of a new trustee who would act

1    independently, who would be concerned about doing the

2    right thing, not out to take the corpus.  And your

3    Honor has the power to do that, and with the assistance

4    of whatever aid the Court would think would be helpful

5    from the Rhode Island Attorney General as obligations

6    in that area.

7         Look, we brought this lawsuit.  We -- it was not

8    our -- we really didn't -- we prefer not to have had

9    this public dispute.  I think it's probably true of

10   them also; they would prefer not to have this public

11   dispute, as I said, in fairness.  But as fun as it is

12   for me to be a lawyer before your Honor, I think they

13   would have preferred to go and preserve it.  But I

14   think that we felt there was no other choice, in our

15   commitment to preserve the synagogue for all time's

16   sake and its future as an active place of Jewish

17   worship.

18        Unless your Honor has some questions, I think

19   I'm done.

20        THE COURT:  Thank you.  I appreciate that.  I've

21   tried to, in treating these as opening statements, so I

22   haven't interrupted you with the hundreds of questions

23   that would normally have come at you if this was a

24   legal argument, which I assume will take place at the

25   end of this after I've afforded you both, and will do

1    with Mr. Solomon as well, the opportunity to make an

2    opening statement uninterrupted.  But I appreciate

3    that.  Thank you.

4         MR. NAFTALIS:  I appreciate that.  And you

5    haven't waived any rights to ask any and all questions

6    at any time and place.

7         THE COURT:  There will be plenty.  Thank you.

8    We'll take our break now.  We'll come back at 11:15.

9         (Recess)

10        THE COURT:  It's always nice when people come

11   back after a break.

12        I forgot to mention this earlier.  If there's --

13   are people able to hear okay?  We have listening

14   devices.  Usually we use it when there's an

15   interpreter, but you're welcome to.  Anyone feel the

16   need of a listening device?  (Pause)  Okay.  Great.

17        Mr. Solomon.

18        MR. SOLOMON:  Thank you.  May it please the

19   Court, I first wanted to thank the Court for seeing us

20   and seeing us as expeditiously and for the work the

21   Court has done.  I think we're not past first base in

22   terms of the work the Court is going to have to do.  I

23   heard able counsel; I think we're never going to get on

24   the same page, he and I, on the law.  Happily your

25   Honor is here, with your able clerks.

1              I did, before I begin, want to address and thank

2      for coming our client representative, Michael Katz, who

3      is segan of the Congregation Shearith Israel and also a

4      very able adviser to the board.

5              THE COURT:  Welcome, Mr. Katz.

6              MR. SOLOMON:  Thank you, your Honor.  I

7      particularly want to thank my colleagues who have given

8      of their time.  And I, like you, want to thank the

9      public for the interest in this case because, in fact,

10     I believe it is the public who will lose if CJI gets

11     its way.

12             Now I heard Mr. Naftalis tell the Court, I think

13     it was argument, and I know, and I know your Honor

14     knows that openings are arguments of counsel, they are

15     not evidence, and what he said wasn't evidence.  And,

16     in fact, I believe in a very real way what he said

17     wasn't evidence.

18             But he did give a little glimpse of what CJI

19     would actually have to prove to open the courthouse

20     door, to get the kind of relief that they want:  We

21     tried to nuke them; Shearith Israel was disloyal, acted

22     totally absent from the scene; unhelpful; punitive.

23     As a matter of law that will not be enough.  Even if

24     they prove that.

25             But if your Honor wants the frame that they

1   should be in, at least that's the frame.  The facts

2   will not bear that out.  He did say, however, that you

3   can't give away more than you own, and he is right.

4        I have five parts:  I want to give a quick

5   overview, a chronology that we're going to have

6   witnesses for, your Honor.  And, as your Honor knows,

7   CJI has no witnesses for the first 97 percent of the

8   entire time period covered by this case.

9        I want to address their equitable defenses,

10  since it seems to be all he's talking about.  The trust

11  issues, important, though at the end of the day I

12  believe irrelevant.  Shearith Israel has deep

13  commitment to the people and Jews of Newport and Jews

14  around the world and in America, and to American

15  co-religionists.  And I believe the record in the case

16  will show that we have carried out our commitment with

17  respect to the Touro Synagogue, formerly known as the

18  Newport Synagogue, for 250 years, long before Jeshuat

19  Israel even existed.

20        But, at the end of the day, the trust issues

21  don't guide us here because Shearith Israel does not

22  have a trust relationship with CJI.  CJI is not a

23  beneficiary of any trust, and I think it's -- and your

24  Honor will sort through it.  We add a whole dollop of

25  confusion by continually misunderstanding CJI's role.

1      And then I want to talk to your Honor about what

2   kind of relief we'll have here.

3      The ironies of the case, if I were in a

4   different court and not with a Western Sephardic

5   congregation, I would say "hutzpah."

6      But the ironies that you're faced with, your

7   Honor, are that Shearith Israel will not close or

8   change Touro Synagogue.  We have protected it for

9   250 years.  We aren't going to take the rimonim

10  anywhere.  We're going to leave them at the Newport

11  synagogue.  We aren't going to remove rimonim, breaking

12  them away from the objects, the holy objects, the

13  ritual objects that are part of this sacred space.

14     But in each of these cases, if CJI is successful

15  here, they are going to do each of those things.  So

16  the confusion comes from their wanting to consign a

17  living ritual object, these rimonim, to a museum,

18  because, he says, there's a concern that they don't

19  want the synagogue to become a museum.  It makes no

20  sense.  There has never been any sense to that.

21     What authority does CJI claim to act?  Well,

22  maybe by fiat, because they claim they own it.

23     We will show they own nothing.  They had nothing

24  when they came into existence in 1893.  They were the

25  last to the party, if your Honor will.  They have

1    nothing now.  They act as lessees of property.  They

2    were for 110 years important, actually maybe treasured

3    lessees of property.  I think they have gone astray.  I

4    think they need to be brought back.

5          But are there private contracts that they have

6    brought, your Honor?  Do they have any proof that they

7    own the rimonim?  None.  Well, do they have any public

8    contracts?  They have none.

9          Do they have other writings between the parties

10   that say, okay, these rimonim, they're yours?  They

11   have nothing.

12         The one thing he says is that, Well, if you

13   ignore the fact that it doesn't talk about rimonim,

14   Shearith Israel held for safekeeping some of the Torahs

15   that were, admittedly by documents, belonging to the

16   original Newport congregation.  What's telling about

17   those documents, of course, is that they say nothing

18   about the rimonim.  And that's because they weren't

19   treated that way because they weren't owned that way,

20   as the story will unfold.

21         So they have nothing to stand on to make these,

22   I think, audacious claims that turned the world on its

23   head:  It's the avaricious New York congregation that's

24   coming, your Honor, to maintain the status quo, to keep

25   the rimonim where they belong as part of this space.

1      And so, why?  Well, are lives at stake?  Do poor

2   people need to be fed to sell these rimonim?  Do

3   hostages need to be ransomed?  Unfortunately, in the

4   history of the Jewish faith those things happened, and

5   for those things you can begin to think about selling

6   otherwise priceless ritual objects.  There's no proof

7   of that here.

8      Well, are they about to close?  No.  Although he

9   tells us that there's an existential crisis, your Honor

10  will see in the evidence, his own witnesses, the one

11  thing they say is there was no existential crisis.

12  Okay?

13     Well, have they spent millions?  Do they owe the

14  bank millions?  No.  Do they -- are they about to go

15  under?  No.

16     What they want is, if you'll pardon me, a vanity

17  endowment.  Now, an endowment is a good thing, okay?

18  No one is going to disagree with that.  We'd like to

19  have an endowment also at Shearith Israel.  I think

20  every religious institution in the world would like to

21  have an endowment.

22     What do you have to sell?  What do you have to

23  give away to get it?  That's the question.  And, more

24  fundamentally, who makes that decision?

25     CJI, I submit, is the one person everyone should

1    at the end of the day agree with does not make the

2    decision.  They do not stand as owner.  They do not

3    stand as trustee.  They do not stand as beneficiary.

4    They stand as lessee.

5         And that is the document that we think is

6    critical.  I'm perfectly happy to embrace the 1945

7    agreement.  We do embrace the 1945 agreement.

8         But the chasm that exists between the challenge

9    that CJI now faces, they have a dwindling and aging

10    congregation.  They've told witnesses on our side,

11    they're going to tell that they think they have 60 or

12    70 members, and now today they have 130 members,

13    whatever.  I'm going to use a hundred because it's easy

14    and it's in the middle.  They have a hundred members.

15         There are a thousand Jews in Newport.  And if

16    they do not any longer have the intelligence, the

17    drive, the vitality to go and find them, if they no

18    longer have the insights to go raise funds that they

19    say are needed -- although four of the last five years

20    they've operated in the black.  They've made money.

21    They only didn't in one of the five years because of

22    this litigation.  All right.

23         And I know your Honor is not going to be

24    confused about how, even if they were a trust

25    beneficiary, if you can only sue your trustee and say

1    enough bad things about them, then you can replace

2    them.  It doesn't work like that, and the law doesn't

3    protect that.

4          Selling your birthright -- and I believe these

5    rimonim are fundamentally a part of that sacred

6    space -- selling your birthright is not a good idea.

7    Selling somebody else's is even worse under the system

8    of laws that we operate under, and that is what they're

9    trying to do.

10         CJI is a holdover lessee.  It owns nothing.  We

11   intend to prove that they cannot carry their burden of

12   showing that it owns the rimonim or that it has any

13   right to force their sale under any circumstances.  Not

14   only is there no deed, no title, no bill of sale, no

15   gift receipt, no nothing; they have possession pursuant

16   to a lease for 112 years.

17         I also believe they cannot prove that, by clear

18   and convincing evidence, not as a trust exists.  The

19   time for that sort of confusion ended, or certainly

20   will when the evidence begins, because when your Honor

21   takes over and is in control; okay?  The question isn't

22   does a trust exist.  The question is for whose benefit?

23   And it's not their benefit.

24         And the confusion of role that CJI feels that it

25   needs to do in order to prevail here, I think, is one

1    of the reasons why they should not prevail.  They need

2    to show that they are beneficiaries of a trust, by

3    clear and convincing evidence.  They then need to show

4    that they can take the corpus of the trust, some of the

5    corpus, the rimonim, and sell them.  It's not the way

6    trust law works, even if trust law were relevant here.

7         I want to give a quick summary of the travel of

8    the title of the rimonim and what I believe the

9    evidence will show in that travel of the property,

10   because there are these two different issues.

11        There are only two possibilities, as I think the

12   evidence will show:  Shearith Israel either paid for

13   the rimonim that we're talking about now, in 1760,

14   1770, when they were made; or, Yeshuat Israel was the

15   original possessor.

16        And, on information and belief, Shearith Israel

17   did say that it believed at the beginning of the

18   lawsuit, before we spent countless amounts finding the

19   evidence and paying the experts to tell us what we

20   think -- what the facts are, that Yeshuat Israel was

21   the original possessor.

22        Now, Yeshuat Israel is not CJI, and that

23   confusion also, I think, will be clarified with the

24   proof.  But in either case, by the 1820s the

25   congregation failed in Newport.  Shearith Israel became

1    both the possessor and title owner of the rimonim.

2            And there's no evidence, there is no evidence,

3    doesn't matter how many times he says it, and, you

4    know, we're each making representations to the Court,

5    okay?  There's going to come a day of reckoning, all

6    right, and there is no evidence that anyone treated or

7    talked of the rimonim as being held in safekeeping.

8            The contemporaneous evidence is that the three

9    Torah, the Torah scrolls, which were treated separate

10   from the rimonim -- and the reason is because two of

11   those Torah scrolls belonged to Shearith Israel.  We

12   loaned them to the original congregation so that they

13   could get started.  There was love, admiration, mutual

14   respect between these entities.

15           And then, thereafter, Jeshuat Israel obtained

16   four other Torahs.  That's what the records show.  And

17   with respect to those four others, we held them in

18   safekeeping.  We made good on that promise.  And

19   there's no issue here about who owned them or who

20   doesn't, and now what we're talking about is what's not

21   held in safekeeping.

22           We believe we have the title in 1869.  There's

23   an inventory that says we have the title, that they

24   belong to us.  And I believe the evidence will show

25   that we did not ever relinquish control over the

1    rimonim; indeed, I believe the evidence will show

2    preponderantly that we exercised control over the

3    rimonim.

4         With respect to the title, there were three

5    holders of the land.  I think it probably is fair to

6    say, Judge, that just like the Shearith Israel trustees

7    hold property for the benefit of Shearith Israel, that

8    these three held the property for the benefit of

9    others.  It doesn't create a trust.  But there's no

10   question about that, nor does it matter because none of

11   that has been violated or overcome.

12        We got title to the building in the 1820s.  We

13   have held title ever since.  And the trust relationship

14   that I'm comfortable describing is one that has a

15   lower-case "t", as we've described both to the Court

16   and to the Attorney General, not with a capital "T."

17   Because the capital "T" brings in all sorts of

18   confusion I think that's not necessary for this case,

19   since at the end of the day we have to remember that

20   CJI is not a beneficiary of that trust.

21        The Jews of Newport, the Jewish congregation of

22   Newport are the beneficiaries of the trust deeds.

23   That's what it says.  In 1945 when we entered into the

24   agreement with the federal government, it says it

25   exactly that way also.  And in the 1890s when CJI

1       didn't even exist, we can understand why nobody would

2       reference them.

3               But in 1945, when these parties entered into the

4       agreement, the three-party agreement, how is it that

5       CJI is not named as the beneficiary in the document?

6       Well, it's because they're not the beneficiary.  And

7       they understood that until they needed to come up with

8       an argument to make the case to your Honor.  And the

9       federal government understood that, and we understood

10      that.

11              So it's a little bit more nuanced, but not too

12      nuanced.  There's a trust relationship.  It doesn't run

13      to them.  They have no standing to assert it.  That is

14      what we believe the evidence is going to show.

15              We intend to prove our case from records of the

16      past 250, some are as old as 300 plus years.  That is

17      not an easy task, although I do think that there are

18      some milestones, some landmarks that are unarguable

19      along the way, and we hope to be able persuade the

20      Court that it's those landmarks that need to be looked

21      to, instead of the likelies, piled on top of likelies,

22      piled on top of likelies, which I think, at the end of

23      the day, aren't what we're supposed to do in a court of

24      law, even a court of law acting as a court of equity.

25      I dare say even, even as a court acting as a court of

1    maritime, okay, but it's a court of law.  And so I

2    think we need to try to avoid that.  And I think that

3    is all that CJI's case is based on.

4         Who are the parties?  Shearith Israel, we were

5    here first only by a few years, okay?  No one is

6    claiming anything because of that.  In 1654 we came, we

7    established the congregation.  Peter Stuyvesant wanted

8    to throw us out --

9         THE COURT:  Could you slow down just a little

10   bit; it's because of the court reporter.

11        MR. SOLOMON:  Of course.  I apologize.

12        THE COURT:  All right.

13        MR. SOLOMON:  It's just always where I come from

14   just to say, "Counselor, slow down."  So I apologize.

15        We fought back Peter Stuyvesant in 1658.  Jews

16   started coming to Newport also were also Western

17   Sephardic Jews.  There was a close connection between

18   them, and we act for many constituencies, not just the

19   Jews of Newport, okay?

20        We act for the Jews of Newport as follows:

21   Congregation Shearith Israel owns the Touro Synagogue,

22   the grounds, the building, the contents.  And we own

23   that for the benefit of the Jews of Newport.  And all

24   of the asservations that we won't say and we don't mean

25   it, okay, they amount to nothing.  It's not true.

1        What we do say, what we do assert is that we

2   have no trust relationship with CJI, the latecomer to

3   the party.  The confusion here is that they think they

4   can tell your Honor what's best for the Jews of

5   Newport.  They have no legal basis to do so.

6        The Touro Synagogue is managed by, is leased to,

7   Congregation Jeshuat Israel.  We do seek to preserve

8   the Touro Synagogue.  We do seek to do it for the Jews

9   and the Jewish society of Newport.  And I do not mean

10  to exclude, by the way, anyone, your Honor, by saying

11  that.  It's for their benefit.  But it's a far broader

12  benefit than that, and there are far broader

13  constituencies than that.  I don't think you run

14  roughshod over people's property rights because of

15  that.

16       But we're ever mindful that there's a broader

17  constituency here, that Touro Synagogue does act as a

18  place that embodies the, sort of the fundamentalism,

19  the fundamental precepts, I have a slight -- the

20  fundamental precepts of opportunity, of religious

21  freedom, okay.  So do the rimonim.  That's why they

22  need to stay there.  That's why they are part and

23  parcel of it.  But there's no question about that.

24       How do we, how did we or how have we gone to

25  protect these, these interests?  Well, we have letters.

1    We have writings.  We have a constitution and bylaws

2    that learned counsel never made reference to in his

3    opening.  We have indentures with leases.  It's an

4    indenture with a lease, frankly, except that the

5    indenture does more than the lease.  I don't know why

6    it's called an indenture with lease, but it is.  And

7    your Honor maybe will help us figure that out.

8         THE COURT:  I was hoping you were going to help

9    me figure that one out.

10         MR. SOLOMON:  Well, we don't have any lawyers

11    we're calling, but I do believe that we have a witness

12    who can try.

13         Who is CJI?  What is CJI?  They were established

14    in 1893.  Enough said.  Most of the action was over in

15    1893.  The Newport congregation had already failed.  We

16    had already resurrected, helped resurrect it.  It was

17    already flourishing by the time CJI came into

18    existence.  I'll show your Honor that in the

19    chronology.

20         CJI is not a person.  CJI is not Jewish.  CJI is

21    not the Jewish society of Newport.  CJI is a juridical

22    entity, a juridical entity, and it is entitled to the

23    respect as it has, a juridical entity.

24         But it can't sort of, you know, put a mask and

25    the glasses and a mustache on to be something that it's

1       not.  It is not the Jews of Newport.  It is not the

2       Jewish society of Newport.  That phrase has both a

3       horizontal component and a vertical component.  It's

4       the only way I can think about it; I'm sure it's

5       probably not very useful.

6               The horizontal component is that when Shearith

7       Israel helped reopen the Touro Synagogue in the 1890s,

8       there were Jews fighting with each other there about

9       who was going to take control, and it was Shearith

10      Israel who said this synagogue is going to be open to

11      all Jews.  That's what the proof is going to show, and

12      it's a remarkable sort of discord with what counsel has

13      said.  That's what happened.  And so, horizontally, we

14      stand as overseer to make sure that the Touro Synagogue

15      is, in fact, open to all Jews.  We did then, and we

16      still do.

17              And I think there's a vertical component to the

18      Jewish society of Newport, and that is that this is not

19      just for now.  And so there was a 70-year period, as

20      your Honor knows, a 70-year period, as your Honor will

21      learn, when the property was abandoned, vacant.  We

22      stood by it then, and the proof will show your Honor

23      what we did.

24              We are here now in 2015.  In 112 years, perhaps,

25      the next time these two congregations unfortunately

1    have a lawsuit, we intend the congregation of Newport

2    will still be there.

3        And so this concept of the Jewish society is not

4    narrow, is not focused.  It's broader, both

5    horizontally, both geographically, both by type of Jew,

6    and vertically over time.  CJI is not that.

7        These are copies of rimonim.  They adorn the

8    Torah.  They play a very distinctive role in the Jewish

9    service.  They have only a ritual use.  It's not like

10   other things that, you know, you take them outside and

11   do something else with it.  Their job is to stay with

12   the Torah.  And they're not used outside the synagogue.

13   And you don't handle them.  Jewish practice, it doesn't

14   handle them in ways that you handle other properties.

15       These particular rimonim, these Myer Myers

16   rimonim are, in fact, the embodiment, to give your

17   Honor a little history that your Honor will get in the

18   proof.

19       We've had our place of worship and the

20   Philadelphia congregation's place of worship, and but

21   for the hiatus down in Newport, we have had an

22   uninterrupted period of use of religious objects by

23   Jews that is, in fact, not completely unheard of, but

24   very close to unheard of.

25       Jews had pogroms.  Jews had their synagogues

1    burned.  Jews in various countries, and certainly in

2    the West, have not enjoyed their liberties and their

3    freedom.  And these rimonim, which were made by a

4    Jewish silversmith, the first person to enter the

5    guild -- the first Jew to enter the guild since the

6    1300s -- made those rimonim.  He made them for use, and

7    they have been in use.  And this is the part of the

8    case that we, that I do not think encroaches on

9    religion, but I also think cannot be overlooked.

10       And the suggestion that the instantiation of

11   American exceptionalism where this incredible freedom

12   allowed a Jew, of all things, to create ritual objects

13   that then a Jewish congregation can use over a long

14   period of time, isn't the stuff for a museum.  The very

15   use of it is what embodies, it is what manifests the

16   success of America.  And we want them to continue to be

17   a part of that.

18       And this idea, this casual idea, well, let's

19   send them to a museum because a lot of people will see

20   them?  Shearith Israel loans its ritual objects.  We've

21   never objected to them loaning the ritual objects.

22       This idea that, well, we never objected before.

23   It's because they never tried to sell them before.

24       And loaning is a good thing.  Loaning opens up

25   to a different public.  We then get them back.  The

1    reason we haven't done that since 2012, they sued us,

2    and we'll have to sort out how long the museum should

3    hold on to them.  I don't have a -- I don't think we

4    need to worry about that right now.  But we do loan

5    them.  There's nothing wrong with that.

6          But their fundamental use is to use; and having

7    overlooked that, CJI, I think, made a very serious

8    mistake.  It's not just that they don't own them.  It's

9    that they want to treat them in a way that removes them

10   from Rhode Island.  It removes them from the use being

11   made of them.  And with that sort of, sort of, they

12   then become relics.  Relics isn't what this country is

13   about.  It's not what the rimonim are about.  So I

14   guess one thing we can agree on is there's a lot at

15   stake.  Okay.

16         Now, there are two sets of Myer Myers rimonim

17   that are located at the Touro Synagogue; one CJI wants

18   to sell, and one came from Caroline Cohen.  The record

19   that your Honor will see about these Caroline Cohen

20   rimonim I think is a good sort of exemplar of what

21   we're really talking about here.

22         In 1892, so your Honor will know that that's

23   before CJI even came into existence, Caroline Cohen

24   wrote to the minister that's, you can think of it as a

25   rabbi, I think, easily, the head religious person who

1    was there dealing with Jews of Newport, because there

2    were Jews in Newport.  We had already rededicated the

3    congregation in 1883.  So there were already Jews

4    there, long before CJI came on the scene, long before,

5    meaning a decade.  And she wrote of loaning a pair of

6    rimonim, that were in her possession, to that rabbi.

7          In 1893 that rabbi dies, and what she says is

8    that she desires -- she wrote to us, to Shearith

9    Israel, and in the letter she says she desires Shearith

10   Israel to take charge of the silver bells lent by me to

11   the late Reverend A.P. Mendes to be used at Newport

12   subject to your approval.

13         This is one of those documents that we maintain

14   the proof will show was a limited authorization whereby

15   we wanted to make sure that ultimately we could be

16   careful who ultimately would have these ritual objects,

17   this silver.

18         And what I find very interesting about this is

19   that Mr. Naftalis sort of casually says, Oh, CJI owns

20   them; when there's letters, specific letters giving

21   them to us and making their use at Touro subject to our

22   approval.  And that's what he claims they own.

23         And when your Honor wants to go through, and I

24   wouldn't suggest it frankly, but when your Honor wants

25   to go through the catalogs of museums, what I believe

1    that's kind of fifth-order evidence, it's not going to

2    -- frankly, at the end of the day I don't think it's

3    going to get us anywhere because none of them purports

4    to be doing the provenance research as to who owns

5    what; right?  Most of them say, well, you know, they're

6    located at Touro; they're the property of Touro.  Not

7    CJI.  Some of them talk about CJI.  None of it matters

8    because they don't prove anything.  It's not going to

9    be evidence that I believe your Honor is going to take

10   seriously.

11       But the same museum catalogs refer to these in

12   the same way, and as to these there's no issue.  I

13   don't think there's a legitimate issue anyway.  Okay.

14       How did it all begin?  Okay.  Eighteenth

15   century, I already told your Honor about.  Congregation

16   Shearith Israel was ambulant, ectatic, excited, happy

17   there was going to be a congregation in Newport.  We

18   raised funds for it.  We spent about a tenth of the

19   total cost.  And the proof will be that when the

20   Newport congregation ran out of money in roughly 1761,

21   they came back to Shearith Israel and didn't get a lot

22   from others, did get from Shearith Israel, and they

23   were able to actually finish the building.

24       There were gifts.  They're documented.  They

25   don't include the rimonim.  We have a record of what

1    was given.

2          One can be certain, I believe it's fair to say,

3    that Myer Myers didn't give them away, and I don't

4    fault him for it.  The rimonim that we have, he sold to

5    us.  The rimonim that Mikveh Israel in Philadelphia

6    has, he sold to them.

7          And so the idea that he didn't sell these, I

8    think, is not to be taken seriously.  No bill of sale,

9    at least that they have.  We have records, and our

10   expert will explain to your Honor why we believe we

11   actually did pay for these.  It doesn't matter because

12   the congregation thanked us, and I think the letters

13   are, is gorgeous and the language is gorgeous.

14         But then Congregation Yeshuat Israel in Touro

15   Synagogue, it failed.  It was demised.  The

16   Revolutionary War started.  The CJI, the former CJI

17   rabbi, who was also a historian, who took the job in

18   part to write the history, said that the conflict with

19   Great Britain was a death blow to the prosperity of the

20   city of Newport and, in particular, to the Jewish

21   community of the town; that by the late 1790s there

22   were no services there.  They shut their doors in about

23   1892 when the last Jew left Newport, and the doors were

24   then locked.

25         We then took possession, control and title.

1          I think your Honor wants to look with particular

2     care with a lot of the third-party public articles that

3     are not themselves evidence and were not for the

4     stipulation.  And it's at least our confidence that the

5     Court is going to sort through the real.  And then what

6     just gets repeated as error over centuries, I don't

7     think would ever be evidence.

8          But here your Honor has that, what the public

9     perception was, since Mr. Naftalis claims the public

10    perception matters, is that the last representatives,

11    when they left, formally handed over to the active

12    congregation, Shearith Israel in New York, the title to

13    the closed synagogue, the burial ground, and other

14    communal property.

15         And when Mr. Kusinitz, who is, was a CJI

16    president and called their official historian for a

17    time, the way he describes it is that when the Seixas

18    family left Newport and moved to New York, they became

19    members of Shearith Israel.  We later assume -- and

20    therefore we assumed *de facto* ownership.  And later on

21    the heirs turned over legal rights to the trustees, and

22    Shearith Israel became *de jure* owners, and that's what

23    the CJI president and historian has said.  And what

24    happens during this period is that -- nothing.  There

25    are no Jews there.  It took from 1820 something to 1880

1    for Jews to start coming back.

2         And who was looking after this synagogue during

3    this period?  The city of Newport was doing its share.

4    It had money from the Touro brothers.  And Shearith

5    Israel was doing its share.  And the only entity that

6    had any role in the religious life of this closed and

7    thought to be more abundant entity, congregation,

8    edifice, was Shearith Israel.

9         And when there were -- when burials needed to

10   take place, it was Shearith Israel who sent its clergy

11   to do them.  And when a wedding had to take place or

12   wanted to take place, it was we, Shearith Israel, who

13   sent its clergy.  And when there was a question about

14   what could be done within the cemetery, how a body

15   could be buried, what it could be buried with, it came

16   to us.  And the record will show, your Honor, that we

17   decided how it was to be and then we did it.  And we

18   didn't take anything for it.  And it would have been

19   very easy to wash our hands of it, and we stood by

20   because, because we do feel a commitment to the space

21   and to the Jews and to have a habitable comfortable

22   place for them to live.

23        In 1852, I find this undoubtedly more meaningful

24   than anyone else.  Henry Wadsworth Longfellow, no

25   slouch, right, wrote this beautiful poem about the

1    Cemetery at Newport.  And he says:  "Gone are the

2    living" -- but not the dead, right -- "but the dead

3    remain."  And then he says:  "What once has been shall

4    be no more!  The groaning earth in travail and in pain

5    Brings forth its races, but does not restore, And the

6    dead nations never rise again."

7         And whether he was talking about Newport or

8    whether he was talking about Jews in general, he

9    actually believed that they were going to be no more.

10   And the reason that he was not right, the reason both

11   that the cemetery was green, and the reason why Jews

12   ultimately came back, was because of the watchful

13   oversight of Shearith Israel.

14        Where are the rimonim -- I feel a little bit

15   like Alice's Restaurant; I have to keep reminding

16   myself, oh, yeah, right, this a song without Alice.

17        This is a case about the rimonim.  Where are

18   they during this period?  We have them in New York.

19   This is a copy of the inventory that was made.  The

20   board of Shearith Israel had asked for a complete

21   inventory of all of the property that we both owned and

22   held for others, and painstakingly that was done by the

23   head ritual rabbi, he was called a hazzan of Shearith

24   Israel, and we have references here to the very rimonim

25   that we're talking about.

1      What is significant here is not only that they

2   are said to be property of kahal -- kahal in Hebrew is

3   the congregation, meaning Shearith Israel.  In the

4   keeping of the shamas.  The shamas is the equivalent of

5   the sexton.

6      So it not only says, with respect to the rimonim

7   that they tried to sell, that they are the property of

8   Shearith Israel; but on the left-hand side your Honor

9   will see, and the proof will show, that when we were

10  holding objects for others -- and that was common, your

11  Honor, that the religious institution would hold the

12  objects, but they would belong to other people.

13  Because a Torah scroll, for example, has to be in a

14  particular place and treated in a particular way.  And

15  so they would be in our possession.  This is throughout

16  the world this is what happened.

17      And so when there was a pair of rimonim that was

18  owned by S or L.I. Cohen, it says that.  And when it

19  was owned by -- I can't read the next one, I use the

20  transcriptions -- these other two people who are down

21  there, it says that.  And it doesn't say that about the

22  Myer Myers rimonim because Shearith Israel owned these,

23  or at a minimum we believed we owned them, and that

24  makes all the difference, given the events that

25  happened here.

1          So Shearith Israel enables the rebirth of the

2     Jewish congregation a decade before CJI comes into

3     existence.  We are sending ritual objects back for a

4     congregation to use.

5          Well, who is the congregation?  We supply the

6     rabbi.  We bring the ritual objects back.  And what

7     first began as only a few days a year and then became

8     more, we received help from Newport in terms of funds

9     to pay the rabbi.  We are still using our own money,

10    but when we're sending things back we actually don't

11    know whether this next iteration, this next will

12    incarnation is going to last.

13         And so we send them up with letters of

14    authorization.  These are limited authorization letters

15    I believe legally -- step out of the story for a

16    minute -- legally.  They are very important documents

17    because they show that whatever we sent up we sent up

18    pursuant to writings that made sure that whoever was

19    receiving them would have to give them back when they

20    were done, or when they weren't needed, or when we

21    asked for them.

22         In 1883, the Newport synagogue then started to

23    become known as Touro Synagogue because the Touro

24    family was both its first rabbi, or rabbi-like, and

25    because the Touro brothers had given money that the

1   city had to support it.  So the Touro Synagogue is

2   reconsecrated.  This is a decade before CJI even

3   exists.  And when we send it up we, again, have one of

4   these limited authorizations documents that say we are

5   sending up ritual objects, we're sending up seforim,

6   meaning the Torahs, to be used at Touro Synagogue,

7   quote, during the pleasure of the board.  Okay?  And

8   that is one of the ways that we protected these ritual

9   objects from having someone later come and try to take

10  them away from the Jews of Newport, to take them away

11  from where they should be used.

12      Now we have CJI.  Now, CJI is not a successor,

13  in any legal sense, of Yeshuat Israel.  This is one of

14  the historians, Adelman, who writes that the CJI and

15  the other warring faction confusingly called the Touro

16  congregation in the late 1890s were in no sense

17  continuous with the original congregation, Yeshuat

18  Israel, and therefore they did not acquire any rights

19  to the property, real or personal, that the original

20  congregation Yeshuat Israel possessed.

21      I believe any way your Honor wants to measure

22  successorship, factually or legally, CJI is not a

23  successor.  It doesn't prevent them from carrying out

24  their true role.  It does prevent them from usurping a

25  role that is not theirs.

1    So they, in fact, had nothing.  They wanted to

2    form a congregation, and they did.  And in their

3    organizational meeting, the Minutes reflect that they

4    asked us, they requested of Shearith Israel -- Shearith

5    Israel has had five places where it has been since

6    1654, five different places in New York.  At that time

7    it was on 19th Street, before it moved 70th Street.

8    And it says, that we request of Shearith Israel -- and

9    they said the 19th Street congregation -- the further

10   assistance, which they have in the past rendered, in

11   the loan of such property as has formally been in use

12   in the services.

13       That's right; they understood that.  They were

14   on loan.  It's a very long loan.  I hope that, I hope

15   that in a thousand years they continue to be there.

16   But it's a loan and it means you can't take it and sell

17   it.  It's a loan, and they knew it was a loan.

18       We -- at the beginning of this relationship,

19   counsel is right that we objected to the use of the

20   name Jeshuat Israel because we think it was confusing

21   to Yeshuat Israel.  But the idea that at that point the

22   legislature then decides everything and means that they

23   can then usurp our rights as owner, I think goes way

24   too far.

25       So they won this battle.  They got the name.

1    But they didn't have anything.  They didn't have a

2    place to worship, because that same legislature

3    protected Shearith Israel's right to figure out who

4    should be worshiping there.  And they didn't have

5    anything to worship with.  They had nothing, because

6    that same legislature protected Shearith Israel's right

7    to its appurtenances, its paraphernalia.

8        These are words that I think are not going to

9    bear this sort of tortured and truncated reading that

10   CJI wants to give them.  I think the parties knew

11   pretty well that they were all talking about, well, you

12   got the place, and you got the things that you use in

13   the place.  And they used a lot of different language

14   for it.

15       In 1893 we give to the next rabbi, the rabbi who

16   takes the place of Rabbi Mendes, who we saw just died,

17   we give to him -- not to CJI -- because weren't quite

18   sure what they were about just yet, and we say that

19   you are empowered to use the seforim, meaning those are

20   the Torah scrolls; the bells, those are the rimonim;

21   the books, the shofar, and all other appurtenances for

22   worship.  And, it says, subject to the conditions set

23   forth in the letter of May 5 -- to the mayor of June 5,

24   and your Honor will see that in the proof.

25   (Reading) Upon termination of your appointment, you

1    will return to us, or to our agent or legal

2    representative, the custody of the buildings and

3    appurtenances.

4         And what's clear is that anything we were

5    sending up there we were sending up there with a string

6    attached, yes, and the string hasn't had to be yanked

7    actually since then because nobody ever tried to sell

8    what's not theirs.  They loaned what's not theirs;

9    good.  They refurbished what's not theirs, largely at

10   the expense, by the way, of our congregant.  But we'll

11   get to that.  But you can't sell what's not yours.

12        Then CJI tries to get the silver.  This is from

13   the wife of the Reverend Mendes who had just died, and

14   said please let us get at this silver, and she did not.

15   It did not happen.  And they ignore all of this.

16        They then came to us and said certainly we do

17   not claim any ownership to the property.  We don't

18   claim any ownership to the property, said CJI, in its

19   first year of existence.  We don't claim ownership in

20   the property or appurtenances.  Of course they didn't.

21   They had nothing.  They entered bare.

22        So they came to us and they asked us to loan,

23   and we did, once we figured out whether the

24   congregations, the people up there, could not exclude

25   the other one.  Because this edifice, this place of

1    worship was, from our perspective, going to be open to

2    everyone.  Okay?

3         CJI in 1893 says, well, you really need to show

4    us some proof, you know, because, I mean, do you own it

5    or not?  That is what prompted us to go get the deeds

6    that they now are talking about, the deeds I think that

7    helped them not at all because these deeds are not held

8    in trust for CJI.  And it's quite meaningful at this

9    point that they are not held in trust for CJI, because

10   CJI exists.  They're held in trust for the same people

11   we had been hoping would come back, and that is the

12   Jewish society of Newport and the people that we're

13   still trying to protect.

14        We cemented that relationship with a

15   constitution and bylaws of 1897 which on its face says

16   it cannot be amended without our consent.  It made

17   Shearith Israel, it gave us four seats on the board and

18   critically said that you can't sell any property

19   without a unanimous board vote.  And it also said that

20   that paragraph can't be amended without our consent.

21   And we didn't do that so we could take them back and we

22   could sell them and pocket the money.  We did that so

23   that they would be forever available to the Jewish

24   society of Newport.

25        There are four lawsuits.  On Page 39 of the

1      pretrial memorandum, CJI said to your Honor, "Before

2      this lawsuit Shearith Israel never sought to exclude or

3      evict Jeshuat Israel from the Touro Synagogue." Well,

4      it's right, except that it's wrong. And at the end of

5      the 19th century there was, in fact, a lawsuit. First

6      there was a lawsuit involving the Touro congregation;

7      right? That's confusingly similar. And then there

8      were several relating to CJI where they were actually

9      breaking and entering.

10          Now, your Honor is going to be able to read that

11     opinion. Your Honor is going to be able to see whether

12     the claims were or could have been brought. Your Honor

13     will apply the rule of *res judicata* as appropriate to

14     it. But, as a factual matter, we won, they lost.

15     Everybody knew that. And the doors were locked. They

16     were evicted.

17          And so this is a second moment where I think

18     that although some of the letters and some of the early

19     correspondence may be a little confusing, there's no

20     confusion about this. By order of us, we lock the

21     doors. And inside where the rimonim. They admit that

22     in their complaint.

23          So they were out on the street. CJI had

24     nothing. We locked the doors. We go through the

25     litigation. And, as a result of that, here's a

1    picture, your Honor, of the doors open.  And here's a

2    picture of the doors closed.  And there is a picture

3    right in the center of one of the locks.

4        And we went through the litigation, several

5    different litigations; in each case Shearith Israel

6    being told that we have right to possess the property,

7    they do not; that we have right of -- a replevin action

8    was made with respect to a Torah that they, that a

9    faction of them said they owned.  They were told give

10   it back, it belongs to us.  Again, not us so that we

11   can misuse; us so we can use and not sell.

12       And then when we're done, what the public says

13   about this is that the rights of Shearith Israel were

14   completely vindicated, the rights in the Newport

15   synagogue.

16       And your Honor is not going to take this

17   evidence as proof of what happened in the case.  Your

18   Honor is going to read the case.  But it is evidence of

19   the parties' intent when they enter into the lease,

20   when the Jewish Encyclopedia says, right, the courts,

21   after litigation, have sustained our title, that is the

22   state of mind that we went into when we then have the

23   settlement agreement with them in 1903 whereby they

24   admit and recognize, without qualification, the title

25   and ownership of the trustees.

1      Mr. Naftalis says, Wait, it says the trustees;

2  Oh, that must mean you hold it in trust.  No.  That's a

3  confusion that your Honor will sort through.  The

4  reference to trustees in many cases is reference to the

5  Shearith Israel trustees who do hold as trustees for

6  Shearith Israel.

7      The one entity that we don't hold in trust for

8  is CJI.  We hold in trust for Shearith Israel.  We hold

9  in trust with a lower-case "t" for the Jews of Newport.

10  But we don't hold in trust for Shearith Israel (sic).

11      But when they recognize without qualification

12  and they surrender the possession of the building, the

13  premises, and the paraphernalia, they're out

14  completely.  The doors are locked.  We enter into a

15  formal ceremony with the keys that explicitly said

16  let's make sure that all of the personal property is

17  used.  I think it matters nothing at all.  I believe

18  the proof will show that they didn't use magic words

19  that CJI would like now to say should have been done.

20      Everybody knew what was going on.  They were

21  out, and, in order to come back in, needed to enter

22  into the lease, which we had been asking them to do.

23  And they say that, well, it's a symbol, you know, it

24  doesn't amount to very much.  It's a dollar a year.

25  yeah, but it's a dollar that costs nothing but says

1    everything, because it says that they have a lessee

2    relationship.  It says that the lease remains in

3    existence.  It says that Shearith Israel continues to

4    be the lessor, and CJI continues to be the lessee of

5    the appurtenances and of the paraphernalia.

6            And, you know, it may amount to nothing.  In my

7    mind, it means everything.  It means they continue to

8    recognize the relationship that Shearith Israel has to

9    the Jews of Newport.

10           The lease also says that if they overstay or if

11   they breach the lease, they have to quit the premises.

12   So -- down at the bottom -- they will quit and

13   surrender the premises.  So this idea that, well, they

14   actually can say for as long as they want and they're

15   somehow trustees, they're somehow beneficiaries, it

16   doesn't comport with the documents.  And these

17   documents remain in existence.

18           Not only is it -- did we receive rent from them

19   in 2012, okay, but there is another part of this, and

20   that is that the lease requires that we have a role in

21   the appointment of a rabbi, okay?  Which is another

22   reason why changing trustees is, it's lawless, but it's

23   completely unworkable as well.  And we have had that

24   role, and I believe the evidence will show that.  Okay.

25           But when Mr. Kusinitz says that the terms of

1    this, I think it was 1975, the terms of that lease

2    still are adhered to, when Dr. Urofsky in 2013 says the

3    contract, the lease, has held for more than a century,

4    that's correct.  Their own website says that.

5         And I would like to skip through this with great

6    speed.  Your Honor will see all of this evidence of

7    rents and payments of the dollar a year, which means

8    nothing but means everything, and that we were actively

9    involved, and they needed our approval, and we gave it,

10   to their appointment of rabbis.

11        Your Honor will see in more detail than I think

12   anyone should have to, because I think this is not an

13   arguable proposition.  It's not an arguable proposition

14   because all you have to do, your Honor, is do what

15   you're not going to allow the jury to do, and that is

16   go look at their website today.  Because what their

17   website says is that we were handed legal oversight of

18   the building, its contents and the deed.  That is all

19   we need to show to stop them from undermining their own

20   purpose and trying to sell the rimonim.

21        They say that they continue to pay rent to the

22   New York group, and the building and grounds, which are

23   still owned by the New York group.  Let me move on.

24        Ah, so the question is, why am I not sitting

25   down?  Because I do believe that that is the

1    fundamental part of our case.  It is because of these

2    defenses, okay?

3         Now, they say that the 1945 agreement with the

4    federal government required Shearith Israel to

5    preserve, that the 1945 agreement -- CJI says that the

6    1945 agreement with the federal government requires

7    Shearith Israel to preserve, protect and maintain.  And

8    they said it six times in their brief, and Mr. Naftalis

9    said it six times today, without once pulling out that

10    ellipsis and finishing the sentence, because it says

11    that in carrying out the provisions of this agreement,

12    that very paragraph that he's talking about, their

13    obligation shall be performed in accordance with and

14    subject to their respective rights and obligations as

15    lessor and lessee.

16         And they never showed your Honor that, and it

17    determines the issue, because in 1945 the parties fully

18    understood that the lease was still in effect.  There

19    is no obligation on the landlord's part to preserve and

20    protect, defend and maintain.  And so no reason to

21    suggest that we didn't; that we breached it.

22         They have the obligation to do that, as the

23    formal documents reflect.  They again say -- and he

24    said it again today -- that we have little, if

25    anything, to do with Jeshuat Israel during the 20th

1    century.  And I believe the proof will go -- not only

2    is that legally insufficient, because it requires that

3    we would have known --.

4        There's no adverse possession claim or defense

5    made in this case, Judge.  They have equitable defenses

6    of laches, waiver and estoppel, okay, and there's no

7    adverse possession.  But until we know that they're

8    trying to act inconsistently with our rights, there's

9    not even a duty.  I also think that it's factually

10   unprovable.

11       But your Honor will at one point count, or I

12   will count for your Honor, the number of times your

13   Honor was told today that we, as faithless fiduciaries,

14   have done nothing, totally absent; where have we been?

15       In 1905 they want to add to the school building.

16   We say no.  What are we doing involved in this?  Well,

17   because the lease exists.  They want -- they ask again.

18   We say no.  They wanted to change the Touro Synagogue

19   because that's what they thought was the right thing to

20   do at the time.  And we exercised our right as owner,

21   for the benefit of the Jews of Newport, and they

22   accepted that and they acquiesced to that.  1907, 1910,

23   1911; these are moments that the proof will show where

24   we are interfacing with them, where they're trying to

25   do something with the space or with the objects, and we

1    have to assert our rights as owner.

2         1920, in 1926 they cast aspersion to the fact

3    that we went to our members and raised $5,000 for their

4    community center.  They needed a *chochet*,  it's someone

5    who does ritual slaughtering for Kosher food; right?

6    And we helped them do that.  Why are they coming to us

7    and asking us about that?  Because it's the role that

8    we play with respect to them.

9         They needed to put up a monument.  Well, why are

10   they asking us about that?  Why are we giving approval

11   for that?  Because the lease remains in existence.  And

12   the suggestion that we have been absent is totally

13   absent.

14        '58, '68, '78, eighties, nineties; your Honor

15   will see proof that the TSF, which is the Touro

16   Synagogue Foundation, is an entity that did much of the

17   fundraising for the Touro Synagogue.  CJI did not.  The

18   Touro Synagogue Foundation did.  And Shearith Israel

19   was and remains a part of TSF.  So even were it

20   relevant that we needed to fund them -- and we didn't;

21   we had no obligation to do that.  We have no obligation

22   as lessor to CJI at all.

23        We have ample obligations, we recognize them, to

24   the Jews of Newport and to maintain the Touro

25   Synagogue.  Okay.  But that's different.  We would

1    never sell a priceless ritual object so that we could

2    get some money.  We'll find another way to do it.  And

3    if they don't have the perspicacity anymore to do it,

4    then we'll find somebody else who will.

5         2005 we write, on their behalf so they can get a

6    loan, that we are legal owner and historic steward of

7    the Touro Synagogue.  And they then, in 2004, wrote a

8    similar letter, and they wrote us and they said thank

9    you very much, CJI wrote such a nice letter, thank you

10   very much for helping us get this, get these funds.

11   Right?  And all through the century, of course, they're

12   using the space rent-free.  So we never hear from them

13   about the benefits of having a rent-free space, which

14   they, in fact, have had.

15        Now, is any of this held by the trust?  I think

16   it's all confused by the trust.  I think they have even

17   less of a case if there is a trust that runs to them.

18   There is no trust that runs to them, and I believe that

19   this is very confusing if -- and we will get into it.

20   Any trust that exists is for Newport Jews, not CJI.

21   CJI has about a hundred members.  He said about a

22   hundred 30.  The proof is going to be 70, 80.

23        There are a thousand Jews in Newport, and they

24   should be accessing them.  And they should be accessing

25   the six million in America.  And they should be

1    accessing non-Jews.  And they should be getting money,

2    if they need an endowment, they should be going and

3    getting it in a way that doesn't sell a birthright that

4    is not theirs.

5        So I don't think that even if they can prevail

6    and show that there's somehow a trust and they somehow

7    are the beneficiaries of that trust, that the inmate,

8    if you will, that the trust, the beneficiary then gets

9    to turn around and say thanks very much; I think I'm

10   going to sell part of the corpus.  I don't think trust

11   law works that way, and I don't think the facts are

12   going to work that way.

13       In 2012 when they sued us, while we were having

14   discussions and they sued us, they say, and Bea Ross

15   says it here, she said it -- and Mr. Katz will be

16   here -- she says, Don't worry; we're going to take the

17   money that we get and we're going to put it into an

18   endowment, and if the congregation in Newport ever

19   ceases to exist and responsibility for the synagogue

20   returns to Shearith Israel -- which in my mind actually

21   says it all -- she says, the income will also go to

22   you.

23       We don't want their money.  They shouldn't want

24   the money.  This so misunderstands and misapprehends

25   what these religious objects are about and what their

1    role as stewards is, that they either need to -- that I

2    hope at the end of this case your Honor will explain

3    them.  They have certainly lost their way.

4         Now, your Honor will see in the proof that it

5    does feel a little bit like every 10 or 20 years

6    there's a little discussion, a dialogue, an eruption

7    between the two.  Up until now it has been cordial, it

8    has been transparent, nobody has misled, at least not

9    that we can tell, has misled us.  That's only very new;

10   it's only very recently.  But there have been these,

11   and one wonders, well, why does it, sort of, have to

12   keep going on?  And it's their, their presidents, we

13   will show your Honor the proof, who actually finally

14   went -- came down to Shearith Israel, looked at the

15   records, went back, and in a formal way said I want

16   this to be part of the Jeshuat Israel, the CJI record,

17   that we own it and we have this relationship.

18        Now, have we been overbearing landlords?  We

19   have not.  They didn't want us to be overbearing

20   landlords.  In fact, they wanted from time to time to

21   say that -- there's a wonderful document that says,

22   Please release us from the bounds of trusteeship.

23   Okay?  And it was one of their presidents who then came

24   down and then told his board he completely understands

25   the benefits of being affiliated with us, and, in fact,

1  we do have legal rights which we are exercising for the

2  benefit of the Jews of Newport, and then the parties

3  went back to harmonious relations for then another 10

4  or another 20 years.

5          But until now it has been forthright, and until

6  now the dialogue has been transparent.  And that has

7  recently changed.  And what brings us here is because

8  they've sued us, we've now found that they are, in

9  fact, veering off course.  They deceived us.  Their

10 congregants, several of their congregants, in kind of

11 growing chorus, kept saying, when they surreptitiously

12 sought to try to sell these, right, and it was

13 surreptitious; and they make an agreement with

14 Christie's not to disclose it publically.  They tell

15 their own congregants, the record will show, that not

16 to repeat this.  Don't tell anybody.

17         And several of their congregants, who had some

18 history, said doesn't Shearith Israel own those

19 rimonim?  And they didn't pick up the phone.  And they

20 didn't write us a letter.  And they didn't come and

21 visit with us.  And they didn't once say, Listen, we

22 have a problem; this is how we need to solve; we think

23 we want to do it this way.  What do you think?

24         It didn't happen, and it calls into question

25 whether they should remain the lessee, not whether we

1    should be the trustee.  Their conduct calls into

2    question whether they should remain the lessee.

3         They deny in their answer to our counterclaims,

4    they deny that rimonim are sacred religious objects.

5    They deny that they're significant religious articles.

6    Okay.

7         Now, I am not going to argue to your Honor that

8    things that have been said in this litigation should

9    then lead to juridical outcomes, because we're going to

10   need a little guidance from your Honor, and then I

11   believe that the parties are going to go back to the

12   position that they were in when the rights were

13   clarified, and I do believe that.

14        But for them to admit -- and I don't, I'm not

15   talking about this as a litigation posture, but for

16   them to say they have developed a long-term strategy

17   for the use of Touro Synagogue, based on the sale of

18   the rimonim, without obtaining the approval and consent

19   of CSI, is off the reservation.  It's beyond the pale.

20   They're no longer acting as our lessee.  And they are

21   no longer allowing us to act as stewards for the Touro

22   congregation and Touro Synagogue.

23        And the idea what we want to do is to put these

24   in a museum is precisely what Longfellow thought was

25   happening, and what we can not allow to happen.  A

1    museum is lovely.  Gone are the living, but the dead

2    remain.

3         And that's the principle that we have to

4    establish in this case.  And I believe we do it with

5    the documents that are legal in nature and your Honor

6    can adjudicate.

7         I told your Honor that the idea that they're an

8    extremist, that they are facing an existential crisis

9    will not be borne out by the evidence.  Their financial

10    records show that they have made money.  They have

11    about a million and a half dollars in current assets.

12    Before they sued us we suggested, Listen, if it's money

13    that you need, let's sit down and talk about it.  We

14    can help you for 10 years, okay?  And now that we know

15    what the operating expenses are, we were going to be

16    covering about 73 percent of their operating expenses

17    with what we were willing to do for them; and they

18    rejected that, because they have an idea, quite

19    antithetical to the proper running of this place of

20    worship.  It's not, for them, about that anymore.  It's

21    about a vanity endowment.

22         The position that they're taking here has led

23    them to radical inconsistency with the documents that

24    they have, in fact, signed; on the basis of which

25    they've made representations to the federal and state

1    governments, and on the basis of which they have gotten

2    money.  They acknowledge that we are owners and that we

3    are the lessors in these documents.  In the 1945

4    agreement it says the title to the Touro Synagogue and

5    its appurtenances shall remain in the Shearith Israel

6    trustees.  Inconsistent with what they're telling you

7    now.

8         To the National Register of Historic Places, in

9    1989 they acknowledge that title to the Touro Synagogue

10   passed to Shearith Israel when the synagogue was

11   closed.  No issue about trust.  There's nothing like

12   that.  This is what they say.

13        And they also say, and this is their input,

14   which leads to the Historic Places Register making a

15   report, they also say that the rimonim are part of this

16   *genius loci*, this sense of place, they are part and

17   parcel, they're integral to the religious experience

18   there.  That's what they want to rip out, okay?

19        In 1999, to the National Historic Trust, they

20   say management of the synagogue is carried out by its

21   officers, but Shearith Israel is the owner.  And that's

22   correct.  And, in the operating agreement that they

23   entered into with the National Trust, they say that

24   they have possession of the site, and by "the site,"

25   your Honor, it includes both the property and the

1    artifacts.

2         Through a lease with Congregation Shearith

3    Israel as owner, they called the rimonim "appointments

4    of the place."  The grant application says that the

5    lease is still in effect.  This is the DX375 about

6    which your Honor has heard just a very little.

7         And what here are we asking for?  Well, as I

8    said at the outset, it was a 112 years ago that we

9    needed to burden the federal courts the last time.  I

10   hope it will be 2127 before we are back.

11        Shearith Israel wants the Touro Synagogue to

12   thrive.  It wants it to stay true to its history and

13   its purpose at the same time.  We want the rimonim to

14   stay at the Touro Synagogue and in Rhode Island.  And

15   we want to do what we've done for 250 years, and that

16   is preserve that synagogue both in space -- it's not

17   going to be exclusionary -- it's going to rule all

18   people to come and pray, and in time, now and forever

19   in the future, okay?

20        But the rimonim, like the synagogue, and unlike

21   the cemetery, must remain active and living and vibrant

22   and itself a testament to the continued vitality to the

23   principles that they reflect.

24        Thank you very much, your Honor.

25        THE COURT:  Thanks, Mr. Solomon.

1           Mr. Solomon, when you get a chance could you

2    copy the slides and give them to the clerk.  It doesn't

3    have to be today; just at some point.

4           MR. SOLOMON:  We'll be happy to, your Honor.

5           THE COURT:  Great.  Thank you.

6           MR. NAFTALIS:  We can get a set too?

7           MR. SOLOMON:  No.

8           THE COURT:  I'm sure, yes.

9           MR. NAFTALIS:  I would have expected a no.

10           MR. SOLOMON:  Yeah.

11           THE COURT:  We're going to break for lunch.

12    We'll be back at 1:30.

13           (Lunch Recess)

14           THE COURT:  Plaintiff going to call its first

15    witness.

16           MR. NAFTALIS:  Yes.  Jeshuat Israel calls David

17    Bazarsky as its first witness.

18           THE COURT:  It's a landmine out there,

19    Mr. Bazarsky, so come right over here.

20           THE WITNESS:  As long as I don't trip.

21           THE COURT:  Yes.  And if you would, when you get

22    there, just remain standing and Ms. McGuire will swear

23    you in.

24           DAVID BAZARSKY, PLAINTIFF'S WITNESS, SWORN

25           THE CLERK:  Please state your name and spell

1    your last name for the record.

2              THE WITNESS:  David Bazarsky, B-a-z-a-r-s-k-y.

3              THE CLERK:  Thank you.  You may be seated.  Just

4    pull the microphone in.

5              THE COURT:  It's very fungible, so just pull it

6    right up to your mouth and speak right into it.

7              THE WITNESS:  Thank you.

8              MR. NAFTALIS:  Your Honor, we put together a

9    book of exhibits.  I think we're going to try to do it

10   here, too, but I make no promises how well I'll do that

11   part.

12             THE COURT:  I'm old enough that paper still

13   beats a screen any day.  Thank you.

14             <u>DIRECT EXAMINATION BY MR. NAFTALIS</u>:

15   **Q.**   Good afternoon, Mr. Bazarsky.

16   **A.**   Good afternoon.

17   **Q.**   Mr. Bazarsky, where do you live, sir?

18   **A.**   I live in Newport, 59 Kay Boulevard.

19   **Q.**   And you say Newport.  Newport, Rhode Island?

20   **A.**   Correct.

21   **Q.**   And were you born and raised in Newport?

22   **A.**   I was.

23   **Q.**   And have you lived -- and did you grow up and go

24   to school in the Newport area before you went to the

25   university?

1    **A.**    Well, I went through the eighth grade in Newport,

2    and then I went to boarding school starting the ninth

3    grade.

4    **Q.**    And then did you go to university?

5    **A.**    I did.  I went to Boston University for college.

6    **Q.**    And did you go for any advanced degree?

7    **A.**    Yes.  I went to the University of Miami and I

8    received my JD degree and my LLM.

9    **Q.**    Have you lived your adult life in Newport?

10   **A.**    Most of it.  There has been a period of probably

11   10 years that I haven't lived in Newport.

12   **Q.**    And what do you do for a living?  You're a

13   graduate of law school.  Do you practice law?

14   **A.**    I do not.

15   **Q.**    What do you do for -- to earn a living?

16   **A.**    I have a company called Samuels Realty, and I

17   manage and develop real estate.

18   **Q.**    And are you familiar with Congregation Jeshuat

19   Israel?

20   **A.**    I am.

21   **Q.**    And are you a member of Congregation Jeshuat

22   Israel?

23   **A.**    I am.

24   **Q.**    And how long have you been a member of

25   Congregation Jeshuat Israel?

1    **A.**   Well, I've been an individual member since I moved

2    back to Newport in 1979.  Prior to that I was -- my

3    parents had a family membership, so since I was born I

4    have been a member.

5    **Q.**   What is Congregation Jeshuat Israel?

6    **A.**   It is a congregation of Jewish families that

7    worship in Touro Synagogue.

8    **Q.**   And throughout your whole adult, throughout your

9    whole life since you were a kid, up to today, has

10   Congregation Jeshuat Israel been the congregation at

11   the Touro Synagogue?

12   **A.**   Yes.

13   **Q.**   And Congregation Jeshuat Israel is the -- prays at

14   the Touro Synagogue?

15   **A.**   Yes.

16   **Q.**   And there's no other congregation praying there

17   during this period of time?

18   **A.**   That's correct.

19   **Q.**   What is the Touro Synagogue, sir?

20        MR. NAFTALIS:  Can we put up Exhibit 281.

21   **A.**   Touro Synagogue is a house of worship that was

22   built in 1763.  The architect was Peter Harrison,

23   and --.

24   **Q.**   And showing you Exhibit 281.

25        THE COURT:  Hold on.

1          MR. SOLOMON:  Your Honor, I too would like the

2     ground rules laid.  Obviously the witness doesn't have

3     personal knowledge.  He hasn't been qualified.  He's

4     not an expert.  This preliminary back and forth I think

5     is fine, but.

6          THE COURT:  I'm glad you so ruled, Mr. Solomon.

7          MR. SOLOMON:  I meant with respect to my

8     objection, Judge.  Unless your Honor actually wants to

9     hear this testimony from people that are not qualified,

10    I would object.

11         THE COURT:  The objection is overruled.  You can

12    continue.

13         MR. NAFTALIS:  You want to read the --

14    **Q.**   Do you remember where you were?

15    **A.**   Yes.  I mean, and it is the Jewish synagogue for

16    the congregants that live in Newport.

17    **Q.**   And Exhibit 281, I think I was mentioning -- when

18    the objection came out I lost my train.  Had you

19    identified Plaintiff's Exhibit 281 as a picture of the

20    exterior of the Touro Synagogue?

21    **A.**   It is.

22         MR. NAFTALIS:   And could we put up Exhibit 314.

23    **Q.**   And that, Mr. Bazarsky, could you tell us what

24    Exhibit 314 is?

25    **A.**   It is a wide-angled photograph of the main

1    sanctuary of inside the synagogue.

2    **Q.**    And if you could --

3        THE COURT:  Mr. Naftalis and Mr. Solomon, so I'm

4    clear and the record is clear, we've had pretrial

5    discussions about the admission of exhibits and the

6    parties filed a stipulation concerning exhibits.

7        Am I assuming that we're proceeding under the

8    stipulation in terms of these exhibits; that is, that

9    the exhibits that are being identified now are full,

10   admitted exhibits, absent the filing of objections,

11   which both of you did to a limited number.

12       MR. NAFTALIS:  That's my understanding, your

13   Honor.

14       THE COURT:  Mr. Solomon.

15       MR. SOLOMON:  That is right, your Honor, except

16   that we have asked for, and I think your Honor has

17   permitted us, I think the stipulation, of course, that

18   we preserved our objections to be able to argue to your

19   Honor at a --

20       THE COURT:  Absolutely.  The stipulation

21   contains the full extent of it.  I just wanted to make

22   sure the record is clear.  Normally what happens is we

23   move the admission, and the Court rules on it.  But

24   because of the fine work you all did coming to an

25   agreement, we're able to bypass that procedure and the

1      exhibits that are referenced are, in fact, fully

2      admitted exhibits, absent the objections process that's

3      contained in the stipulation.

4                  MR. SOLOMON:  Correct.

5                  THE COURT:  Great.  Thanks.

6      **Q.**   If this is the right picture to use, Mr. Bazarsky,

7      can you just identify for us the different parts of the

8      synagogue and so on.

9      **A.**   Sure.  So in the lower center where you see the

10     red cloth, that is the *bema* where the rabbi stands.

11     And that is actually more in the center on the first

12     floor.  It's, it's not quite representative in this

13     photograph, but it's more in the center.  And then if

14     you look at the far center, you'll see the ark outlined

15     in red.

16                  THE COURT:  Mr. Bazarsky, you can actually touch

17     the screen and circle and do various things, if that

18     helps your testimony.

19                  THE WITNESS:  Okay.

20     **A.**   So I've just sort of put an arrow over where the

21     Torahs are.  And the *bema* is down here in the lower

22     center in red, in an arrow.

23                  The women sit upstairs, and the men sit

24     downstairs.

25                  On the lower left where there's a little

1    partition there, I'll put a little red mark.  That's

2    called the President's Box.  It's called the

3    President's Box because President George Washington has

4    sat there, President Eisenhower has sat there,

5    President John F. Kennedy has sat there, and the

6    president of the congregation, during services, sits

7    there.

8         There are 12 columns, and the 12 columns

9    represent the 12 tribes of Israel.  The synagogue faces

10   east because it's facing towards Jerusalem.

11   **Q.**   You mentioned women sit upstairs, and the men sit

12   downstairs.  Why is that?

13   **A.**   That is tradition in the orthodox part of the

14   religion is that men and women are separated.  They can

15   be separated on left to right with a barrier, or they

16   can be separated top to bottom.  So in Touro Synagogue,

17   the women are on the second floor, the men are on the

18   first floor.

19   **Q.**   Just going through it quickly, there are other

20   branches of Judaism, the Jewish faith; right?

21   **A.**   There are.

22   **Q.**   Conservative and reformed being the two principal

23   ones?

24   **A.**   Correct.

25   **Q.**   In those, is it fair to say that in those branches

1    of Judaism the men and the women are not segregated,

2    that they can sit together at services?

3    **A.**    That's true.  That's called family seating.  And

4    reformer conservative has family sitting, and in

5    orthodox it's separate seating.

6    **Q.**    Now, are you familiar with letters that were

7    written by the Touro Synagogue to President Washington

8    and President Washington's response?

9    **A.**    Yes.

10          MR. NAFTALIS:  Could we put them up,

11    Exhibits 133.

12          MR. SOLOMON:  Let me interject and seek your

13    guidance.  I don't have to keep jumping up.  The

14    witness can't know any of this from personal knowledge.

15    He's not an expert.  Wasn't identified as an expert.

16          THE COURT:  I didn't mean to be short shrift

17    with you earlier, Mr. Solomon.  I think you're right

18    that this is preliminary matters, it doesn't go to a

19    real contested fact, and I consider it in the nature of

20    background preliminary matter.  Thanks.

21          MR. SOLOMON:  Thank you.

22    **Q.**    And more relevant, what you have absolute personal

23    knowledge about, is there a ceremony held every year at

24    the Touro Synagogue to commemorate these letters?

25    **A.**    Yes, there is.  It's called the George Washington

1    Letter Reading, and it's held on the third Sunday in
2    August of every year.
3    **Q.**   And what is the purpose of that program?
4    **A.**   I think the purpose is to celebrate, it's to
5    celebrate the small part that the Jewish congregation
6    in Newport played in the concept of religious freedom
7    in the United States.
8         And it was Moses Seixas writing a letter to
9    George Washington saying, in essence, that you're
10   forming this country, and to us religious freedom is
11   very important; it's important because even though
12   Roger Williams had founded Rhode Island, the Catholics
13   and Jews were not allowed to become a citizen of the
14   state.  The only ones that could become citizens of the
15   state of Rhode Island were protestant, and if you
16   couldn't become a citizen of the state, you couldn't
17   become a citizen of the United States.
18        And so Moses Seixas was asking the president
19   for -- form this country with religious freedom.  And
20   this was a letter that George Washington wrote back, in
21   essence saying that this is going to be the basis, that
22   there's going to be freedom of religion.
23        And in two years, when the Bill of Rights was
24   passed and the First Amendment, the first right of the
25   First Amendment was the religious freedom.

1    So that part that the original colonial Jews

2    played in the part of the formation of the United

3    States is very important to the Jewish congregation of

4    Newport, and they celebrate that.  And that's what this

5    symbolizes.

6    **Q.**    Is this annual ceremony open to the public?

7    **A.**    It is open to the public.  And --

8    **Q.**    I'm sorry.  Go ahead.

9    **A.**    It's open to the public.  People are encouraged to

10   come.  Usually both of our U.S. senators are there.

11   Our congressmen are there.  Our mayor is there.

12   Members of the city council are there.  Members of the

13   Rhode Island government are there.  And we have the

14   artillery company of Rhode Island there.  And we have

15   distinguished speakers that come and give a keynote

16   address, as well as to read the Moses Seixas letter, as

17   well as to read the George Washington letter.

18   **Q.**    And have members of the United States Supreme

19   Court been keynote speakers in recent years?

20   **A.**    Yes, they are.

21   **Q.**    Who?  Which ones?

22   **A.**    Well, Ruth Bader Ginsburg came and she was a

23   keynote speaker I'm guessing ten or 12 years ago.  And

24   a few years ago Justice Elena Kagan was the keynote

25   speaker.

1   **Q.**   And now, in -- you said you became -- you said

2   you've started your membership or you started your

3   involvement in, with the Touro Synagogue as a kid;

4   right?

5   **A.**   Yes.

6   **Q.**   Now, how long has your family, that is, your

7   family, Mr. Bazarsky, been involved with the Touro

8   Synagogue and the congregation that prays there,

9   Congregation Jeshuat Israel?

10   **A.**   Well, I have three sons that are all in their late

11   20s.  They have been members their entire lives.  They

12   have been, all three have been bar mitzvahed there.

13   I've been a member since I was born in 1948.  I was bar

14   mitzvahed there.  My two sisters were married there.

15   My son was married there.

16          My mother was born in 1919, and this is the only

17   synagogue -- she's still living, she's 96 -- it's the

18   only synagogue that when she's in Newport that she

19   prays in at Newport.  Her parents, who came from Russia

20   in the late 1800s, they were members of the

21   Congregation Jeshuat Israel and prayed in Touro

22   Synagogue.  So, four generations.

23          And I'm not an exception.  I mean, many, many

24   families at Touro Synagogue that have the same story

25   that I have.

1  **Q.**   And what's the meaning of Touro Synagogue to the,

2  to Congregation Jeshuat Israel and its community?

3  **A.**   Well, I think the meaning is very significant.  I

4  mean, we take great pride in that we are the second

5  oldest congregation in the United States.  We publicize

6  that everywhere.  There's never been an objection to

7  that.  We feel that we are carrying on the story of the

8  original colonial Jews.

9       You know, our membership is not orthodox.  We

10  don't, other than, I suspect, the rabbi, we don't have

11  a single orthodox member.  But everyone who belongs to

12  Touro Synagogue, they belong to it because of the

13  history of the building and the history that goes back

14  to the original colonial Jews that came over here.  And

15  they take that very personally and very important, to

16  the point where we, five years ago, completed building

17  a visitor center, at a cost of approximately

18  $14 million, which tells the story of the original

19  colonial Jews that came over a hundred years before the

20  Revolutionary War and the story of this George

21  Washington letter.

22       And so I think the reason why people join Touro

23  Synagogue is because they feel so connected to the

24  story, to the history; and because so many of my

25  contemporaries, it's their parents and their

1    grandparents that were members of Touro Synagogue.

2    **Q.**   By the way, it's not necessary, is it, to have an

3    ancestor or relative who is a member to become a member

4    of Touro Synagogue, is it?

5    **A.**   No.  Anyone who -- anyone can join who is Jewish

6    can join.

7    **Q.**   And, to your knowledge, to join your synagogue you

8    don't have to have been there in colonial times or

9    be -- or have to trace ancestry back to colonial

10   America coming over on the Mayflower; right?

11   **A.**   No.

12   **Q.**   To your knowledge, that's the general rule in

13   every synagogue in America, isn't it, that you can join

14   even if your parents weren't here in the 1700s;

15   correct?

16          MR. SOLOMON:  Your Honor, if you want to hear

17   this from this witness -- I object.

18          THE COURT:  Overruled.

19   **A.**   That is my understanding, is that you can join any

20   synagogue, yes.

21          THE COURT:  Can I interrupt and ask,

22   Mr. Bazarsky.  You have used the term "synagogue" and

23   "congregation" almost simultaneous when the question

24   was asked about joining the synagogue.

25          THE WITNESS:  Yes.

1       THE COURT:  Do you mean to use them

2   interchangeably?

3       THE WITNESS:  We, we -- when you join you

4   technically, technically you are joining the

5   congregation, and so legally you become a member of

6   Congregation Jeshuat Israel.  As a member, you worship

7   in Touro Synagogue.

8       THE COURT:  Thank you.

9   Q.   And Touro Synagogue is the only place that Jeshuat

10  Israel prays?

11  A.   Yes.

12  Q.   And has ever prayed for a long, long time?

13  A.   That's true.

14  Q.   Now, I think you mentioned that it's an orthodox

15  synagogue.

16  A.   It is.

17  Q.   And without going into how things, what prayers

18  you say or anything like that, have the services

19  changed in any way since you've been involved with the

20  synagogue?

21  A.   No.  The services are exactly the same.

22  Q.   And the services are open to any member of the

23  public who wants to come in?

24  A.   I would say yes.  I mean, it would be rare that

25  just members of the public would just come in and pray,

1  unless they're Jewish, and so --.  But any member of

2  the Jewish world who wants to come in is certainly

3  welcome.

4  **Q.**   And during the time you've been involved in Touro

5  Synagogue, this goes back to, what, the late seventies

6  as an adult?

7  **A.**   As an adult, yes.

8  **Q.**   Has anyone from Shearith Israel ever objected to

9  how the services are run by Jeshuat Israel at the Touro

10  Synagogue?

11       MR. SOLOMON:  Objection.  No foundation.

12       THE COURT:  Overruled.

13  **A.**   Not to my knowledge.

14  **Q.**   And when I asked you, sir, about -- let me follow

15  up a little bit on a question I asked you about before.

16  When I asked you if people from the public can come to

17  pray, tell me when, what are the -- let's break it up

18  timewise.

19       During the non-summer period of time, when are

20  services held?

21  **A.**   They're held twice a week, every Friday night and

22  every Saturday morning; in addition to the Jewish

23  holidays.  So in addition to the Jewish holidays, there

24  would be services every Friday night and Saturday

25  morning.

1    **Q.**    And those are the normal Shabbat or Sabbath

2    services?

3    **A.**    Right.

4    **Q.**    And those are held Friday night and Saturday

5    morning?

6    **A.**    Correct.

7    **Q.**    Now, during what I call summer, but you might tell

8    me I'm right or wrong from the calendar, is there a

9    part of the year when services are held even more

10    frequently?

11    **A.**    Yes.

12    **Q.**    When is that?

13    **A.**    Well, during part of June, July, August,

14    September, part of October, so many tourists come from

15    all over the world to worship in Touro Synagogue, that

16    we have to have services every morning, every night,

17    seven days a week.  This is primarily not for the

18    congregation.  This is strictly for tourists.  And

19    because it is a great thrill to many Jews to be able to

20    come into the oldest synagogue in the United States and

21    to worship.  It's a big deal.

22    **Q.**    And you need a full-time rabbi who can conduct

23    those services?

24    **A.**    That's right.

25    **Q.**    And that financial responsibility is handled by

1    whom?

2    **A.**   That is handled by the congregation, Jeshuat

3    Israel.

4    **Q.**   Jeshuat Israel.  Now, in the greater Newport area,

5    isn't there the Naval War College?

6    **A.**   Yes, there is.  In Newport, in Newport, yes.

7    **Q.**   In Newport itself?

8    **A.**   In Newport itself.

9    **Q.**   And do people come from the Naval War College to

10   pray?

11   **A.**   They do.  Any officers -- well, there's always two

12   officers every year from Israel that would attend the

13   Naval War College, so they are given free memberships

14   to Touro Synagogue, as well as any other military

15   personnel that are on the naval base are given free

16   memberships to Touro Synagogue.  And what we try to do

17   is invite them to our homes, if possible, for Friday

18   night services, so many of the congregants do that.

19   **Q.**   You had mentioned before something about a visitor

20   center.

21   **A.**   Yes.

22   **Q.**   And tell us just a little bit about that again.

23   **A.**   Well, the congregation owns two parcels of land

24   that abut the synagogue, or abut the park that abuts

25   the synagogue, in which was built the Ambassador John

1    L. Loeb Junior Visitor Center, and when -- we give

2    tours. And so when Touro Synagogue is not having

3    services, it has a tour program.  It's primarily run

4    from Memorial Day through Columbus Day, unless you

5    arrange for a private tour.  And that's as a result of

6    so many Jews and non-Jews that want to see what Touro

7    Synagogue is all about.  They want to learn about the

8    George Washington letter.  They want to learn the story

9    of the colonial Jews pre-American Revolution.

10          So we built this visitor center that they enter

11   first.  It's a self-guided tour.  And then they come

12   into the synagogue and then we have tours for them,

13   like 20-minute tours.

14   **Q.**   And you mentioned Ambassador Loeb.  What was his

15   role in the building and the economic payment for the

16   visitor center?

17   **A.**   So Ambassador Loeb paid for the visitor center, so

18   he paid the 14 million plus or minus dollars for the

19   visitor center.  He also was intimately involved in

20   every detail of it, the exhibit itself, the paint, the

21   color, the staircase, everything; and he underwrites

22   the cost of operating the visitor center.

23   **Q.**   Did you say Ambassador Loeb?  Is he a member of

24   the Touro Synagogue?

25   **A.**   Yes, he is a member.

1    **Q.**    And Congregation Jeshuat Israel?

2    **A.**    Yes, he is.

3    **Q.**    And I think Mr. Solomon, you may have heard

4    Mr. Solomon say nobody who is a member of Congregation

5    Jeshuat Israel can trace their roots back to colonial

6    times.  Do you recall him saying that this morning?

7    **A.**    Yes.

8    **Q.**    And how about Ambassador Loeb?

9         MR. SOLOMON:  Objection.  No foundation.

10    Personal knowledge.

11         THE COURT:  Sustained.

12    **Q.**    Have you ever been present in any conversations

13    with Ambassador Loeb where he indicated how long his

14    connection has been with the Touro Synagogue, with the

15    Congregation -- with the Touro Synagogue?

16    **A.**    Yes.  I have been present when John Loeb has

17    discussed his lineage with former members of Touro

18    Synagogue.

19    **Q.**    And what did Mr. Loeb say?

20         MR. SOLOMON:  Objection.

21         THE COURT:  Sustained.

22    **Q.**    Now, in connection with the maintenance and, of

23    Touro Synagogue, what role does Congregation Jeshuat

24    Israel play in maintaining the physical structure of

25    the synagogue?

1    **A.**   Well, it has the 100 percent sole responsibility

2    of taking care of the synagogue, maintaining it,

3    preserving it, restoring it.

4    **Q.**   And in that aspect, are you familiar with

5    something called the Touro Fund?

6    **A.**   Yes, I am.

7    **Q.**   And what's the purpose of Touro Fund?

8    **A.**   When you say the Touro, do you mean the Abraham

9    Touro Fund?

10   **Q.**   The Abraham Touro Fund.

11   **A.**   So the Abraham Touro Fund is a fund that was

12   established I believe when Abraham Touro died in around

13   1823, and he left money to the state of Rhode Island

14   for the care and maintenance and upkeep and the cost of

15   the rabbi of Touro Synagogue.

16   **Q.**   And who receives the money from the Touro funds to

17   use for the upkeep and -- of the synagogue?

18   **A.**   Congregation Jeshuat Israel.

19   **Q.**   And is that provided for by Rhode Island law?

20   **A.**   It is.

21   **Q.**   And the terms of -- and we'll get into this in a

22   little more detail.

23          The upkeep and the operating expenses of running

24   the Touro Synagogue, do you receive any funds from

25   Shearith Israel?

1   **A.**    We do not.

2        MR. NAFTALIS:  Can we put up 261.

3   **Q.**    261, you're familiar with this photo?

4   **A.**    I am.

5   **Q.**    This is a photo of the plaque which is on the wall

6   outside of Touro Synagogue?

7   **A.**    It is.

8   **Q.**    And could you read the first few lines of it,

9   please?

10  **A.**    Yes.  (Reading)  National Historic Site, Touro

11  Synagogue of Jeshuat Israel Congregation founded in

12  1658.

13  **Q.**    And where is this plaque affixed?

14  **A.**    It is affixed to the, I'm going to say I think

15  it's the -- I'm trying to get the corner.  East -- I

16  think it's on the west side of the synagogue facing the

17  street, facing Touro Street, and it's probably about

18  10 feet high, so that it's very visible.  When you're

19  on the street and you look at the synagogue, this is

20  the plaque that you see.  It's the only plaque that's

21  on the synagogue.

22  **Q.**    And over the years have people, I take it, from

23  Shearith Israel may have come up on occasion?

24  **A.**    To my knowledge there have been some people have

25  come up from Shearith Israel, yes.

1    **Q.**    And when you walk into the synagogue, Touro

2    Synagogue, the plaque is right on the right side as you

3    enter, isn't it?

4    **A.**    Correct.

5    **Q.**    Pretty hard to miss, isn't it?

6    **A.**    Yes.

7    **Q.**    And I think, as you said, you can see it from the

8    street even; right?

9    **A.**    Yes.

10   **Q.**    And at any time, in all the years, did anybody

11   from Shearith Israel ever say there's anything

12   inaccurate or incorrect about that plaque?

13   **A.**    Not that I ever heard.

14   **Q.**    Did anyone from Shearith Israel say it's

15   inaccurate, the Jeshuat Israel congregation founded

16   1658, you really, that's not really you; you're not

17   really the successor.  Did they ever say that?

18           MR. SOLOMON:  Objection.

19           THE COURT:  Basis, Mr. Solomon.

20           MR. SOLOMON:  It's leading and argumentative.

21           THE COURT:  You have been leading quite a bit.

22   I'm sure I'll let Mr. Solomon do the same.  It's a

23   bench trial, so we'll give you a little more leeway in

24   that regard.  I'll overrule the objection.

25   **A.**    Your question is did anyone from Shearith Israel

1    ever object to a --

2    **Q.**    Did anyone from Shearith Israel ever say --

3    **A.**    No.

4    **Q.**    -- at any time, in words or substance, that the

5    words on this plaque that Jeshuat Israel congregation

6    was, which is your congregation, was founded in 1658

7    was in any way inaccurate or incorrect?

8    **A.**    No.

9    **Q.**    Did they ever say it?

10    **A.**    Not that I ever heard.

11    **Q.**    By the way --

12        THE COURT:  Mr. Naftalis, I've got to enforce

13    one rule.  I try not to follow too many procedural

14    rules, but you have to stay by a mic.  We can mic you

15    up if you're a wanderer.  I call them wanderers.  We

16    can put a mic on your lapel.  And the reason for that

17    is two-fold.  One is these wonderful professionals have

18    to get every word down, and they can only hear it

19    through there; but we also digitally record, and it

20    doesn't pick up if you're not at a mic.  So at the

21    break you're welcome to mic-up, if you're a wanderer,

22    because I have a feeling you are, but until then you

23    have to stick by the mic.  Just try and control

24    yourself; hold on if you have to.

25        MR. NAFTALIS:  Throw me a life preserver.

1          THE COURT:  I will.

2          MR. NAFTALIS:  I apologize.

3          THE COURT:  It's no problem.  I was a wanderer

4    when I tried cases, but.

5          MR. NAFTALIS:  It's more fun.

6          THE COURT:  We'll mic you and then you can

7    wander to your heart's content.

8          MR. NAFTALIS:  All right.

9          Can we put up Plaintiff's Exhibit 215.

10   **Q.**   And do you have that in front of you?

11   **A.**   I do.

12   **Q.**   And just so I can move it.

13   Plaintiff's Exhibit 215 is a letter, is it not, on the

14   letterhead of Touro Synagogue, Congregation Jeshuat

15   Israel?

16   **A.**   Correct.

17          THE COURT:  Is this Jeshuat Israel's stationery?

18          THE WITNESS:  Yes, it is.

19   **Q.**   Is this the normal stationery Jeshuat Israel used

20   for its normal correspondence?

21   **A.**   It is, yes.

22   **Q.**   Including correspondence sent to Shearith Israel?

23   **A.**   Correct.

24          MR. NAFTALIS:  I want to put up Exhibit 241, and

25   if we could go to Page 23.

1    **Q.**    You've seen the pleadings in this case?

2    **A.**    I have.

3    **Q.**    By the "pleadings," I mean the documents that your

4    lawyers, Jeshuat Israel's lawyers have filed, and the

5    documents that were filed by our opponents for the New

6    York congregation; right?

7    **A.**    Yes, I have.

8    **Q.**    And are you aware that Shearith Israel has filed a

9    counterclaim, which is on Page 23, a counterclaim which

10   includes a request that this court evict Jeshuat Israel

11   from the Touro Synagogue; right?

12   **A.**    Yes.

13   **Q.**    And what would the eviction of congregation --

14   what would be the effect of the eviction of

15   Congregation Jeshuat Israel?  What would it be?

16          MR. SOLOMON:  Your Honor, calls for speculation.

17   I object.

18          THE COURT:  Overruled.

19   **A.**    Well, I think it would be kind of

20   incomprehensible.  It would be the destruction of, I

21   mean, of the congregation.  If the congregation was

22   evicted from the synagogue, they would have no place to

23   worship.  They would -- I mean they could join another

24   synagogue in another community, but all of their

25   history, their roots, their connection to Touro

1    Synagogue would be gone.

2         Everything that this congregation has done and

3    believes in with respect to keeping this building

4    restored, open, operating, doing everything they're

5    doing in order to tell the story of the original

6    colonial Jews, the George Washington letter, the

7    history; if they were evicted -- well, first of all, I

8    guess if they were evicted it would become a museum,

9    because there wouldn't be anybody to worship there, so

10   it would ultimately just close. And I think we all

11   feel that, you know, one of the worse things that could

12   ever happen is the oldest synagogue in the United

13   States closes.

14        I think it would be devastating to the -- if

15   you're asking to the congregation, it would be

16   devastating. It's been their whole life.

17   **Q.**   And I think -- by the way, how many members are

18   there in the congregation, Jeshuat Israel?

19   **A.**   You know, I would say around 130. It's hard to

20   tell because we have a lot of members that are in

21   nursing homes and so there's a difference between

22   really active members and, you know, we have members

23   who can't afford the dues. We have members who are

24   incapacitated and can't attend.

25        But I would say, if you were trying to count

1    everybody, you'd probably get in the low one hundreds.

2    **Q.**    And I think -- is there another congregation in

3    the city of Newport?

4    **A.**    No, there is not.  Not another Jewish

5    congregation, no.

6    **Q.**    I meant Jewish congregation.

7    **A.**    No, no.  Right.  I mean, there is a group that's

8    called the hardiwhar (phonetic) and they sometimes meet

9    in people's homes.  It's a very, very reformed group.

10   I'm not even sure they're in existence, but at one time

11   they were.

12   **Q.**    Now, counsel for Shearith Israel said something to

13   the effect, Well, gee, there are a thousand Jews in

14   Newport, so you're still surviving even if you were

15   evicted and shut down.

16          What's your understanding of the demographics of

17   the Jewish population in Newport?

18   **A.**    Well, my understanding is that there are

19   approximately 1,000 Jews that live in six towns, that

20   live in Newport, Middletown, Portsmouth, Jamestown,

21   Tiverton and Little Compton.  And so if you did out an

22   average of three people per family, you're probably

23   talking around 300 families, of which I believe -- what

24   we've always felt is that there's about a hundred

25   families that belong to the conservative synagogue in

1    Middletown, about a hundred families that belong to

2    Touro Synagogue, and about a hundred families that are

3    not affiliated with any synagogue.

4    **Q.**    And you talk about six towns.  Some of these towns

5    are not right next door to Newport, are they?

6    **A.**    No.  To drive from Little Compton to Touro

7    Synagogue would take 45 minutes or so.

8    **Q.**    And people who are orthodox are not supposed to

9    drive on Saturday, are they?

10              MR. SOLOMON:  Objection, Judge.

11              THE COURT:  Overruled.  I can take judicial

12    notice of that.

13              MR. SOLOMON:  It's opening doors that I thought

14    your Honor didn't want to open.

15              THE COURT:  Again, I think --

16              MR. NAFTALIS:  I don't think I've opened any

17    doors to anything.

18              THE COURT:  I don't think we're in the area of

19    disputed testimony where we don't have to be too

20    concerned.  I still think we're in the background.  So

21    it's is overruled.

22    **A.**    So people who are orthodox and practice the

23    religion do not drive on Friday night or Shabbat,

24    Friday night or Saturday.

25    **Q.**    And I take it, just so I deal with some

1    implications from the opening statement --

2          MR. NAFTALIS:  Arrest me now.

3          THE COURT:  Thinking about it.

4    **Q.**   Congregation Jeshuat Israel is not a closed club.

5    Have you made -- had membership drives?  Have you tried

6    to increase the membership?  Why don't you tell his

7    Honor about that.

8    **A.**   Well, we definitely -- we have a committee.  We

9    have a standing committee of the board, and their job

10   is trying to promote to get active members.

11         The truth of the matter is that, as I mentioned,

12   other than the rabbi, no one is orthodox, and so it's

13   difficult to attract new members because most people

14   who are going to join a synagogue prefer family

15   seating.  They prefer husband and wife and children

16   sitting together.  We cannot offer that at Touro

17   Synagogue.

18         And so it's also true that many marriages are

19   mixed marriages, and so we can't offer membership to

20   people who are not Jewish or haven't converted to

21   Judaism, and so it makes it difficult to attract new

22   members.  And that's why we have a pretty old

23   population of our congregants.

24         MR. SOLOMON:  I object and move to strike.  Part

25   of the answer relating to mixed marriage is not only

1    inaccurate, but it purports to make some statement

2    about Jewish law.  It's going to open the door.  We're

3    going to need to refute it.  It's not accurate.

4            MR. NAFTALIS:  Oh, please.

5            THE COURT:  You raised, during your opening, the

6    issue of the other thousand Jews that live on, I can't

7    remember if you said Newport or Aquidneck Island.

8            MR. SOLOMON:  The county, your Honor.

9            THE COURT:  In the county.  And I think what the

10   Plaintiff here is attempting to do is put that

11   representation by you in perspective about it.  So I

12   don't think it's objectionable.  I'm going to overrule

13   the objection.  What weight I'll give it is another

14   story.

15   **Q.**   If Shearith Israel's plan to have you evicted

16   succeeds, is there any other congregation there to take

17   Jeshuat Israel's place?

18   **A.**   No, there isn't.

19           MR. NAFTALIS:  Do we have 241 still up?  Could

20   we turn to Page 19.  Put Page 19 of Exhibit 241 up.

21   **Q.**   I think you were in court this morning when

22   Mr. Solomon said that if they succeeded in their case,

23   that the rimonim, that the rimonim would stay in

24   Newport.

25   **A.**   I did hear him say that, yes.

1    **Q.**   I think I asked you earlier -- you've read the

2    counterclaim; right?

3    **A.**   Yes, I have.

4    **Q.**   Would you turn to -- I guess you don't have the

5    paper in front of you, but you have it on your screen,

6    on Exhibit 241, Page 19, paragraph 52.

7    **A.**   Yes.

8    **Q.**   This is Shearith Israel's pleading.  And could you

9    read paragraph 52.

10   **A.**   (Reading)  The rimonim should be returned

11   forthwith to the possession of Defendant in New York or

12   to such other place as Defendant determines, absent an

13   agreement between Shearith Israel and the Museum of

14   Fine Arts, MFA, on terms satisfactory to Shearith

15   Israel.

16   **Q.**   Now, New York isn't Newport; right?

17   **A.**   It is not.

18   **Q.**   Let's talk a little bit about the rimonim, okay?

19        MR. NAFTALIS:  Can we put up Exhibit 278.

20   **Q.**   And how many sets of rimonim are in the

21   possession, custody or control of Congregation Jeshuat

22   Israel?

23   **A.**   I believe we have five sets.

24   **Q.**   And how many of these five sets of rimonim that

25   you have were made by Myer Myers?

1    **A.**    Two sets.

2    **Q.**    The other three are made by somebody else or some

3    other people; right?

4    **A.**    Right.

5    **Q.**    And I put up in front of you the photograph,

6    Plaintiff's Exhibit 278?  This is the -- these are the

7    rimonim, are they not, which are the subject of this

8    dispute?

9    **A.**    Yes.

10    **Q.**    And could we put up now Exhibit 280.  And I think

11    we mentioned that Mr. Myers had made two other -- made

12    a total of two sets that are in your possession; right?

13    **A.**    Correct.

14    **Q.**    This is the other set?

15    **A.**    It is.

16    **Q.**    And this is, and what is this -- this has a name

17    people refer to that as?

18    **A.**    I'm sorry, I'm not sure.  I mean one -- we refer

19    to this set as, a silver set as silver bells, and we

20    refer to the other set, I believe, as the one that has

21    gold bells or brass bells.

22    **Q.**    Okay.  Now, when are these rimonim used?

23    **A.**    We use them during the high holidays.  So we

24    basically -- when they're not in a museum or on

25    display, they're in a safety deposit box.  We take them

1    out for the Jewish holidays in the fall, and we use

2    them then.

3    **Q.**    And why are, why are these two sets of rimonim

4    kept in a safe deposit box when they are not being

5    utilized?

6    **A.**    Well, they never were.  We used to use them on a

7    regular basis, and we used them on a regular basis up

8    until the year 1999 or 2000 when they had become, over

9    the years, dented and the bells would fall off.  And so

10   we decided to have them totally restored.

11        And once we had them totally restored, we were

12   kind of afraid to use them because we didn't want them

13   to get damaged again, so we just started to use them

14   for the high holidays.

15        Once we subsequently found out the value of

16   them, we started to use them as little as possible

17   because we were concerned that we don't have the

18   security to protect them, and so we got very concerned

19   about them and so they primarily were staying in a safe

20   deposit box.

21   **Q.**    And by the way was -- did Shearith Israel play any

22   role in the decision to put them in a safe deposit box?

23   **A.**    No.

24   **Q.**    Did Shearith Israel play any role or have any

25   involvement in determining when you used them?

1    **A.**    No.

2    **Q.**    You mentioned that from time to time, because

3    these rimonim have some historical significance, they

4    were lent out to various museums?

5    **A.**    Yes.

6    **Q.**    And did Shearith Israel play any role whatsoever

7    in the decision to lend these rimonim out to various

8    museums and cultural institutions over the years?

9    **A.**    They did not, no.

10   **Q.**    Now, you're familiar with a museum called the

11   Museum of Fine Arts?

12   **A.**    I am.

13   **Q.**    And where is that located, sir?

14   **A.**    In Boston, Massachusetts.

15   **Q.**    And are you familiar with a university called Yale

16   University?

17   **A.**    I am.

18   **Q.**    They're located --

19   **A.**    New Haven, Connecticut.

20   **Q.**    And were the rimonim ever loaned to Yale

21   University?

22   **A.**    They were.  Yale University I believe in 2001 put

23   on a Myer Myers exhibit, and they asked if we would

24   send down our two pair for around six months to be on

25   display there, and we did that.

1   **Q.**   And I place in front of you which you refer to

2   during the course of your questioning, Plaintiff's

3   Exhibit 150, which is a catalog from the Yale

4   exhibition, isn't it?

5   **A.**   Yes, it is.

6   **Q.**   And why did Congregation Jeshuat Israel loan its

7   rimonim to Yale University?

8   **A.**   We -- well, because they asked us to do it, and we

9   thought -- it was a Myer Myers exhibit, and we thought

10  it was a very nice thing to do.

11  **Q.**   Did you seek any permission from Shearith Israel

12  to loan your rimonim to Yale University?

13  **A.**   We did not, no.

14  **Q.**   Did you ever hear any complaint or objection at

15  any time prior to this litigation about Jeshuat

16  Israel's decision to loan its rimonim to Yale

17  University?

18          MR. SOLOMON:  Object to the form of the

19  question, your Honor.

20          THE COURT:  Basis?

21          MR. SOLOMON:  The question was prior to this

22  litigation, suggesting there's been any objection to

23  their loaning during any part of this litigation.

24  There has not.

25          THE COURT:  Overruled.

1    **A.**    The answer is no.

2    **Q.**    By the way, has there ever been any complaint or

3    objection by Shearith Israel to any of the loans of

4    your rimonim to any cultural institution or museum?

5    **A.**    Not that I know of, no.

6    **Q.**    In connection with any of the loans of which you

7    are aware, did Jeshuat Israel ever seek permission from

8    Shearith Israel to loan out the rimonim in its

9    possession?

10    **A.**    We never did, no.

11    **Q.**    Did Shearith Israel at any time ever complain,

12    Hey, you can't go out loaning these rimonim because

13    they belong to us?

14    **A.**    Absolutely not.

15    **Q.**    Now --

16          MR. NAFTALIS:  Could we turn to Page 154 in this

17    exhibit, which is, if I'm correct, that's the numbers

18    on the lower left, not the Bates numbers.

19          Mr. Solomon, I'm referring to the actual catalog

20    number in the lower left, not the Bates numbers.  I

21    don't want to confuse you.  Here we go.  Got it.

22          THE COURT:  Bates number 3248.

23          MR. NAFTALIS:  Thank you.

24    **Q.**    Before I get back to this, I neglected to ask you

25    a couple of questions about your connection to Jeshuat

1    Israel which I think may be relevant on foundation,

2    so --.

3         Have you ever held any leadership positions at

4    Jeshuat Israel?

5    A.   Yes, I have.

6    Q.   And why don't you tell the Court about what

7    leadership positions you've held and the years you've

8    done it.

9    A.   I was president of Congregation Jeshuat Israel for

10   12 years.  I was president from 1993 to 2005.  The last

11   four years I was co-president, so I was co-president

12   with Rita Slom for two years and co-president with

13   Laura Pedrick for two years.

14        And then subsequent to that time of 2005, I have

15   been a member of the board right up to this, right up

16   to today I've been a member consistently.

17   Q.   Now, I'm showing you from Exhibit 150, the Yale

18   catalog, and we have -- do you have that in front of

19   you?

20   A.   I do.

21        MR. NAFTALIS:  And his Honor accurately

22   identified the Bates number so I won't repeat it.

23   Q.   You see there there's a couple of items there,

24   Item 63 and 64.  Do you see that?

25   A.   Yes, I do.

1    **Q.**    And Item 63, can you tell us what Item 63 is.

2    **A.**    Item 63 seems to be the pair of rimonim that is

3    owned by Shearith Israel.

4    **Q.**    So at this exhibit at Yale University, Shearith

5    Israel also had on display its own rimonim in the same

6    exhibition that Jeshuat Israel had its two sets of

7    rimonim on display?

8    **A.**    That's right.

9    **Q.**    And if you go down to Item 64, what is that?

10    **A.**    Well, that is referencing the set of rimonim that

11    is the dispute in this lawsuit.  And it says:

12    (Reading)  Provenance with Congregation Yeshuat, now

13    Jeshuat Israel, by about 1780 and probably earlier, see

14    below, and it says the Touro Synagogue, Congregation

15    Jeshuat Israel, Newport, Rhode Island.

16          MR. NAFTALIS:  Would you highlight those two

17    lines.  Thank you.  All the way to the bottom.

18    **Q.**    So you read the lines referring to the rimonim

19    which are the subject of the lawsuit here that you

20    loaned to Yale University, it says:

21    (Reading) Provenance with Congregation Yeshuat now

22    Jeshuat, close paren, Israel, by about 1780 and

23    probably earlier, see below, the Touro Synagogue,

24    Congregation Jeshuat Israel, Newport, Rhode Island.

25    **A.**    Correct.

1   **Q.**   And that's how those rimonim were publically

2   identified in this public catalog in the Yale

3   University exhibition; right?

4   **A.**   Correct.

5   **Q.**   And they were publically identified in the Yale

6   catalog right below the public identification of

7   Shearith Israel's own rimonim; right?

8   **A.**   Correct.

9   **Q.**   At any time -- you were president of CJI at this

10   time?

11   **A.**   I was.

12   **Q.**   Anytime did anybody from Shearith Israel ever

13   complain or object to how the provenance of your

14   rimonim were described?

15   **A.**   No, never did.

16   **Q.**   Did anyone from Shearith Israel ever object or

17   complain, Hey, Jeshuat Israel is not a successor of

18   Congregation Yeshuat Israel; They're not part of the

19   Jewish society of Newport.  Did they ever say that?

20          MR. SOLOMON:  Your Honor, part of the leading,

21   if your Honor -- I object to the form of the question.

22          THE COURT:  The objection is sustained.  Why

23   don't you reword the question, please.

24   **Q.**   Did you ever have any conversation with anyone

25   from Shearith Israel in which, which discussed the

1    labeling of the provenance in this Yale catalog of the

2    rimonim put on display from Jeshuat Israel?

3    **A.**    No, never did.

4         MR. NAFTALIS:  Now why don't you put up

5    Exhibit 172.

6    **Q.**    Are you familiar with the Library of Congress?

7    **A.**    Yes, I am.

8    **Q.**    What is the Library of Congress?

9    **A.**    It's the library of the United States of America.

10   **Q.**    And did there ever come a time that Jeshuat Israel

11   ever lent its rimonim to the Library of Congress for

12   display?

13   **A.**    Yes, we did, in two thousand -- I think it was

14   2005, 2006.

15        MR. NAFTALIS:  If we could go to the second

16   page.

17   **Q.**    Do you see the highlighted language?

18   **A.**    I do.

19   **Q.**    You want to read that, please.

20   **A.**    Can they center it a little more, so I can?

21        MR. NAFTALIS:  Yes.  Put it up a little higher.

22   Thank you.  Higher -- the other way.  Stop.

23        Paper was better.

24   **A.**    I can't see the right side of it.  I think -- I

25   can't, after the first line after "Jewish ceremonial" I

1    can't, it didn't -- object.  Okay.  So I can do this.

2         It says:  (Reading) Colonial silversmith Myer

3    Myers, born in New York in 1723, Myer Myers was a

4    skilled silver and goldsmith who created the first

5    American examples of Jewish ceremonial objects.  He

6    served as president of New York's Congregation Shearith

7    Israel three times and created silver rimonim, Torah

8    finials, for synagogues in New York, Newport and

9    Philadelphia.  Displayed here are the finials belonging

10   to Newport's Touro Synagogue which would have been,

11   which have been placed over the -- can we go back --

12   which would have been placed over the handles of the

13   scroll as adornment.

14   Q.  Ever have any conversation with anyone from

15   Shearith Israel about the description of the Myer Myers

16   finials as belonging to your synagogue?

17        MR. SOLOMON:  Objection.

18        THE COURT:  Overruled.

19   A.  No, never did.

20   Q.  By the way, the rimonim that were lent to Yale by

21   Congregation Jeshuat Israel, did they go subsequently,

22   as part of this exhibition, did it go to other places

23   as well?

24   A.  It did.  I think that after it was in -- at Yale

25   for six months, it then went on to the Skirball Museum

1    in Los Angeles.  It may have been there six months.

2    And then it went on to a museum in Delaware.

3    **Q.**    Would that be the Winterthur?

4    **A.**    I think it was, yes.

5    **Q.**    And the Library of Congress exhibition, did it go

6    to another place?

7    **A.**    I'm not sure.  I'm not sure if it went someplace

8    else after the Library of Congress.  It had been on

9    loan in the fifties and the sixties to other museums.

10    (Pause)

11    MR. NAFTALIS:  Your Honor, I don't know if this

12    would be the appropriate time to -- he doesn't have

13    personal knowledge of other exhibits.  These are the

14    ones he has personal knowledge of.  We have witnesses

15    who have personal knowledge of --.

16    I could call the Court's attention to the other

17    exhibits at this point or wait for another time.  This

18    is really court management issues.  He wouldn't be able

19    to testify as to those.

20    THE COURT:  Assuming -- it's often difficult in

21    primarily paper-driven cases, historical cases like

22    this, to put on a case, I understand that, and so I'm

23    going to give both of you a lot of leeway and be able

24    to do that, and if it's better -- I mean, I guess I'm

25    basically throwing it back at you and saying if there

1    are other witnesses that can testify about it that will

2    walk me through it -- we're fortunate in some ways not

3    to have a jury here, so I will read the exhibits all by

4    myself, as well.  So, it's your call.  If there are

5    other witnesses that will testify from personal

6    knowledge, why don't we wait and have them do it.

7          MR. NAFTALIS:  What I could do just so the

8    record is clear --

9          THE COURT:  I want to be clear so that the

10   record is clear so someone looking back on this later

11   doesn't -- because I imagine a lot of people are going

12   to look back on this record some day.

13         MR. NAFTALIS:  I hope nicely.

14         THE COURT:  Only if you win do you hope nicely.

15   I don't require documents to be brought to the Court's

16   attention if they're admitted as full exhibits.  If

17   they're admitted as full exhibits, they're admitted as

18   full exhibits for what they are and what they say, and

19   when I am making findings of fact and ruling I will

20   rely on the exhibits that are admitted.

21         So don't feel compelled that a document has to

22   be drawn to the Court's attention during the course of

23   its admission.  If it is a fully admitted exhibit, then

24   it is able to be considered by me in making findings of

25   fact.  I don't know if that helps you make that

1    determination or not.

2          I've practiced before some courts that said if

3    it wasn't drawn to the attention, then you couldn't

4    rely on it.  I don't follow that rule if it is, in

5    fact, a custom.

6          MR. SOLOMON:  And in this case the only

7    difference, your Honor, I want clarity on, is that

8    we've admitted many of these subject to our objections

9    and, as I mentioned, will want some time at some point

10   to tell your Honor that, if your Honor will give them

11   weight because of the objection.

12         THE COURT:  Sure.  Let's just remember where we

13   fit that in, Mr. Solomon.  That's my understanding as

14   well.  Thanks.

15         MR. NAFTALIS:  Maybe, if this is okay, that the

16   fastest thing I could do is just list the other exhibit

17   numbers --

18         THE COURT:  Sure.

19         MR. NAFTALIS:  -- which are I think all in the

20   book here where there are other exhibits of the

21   rimonim, and this, I think I can do that quickly.

22         THE COURT:  That would be great.

23         MR. NAFTALIS:  Exhibit, Plaintiff's Exhibit 114

24   is a catalog of the exhibit at the Jewish Museum in

25   1965 where the rimonim were lent.

1          That will also show that both Jeshuat Israel's

2     Myer Myers were lent as well as Shearith Israel's.

3     They also lent the same time.

4          Exhibit 103 is a catalog from an exhibit in 1955

5     where the rimonim were lent to the RISD, to the Rhode

6     Island School of Design.

7          Exhibit, Plaintiff's Exhibit 101 is the exhibit

8     at the Brooklyn Museum in 1954 where we lent the

9     rimonim.  And I think that one, we lent both pairs of

10    our rimonim and Shearith Israel lent theirs as well.

11         And, in addition, at Exhibit 97, this is an

12    earlier loan to the Museum of Fine Arts, I believe, and

13    this is Exhibit 97, in 1953.

14         THE COURT:  Okay.

15         MR. NAFTALIS:  I think I finished my listing

16    there.

17         THE COURT:  Great.  Thank you.

18    **Q.**   Now, I think I may have asked you before about who

19    takes care of the rimonim.

20    **A.**   The Congregation Jeshuat Israel, we take care of

21    the rimonim.

22    **Q.**   And what's involved in taking care of the rimonim?

23    **A.**   Well, we have restored them.  We clean them.  We

24    secure them in a safe deposit box.  When there's

25    services when we want to bring them into the building,

1    we go down to the safe deposit box, we bring them into

2    the building, we use them, and then we take them back,

3    and so we just watch over them.

4    **Q.**    And I think there was some reference to a need to

5    repair or restore the rimonim.

6    **A.**    Correct.

7    **Q.**    And do you recall when that was?

8    **A.**    Around the year 2001.

9    **Q.**    And tell us why they needed restoration.

10   **A.**    Well, they were, both sets were in a condition

11   that they needed to be repaired.  They had dents in

12   them, and the bells had fallen off, not all the bells,

13   but some of the bells had fallen off.  And we just felt

14   that they didn't look nearly what they should look

15   like.

16          And so we tried to find out who was the foremost

17   person who would restore silver.  We found out that was

18   a man named Vitali in New Jersey, and he wanted like

19   $25,000, I think, to restore them.

20          We had heard that a man in New York, his name is

21   Roy Zuckerberg, had paid part of the money to

22   Mr. Vitali to restore the set of rimonim that Shearith

23   Israel had.  So we contacted him, and we asked him if

24   he would be willing to help us defray the cost of

25   restoring our set.  He said that he would pay

1    approximately half the cost.

2         And we then went to, sought out to raise the

3    other half; around $12,000.  Between members of our

4    congregation and our congregation, the congregation

5    itself and members of our congregation, we did raise

6    the money.  We were able to.  We took them down to New

7    Jersey.  They were totally restored, and we brought

8    them back.

9    Q.   And did you seek, did Jeshuat Israel seek any

10   permission from Shearith Israel to -- after the rimonim

11   were restored?

12   A.   No, we did not.

13   Q.   Did you ever have any conversation with anyone

14   from Shearith Israel in which they complained that you

15   hadn't sought permission to have the rimonim restored?

16   A.   No, did not.

17   Q.   And you mentioned Mr. Zuckerberg.  Mr. Zuckerberg,

18   you said, lives in New York?

19   A.   Yes.  My understanding is at the time he was

20   living in New York.

21   Q.   And is he -- did he have some expertise in silver?

22   A.   Not that I know of.  He had a reputation of being

23   very interested in silver, and I don't know if he had

24   expertise, but he was interested in silver.

25   Q.   Did he himself have any connection with Shearith

1    Israel?

2    **A.**   My understanding is he was a member of Shearith

3    Israel.   May be today, too, a member of Shearith

4    Israel.

5    **Q.**   If Mr. Zuckerberg assisted your congregation on

6    behalf of -- did Mr. Zuckerberg assist your

7    congregation on behalf of Shearith Israel, or was he

8    acting as an individual?

9         MR. SOLOMON:   Objection.

10        THE COURT:   Sustained.

11   **Q.**   In any -- how did Mr. Zuckerberg -- what did

12   Mr. Zuckerberg say in words or substance in this

13   conversation in what capacity he was acting?

14        MR. SOLOMON:   Objection.

15        THE COURT:   Overruled.

16   **A.**   He represented that it was him himself and, in

17   fact, we sent him individually a letter of thank you

18   and a letter that he could use as an, I guess a

19   donation.   A letter was sent to him personally.

20   **Q.**   By the way, does Mr. Zuckerberg now have any

21   connection to Congregation Jeshuat Israel?

22   **A.**   Yes.   I believe he is a member of Jeshuat Israel,

23   Congregation Jeshuat Israel as well.

24        THE COURT:   Mr. Naftalis, is this a good time

25   for an afternoon break?

1        MR. NAFTALIS:  Sure.

2        THE COURT:  We'll take a 15-minute break and be

3    back at 3:15.

4        (Recess)

5        THE COURT:  Mr. Bazarsky, you're still under

6    oath.  You understand that.

7        THE WITNESS:  I do.

8        THE COURT:  Great.  Mr. Naftalis.

9        MR. NAFTALIS:  Before I begin the question I

10   wanted, I can put it up on the screen, Defendant's

11   Exhibit 451 at Page 135 which traces I think it's --

12   push it down a little.  It traces the genealogy of John

13   Loeb back to all sorts of people, all kinds of people.

14       THE COURT:  Thank you.

15       MR. NAFTALIS:  Including the Seixas.

16       Could we put 154 up for a second.

17   Q.   What is Exhibit 154?  Take a look at it.

18   A.   This is a letter that we sent out in 2001 to

19   members of the congregation to ask them if they would

20   donate money to the cause of having the rimonim

21   restored.

22   Q.   And this was in connection, this was in connection

23   with the restoration, about which you testified before

24   the break, where Mr. Zuckerberg pledged a certain

25   amount and the congregation had to come up with the

1    rest?

2    **A.**   That's correct.   Mr. Zuckerberg is the "angel"

3    that's represented down at the fourth paragraph.

4    **Q.**   You want to read that, what it -- read that fourth

5    paragraph.

6    **A.**   I think if you scroll it up a little bit.   Okay.

7    (Reading) But an angel from New York has come forth and

8    offered to pay for half of the cost, if we will match

9    his offer.   That means that he will donate at least

10   $8,000 if we can raise the matching amount.   This

11   gentleman is a well-known collector of colonial silver

12   and is anxious to see that our possessions are in

13   excellent shape.

14   **Q.**   Read the next paragraph.

15   **A.**   (Reading)   It is up to the congregation to raise

16   at least $8,000 for this important project.   We must do

17   this by the first of June in order for Mr. Vitali to

18   repair them before Rosh Hashanah.

19   **Q.**   Did the congregation meet its goal?

20   **A.**   It did, yes.

21   **Q.**   And how much was raised and how much was the whole

22   repair?

23   **A.**   My understanding is it came in around $25,000, and

24   so I'm not sure exactly how much over 8,000

25   Mr. Vitali -- excuse me -- Mr. Zuckerberg gave; but we,

1    the congregation, raised the difference.

2          MR. NAFTALIS:  Could we put up Exhibit 150,

3    please, and with the Bates number ending in 254.

4    Q.   I'm putting in front of you, put on screen,

5    Exhibit 150.  So that we have the right context, 150 is

6    the catalog from the Yale University art gallery in

7    connection with the display of Myer Myers materials at

8    Yale University to which your congregation provided two

9    sets of rimonim.

10          And I had shown you earlier certain other parts

11    of this catalog; correct?

12    A.   Correct.

13    Q.   I want to direct your attention to page, which is

14    Bates number, lower right-hand corner, Bates Number

15    254.

16          MR. NAFTALIS:   Sir, could we highlight -- I'm

17    going to go to my technician for a second.

18          THE COURT:  Sure.

19          MR. NAFTALIS:  Now highlight this paragraph here

20    and this paragraph here, okay?

21    Q.   I want to direct your attention to the first

22    yellow highlighted paragraph.  Could you read that,

23    please, into the record.

24    A.   (Reading)  At some point the word "Newport" was

25    engraved on one of the finials in categories --

1    catalog, I guess, 63 and 64.

2    **Q.**    Stop for a second.  63 was the Shearith Israel

3    rimonim, and 64 was the ones from Jeshuat Israel.

4    **A.**    That's right.  That's right.

5        (Reading)  The two thus engaged presumably

6    formed a single pair that belonged to the Newport

7    congregation, but subsequently became intermixed with a

8    pair belonging to Shearith Israel.  In other words,

9    each congregation now owned one finial originally from

10   the Newport pair and one finial originally from the New

11   York pair.

12       As in New York, most of the Jews in Newport fled

13   the city prior to the British takeover in 1776, but,

14   unlike New York, the community never returned in large

15   numbers.  After the war, the Touro Synagogue was used

16   only occasionally as a house of worship, and in 1818 it

17   was reported to the, to the parnassim of Shearith

18   Israel.

19   **Q.**    You can read the rest of that, too, which is not

20   highlighted.

21   **A.**    Okay.

22       (Reading)  For a great number of years past

23   there has not been service in the synagogue in Newport

24   and the seapharim have been deposited in the house of

25   the late Mr. Moses Seixas of that place for more than

1    20 years and now under the charge of his widow and son,

2    Mr. Benjamin Seixas.

3    **Q.**   And if you could go up to the top of the next

4    column on Exhibit 150 on this page.  Could you read

5    into the record that next paragraph.

6    **A.**   (Reading)  However, it was not until 1833 that the

7    four Torahs, and presumably their ornaments, were

8    transferred to Shearith Israel for safekeeping in our

9    place of worship until they should be required for the

10   use of the Newport Shool.  At this time "Newport" may

11   have been engraved on each finial, and the Shearith

12   Israel's pair, to distinguish them from the nearly

13   identical pair already at Shearith Israel.  If this

14   scenario was correct, we may thereby infer that both

15   pairs were in their respective congregation's

16   possession before 1833.

17         (Reading)  The Torahs and the Torah finials were

18   returned from New York in 1883, and the congregation in

19   Newport was rechartered under Jeshuat Israel in 1894.

20   By this time, however, the distinction between these

21   pairs had been forgotten, resulting in the present

22   arrangement.

23   **Q.**   Did you ever have any conversation with anyone

24   from Shearith Israel regarding these two paragraphs

25   that appeared in the Yale catalog?

1    **A.**   I don't believe so, no.

2    **Q.**   Shearith Israel, in any conversation you've ever

3    had with them, ever take issue with the contents of

4    those paragraphs?

5    **A.**   No, they never did.

6    **Q.**   Now, Jeshuat Israel had, did -- tell us whether or

7    not Jeshuat Israel had the rimonim ever appraised for

8    insurance purposes.

9    **A.**   We did have them appraised in 1996.  We went to

10   Sotheby's, and we asked them to appraise them for us,

11   and we wanted them appraised for insurance purposes.

12   They'd always been insured, but we wanted to make sure

13   we had the correct valuation.

14        And so Sotheby's came back and said the set that

15   we're talking about in this lawsuit they appraised at

16   $600,000, and the other set that we had at $800,000.

17   **Q.**   And was that appraisal connected with insurance?

18   **A.**   It was, yes.  We used that, those numbers, the

19   million four, for the insurance policy.

20   **Q.**   And who paid the premiums on these insurance

21   policies?

22   **A.**   Congregation Jeshuat Israel.

23   **Q.**   Did Shearith Israel pay any portion of the

24   insurance covering the rimonim?

25   **A.**   No, they never did.

1    **Q.**    Have they ever paid any premiums for insurance on
2    the rimonim?
3    **A.**    No, they never have.
4    **Q.**    Have they ever offered to pay any of the premiums
5    on the rimonim --
6    **A.**    No, never have.
7    **Q.**    -- insurance?
8    **A.**    Never have.
9    **Q.**    Now I want to ask you a question.  Did you ever
10   have a conversation with anyone from Shearith Israel on
11   the subject of any kind of insurance?
12   **A.**    Yes, I did.
13   **Q.**    And with whom was that conversation?
14   **A.**    Well, in 1996 three other people beside myself, I
15   think it was Bea Ross and Laura Pedrick, and it may
16   have been Alan Feinberg, we went to New York to meet
17   the leadership of Shearith Israel.
18   **Q.**    I'm sorry, for one second, just so -- I apologize
19   for interrupting.
20        The three people you mentioned, Ms. Pedrick,
21   Ms. Ross and Mr. Feinberg, are they members of Jeshuat
22   Israel.
23   **A.**    Yes, they are.
24   **Q.**    Okay.  I'm sorry.  I didn't mean -- I apologize
25   for interrupting.

1    **A.**    I believe they were all on the board of officers.

2         THE COURT:  Ms. Pedrick is "Ms. Freedman" in

3    reference to other documents; right?

4         THE WITNESS:  Yes.

5    **A.**    And so when we met in New York, at one point Alvin

6    Deutsch, who was the vice president of Shearith Israel

7    who later became president of Shearith Israel, said,

8    you know -- and I remember this because he said, You

9    know, we're trustee of the building, and if somebody

10   was to trip and fall, we could be named in the lawsuit,

11   and would you mind adding Shearith Israel on to the

12   policy for liability purposes only.

13        And we said, Yeah, that's not a problem at all.

14   We're happy to name Shearith Israel as an additional

15   named insured on the liability policy that we had.

16   **Q.**    And did that occur?

17   **A.**    It did occur, yes.

18   **Q.**    And did they pay any portion of the, of that

19   liability insurance, or was it all paid by Jeshuat

20   Israel?

21   **A.**    It was all paid by Jeshuat Israel.

22   **Q.**    After that did you have any subsequent

23   communications on the subject of insurance with anyone

24   else from Shearith Israel?

25   **A.**    No.  Well, a couple years later, so this would be

1    1998, I did have conversations again with Alvin

2    Deutsch, who I think was president of Shearith Israel

3    at the time, and he asked if Shearith Israel could be

4    named on a fire policy of the building.  And we had

5    concern about that, because our concern was that if

6    there was a fire at Touro Synagogue and the check was

7    made out to both Shearith Israel and Jeshuat Israel,

8    and Shearith Israel would have to sign the back of the

9    check, we weren't sure that Shearith Israel, given

10   conversations we had had with them before, that they

11   would be guaranteed that they would allow the money to

12   be spent to repair the building.  And so we were very

13   hesitant to have Shearith Israel named on the fire

14   policy.

15        And then Mr. Deutsch said, Well, we can resolve

16   that problem.  We can sign an agreement that would say

17   that any proceeds, insurance proceeds from the, if

18   there's a damage to the building, we will give you

19   something in writing that says those proceeds can be

20   used for the repair of the building.  And he did give

21   us that, and we did add him -- add Shearith Israel on

22   to the fire policy.

23        At no time then or subsequent has Shearith

24   Israel ever asked for or been named on any of the

25   personal property policy, which is totally separate.

1    So they've never been, they've never been added to the

2    insurance that would cover the rimonim, and they never

3    asked for that.

4           MR. NAFTALIS:  Could we put up Exhibit 144.

5    Q.   And tell us, what is Exhibit 144.

6    A.   Well, this was a letter that, if we scroll down I

7    believe this is from Alvin Deutsch -- it is -- from

8    Alvin Deutsch to me saying to me that we've worked out

9    the language on a separate agreement so that the, any

10   proceeds of the fire policy would be used to cover any

11   loss in connection with the reconstruction of Touro

12   Synagogue.

13          (Reading)  If you'll be good enough to furnish

14   me -- the wording.  So then I think then I subsequently

15   sent him the wording.

16          MR. NAFTALIS:  We want to put up now

17   Exhibit 145.

18   A.   This is a, I believe that this was a fax I might

19   have sent to Alvin Deutsch that just -- where I furnish

20   to him the wording and asked him to run it by his board

21   to see if that was acceptable to them, and we would be

22   willing to name Shearith Israel as an additional

23   insured on our fire policy.

24   Q.   And that all happened, as you did previously

25   testify.

1    **A.**    It did happen.

2    **Q.**    During any of these conversations, did Mr. Deutsch

3    ever make any request that Shearith Israel should be

4    added to any liability or any personal property or fine

5    arts coverage?

6    **A.**    Never, never raised the topic.

7    **Q.**    Did he ever say anything about Shearith Israel

8    owns the rimonim so we should be named as an insured on

9    any policy that covers them?

10   **A.**    No.  The only things that were ever raised is

11   because we're trustee of the building, for liability,

12   we could be sued, we want to have insurance if we're

13   sued, and we think we should be on the fire policy

14   because we're trustee.

15   **Q.**    To the best of your knowledge does Shearith Israel

16   pay any costs or expenses concerning the rimonim?

17   **A.**    No, they do not.  They do not pay any costs.

18   **Q.**    Now, by the way, I think I asked you earlier

19   about, when you were giving us the little tour of Touro

20   Synagogue, you told us about presidents who had visited

21   Touro Synagogue.  I think you mentioned --

22   **A.**    I did.

23   **Q.**    -- Kennedy and George Washington and I think

24   Eisenhower.

25   **A.**    Yes.

1  **Q.**   Has CJI had any current connection and Touro

2  Synagogue had any current connection with

3  President Obama?

4  **A.**   Well, we did.  Not directly with President Obama,

5  but about two years ago when we received a call from, I

6  believe it was the Protocol Office of the White House

7  where they said that President Obama would be going on

8  a trip, a state visit to Israel and wanted to give a

9  gift, wanted to bring a gift to the prime minister, and

10  they asked us if we had something at Touro Synagogue

11  that we could give to President Obama that he would

12  then give to Prime Minister Netanyahu.

13       MR. SOLOMON:  Your Honor, I didn't want to

14  interrupt.  Motion to strike.

15       THE COURT:  Overruled.  Motion is denied.

16  **A.**   So, when we completed the restoration of the

17  building back in 2006, there were some rotted rafters

18  up in the ceiling in the roof, and we saved all that

19  rotted wood.  And so we gave a section of that wood, we

20  sent it to the Protocol Office, and they went ahead and

21  mounted it on a plaque, and President Obama did, in

22  fact, present that wood to Prime Minister Netanyahu as

23  a gift from the United States, a piece of the oldest

24  synagogue in the United States.

25  **Q.**   Now, I think you testified that there came a point

1    in time when you became the president of Congregation

2    Jeshuat Israel.

3    **A.**    Correct, in 1993.

4    **Q.**    And in connection with that, did there come a time

5    when you had any, you sought to have any kind of

6    meeting with people at Shearith Israel?

7    **A.**    Yes.  I mean, when I became president in 1993,

8    nobody knew anything about Shearith Israel.  We heard

9    about Shearith Israel.  We didn't know, we didn't know

10   anything about them.  Nobody really knew -- we knew

11   about one member, his name was, I think, Jonathan de

12   Solo Mendes.  He was a member of Shearith Israel who

13   would come up to the George Washington letter.  I'd met

14   him.  But we didn't know any of the officers.  We

15   didn't know anyone from the board.

16        And so I took it upon myself to call their

17   president.  His name was Dennis Frelich.  And I said to

18   him that we would love to meet up and, you know, I

19   would be willing to come down to New York and meet who

20   you are.

21        I just want to back up.  There was one other

22   contact that I had when I first became president in

23   1993 where I called the rabbi of Shearith Israel just

24   to -- his name is Marc Angel -- just to introduce

25   myself, and we had a little conversation, but it was to

1    introduce myself primarily.

2    **Q.**   So you were telling the Court about how you, you

3    were going to reach out and you did reach out for

4    Mr. Frelich.

5    **A.**   I did.  And he said that if we wanted to come down

6    to New York he was, he would arrange that.  And so in

7    1996, I believe it was, like I said, Bea Ross, and I

8    think it was Alvin Feinberg, and I think it was Laura

9    Pedrick, and the four of us went to New York and we met

10   with Dennis Frelich, who was the president, Alvin

11   Deutsch was the vice president, Rabbi Marc Angel was

12   there, and they might have had one or two other

13   representatives.

14          And do you want me to tell you about what

15   transpired?

16   **Q.**   Why don't you tell the Court about your meeting.

17   **A.**   Well, basically, you know, we were down to, like I

18   said, to introduce ourselves.  We had a couple of

19   topics.  One was that we were thinking about replacing

20   the rabbi that we had, and we asked them, I asked him

21   for advice.  I said, you know, how -- do you have any

22   suggestions on how we would go about finding a rabbi?

23   And they said you should contact this Rabbi Shulman,

24   and he was at Yeshiva University, and he would be the

25   best person for you to contact.  And so we noted that.

1          We said to them that, do you have any

2     suggestions, you know, we're a small orthodox

3     congregation in Newport, Rhode Island; we have a lot of

4     difficulty attracting new members because we don't

5     offer family seating; and, do you have any suggestions

6     on how to attract new members?  And they didn't really

7     have any suggestions.

8          The issue of the insurance that we talked about

9     came up.

10          And the fourth thing we talked about -- I just

11     lost my train of thought here.  The fourth thing we

12     talked about was -- we had just completed a historic

13     structures report.  The Touro Synagogue, the building,

14     was really getting into deplorable condition.  The roof

15     was leaking.  You couldn't even -- if it rained you

16     couldn't go to the men's room or the women's room

17     because they were flooded out.  The columns, the

18     columns that I pointed out, large columns like this,

19     they were splitting, and the place was really being run

20     down.

21          We didn't have the money to restore the

22     synagogue.  And so we commissioned -- we actually went

23     to Bank Newport and we asked them for the money, if

24     they would give us the money to fund a historic

25     structures report done by Claude Menders.  And this

1     report came back, which was several hundred pages, and

2     it listed all the things that needed to be done at

3     Touro Synagogue.  It was very extensive.

4          And so we had that report, and we said to

5     Shearith Israel, What can you do to help us?  We need

6     to raise, we need to raise money, a lot of money,

7     several million dollars in order to restore the

8     building.  And, you know, what help can you offer us?

9          And they said, We're not paying; We're not

10    giving you any money; You're on your own.  I remember

11    them saying, We have our own synagogue to take care of;

12    We're not taking care of your synagogue.

13         I specifically asked for, I said, Well, could we

14    have your membership list?  Because -- could we make an

15    appeal to your members?  And they said, No, we're not

16    going to give you our list because we'll be soliciting

17    our own members for our own synagogue.

18         We asked if they had the names of any

19    fundraising companies or any suggestions at all, and

20    they said no.

21         And so we left, and we were kind of surprised

22    that they were so unhelpful.  And we sort of said to

23    ourselves, I guess that's why there hasn't been any

24    relationship with Shearith Israel prior to our group

25    coming into power, I guess, since -- before us.  I

1    guess that's why, because they have no interest in us.

2         And that's really what that meeting was.

3    **Q.**   Did there come a subsequent time when you were

4    involved with any request to Shearith Israel for them

5    to provide assistance?

6    **A.**   There was one other time and that was -- we as a

7    board in 2004, we realized that this building has to be

8    restored.  We just can't let it go any more.

9         We actually -- I told you we had a Claude

10   Menders historic structures report.  We actually

11   contacted the Department of Interior, and we paid them

12   to do a historic structures report, because we showed

13   Claude Menders report and they didn't feel it was

14   complete enough.

15        So I believe that I went to the Alletta Morris

16   McBean Foundation, and they gave money so that we could

17   hire the Park Service, and they said we will do a

18   historic structures report.  And that's when we

19   realized that this building needs like $3 million and

20   we -- not two, now we're up to $3 million to stabilize

21   this building.

22        And we said to ourselves that, you know, we're a

23   small group, a small congregation.  What we should do

24   is run a capital campaign, and that capital campaign

25   should be to do three things.  Well, it should be to

1    restore the synagogue for like $3 million.  It should

2    be to endow the synagogue for like $7 million.

3          And then we talked to John Loeb with regards to

4    the visitor center, and he said, you know, if you throw

5    in an endowment for the visitor center, I'll help you

6    fund the fundraising, and so we said sure.

7          So we came up with an idea of running a capital

8    campaign of $17 million.  But we said the first monies,

9    the very first 3 million is going to go to restore the

10   building.

11         And we went and we asked two members of our

12   congregation, Bernie Aidinoff and Laura Pedrick, if

13   they would go to New York and meet up with Shearith

14   Israel and explain to them that we really desperately

15   need $3 million.  And they came back and said --

16         MR. SOLOMON:  Objection, your Honor.  Calls for

17   a hearsay response.  The witness was not present.

18         THE COURT:  Hold on.  The objection is

19   sustained.

20         MR. NAFTALIS:  Let me do this in a non-hearsay

21   way.

22   Q.   I think you testified that you -- the synagogue

23   was in urgent need of restoration; right?

24   A.   Yes.

25   Q.   And as part of your campaign to get funds to

1    accomplish this worthy project, two members of the

2    synagogue, Mr. Aidinoff and Ms. Pedrick, went to New

3    York City; right?

4    A.    That's true.

5    Q.    And the purpose of their going to New York City

6    was to ask Shearith Israel to give financial assistance

7    in this campaign to restore Touro Synagogue?

8    A.    That's true.  Correct.

9    Q.    And you know that they went and had a meeting;

10   correct?

11   A.    I do, yes.

12   Q.    And they came back from the meeting; right?

13   A.    Yes, they did.

14   Q.    And they made a report from the meeting; right?

15   A.    Yes, they did.

16   Q.    And did you ever get a dime from Shearith Israel

17   towards this restoration project?

18   A.    Not a dime.  Nothing.

19   Q.    And what did Jeshuat Israel have to do -- you

20   didn't drop the project, did you?

21   A.    We did not drop the project.  And what we did is

22   primarily Bernie Aidinoff and myself set out to, with

23   some of the members of the board, set out to raise the

24   money, and we were able to raise $2 million for the

25   restoration of the building.

1          And so we had $2 million.  We went to Bank

2    Newport.  We borrowed $1 million.  And we hired a

3    company out of Boston called the Shawmut Company to

4    oversee the construction.

5          We went back to the Park Service and we said to

6    the Park Service would you actually do the

7    architectural drawings?  They had a hard time with that

8    because they said that they were not supposed to

9    compete with private architectural firms, and -- but

10   they said this building has such historic significance

11   that they're going to make an exception and they would

12   actually draw all the construction documents and they

13   would oversee the work.

14         And so with the $3 million, and the Park Service

15   having done the historic structures report and them

16   having done all the construction documents and

17   overseeing the work, we totally had the building

18   restored.

19   **Q.**   And you say a portion of the money was borrowed

20   from the Bank of Newport?

21   **A.**   Correct.  $1 million.

22   **Q.**   And was it -- and was that loan ever repaid?

23   **A.**   It has now been repaid, yes.  We initially went

24   back to everybody that we could think of, and we raised

25   a half a million dollars.  And then we were down to a

1    half a million dollars, and then just recently we shook

2    everything we could shake, everybody, to pay off the

3    loan, and we did pay off the loan.

4    **Q.**    And did Shearith Israel give you a dime towards

5    paying off that loan?

6    **A.**    No.  Not a dime.

7    **Q.**    Now, in connection with the -- tell me about how

8    Congregation Jeshuat Israel is governed.  I may have

9    asked you this already; if I did, please forgive me.  I

10    just want to put it in context.

11    **A.**    Well, we have a board, and we have a president or

12    some years co-presidents.  We have usually two or three

13    vice presidents, two or three assistant vice

14    presidents.  We have a secretary, a treasurer.  And

15    then we have members of the board.  And the top ten

16    officers form an executive committee, and they meet

17    when the board is not meeting.

18        And so it's run just like most organizations.

19    And we have committees.  So we have a committee that's

20    buildings and grounds committee.  We have a rituals

21    committee that handles the religious activities.  So

22    it's handled like most boards are handled.

23    **Q.**    And are members of the board elected by the

24    congregation?

25    **A.**    Correct, they are.

Q.    During the time that you have been involved as an adult with the synagogue, Congregation Jeshuat Israel, has Shearith Israel participated in the governance?

A.    No, they have not.

Q.    In any conversations that you had, whether at those two -- whether at that meeting in New York or otherwise, has anyone from Shearith Israel ever made any complaint about how Jeshuat Israel and the Touro Synagogue were being governed?

A.    Never.  Our relationship with Shearith Israel was really a one-way street.  It was -- we reached out to them on several occasions.  They've never reached back to us.

        MR. SOLOMON:  Your Honor, move to strike.  No question pending.

        THE COURT:  Denied.

Q.    And Shearith Israel appointed no members to serve on the board, did they?

A.    No, they never did.

Q.    Did you ever hear of any complaints from Shearith Israel that they weren't being informed of meetings?

A.    No, never.

Q.    Or votes?

A.    Never.

Q.    I asked you some questions about the synagogue

1    before, and I wanted to ask you something about another

2    piece of, another piece of property there, which is,

3    does Jeshuat Israel and Touro Synagogue have any

4    cemeteries?

5    **A.**    Yes.  We have a cemetery at the top of the hill on

6    Touro Street, corner of Kay, Touro and Bellevue Avenue.

7    **Q.**    And who maintains the cemeteries?

8    **A.**    Congregation Jeshuat Israel.

9    **Q.**    Does Congregation Shearith Israel contribute at

10    all to the maintaining or caring for the cemetery?

11    **A.**    They do not.

12    **Q.**    Is there insurance, liability insurance or any

13    other kind of insurance, on the cemetery?

14    **A.**    Yes, there is.

15    **Q.**    What kind of insurance is that?

16    **A.**    We have -- it's liability, basically.  I mean, I

17    think we actually have -- there's a big wall around it

18    that I think is insured.  But otherwise it's primarily

19    liability.

20    **Q.**    And who pays for the liability insurance on the

21    cemetery?

22    **A.**    Congregation Jeshuat Israel.

23    **Q.**    And does Congregation Shearith Israel contribute

24    any financial, any money towards the payment of the

25    insurance?

1   **A.**   No, they don't.

2        MR. NAFTALIS:  Could we put up Exhibit 316,

3   please.

4   **Q.**   Do you have it in front of you?

5   **A.**   I do.

6   **Q.**   And what is Exhibit 316?

7   **A.**   Well, this is --

8        MR. NAFTALIS:  Plaintiff's 316, for the record;

9   I'm sorry.

10  **A.**   This is a monument that is located in the

11  cemetery.  It's actually right up against a wrought

12  iron fence so that it's, it abuts the sidewalk of

13  Bellevue Avenue.  It was put there because it's very

14  visible if you're walking by or driving by, that you

15  can see it.  It's very large.  I mean, if I had to

16  guess, it's four and a half or five feet wide and it's

17  probably three feet tall.

18  **Q.**   Can you describe how visible it is from the street

19  or from outside the cemetery?

20  **A.**   It's very visible.  I mean you just -- it's right

21  up against this wrought iron fence, and the fence is

22  just posts, like posts, like it's the fence that goes

23  around the White House, and so it's probably, you know,

24  six or seven inches between the vertical post and so

25  you just -- and it's right up against it so that it's,

1    it is very visible.

2    **Q.**   And can you read the top three lines.

3    **A.**   (Reading)  Colonial Jewish cemetery of New England

4    purchased in 1677 and enlarged in 1768.

5    **Q.**   And can you continue.

6    **A.**   (Reading)  Among the known mortal remains interred

7    within are the following noted Newport families:

8    Abraham Touro, Judah Touro, Aaron Lopez, Moses Levy,

9    Moses Seixas, Israel Polock, Jacob Rodrigues Rivera,

10   Moses Michael Hays, Myer Benjamin.  First known burial,

11   Joseph Frazon of Massachusetts.  Owned and maintained

12   by Congregation Jeshuat Israel of Newport, assisted by

13   the Society of Friends of Touro Synagogue.

14   **Q.**   Have you had any conversation or communication

15   with anyone from Shearith Israel in which they objected

16   to this monument?

17   **A.**   Never.

18   **Q.**   Have you ever had a conversation or a

19   communication with anyone from Shearith Israel in which

20   they said, in words or substance, that that's -- that

21   this monument isn't accurate?

22   **A.**   Never.

23   **Q.**   And you mentioned earlier that Shearith Israel, to

24   your knowledge, paid any money at all at any time to

25   maintain the cemetery?

1    A.    Never.  No, they have not.

2    Q.    Now, who has the keys to the cemetery?

3    A.    Congregation Jeshuat Israel.

4    Q.    And to your knowledge does Shearith Israel have a

5    set of keys to the cemetery?

6    A.    To my knowledge they do not.

7    Q.    And usually the owner has the keys; right?

8    A.    Correct.

9    Q.    Now, I think you testified earlier about the

10    George Washington letter reading.

11    A.    Yes.

12    Q.    And I think you testified that occurs, what, the

13    third Sunday in August, give or take?

14    A.    Correct.  Yes.

15    Q.    I always get them mixed up because the birthdays

16    don't always happen when they're supposed to.

17         And at the time that people come for the George

18    Washington letter reading, is the cemetery open for

19    tour?

20    A.    It is.  We encourage people to go in and see it.

21    Q.    Is it left locked or unlocked for this?

22    A.    Well, there's usually a meeting of the, what's now

23    called The Foundation, and we open it up, and people

24    come up and go through it.

25    Q.    Now I want to ask you some questions about the

1    current status of the financial condition of

2    Congregation Jeshuat Israel.  Okay.

3         You have familiarity with their financial

4    condition?

5    **A.**    Somewhat.  I'm not the treasurer, but I have some

6    knowledge.

7    **Q.**    During the time -- and you've been, what, since

8    1993 either the president or the co-president or a

9    board member and active in the governance of the

10   synagogue; is that true?

11   **A.**    That's true.

12   **Q.**    And tell us a little bit about the general,

13   because we'll have a witness that can talk about the

14   books, all right, but the general financial condition

15   of the synagogue.

16   **A.**    Well, our operating budget is approximately, has

17   been, about $350,000 a year.  Of that we get roughly a

18   hundred thousand from the Abraham Touro Fund.  The

19   other 250,000 comes from donations, gifts and dues.

20        Now, in the last seven years our budget -- we

21   didn't have that money, and we were going into the

22   hole, and to stay alive we were using reserves that we

23   had that had to be repaid back.  But, so we were

24   constantly in the negative.

25        And so we cut all of our expenses to the bone, I

1    mean, let everybody go; so that the only employee that

2    we have is a rabbi, and, on an hourly rate, I believe,

3    we have someone to cut the grass and, you know, open

4    the doors and that.

5          But we don't have an executive director any

6    longer.  We don't have a secretary any longer.  We have

7    shut down our community center in the winter because we

8    don't have the money to heat it, and so when we have

9    meetings, we meet somewhere else.  Or, you know, when

10   we have committee meetings they might meet at my

11   office, for example, in the winter, so that we don't

12   have to heat the community center.

13         And in the community center is rabbi's office

14   and it has a chapel which we're really not able to use

15   in the winter.

16         So we've cut all of our expenses down to go from

17   about 350,000 down to about 250,000, and that's why

18   we're able to right now break even, for the most part.

19   Q.   And you say there was formerly a paid executive

20   director?

21   A.   Yes.

22   Q.   And who was that?

23   A.   Well, it was, I think it might have been Bea at

24   some time, Bea Ross, and Kathy.  We had -- right up

25   until I'm guessing 2008 we took Kathy, who I believe

1    was full-time, and then we made her part-time, and then

2    we had to let her go totally because we couldn't afford

3    it.

4    **Q.**   Who is doing that job now?

5    **A.**   All volunteers.  Everything done at Touro

6    Synagogue today, other than rabbi or maintenance, is

7    done by volunteers.

8         THE COURT:  You said the Abraham Touro Fund.

9    That's the state fund endowment?

10        THE WITNESS:  Yes.

11        THE COURT:  What happens to the money that was

12   left to the city of Newport in endowment?  Where does

13   that go, or is that included in here?

14        THE WITNESS:  That's included, but that's not a

15   lot of money.  That money is with the city of Newport,

16   and I think that might generate $5,000 a year, so it's

17   not very much.

18        The Abraham Touro money, unfortunately the state

19   managed it for hundreds of years, and they had it

20   either in non-interest bearing checking accounts or

21   they had it in bank stocks that did very, very poorly.

22   So about ten years ago, when Nancy Mayer was the

23   treasurer, we were able to partition the legislature to

24   allow us to manage the money.  So Congregation Jeshuat

25   Israel manages that Abraham Touro Fund instead of the

1    state.

2            Initially we put it with Brown Brothers and

3    Harriman (sic) in New York.  And then we have since

4    changed it.  It is now with the Jewish Foundation.

5    It's spinoff of the Jewish Federation of Rhode Island,

6    Jewish Alliance.  So they have a foundation, and

7    they're now managing the money.

8            THE COURT:  What's the corpus right now?

9            THE WITNESS:  About, I'm guessing, $2 million.

10   **Q.**   Did the people at Jeshuat Israel have meetings or

11   conversations or discussions of what do we do to deal

12   with these challenging financial problems?

13   **A.**   Yes, we did.

14   **Q.**   And tell us, before you get to the specifics of

15   what may have been discussed, were any structures set

16   up to deal with this, any committees or any group?

17   **A.**   Yes.  Well, we formed a committee of seven people,

18   this goes back to 2008, for the purpose of seeing what

19   we could do to raise money or get an endowment.

20           The concern we have is that we have a dwindling

21   congregation.  There are very, very few people that

22   want to join an orthodox synagogue in a small New

23   England town.  And so we see where the congregation is

24   getting smaller and we -- I don't know if I can go too

25   far afield, but you can stop me.

1          But we view Touro Synagogue different than any

2     other synagogue in the world.  If any other synagogue

3     in the world loses its membership, fine, put a key in

4     the door and lock it up, sell the building if you want.

5          Touro Synagogue is unique, and the members of

6     Touro Synagogue are committed to say that the oldest

7     synagogue in the United States must not close and must

8     not become a museum.  We don't want people to come

9     through and say there once were weddings here, there

10    once were bar mitzvahs here.  Because, as Mr. Naftalis

11    pointed out in his opening remarks, that's what's

12    happened in a lot of synagogues in Europe.  And it

13    would send a terrible message to the rest of the world

14    to have the oldest synagogue in the United States

15    close.

16          Because of that, now that this congregation was

17    able to get that building totally restored, we said

18    while we still have the strength and power, we need to

19    endow it.  And we want to, because we get tens of

20    thousands of people who not only visit Touro Synagogue

21    but want to worship there, and to worship there you

22    need to have a rabbi, you need to have services.

23          So we don't want the doors to be closed.  We

24    need to have an endowment.  What we said, we need an

25    endowment of approximately $7 million.  Why $7 million?

1    Because $7 million at four and a half percent interest

2    was $300,000.  We wanted to take about 15 percent,

3    which is $50,000, and put it for a reserve for capital

4    expenses.  That left 250,000.  We knew that we were

5    getting, from the Abraham Touro Fund, about a hundred

6    thousand.

7         There's $350,000 that Touro Synagogue could live

8    in perpetuity, way past our generation, for the future,

9    and it will always be open with a rabbi, heat,

10   electricity, for all of the tens of thousands of Jews

11   that come from around the world to pray.

12        That was our mission.  And that's why we formed

13   a group of seven people in 2008 to say how is it

14   possible for us to make this a reality.

15   Q.   And in terms of raising this endowment, what

16   options did you consider or did you -- withdrawn.  Let

17   me start again.

18        Did you consider potential options?

19   A.   We did.  The first one we looked at was raising

20   money.  Everybody said, Well, is it possible to raise

21   money?  We had been down that road.  We tried to raise

22   money for the building, 3 million and $7 million.  We

23   were unsuccessful.

24        Actually we think we were incredibly successful

25   to raise, this little group of people, raise $3

1    million.  That was enormous that we were able to do it.

2    But we realized that we couldn't raise any more, and

3    we'd asked people and they would say, I have my own

4    synagogue to worry about; I'm not going to worry about

5    your synagogue.

6         And we, after a lot of effort and time, energy,

7    we said, You know what?  When we raise that last

8    500,000 and pay off Bank Newport, we tapped out

9    everybody.  There was no one left that we could

10   approach.  So we knew fundraising was not going to get

11   our endowment.

12        And so we looked at what assets we had, and we

13   looked at our community center and we said, well,

14   that's going to bring in five or $700,000.  That's not

15   going to do it.

16        And then we looked at the rabbi's house, and we

17   said, well, that's going to bring in $500,000.  That's

18   not going to do it.

19        You mentioned that we had a painting.  Well,

20   that was worth $50,000.

21        And so we said, you know, the only thing that we

22   have of value, and we don't know how much it's worth,

23   is one set of, one set that we would be willing to sell

24   of Myer Myers rimonim.  And if we were able to sell it

25   under an arrangement where we were guaranteed it

1    wouldn't go into a Russian oligarch's living room, but

2    that was something that would be very palatable to us,

3    if we could do that, and we could get $7 million, and

4    we put it into a trust where no one could ever touch

5    the principal, that is something we would look into.

6    And that was the road we chose to go down.

7    Q.    I take it that it wasn't that you wanted to sell

8    the rimonim.  You felt that was your only option.

9    A.    Yes.  We felt it was our only option, and we said

10   if we don't secure the future of Touro Synagogue right

11   now -- the two things:  If we don't restore the

12   building, and we don't create an endowment, well, it

13   will never happen.

14   Q.    In connection with this potential, did you speak

15   to, did you speak to people at Christie's or Sotheby's?

16   A.    We did.  We first approached Sotheby's, and we

17   said to Sotheby's, how would you go about selling the

18   set of rimonim?

19         MR. NAFTALIS:  You can answer.

20   A.    And they said that our suggestion --

21         MR. SOLOMON:  Your Honor, I object.

22         THE COURT:  Sustained.

23         MR. NAFTALIS:  Your Honor, I think the objection

24   was on hearsay grounds that was sustained, but we're

25   really not offering it for the truth.  We're offering

1    it just for the fact it was said to him.  So the

2    context of what Sotheby's said to him could be true or

3    not true, but it was what was said to him.  It's a

4    non-hearsay purpose.

5         THE COURT:  State of mind, Mr. Solomon.

6         MR. SOLOMON:  Your Honor, there's no state of

7    mind exception for selling what you don't own.

8         THE COURT:  The Court will reconsider its prior

9    ruling, and the objection is overruled on the issue of

10    state of mind, not as to the truth of the matter

11    asserted.

12        MR. SOLOMON:  And, your Honor, I just don't want

13    to not say this.  This is what is then going to open

14    the state of mind of Shearith Israel with respect to

15    their reasons for objecting to the sale.

16        THE COURT:  Well, I'm not so ruling.  That may

17    be your warning to the Plaintiffs, but we'll deal with

18    that when it happens.

19        MR. SOLOMON:  I'm sorry, your Honor, I wasn't

20    suggesting that's how you were ruling.  But I didn't

21    want to be remiss, because if somebody is not on their

22    feet then we're all claiming to have waived things, and

23    I know that your Honor has granted a motion to strike

24    Robert Soloveichik.  It goes to the question of motive

25    and state of mind that we're now addressing.

1          MR. NAFTALIS:  Just so the record is clear, and

2     you'll hear from his testimony, this opens no door to

3     nothing that they're trying to slip in.  This goes to

4     why they chose to go with one firm as opposed to

5     another firm.  It has nothing to do with why these guys

6     scuttled the deal.

7          THE COURT:  I've ruled.  You can proceed.

8     **A.**   So we went to Sotheby's, and Sotheby's said that

9     our suggestion to sell the rimonim would be to have an

10    auction, a public auction.  And we thought about it,

11    and we said no, we don't want to do that for two

12    reasons.  One, we don't know what it's going to bring.

13    If it doesn't bring in $7 million, it doesn't

14    accomplish our goal, so we're not going to sell it.

15    And, two, we're concerned that who is going to buy it?

16    As I mentioned before, we didn't want it to go into

17    somebody's living room.  So we said to Sotheby's, no,

18    we're not going to deal with you.

19          We then approached Christie's, and Christie's

20    said to us, We agree with you; we don't think a public

21    auction is the way to go.  We think what we'd like to

22    do is identify five potential buyers, and we would like

23    to go to each one, one at a time, and we would offer

24    the rimonim to the first party, and they would say yes

25    or no, and if they said no we go to the second, the

1    third, the fourth and the fifth.

2         They said, however, this is something that you

3    must not tell anybody that you're doing this.  This has

4    to be kept totally confidential.  And the reason that

5    they wanted it confidential is because, they said, two

6    things.  One, we want to be able to approach these

7    people and say this is not public; it's an opportunity

8    of a lifetime, if you want it.

9         And, two, because there were three other sets of

10   Myer Myers rimonim, there was a fear that if

11   Philadelphia, for example, their congregation, which

12   has two sets, if they were to put one of their sets on

13   the market, the price would precipitously just drop.

14   And so they said it is really important that you don't

15   tell anybody that we're doing this, and we're just

16   going to go to the five people.

17        Well, they went to the five people and all five

18   said no, we don't want it.  And so this is now 2010.

19        And it was just at this time that the Museum of

20   Fine Arts had just built a new wing called the Art of

21   the Americas, and they have on the first floor a room

22   called the Newport Room, and in the Newport Room they

23   have six or seven pieces of Goddard and Townsend

24   furniture, and they contacted Christie's and -- because

25   Christie's at this point had approached certain museums

1   to see if they were interested in buying it, the

2   rimonim.

3         And they approached Christie's and said to

4   Christie's, Do you think that Congregation Jeshuat

5   Israel would allow us to have the rimonim on display in

6   the Newport Room for our grand opening?  And Christie's

7   came to us and we said yes, that would be a wonderful

8   thing; we would do it.

9         They said, the Museum of Fine Arts said we will

10   insure it, and we turned it over to them, and they

11   actually had a beautiful display case and they put it

12   in the Newport Room.

13         And they said to us that while they have it --

14   they had just been given a donation to have a Jewish, I

15   don't know if it was a curator or a Jewish program

16   person, and they would love to use the rimonim to have

17   educational classes.  They said to us we did get over a

18   million people a year coming through here, and we would

19   like to tell the same story that you're trying to tell

20   in the visitor center, the story, the original colonial

21   Jews that were in this country a hundred years before

22   the Revolutionary War.

23         MR. SOLOMON:  Objection.  Move to strike, unless

24   your Honor is taking this for state of mind.

25         THE COURT:  I am.  Denied.

**A.**   And so we said to ourselves, you know, what they want to do is exactly what we want to do, and so we allowed it to be there for the opening and we allowed it to stay there.  And it stayed there for about 10 months.  And after about 10 months the Museum of Fine Arts contacted Christie's and said we would like to purchase the rimonim, and we have a donor who is willing to put up about -- who is willing to make a large donation to the Museum of Fine Arts, and they told us that the donor had no interest in the fact that it was Jewish or that it was religious.  The interest was that, in his opinion, this was the finest example of colonial silver that was out there, and they would really like to have it.

And they came, and through Christie's they made an offer to us of $5 million.  And we met and we said no, we're not going to do it because unless we can get $7 million which is going to ensure the future, that's the only way this is going to happen.

And they then came back and said, okay, subject to our raising the money -- because they would have to raise the balance of the money -- subject to our raising the money, we would offer $7.4 million; 400,000 goes as a commission to Christie's, and your congregation would get $7 million.

1          THE COURT:  Is this a good break time?

2          MR. NAFTALIS:  Yes, it is, your Honor.  Thank

3     you.

4          THE COURT:  Mr. Bazarsky, you can step down.

5     We're going to adjourn for the day.  I think I misspoke

6     on the schedule.  I said we'd be meeting every day

7     until we're done.  In case anyone is not here before

8     then, we are not meeting on Thursday.  I have a

9     criminal jury that I have to empanel that day.  So

10    we're going to meet Tuesday, Wednesday, Friday of this

11    week and then every day next week.

12         MR. NAFTALIS:  Thank you, your Honor.

13         THE COURT:  We'll stand adjourned.

14         (ADJOURNED)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

      I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


      /s/  Denise P. Veitch

_____

      Denise P. Veitch, RPR



      June 22, 2015

_____

      Date