1

TRIAL DAY 2

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF RHODE ISLAND

NO.:  12-822-M(LDA)

--------------------------------x

CONGREGATION JESHUAT ISRAEL,

              Plaintiff

V.

CONGREGATION SHEARITH ISRAEL,

              Defendant.

---------------------------------x


TRIAL DAY 2,

Tuesday, June 2, 2015, 9:30 a.m.

Before:    Judge John McConnell

United States District Court

One Exchange Street, Providence, Rhode Island




Reported by:

Tara L. Wosny, CSR

1                    JUNE 2, 2015, 9:30 a.m.

2

3            Trial, Day 2, held at the United States

4       District Court, for the District of Rhode

5       Island, One Exchange Street, Providence, Rhode

6       Island, pursuant to Agreement before Tara L.

7       Wosny, a Certified Shorthand Reporter, and a

8       Commissioner within and for the State of

9       Rhode Island.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          APPEARANCES:

 2          KRAMER LEVIN NAFTALIS & FRANKEL, LLP

 3          BY:  Gary P. Naftalis, Esquire,

 4          Jonathan M. Wagner, Esquire,

 5          Tobias B. Jacoby, Esquire,

 6          Daniel P. Schumeister, Esquire

 7          1177 Avenue of the Americas

 8          New York, NY 10036

 9          212.715.9253

10          gnaftalis@kramerlevin.com

11          tjacoby@kramerlevin.com

12          Counsel for the Plaintiff

13

14          PATRIDGE SNOW & HAHN, LLP

15          BY:  Steven E. Snow, Esquire

16          40 Westminster Street, Suite 1100

17          Providence, Rhode Island 02903

18          401.861.8200

19          ses@psh.com

20          Counsel for Plaintiff

21

22

23

24

25
```

```
1       APPEARANCES CONTINUED:

2       LOCKE LORD, LLP

3       BY:  Deming E. Sherman, Esquire

4       Providence, Rhode Island 02903

5       401.274.9200

6       deming.sherman@lockelord.com

7       Counsel for the Defendant

8

9       CALDWALADER, WICKERSHAM & TAFT

10      BY:  Louis M. Solomon, Esquire,

11      Yan Grinblat, Esquire,

12      Colin Underwood, Esquire, and Jennifer Chiang,

13      Esquire

14      One World Financial Center

15      New York, New York 10281

16      212.504.6000

17      louis.solomon@cwt.com

18      yan.grinblat@cwt.com

19      jennifer.chaiang@cwt.com

20      Counsel for the Defendant

21

22

23

24

25
```

1    APPEARANCES CONTINUED:

2    RHODE ISLAND DEPARTMENT OF THE ATTORNEY GENERAL

3    BY:  Adam J. Sholes, Esquire

4    150 South Main Street

5    Providence, Rhode Island 02903

6    274.4400 x 2219

7    Ajsholes@riag.ri.gov

8    Counsel for the Attorney General of the State of

9    Rhode Island

10

11    ALSO PRESENT:

12    Louise Teitz

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X

2    WITNESS:          Direct  Cross   Redirect   Recross

3              .

4    DAVID BAZARSKY

5

6    By Mr. Naftalis      8                185

7    By Mr. Solomon            45, 117

8

9

10

11
     Defendant's Exhibit No. 3 (Demonstrative) - 155
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2                         *   *   *

3              THE COURT:  Welcome back.  We are

4       pleased to have a new court reporter with us

5       today, so I don't normally begin every day

6       asking the attorneys to identify themselves for

7       the record, but I'm going to today to help her

8       get used to your voices and your presence.  So

9       Mr. Naftalis.

10             MR. NAFTALIS:  Good morning, Your

11      Honor, Gary Naftalis with Kramer, Levin,

12      Naftalis & Frankel.  With me are Jonathan Wagner

13      and Toby Jacoby.

14             MR. SNOW:  Steven Snow for the

15      plaintiff, Partridge, Snow & Hahn.

16             MR. NAFTALIS:  And with us is Professor

17      Louise Teitz from the Roger Williams Law School

18      as a client representative on behalf of the

19      Congregation Jeshuat Israel.

20             THE COURT:  Thank you, Mr. Naftalis

21                  Mr. Solomon.

22             MR. SOLOMON:  Good morning, Your

23      Honor.

24             THE COURT:  Good morning, how are you?

25             MR. SOLOMON:  Well, thank you, Your
```

1      honor.

2              Co-Counsel, Mr. Sherman, is known to

3      the Court, and I hope to the court reporter.

4      With me are my colleagues, Mr. Underwood,

5      Ms. Chiang, Mr. Grinblat and Mr. Mendes and Miss

6      Nuata. [phonetic] Thank you.

7              THE COURT:  Great.  Welcome everyone.

8      I think I saw Mr. Bazarskey.  Unless you've

9      settled this case.  Apparently not.  Come on up.

10             THE COURT:  You know you're still under

11     oath.

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  Okay.  Thanks.

14                     *   *   *

15     DIRECT EXAMINATION BY MR. NAFTALIS:

16  Q.   Good morning, Mr. Bazarsky.

17  A.   Good morning.

18  Q.   I wanted to go back to one item that I asked you

19       about earlier and neglected to show you a

20       document about, which is -- I think you had

21       testified about the annual reading of the George

22       Washington's letter that the Touro Synagogue and

23       Congregation Jeshuat Israel, Touro Synagogue

24       Foundation are involved in?

25  A.   Correct.

1    Q.    And remind us again when does it happen?

2    A.    It happens on the third Sunday of each August.

3    Q.    I think you indicated on one of the recent

4          readings, Supreme Court Justice Elena Kagan was

5          the keynote speaker; is that correct?

6    A.    That is correct.

7    Q.    I will place on the monitor in front of you

8          Plaintiff's Exhibit 317 in evidence.  Can you

9          tell His Honor what this document is?

10   A.    Well, this is a brochure that everyone who

11         attends the George Washington letter is given.

12   Q.    What is the date of this brochure?

13   A.    August 13, 2013.

14   Q.    And does it commemorate a particular anniversary

15         in the Touro Synagogue's foundings?

16   A.    It did.  It commemorates the 250th anniversary

17         of Touro Synagogue.

18   Q.    And states on the bottom, "The sponsors Touro

19         Synagogue Foundation and Congregation Jeshuat

20         Israel," does it not?

21   A.    It does.

22   Q.    Sunday, August 18, 2013?

23   A.    Correct.

24   Q.    At Touro Synagogue Newport.  Could we go to the

25         second part of this document.  If you look on

1      the right side, what does that contain?

2   A.  Well, that is the program itself, and it lists

3      the people who -- the names of the people who

4      will be participating in the program.

5   Q.  And it indicates Senator Reed as the master of

6      ceremonies?

7   A.  That is correct.

8   Q.  Who is the next speaker?

9   A.  Is the Rabbi Marc Mandel of Touro Congregation

10      Jeshuat Israel.

11   Q.  What happens next in the program?

12   A.  The Artillery Company of Newport does a

13      presentation of colors.

14   Q.  And then there are some additional speakers?

15   A.  Correct.  There is the co-president of

16      Congregation Jeshuat Israel and the treasurer of

17      the Touro Synagogue Foundation.  There is

18      greetings from the mayor of Newport.  There is

19      greetings from the governor of the State of

20      Rhode Island, and there is greetings from

21      Senator Sheldon Whitehouse.

22   Q.  Then is there is some sayings --

23   A.  Yes.  Then it is tradition that we have someone

24      who sings America the Beautiful and God Bless

25      America at the conclusion.

```
1    Q.   And then it indicates there is some

2         presentations.  What are they?

3    A.   Well, there are some awards.  There is a Slom

4         Scholarship Award that is given to students.

5         That's given annually at the George Washington

6         letter reading, as well as there is the Judge

7         Alexander George Teitz award, which is given --

8         it was given posthumously that year to Noreen

9         Drexel.

10   Q.   And it indicates that Andrew Teitz is giving the

11        award?

12   A.   Yes, he was chairman of the Touro Synagogue

13        Foundation.

14   Q.   And is Andrew Teitz related to Professor Louise

15        Teitz?

16   A.   I believe they are brother and sister.

17   Q.   And have they been active in the Touro Synagogue

18        and Jeshuat Israel for many years?

19   A.   Many years, as well as their parents and

20        grandparents.

21   Q.   Then it indicates that there are certain

22        readings; is that correct?

23   A.   Yes.  We usually have a distinguished person who

24        would read the Moses Seixas letter, the letter

25        that went to George Washington.  And then we
```

1      would have someone read the George Washington

2      letter itself, and then there is a keynote

3      address.

4  Q.  And the two letters, are they located on the

5      program?

6  A.  They are.  They are on the left side of the

7      program.  The top letter is the Moses Seixas

8      Letter, and the bottom letter is the George

9      Washington letter.

10  Q.  And you said then the guest speaker speaks or

11      does somebody introduce the guest speaker?

12  A.  Correct.  In this case it was Bernie Aidinoff

13      who was the past president of the Touro

14      Synagogue Foundation.

15  Q.  Is Mr. Aidinoff -- can you tell us whether or

16      not Mr. Aidinoff was a member of Congregation

17      Jeshuat Israel?

18  A.  Yes, he's been a member his entire life.  He was

19      also bar mitzvahed at Touro Synagogue when he

20      was 13.

21  Q.  Is this the same Mr. Aidinoff about whom you

22      testified yesterday was involved with you in the

23      major fundraising to restore the Touro

24      Synagogue?

25  A.  Yes.  That's right, yes.

1    Q.    Who is the keynote speaker?

2    A.    This year it was Justice Elena Kagan.

3    Q.    And then tell us about the rest of the program?

4    A.    Well, then there is another -- the singing of

5          God Bless America.  And then there was a

6          benediction by a Reverend Hanson who is from the

7          United Baptist Church.

8    Q.    Is that in Newport that church?

9    A.    It is, yes.

10   Q.    When we left off yesterday -- one other

11         question.  You mentioned here a Rabbi Mandel; is

12         that correct?

13   A.    Yes.

14   Q.    He is the current rabbi of the Touro Synagogue?

15   A.    Correct.

16   Q.    And of Congregation Jeshuat Israel?

17   A.    Yes.

18   Q.    When he was hired did Shearith Israel play any

19         role in his hiring?

20   A.    They did not.

21   Q.    Have you ever heard any objection from Shearith

22         Israel about lack of advance approval for hiring

23         Rabbi Mandel?

24   A.    We did not.

25   Q.    Now, when we left off yesterday, we were talking

1          about the attempts to raise an endowment.  Do

2          you recall that?

3     A.   Yes.

4     Q.   I think you had told us about some of the

5          efforts and -- including and leading up to

6          dealing with the Museum of Fine Arts in Boston

7          is that correct?

8     A.   Correct.

9     Q.   I'd like to return to that topic for a moment.

10         I believe -- I think you told us there were two

11         major firms that you had chosen from for your

12         representatives in this -- do you remember that?

13    A.   Are you talking about Sotheby's and Christie's?

14    Q.   Yes.  And just remind us again which one you had

15         chosen.

16    A.   We decided to go with Christie's.

17    Q.   And Christie's was the one who advocated a sale,

18         a private sale to an institution as opposed to a

19         public sale or auction?

20    A.   Yes.

21    Q.   I think you had indicated that the rimonim had

22         been placed on display -- I think you told us as

23         far as timewise, the actions of this committee

24         began in 2008?

25    A.   2008.

1    Q.   And when was the proposed transaction agreed to?

2             MR. SOLOMON:  Objection.  The

3       information that I believe the witness is

4       testifying to is not from even a hearsay source,

5       but it's from a hearsay, hearsay source, and I'm

6       not going to be to cross examine that.  I

7       believe that it is not directly -- no foundation

8       has been laid.

9             THE COURT:  Maybe I misheard, and I'm

10      at a loss because I don't have real time anymore

11      because of the court reporter situation.  So I

12      might have the question read back, but I thought

13      the question was, when was the agreement come to

14      sell, which I think was evidenced in the June

15      2012 minutes; isn't it?  I assume that's the

16      agreement.

17             MR. NAFTALIS:  That's exactly what

18      happened.  I was just trying to set up a time

19      marker.

20             THE COURT:  I think the issue was the

21      thought about selling these began in 2008, and

22      then ultimately on June 15, I think or

23      something.  Exhibit 228, the minutes, where they

24      take a vote and it's 31 to 6 or something.  I

25      assume that's what he's talking about.

```
 1              Why don't we see and if you still have
 2         an objection, Mr. Solomon, than press it.
 3              MR. NAFTALIS:  If I could be the
 4         witness I would say, yes, that's what I'm
 5         talking about.
 6    BY MR. NAFTALIS:
 7    Q.   Is it your basic recollection of the month and
 8         the year that the transaction, the proposed
 9         transaction was agreed to, was June 2012 as
10         you're talking about when the Congregation
11         approved the sale?
12    A.   Yes.
13    Q.   And just, again, to set our time line, when had
14         the rimonim placed on loan to the Boston Museum
15         of Fine Arts?
16    A.   In 2010 when they opened the Art of Americas new
17         building.
18              MR. NAFTALIS:  Could you put Defendants
19         Exhibit 564 up, please.
20    Q.   I'll show you Exhibit 564, sir, which is
21         evidence which is the plaque or descriptive part
22         of the placard, descriptive materials that the
23         Museum of Fine Arts placed on the exhibit; is
24         that correct?
25    A.   It is.
```

1   Q.   You've personally seen the --

2   A.   I have.

3   Q.   And this inscription, this was done by the

4        Museum of Fine Arts, or who was it done by?

5   A.   It was done by the Museum of Fine Arts.

6   Q.   And could you read the first two sentences of

7        the descriptive materials that the Museum of

8        Fine Arts had placed on this, on the exhibit of

9        the Myer Myers Rimonim, which you lent to them?

10  A.   "Among the rarest works of American silver,

11       characterized by brilliant open work and

12       exuberant shapes, these finials for a Touro

13       scroll are masterpieces of the New York

14       silversmith, Myer Myers.  Since before the

15       Revolution, they have been associated with

16       Congregation Jeshuat Israel of Newport Rhode

17       Island whose 1763 building, Touro Synagogue, is

18       the oldest synagogue in the United States still

19       in use."

20  Q.   And to the best of your knowledge, is this

21       inscription and this regarding the rimonim, this

22       has been on display there now for five years?

23  A.   Correct.

24  Q.   Prior to this dispute with the New York Shearith

25       Israel, did you ever hear of any complaints

1         whatsoever about the loaning of the rimonim to

2         the Museum of Fine Arts?

3  A.   We did not.

4  Q.   Any claim or comment by them that there was

5         anything inaccurate about the inscription on the

6         wall relating to the rimonim?

7            MR. SOLOMON:  Objection.  There is no

8         foundation that -- there is no evidence that

9         Shearith raises anything about the wall or the

10        inscription.

11          THE COURT:  Overruled.

12  A.   No, we never heard any objection.

13  Q.   No one from Shearith Israel ever called you up

14        or anyone on the board of Jeshuat Israel and

15        said, do you know that the Museum of Fine Arts

16        is -- inaccurately said that your congregation

17        has been around since way back when, including

18        back to Colonial times and the Revolution and

19        these rimonim have been associated with your

20        congregation?

21  A.   No, never have.  I mean, prior to the lawsuit,

22        Shearith Israel had never commented to

23        Congregation Jeshuat Israel, anyone about the

24        rimonim or any personal property

25          THE COURT:  Mr. Bazarsky, do you know

1        anyone from Shearith Israel ever saw the

2        inscription on the MFA exhibit?

3              THE WITNESS:  I do not know.

4        BY MR. NAFTALIS:

5    Q.  Now, I think the judge focused you better than

6        I, so I'll follow his lead.  You indicated that

7        there came a point in time where -- did there

8        come a point in time where the congregation was

9        asked to vote on the proposed transaction with

10       the Museum of Fine Arts?

11   A.  Yes, in 2012, in June.

12   Q.  And if we could put up exhibit -- and at that

13       board meeting were minutes taken?

14   A.  Yes, there were.

15   Q.  And were presentations made?

16   A.  Yes.

17   Q.  And was there a principal presentation made on

18       behalf of your committee?

19   A.  Yes, there was.

20   Q.  And who made that presentation?

21   A.  I believe it was Andy Seagle?

22   Q.  And was his presentation --

23              MR. NAFTALIS:  Let's put up Exhibit

24       230.

25   Q.  Have you seen this document before?

1    A.    I have.

2    Q.    And what is this document?

3    A.    This is the -- I believe it's the speech that

4          Andy Seagle had written out to read to the

5          congregation at the board -- at the congregation

6          meeting.

7    Q.    And was this document subsequently distributed?

8    A.    I don't think it was distributed.

9                    THE COURT:  It was attached to the

10         minutes.

11         BY MR. NAFTALIS:

12   Q.    Was it attached to the minutes?

13   A.    Yes, it was attached to the minutes.

14   Q.    And the minutes went to everybody who is a

15         member of the congregation?

16   A.    Correct.

17   Q.    Those in attendance, as well as those who were

18         not at the meeting?

19   A.    Correct.

20   Q.    And the minutes are Exhibit 228 in evidence,

21         just for your -- I'd like to look at

22         Mr. Seagle's presentation for a moment with

23         you.  Could you read the first paragraph?

24   A.    "You are here today to make a very important

25         decision that will ensure the future of Touro

1        Synagogue for many generations to come.  It is a

2        difficult decision, and one I strongly oppose

3        when it first presented itself almost four years

4        ago.  That is why I became actively involved

5        with the committee in 2008 charged with the task

6        to investigate the possible sale of Touro assets

7        to stay financially solvent."

8    Q.  Could you read the second paragraph?

9    A.  "But to sell or deaccession an object just to

10       become financially solvent was not the ultimate

11       goal of the committee.  If we were to sell

12       something, it had to go beyond providing a Band-

13       Aid solution."

14   Q.  Please read the third paragraph.

15   A.  "It became clear that our rimonim which were

16       appraised in the hundreds of thousands at that

17       time were potentially viable objects that could

18       be for sale.  But it was understood that unless

19       we were able to realize a figure that would

20       represent a solid endowment base, we would not

21       present it to the congregation."

22   Q.  And could you continue?

23   A.  "Over the past four years I would like to give

24       you an understanding of how we have gotten to

25       this point.  Please listen carefully because

1          many of your concerns and questions may be

2          answered.   The committee members are Beau Ross,

3          Louise Teitz, Laura Pedrick, David Bazarsky and

4          Alan Feinberg.

5               "Initially the committee worked on its

6          own in conducting exploratory visits with top

7          figures in Judaica.   These included local

8          contacts at the Golding Judaica Center at

9          Brandeis University, Jonathan Sarna, David

10         Barquist, Myer Myers scholar at Yale University,

11         and our own congregate philanthropist and

12         collector Roy Zuckerberg, Patricia Payne from

13         the Yale University Art Gallery, George Ross,

14         founding supporting of the National Museum of

15         American Jewish History, Jewish Museum in New

16         York and others.

17              "At the recommendation of Roy

18         Zuckerberg, we conducted three interviews with

19         three entities for appraisal value and for

20         possible avenues and ideas of how to present

21         these objects for sale.   The three were Jonathan

22         Trace, a highly regarded dealer and silver

23         expert and the silver experts from Christie's

24         and Sotheby's."

25    Q.   His presentation indicates that Roy Zuckerberg

1          put your committee in touch with Christie's

2          Sotheby's and this Mr. Trace in connection with

3          the potential to see about a potential sale of

4          the rimonim; is that correct?

5     A.   That is correct.

6     Q.   And this is the same Mr. Zuckerberg about whom

7          you testified was a contributor to the

8          restoration of the rimonim?

9     A.   Correct.

10    Q.   Go on.  If you could go on to the next page.

11    A.   "For a pure silver dealer/collector prospective,

12         these items had a value of around one million to

13         $1,200,000.  From an auction house perspective,

14         these items had a much higher value representing

15         much more than rareties among 18th century

16         Judaic worldwide.  These venerated objects, like

17         the Touro Synagogue itself, have become symbols

18         of religious tolerance in the age of

19         enlightment.

20              "So we solicited formal proposals from

21         both Christie's and Sotheby's to help us decide

22         on a methodology if we were going to sell these

23         items.  It came down do Christie's recommending

24         a private sale versus Sotheby's recommending a

25         public worldwide auction.  The committee chose

1           the private sale option because can ask for hire

2           price established at auction, allows for greater

3           control over all aspects of sale.  The synagogue

4           can choose an eventual purchaser, i.e. a

5           philanthropist with a record of lending support

6           of institutions.

7                "The synagogue can control public

8           relations, individually approach collectors or

9           institutions are often willing to pay a premium

10          to acquire a property that has been withheld

11          from public exposure.  The largest purchases is

12          by the Metropolitan Museum of Art, the Museum of

13          Modern Art and the nudes gallery have all been

14          private.

15               "Some disadvantages of a public auction

16          are, cannot control where works end up and who

17          is the buyer."

18     Q.   Can I interrupt you for a second.  I think you

19          had testified the congregation or the committee

20          and the congregation had a concern of not

21          wanting the rimonim to end up in the hands -- I

22          think you testified a Russian oligarch?

23     A.   That's true.

24     Q.   I mean, it was very important.  There were two

25          parts to this.  One part was to generate enough

1  money to have the endowment, and the other part

2  of it was to treat these special rimonims with

3  respect.  And our real thinking was rather than

4  have them forever in a safe deposit box, to have

5  them exposed to the world.

6    And so we had said regardless of the

7  money -- we had said, even if we were offered

8  twice as much money, we would not allow a person

9  to just take them and put them in their living

10  room.  So there was two parts to this, and

11  unless they both came together, we were not

12  going to go through with the sale.

13 Q. If you could continue.

14 A. "Delicate public relations play a need to

15  deaccession items.  Likely to be some chilling

16  effect on bidding since potential bidders may be

17  reluctant to be criticized for bidding on an

18  object of national stature.  Price achieved may

19  be constrained by current auction levels.

20    The current Myer Myers stands at only

21  $300,000.  The current record for Judaica is

22  just 1.3 million dollars at auction.  So since

23  we selected Christie's, the committee then

24  interviewed the Christie's team.  Stephen Lash,

25  chairman of the board, Mark Porter, president of

1       Christie's, and Jean Sloan, deputy chairman,

2       head of silver.

3               In September, 2009, we engaged

4       Christie's in an advisory role to pursue a

5       private sale strategy.  For the next three to

6       four months, Christie's conducted extensive

7       research to add value to the finials.  The most

8       important discovery is that the Touro finials

9       are a true pair, not a marriage as previously

10      published.

11              "Archival records for founding families

12      of Touro searched for additional references and

13      provenance to establish Touro's ownership.

14      January 2010 to June 2010, Christie's makes

15      discreet approaches, one at a time, to several

16      prospective private buyers.  Not well received."

17  Q.  Didn't you testify about this yesterday?

18  A.  That is correct.  I believe there were five.

19      "July to August 2010, Christie's approaches the

20      Museum of Fine Arts, Boston, including meetings

21      with curators, proposals engaging in independent

22      conservator to right a conditions report.

23              "October 2010.  Loan agreements signed

24      with the MFA.  November 2010, Christie's

25      delivered the finials to the MFA on loan for the

 1          opening of the America wing where they are

 2          featured and installed in the Newport room for

 3          the Newport gallery.

 4                    "April 2011, written initial offer from

 5          Museum of Fine Arts for 5 million dollars.

 6          December 2011, committee and MFA agree on a

 7          price of 7 million dollars net to the

 8          synagogue.  January 2012 to present, museum

 9          quitely raises funds and needs to begin public

10          appeal all pending approval of Congregation

11          Jeshuat Israel.

12    Q.    Now, at the board meeting --

13                    MR. NAFTALIS:  Why don't we put up 228

14          now.

15    Q.    Exhibit 228 in evidence, Plaintiff's Exhibit 228

16          are the minutes of the Congregation Jeshuat

17          Israel of June 25, 2012, are they not?

18    A.    They are.

19    Q.    And it indicates -- and I'm not going to make

20          you read these.

21                    THE COURT:  I already have, but you can

22          highlight anything you'd like to.

23                    MR. NAFTALIS:  Okay.

24          BY MR. NAFTALIS:

25    Q.    The minutes, I'll point out, Mr. Seagle's

```
 1              presentation, does it not?
 2    A.   It does.
 3    Q.   Then it indicates that you spoke, right?
 4    A.   I did.
 5    Q.   And if you could just turn to that paragraph.
 6              MR. NAFTALIS:  Would it be okay, your
 7         honor, if he read that paragraph?
 8              THE COURT:  Whatever you want, sure.
 9              MR. NAFTALIS:  Whatever is best for the
10         Court.
11         BY MR. NAFTALIS:
12    Q.   Why don't you read -- begin reading that
13         paragraph just so it's clear what you said.
14              THE COURT:  You need page 2.
15         BY MR. NAFTALIS:
16    Q.   We're on page 2 of Plaintiff's Exhibit 228,
17         which would be the third paragraph, the one that
18         starts, "Mr. Bazarsky."
19    A.   "Mr. Bazarsky said that the proceeds will be
20         placed into an irrevocable trust or endowment
21         fund where the principal could never be invaded
22         and the income used to offset the operating cost
23         of the congregation.  He added that perhaps 15
24         percent of the income could be set aside
25         specifically for the maintenance of the
```

1           synagogue, the rabbi's house, the Levi Dale

2           house, the Colonial Cemetery and Patriots Park.

3                  The remainder would then be used for

4           offsetting the rabbi's salary, utilities and

5           various other operating needs of the

6           congregation.  None of the income generated by

7           the proceeds of the sale would be used for the

8           Loeb Visitor Center.  Such an endowment, said

9           Mr. Bazarsky, would guarantee that the synagogue

10          would always have a full-time rabbi in residence

11          and be open for services.  He estimated that the

12          income from the endowment would be about

13          $300,000 per year.  Mr. Bazarsky concluded by

14          saying that the congregation would not only have

15          the opportunity to improve the actual sale, but

16          would have the final approval on how to proceed

17          with the endowed protected end use.

18     Q.   And then the next paragraph, if you could read

19          it.  Mr. Pimental talked about the expense

20          issues and the problems that the synagogue was

21          having?

22     A.   Correct.

23     Q.   The cutting of expenses and et cetera, right?

24     A.   Correct.

25     Q.   And then the floor was open for questions,

```
 1              right?

 2   A.   Yes.

 3   Q.   And were people free to ask any and all

 4        questions that they had or might have about the

 5        proposed transaction?

 6   A.   Yes.

 7   Q.   And the minutes faithfully reflect, do they not,

 8        people who raised questions or issues?

 9   A.   Yes.

10   Q.   And questions that were raised and the answers

11        that were given?

12   A.   Yes.

13   Q.   And there were a couple of folks who raised

14        questions, does the CSI have any kind of

15        interest in this?

16   A.   Yes.

17   Q.   If we could turn to page 3.

18              MR. NAFTALIS:  Direct the Court's

19        attention --

20        BY MR. NAFTALIS:

21   Q.   Ms. Leibman, who is Ms. Leibman?

22   A.   A member of the congregation.

23   Q.   And she asked the question about whether or not

24        CSI had any ownership interest?

25   A.   Correct.
```

```
1   Q.   And why don't you read what Ms. Ross said.

2   A.   Mrs. Ross explained that any items given to

3        Congregation Shearith Israel for safekeeping

4        when the synagogue closed in the 1800s were

5        returned to us when the synagogue reopened.  She

6        added that Christie's research indicates we have

7        good title to the items.

8   Q.   Mr. Hersoff, is he a member?

9   A.   He is.

10  Q.   And going down, he said something about he

11       wasn't in favor of selling them?

12  A.   That is correct.

13  Q.   And he raised a question also about whether or

14       not CSI had any ownership interest?

15  A.   Correct.

16  Q.   And did you respond to that?

17  A.   I did.

18  Q.   I think it indicates three answers.  I'll skip

19       the one about -- the first one about the

20       articles of incorporation.  Let me go to -- he

21       raised a question.  If the congregation ceases

22       to exist, what happens to the endowment fund?

23       Doesn't CSI take ownership?  And what was your

24       answer in number 2?

25  A.   "The fate of the endowment, in case the
```

1  　　　　congregation ever ceased to exist will be one of

2  　　　　the terms that the congregation will approve in

3  　　　　determining how the proceeds are managed."

4  Q.  And then he asked the question, "Does CSI have

5  　　　　ownership claim because they -- the rimonim were

6  　　　　in the building at the time during the 1800s?"

7  A.  Correct.

8  Q.  And you answered, "With respect to the ownership

9  　　　　issue, Mr. Bazarsky asserted that Congregation

10 　　　　Shearith Israel got title to the building and

11 　　　　the fixtures and not ownership of the personal

12 　　　　property.

13 　　　　　　　"Furthermore, any property held by

14 　　　　Shearith Israel for safekeeping was given back

15 　　　　to the congregation."

16 Q.  A Mr. Layden asked a question next?

17 A.  Yes.  Mr. Layden asked why the entire proceeds

18 　　　　must be endowed.  "Is there an opportunity to

19 　　　　use some money for repairs we might need now?"

20 　　　　　　　"David Bazarsky responded by saying

21 　　　　that it that it was more important

22 　　　　to irrevocably protect the principal and prevent

23 　　　　future boards of officers from invading the

24 　　　　principal for uses that may be improved."

25 Q.  Dr. Leiberman raised a question also?

1    A.    He did.

2    Q.    Did he indicate that he himself spoke to CSI and

3          a Mr. Katz?

4    A.    Yes, he did.

5    Q.    And what did Ms. Ross say?

6    A.    "Beau Ross reported that she had spoken with

7          Mr. Katz, and the intention is to keep Shearith

8          Israel informed and work with them to secure the

9          financial future of the Congregation.

10              "Mr. Bazarsky added that the lease

11         agreement in question technically terminated on

12         December 31, 1913, and went on to say that

13         Congregation Shearith Israel should have a

14         vested in seeing that the building will be

15         maintained in perpetuity."

16   Q.    Then a Mr. Saul Schweber spoke.  Who is he?

17   A.    He's a member of the congregation.

18   Q.    Could you read what Mr. Schweber said.

19   A.    "Mr. Schweber mentioned that although

20         Congregation Israel may technically own the

21         building, they have historically provided no

22         financial assistance to this congregation, and

23         it is up to us to secure our own financial

24         future."

25   Q.    And that was a true and correct statement?

```
 1    A.    It was and is.

 2    Q.    And there was a vote?

 3    A.    And there was a vote, yes.

 4    Q.    The vote was?  What was the vote?

 5    A.    I think it was 30 to 6, but I don't see that on

 6          here.

 7                THE COURT:  Thirty-one.

 8    A.    Your Honor was correct.  Thirty-one in favor.

 9          Six opposed.

10    Q.    Were you and the members -- counsel for Shearith

11          Israel has stated in their papers and in their

12          opening remarks that this was some kind of a

13          vanity endowment as opposed to something for the

14          best interest of the Touro Synagogue.  Is that

15          statement true or false?

16    A.    Totally, totally false.

17    Q.    Was this sale motivated in any way, shape or

18          form by any self interest on the part of the

19          congregants of Jeshuat Israel and of Touro

20          Synagogue?

21    A.    Absolutely not.

22    Q.    What was -- again, what was the purpose of this

23          transaction?

24    A.    The purpose of the transaction was the fear of

25          the congregation, that the congregation is
```

1    dwindling in size, and they were struggling to

2    meet their expenses.  They had -- as I

3    mentioned, they had laid off all of their

4    staff.  They had closed down their community

5    center.  They had had just volunteers working

6    other than the rabbi and someone doing

7    maintenance.

8         There was a fear that down the road

9    there would not be the funds to keep the doors

10   open.  And as I mentioned yesterday, the primary

11   focus of this congregation was to do two

12   things.  It was to restore the building and get

13   the building in as absolute pristine condition

14   that we could, regardless of the cost.  We would

15   struggle.  We would raise the money, and we

16   did.  And as I mentioned, to get the absolute

17   best people to do the work, The Department of

18   Interior doing the historical structures

19   report.  The Department of Interior to do the

20   actual construction documents, the Department of

21   Interior to oversee the construction.  And we

22   hired one of the best companies, Shawmut out of

23   Boston.

24        So we felt it was our charge while we

25   still had the strength and the power to get that

```
 1          building in perfect condition.  And at the same
 2          time our charge was to provide for a permanent
 3          endowment so that it would always stay open in
 4          perpetuity because we felt that was extremely
 5          important to our congregation, to the tens of
 6          thousands that come and worship every year, to
 7          the Jews from around the world that come to the
 8          oldest synagogue in the United States.
 9               We felt it was important for them to go
10          through the visitor center and go into the
11          synagogue and say this is still an active home
12          of worship.  The alternative we saw was a closed
13          synagogue, a museum.  There is enough of those
14          in Europe.  We did not want that to happen.  We
15          felt that there was a way that we could prevent
16          from that happening, and we felt if we didn't
17          take that opportunity, shame on us.
18    Q.    Now, I think you testified about the board
19          meeting.  What happened with respect to Shearith
20          Israel after you had taken this vote?  Did you
21          get any communication from Shearith Israel?
22    A.    The first thing that happened after we took the
23          vote -- we had the vote on a Sunday.  And I
24          believe by Wednesday we had a lawyer's letter
25          from Mr. Sherman telling us to cease and desist,
```

1            that we do not own the rimonim.  We had no right

2            to sell it, and there was an immediate demand to

3            stop.  That's what happened next.

4     Q.    Prior to this lawsuit, were there any

5            communications with Shearith Israel?  Just

6            without going into them.

7     A.    Prior to the filing of the lawsuit, there was

8            communication with Shearith Israel where we were

9            trying to reason with them and say to them, this

10           is an enormous win, win, win situation.

11           Everybody wins here.

12                The rimonim instead of being in a safe

13           deposit box are on display at the Museum of Fine

14           Arts where they get millions of visitors, where

15           the world can see it.  And the museum said they

16           wanted to build a cultural program around them,

17           and that they wanted to tell the story of -- the

18           same story that we were telling at the visitor

19           center.  So we saw that as a win versus being in

20           a safety deposit box.

21                Next we said, the money is going to be

22           locked in a trust and it will guarantee the

23           perpetuity that the Touro Synagogue will be

24           open.  And we also said to Shearith Israel that,

25           you know what, you could be co-trustee with the

 1          money.  We don't care.  You can be trustee of

 2          the 7 million dollars.  All we want is the

 3          income, and here's the benefit.  If our

 4          Congregation ever closes, Shearith Israel, you

 5          have the money.  You keep it open.  As long as

 6          the money is used to keep Touro Synagogue open

 7          in perpetuity, that's all we care about.

 8          They said absolutely not.

 9     Q.   Let me put up on the board Exhibit 238.

10               THE COURT:  Could I just ask before you

11          leave the congregation minutes.  I had two

12          questions.  It references that there was

13          research done by Christie's concerning the

14          title.  Someone had referenced that.

15               Did you ever see than in writing, that

16          research?

17               THE WITNESS:  I did not.

18               THE COURT:  Do you know if it exists in

19          writing?

20               THE WITNESS:  I don't know.

21               THE COURT:  Okay.  Do you know who

22          requested that from Christie's?

23               THE WITNESS:  Andy Seagle.  Well,

24          Christie's on their own.  Christie's themselves

25          said that before we go to the next step, we

```
1              wanted to do --
2                   MR. SOLOMON:  Your Honor, the question
3              did not call for a hearsay response and the
4              witness is giving a hearsay response.
5                   THE COURT:  I'm inquiring about what
6              the state of mind of the congregation was when
7              they sold it in terms of their attitude about
8              their ownership and what the basis of that was.
9                   THE WITNESS:  We felt 1,000 percent
10             comfortable that it was ours.  We've always
11             represented it to be ours.  Christie's said they
12             wanted to do their own provenance.  We said
13             fine.  We thought that would be great.
14                  THE COURT:  And as far as you know, the
15             extent that are in the minutes and the extent
16             that you know about Christie's research?
17                  THE WITNESS:  Yes.
18                  THE COURT:  But you don't know anything
19             else about Christie's research other than the
20             fact that it was represented at the meeting that
21             it took place and it was positive towards your
22             point of view?
23                  THE WITNESS:  Yes, that's true, Your
24             Honor.
25                  THE COURT:  And the second question is,
```

1      one member raised the question of your articles

2      of incorporation, which limited you from

3      transferring -- and I think you pointed out --

4      even owning anything in excess of $20,000 and

5      that the state legislature had approved those

6      articles of incorporation with those

7      restrictions in it.

8              You referenced that that might have to

9      be fixed.  We might need to pass a bill, perhaps

10     first change the articles, and then pass a bill

11     in conforming.  Were either of those actions

12     ever taken?

13             THE WITNESS:  Yes.  Well, first thing

14     that happened was we got in touch with -- I

15     think Theresa Driver who put us in touch with

16     the office of legislation.  And they said that

17     that $20,000 restriction doesn't apply any

18     longer, that the legislature has passed a bill

19     that took away the restriction on all

20     nonprofits.  And so they said that is a

21     non-issue.

22             Just to be safe, we petitioned the

23     legislature, and through Theresa Driver, carried

24     it through.  And that specific provision was

25     taken out of our charter.

```
 1                    THE COURT:  Thank you.

 2                    MR. NAFTALIS:  Just to call the

 3          Courts's attention.  Christie's report is in

 4          evidence of their work.  It's Plaintiff's

 5          Exhibit 311.

 6                    THE COURT:  Thank you.

 7          BY MR. NAFTALIS:

 8     Q.   In front of you is Plaintiff's Exhibit 238.  Do

 9          you see that?

10     A.   I do.

11     Q.   And Plaintiff's Exhibit 238 is an e-mail chain,

12          is it not?

13     A.   It is.

14     Q.   I think, if you can see there, it's two pages.

15          Like most e-mails, I think the first one comes

16          later, right?

17     A.   I think that the first one here is the second

18          one, yes.  It's in response to my e-mail.

19     Q.   So the first e-mail in the chain, just to move

20          this along quickly, is an e-mail from you, David

21          Bazarsky, to a number of folks, Shearith Israel,

22          Mr. Solomon, Mr. Katz?

23     A.   Yes.

24     Q.   Miss Sutton.  I don't know if it's a man or a

25          woman, and with a copy to one of their lawyers,
```

```
 1              Mr. Sherman, right?

 2    A.    Correct.

 3    Q.    And now we'll look at the -- there is a

 4          response, is there not?

 5    A.    There is.

 6    Q.    Which is at the top of Exhibit 238?

 7    A.    Correct.

 8    Q.    It's sent from Mr. Solomon?

 9    A.    Correct.

10    Q.    To you; is that correct?

11    A.    It is.

12    Q.    With copies to the same folks who got your

13          e-mail, right?

14    A.    Yes.

15    Q.    Mr. Sherman and people associated with Shearith

16          Israel, right?

17    A.    Yes.

18    Q.    I'd like to go down.  If we could highlight that

19          in yellow.  Go down to number 4, paragraph 4 of

20          Mr. Solomon's e-mail to you.

21              Would you begin reading with the line

22          -- why don't you read it all.  Start reading,

23          and I may stop you along the way.

24    A.    Number 4?

25    Q.    Yes.
```

```
 1    A.    "Preemptory in unilateral description of the

 2          escrow is unacceptable.  I can't here list all

 3          of the reasons, but they include without

 4          limitation the fact that, as I said at the

 5          meeting, you wanted cash.  Much of the income

 6          from maintenance during a defined period would

 7          go to Touro, subject to documentation acceptable

 8          to Congregation Shearith Israel, and to

 9          Congregation Shearith Israel's board approval,

10          which has not even been sought, much less

11          received."

12    Q.    Stop there.

13                MR. NAFTALIS:  Could we highlight from,

14          "in return" through the next to the last

15          sentence.  Highlight that in yellow, please.

16          BY MR. NAFTALIS:

17    Q.    So Shearith Israel's representative, Mr. Solomon

18          then continues, correct?

19    A.    Yes.

20    Q.    He says -- read on beginning with "In return."

21    A.    "In return Congregation Shearith Israel wants

22          clarification of governance, which is an and

23          will remain in Congregation Shearith Israel,

24          completely the opposite of what you wrote.

25          There will need to be a sharing of the income in
```

1          a way that will favor Touro, but is not as you

2          describe it which appears to be 100 percent to

3          you.  The principal belongs to Congregation

4          Shearith Israel."

5     Q.   Stop there for a second.  Thank you.  So

6          Shearith Israel's president and lawyer,

7          Mr. Solomon writes that they want 100 percent of

8          the principal of the endowment, true?

9     A.   True.

10              MR. SOLOMON:  I object, Your Honor.

11         The facts are wrong.

12              THE COURT:  It says what it says.  You

13         can move on.  Overruled.

14         BY MR. NAFTALIS:

15    Q.   And Mr. Solomon wrote that in terms of income

16         generated by the endowment or the transaction,

17         Touro would get some, but Shearith Israel would

18         get the greater share?  That's what it says

19         here, right?

20    A.   It says that they want a share in the proceeds.

21         They want 100 percent of the income and they

22         want some of the income.

23    Q.   Sharing of the income?

24    A.   Right.

25    Q.   It continues.  He writes, "And that Touro will

```
 1              be confirming."
 2                        Touro is you, right?
 3    A.   Yes.  Jeshuat Israel.
 4    Q.   Touro and Jeshuat Israel have been used
 5              interchangeably for a century, right?
 6    A.   Correct.
 7    Q.   Touro, according to Mr. Solomon will be placing
 8              Shearith's Israel ownership of the land, the
 9              building, personality, et cetera, or there will
10              be no compromise at all, correct?
11    A.   Correct.  I'm just going to say, we took it as
12              being blackmailed.  Maybe I shouldn't say that?
13                        MR. SOLOMON:  Objection.  Move to
14              strike.
15                        THE COURT:  The comment will be
16              stricken.  Motion is granted.
17                        MR. NAFTALIS:  I have no further
18              questions.
19                        THE COURT:  Thank you.  Mr. Solomon.
20                        *   *   *
21              CROSS EXAMINATION BY MR. SOLOMON:
22    Q.   Good morning, Mr. Bazarsky.  Let's begin with
23              the document that was just on the screen.  We'll
24              try to do it somewhat more systematically.
25                        MR. SOLOMON:  Could we put up, please,
```

```
 1            the exhibit that was just in front of the

 2            witness.  I think it is PX 238.

 3        BY MR. SOLOMON:

 4    Q.    As part of the cease and desist letter that

 5            Shearith Israel sent, there was a specific

 6            statement there that they wanted to dialogue,

 7            have a communication sit down and discuss the

 8            matter, see what the problem was, isn't that

 9            right?

10    A.    I'd like to see that because I don't remember

11            there being from Shearith Israel any desire to

12            communicate.  It seemed to us that we were --

13    Q.    Thank you.  I think you answered my question.

14                (Inaudible)

15                MR. SOLOMON:  No, no, it's the letter.

16                MR. NAFTALIS:  I think he should let

17        the witness finish, Your Honor.  The witness was

18        in the middle of an answer.

19                THE COURT:  I think he answered the

20        question.

21                MR. SOLOMON:  Let me come back to that.

22        BY MR. SOLOMON:

23    Q.    There was, after the cease and desist letter, at

24            least two meetings, correct?

25    A.    Yes.
```

1    Q.    And you attended both of them, correct?

2    A.    Correct.

3    Q.    Shearith Israel had representatives that

4          attended both of them, correct?

5    A.    Correct.

6    Q.    And at the second of the meetings, there was a

7          specific discussion about Shearith Israel or its

8          members assisting financially CJI for up to a

9          period of about 10 years; isn't that right?

10   A.    Can I explain what --

11   Q.    No, unless the judge wants an explanation.  I

12         would just like an answer to my question.  If

13         you could just answer my question, we can move

14         through what I need to cover much more quickly.

15   A.    If you could ask me the question.

16   Q.    Sure.  At the second meeting there was a

17         proposal by CSI, by Shearith Israel, to help

18         financially CJI for up to $75,000 for ten

19         years.  Is that --

20   A.    Potentially.

21   Q.    -- is that correct?

22   A.    No, potentially help.

23   Q.    Okay.  And CJI rejected that; is that right?

24   A.    Yes.

25   Q.    And then the discussion moved to whether CJI

```
 1              might try to lease the rimonim; isn't that

 2              right?

 3    A.        CGI -- Congregation Jeshuat Israel suggested to

 4              Shearith Israel that if the objection was a

 5              sale, that it might be possible to accomplish

 6              the same thing by creating a lease in perpetuity

 7              with the Museum of Fine Arts.  At that point

 8              you, Mr. Solomon said, we might be willing to go

 9              along with 200 years.  And Mr. Katz said, no,

10              no, no, 100 years.  And then you said, well,

11              maybe we could go along with 25 years with three

12              25-year-options, to which I said, there is no

13              way that the Museum of Fine Arts is going to pay

14              7.4 million dollars for a one- or 200-year

15              lease.  That would kill the deal.

16    Q.        Thank you.  After Shearith Israel offered a

17              potential $75,000 for up to ten years, each

18              year -- that's $75,000 for each year for ten

19              years, correct?

20    A.        It wasn't an offer that way.  If I could say

21              what the offer was?

22    Q.        No.  Let me withdraw.

23    A.        Then, no, that's not what the offer was.

24    Q.        So that's your testimony.  Thank you.

25                       At the end of the second meeting,
```

1          however, there were representatives, lawyers for

2          each of the parties who were assigned the task

3          of trying to come up with some bullet point

4          agreed statements, correct?

5   A.   No.  At the end of the meeting --

6   Q.   Thank you.  You've answered the question.

7            THE COURT:  Could I interject.  We're

8          going down an avenue that I want to make sure

9          that I'm clear why we're going down this avenue

10         before we get too far and then realize we're

11         already there and what does it matter.

12           I'm not really sure what the relevance

13         is to what I have to decide the current

14         potential settlement negotiations, if I can call

15         it that -- have on any legal or factual issue

16         before me.  I realize we got into it a little

17         bit on direct, so clearly you want to clear up

18         any misconceptions for some reason.

19           As far as I can figure, I'm not very

20         interested in the negotiations that took place.

21         I consider them like one would in an otherwise

22         lawsuit.  The negotiations were negotiations and

23         unfortunately they didn't work out and that's

24         why we're here.  I'm not quite sure of the

25         relevance, Mr. Solomon, of too much of this kind

1      of testimony.

2                  MR. SOLOMON:  I agree with that, Your

3          Honor, and I have to make sure --

4                  THE COURT:  I should have said it

5          earlier.

6                  MR. SOLOMON:  I don't want to go too

7          far.  The fact that there was an offer of

8          $75,000 for ten years seemed to be relevant

9          given the testimony that this witness had given,

10         and this is a document that they showed the

11         witness.

12                 THE COURT:  I understand that.  I

13         probably should have raised it earlier, and now

14         I realize we're further down that avenue so I

15         wanted to stop it.

16         BY MR. SOLOMON:

17     Q.  Solomon and Aidinoff were appointed at the end

18         of the second meeting to come up with some

19         agreed upon fine points if they could; is that

20         correct?

21     A.  Yes.

22     Q.  Okay.  And that was right at the time that you

23         sent your e-mail of November 2nd; is that

24         correct?

25                 MR. NAFTALIS:  Your Honor, at this

 1           point I would object.  I think he's going into

 2           an area which is irrelevant.

 3                   THE COURT:  That's what I tried to

 4           point out.  You did open the door, Mr. Naftalis,

 5           so I was allowing some of it and trying to stop

 6           it before it got too far.

 7                   Why don't we wrap this up and anything

 8           you need to clear up that might come out of

 9           direct, and then let's move on, Mr. Solomon.

10      BY MR. SOLOMON:

11      Q.   And I think you just said you sent your e-mail

12           during the period of time that Solomon and

13           Aidinoff were supposed to be having the

14           discussions, correct?

15      A.   My understanding is --

16      Q.   Yes or no or you don't remember.

17      A.   I do remember, but I remember.

18      Q.   Yes or no.

19      A.   No.

20      Q.   Okay.  You just said yes --

21      A.   The negotiations were over.  Mr. Aidinoff had

22           said to me that the negotiations were over, and

23           I sent a letter of clarification.

24                   MR. SOLOMON:  Move to strike the

25           hearsay.

1           THE COURT:  Denied.

2      BY MR. SOLOMON:

3      Q.   Mr. Aidinoff is copied on this e-mail, isn't he?

4      A.   Yes.

5      Q.   And you don't have another e-mail from him

6           copying all of us saying that what you just

7           said?

8      A.   I do not.

9      Q.   All right.  And the tenor of the discussion here

10          is about a lease.  What would a lease look

11          like?  What would the terms of a lease look

12          like, isn't that right, this whole e-mail that

13          you're talking about?

14     A.   No, the tenor of my e-mail was the endowment to

15          say that the funds would be held in trust in

16          perpetuity.  That was the point.

17     Q.   Funds deriving from leasing the rimonim, yes or

18          no?

19     A.   No, it was a sale.  Shearith Israel had said

20          they wouldn't allow a lease, so the only option

21          we had was a sale.

22     Q.   It's your testimony that Shearith Israel said

23          that they wouldn't allow a lease.  Did you tell

24          me ten minutes ago that there was --

25     A.   A lease that -- they would not allow a lease

1    that would generate the kind of money that --

2    the museum had said to us unless they end up --

3         MR. SOLOMON:  Objection, Your Honor.

4    Goes beyond the scope.

5         THE COURT:  Denied.  Overruled.  You

6    can answer.

7  A.  The museum had said to us that unless they end

8    up with title or the equivalent of title, they

9    would not pay 7.4 million dollars.  So the

10   concept of a lease for 100 years was totally

11   unacceptable.

12 Q.  As of November 2, 2012, had you communicated

13   what you just testified to that the MFA said to

14   you, had you communicated that to Shearith

15   Israel in writing?

16 A.  Okay.  Can you ask me the question again?

17 Q.  You just testified to a communication that you

18   had from the MFA.  By the way, was that

19   communication directly to you?

20 A.  No, I was dealing with Christie's.

21 Q.  And earlier in your testimony -- you spent a lot

22   of time in the last couple of days testifying to

23   many communications with the MFA.  You didn't

24   speak directly to the MFA?

25 A.  No, I did.  I definitely had conversations with

1          the MFA.  I had conversations with the MFA

2          regarding whether or not they would accept

3          anything short of -- I offered them a 700 year

4          lease and they said no.

5     Q.   Didn't you just say that -- the testimony that

6          you just gave, the court is allowing you to give

7          about the discussion with the MFA, that went

8          through Christie's, correct?

9     A.   Initially, yes.

10    Q.   Okay.  And as of November 2, 2012, had you

11         communicated that to Shearith Israel in writing?

12    A.   Had I communicated in writing -- not in writing,

13         no.

14    Q.   You began the day today by talking about the

15         George Washington letter reading in 2013.  In

16         years prior to the lawsuit, prior to the time

17         that CJI sued Shearith Israel in 2012, Shearith

18         Israel representatives attended the George

19         Washington reading, didn't they?

20    A.   My understanding is that there have been years

21         that they had -- members of Shearith Israel had

22         attended various George Washington letter

23         readings, yes.

24    Q.   And in 2013, CJI disinvited Shearith Israel from

25         attending; isn't that correct?

```
 1   A.   No, it's open to the public.  It's open to
 2        anyone.  We would never stop anybody from
 3        walking in.
 4   Q.   You disinvited them from participating in it;
 5        isn't that correct?
 6   A.   We did not disinvite them.
 7   Q.   And did they show up?
 8   A.   I don't know if members were there or not.
 9   Q.   You also testified that Shearith Israel had
10        nothing to do with the hiring of Rabbi Mandel.
11        Do you remember testifying to that just this
12        morning?
13   A.   I didn't say that we had nothing to do.  I said
14        that we -- to my knowledge, Congregation Jeshuat
15        Israel went and hired Rabbi Mandel and did not
16        seek the prior approval of Shearith Israel.
17   Q.   Okay.  So when you said this morning that it had
18        nothing to do with it, what you meant was what
19        you just testified to?
20   A.   Yes.
21   Q.   Okay.  Now, you do know that from the time that
22        you've been involved as either president or
23        chairman of the rimonim committee, Rabbi Angel
24        of Shearith Israel did advise CJI that if CJI
25        wished to hire a rabbi from Yeshiva University
```

1        or recommended by Yeshiva University, that that

2        was fine with Shearith Israel, correct?

3   A.   Yes.

4   Q.   And Yeshiva University is a particular place in

5        New York, right?

6   A.   Yes.

7   Q.   It's a particular Yeshiva, correct?

8   A.   Yes.

9   Q.   And there are lots of other places that ordained

10       rabbis and that -- those were not what Shearith

11       Israel was talking about, it was talking about a

12       particular place, correct?

13  A.   Yes.

14  Q.   Okay.  The Rabbi Mandel is from Yeshiva

15       University, correct?

16  A.   Yes.

17  Q.   He was ordained there, correct?

18  A.   Okay, yes.

19  Q.   And you then sent along e-mail -- CJI sent a

20       long note to Shearith Israel about Rabbi Mandel;

21       isn't that right?

22  A.   I believe it was notifying -- it was welcoming

23       or -- I don't have it in front of me.  We wanted

24       to inform you that we have hired a rabbi and who

25       the rabbi is.

1    Q.    And at a meeting of CJI, CJIs Ms. Ross explained

2          that the congregation actually wrote to Shearith

3          Israel and received back correspondence

4          indicating that the rabbi knows Rabbi Mandel and

5          spoke highly of him, correct?

6    A.    Yes.

7    Q.    And all of that happened before rabbi Mandel

8          joined you; isn't that right?

9    A.    My understanding is that it happened after a

10         contract with Rabbi Mandel.

11   Q.    After he signed but before he joined you?  That

12         was my question.

13   A.    I don't know.

14   Q.    Okay.  Let's look at DX395, please.  This is a

15         February 12, 2012 CJI board minute.  I think you

16         probably want to show the witness the first

17         page.

18               This is a congregational meeting of

19         February 12, 2012.  Can you tell me whether

20         that's true or not?

21   A.    I wasn't at the meeting, and so it appears that

22         it was minutes of a meeting.

23   Q.    Okay.

24   A.    February 12th.

25   Q.    Could you look at the paragraph beginning, Old

```
 1            business.  It begins with the sentence,
 2            Dr. Oscar Leiberman.  And it says, "Dr. Oscar
 3            Leiberman asked if Congregation Shearith Israel,
 4            (CSI) was aware of our choice, and he mentioned
 5            the historical agreement with CSI.  Beau Ross
 6            explained that the congregation had received
 7            e-mail correspondence from CSI indicating that
 8            their rabbi knows Rabbi Mandel and spoke highly
 9            of him.
10                 "A motion was made and approved to
11            formally inform Congregation Shearith Israel of
12            our intention to hire Rabbi Marc Mandel as our
13            rabbi."
14                 Did I read that correctly?
15       A.   You did.
16       Q.   Thank you.  Also this morning you spoke about
17            Roy Zuckerberg, and we'll talk about him a
18            little bit.
19                 Did you ever say to Mr. Zuckerberg that
20            you believed that CJI owned the rimonim?  Did
21            you ever say that to him in words or substance?
22       A.   Yes, I did.
23       Q.   When did you do that?
24       A.   When I spoke to Mr. Zuckerberg on one occasion
25            because he thought that he could be of some help
```

1          in settling this matter.

2     Q.   And did you tell Mr. Zuckerberg ever that

3          Shearith Israel had a right to the rimonim?

4     A.   Absolutely not.

5     Q.   And you never told him that Shearith Israel had

6          a claim that it owned the rimonim, correct?

7     A.   I don't remember if I ever said -- no, I'm sure

8          I said that Shearith Israel is trying to say

9          that they own the rimonim.  I'm sure I said

10         that.

11    Q.   But this is after 2012, after the lawsuit,

12         right?

13    A.   This was after the lawsuit.

14    Q.   Okay.  I meant before the lawsuit when you

15         talked to -- when you testified this morning

16         that you had spoken to him about going out and

17         finding possible -- people of possible interest

18         in the rimonim.  Did you ever say to him, by the

19         way, Shearith Israel takes the position that

20         they own the rimonim?

21    A.   I did not talk to Mr. Zuckerberg at that time.

22         The only -- I'm not saying I spoke to him

23         before.

24    Q.   Thank you very much.  You walked through I think

25         in and read the minutes of the June 2012

1          meeting.  Do you recall that?

2     A.   Yes.

3     Q.   Okay.  And did you at that time know that

4          Christie's did not do any research into

5          ownership?  Did you know that?

6     A.   I did not know that.

7     Q.   And did you know that Christie's research,

8          according to Christie's, did not indicate

9          anything regarding title?  Did you know that at

10         the time?

11    A.   No, I did not know that.

12    Q.   The issue of title came up a lot at that

13         meeting, right?

14    A.   I think it came up by a question that was

15         raised.

16    Q.   Several questions that were raised.  I think you

17         read them this morning, right?

18    A.   Yes.

19    Q.   Okay.  And the statement about what Christie's

20         had said was an important piece of information

21         to give to the congregation, wasn't it?

22    A.   No, I think that -- I think that we were --

23    Q.   I think you've answered it.

24    A.   No.

25    Q.   Thank you.  It didn't matter?

61

```
 1    A.   It did matter but it wasn't that important

 2         because --

 3    Q.   All right.  Thank you.

 4              MR. NAFTALIS:  Your Honor, he's trying

 5         to answer.  He shouldn't be cutting off a

 6         witness.

 7              THE COURT:  You know, Mr. Bazarsky, the

 8         general rules are if the question calls for a

 9         yes or no answer, you need to give a yes or no

10         answer.  If you can't without an explanation,

11         then say I can't without an explanation if you

12         don't know.  Remember that your attorney will be

13         able to redirect on anything of importance that

14         he may want further.  So if you can try to

15         answer the question directly.

16              If you can't without explanation,

17         please feel free to say so.  Try to answer yes

18         or no if that's the kind of question Mr.

19         Solomon asks for, that's usually how the

20         procedure works.  All right.

21              THE WITNESS:  Thank you.

22    BY MR. SOLOMON:

23    Q.   Mr. Bazarsky, you personally, through companies

24         that you control, own property in or around the

25         Touro Synagogue area; is that correct?
```

1   A.   I guess it would depend on what "in and around"

2        means.

3   Q.   You own 14 properties in Newport; is that right?

4   A.   Yes.

5   Q.   I within several blocks of the synagogue, you

6        own some?

7   A.   Within -- one within five blocks and the rest

8        more than half a mile away.

9   Q.   Thank you.  And let me put up, please, DX 421.

10       If we can turn to the next page.  This is the

11       entrance to the Touro Synagogue; is that right?

12  A.   It is.

13  Q.   And up on top we see the chiseled lettering that

14       says what it says up there.  I can't read it

15       all, "Erected by."  I can't read it.  The last

16       line says, "Made by Abraham Touro"?

17  A.   Yes.

18  Q.   And down on the left on that column there is a

19       plaque, correct?

20  A.   Yes.

21  Q.   And let's zoom in on that if we could to the

22       prior page.  It says, "In grateful appreciation

23       to the Bazarsky family for its generous support

24       and leadership."

25            And that plaque is on that wall,

1      correct?

2   A.  It is not on the wall today, but it was on the

3       wall at one time.

4   Q.  When was it put up?

5   A.  Probably four years ago.

6   Q.  Now, can you -- it was before the lawsuit,

7       wasn't it?

8   A.  Yes.

9   Q.  Can you identify for us a piece of

10      correspondence, a letter, an e-mail, a writing

11      where you asked Shearith Israel for a financial

12      contribution?

13  A.  You want it in writing where I asked for a

14      financial contribution?

15  Q.  Yes.

16  A.  I don't believe I ever asked for a financial

17      contribution in writing.

18  Q.  Can you identify for the court a writing that

19      you asked Shearith Israel to pay for insurance?

20  A.  I never asked in writing.

21  Q.  You never asked Shearith Israel to pay for

22      insurance, did you?

23  A.  To pay for insurance?

24  Q.  Yes, sir.

25  A.  No, I did not.

```
 1    Q.   And did you ever ask in writing for them to pay
 2         any of the expenses, operating expenses of Touro
 3         Synagogue?
 4    A.   No, I did not.
 5    Q.   And in writing did you ask them ever to fund any
 6         part of an endowment?
 7    A.   No.  Not in writing, no.
 8    Q.   Now, in writing did you ever complain to them
 9         that they hadn't made any financial contribution
10         or financial assistance?
11    A.   Not to my knowledge.
12    Q.   And did you ever in writing complain that they
13         hadn't paid any part of the Touro Synagogue
14         operating expenses?
15    A.   Not to my knowledge.
16    Q.   And in writing did you ever complain that they
17         didn't fund any part of an endowment for Touro
18         Synagogue?
19    A.   Not to my knowledge.
20    Q.   Now, for any of those, do you know of anything
21         in writing that anyone else on behalf of CJI
22         ever made to Shearith Israel?
23    A.   Not in writing.
24    Q.   Okay.  And you testified on direct to loaning
25         the rimonim and insuring them and renovating
```

```
 1              them, but prior to the event that we're talking
 2              about, CJI to your knowledge never tried to sell
 3              the rimonim, right?
 4      A.      That's true.
 5      Q.      And you never told Shearith Israel that CJI
 6              owned the rimonim, correct?
 7      A.      We promoted it everywhere.  We didn't --
 8      Q.      We were doing so well.
 9      A.      Okay.
10      Q.      If you need the question read back, I'm happy to
11              do it, but can you answer just the question
12              please?
13      A.      To my knowledge we never said to Shearith Israel
14              that Jeshuat Israel owns the rimonim.
15      Q.      Okay.  And you never told Shearith Israel that
16              CJI was trying to find a buyer for the rimonim
17              prior to the middle of 2012, correct?
18      A.      That's true, correct.
19      Q.      And to your knowledge, nobody at CJI told
20              Shearith Israel before 2012 that CJI was trying
21              to find a buyer for the rimonim, correct?
22      A.      Correct.
23      Q.      Okay.  Now, you talked about the property being
24              held in trust.  I want to explore what kind of a
25              trust you think it is.
```

66

1              THE COURT:  It sounds like you're going

2         into a substantial area.

3              MR. SOLOMON:  I am.

4              THE COURT:  It's the morning break

5         time, so this might be a good time.

6              MR. SOLOMON:  It is.

7              THE COURT:  Okay.  We'll take a break.

8         We'll be back at 11:15, Mr. Bazarsky.  One of

9         the rules of the court is when you're on cross-

10        examination, the way you are now, is you're not

11        allowed to confer with your attorney about the

12        subject matter of your testimony.  You can talk

13        about anything else you want, but not about the

14        case or the subject matter or the testimony.

15        Thank you.

16             (Morning break.)

17             THE COURT:  Mr. Solomon.

18             MR. SOLOMON:  Thank you, Your Honor.

19                   *   *   *

20   CONTINUATION BY MR. SOLOMON:

21   Q.   Mr. Bazarsky, let me ask you to look at Exhibit

22        DX 78, please.  Can you identify this as one of

23        the indentures from 1894?

24   A.   I see 1894.  I don't know what this document is.

25   Q.   You don't know that this is one of the

67

```
 1              indentures and conveying to Shearith Israel the

 2              land that are pertinences relating to the Touro

 3              Synagogue real estate?

 4    A.   I have seen this before.

 5    Q.   Never seen it before?

 6    A.   I have not.

 7    Q.   Okay.  Let me ask you to look at page 3 of this

 8              document to see if we can refresh your

 9              recollection.

10                  At the bottom of the page it begins,

11              "Where use occupancy employed for the

12              maintenance."  Okay.  So this indenture and deed

13              says that, "Shearith Israel is to take

14              possession of the said premesis here and above

15              described and every part thereof and to use and

16              apply the same or cause the same to be used,

17              occupied and employed for the maintenance

18              therein of the many usual and stated religious

19              services according to the ritual, right and

20              customs of the Orthodox Spanish and Portuguese

21              Jews as at this time practiced and observed in

22              the synagogue of the Congregation Shearith

23              Israel and the city of New York now located at

24              Number 5 West 19th Street.  Do you see that?

25    A.   I do see that.
```

```
 1    Q.    And you testified that you had been told that

 2          Shearith Israel held the Touro Synagogue in

 3          trust, correct?

 4    A.    Shearith Israel is the trustee of the building,

 5          yes.

 6    Q.    Okay.  And is this the trust?  Is this the trust

 7          language that controls what the use is of the

 8          building or what the trust is?

 9               MR. NAFTALIS:  Objection.  This

10          document is a document the witness has never

11          seen.

12               THE COURT:  It's an admitted document.

13          Certainly Mr. Solomon can ask about it.  I think

14          he can ask about it because it goes at a minimum

15          to state of mind.  The Court will determine the

16          effect of a document, but I'm going to overrule

17          the objection.

18    A.    I haven't seen the document before, so I just

19          don't know.

20    Q.    I just read you some language, and I'm asking

21          you whether this accurately describes the trust

22          relationship that Shearith Synagogue has to the

23          Touro Synagogue.

24    A.    No, I don't think any --

25    Q.    Thank you.
```

1    A.    No.  The answer is no.

2    Q.    Okay.  Let's look at another document.  Let's

3          look at the lease, the indenture with lease.  I

4          think that is Exhibit 148.  I think both --

5          well, we can have?

6                MR. NAFTALIS:  I don't mean to

7          interrupt, but does he have copies of the

8          exhibits for us the way we supplied to them?

9                THE COURT:  I was actually at the break

10         going to ask that I get copies.  I'll talk to

11         the attorneys later.  If you have hard copies,

12         that would be helpful.

13               MR. SOLOMON:  Of course.

14         BY MR. SOLOMON:

15   Q.    You have seen the leases, the indentures with

16         leases that were executed between Congregation

17         Jeshuat Israel and the trustees of Shearith

18         Israel?

19   A.    I have, yes.

20   Q.    This is one of them, isn't it?

21   A.    I believe it is.

22   Q.    Okay.  And here I want to have you look at page

23         0 03 at the bottom, and it's the paragraph that

24         begins, "This lease and the term hereby granted

25         is made upon the express covenant and condition

```
 1                that the party of the second part" -- you know
 2                that was CJI, correct?
 3      A.        Correct.
 4      Q.        -- "will cause the same to be used and occupied
 5                for the maintenance therein of the usual and
 6                stated religious services according to the
 7                ritual rights and customs of the Orthodox
 8                Spanish and Portuguese Jews as at this time
 9                practiced in the Synagogue of the Congregation
10                Shearith Israel in the City of New York."
11                     You knew that this use provision was in
12                this lease, correct?
13      A.        Correct.
14      Q.        And does that describe in your mind the trust
15                relationship that Shearith Israel has to the
16                Touro Synagogue?
17      A.        No, it does not.
18      Q.        Let's look at another document.  This is the
19                1940 -- let me see here.  Why don't we just take
20                a couple of quick questions here.
21                     I asked you before about the approval
22                of the Rabbi, and this document that provides
23                for that approval, correct?
24      A.        You asked me whether -- which document now?
25      Q.        The lease that we just talked about.
```

1    A.    That's a different section?

2    Q.    Yes.  Do you know without looking at it?

3    A.    There is something -- I believe there is

4          something in the lease that says that Shearith

5          Israel is to approve during the term of the

6          lease who the Rabbi is at Jeshuat Israel.

7    Q.    You're not aware of any other writing between

8          the parties that addresses the approval of the

9          Rabbi, are you?

10   A.    There is another lease besides this lease?

11   Q.    Right.  Other than the two indentures with lease

12         of 1903 and 1908, are you aware of any other

13         writing that addresses the issue of the approval

14         of the rabbis?

15   A.    I am not.

16   Q.    And this lease also provides for a dollar a year

17         rent to be paid by CJI to Shearith Israel; is

18         that correct?

19   A.    During the term of the lease, yes.

20   Q.    And in 2012, that rent was paid, wasn't it?

21   A.    No.

22   Q.    A dollar was paid to Shearith Israel by CJI in

23         2012; is that correct?

24   A.    I believe that's true.

25   Q.    And are you familiar with the website of the

1              Touro Synagogue and CJI?

2    A.    I have looked at it only once.  I think only

3          once.  I'm not really familiar with it?

4    Q.    You aren't aware of anything on that website

5          that's inaccurate in describing anything about

6          Touro Synagogue?

7    A.    To be honest with you, I haven't ever read

8          through it, the website.

9    Q.    Do you know why the website is there?  Yes or

10         no.

11   A.    No.  I mean, like any other website.

12   Q.    Okay.  Let's look at the agreement with the

13         federal government.  This is DX 240.  Here on

14         page 004 there is a paragraph, Article 1F.  Here

15         again we see language that the public is going

16         to be admitted to all parts of the Touro

17         Synagogue.  And then I'm going to drop down a

18         little.

19              "So far as consistent with the

20         preservation of the synagogue for the use,

21         benefit and behoove of the Jewish society of

22         Newport as a place of public worship forever and

23         for the maintenance of divine services in

24         accordance with the ritual, rights and customs

25         of the Orthodox Spanish and Portuguese Jews as

1         practiced and observed in the synagogue of said

2         Congregation Shearith Israel and subject to such

3         fees as may be mutually agreed upon by the

4         parties."

5                   Do you see that?

6    A.   I do.

7    Q.   And you knew about this document when you were

8         trying to sell the -- did you know about this

9         document at the time that you decided to try to

10        sell the rimonim?

11   A.   Yes.

12   Q.   And this is the same language that we saw just

13        in the lease, right?

14   A.   Well, not exactly, but some of the things are

15        the same, yes.

16   Q.   Well, the language that I read about use,

17        benefit and behoove that runs through the end of

18        Congregation Shearith Israel, is that the same

19        as in the lease?

20   A.   I'm not sure.

21   Q.   Okay.  We can compare the words ourselves.  Is

22        this now the trust relationship that Shearith

23        Israel has with the Touro Synagogue?

24   A.   No, I don't think this is the basis of the

25        trust.

1    Q.    Can you identify any other writing between

2          Shearith Israel and CJI, any other agreement or

3          contract?

4    A.    Nothing that I'm aware.

5    Q.    Can you identify any other writing besides what

6          we've just looked at where Shearith Israel is

7          articulating the relationship that it has to CJI

8          or to the Touro Synagogue?

9    A.    Not that I'm aware of.

10   Q.    The documents that -- you understood that the

11         documents that we were just referring to mandate

12         that the Touro Synagogue be used in a particular

13         way in terms of being a house of worship, right?

14   A.    You're referring to the '45 agreement?  The

15         lease affects things that happen during the term

16         of the lease.  The '45 agreement affects what is

17         going on today, yes.

18   Q.    I see.  And it's actually your testimony that

19         the leases are of no force and effect today; is

20         that correct?

21   A.    Absolutely, that's true.

22   Q.    Okay.  Now, let's then focus on the 1945

23         agreement, and it describes the particular way

24         that the Touro Synagogue worship will occur,

25         correct?

```
 1    A.    Correct.

 2    Q.    There is a reference to the Jewish society of

 3          Newport.  You have some idea of what that means?

 4    A.    I do.

 5    Q.    Okay.  There are Jews in Newport who are not

 6          members of CJI, correct?

 7    A.    I'm going to assume that to be true.

 8    Q.    You don't know that?

 9    A.    I would say there are Jews in Newport who do not

10          belong to -- yes, that's true.

11    Q.    You told us yesterday that you thought that

12          there were about 300 families in the vicinity;

13          is that right?

14    A.    In the six communities, yes.  In six

15          communities, there are about, approximately, I'm

16          told, about 300 families.

17    Q.    Three hundred Jewish families, 100 of them

18          belong to --

19    A.    Temple Shalom in Middletown, a conservative.

20    Q.    And 100 of them belong to?

21    A.    Congregation Jeshuat Israel.

22    Q.    And you don't know of any reason why members of

23          Temple Shalom can't also be members of Jeshuat

24          Israel, right?

25    A.    Any reason why members of Temple Shalom?
```

 1    Q.    Cannot be members -- you can be a member of more

 2          than one Synagogue; is that right?

 3    A.    Yes, right.

 4    Q.    And indeed, CJI has tried to get some members of

 5          Temple Shalom to come to services at the Touro

 6          Synagogue to make a quorum, correct?

 7    A.    No, not for the purpose of making a quorum, but

 8          for cooperation.  We've tried to have -- to

 9          cooperate with each other to promote Jewish

10          identity on a Equine Island.

11    Q.    Now, are tourists members of the Jewish Society

12          of Newport?

13    A.    They are not.

14    Q.    While we're on this document, I'll call your

15          attention to Article 2 with the federal

16          government.  It says that, "The Shearith Trustee

17          and Congregation Jeshuat Israel mutually agree

18          for themselves, their respective successors and

19          assigns that in carrying out the provisions of

20          this agreement, their obligation shall be

21          performed in accordance with and subject to

22          their respective rights and obligations as

23          lessor and lessee as heretofore established."

24                Do you see that?

25    A.    You said that's in Article 2?

1    Q.    It is, sir.  It's at the bottom of page 4.  It's

2          about six lines up from the bottom of the page

3          is where I'm reading.

4    A.    Yes, I see that.

5    Q.    Then the lessor/lessee relationship is the one

6          that was created by the leases that we talked

7          about from 1930 and 1908?

8    A.    No, that's not true.

9    Q.    Okay.  I see.  Okay.  Now, are you aware of any

10         other written lease between the parties?

11   A.    I'm not.

12   Q.    Okay.  Are you aware of any other writing that

13         sets forth Shearith Israel's obligations or

14         responsibilities to Touro Synagogue or to CJI?

15   A.    In writing?

16   Q.    Yes, sir.

17   A.    No, I'm not.

18   Q.    Okay.  To your knowledge, has anyone from CJI,

19         including its rabbis ever reached out to anyone

20         at Shearith Israel, including its rabbis, on

21         matters relating to the rights, rituals and

22         customs, the religious aspect of prayer of the

23         service?

24   A.    I don't know that, the answer to that question.

25   Q.    So you're not aware of any instance where CJI

```
 1              asked for some religious guidance and didn't get

 2              it, correct?

 3       A.     Not guidance, no, but Shearith Israel came up to

 4              Newport a few years ago and conducted a service

 5              at Touro Synagogue.

 6       Q.     When they actually used to come, they would in

 7              fact help lead the service, sort of help lead

 8              the service, right?

 9       A.     No.  This was on one single occasion.

10       Q.     In all of your years there, you're only aware of

11              one instance where anyone from Shearith Israel

12              came to help lead services; is that right?

13       A.     That is true.

14       Q.     Okay.

15       A.     That I'm aware of, yes.

16       Q.     Are you aware in the history of the Shearith

17              Israel that Shearith Israel helped decide

18              religious questions about burial in the Newport

19              Cemetery?  Are you aware of that?

20       A.     No, I'm not.

21                     MR. NAFTALIS:  Objection.  Foundation.

22                     THE COURT:  Overruled.

23              BY MR. SOLOMON:

24       Q.     Were you aware that Shearith Israel helped the

25              question of whether and what kind of ritual
```

```
 1              slaughterer there should be for kosher meat in

 2              the Newport congregation area?

 3     A.       No, I'm not.

 4     Q.       You will agree with me that the rimonim are part

 5              of the religious articles of Touro Synagogue,

 6              don't you?

 7     A.       I'm not sure I understand the question.  Part of

 8              the religious articles?

 9     Q.       Yes.

10     A.       Of Touro Synagogue?

11     Q.       That's right.  The rimonim that we're talking

12              about here today, are they part of the religious

13              articles of Touro Synagogue?

14     A.       They're part of the personal property of

15              Congregation Jeshuat Israel.  So they're not

16              part of the building.  Touro Synagogue is a

17              building.  They're not part of the building.

18     Q.       Are they religious articles?

19     A.       They are religious items, articles.

20     Q.       And these are religious articles that when

21              you're not loaning them, are used on special

22              occasions, correct?

23     A.       Yes.

24     Q.       I think you told us the Jewish holidays and the

25              high holidays, right?
```

```
 1    A.   Yes.

 2    Q.   And the high holidays are those two days in

 3         about September, and then a third day, Yom

 4         Kippur, right?

 5    A.   Yes.

 6    Q.   And the other Jewish holidays happen in like

 7         October?

 8    A.   We don't normally use them on regular Jewish

 9         holidays, just the high holidays.

10    Q.   Just the high holidays.  All right.  But they

11         were used there, correct?

12    A.   Correct.

13    Q.   And do you agree with me that selling the

14         rimonim would be selling a part of the Touro

15         Synagogue history?

16    A.   Not if it was on loan to a museum where millions

17         of people would see it and be identified to

18         Touro Synagogue.  No, I don't think -- I

19         disagree with that.

20    Q.   You don't think it would be selling a part of

21         the Touro Synagogue history?

22    A.   Well, in a way, yes.  In a way, yes.

23    Q.   And I think in substance you testified that were

24         it not for CJI facing an existential crisis, you

25         wouldn't even favor selling the Rimonim; is that
```

1          a fair statement?

2     A.   No, it's not.

3     Q.   So you don't think that CJI is facing an

4          existential crisis, correct?

5     A.   Not today.  It depends on your definition of

6          "existential crisis."

7     Q.   I'm just using yours, and you answered the

8          question so I'm --

9               MR. NAFTALIS:  Your Honor, I think he

10         cuts the witness off.  The witness is trying to

11         answer the question, and it wasn't a yes or no

12         question.

13              THE COURT:  I'm going to overrule the

14         objection.  I think Mr. Bazarsky had his point

15         made.

16    BY MR. SOLOMON:

17    Q.   I want to look at DX 35, please.  You were

18         president of CJI in 1995, correct?

19    A.   Correct.

20    Q.   And these are minutes of the executive committee

21         meeting held June 27, 1995?

22    A.   Correct.

23    Q.   Three paragraphs from the bottom of the page is

24         the paragraph I'd like to call your attention

25         to.  It says, "At a recent meeting of the Board

1         of the Society of Friends, Colonel Jonathan de

2         Sola Mendes, he's a Shearith Israel

3         representative, correct?

4    A.   He is a Shearith Israel member.  I don't know if

5         he's a representative back then.  I don't know

6         the relationship he has.

7    Q.   "Spoke regarding our relationship with

8         Congregation Shearith Israel.  He said that they

9         own the billing and as a sign of good faith, we

10        should pay the 1 dollar a year rent.  Following

11        a discussion as to trying to mend fences,

12        whereby we have control, but they own the

13        building.  Lynn Freidman said that she will

14        check into the lease and see if it's binding."

15             Do you see that?

16   A.   I do.

17   Q.   And after this time in 2012, the dollar was

18        paid, correct?

19   A.   There was a dollar paid in 2012, yes.

20   Q.   Okay.  Let's look at 336, please, DX 336.  This

21        is minutes of a congregational meeting, October

22        15, 1995.  You are present at this time as well,

23        weren't you?

24   A.   Yes.

25   Q.   And in paragraph 4 it says, "The discussion

1          included the fundraising must be on a

2          professional level.  We need to have enough

3          money in a fund for future maintenance.  We

4          acknowledge that we are tenants and custodians

5          of the building, which is observed by

6          Congregation Shearith Israel.  There is a lease

7          dating up to 1913, but we can find nothing more

8          recent."

9               Do you see that?

10    A.    I do.

11    Q.    And that accurately described your understanding

12          of CJI's role, that it was a tenant and a

13          custodian of the building; is that correct?

14    A.    No.

15    Q.    Okay.  Let's look at 344, please.

16    A.    Can I clarify that answer?

17    Q.    I think your lawyer is going to be able to ask

18          you that question.  I have a lot to cover, and I

19          think you did answer my question.

20               Your Honor, if you want to hear it now

21          instead, that's fine.

22               THE COURT:  You have the floor, Mr.

23          Solomon, it's your call.

24               MR. SOLOMON:  Thank you, Your Honor.

25          Let's look at DX 344.

1        BY MR. SOLOMON:

2    Q.   In the president's report you were the president

3         being referred to here in this February 8, 1998

4         membership, correct?

5    A.   Correct.

6    Q.   In the president's report in the second

7         paragraph you say, "Whatever the relationship."

8         There you're talking about the relationship with

9         Shearith Israel.  Do you see that?

10   A.   Yes.

11   Q.   "Whatever the relationship, it's time to get it

12        documented recognizing in writing that Shearith

13        Israel is the owner of the building.  CJI

14        maintains, runs and ensures the building."

15             Do you see that?

16   A.   I do.

17   Q.   Okay.  And was that your understanding of the

18        relationship?

19   A.   Yes.

20   Q.   Okay.  Let's look at DX 354, please.  This a

21        national trust for historic preservation grant

22        application submitted on behalf of CJI.  Do you

23        recognize it?

24   A.   I haven't seen it before.

25   Q.   Okay.  Ms. Beau Schlesinger Ross was executive

```
 1            director of the Touro Society of Friends of

 2            Touro Synagogue?

 3      A.    Correct.

 4      Q.    And obviously authorized by CJI to obviously

 5            raise funds for the Touro Synagogue?

 6      A.    Correct.

 7      Q.    At the bottom of page 1 it says here -- in the

 8            second section it says, "The state mission and

 9            goals of organization.  The Society of Friends

10            of Touro Synagogue is a nonsectarian,

11            nondenominational, not-for-profit organization

12            dedicated to the principals of religious freedom

13            and committed to the preservation of the Touro

14            Synagogue and it's related properties and

15            artifacts."

16                 Is that an accurate statement?

17      A.    Yes.

18      Q.    You understood the Touro Foundation was -- it's

19            goal?

20      A.    Yes.

21      Q.    Okay.  And the artifacts include the Rimonim,

22            correct?

23      A.    Again, I haven't seen this document before.

24      Q.    Would it be a fair statement?

25      A.    Well -- I'm not actually sure as to what it's
```

 1          referring to.

 2     Q.   Okay.  On page 3 under item 16, it has the name

 3          of the site is Touro Synagogue.  The owner is

 4          Congregation Shearith Israel and the City of New

 5          York.  And then it gives the address.

 6               Do you see that?

 7     A.   Yes.

 8     Q.   And then underneath that, it says, "Congregation

 9          Shearith Israel is not involved in the day-to-

10          day management of Touro Synagogue.  The

11          management of the synagogue is carried out by

12          its own officers and board."

13     A.   Yes.

14     Q.   That's accurate in your view; is that right?

15     A.   Yes.

16     Q.   And Shearith Israel wasn't breaching any

17          obligation to CJI or the Touro Synagogue in not

18          being involved in the day-to-day management, was

19          it?

20     A.   No.

21     Q.   Let's look at DX 346, please.  This a 2001

22          document.  You are copied on the cover letter.

23          If you look at it with enough care to tell us

24          whether you recognize it or remember it.

25     A.   Yes, I've seen this before.

1    Q.    Okay.  And Mr. Andrew Teitz, he was a -- is he a

2          CJI member?

3    A.    No, he's not a member of Congregation Jeshuat

4          Israel, but he was a member of the Society of

5          Friends.

6    Q.    And is Mr. Andrew Teitz in any relation to

7          either of the Teitz's that we talked about

8          today?

9    A.    Well, yes.

10   Q.    What's his relationship?

11   A.    The sister of Louise Teitz.

12              THE COURT:  He meant the brother.

13              THE WITNESS:  Yes, thank you.

14   Q.    Mr. Teitz is here stating that the operating

15         agreement relates only to the operation and not

16         the ownership of the site.  And then says -- do

17         you see that on the cover letter in the

18         paragraph that begins, "Without depriving?"  It

19         says, "First, it is an operating agreement

20         related to the operation and not the ownership

21         of the site."

22              Do you see that?

23   A.    Yes.

24   Q.    And then he said, "As indicated in the third

25         whereas clause, the lease with Congregation

```
 1              Shearith Israel is explicitly acknowledged."
 2                   Do you see that?
 3    A.    Yes.
 4    Q.    And then lastly and importantly he says,
 5          "Furthermore at the end of paragraph 3, it is
 6          specifically acknowledged and agreed", quote,
 7          'that the primary use of the Touro Synagogue is
 8          as a place of worship and that the public
 9          visitation is a secondary use of the property.'"
10                   Do you see that?
11    A.    I do.
12    Q.    Now, the agreement itself is between the
13          Congregation Jeshuat Israel.  This is on the
14          first page of the agreement which is Bates 003
15          of the document.  The friends, the Society of
16          friends of Touro Synagogue, correct?
17    A.    Yes.
18    Q.    And the National Trust For Historic Preservation
19          in the United States.  Do you see that?
20    A.    Yes.
21    Q.    Okay.  And as part of this agreement on page 2
22          is the -- which is the bottom that has the
23          number 004 on it.  It's that top whereas clause
24          that says that Touro Synagogue is an active
25          place of worship of the congregation Jeshuat
```

```
 1            Israel.  That was accurate, right?
 2    A.      Yes.
 3    Q.      Which has possession of the site through a lease
 4            with Congregation Shearith Israel as owner and
 5            that was accurate, right?
 6    A.      Well, the lease you're referring to and the
 7            lease that we're referring to are two different
 8            leases.
 9    Q.      Is this an accurate statement?
10    A.      It depends on what the definition of "lease" is.
11    Q.      And I asked you before about a writing because I
12            think it may be important to the Court that
13            there be writings that are leases.  You don't
14            know of any writing other than the 1903 and the
15            1908 leases, correct?
16    A.      That's right.
17    Q.      Okay.  In paragraph 3 on page 005 of this
18            agreement, the National Trust Congregation and
19            the Society agree to cooperate fully with each
20            other and the treatment of the Touro Synagogue
21            as a national trust historical site, including
22            the preservation, interpretation and visiting
23            and marketing of the property.  Do you see that?
24    A.      I do.
25    Q.      And then the last full sentence on the page.
```

```
1              "It is acknowledged and agreed that in the
2         performance of this agreement, any obligation of
3         the Congregation Jeshuat Israel specified herein
4         may be performed by the Society on behalf of the
5         Congregation."
6              Do you see that?
7    A.   Yes.
8    Q.   So the Society of Friends, which is now called
9         The Foundation, right?
10   A.   Yes.
11   Q.   Okay.  Is an agent for CJI in carrying out its
12        maintenance and preservation obligations, isn't
13        that right?
14   A.   Well, in reality it is not true.
15   Q.   Was it true when this was written in 2001?
16   A.   Okay.  So we have to look at what the
17        obligations of CJI specified herein are.
18   Q.   Actually --
19   A.   So I'd have to look at those.  To give you an
20        answer, I'm not sure -- it says, "Any obligation
21        of CJI specified herein."  I have to know what
22        those are.
23   Q.   In the first sentence it says, "Preservation,
24        interpretation, visitation and marketing of the
25        property."
```

1                    Let's just focus on preservation.  Was

2               the foundation an agent for CJI in carrying out

3               preservation?

4       A.    The answer is no.

5       Q.    Okay.  Now, you see it's further acknowledged

6               that the agreement -- at the bottom of page 005

7               says, "It is further acknowledged and agreed

8               that the primary use of the Touro Synagogue is a

9               place of worship and that the public visitations

10              is a secondary use of the property."

11                   Do you see that?

12      A.    Where are you reading that from?

13      Q.    The bottom of 005 to the top of 006.  It's the

14              end of paragraph 3 under cooperation.  The last

15              line of the page says, "It is further

16              acknowledged and agreed."

17      A.    Yes.

18      Q.    That was true in 2001?

19      A.    Yes.

20      Q.    It's true today, isn't it?

21      A.    It is.

22      Q.    Okay.  In paragraph 5 under conservation it

23              says -- the second sentence.  "Congregation

24              Jeshuat Israel agrees that it will continue to

25              maintain preserve and administer Touro Synagogue

1          so as to protect and conserve the related

2          collections in its ownership, possession or

3          control."

4                    Do you see that?

5     A.   I do.

6     Q.   Okay.  And the rimonim are part of the

7          collections in its possession, ownership or

8          control, correct?

9     A.   Yes.

10    Q.   Okay.  Then paragraph 8 says -- I'm going to

11         pick up with "Prior to implementing any

12         substantial change or plan."  Do you see it's

13         the second full sentence in paragraph 8?

14    A.   Yes.

15    Q.   Okay.  And that relates, if you'll look at the

16         first sentence, to among other things, the

17         collection.  Do you see that?

18    A.   Yes.

19    Q.   So it says, "Prior to implementing any

20         substantial change or plan, the congregation

21         agrees, except in emergencies to give --

22              THE COURT:  You have to slow down.

23         When you're reading, you tend to --

24              MR. SOLOMON:  I apologize.

25         BY MR. SOLOMON:

1   Q.   "Prior to implementing any substantial change or

2        plan, the Congregation agrees, except in

3        emergencies to give the national trust an

4        opportunity to participate in the planning

5        process and to review plans and specifications

6        for projects."

7            Did I read that correctly?

8   A.   You did.

9   Q.   And prior to today, has CJI communicated with

10       the National Trust concerning the sale or

11       potential sale of the rimonim?

12   A.   No, to my knowledge.

13   Q.   Further below it says, "The congregation agrees

14       in finalizing plans to give serious

15       consideration to all advice and recommendations

16       of the National Trust."

17           Do you see that?

18   A.   Yes.

19   Q.   I only read part of the sentence.

20   A.   Yes.

21   Q.   So CJI didn't give any consideration to the

22       thinking of the national trust --

23   A.   It gave them consideration in the sense that it

24       knew that this agreement could be terminated at

25       the will of CJI.  So they knew they could

```
 1              terminate it if they wanted to.  So that was the

 2              consideration.

 3     Q.       So you did think about this agreement when you

 4              were thinking about selling the rimonim?

 5     A.       I didn't personally think about it.

 6     Q.       Okay.  In considering the potential sale of the

 7              rimonim, did CJI go back to the federal

 8              government with respect to the 1945 agreement to

 9              discuss it with them?

10     A.       No.

11                   MR. SOLOMON:  I want to look at DX 324,

12              please.

13     Q.       Are you familiar with the documentation of Touro

14              Synagogue to become or to be listed in the

15              National Register?

16     A.       I'm not.

17     Q.       This is not a document that you've ever seen

18              before?

19     A.       I have not seen this before.

20     Q.       And if you'll look further into this document,

21              you'll see beginning on page 024 that there

22              is -- it's a layout in flat of a brochure of the

23              Touro Synagogue.  Is that something that you

24              have seen before?

25     A.       You know, I may have seen it.  I don't recall it
```

```
 1              just seeing it like this.  I'm going to say I

 2              don't recognize it.

 3       Q.     Can you tell the Court looking at the

 4              photograph, which is on page 025 -- so this is

 5              on the right panel, but it would be a panel in

 6              the brochure.  Do you see the photograph of the

 7              Touro Synagogue?

 8       A.     The interior, yes.

 9       Q.     Do you see that the ark is open?  Do you see

10              that?

11       A.     Yes.

12       Q.     And can you tell that the rimonim are shown in

13              the ark?

14       A.     It does appear that there are rimonim in the

15              ark.

16              THE COURT:  Are you seeing that?  Can

17       you point on the screen, Mr. Solomon?

18              MR. SOLOMON:  Yes, judge.

19              THE COURT:  It looks like there are

20       three sets.

21              MR. SOLOMON:  Correct.  We actually do

22       have a better picture.

23              THE COURT:  That's fine.  I was just

24       wondering what you were directing his attention

25       to.
```

1               MR. SOLOMON:  I actually would like

2          this -- could we have DX 350 pulled up, please.

3          That should be a little easier.

4          BY MR. SOLOMON:

5     Q.   Do you see that there are three Torahs?  On top

6          of each of the three are three rimonim,

7          correct?

8     A.   Correct.

9               MR. SOLOMON:  Okay.  Now, I would like

10         this page, the text of this page pulled up, if

11         possible, please.

12         BY MR. SOLOMON:

13    Q.   This is underneath the photograph that we just

14         looked at, right?

15    A.   Correct.

16    Q.   And here it says in part, "The scrolls,"

17         referring to the five books of Moses.  It says,

18         "On them are recorded the five books of Moses,

19         the source of Jewish Faith.  The scrolls are

20         mounted on wooden rollers, two of which are

21         decorated with exquisite bell tops, the work of

22         colonial silversmith Myer Myers."

23              Do you see that?

24    A.   Yes, I do.

25    Q.   Okay.  And then it talks about what is above the

1        ark.  And then in the next paragraph it says,

2        "These holy objects, all rich in symbolism give

3        to the synagogue a profoundly religious

4        atmosphere.  The total effect does indeed

5        provide"  -- and then there is a quote.  "A

6        faint idea of the majesty and grandure of the

7        ancient Jewish worship mentioned in scripture. "

8        Do you see that?

9  A.   I do.

10  Q.   And among the holy objects that are being

11       referred to, there are the rimonim, correct?

12  A.   Correct.

13  Q.   Now, in the other document that we were looking

14       at of which the brochure is a part, so we're now

15       back to DX 324.  Let me ask you to look at page

16       7 of this.

17          If you'll notice that in the last

18       paragraph, the sentence that talks about the

19       holy ark, it says, "The rimonim silver bell tops

20       which adorn the rollers are the work of the

21       famous pre-revolutionary silversmith Myer

22       Myers."

23          Do you see that?

24  A.   I do.

25  Q.   And then going to the last page before the

1              citations, page 10, 010, it gives the history.

2              The second to the last paragraph says, "In 1791

3              the synagogue was closed again and remained

4              closed for 60 years.  During this time title of

5              the building passed into the hands of the

6              Congregation Shearith Israel of New York City."

7                   Do you see that?

8    A.   I do.

9    Q.   And then there is the rest of the history there

10             given.  In the center of the middle of the next

11             paragraph, talking about after the new

12             congregation in 1893 it says, "It was

13             incorporated by the State of Rhode Island in

14             1894 with the trustees of Shearith Israel acting

15             as its trustees.

16                  "The property is still owned by the

17             Congregation of Shearith Israel, the

18             Congregation Shearith Israel in New York City,

19             who together with the Secretary of the Interior,

20             the Congregation Jeshuat Israel of Newport and

21             the Society of Friends of Touro Synagogue,

22             National Historic Shrine, continue to preserve

23             the balance, fabric and genius loci of the

24             site."

25                  Do you see that?

1   A.   Yes, I do.

2   Q.   And the rimonim are part of the balance and

3        fabric of the site; isn't that correct?

4   A.   No, I don't think that the --

5   Q.   Thank you.  You answered my question.  You do

6        agree with me, though, that in describing the

7        site, specific reference is made to the rimonim

8        and Myer Myers rimonim, right?  You just saw

9        that on page 7, right?

10  A.   One has to do with its inside and one has to do

11       with the site, the national historic site.  It's

12       the building, the real estate.

13            MR. SOLOMON:  I need the 2004 state

14       preservation grant application form, please.

15       BY MR. SOLOMON:

16  Q.   Is this document familiar to you?

17            MR. NAFTALIS:  Your Honor, this is the

18       one document that we objected to because of the

19       authenticity of the signatures.

20            THE COURT:  I understand.  Mr. Solomon,

21       my thought in reviewing the document as it was

22       submitted and the objection to it was that I

23       would need the testimony of Ms. Friedman

24       initially before being able to rule on its

25       admisability because from what I understand, CJI

1          is challenging the issue of the authenticity.

2          Perhaps something to do with her signature.  I'm

3          pretty sure she is on their witness list.  I

4          remember her being listed.

5                    So if we can old off on the Court

6          having to rule on that document until she takes

7          the stand.

8                    MR. SOLOMON:  Whatever Your Honor

9          pleases.  I was only going to use it for cross-

10         examination at this time.  With the Court's

11         permission, could I lay one question predicate?

12                    THE COURT:  Of course.

13     BY MR. SOLOMON:

14     Q.   On the basis of the, was CJI awarded $120,000

15          from the State?

16     A.   I don't know the answer to that.

17     Q.   Okay.  I would cross-examine the witness based

18          on some statements that he made with this, but

19          if the honor wishes, I can old off.

20                    THE COURT:  I think if need be because

21         Mr. Bazarsky could be called back after we find

22         out about the authenticity of that.  Is she now

23         Ms. Friedman or is she now Ms. Pedrick?  I

24         haven't been able to follow the order.  Anyway

25         Ms. Friedman, Pedrick.

1           SPEAKER:  Her name is Friedman, but

2      uses Pedrick.

3           THE COURT:  As long as we know that

4      we're all talking about the same person and

5      that's who we need to hear from on that

6      document.

7           MR. NAFTALIS:  To move things along on

8      this.  The issue is really whether she signed it

9      or not.  She testified in deposition that she

10     hadn't.  He can use it to cross-examine

11     Mr. Bazarsky now whether she signed it or not

12     and you can take it into account or not take it

13     account when you submit the document.  So we

14     don't have to put him through the problem of

15     coming back?

16          THE COURT:  Are you withdrawing your

17     objection to it?

18          MR. NAFTALIS:  We're happy to wait.

19     Let it get treated like all the rest.

20          THE COURT:  We'll defer at this time.

21     Thank you, Mr. Solomon.

22          MR. SOLOMON:  Your honor, I'm not going

23     to ask him questions?

24          THE COURT:  Correct.  I just don't

25     think we should be cross-examining on a document

1          whose authenticity is questioned until we

2          establish the authenticity with the witness that

3          has nothing to do with the authenticity of the

4          document.

5                    MR. SOLOMON:  Perfectly comfortable

6          with that.  Thank you, Your Honor.

7          BY MR. SOLOMON:

8     Q.   When you became president in 1993, you said

9          nobody knew anything about Shearith Israel.

10         Isn't that what you said?  Did I get that down

11         right yesterday?  You didn't know anything about

12         them yesterday.

13    A.   None of --

14    Q.   Did you testify yesterday that when you became

15         president in 1993?  When I became president in

16         1993, nobody knew anything about Shearith

17         Israel.  Is that what you said yesterday under

18         oath?

19    A.   Yes, but there is more to the sentence.

20    Q.   Okay.  Not as the court reporter transcribed it,

21         but okay.

22                    MR. NAFTALIS:  Your Honor, he doesn't

23         have to make comments --

24                    MR. SOLOMON:  He can answer my

25         question.

```
 1                    THE COURT:  I think I have given both

 2            attorneys pretty good leeway.  Let's all

 3            remember we don't have a jury here.  You're

 4            stuck with me now, as I said a few times.  Some

 5            of the things you might do before a jury aren't

 6            necessarily required to convince me what the

 7            facts are.  Ultimately the law will be.

 8                    I've given both counsel -- I'm going to

 9            continue to give you both leeway.  I believe you

10            are both incredibly competent trial lawyers, and

11            you're here to try the case the way you want

12            it.

13                    MR. SOLOMON:  I didn't mean to push the

14            edge.

15          BY MR. SOLOMON:

16     Q.    You became president and knew nothing about

17            Shearith Israel is what you testified to

18            yesterday.

19                    When you became president -- let me ask

20            the question this way:  Shortly after you became

21            president, you called Rabbi Angel.  You

22            testified to that yesterday, right?

23     A.    Yes.

24     Q.    And let's look at Exhibit 332, please.  This is

25            another document marked --
```

1              MR. SOLOMON:  And I think, Your Honor,

2         this has someone's handwriting on it.  So I'm

3         going to ask the witness to ignore the

4         underscoring.

5         BY MR. SOLOMON:

6    Q.   I'm going to go through this quickly with you,

7         Mr. Bazarsky, to see if this refreshes your

8         recollection of your conversation with Rabbi

9         Angel about what you learned right when you

10        became president.

11             So you recall talking to Rabbi Angel in

12        or around June of 1993?

13   A.   Vaguely.  I mean, not -- it was a one ten-minute

14        conversation, but I vaguely remember it.

15   Q.   Do you recall asking Rabbi Angel what exactly

16        the legal relationship between Shearith Israel

17        and the Touro Synagogue was?

18   A.   Yes.

19   Q.   And do you recall telling him that one of your

20        concerns was that a majority of the members of

21        the Touro Synagogue are not Orthodox?

22   A.   Yes.

23   Q.   Okay.  You thought that there might be some

24        pressure to modify Orthodox practices?

25   A.   Yes.

1    Q.   Did Rabbi Angel tell you that his understanding

2         has always been that -- Rabbi Angel, he is not a

3         lawyer, right?

4    A.   I don't believe so.

5    Q.   Okay.  That his understanding has always been

6         that Shearith owns the Touro Synagogue?

7    A.   Yes.

8    Q.   "That you rent the building to the congregation

9         in Newport on condition that the congregation

10        function as an Orthodox congregation with all

11        that entails.  I told him that in the past the

12        organization has always consulted us before

13        consulting a new Rabbi."

14             Is that in substance what he told you

15        in 1993?

16   A.   I would say yes.

17   Q.   Okay.  And then you testified that you had a

18        meeting with Shearith Israel, right, and you

19        said that was in 1996, correct?

20   A.   Correct.

21   Q.   So it was three years later?

22   A.   Correct.

23   Q.   And in the meantime, you did have an ad hoc

24        legal committee established to focus on the

25        ownership of the synagogue to get the facts,

1               right?

2       A.      You know, I don't remember doing that.

3       Q.      All right.  Let's look at DX 569, please.  These

4               are minutes of a board of officers meeting of

5               July 1993 of Congregation Jeshuat Israel,

6               correct?

7       A.      Yes, it appears to be, yes.

8       Q.      And one of your first acts as president was to

9               create an ad hoc committee.  I'm on page 005 of

10              the document, the last page of the document.

11                      Under legal it says, "There are two

12              unresolved issues at present.  Ownership of the

13              synagogue and return of the George Washington

14              letter."

15                      Do you see that?

16      A.      I do.

17      Q.      And that refreshes your recollection that you

18              had an ad hoc committee setup for that purpose?

19      A.      Yes.

20      Q.      And did you learn the facts about the

21              relationship before 1996 when you went to visit

22              with Shearith Israel?

23      A.      Did I learn the facts?  No.  I mean, we had a

24              discussion about it.

25      Q.      All right.  In or around August of 1993, you

1   spoke to Jonathan Mendes, correct?

2 A. Can you refresh my memory on that as well?.

3 Q. DX 481.  These are minutes of a board of

4   officers meeting of August 23, 1993.  It begins

5   under the paragraph headed, "Relationship with

6   Shearith Israel."

7     Do you see that, sir?

8 A. Yes, I see it.

9 Q. It says, "The president reported."  That was

10   you, correct?

11 A. Correct.

12 Q. "On a telephone conversation with Jonathan

13   Mendes," which you now recall any substance of?

14 A. Yes.

15 Q. So did Mr. Mendes point out that there is a

16   contract between Shearith Israel and Touro?  Did

17   he say that to you?

18 A. I would say that he did.

19 Q. All right.  And did he in his own gentle way

20   tell you that he thought you were six years

21   behind in rent payments?

22 A. He may have made that statement.

23 Q. And whatever you're going to call it, this is

24   the same dollar that was paid in 2012; is that

25   correct?

1   A.   I'm not sure in 2012.  In some years they sent

2        it as a donation.

3   Q.   A donation of one dollar?

4   A.   Yes.

5   Q.   That had nothing to do at all with the --

6   A.   This was before my time.  Before my time.

7   Q.   Okay.  You then go on in the next paragraph to

8        say, "The president also reported that Shearith

9        Israel wants Touro to survive."

10              Did he say that to you?

11  A.   Can I just read the paragraph?

12  Q.   Yes.

13  A.   This conversation had to do with my asking --

14  Q.   Sorry.  My question really was just, did he say

15       to you in words or in substance that Shearith

16       Israel wanted Touro to survive?

17  A.   Yes.

18  Q.   Okay.  You believed him when he said that or

19       not?

20  A.   Yes.

21  Q.   Okay.  Now, there had been predecessor

22       presidents of CJI.  You talked a little bit

23       about some of them, yesterday, correct?

24  A.   Yes.

25  Q.   And there was a Mr. Greenberg who preceded you

 1              by some years?

 2      A.    Al Greenberg.

 3      Q.    Al Greenberg as president?

 4      A.    Yes.

 5      Q.    And Mr. Kucinich?

 6      A.    Yes.

 7      Q.    He was also a president?

 8      A.    Yes.

 9      Q.    CSI and CJI?

10      A.    Yes.

11      Q.    And he was also for a time its official

12              historian, correct?

13      A.    That's true.

14      Q.    Okay.  There was also a Mr. Schweber?

15      A.    Saul Schweber, yes.

16      Q.    He was a president also?

17      A.    Yes.

18      Q.    And Mr. Herstoff?

19      A.    Yes.

20      Q.    And he was also a prior president?

21      A.    Yes.

22      Q.    Now, did you go into the records of CJI when you

23              became president to see what the historical

24              record was of the relationship between Shearith

25              Israel and CJI?

1    A.   I asked people.  I didn't go into archives but

2        we discussed it.

3    Q.   Did anyone give you documents from that period?

4    A.   Did not, no.

5    Q.   Did you ask for any documents?  Say, are there

6        any documents that reflect this relationship?

7    A.   No.

8    Q.   Did you ever become aware that there were times

9        in CJIs past when formal submissions had been

10       made to the CJI record so that CJI would have an

11       institutional memory of the relationship between

12       Shearith Israel and CJI?

13    A.   No.

14    Q.   I want to look at Exhibit 262, please.  This

15       records a meeting of Congregation Jeshuat

16       Israel, a special meeting on March 15, 1959.  In

17       it President Greenberg presented a legal

18       memorandum which is referred to on the bottom

19       page of 002 to the top of 003, where he's

20       presenting a legal memorandum containing the

21       following.  And then it lists six items,

22       including the extract of the will and testament

23       of Jacob Rodriquez Rivera, transcript of deeds,

24       transcript of cases, certified copies of

25       leases -- of a lease dated February 1903, a

1          lease dated January 1908.

2                    And when you became president, did you

3          know that these were in CJI's files?

4     A.   I have not seen this document before, no.

5     Q.   Did you know that Mr. Greenberg had

6          communications with Shearith Israel's

7          representatives seeking to learn what the

8          relationship was?

9     A.   I did not.

10    Q.   Let's look at DX 264, please.  This is a March

11         18, 1959 letter from President Greenberg to

12         George Teitz.  Do you see that?

13    A.   I do.

14    Q.   That's the Mr. Teitz that we've made some

15         reference to earlier in these proceedings or is

16         it someone else?

17    A.   This is someone else.

18    Q.   Any relationship.

19    A.   I'm not sure?

20    Q.   Okay.  So he there is explaining to Mr. Teitz

21         that he introduced at a CJI meeting extracts and

22         copies of records pertaining to the reposing of

23         the title and the present relationship between

24         the CJI and the CSI.  And then he goes and he

25         lists various things, including the six things

```
 1              that we just mentioned.
 2                        And with respect to the lease he says
 3              at the second to last line, "Lease dated 1903
 4              and 1908 wherein CJI -- I cannot read the next
 5              words.  "To pay 1 dollar a year to the CSI."
 6                        Do you see that?
 7     A.       I do.
 8     Q.       And in the second to last paragraph he says, "In
 9              view of the existing records and the excellent
10              relationship existing between these two
11              congregations, I urge that the one dollar annual
12              rent be forthwith paid and annually after paid
13              regularly."
14                        Do you see that?
15     A.       I do.
16     Q.       And was that your understanding of the
17              relationship when you became president and had
18              the discussions that you testified to?
19     A.       No.
20     Q.       You are aware that after this time, the one
21              dollar rent was paid?
22     A.       Say the question again, please.
23     Q.       You are aware that after 1959, the one dollar
24              rent was paid?
25     A.       In 2012.
```

1    Q.    How about any time in between 1959 and 2012?

2    A.    Not that I know of.  It could have been.  I

3          don't know.  I know that when I became president

4          in '93, I was told that it hadn't been paid for

5          five or six years.  I know it was not paid from

6          '93 to today other than this 2012.

7    Q.    Other than the 2012?

8    A.    If that was in fact a donation or rent, I'm not

9          sure.

10   Q.    And the website of Congregation Jeshuat Israel

11         says that annual rent is paid every year,

12         correct?

13   A.    I haven't read the website.

14   Q.    You didn't see reference to that yesterday?

15   A.    I haven't read the whole website.

16   Q.    Okay.  We talked about President Kucinich.

17         Let's look at Exhibit 479 so that the record is

18         clear.  We have had transcribed to the best of

19         our knowledge and have had certified

20         transcribers certify these -- I have such a hard

21         time reading the old handwriting, but the

22         handwriting.  We do have transcriptions for a

23         lot of the documents, and we'll be submitting

24         them to the Court.

25                  Can you recognize DX 479 as a report?

1          To me, I'm telling you it looked like historian,

2          E-A-N at the end, of May of 1981.  Do you see

3          that?  I'm going to read from the transcribed

4          portion.  It refers to a report of 1981 by AL

5          Greenberg and contained in the letter to our

6          president Saul Fein, which is another president

7          of CJI?

8     A.   I assume so.

9     Q.   You don't know?

10    A.   Not for sure.

11    Q.   All right.  He says -- it is now referring to

12         the earlier letter.  "It has always been my

13         general opinion and belief in years of

14         association since 1926 that never should there

15         be a challenge to the New York Congregation in

16         their capacity as title holder and trust for the

17         benefit of the Jewish Society of Newport.  The

18         Congregation Jeshuat Israel can remain tenant

19         manager, so long as they preserve the synagogue

20         not only for the present public worship, but

21         keep the synagogue in good condition for the

22         future Jewish public as the years roll buy.

23              "The New York Congregation will never

24         interfere with the local congregation as long as

25         said congregation preserve the synagogue for

1           present use and for future years.  If in the

2           future any group of Jewish people become members

3           of the congregation Jeshuat Israel and fail in

4           their obligation to preserve the synagogue, then

5           will the New York Congregation cause the tenancy

6           to cease and undoubtedly they would endeavor to

7           obtain another congregation who would abide by

8           the terms."

9                   Do you see that?

10     A.    I do see that.

11     Q.    Did you understand this during the time that you

12           were president that this is what Mr. Kucinich

13           had concluded?

14     A.    No, I've never seen this before.

15                  MR. NAFTALIS:  That's not what the

16           document says.  The document says -- there are

17           two opinions, and that's a quotation from the

18           first.  He didn't even read the quotation from

19           the second.  There is no conclusion.

20                  MR. SOLOMON:  Well, you're welcome.

21                  MR. NAFTALIS:  Don't misstate it.

22                  THE COURT:  It's probably a good time

23           for us to take a lunch break.  We'll be back at

24           1:30.

25                  (Lunch Recess taken.)

Page 116

(1)                    STATE OF RHODE ISLAND

(2)

(3)        I, Tara L. Wosny, Certified Shorthand Reporter

(4)    and Commissioner in and for the State of Rhode Island,

(5)    do hereby certify that the witnesses whose testimony is

(6)    herein before set forth, was duly sworn and that such

(7)    testimony is a true record, to the best of my ability, of

(8)    the testimony given by the witnesses.

(9)        I further certify that I am neither related to

(10)   or employed by any of the parties in or counsel to this

(11)   action, nor am I financially interested in the outcome of

(12)   this action.

(13)       In witness whereof, I have hereunto set my hand

(14)   and seal this 1st day of June, 2015.

(15)

(16)   Tara L. Wosny

(17)   Notary Public

(18)   My commission expires:

(19)   June 10, 2017

(20)

(21)

(22)

(23)

(24)

(25)

Rhode Island Court Reporting

1                    AFTERNOON SESSION

2             (Commencing at 1:30 p.m.)

3                    THE COURT:  Slight scheduling

4    issues tomorrow, break from 1:30, will be

5    2:00.  I have a lunchtime meeting that will

6    take me a little bit to get to.

7             So tomorrow the break is for an

8     hour and a half at lunch.

9        MR. SOLOMON:  Thank you, Your Honor.

10            CROSS EXAMINATION BY MR. SOLOMON:

11   Q.  Mr. Bazarsky, are you related by blood

12   or marriage to Mr. Kucinich?

13   A.  I believe he is a second or third

14   cousin to his wife, so I'm a cousin

15   removed.

16   Q.  Okay.  And did you go over any of the

17   work that he did as historian of CJI?

18   A.  I did not.

19   Q.  You never considered doing that?

20   A.  No.

21   Q.  Okay.  I had asked you earlier today

22   about a trust deed.  Look at DX491, please,

23   quickly.

24            (The witness complies.)

25   Q.  You recognize Mr. Kucinich's

1  handwriting?

2    A.  I do not.

3    Q.  This says report of the historian, I

4  think it's spelled with an "i" this time, and

5  a museum committee, regular meeting, October

6  11, 1981.

7           And if you look at item No. 4,

8   Mr. Kucinich is there saying that he made

9   a copy of the 1894 deed of trust

10   transferring control of Touro Synagogue

11   from the heirs to the trustees of Shearith

12   Israel; do you see that?

13    A.  I do.

14    Q.  And does looking at that refresh your

15  recollection that, in fact, that deed that we

16  have looked at earlier today, is at CJI

17  available for you to look at?

18    A.  The deed?

19    Q.  Yes?

20    A.  Ask me the question again.

21    Q.  The deed that is being referred to, the

22  1894 trust of CJI, was at CJI since 1981?

23    A.  I don't know if -- this is a copy of

24  the deed, right.  So I don't know.

25    Q.  Okay.  Let me show you something else.

1   Mr. Kucinich, this is DX446, is that the one

2   we have?  That's the one we don't have.

3   Okay.

4              Let me just -- let's take a quick

5    look at the footnote and then deliver

6    copies later.  If you need to see

7    something more, Mr. Bazarsky, we can get a

8    copy, just don't have the document here.

9              Is this an article that is known

10   to you -- go back to the first page.  As

11   historian of CJI, Mr. Kucinich wrote some

12   articles; is that right?

13   A.  I believe he did, yes.

14   Q.  And did you see this article that's

15   called, "How Touro Synagogue Got It's Name"?

16   A.  I don't remember reading this.  This

17   is 1983.  1983.

18   Q.  Okay.

19   A.  I don't remember reading it.

20   Q.  And return to the footnote 6, please.

21              (The witness complies.)

22   Q.  Can you see that?

23   A.  I can.

24   Q.  I want to call your attention to the

25   bottom half of that footnote where it says,

1    "Thus, when the Seixas family, who had become

2    the last legal heirs to the synagogue, moved

3    to New York and became members of

4    Congregation Shearith Israel, the latter

5    assumed de facto ownership of the synagogue

6    in Newport.

7              "Later on, the heirs turned over

8     their legal rights to the trustees of

9     Shearith Israel, who then became the de

10    jure owners.  In the interim, the new

11    Jewish residents of the City of Newport

12    asked for and received permission to use

13    both the synagogue and the funds"; do you

14    recall reading that?

15    A.  I don't.

16    Q.  Do you recall knowing that?

17    A.  No, I don't.

18    Q.  Okay.  DX445.  Please let's look at

19    that, something else Mr. Kucinich wrote.

20              Do you remember seeing this?  And

21    we have to go to the cover page, the

22    title.  There we go.  1902, Touro

23    Synagogue, is that an article that you

24    read?

25    A.  I don't believe so, this is, when,

1    in the 1970's?

2    Q.  I think 1975.

3    A.  Yeah, I don't recall reading it.

4    Q.  Okay.  Please let's turn if you will to

5    the quote that he has there.

6    A.  Yeah.

7            (The witness complies.)

8    Q.  You don't have a copy of this, either,

9    for The Court.  Okay.

10           Here he says that, "Whatever

11   relationship had developed, whether others

12   in Newport liked it or not, was formalized

13   when Dr. Perry Clemens and Ann Taylor

14   Phillips went to Newport on declaration

15   Memorial Day, 1898, and recorded the

16   following action in the guest book of the

17   synagogue -- and I'm not going to read the

18   whole thing, but I want to call your

19   attention to the fact that it, there it

20   records in the Touro Synagogue CJI guest

21   book that Mr. Eugene Shrick, a resident of

22   Newport, Rhode Island, was to act as

23   representative or agent to the said

24   congregation Spanish and Portuguese

25   Shearith Israel of New York to take charge

122

1     of the building, appurtenances or

2     properties, services, and cemetery, the

3     synagogue's building situated in the

4     ancient site in Touro Street, and the

5     cemetery at the corner of K Street and

6     Bellevue Avenue, that's the cemetery that

7     you spoke of yesterday?

8        A.  Yes.

9        Q.  And did you ever bring to anyone at

10    Shearith Israel's attention the plaque that

11    you testified to yesterday that's at the

12    cemetery?

13       A.  No, I did not.

14       Q.  Okay.  And do you have any evidence at

15    all that Shearith Israel knew about that

16    plaque?

17       A.  Well, only --

18       Q.  Any evidence that Shearith Israel knew

19    about it?

20       A.  No.

21       Q.  We also talked about Mr. Herstoff,

22    another president of CJI?

23       A.  Yes.

24       Q.  Let's look quickly at DX333.

25              And I call your attention to the

1    last page of that document, which is a

2    letter from Mr. Herstoff to Mr. Teitz.

3         The second to last paragraph, it

4    says, "Congregation Jeshuat Israel, the

5    synagogue, has had the agreement with

6    Shearith Israel for many years, and it's

7    pointless and serves no useful purpose to

8    expend time, effort, and money to change

9    the lease agreement within the confines of

10   your lease.  We are quote, autonomous,

11   closed quote, and it's a tragedy and a

12   great embarrassment to ourselves and to

13   the proud history of our synagogue to

14   consider any change in our traditional

15   orthodox rituals.  Our history is tied to

16   this heritage, and our congregation must

17   maintain that tradition; to do otherwise,

18   does a disservice to us and our fore

19   bearers."

20        This is 1994 that he wrote this,

21   right?  You were president at the time,

22   right?

23   A.  Correct.

24   Q.  Did you see this letter?

25   A.  I did not.

1     Q.  You knew that Mr. Herstoff had been a

2   prior president of CJI; is that correct?

3     A.  Correct.

4     Q.  Did you solicit his views or to talk to

5   him at all about the relationship between

6   Shearith Israel and CJI?

7     A.  Only what was expressed in open

8   congregation or board meetings.

9     Q.  Let's look at the website.  We have it

10  as DX549.  We have marked it as DX549, and we

11  have taken some snapshots of it.  You only

12  looked at this once; is that right?

13    A.  I have never looked at the website

14  on the Internet.  I have looked at

15  something like this once or twice.

16    Q.  Okay.  Under the quiet years --

17        THE COURT:  Mr. Solomon, is this

18   the CJI website or the Touro Foundation

19   website?  Or do we not know?

20        MR. SOLOMON:  If I can ask the

21   witness.  And thank you, Your Honor.

22    Q.  If I can ask the witness to look at the

23  third page in.  We did put the copyright slug

24  from the website, which is a copyright,

25  Congregation Jeshuat Israel, Touro Synagogue

1    Foundation, George Washington Institute for

2    Religious Freedom, and this was copyrighted

3    2011-12, although portions are copyrighted as

4    early as 2008.

5              Under "The Quiet Years," the

6    website says, that:  "By the time the War

7    of 1812 ended, most of the Jewish families

8    had moved to do the newly forming

9    synagogue communities in the rival

10   cities..." --  and skip a couple of -- a

11   sentence, it says, "...eventually the

12   remaining congregants decided to lock the

13   doors.  Stephen Gould, a member of a local

14   Quaker family, and good friend to many of

15   the former Jewish residents of Newport,

16   was engaged as caretaker.  Legal oversight

17   of the building, it's contents, and it's

18   deed, was handed over to Congregation

19   Shearith Israel of New York"; do you see

20   that?

21    A.  I do.

22    Q.  And you are not aware of any fact

23   whereby legal ownership was thereafter

24   transferred to anyone after it went to

25   Shearith Israel; isn't that correct?

126

1    A.  Well, I think this was transferred

2    in -- to safekeeping.  And Shearith

3    Israel did in fact return it to -- you

4    are asking me to transfer back?

5    Q.  No, asking you to answer my question.

6            So I will ask this way.  Are you

7    aware of any document subsequent to the

8    time that indicates that the legal

9    oversight was handed over to anyone else,

10   anyone other than Shearith Israel?

11   A.  No, I don't.

12   Q.  Okay.  And are you aware of any other

13   fact by which legal oversight was transferred

14   to someone other than Shearith Israel

15   subsequent to the time that's being referred

16   to in the website?

17   A.  Yes.

18   Q.  Okay.  And I'm going to ask you to look

19   at, just to see if I can read from your

20   deposition in this case -- your deposition

21   was taken in this case?

22   A.  It was.

23   Q.  And you were under oath when you gave

24   that deposition?

25   A.  Yes.

1     Q.   Okay.  On page 46, beginning of line 10.

2   There's a question:

3              "QUESTION:   At that time this

4   website says that the legal oversight to

5   the building, its contents and its deed,

6   was handed to Congregation Jeshuat

7   Israel -- should mean Shearith Israel of

8   New York -- and my question to you is:

9   Are you aware of any document subsequent

10   to that time that indicates legal

11   oversight being handed to anyone else?

12              "THE WITNESS:   Any other than

13   Shearith Israel?

14              "MR.  SHINEROCK:   And where are

15   the Shinerocks of yesteryear?

16              "THE WITNESS:   Anyone other that

17   Shearith Israel?

18              "MR. SHINEROCK:  Yes?

19              "THE WITNESS:  No, I'm not."

20              Did you give that answer to that

21   question?

22     A.  Yes, I did.

23     Q.  And below it is a question beginning on

24   line 24:  "Are you aware of any other fact by

25   which legal oversight was transferred to

1  someone other than Shearith Israel subsequent

2  to this time?

3          "ANSWER:  No, I'm not."

4          Did you give that answer to that

5  question?

6   A.  Yes, I did.

7   Q.  Thank you.

8          "The end of the Nineteenth

9  Century ushered in new life for the Touro

10  Synagogue with the arrival of the Eastern

11  European Jews to the United States.

12          "In 1881, the new Jewish

13  community of Newport petitioned

14  Congregation Shearith Israel to reopen the

15  town's synagogue for services and to

16  appoint a permanent rabbi."

17          Do you see that?

18   A.  I see that.  I do.

19   Q.  And then goes down a couple of other

20  sentences giving the history, and then says

21  there's a lease amount of one dollar, is

22  still paid by the current Newport

23  congregation to Congregation Shearith Israel,

24  and "...for use of the building and the

25  grounds, which are still owned by the New

1  York Group"; do you see that?

2    A.  I do.

3    Q.  Okay.  Beneath that, by the way, there's

4  reference to the Touro Foundation, and in the

5  last, second to last sentence, it says, "Each

6  year the Touro Foundation sponsors an

7  educational lecture series and holds a public

8  reading of the George Washington letter as a

9  celebration and pronouncement of religious

10  freedom"; is it your understanding that

11  that's sponsored by the Touro Foundation?

12    A.  Correct.

13    Q.  And you know that Congregation Shearith

14  Israel has involvement with the Touro

15  Foundation, correct?

16    A.  No, I don't.  I don't know what that

17  relationship is.

18    Q.  Do you know whether it ever had any

19  relationship?

20    A.  I don't know what the word

21  relationship means.

22    Q.  Were there members on the board?

23    A.  Could have been, I don't know that,

24  whether -- I don't know specifically that

25  there were members of Shearith Israel on

130

1    the board of the Foundation.  But it's

2    possible.

3      Q.  Okay.  Last question with respect to the

4    website, there's a few pages in, this is

5    CSI14647, my copy doesn't have the page

6    number under Myer Myers, but it has him

7    listed as Connecticut, and the last line of

8    that it says, "He created the magnificent

9    Torah finials for the new rimonim now found

10   in the Touro Synagogue"; did I read that

11   correctly?

12     A.  You did.

13     Q.  You testified yesterday to a meeting at

14   Shearith Israel in 1996, that you testified

15   that you attended, right?

16     A.  Yes.

17     Q.  In substance you testified that what

18   Shearith Israel told you at the time, was,

19   "We are not paying.  We are not giving you

20   any money.  You are on your own."  Do you

21   remember that?

22     A.  I do.

23     Q.  You were quite --

24     A.  We didn't ask for any money, we

25   didn't ask them specifically for money.

131

1    Q.  You didn't tell that to The Court

2    yesterday, so thank you for saying that now.

3    You didn't ask for money, correct?

4    A.  We did not ask for a dollar amount,

5    that's right.

6    Q.  So in the fateful meeting that you

7    testified to yesterday, that was so shocking

8    to you, right, you didn't ask for money?

9    A.  We asked for help.

10   Q.  And that's what you reported back to

11   your board and to the congregation of Jeshuat

12   Israel, you reported back that you asked for

13   the support, for the campaign, not their

14   money; do you remember that?

15   A.  Correct.

16   Q.  Okay.  And that was true when you said

17   that to your congregation in 1996, right?

18   A.  Correct.

19   Q.  And let's take look at DX338 for a

20   minute.  Shearith Israel, and here is where

21   you record minutes of the congregation

22   meeting of June of 1996, right?  Correct?

23   A.  I have not seen it yet.

24   Q.  I thought it was on the screen.

25   A.  Yes.

132

1    Q.  Does that accurately reflect what you

2   told your congregation on June 2nd, 1996; is

3   that correct?

4    A.  Yes.

5    Q.  And accurately reflects what happened at

6   the meeting in 1996, doesn't it?

7    A.  A lot more happened at the meeting.

8           But this is just the highlights

9    that I referenced at the congregation

10   meeting.

11   Q.  And one of the headlights was that you,

12   you did not ask them for money?

13   A.  Correct.  I did not ask for them for

14   their money, yes.

15   Q.  And this also records where Rabbi Angel

16   told you any rabbi that is approved by the

17   placement office at Yeshiva University would

18   be fine from his perspective; is that

19   correct?

20   A.  Correct.

21   Q.  And this records that at the meeting you

22   asked if there was any archival material

23   which should belong to Touro, and they, I

24   think Shearith Israel, suggested that you

25   send an archivist to meet with their

1  archivist; did they suggest that to you?

2  A.  They said if you want to go through

3  our archives, you are welcome to do it.

4  And if you find things that belong to

5  you, you are welcome to take it.

6  Q.  And did you send an archivist?

7  A.  We never did.

8  Q.  So this is your report of the only

9  meeting that you attended with Shearith

10  Israel in New York, correct?

11  A.  Prior to what period of time?

12  Q.  Prior to the time that you decided to

13  try and sell the rimonim?

14  A.  Yes.  That I participated in.

15  Q.  Yes, that you participated in?

16  A.  Yes.

17  Q.  Okay.  Now, as part of the efforts that

18  CJI has made to fund raise, it contacted Roy

19  Zuckerberg; is that correct?

20  A.  Are you speaking about the campaign

21  or the restoring of the rimonim?

22  Q.  Well, did you try and solicit his

23  financial assistance at any time?

24  A.  Yes.

25  Q.  Okay.  And you reported at the

134

1    congregation meeting that you had asked him

2    for help, and that he was a member of

3    Shearith Israel, right?

4    A.  Yes.

5    Q.  And when you made the formal board

6    resolution thanking him, you also identified

7    him as a member of Shearith Israel, correct?

8    A.  Correct.

9    Q.  Now, at the time that you solicited him,

10   he was not a member of CJI; is that correct?

11   A.  He was not, correct.

12   Q.  He then -- you then solicited him, he

13   contributed, and then he then joined; is that

14   right?

15   A.  That's correct.

16   Q.  And with respect to Mr. Loeb, you also

17   solicited funds from Mr. Lobe; is that

18   correct?

19   A.  Yes.

20   Q.  And at the time he didn't live in

21   Newport; is that correct?

22   A.  He did not.

23   Q.  Was he a member at the time that you

24   first approached him?

25   A.  He was not.

135

1    Q.  So he, too, you solicited him, he gave

2   money, and then he became a member; is that

3   correct?

4    A.  That is true.

5    Q.  You testified yesterday, I think at one

6   point, you says tens of thousands of people,

7   visitors come through the synagogue in the

8   summer; is that accurate?

9    A.  That is accurate.

10    Q.  Do you somehow get their names?

11    A.  There was a time when we did

12   actually have them fill out cards.  I

13   don't believe today we are having them

14   fill out cards.

15    Q.  You knew their names, you could try and

16   contact them and solicit them for funds; is

17   that correct?

18    A.  Not so much solicit them, but to

19   welcome them and tell them about what

20   opportunities there are at Touro

21   Synagogue.

22    Q.  But you don't do that anymore?

23    A.  We do not collect the names of -- to

24   my knowledge, of the people who take

25   tours of the synagogue.

1    Q.  There's something called the Abraham

2  Touro Society; is that correct?

3    A.  Yes.

4    Q.  And that society is for people who can

5  give $10,000 and be a member of the society;

6  is that right?

7    A.  Yes.

8    Q.  And that is something that the

9  foundation, CJI created to try and raise

10  funds for the synagogue; is that right?

11    A.  I believe, if I'm correct, it was

12  just the synagogue.  Just the

13  congregation that did that.  Not sure the

14  foundation was involved at all in that.

15    Q.  How much money has been raised by them?

16    A.  To my knowledge about $120,000.

17    Q.  If I told you it was $142,000, would you

18  accept that?

19    A.  Yes, that could be right.

20    Q.  Okay.  And are the members of the

21  Abraham Touro Society members of CJI, or are

22  they more generally geographically

23  distributed in America?

24    A.  I do not actually have a list of the

25  people, of the 14 people that have

137

1  donated the $10,000.  I don't have their

2  names.

3    Q.  Can you tell us whether any of them is

4  not a CJI member?

5    A.  I don't know.  I don't know.

6    Q.  Okay.  Now, in anticipation -- withdraw

7  the question.

8         We received a communication from

9  a Mr. Book, Mr. Jesson and Mr. Schonstein,

10  you know all three of the gentleman, don't

11  you?

12    A.  Yes.

13    Q.  And all three of them are fairly wealthy

14  Jewish philanthropists; is that correct?

15    A.  Correct.

16    Q.  And have they contributed money to Touro

17  Synagogue?  It's a yes or no.

18    A.  Yes.  The answer is yes.

19    Q.  Okay.  So none of them is a member of

20  the Touro Synagogue or of CJI; is that

21  correct?

22    A.  I think they are all members of.

23    Q.  Were they members before you solicited

24  them?

25    A.  Were they members, no, I don't think

1    they were.

2        Q.  Let's look at DX334, please, minutes

3    from 1994.

4            While he is handing that to you,

5    Mr. Bazarsky, CJI has not contacted all of

6    the wealthy philanthropists in America,

7    have they?  You have not already tapped

8    that out, have you?

9        A.  No.

10       Q.  Do you have a sense of how many Jews

11   there are in America?

12       A.  I think there's about six million.

13       Q.  And, obviously, you have not tapped that

14   resource out, right?

15       A.  We have not contacted all six

16   million, right.

17       Q.  Let's look at DX334, minutes from 1994,

18   you were president at the time?

19       A.  I was.

20       Q.  And on page 3, under Society of Friends

21   of Touro, it says the society is working with

22   the trust to bring about a merger to the

23   organization, it is also talking to

24   Congregation Shearith Israel and is beginning

25   to formulate strategy for a national

1  campaign; do you see that?

2    A.  I do.

3    Q.  And this is the Society of Friends of

4  Touro Synagogue that's being referred to

5  here, is that correct?

6    A.  Yes.

7    Q.  And that entity had a name change and

8  became the Touro Synagogue Foundation, that

9  we have been talking about?

10   A.  Correct.

11   Q.  Okay.  And this society is talking to

12  Congregation Shearith Israel because of its

13  role as part of the Society of Friends of

14  Touro and later the Foundation; is that

15  right?

16   A.  No, I don't know that to be true.

17   Q.  Well, tell me why were they talking to

18  Shearith Israel?

19   A.  There was some -- vaguely remember

20  this -- there was this Touro National

21  Heritage Trust that was trying to bring

22  in scholars to study, and I think there

23  were conversations about merging the

24  trust into society.

25   Q.  Right there, that's not the part that I

1  was talking --

2        MR. NAFTALIS:  Your Honor, let

3   him finish the answer.  I think he should

4   be allowed to finish the answer.

5    A.  I think that it was a situation

6   where Shearith Israel raised some

7   questions about whether they thought the

8   seminar program was a good thing for

9   Touro to be involved in, something like

10  that.

11   Q.  You are aware that CJI and the

12  foundation tried to raise -- I withdraw the

13  question.

14        The foundation tried to raise

15   funds from the National Trust for Historic

16   Preservation; is that correct?

17   A.  No.  You cannot raise money for the

18  National Trust of Historic Preservation.

19   Q.  The answer is no?

20   A.  No money.  None.

21   Q.  So let's look at DX351, a letter from

22  David Nathan from Shearith Israel to Ms. Ross

23  of the Society of Friends of Touro Synagogue.

24        He executed on behalf of six

25   board of trustees of Shearith Israel a

```
 1    letter, which is on page 2, that says,

 2    "The board of trustees of Congregation

 3    Shearith Israel of the City of New York,

 4    the owner of Touro Synagogue located in

 5    Newport, Rhode Island, support the effort

 6    of the society of Friends of Touro

 7    Synagogue to compile a historic structures

 8    report relating to Touro Synagogue and

 9    it's application to the National Trust for

10    Historic Preservation for funding, to

11    compile such a report.  Please feel free

12    to contact us if you require any further

13    information."

14            Did you know about this at the

15    time?

16      A.  I did.

17      Q.  Okay.  And here Shearith Israel is

18    lending support so that the Friends of Touro

19    Synagogue can go seek, make an application to

20    the National Trust for Historic Preservation;

21    is that right?

22      A.  I think this was a request by the

23    National Trust that they wanted the

24    consent of whoever the trustees of the

25    building.
```

1    Q.  The trustees of the building, although

2   it says are the owners?

3    A.  The owner.

4    Q.  Right?  Right?

5    A.  Right.

6    Q.  And if you look at 352, which is the

7   next exhibit in sequence here, Ms. Ross is

8   thanking Mr. Nathan for writing the letter of

9   support needed from Shearith Israel to

10  include with the grant application; do you

11  see that?

12   A.  Yes.

13   Q.  And she -- they are identified --

14  identifies $2,000 awarded from the National

15  Trust; is that right?

16   A.  Okay.  Yes.

17   Q.  Okay.  And, now, have there been

18  liaisons between Shearith Israel and CJI

19  during any of the times since 1993?

20   A.  Yes.

21   Q.  Has their been communication?

22   A.  Yes.

23   Q.  Who are the liaisons from Shearith

24  Israel during the time since you have become

25  president in 1993?

143

1    A.  Well, I mean, I spoke to Dennis

2    Freilich, the president at one point, and

3    I spoke to Rabbi Mark Angel at one time,

4    the rabbi.  And I spoke to Dennis, try

5    like, the vice-president.

6    Q.  Did you know if there was, sort of, a

7    position, even if an informal position, of

8    liaison or communicator between the two

9    entities?

10   A.  I think Jonathan de Sola Mendes, he

11   would come to our -- to Touro.  He was

12   representing Shearith Israel.

13   Q.  Do you know who Lenny Groupman is?

14   Lenny Groupman, Dr. Groupman, do you know who

15   he is?

16   A.  No.

17   Q.  Never heard of him?

18   A.  Never have.

19   Q.  Michael Katz, did you have

20   communications with him?  This is before

21   2008?

22   A.  No, never did.

23   Q.  Was there somebody on the CJI end who

24   was tasked with making sure that the lines of

25   communication were open between Congregation

144

1    Jeshuat Israel and Shearith Israel?

2      A.  No.

3      Q.  Never?

4      A.  To my knowledge, never.  Never to my

5    knowledge -- to my knowledge, other than

6    myself, when I undertook to do it.  But

7    we had no formal position.

8      Q.  As of 1991 the Society of Friends is

9    consistently paying half of all of the

10   maintenance bills of Touro Synagogue that had

11   been presented to it; is that correct?

12     A.  They were paying half of the bills

13   that we presented to the society.

14     Q.  Correct?

15     A.  I don't know that firsthand, but...

16     Q.  Let's take a look at DX521, it's on page

17   13.  Have you seen the long range planning

18   study of the Society of Friends?

19     A.  I see it, yes.

20     Q.  Have you seen it before?

21     A.  I have not, to my recollection, have

22   ever seen this.

23     Q.  I call your attention to page 13, 013 at

24   the bottom, wherein talking about the history

25   of the Society of Friends that begins on page

1    12.

2           It refers to Congregation

3    Shearith Israel as the synagogue's legal

4    owners, and then identifies prime

5    objectives to assist the congregation in

6    the maintenance and the upkeep of the

7    synagogue building, grounds, and personnel

8    of Touro Synagogue as a National Historic

9    Site; do you see that?

10   A.  I do.

11   Q.  And the first of these it says, the

12   first two objectives have been squarely met,

13   the society consistently paid half of all of

14   the maintenance bills of the synagogue,

15   building presented to it by the congregation;

16   do you see that?

17   A.  I do.

18   Q.  And you knew that the society, the

19   foundation, was a resource for the payment of

20   the expenses, correct?

21   A.  It was definitely not a resource

22   when I became president in 1993.  Whether

23   they were a resource prior to 1993, I do

24   not know.

25   Q.  Okay.  In fact, before 2008 the

1    congregation Jeshuat Israel didn't even do

2    fund raising, it was done by the foundation;

3    is that correct?

4      A.  No, that is not correct.

5      Q.  Let's take a look at PX181, please.

6            This is a meeting of the board, a

7    special board meeting, December 9, 2008.

8    Do you see this?

9            THE COURT:  Do we have a copy of

10   that.  It's a plaintiffs exhibit, you may

11   have it as 181.

12     Q.  The judge is right, it's their exhibit.

13           The bottom of this, the first

14   page of this document, you are shown as

15   having attended; do you remember the

16   meeting?

17     A.  I don't offhand, but I was there.

18     Q.  Okay.  And the first begins at the

19   bottom, talking about $30,000 into the

20   foundation having been committed to paying

21   for a portion of the maintenance of the Levi

22   Gale House; do you see that?  And the Levi

23   Gale House is not the synagogue, it's the

24   edifice that Congregation Shearith Israel

25   owns; is that correct?

1    A.  Correct.

2    Q.  So the foundation money being used was

3  not just for the synagogue, but for some of

4  the associated properties, the other

5  properties?

6    A.  No.  The foundation is renting space

7  inside the Levi Gale House, so they were

8  operating in the second floor.

9         And they were reimbursing the

10  congregation for their share of the

11  expenses, heat, electricity, et cetera.

12    Q.  And that was for $30,000, for three

13  months; is that right?

14    A.  Well, I cannot tell from this.  It

15  says they have paid for three months, and

16  there was a backlog of $30,000, so.

17    Q.  How much were they paying a month?

18    A.  I honestly don't know.

19    Q.  But you do know that CJI has never paid

20  more than a dollar a year in rent for the

21  synagogue building since 1903, correct?

22    A.  Well, that is true, not paid more

23  than a dollar.

24    Q.  Thank you.

25         On the second page of this

1   document, so it would be the third page of

2   the exhibit, it's got 13826 at the bottom

3   of it, bottom of a paragraph, Laura

4   Pedrick, chair of the fund raising

5   committee reported that, "We have done no

6   fund raising in the past, because the

7   foundation has been doing it.  We now have

8   to start to do our own."

9           Do you remember her saying that?

10  A.  I do.

11  Q.  Okay.

12  A.  But I can explain that.

13  Q.  You have answered my question.  Thank

14  you.

15          Now, subsequent to this, this is

16  talking about the foundation, right, you

17  said by the time that you became president

18  it wasn't doing anything for you but

19  Ambassador Lowe, his people, also lost

20  confidence in CJI and the foundation's

21  ability to take care of the visitor

22  center; is that right?

23  A.  No, I don't think that's true at

24  all.

25  Q.  How about their ability to raise funds?

1    A.  I think that he felt, yes, that the

2    foundation was not capable of raising the

3    kind of money that he was trying to

4    raise.

5    Q.  Okay.  And there was, also -- when was

6    that, by the way?

7    A.  2006, 2007.

8    Q.  Okay.  And a little bit later than that,

9    was there some irregularities that CJI

10   believed they found in the foundation's fund

11   raising or bookkeeping of the fund raising?

12   A.  You would have to refresh my memory,

13   not sure what you are referring to.

14   Q.  Okay.  181, Exhibit, it's PX181.

15          Now, it's PX183.  Executive

16    committee minutes of CJI of March 11,

17    2009.  You are shown as being there; do

18    you remember it?

19   A.  I do.

20   Q.  If you look at the second page, it makes

21   reference there to is May 2005, a transfer of

22   110,000 in a journal entry in the TSF account

23   from the restricted account to the

24   conservation account, and then it goes on,

25   and the witness is not here, but it says that

1    it is believed that a person identified here

2    used fraud to transfer this money; do you

3    remember that discussion?

4    A.  I do.

5    Q.  So after this time did CJI, this is

6    2009, have less to do with the foundation?

7    A.  No.

8    Q.  No?

9    A.  No.  CJI have less to do with the

10   foundation?

11   Q.  Correct.

12   A.  No.

13   Q.  After this time?

14   A.  No.

15   Q.  Did CJI ever hire or engage or somehow

16   get the services of development people, fund

17   raising people that have expertise in that?

18   A.  I don't know if they officially

19   hired a professional development

20   director.

21   Q.  I mean, well, a development director or

22   an organization?

23        MR. NAFTALIS:  Has he finished

24   the answer?

25   A.  I don't know if they did or not.  I

1   don't.

2      Q.  Talking about CJI now?

3      A.  Oh, CJI.

4      Q.  Did CJI ever hire a development office

5   or developmental organization?

6      A.  Did not.

7      Q.  You made reference to a loan of what

8   was, I guess a million, and then a half

9   million dollars yesterday, for the fund

10  raising that was done in the early part of

11  the 2000's; is that correct?

12     A.  Correct.

13     Q.  And CJI was successful in that fund

14  race, weren't they?

15     A.  Ultimately, yes.

16     Q.  Yes.  And on the loan that the

17  foundation was also a cosigner of the loan

18  on; is that correct?

19     A.  I believe so.

20     Q.  And the foundation paid the interest on

21  the loan until the whole thing could be paid

22  off; is that correct?

23     A.  Correct.

24     Q.  Now, what began with your efforts to try

25  and sell the rimonim was a difficult

1    financial circumstance that CJI found itself

2    in, and this is in 2008; is that correct?

3    A.  Yes.

4    Q.  And at that point it was reported by, I

5    think your treasurer, that if no more funds

6    came in, CJI had four more years that it

7    could operate; is that correct?

8    A.  Someone may have reported that.  I

9    don't know recall that.  I don't think

10   anyone thought that, but.

11   Q.  Okay.  Well, we will get that.

12   A.  Okay.

13   Q.  By 2010, however, CJI had balanced its

14   budget, right?

15   A.  It had.

16   Q.  Balanced and was operating from 2010 on

17   at a surplus; is that correct?

18   A.  Depends on how you define surplus.

19   Q.  The way your treasurer defined in this

20   the report of June 2010, a surplus?

21   A.  Because we cut all expenses and

22   didn't pay any deferred maintenance, and

23   we didn't pay the heat, and we let

24   everybody go, we had a balanced budget.

25   Q.  So there was a surplus in 2010; is that

1    right?

2      A.  If you mean the difference between

3    income and expenses, yes.

4      Q.  Let me -- we have created a chart so

5    that this can move more quickly.

6            MR. SOLOMON:  Just for

7     demonstrative purposes, Your Honor, for

8     the witness, so he can speak to it.

9      Q.  So what this shows, Mr. Bazarsky, over

10   the last five years, from 2010 to 2014, total

11   expenses have risen from $237,000 to

12   $261,000; is that correct?

13     A.  Yes.  Taking it at face value.

14     Q.  Yes, of course.  Right.

15            And the operating expenses have

16    in fact gone up from $117,000 to

17    $130,000 --

18     A.  Okay.

19     Q.  -- and salaries and wages have gone from

20   -- down to $111,000, and up to $135,000, and

21   then up to $137,000; is that right?

22     A.  Yes.

23     Q.  When was that cutting to the bone, when

24   was the firing of everybody and the having

25   volunteers, when did that happen?

1     A.  Around 2008, 2009.  I'm not sure

2   exactly the date.

3     Q.  Okay.  So since then, I guess, salaries

4   and wages have either remained stable or gone

5   up; is that right?

6     A.  Well, up and down.

7     Q.  And your operating expenses are roughly,

8   roughly the same, except in 2014, when they

9   went up?

10     A.  Right.

11     Q.  Right?

12     A.  Yes.

13     Q.  Now, you made reference to having the

14   need for a rabbi and the rabbi's salary, is

15   some part of this salary and wages; is that

16   correct?

17     A.  Correct.

18     Q.  And if I suggested that it's some place

19   south of $100,000, you are comfortable that

20   that's accurate?

21     A.  Yes.

22     Q.  It's all in, but the compensation total?

23     A.  Yes.

24     Q.  Let's pull DX458.

25           THE COURT:  Can we mark as

1    Defendant's Exhibit No. 3 for ID, and make

2    sure that Vickie gets a copy.

3                    (Defendant's Exhibit 3

4                    marked for identification.)

5            MR. SOLOMON:  Thank you, Your

6    Honor.

7      Q.  This is a letter from Ted Walliter from

8    to Kramer Levin dated February 28th, 2014.

9    The highlighted portions are what I want to

10   look at.

11           In 2014 your counsel is told that

12   it's, as clear from a transcript that was

13   cited, "We are not seeking eviction of the

14   congregants; in fact, we see no present

15   dispute with the congregants at all, you

16   know, the dispute is with CJI and CJI's

17   conduct."

18           Did you see this on or shortly

19   after February 26th, of 2014?

20     A.  Did I see this particular letter?

21     Q.  Yes, sir.

22     A.  I did not, no.

23     Q.  Was that reported to you?

24     A.  No.  No.

25     Q.  Thank you.  Okay.

1    A.  Can I make a comment on that?

2    Q.  Not to me.  Thank you very much, you

3  answered my question.

4           Mr. Bazarsky, you testified

5  several different times about insurance,

6  and CJI buying insurance.  You were aware

7  that Congregation Shearith Israel had

8  insurance for the Touro Synagogue, at

9  least at some point in time?

10    A.  No, I never knew that.

11    Q.  Okay.  Let's quickly look at DX257,

12  please.

13           These are Minutes from 1957 of

14  congregation Shearith Israel, they are

15  redacted except on the second page, there

16  is a reference to insurance.

17           And in the middle of that

18  paragraph it says, a separate -- it says,

19  "The public policy, the public liability

20  policy is now with Greater New York Mutual

21  Insurance Company; however, a separate

22  policy covering the Touro Synagogue in

23  Newport, Rhode Island, is being continued

24  with the Hartford Accident & Indemnity

25  Company."

1              Does that change your view,

2     opinion, change your testimony about

3     whether you knew that Shearith Israel had

4     insurance?

5     A.  Well, I still don't know.  I know

6     what this says, but I don't know that.

7     Q.  In 1990 you were aware that Shearith

8     Israel communicated with Mr. Kucinich's about

9     the insurance issue?

10    A.  I'm not aware of --

11    Q.  You are?

12    A.  I'm not aware of that.

13    Q.  Look at DX328.  This is a letter January

14    22nd, 1990 from Stuart Marks to Bernard

15    Kucinich.  And Mr. Marks says that he -- he

16    identifies himself as a member of the board

17    of trustees of the Spanish and Portuguese

18    Synagogue here in New York, and he says,

19    "Recently I got in touch with Ms. Chris

20    Mann," do you know who she -- or was?

21    A.  Yes.

22    Q.  And did she work for CJI?

23    A.  She did.  I don't know in 1990.  But

24    subsequently she did.

25    Q.  Okay.  "...and to discuss the questions

1  about insurance of the Touro Synagogue which

2  I have been requested by our board to follow

3  up.  Something over a year ago someone from

4  the Touro Synagogue was kind enough to send

5  us a copy of the insurance policy covering

6  the synagogue, our own insurance advisor

7  thought that the coverage was intelligently

8  chosen, but the question arose whether our

9  synagogue, as the owner of the building in

10  Newport, and possibly some to the furnishings

11  -- I am not well informed about the latter,

12  -- was covered or needed coverage;

13  specifically we would be interested in having

14  our synagogue covered by your liability

15  policy.

16          "In addition, we would like the

17  policy covering destruction or destruction

18  or damage to the Touro Synagogue to

19  provide for payment to the owner, family,

20  the Spanish and Portuguese Synagogue in

21  case of damage or destruction.

22          "Finally, we would be interested

23  in having the policy covering the contents

24  of the building, insurance for both your

25  congregation and the Spanish and

1    Portuguese synagogue as their interests

2    may appear."

3             Was this called to your attention

4    ever?

5    A.  It was not.

6    Q.  Okay.  If you look at, let's look at the

7    next document, please, was DX329.

8             This is a letter from Chris --

9    excuse me, Kirsten Mann, who I think you

10   remember did work at CJI at the time?

11   A.  Okay.

12   Q.  Yes.  So Judge Teitz, and he was at CJI,

13   also, correct?  What role was he playing?

14   A.  I don't know.  Teitz.  I don't know

15   him.

16   Q.  You don't know who the judge, Alexander

17   Teitz was?

18   A.  I knew -- I believe his children are

19   members, but I did not ever personally,

20   to my knowledge, know Judge Teitz.

21   Q.  Well, he is being asked or being told at

22   the congregation in New York, "...pointed out

23   to us that the failure to list them as

24   property owners may cause the insurance

25   company to void the policy and in the event

1   of a claim.

2          "On the other hand, listing them

3   could be a significant acknowledgment of

4   the validity of their ownership claim.

5   They are pressing for action.  And so, G-d

6   bless us, you, and press for action.  So

7   we appreciate your advise as soon as

8   possible, with my appreciation in advance.

9   Sincerely, Kirsten Mann."

10          Did you know that -- that this

11  document existed?

12   A.  No.

13   Q.  Did you know that the -- that this

14  communication took place?

15   A.  I did not.

16   Q.  Let's look at DX330, please.

17          In the document from January of

18  1990, that's DX328 that we went over from

19  Mr. Marks, asked for copies of all the

20  policies?

21   A.  Sorry.  Which page are you reading,

22  not meaning to interrupt.

23   Q.  You have the document in front of you.

24  I will rephrase the question.

25   A.  I do.  I have the Minutes of May

1    8th, 1990.  Yes.

2      Q.  In the January letter DX328 we looked at

3    before, Mr. Marks is talking about all the

4    policies being referenced, all the policies,

5    right, including fire, liability, and

6    contents; is that correct?  That's what we

7    saw before.

8      A.  It said interested in having a

9    policy on contents.

10     Q.  Did you read something in particular,

11   some particular about qualifications when he

12   says that?

13     A.  Just saying he would like to have

14   it, yes.

15     Q.  Okay.  And then in No. 3, on page

16   DX3830, item No. 3 under correspondence, it's

17   recorded, and in the CJI minutes, that,

18   "Congregation Shearith Israel requested that

19   they be put in as a co-insurer on all of our

20   insurance"; do you see that?

21     A.  I do.

22     Q.  Now, did you ever, in writing, tell

23   Congregation Shearith Israel that they were

24   not being put on as a co-insurer on all of

25   CJI's insurance?

1    A.  Well, I was not on the board in 19

2  -- no, I never did.

3    Q.  And did you ever orally, did you ever

4  tell Congregation Shearith Israel that they

5  were not being put on as a co-insurer of all

6  insurance?

7    A.  Well, in 1996, they knew they were

8  not on any of the insurance because they

9  asked me to be put on for liability

10  purposes only.

11    Q.  Let's look at DX341, please.  Do you

12  know who Bob Furman is?

13    A.  I don't.

14    Q.  Do you know who Alexander Sanger is, or

15  was?

16    A.  I have heard he was executive -- I

17  never met him, but I have heard the name.

18    Q.  So enclosed to Bob Furman is a copy of

19  the Touro Synagogue certificate of insurance

20  which names Congregation Shearith Israel as

21  an additionally insured; do you see that?

22    A.  Yes.

23    Q.  And please review this item carefully.

24    A.  Yes.

25    Q.  Okay.  Let me ask you to look at a

1    document that you may not well have seen

2    before, DX342.  Do you know Loveman Kornreich

3    & Company to be an insurance brokerage firm?

4       A.  I don't know who they are.

5       Q.  Okay.  When Mr. Furman is writing to Mr.

6    Deutsche, and Mr. Deutsche, you said,

7    communicated in the late 1990's concerning

8    insurance, right?

9       A.  Correct.

10      Q.  He is here being told that, first off,

11   as I understand it, that the Touro building

12   and contents and land are owned by CSI, and

13   are leased to the Touro Congregation for one

14   dollar per year, or some such amount; do you

15   see that?

16      A.  I do.

17      Q.  And then goes down and on to say,

18   "Therefore, since the building and contents

19   belong to CSI, the policy should show the

20   additional interest of CSI as named insured

21   as well as loss payee.  This also extends to

22   the liability policy."

23           So the first policy they are

24    talking about is a fire policy, and not a

25    liability policy, and he then says it

164

```
 1    should extend to the liability policy; do

 2     you agree with that?

 3      A.  Just one second here.  So is this a

 4    letter between the president of Shearith

 5    Israel and its insurance agent?

 6      Q.  Correct.

 7      A.  So this is Shearith Israel has told

 8    its insurance agency that it owns

 9    everything, and that it is looking for

10    coverage.

11      Q.  Good.  Both in agreement.

12             Now, look at DX343.  This is a

13     letter from Robert J. Hole of Bromine &

14     White, and Bromine White is an insurance

15     brokerage?

16      A.  Yes.

17      Q.  And a letter dated January 14, 1998, to

18    you, which says that he had added

19    Congregation Shearith Israel as a named

20    insured to the Touro Synagogue property

21    insurance policy, with respect to the Touro

22    Synagogue building only.  The "only" there is

23    because Shearith Israel wanted to be on the

24    Touro property not on -- the Touro Synagogue

25    property not the other properties of CJI; is
```

1    that correct?

2      A.  One second.

3            MR. NAFTALIS:  Objection to the

4      form of the question.

5            THE COURT:  Sustained.  Another

6      question.

7            MR. SOLOMON:  Thank you, Your

8      Honor.  Was going to wait for the witness,

9      he said he was reading the document.

10     A.  Okay.  Ready.

11     Q.  Okay.  The statement here, the property

12   insurance policy, right, with respect to the

13   Touro Synagogue building only?

14     A.  Correct.

15     Q.  And that only -- that is there because

16   CJI was insuring other buildings besides the

17   Touro Synagogue at the time; is that correct?

18     A.  No, I don't think so.  I think it's

19   because Shearith Israel had only asked to

20   be named on the fire policy of the

21   building, so this is referring to the

22   Touro Synagogue building only meaning not

23   contents.

24     Q.  We just saw two documents where two, two

25   to CJI, where CJI is being told that we want

1   to be on all the policies, and we are asking

2   for all the policies, and when -- when did

3   you in writing tell Shearith Israel --

4              MR. NAFTALIS:  Objection, Your

5   Honor.  He is now referring to a document

6   from seven or eight years before that.  It

7   did not go to --

8              THE COURT:  It's going to be

9   cross-examination, you will be able to

10  point it out.

11             The objection is overruled.

12   Q.  When did you write to CSI, when did you

13  write Congregation Shearith Israel, "This is

14  the only policy we are putting you on," when

15  did you do that?

16   A.  I didn't.  But --

17   Q.  Okay.

18   A.  I spoke --

19   Q.  Thank you.  You have answered my

20  question.

21             MR. NAFTALIS:  Your Honor, he is

22  trying to answer the question.  It's not a

23  question that can be answered yes or no.

24  This one --

25             THE COURT:  Then he should have

167

1    said that.  And make a note and follow

2    that up on the redirect.

3      Q.  And look at DX348, please.  This is an

4    insurance policy of CJI, correct?

5      A.  CJI, yes.

6      Q.  And named insured are Congregation --

7    Touro Synagogue and Congregation Shearith

8    Israel of New York; do you see that?

9      A.  Yes.

10     Q.  And this policy covers fire, right?

11     A.  Yes.

12     Q.  It covers general liability, correct?

13     A.  I'm looking.  Yes.

14     Q.  And it covers on page 2, if you look at

15   the schedules, contents, correct?

16     A.  Yes.

17     Q.  That's $25,000, that's not --

18     A.  That's not the personal property,

19   that's not the contents we are talking

20   about?

21     Q.  And when in writing did you tell

22   Congregation Shearith Israel that you had a

23   different policy that also covered contents?

24   When did you do that?

25     A.  Not in writing.

1    Q.  Okay.  Now, let's see here, and in this

2    policy that we are looking at now,

3    Congregation Shearith Israel is being named

4    as a co-insured, right?

5    A.  I have to check on that.

6    Q.  It was the named insured section right

7    at the top.

8    A.  Yes.

9    Q.  And now, then, if you can look at the

10   DX353, this is the same policy covering the

11   year 2000 to 2001; is that correct?

12   A.  Correct.

13   Q.  And on this one, Congregation Shearith

14   Israel is added as the loss payee, it's on

15   page 46 of the policy.

16   A.  Yes.

17   Q.  Okay.  Let's look at DX366, please.

18              (The witness complies).

19   Q.  This is an insurance review prepared for

20   Congregation Jeshuat Israel; is that correct?

21   A.  Yes.

22   Q.  And on page 2, the broker there is

23   listing the relevant players and it lists

24   Congregation Jeshuat Israel as it operates as

25   a synagogue, and real estate, Congregation

1    Shearith Israel of New York, owns building,

2    with an "S" struck through.  And Society of

3    Friends of Touro Synagogue operates Touro

4    Synagogue, and fund raising, and then

5    underneath that is Touro Synagogue

6    Foundation, right?

7      A.  Correct.

8      Q.  And that information came from the CJI

9    broker; is that correct?

10     A.  Correct.

11     Q.  All right.  And I would like to ask you

12   one document more on the earlier policy, the

13   383 policy, this is Exhibit No. 143.

14     A.  What am looking at?

15     Q.  The document I'm about to hand you.  We

16   don't have it.

17             Plaintiffs Exhibit No. 141.  It

18   is?  Really?

19             Look at Plaintiff's Exhibit 143.

20   Exhibit 143.  So in Plaintiff's Exhibit

21   143, this is evidence that fine arts

22   coverage under the 883 policy is being

23   increased to 1.9 million; is that correct?

24     A.  I see that.

25     Q.  After the 883 series from the Utica, CJI

170

1   moved to executive insurance; is that right?

2      A.  I don't recall.

3      Q.  Let's look at DX378, please.  Here the

4   named -- do you see that in front of you,

5   sir?

6      A.  I do.

7      Q.  And the named insured on this policy,

8   are Congregation Jeshuat Israel and

9   Congregation Shearith Israel of New York, and

10  Society of Friends of Touro Synagogue, and

11  Touro Synagogue Foundation; do you see that?

12     A.  I do.

13     Q.  And this is going to cover, this covers

14  property and general liability and all of the

15  other contents; is that correct?

16     A.  Yeah.  This one was done is a

17  mistake, this was an error that was made.

18  But, yes.

19     Q.  In 2009 you had another insurance

20  proposal made by the Carrie Richmond firm,

21  yes or no, do you remember?

22     A.  I would have to look.

23     Q.  Let's look at 387, DX387, please.

24            (The witness complies.)

25     Q.  This insurance proposal is going to

1    cover Congregation Jeshuat Israel and

2    Congregation Shearith Israel of New York,

3    Society of Friends of Touro Synagogue, and

4    the Touro Synagogue Foundation; do you see

5    that?

6        A.  I do.

7        Q.  And it highlights the coverages, the

8    property and the coverages on the next couple

9    of pages including the property of liability,

10   the umbrella, and the fine arts; is that

11   correct?

12       A.  I see that.

13       Q.  Okay.  And let's look at DX412.

14              (The witness complies).

15       Q.  This is a fine arts policy, correct?

16       A.  In addition to property -- yes, I

17   see that.

18       Q.  Correct.  And right, and covers the

19   historic property and covers the rimonim?

20       A.  Yes.

21       Q.  Specifically, correct?

22       A.  Yes.

23       Q.  And Congregation Shearith Israel is the

24   additional insured on page 412-1, correct?

25       A.  Yes.

1    Q.  Thank you.  We referred yesterday to

2    some museum catalogues.  I would like you to

3    look at PX150.

4             (The witness complies.)

5    Q.  I actually think it's DX -- is that

6    right, DX355, to be used.  I think it's the

7    same.

8             THE CLERK:  What are we using?

9             MR. SOLOMON:  Good question.

10            THE COURT:  DX150 appears to be

11   at the same at DX355.

12            MR. SOLOMON:  Yes, Your Honor.

13   Thank you.

14            THE COURT:  I have it from

15   yesterday.  I don't need it.  Thank you.

16   Q.  Can we turn to Page 8, please.  It is a

17   catalog that you discussed with your counsel

18   yesterday; is that correct?

19   A.  Correct.

20   Q.  I want to call your attention to Page 8,

21   the bottom, to where Mr. Barqueist was saying

22   that no records survive to document --

23   A.  Which page is that?

24   Q.  It's on Page 8, which is --

25   A.  Are you using the plaintiffs?

173

1    Q.  Page 182926.  Well, page 159 of the

2    article, 12926 of the production, and Page 8

3    of the DX355.

4              And where Mr. Barqueist says no

5    records survive to document when the Torah

6    finials at either Shearith Israel or

7    Jeshuat Israel were commissioned or

8    donated to the congregation; do you see

9    that?

10   A.  I do.

11   Q.  And you don't have any information that

12   is inconsistent with that; isn't that right?

13   A.  That's true.

14   Q.  And when you went to the exhibit, and

15   you saw that there was a reference in the

16   catalog to Touro Synagogue, you also read

17   that no records survived or documents when

18   anybody got them; is that correct?

19   A.  Yes.

20   Q.  The reference in the Library of Congress

21   catalog, also, just says courtesy of Touro

22   Congregation, Congregation Jeshuat Israel,

23   Newport, Rhode Island; do you remember that

24   discussion yesterday?

25   A.  Yes.

174

1    Q.  So neither of them says anything about

2   who owns the rimonim; is that correct?

3    A.  It says the same thing about

4   Shearith Israel.

5    Q.  Neither one of them, even the one for

6   the Shearith Israel, says who owns the

7   rimonim; is that correct?

8    A.  It infers who owns it.

9    Q.  Is there anything there that says who

10  owns the rimonim, yes or no?

11   A.  The way I read it, yes.

12   Q.  Because of the language that says,

13  "Touro Synagogue," right?

14   A.  Congregation Jeshuat Israel in the

15  Library of Congress and all the other

16  museums, yes.

17   Q.  And all the other museums counsel did

18  not show you those, but I think there were

19  four others.  One of them is Touro Synagogue,

20  Newport, Rhode Island, can you agree with

21  that?  Nothing about Congregation Jeshuat

22  Israel or anything else?  Touro Synagogue,

23  Newport, Rhode Island, that also is an

24  indication that Congregation Jeshuat Israel

25  owns the rimonim?  Is that also an

1  indication?

2    A.  I would say it would.  I would

3  say -- infer that, yes.

4    Q.  Okay.  What about the three others, all

5  of which say, lent by Touro Synagogue,

6  Newport, Rhode Island, or lent by

7  Congregation Jeshuat Israel, Newport, or lent

8  by the Touro Synagogue, Newport, Rhode

9  Island, that also, that suggested to you that

10  CJI owned the rimonim?

11    A.  Yes.  I mean, in total --

12    Q.  Thank you.

13        MR. NAFTALIS:  Your Honor, I

14  object.  He was answering the question.

15  He shouldn't cut him off in the middle of

16  his answer.

17        THE COURT:  Well, he answered

18  yes.  It called for a yes or no answer.

19  So if you need to follow-up, you can

20  follow-up.

21        Again, if you can't answer yes or

22  no, say so.  You would not be required --

23  or if you can't answer yes or no without

24  an explanation, say so, and then Mr.

25  Solomon can have a choice if he wants the

1    explanation to the answer.  That part is,

2    sort of, up to you.

3           MR. NAFTALIS:  Thank you, Your

4    Honor.

5    Q.  So the record is clear, Mr. Bazarsky,

6    you don't have any -- a document that says

7    CJI owns the rimonim; is that correct?

8    A.  Correct.

9    Q.  You don't have a deed, or a title, or a

10   bill of sale, or a gift, or receipt, or

11   anything like that, correct?

12   A.  Correct.

13   Q.  Okay.  However, when you sought to try

14   and sell them, you knew that there wasn't

15   going to be anything like this, any other

16   rimonim on the market, you did know that,

17   didn't you?

18   A.  Yes, we did know that.

19   Q.  And you knew that because no

20   congregation that is using the rimonim would

21   conceivably think of selling them, right?

22   A.  No.  No, not because of that.

23   Q.  Not because of that?

24   A.  No congregation had put one on the

25   market.

1    Q.  Okay.  And you were pretty confident

2   that nobody else would do that with a

3   rimonim?

4    A.  Not at all.  No.  That's why we

5   wanted to keep it quiet, we were afraid

6   that another congregation would put it on

7   the market.

8    Q.  Look at DX383, please.  This is an email

9   from you, correct?

10   A.  It is.

11   Q.  To who is the "Richard" you are writing

12   to?

13   A.  You know, I'm not sure.

14   Q.  You mention that you didn't see the

15   minutes earlier today, that there was a third

16   potential broker or potential advisor on the

17   sale, not Christies or Sotheby's?

18   A.  Not sure if this was the person or

19   not.

20   Q.  Okay.  And, well, in here, you say to

21   him, in this paragraph that begins, "As I

22   mentioned on the phone, Myer Myers made four

23   sets.  Touro has two sets, one with the gold

24   bells, and one with silver bells.  Shearith

25   Israel in New York has one set, and

1    congregation Mikveh in Philadelphia has one

2    set.  None of the sets have ever been sold.

3    I think that it's safe to say that if we sell

4    one set, it would be the one and only set

5    ever to be sold."  Is that what you told him?

6      A.  I did.  For the purpose of trying to

7    --

8      Q.  Thank you.  There were three meetings

9    with the congregation that you went through

10   with your counsel discussing the possibility

11   of selling some of the assets; is that

12   correct?

13     A.  With our lawyer?

14     Q.  With your congregation?

15     A.  Oh, you said with the counsel, I

16   thought you said --

17     Q.  Sorry, you with your counsel, on direct,

18   spoke about three congregation meetings where

19   you talked about sale of the rimonim,

20   correct?

21     A.  Yes.

22     Q.  And in each of those three, one

23   congregant or another raised the question of

24   whether CJI owned the rimonim, correct?

25     A.  Correct.

179

1    Q.  And with respect to each of those, in

2    none of those cases did you actually do any

3    research as a result of anybody raising any

4    questions, correct?

5    A.  We had discussions amongst

6    ourselves.

7    Q.  Did you do any research?  Research?

8    A.  I did not do any additional

9    research.

10    Q.  Well, you say additional research --

11    A.  Or any research.

12    Q.  And did anybody on the committee do any

13    research?

14    A.  I think it depends on what research

15    means.  We had conversations amongst

16    ourselves, and we were convinced that the

17    rimonim was owned by Congregation Jeshuat

18    Israel.

19    Q.  You were talking amongst yourselves, you

20    convinced yourselves that you owned them, but

21    no external research, that's what I mean by

22    research, research of the records, research

23    of the provenance, research?  Nobody did any?

24    A.  No, we did not.  To my knowledge.

25    Q.  In the board minutes of the second of

1   the three board meetings, okay, the

2   congregation voted down the efforts to try

3   and sell; is that correct?

4   A.  No, that is not correct.

5   Q.  I show you a document.

6   A.  Thank you.

7   Q.  Just to find the date.  Sorry.  Exhibit

8   385.

9          THE COURT:  We can take the break

10   while you are getting that together.

11          It's 3:00, so be back at 3:15,

12   and we can take the afternoon break.

13                  (Recess taken.)

14          THE COURT:  Mr. Solomon.

15          (Discussion off the record.)

16          THE COURT:  Back on the record.

17   Q.  Thank you.  Mr. Bazarsky, we were at the

18   2009 meeting.  I would like you to look at

19   DX385.

20          (The witness complies).

21   Q.  On page 2.  There's a question, "Do we

22   own the rimonim?"

23          And an answer there, "We have

24   been told that we do own them."

25          Who made that statement?

1    A.  I don't know who made that

2    statement.

3    Q.  Second to the last full paragraph, says

4    there's a vote was made to authorize the

5    board to sell the otherwise dispose of any

6    real and personal property that belongs to

7    the congregation at their discretion, and in

8    the best interest of the congregation

9    necessary to raise and endowment and meet

10   current expenses.  There would need to be a

11   two thirds vote by the board.  That's a

12   closed quote after that.  And the vote needed

13   a two thirds majority to pass.  And 20 in

14   favor and 14 opposed.  The petition did not

15   pass.

16            Is that what these minutes

17   reflect?

18   A.  Yes.

19   Q.  Okay.  Thank you.

20            Now, in 2008 or 2009, you are not

21   aware of any proper letter being sent to

22   Shearith Israel explaining either your

23   contemplation or your decision to sell the

24   rimonim; is that correct?

25   A.  Correct.

1    Q.  And in the 2008, 2009 period, there may

2    be -- there was a telephone conversation, but

3    it did not reference the rimonim, correct?

4                MR. NAFTALIS:  Objection.  Form

5    of the question.  Lack of the foundation.

6                THE COURT:  Overruled.

7    A.  You are asking me whether or not

8    there was a conversation with Shearith

9    Israel saying that we wanted to sell the

10   rimonim, is that your question?

11   Q.  Correct.

12   A.   Yes, the answer is not.

13   Q.  You were aware in June of 2012, that the

14   MFA, while very hopeful that there would be

15   an agreement, could not confirm that it would

16   be able to purchase the rimonim; is that

17   correct?

18   A.  Correct.  That is correct.

19   Q.  You also knew that as part of the

20   agreement that was being discussed, Shearith

21   Israel -- an agreement by MFA did not depend

22   on accession and was not -- those rimonim

23   were not part of the discussion; is that

24   correct?

25   A.  We had a discussion about that.

```
 1     Q.  Okay.  Let me try and be clear.

 2          As part of the agreement

 3   proposed, the absence of the agreement,

 4   accession, was not part of that; is that

 5   correct or not?

 6     A.  We had not finalized the question of

 7   agreement.

 8     Q.  I would ask you to look at your

 9   deposition, page 185, and the follow-up top

10   of 186.

11          Beginning on line, a little

12   context have I would give you.

13          The question begins on page 185,

14   line 22.

15          "QUESTION:  And if you were up

16   against a purchaser with more money than

17   what you had in the fund, you'd be out of

18   the race; right?

19          "ANSWER:  Yes.  Though I will

20   tell you that the MFA was, you know,

21   represented -- representing that it was

22   highly, highly unlikely that they would

23   ever deaccession this.

24               "QUESTION:  But that was not part

25   of the agreement, right?
```

```
1                    "ANSWER:  I don't recall that

2    being part of the agreement.

3            "QUESTION:  There was no

4    assurance that in perpetuity, in 100, 200

5    years, these Rimonim would remain at the

6    MFA?

7            "ANSWER:  Right."

8            Did you give those answers to

9    those questions?

10    A.  This was that a preliminary

11   agreement.

12           MR. SOLOMON:  Thank you, very

13   much.  I have nothing further, Your Honor.

14           THE COURT:  Nothing further

15   period?

16           MR. SOLOMON:  Nothing further of

17   this witness at this time.

18           THE COURT:  Thank you, Mr.

19   Solomon.  Any redirect?

20           MR. NAFTALIS:  I do.

21           Are we permitted to consult with

22   the witness on redirect.  Don't know what

23   Your Honor's practice, and the practice in

24   district court.

25           THE COURT:  I don't see why not.
```

1    The theory is we don't allow conferring

2    during cross examination.  He is not on

3    cross examination anymore, so confer away,

4    I guess.

5              MR. NAFTALIS:  Can we have 15

6    minutes?

7              THE COURT:  Oh, my goodness.

8              MR. NAFTALIS:  Ten minutes, or

9    whatever Your Honor --

10             THE COURT:  Ten minutes, I give

11   you.

12             MR. NAFTALIS:  Thank you.

13                  (Recess taken.)

14                REDIRECT EXAMINATION

15             BY MR. NAFTALIS:

16   Q.  Mr. Bazarsky, good afternoon.

17   A.  Good afternoon.

18   Q.  Can I have a second, just to organize

19   the papers.

20             THE COURT:  Sure.

21   Q.  479, can you put up 479A.

22             You were shown a number of

23   documents, were you not, on your

24   cross-examination by Mr. Solomon?

25   A.  Yes.

186

1    Q.  And one of them was a document which was

2    a report of a historian dated 1981; is that

3    correct?

4    A.  Yes.

5    Q.  Mr. Kucinich?

6    A.  Yes.

7    Q.  And I think that this was a document

8    that you had never seen before?

9    A.  Correct.

10    Q.  And in 1981, that's 34 years ago, right?

11    A.  Correct.

12    Q.  And that was long before you were

13    affiliated with Touro Synagogue and

14    Congregation Jeshuat Israel as an officer; is

15    that correct?

16    A.  Correct.

17    Q.  Now, Mr. Solomon said that Mr. Kucinich

18    made some opinions, did he not?

19    A.  Correct.

20    Q.  In fact, as you can see by looking at

21    this, Mr. Kucinich offers no opinion at all,

22    right?

23    A.  That's right.

24    Q.  And in fact he points to two quote,

25    dramatically opposing opinions, right?

1    A.  Correct.

2    Q.  Do you see that?

3    A.  I do.

4    Q.  And Mr. Solomon chose on his

5   cross-examination to say there was only one

6   opinion, and he read only the first one,

7   right?

8    A.  Correct.

9    Q.  And, in fact, there was a second one,

10   which he chose not to read or tell anyone

11   about, wasn't there?

12          MR. SOLOMON:  Objection.  I

13   object to the question.

14          THE COURT:  Yeah, Mr. Naftalis,

15   Mr. Solomon is not on trial here.  And we

16   don't have to make it before a jury, I

17   understand what your point, and get right

18   to the second opinion.

19          MR. NAFTALIS:  I apologize.

20          THE COURT:  It's hard for trial

21   lawyers to realize that those five people

22   in the jury box are not the jurors.

23          And having practiced law and been

24   in your spot for 30 some odd years, I know

25   all the tricks of the trade.

1    So I have also read all the

2    documents, and all of the briefs, and

3    pretty well informed, and I have been in

4    temples and I know, so play the audience,

5    is my suggestion to both of them, a little

6    bit.  And I'm your audience, like it or

7    not.

8        MR. NAFTALIS:  No, I like it.

9        THE COURT: Thank you.  You really

10   have no choice, so.

11       MR. NAFTALIS:  When you are an

12   old dog, you turn around and you see a

13   jury with people in it.

14       THE COURT:  Many times you turned

15   to them, I'm thinking, is he really

16   playing to the press?  I don't know why?

17       I hope not playing to my interns.

18   Or Grandpa Phil that was in the jury box

19   yesterday, you played to.

20       Go onto the second opinion.  Move

21   onto the second opinion contained in that

22   historians report.

23   Q.  If we can go on to that, which is on

24   Defendant's Exhibit, and reading from the

25   typed version, 479A, which is bates No.

1    Ending in 536; do you see that page?

2      A.  Yes, I do.

3      Q.  And could you read the second -- that

4    last page.

5      A.  "The second was written in 1906 by

6    Jay Stacey Brown, and then city

7    solicitor.  And in response to a request,

8    someone requested expenditures by the

9    coverage to be paid for by Abraham Touro

10   Foundation.  Brown wrote a lengthy letter

11   disputing the New York congregation's

12   position.  I just want to read the PS.  I

13   might add, to the above, that the title

14   claims, claimed by certain judge's in New

15   York to the congregation is not a title

16   in fee simple, given to said judge's

17   absolute control of the property, but

18   simply a deed for certain purposes and

19   upon certain trusts; one of which is the

20   trust to keep the same ownership for the

21   exercise and worship therein and

22   according to the Jewish religion.

23   Respectively submitted, Bernard Kucinich,

24   Historian."

25     Q.  Thank you.  You were asked about an

1    application to register as a national

2    historic site, I think it's Exhibit 324.

3              Do you remember that, sir?

4    A.  I do.

5    Q.  And if we can put up on the board page

6    25 of Exhibit No. 324, which is bates No.

7    578.  Is it possible to blow up the left side

8    there, or make that page larger, that would

9    be just great.

10             I think on your direct -- excuse

11    me, cross-examination, you were asked

12    about this document, were you not?

13    A.  Correct.

14    Q.  And this is an application to register

15    with the National Historic Trust as a

16    historic site; is that right?

17    A.  Correct.

18    Q.  And it's the building that is being

19    registered, is it not?

20    A.  Correct.

21    Q.  It's not the contents?

22    A.  Correct, just the building.

23    Q.  And by the way, you read, I think on

24    page 25, read a part of page 25, and there's

25    another part, I would like to call his

1    Honor's attention to, which is on, if you go

2    up to the upper left-hand side, the words, if

3    we can put this, circle this somehow, this

4    noble edification; do you see that this?

5      A.   I do.

6      Q.   Could you read that portion of page 25,

7    which was not read on cross-examination.

8      A.   "When the last survivors of the

9    Congregation Jeshuat Israel moved to New

10   York, title to the Newport congregation

11   passed into the hands of New York's

12   Congregation Shearith Israel solely as

13   trustees."

14     Q.   Now, there was something that you were

15   shown, some Exhibit 364.  Put that up.

16            This is defendant's Exhibit No.

17   364.  This is -- there's a letter, is

18   there not, a letter of a couple of pages,

19   and then there's the document called

20   historic site operating agreement with the

21   Touro Synagogue; is that correct?

22     A.   Correct.

23     Q.   If you look at page 2, could you read

24   the first paragraph there the first

25   "whereas."

1    A.  "Whereas the Touro Synagogue is an

2  active place of worship of the

3  congregation Jeshuat Israel, which has

4  possession of the site through a lease

5  with Congregation Shearith Israel as

6  owner."

7    Q.  And it uses the word site, does it not?

8    A.  Correct.

9    Q.  And there's no reference in this

10  document to contents, is there?

11    A.  None.

12    Q.  And there's no reference in this

13  document to Shearith Israel owning personal

14  property that is located in the Touro

15  Synagogue; is that correct?

16    A.  Correct.

17    Q.  And by the way, following up on the

18  judge's cautionary remarks to me, this

19  lawsuit has received some publicity, correct?

20    A.  Yes.

21    Q.  And it's been going on for a few years,

22  right?

23    A.  Yes.

24    Q.  A couple of years.  The National Trust

25  has never objected to Jeshuat Israel selling

1    the rimonim as any violation of this

2    agreement, have they?

3              MR. SOLOMON:  Objection to form.

4     No foundation.

5              THE COURT:  If you know.

6     A.  No, they have not objected.

7     Q.  Now, you were shown a number of

8    documents and that ante dated your position

9    as president of CJI, right?

10    A.  Correct.

11    Q.  And you told the court which of those

12    documents you had ever seen, right?

13    A.  Yes.

14    Q.  And which you had never seen?

15    A.  Correct.

16    Q.  Is that correct?

17    A.  Yes.

18    Q.  And then some of which went back to when

19    you were a teenager or younger?

20    A.  Yes.

21    Q.  And like one of the first insurance

22    documents that you were shown, what, you were

23    nine years old at the time?

24    A.  Correct.

25    Q.  Now, you were also shown a lot of

194

1    documents -- could I see the grant

2    applications -- involving grant applications,

3    can I see Exhibit 354.  Put that up.

4            354, sir, is a grant application

5     for the National Trust for historic

6     preservation is it not?

7     A.  It is.

8     Q.  And if you turn, which if you turn to

9    page 3, which is bates number, last three

10   digits, 254, paragraph 16, you want to read

11   that, please.

12    A.  "If the project involves a historic

13   resource site, building, ship, et cetera,

14   please complete the following.  The name

15   of the site, Touro Synagogue, owner,

16   Congregation Shearith Israel in the City

17   of New York, address, 8 West 70th Street,

18   New York, New York 10023."

19    Q.  Is there anything in there -- is there

20   anything in there in this application about

21   personal property?

22    A.  No, there is not.

23    Q.  Is there anything in there about

24   Shearith Israel owning any personal property

25   that is in the Touro Synagogue or in the

1    possession, custody or control of

2    Congregation Jeshuat Israel?

3        A.  No, there's not.

4        Q.  Does the word "rimonim" appear in this

5    document?

6        A.  No, it doesn't.

7        Q.  Is there anything in this document about

8    Shearith Israel owning any rimonim?

9        A.  No.

10       Q.  That are in the possession, custody and

11   control of Touro Synagogue and/or

12   Congregation Jeshuat Israel?

13       A.  No, there's not.

14       Q.  Could I have 366.  We need to do 375

15   now.  This is another grant application?

16       A.  It is.

17           MR. SOLOMON:  Your Honor, I

18   didn't go into that on cross, as your Your

19   Honor is aware.

20           THE COURT:  Is this the one that

21   I was deferring on?  Then old hold off on

22   that one until we have Ms. Freeman.

23           MR. NAFTALIS:  Okay.

24           THE COURT:  That is the one that

25   she signed, right, that you have the

1   authenticity issue about?

2            MR. SOLOMON:  Right.

3            MR. NAFTALIS:  Guess it's hard to

4   correct something that didn't happen.

5            THE COURT:  Should have said that

6   is the one that purports to have her

7   signature on it.  I guess that's the

8   question.

9            MR. NAFTALIS:  I mean, we would

10   have permitted you to make the rulings.

11            THE COURT:  We are beyond it.

12   Move on.  We can deal with it.

13   Q.  There's been some testimony about the

14   fellow Mr. Kucinich, right?

15   A.  Correct.

16   Q.  And they read a number of documents that

17   Mr. Kucinich is the author of, correct?

18   A.  Correct.

19   Q.  Historical documents; is that correct?

20   A.  Yes.

21   Q.  I want to direct your attention to

22   Plaintiff's Exhibit No. 125.

23            THE COURT:  Do the local folks

24   know if he is related to Barry, the

25   practicing lawyer?

1              MR. SHERMAN:  Yes, Your Honor, it

2    would be Barry's father.

3    Q.  Plaintiffs Exhibit No -- I think you

4    were asked questions by Mr. Kucinich, who had

5    done historical work; is that correct?

6    A.  Correct.

7    Q.  And I would show you a couple of

8    documents, the first is plaintiff's Exhibit

9    125, and in evidence, it's titled Rhode

10   Island Jewish Historical Notes, the

11   Bicentennial issue; do you see that?

12   A.  I do.

13   Q.  And if we could turn to page bates

14   number 069.  And there's a discussion of a

15   judicial decision by a Judge Brown.

16   A.  Correct.

17              MR. SOLOMON:  May I be heard

18   briefly.

19              Your Honor, this is, obviously,

20   beyond the scope of my cross.  And the

21   document, however, was referred to on

22   cross, but I didn't make any reference to

23   any of this on my cross.

24              And, however, I did make

25   reference to the document.  And if Your

1    Honor thinks that the document in its

2    whole is now fair game.

3              THE COURT:  Well, I actually

4    think that if I can be so bold as to say,

5    pretty effectively you used Mr. Kucinich's

6    words in cross-examination to the witness,

7    and I think that if -- I'm assuming these

8    are other words that may support their

9    side and counter to that.

10             So I'm going to allow it.  If I'm

11   way off base on where he is going, we can

12   revisit that.  Thank you.

13             MR. SOLOMON:  Thank you, Your

14   Honor.

15     Q.  If you look at the last -- there's a

16   last sentence, discussion on the bottom of

17   this page, this is about Judge Brown's

18   decision; do you see that?

19     A.  Yes.

20     Q.  And it says, does it not, the last

21   sentence, "In the last analysis, despite all

22   that happened, Judge Brown's decision in the

23   demurrer did not decide the question of legal

24   ownership, but only the rights and

25   possession," did I read that accurately, sir?

1    A.  Yes.

2    Q.  And if we can go now to Mr. Kucinich's

3  page in Exhibit 125, page 072.  It says,

4  Story of a Paradox?

5    A.  Yes.

6    Q.  "It's Story of a Paradox of the

7  Congregation Jeshuat Israel and the basis for

8  the enduring relationship of relaxed

9  congeniality that has flourished between

10  Shearith Israel of New York, and the

11  Ashkenazi Jews, Jeshuat Israel of Newport.

12  The relationship has been put to the test,

13  and has been renewed many times, contrasts

14  with the earlier controversies begriming in

15  1893; and once it is settled, once and for

16  all, the principal, and of which Newporters

17  would be the legal successor to the old

18  congregation, Jeshuat Israel, and which group

19  would shape the destiny of Touro Synagogue in

20  the years ahead."  Do you see that?

21    A.  I do.

22    Q.  If you can turn to another of Mr.

23  Kucinich writing, Plaintiff's Exhibit No.

24  131.

25          This one is entitled, The Enigma

 1  of the Colonial Jewish Cemetery in

 2  Newport, Rhode Island, Myths, Realities

 3  and Restoration.

 4           I'm turning, Your Honor, to

 5  Plaintiffs 131, to bates No. 345 in the

 6  lower, right-hand corner, or number in the

 7  upper left, 234.

 8           "Ownership confirmed.  The

 9  physical evidence on the site supports the

10  documentary evidence that in all of the

11  visible monuments within the boundaries of

12  the original cemetery, excepting one,

13  which obviously had been dated before

14  1768 -- he is writing about the old

15  cemetery up the hill, right?

16  A.  Correct.

17  Q.  "All after 1768 or on the enlarged

18  grounds purchased in 1768, this constitutes

19  proof of both purchase and ownership.

20           "Further proof of the ownership

21  is in indicated by the facts that the

22  congregation Jeshuat Israel maintained the

23  cemetery grounds during the Colonial days,

24  and out of it's Sedaca Charity fund, and

25  that the Abraham and Judith Touro Funds

1    paid for them during the 19th Century,

2    when there was no Jewish community in

3    Newport, and the reconsecrated

4    congregation, Jeshuat Israel, has

5    maintained them ever since.

6         "This continuity of maintenance

7    constitutes inherently proof of ownership.

8    It can also be ensured that the

9    congregation constitutes the heirs and

10   assigns forever of the three men appointed

11   by the congregation of Jews, and that they

12   should inhabit and dwell within your

13   Colony of Rhode Island at afore said

14   forever, put up the cemetery parking lot

15   --

16         THE COURT:  What exhibit number

17   is that.

18         MR. NAFTALIS:  316, Your Honor.

19   With the Court's permission, Plaintiffs

20   Exhibit No. 316, which is the cemetery

21   plaque, that which you gave testimony on

22   both direct and cross-examination; do you

23   recall?

24   A.  Yes, I do.

25   Q.  If we could, Toby, if we can move that

1    up and turn to the bottom part, the part

2    where it says when it was registered,

3    erected.  Here, your eyesight is better than

4    mine.

5        A.  "Erected 1986.  Cemetery Restoration

6    Committee of the Society of Friends of

7    Touro Synagogue, chairman, Bernard

8    Kucinich."

9        Q.  So this plaque, Exhibit No. 316, has

10   been on the gate of the cemetery for 29

11   years; is that correct?

12       A.  Yes.  It's not actually on the gate,

13   but it is on the ground immediately to

14   the south of the gate.

15       Q.  And I think you testified how visible

16   this plaque is?

17       A.  Correct.

18       Q.  And how visible is it?

19       A.  It's very visible.  Right up against

20   the sidewalk, it's very large.  I think,

21   four and a half or five feet, three foot

22   tall.  And anyone just walking can

23   clearly see, can clearly see it.

24       Q.  And it's the only -- it's the only

25   plaque there at the cemetery?  And I think

203

1    you told us that on the -- during the George

2    Washington birthday -- I am bad at looking at

3    the wrong factfinder.

4              During the George Washington

5     letter reading that is held every August,

6     the cemetery is unlocked; is that right?

7     A.  It's unlocked and the members and

8    the participants are encouraged to go up

9    and walk into the cemetery.

10    Q.  When you say the participants, by that

11    do you mean any member of the public who

12    attends?

13    A.  Yes.

14    Q.  The letter reading is invited to go up

15    and see the cemetery?

16    A.  Yes.

17    Q.  And of the years, over the years that

18    you have had been involved in the Touro

19    Synagogue, have anyone from Shearith Israel

20    ever attended the George Washington letter

21    reading?

22    A.  I believe they have.

23    Q.  And have any of them over these years --

24    you have been involved since when?

25    A.  I have been on the board since 1993.

1    Q.  So in the over the past 22 years, has

2    anybody from Shearith Israel ever complained

3    at all about the cemetery practice?

4    A.  No one has ever.

5    Q.  I think you were shown by Mr. Solomon on

6    cross-examination your web -- the website for

7    the congregation and the Touro Synagogue?

8    A.  Yes.

9    Q.  And if we can put that up.  What Exhibit

10   is that.  Do you have that.  549.

11           Can we go to the very last page

12   of 549, or the next to the last page,

13   which says, I want to show you a portion

14   of the website that you were not shown on

15   cross-examination.

16           I want to show you a different

17   portion.  Could you take a look at the

18   next to the last page of Defendant's

19   Exhibit 549, which is the website of

20   Congregation Jeshuat Israel.

21           Could you read the first two,

22   first if you sentences.

23   A.  "Touro Synagogue, dedicated in 1763,

24   is the oldest synagogue building in the

25   United States.  A structure of exquisite

1   beauty and design, steeped in history and

2   ideals, the synagogue is considered one

3   of the ten most architecturally

4   distinguished buildings of 18th century

5   America and the most historically

6   significant Jewish building in the United

7   States"

8          "The congregation was founded in

9   1658 by the descendants of Marranos who

10  fled the Inquisitions in Spain and

11  Portugal, and who themselves left the

12  Caribbean seeking the greater religious

13  tolerances that Rhode Island offered."

14  Q.  And the congregation is referencing,

15  under the heading, "Congregation," Jeshuat

16  Israel, right?

17  A.  Correct.

18  Q.  Every hear any complaints from the

19  Shearith Israel that this statement about

20  congregation Jeshuat Israel being founded and

21  in 1658 is in any way inaccurate or incorrect

22  or incomplete?

23  A.  Never did.

24  Q.  Now, you were asked about your --

25  something that you had been asked about on

1    direct, and then Mr. Solomon asked you some

2    questions about it on cross-examination,

3    about the time when you journeyed to New York

4    to meet in 1996 with representatives of

5    Shearith Israel; do you remember that?

6    A.  I do.

7    Q.  And I believe, if my memory is right,

8    that Mr. Solomon asked you, showed you the

9    minutes of your report, minutes reflecting

10   your report of your meeting, right?

11   A.  Right.

12   Q.  I think the minutes said, and Mr.

13   Solomon, feel free to correct me, something

14   about you asked for help, but not for money;

15   is that correct?

16   A.  That is true.  Didn't ask for a

17   dollar amount.

18   Q.  Tell us, so it's clear to his Honor,

19   what did you -- what did you say, what did

20   you ask for, and what was the response.

21   A.  Well, we had -- I explained that we

22   had just completed a historic structure

23   report, done by Claude Mendes, and the

24   report stated that the building was in

25   deplorable condition.

1          I outlined some of the problems,

2     where the -- I mentioned before, that the

3     men's room, every time it rained, you

4     could not use the men or ladies room, it

5     flooded.

6          That there was rot in the

7     ceiling.  That the columns were splitting.

8     That the foundation was cracked.  And

9     there was significant problems in the

10    building.

11         And I said, you know, we are

12    here, what can you do to help us.  Can you

13    help us fund raise.  Can you give us your

14    membership list that we could solicit.

15         Do you have the names of

16    development directors or a company that

17    may be you have used in the past that you

18    would recommend.

19         Is there any help that you could

20    give us at all.  The response was, in

21    essence, don't look to us for money, we

22    have our own problems, we have our own

23    synagogue to take care of.  You take care

24    of your building.  It's your

25    responsibility.  We take care of ours.

1    That was basically it.

2    Q.  Did you ever receive a dime from them

3    subsequent or as a consequence of your

4    meeting?

5    A.  We did not, no.

6    Q.  Did they ever give you a donor's list --

7    withdrawn.

8         Did they ever give you a list of

9    any of their members of the donors that

10   you could potentially solicit who could

11   also contribute to Jeshuat Israel and the

12   Touro Synagogue?

13   A.  No.  They made it very clear that

14   they did not want us to solicit their

15   membership.  They did not want us to do

16   that because they wanted to be able to

17   solicit their members for their own

18   synagogue.

19   Q.  Now, I believe there was a second visit?

20   A.  There was.  In 2004.

21   Q.  Now, that was a visit where two other

22   members of Jeshuat Israel went to Shearith

23   Israel?

24   A.  Correct.

25   Q.  And what was their mission?

 1    A.  Their mission was to, at that time

 2  we were about to undertake the actual

 3  construction, we needed to raise three

 4  million dollars.

 5            We now had a dollar figure in

 6   mind.  And we asked them directly for

 7   help, for money.  What could they do to

 8   help us.

 9    Q.  And as a consequence of that visit, and

10  that was -- who are the two people that

11  visited from Jeshuat Israel?

12    A.  Bernie Aidinoff and Laurie Pedrick.

13    Q.  And after they came back from their

14  visit, did you receive any money or any type

15  of financial help from Shearith Israel

16  towards the restoration and reconstruction of

17  the Touro Synagogue?

18    A.  None.

19    Q.  And whose efforts and whose work raised

20  the money for that project?

21    A.  It was a joint effort.  I would say

22  between the leadership of the

23  congregation Jeshuat Israel and the Touro

24  Synagogue Foundation or at that time the

25  Society of Friends of the synagogue.

1    Q.  And any friends that took the lead in

2    this project?

3    A.  It was Bernie Aidinoff and myself.

4    Q.  And what was Mr. Aidnioff's position?

5    A.  He was president of the Society of

6    Friends of Touro Synagogue.

7    Q.  And was he also a member of Jeshuat

8    Israel?

9    A.  Yes, he was.

10    Q.  And you were asked some questions, and

11    I'm going to spend a little time on it on

12    redirect if the Court please, about the

13    tripartite agreement between the United

14    States of America, through the Secretary of

15    Interior, the Trustees of Shearith Israel,

16    and the Congregation Jeshuat Israel; do you

17    remember that you were asked some questions

18    about that?

19    A.  Yes.

20    Q.  And if we could, turn to page 2 of the

21    Exhibit 240, which is the agreement.  And we

22    go to article 1.  You see article 1?

23    A.  I do.

24    Q.  And we can highlight Article 18 and

25    article 1A, and does article 1 impose

1  obligations on Shearith Israel, the trustees,

2  and congregation Jeshuat Israel?

3          MR. SOLOMON:  Objection.  Calls

4   for a legal conclusion.

5          THE COURT:  It does.  Sustained.

6          MR. NAFTALIS:  If the Court

7   please, may I just read it, and then may I

8   ask a question.

9          THE COURT:  Sure.

10   Q.  Could you just read article 1A.

11   A.  "The Shearith Israel trustees and

12  the congregation Jeshuat Israel agree for

13  themselves, their respective sources and

14  assigns, that they will preserve,

15  protect, maintain, and when necessary

16  restore so far as lies within their power

17  the interior synagogue, Newport, Rhode

18  Island, and the grounds immediately about

19  the synagogues building, which grounds

20  are described as follows."

21   Q.  In connection with your work raising

22  funds and conducting the restoration of the

23  Touro Synagogue, about which you have just

24  testified, what efforts did Congregation

25  Shearith Israel do to preserve, protect,

1    maintain, and restore the interior synagogue

2    at that time?

3    A.  Absolutely nothing.

4    Q.  Now, you were asked some questions about

5    fund raising, correct?

6    A.  Correct.

7    Q.  And what efforts you had made, right?

8    A.  Yes.

9    Q.  And what success you had, right?

10   A.  Right.

11   Q.  And what lack of success you had, right?

12   A.  Correct.

13   Q.  And you were asked one question, and is

14   it fair -- how much effort did you and other

15   members of the committee and other people in

16   responsible positions at Congregation Jeshuat

17   Israel exert in the begriming, say mid 2000,

18   going on up through 2012?

19   A.  We put a lot of effort into it.  I

20   mean, though we did not have a

21   development director per se, we printed

22   up a very beautiful brochure.

23          The brochure showed photographs

24    of the deterioration of the building.  We

25    sent them out to various foundations to

1    potential donors.  We came up with within

2    ourselves with names of individuals that

3    we tried to solicit.

4           Even before the campaign

5    officially started, we were out soliciting

6    money on an annual basis to help us

7    improve or maintain and repair the

8    building.

9           So I would say that we actually

10   were fairly effective in that we were able

11   to raise the three million dollars

12   necessary to get the building restored.

13          But it was a tremendous effort.

14   And we didn't have a professional -- we

15   did it ourselves as congregants grants.

16   Q.  Well, you were asked on

17   cross-examination how come you didn't have a

18   professional development person?

19   A.  Well, we just didn't have the funds

20   to do it.  We didn't have the money to do

21   it.  And we just did the best we could.

22   Q.  And I think the testimony was that what

23   year did you form this committee to explore

24   the potential sale of assets to raise funds?

25   A.  I believe 2008.

214

1    Q.  And the committee was in existence for

2    how many years before a transaction was

3    recommended and approved?

4    A.  Four years.

5    Q.  And did the committee spend -- tell us

6    about what the did the committee spend time,

7    effort, tell us about what they did for those

8    four years?

9    A.  Well, we spent a tremendous amount

10   of time, we spent a tremendous --

11   meetings after meetings after meetings,

12   trying first to decide what if anything

13   we could sell, and then once we,

14   basically, we eliminated all options

15   other than the rimonim, it was a very

16   lengthy process to come to the point

17   where we were ready to go to the

18   congregation and ask them for consent to

19   sell it.  And that was probably a two and

20   a half or three year process.

21   Q.  And if you could turn to Exhibit 230.

22   Put that up for a second.

23           Exhibit No. 230, I think you

24   testified, I think -- I think that this

25   was the presentation that Mr. Segal made

1    on behalf of the committee to the

2    congregation?

3              MR. SOLOMON:  Your Honor, this is

4    not a document that I referred to on

5    cross.  If Your Honor wishes to hear that

6    all over again.

7              THE COURT:  I thought this was

8    the one that went along with the Minutes,

9    was that not during cross, that was

10   during -- that was during.

11             MR. SOLOMON:  I did not refer to

12   this document.  And, Your Honor, I

13   referred to the fact that this was

14   attached to the board minutes, I asked no

15   questions about this.

16             MR. NAFTALIS:  Mr. Solomon, he is

17   right, he did not refer to this document

18   on cross.

19             What my intent is, Your Honor,

20   and I need -- I can accomplish it in the

21   amount of time we are having this

22   argument, I guess that always happens in

23   court -- is basically to show, to show

24   that this decision was not a cavalier

25   decision, that it was a hard decision, and

 1    they spent a lot of time, and I wanted him

 2    to read it.

 3              THE COURT:  I would sustain your

 4    objection.  The document speaks for

 5    itself, and I think that your point has

 6    been well made.

 7    Q.  Okay.  Now, I think you were asked on

 8    cross-examination about whether or not there

 9    had been any communications with anybody

10    associated with Congregation Shearith Israel

11    about selling the rimonim prior to this

12    litigation, right?

13    A.  Correct.

14    Q.  Actually, can we keep 230 up.  And who

15    is Mr. Roy Zuckerberg?

16    A.  Mr. Roy Zuckerberg is a member of

17    Shearith Israel who had helped fund in

18    2001 the restoration of the rimonim.

19    Q.  If I can simply call the Court's

20    attention to this, this is -- I think this is

21    in response to a point they made.

22              And looking at Mr. Segal's

23    remarks, if we go to the last paragraph,

24    if we go to the last two paragraphs, the

25    bottom of the page, just call the Court's

1    attention.  Mr. Segal's remarks indicate

2    that amongst the many people that he had

3    reached out to or the committee had

4    reached out to, and in connection with

5    potential sales of the rimonim, was Roy

6    Zuckerberg, right?

7      A.  Correct.  And I might add, I believe

8    that he is honorary trustee of Shearith

9    Israel, emeritus, Shearith Israel.

10     Q.  And at the recommendation of Mr.

11   Zuckerberg you contacted, did you not, people

12   to appraise it, Sotheby's buys, Christie's

13   and another person named Jonathan Trace?

14     A.  Correct.

15         THE COURT:  Are you about done,

16   Mr. Naftalis?

17     Q.  I have probably -- can I have a second,

18   and I can tell you how much time I have.

19         THE COURT:  Well, if you have

20   anything other than a minute or two, we

21   are going to call it a day.

22     A.  I think I probably have a little

23   more than a minute or two.

24         THE COURT:  So break for the day,

25   and see everybody back at 9:30.

1          (Whereupon the proceeding

2           was concluded at 4:30 p.m.)

Page 219

(1)  RHODE ISLAND
     (Providence)

(2)

(3)       I, Lisa Lee Gross, Registered Professional
     Reporter and Notary Public duly commissioned and
(4)  qualified in and for in the State of Rhode
     Island, do hereby certify that this is a true
(5)  record of the testimony given in Re:  U.S.
     District Court, Jeshuat Israel vs. Shearith
(6)  Israel.

(7)       I further certify that I am neither attorney
     nor counsel for, nor related to or employed by,
(8)  any of the parties to the action in which this
     deposition is taken, and further that I am not a
(9)  relative or employee of any attorney or counsel
     employed by the parties hereto or financially
(10) interested in this action.

(11)      In Witness Whereof, I have hereunto set my
     hand and affixed my seal this 2nd day of June,
(12) 2015.

(13)

(14)      _Lisa L. Gross_____

(15)      Notary Public
          My Commission Expires:
(16)      April 13, 2018

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

Rhode Island Court Reporting