TRIAL DAY 3

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF RHODE ISLAND

NO.:  12-822-M(LDA)

--------------------------------x

CONGREGATION JESHUAT ISRAEL,

                Plaintiff

V.

CONGREGATION SHEARITH ISRAEL,

                Defendant.

---------------------------------x


TRIAL DAY 3,

Wednesday, June 3, 2015, 9:30 a.m.

Before:    Judge John McConnell

United States District Court

One Exchange Street, Providence, Rhode Island




Reported by:

Tara L. Wosny, CSR

2

```
1                    JUNE 3, 2015, 9:30 a.m.

2

3               Trial, Day 3, held at the United States

4          District Court, for the District of Rhode

5          Island, One Exchange Street, Providence, Rhode

6          Island, pursuant to Agreement before Tara L.

7          Wosny, a Certified Shorthand Reporter, and a

8          Commissioner within and for the State of

9          Rhode Island.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          APPEARANCES:

 2          KRAMER LEVIN NAFTALIS & FRANKEL, LLP

 3          BY:  Gary P. Naftalis, Esquire,

 4          Jonathan M. Wagner, Esquire,

 5          Tobias B. Jacoby, Esquire,

 6          Daniel P. Schumeister, Esquire

 7          1177 Avenue of the Americas

 8          New York, NY 10036

 9          212.715.9253

10          gnaftalis@kramerlevin.com

11          tjacoby@kramerlevin.com

12          Counsel for the Plaintiff

13

14          PATRIDGE SNOW & HAHN, LLP

15          BY:  Steven E. Snow, Esquire

16          40 Westminster Street, Suite 1100

17          Providence, Rhode Island 02903

18          401.861.8200

19          ses@psh.com

20          Counsel for Plaintiff

21

22

23

24

25
```

```
 1          APPEARANCES CONTINUED:

 2          LOCKE LORD, LLP

 3          BY:  Deming E. Sherman, Esquire

 4          Providence, Rhode Island 02903

 5          401.274.9200

 6          deming.sherman@lockelord.com

 7          Counsel for the Defendant

 8

 9          CALDWALADER, WICKERSHAM & TAFT

10          BY:  Louis M. Solomon, Esquire,

11          Yan Grinblat, Esquire,

12          Colin Underwood, Esquire, and Jennifer Chiang,

13          Esquire

14          One World Financial Center

15          New York, New York 10281

16          212.504.6000

17          louis.solomon@cwt.com

18          yan.grinblat@cwt.com

19          jennifer.chaiang@cwt.com

20          Counsel for the Defendant

21

22

23

24

25
```

```
1       APPEARANCES CONTINUED:

2       RHODE ISLAND DEPARTMENT OF THE ATTORNEY GENERAL

3       BY:  Adam J. Sholes, Esquire

4       150 South Main Street

5       Providence, Rhode Island 02903

6       274.4400 x 2219

7       Ajsholes@riag.ri.gov

8       Counsel for the Attorney General of the State of

9       Rhode Island

10

11      ALSO PRESENT:

12      Louise Teitz

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2    WITNESS:              Direct   Cross   Redirect   Recross

3

4    DAVID BAZARSKEY

5

6    By Mr. Naftalis                   10

7    By Mr. Solomon                                        44

8

9

10   MICHAEL PIMENTAL

11

12   By Mr. Jacoby            58      154

13   By Mr. Solomon                   94

14

15   ROSS SCHELSSINGER

16

17   By Mr. Snow        173

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2                      *   *   *

 3           THE COURT:  Good morning, everyone.

 4      Welcome back.  Good morning, Your Honor.  Our

 5      members in the jury box have grown.  I would

 6      like to welcome Judge Stellers interns, and they

 7      are joining my interns to observe today.

 8           Welcome back, Mr. Bazarsky.  You

 9      remember you're still under oath.

10           THE WITNESS:  I do, Your Honor.

11           THE COURT:  Mr. Naftalis, good

12      morning.

13           MR. NAFTALIS:  Your Honor, good

14      morning.  Your Honor, before we start, I did

15      want to put something on the record briefly, a

16      follow-up to the conference we had in Your

17      Honor's chambers last evening at the close of

18      business.

19           We went back to our offices, and we

20      have decided to cut down a number of witnesses

21      we will be calling in the case.  We will not be

22      calling Mr. Casten and Mr. Segal as witnesses.

23      And the time estimate for Ms. Pedrick is

24      probably much greater.

25           THE COURT:  So one witness to cover
```

1        more of the material than three witnesses would

2        have?

3                MR. NAFTALIS:  No, she will be

4        shorter.

5                THE COURT:  Oh, okay.

6                MR. NAFTALIS:  It was a positive

7        statement, even more positive.

8                THE COURT:  That's great,

9        Mr. Naftalis.  Just to summarize, the Court and

10       all the parties came to the realization that so

11       much of this is driven by documents that the

12       Court promised it would read in study and take

13       the perspective of the various witnesses, and I

14       think that's the perspective that the Court

15       tried to let all sides know has led to today's

16       likely -- not that the case is getting any less

17       complicated or getting any less forcefully

18       argued, it's just a reality of how the case,

19       unlike many other cases will be presented.

20               Mr. Solomon.

21               MR. SOLOMON:  Thank you, Your Honor.

22       This is first we hear of this change, so allow

23       us to --

24               THE COURT:  It didn't put a smile on

25       your face, Mr. Solomon that I would have

1    expected it to if it's the first you've heard of

2    it.

3           MR. SOLOMON:  There are two matters

4    which perhaps early in the afternoon we might

5    take up to help us figure out.  One is we would

6    like a short offer of proof with respect to.  It

7    seems to me just easier for the Court to react

8    to a few page summary of what we think, and then

9    Your Honor can then decide if it's admissible.

10          THE COURT:  I think that would be very

11    helpful.  The pretrial ruling, based off of what

12    I saw, was a rather narrow initial statement

13    about the rabbi concerning quote/unquote Jewish

14    law under Rule 44.1.  But as I tried to convey

15    to you, and apparently I have, that it's quite

16    possible that there are many other areas that

17    may be relevant, so the Court will hear.  So

18    I'll take a look at that and then we can see.

19          There may be no objection, and we may

20    be able to just move forward.  If not, we can

21    hear that out.

22          MR. SOLOMON:  We'll try to get to that

23    this morning.  Perhaps if we had any guidance

24    today, it would help us.  There may be an issue

25    with respect to Dr. Leiberman, and a request for

1          a deposition, but if we don't work that out this

2          morning, we'll advise Your Honor.

3                    THE COURT:  And, again, without a jury,

4          we can easily deal with those issues as they

5          come up while everyone is in here.

6                    MR. SOLOMON:  Thank you.

7                    THE COURT:  And as I told you, and I

8          will say on the record so that it's clear,

9          Mr. Solomon and Mr. Sherman, if for some reason,

10         and now it's even more possible, that the

11         plaintiff's finish before Friday, I'm not going

12         to require you to call witnesses until Monday.

13         So if for some reason we don't finish, we'll

14         just break early so that you can schedule your

15         witnesses knowing that they would not be on

16         before Monday morning under any circumstances.

17                    MR. SOLOMON:  Okay, thank you.

18                    THE COURT:  You're welcome.

19                    Okay, Mr. Naftalis.

20                    MR. NAFTALIS:  Thank you, Your Honor.

21                          *  *  *

22                    REDIRECT EXAMINATION

23         BY MR. NAFTALIS:

24    Q.   So good morning, Mr. Bazarskey.

25    A.   Good morning.

1          MR. NAFTALIS:  Your Honor, following up

2     a little about bit on -- again, on our

3     conference in chambers, which I think might

4     expedite the finishing of the redirect.  There

5     was some documents that were referred to on

6     cross-examination, which the witness really

7     wouldn't have the first-hand knowledge about,

8     but in the interest of clarification, we would

9     want to just call Your Honor's attention -- I

10    could ask the witness the questions and show

11    them to you and then just show Your Honor the

12    parts of the document that they either didn't

13    show or clarify what they did show.

14          MR. SOLOMON:  I think that seems an

15    efficient and appropriate way to handle it,

16    sure.

17          MR. NAFTALIS:  Thank you.

18    BY MR. NAFTALIS:

19  Q.  Mr. Bazarskey, one of the documents that you

20    were shown on your cross-examination by

21    Mr. Solomon was Defendant's Exhibit 481, which

22    were minutes of August 23rd, 1993.  Do you

23    remember that?

24  A.  I do.

25          MR. NAFTALIS:  Your Honor, I wanted to

1          call Your Honor's attention to a portion of the

2          minutes that was not referred to on cross-

3          examination, but obviously is relevant to --

4          which is the yellow highlighted part involving

5          our friend Bernard Kusinitz.  It says, "Bernard

6          Kusinitz" -- I think we yellow highlighted it on

7          Exhibit 481, "Bernard Kusinitz, the Touro

8          historian, explained that a previous board of

9          officers had decided to withhold rent as a sign

10         that we do not agree with the present lease,

11         which dates to 1906."

12              Mr. Kusinitz was asked to give copies

13         of all pertinent documents to Jeffrey Teitz,

14         chairperson of the legal committee.

15    BY MR. NAFTALIS:

16    Q.   I think you testified on cross-examination that

17         the one dollar was not paid on a regular basis?

18    A.   That's correct.

19    Q.   And how often was it paid?  To the best of your

20         memory.

21    A.   To the best of my knowledge -- well, I was told

22         when I became president, it had not been paid

23         for the prior five or six years.  I was

24         president from 1993 to 2005.  It was never

25         paid.  From 2005 to this date, my understanding

1    is one dollar was sent down in 2012.  I'm not

2    sure if it was a donation or if it was rent,

3    called rent.  But from our point of view, it was

4    a symbolic gesture.

5  Q.  Thank you, sir.  You were also asked on cross-

6    examination about the Yale exhibit.  Do you

7    remember that?

8  A.  Yes.

9  Q.  I think you were asked certain questions about

10    things that the academics at Yale, I think

11    Professor Barquist and others, had said about

12    the Myer Myers rimonim?

13  A.  Correct.

14  Q.  There were other things that they said and there

15    were -- and the questions related to whether or

16    not they said, in essence, attributed any

17    provenance to those academics, attribute any

18    provenance these -- to the rimonim, to the

19    Congregation Jeshuat Israel.

20    So I wanted to show His Honor, following

21    that procedure, I would call Your Honor's

22    attention to certain parts of that document,

23    which is Exhibit -- Plaintiff's Exhibit 150 in

24    evidence.  And I would first turn to what is

25    Bates Number 3248, which is also numbered, for

```
 1              the benefit of counsel at the other table, page

 2              154, catalogue.

 3                   I think you testified earlier that item

 4              number 64 in the catalogue, which is Plaintiff's

 5              Exhibit 150, are the finials, the rimonim, which

 6              are at issue in this case?

 7    A.        Correct.

 8    Q.        And they're described in 64 as two Torah

 9              finials.  And going further terrible down, Your

10              Honor, I wanted to direct your attention -- is

11              there a reference to the provenance of those

12              finials?

13    A.        There is.

14    Q.        And I can read it or you can read it into the

15              record, Mr. Bazarskey.

16    A.        It says, "Provenance with Congregation Yeshuat,

17              now Jeshuat Israel, by about 1780 and probably

18              earlier; see below.  The Touro Synagogue,

19              Congregation Jeshuat Israel, Newport, Rhode

20              Island."

21    Q.        And this provenance description was written by

22              the academics at Yale University who put the

23              catalogue together.

24    A.        That's my understanding.

25                   MR. NAFTALIS:  And if we could go,
```

1    Toby, to Bates Number 3254, which is page 160,

2    Mr. Solomon, in the catalogue.

3  Q.  I wanted to call the Court's attention to two

4    paragraphs on that page in the catalogue, which,

5    I guess, for the court reporter I should read

6    into the record, and then we can move on from

7    that.

8      THE COURT:  Sure.

9   BY MR. NAFTALIS:

10  Q.  "At some point the word" -- this is -- "At some

11    point the word 'Newport' was engraved on one

12    finial in catalogue 63 and 64."  Catalogue 63

13    has already been testified to as the finials

14    that were loaned by Shearith Israel.  Catalogue

15    64 was the one -- the finials loaned by Touro

16    Synagogue, Jeshuat Israel.

17      THE COURT:  Hold on, Mr. Naftalis.

18   Mr. Bazarskey, one of the four finials that are

19   at the Touro, the synagogue, one of them is

20   inscribed "Newport," so one of one pair is

21   inscribed "Newport"?

22      THE WITNESS:  Yes, your Honor.

23      MR. NAFTALIS:  Yes, but that's on the

24   base --

25      THE COURT:  The base.

1              MR. NAFTALIS:  That's not on the finial

2     itself.  It's on the base into which it --

3              THE WITNESS:  It fits into it.  It's a

4     three part -- it's three pieces.  And so the

5     base of one --

6              MR. SOLOMON:  Your Honor, may I

7     interpose an objection, please?

8              THE COURT:  Sure, but I asked the

9     question.  Sure, go ahead.  Sure.  Go ahead.

10             MR. SOLOMON:  I need to object.  I do

11    not believe that a foundation has been laid this

12    witness has personal knowledge as to what he is

13    testifying to.  This is expert.  They don't have

14    an expert, and I believe that through that

15    question they're going to try to get in evidence

16    that is not proper.  On that basis, I object.

17             THE COURT:  Let me rephrase my question

18    and see if I can answer that objection, which

19    is, have you seen the bases of the finials that

20    are at Newport on the Touro Synagogue?

21             THE WITNESS:  Yes.

22             THE COURT:  Okay.  On one of the bases

23    of one of the four finials, is the word

24    "Newport" inscribed?

25             THE WITNESS:  It is, yes.

1          THE COURT:  Thank you.  Go ahead,

2     Mr. Naftalis.

3          MR. NAFTALIS:  For the benefit of the

4     court reporter, I'll start it again, I think I

5     only got in to one and a half sentences, so she

6     has an accurate rendering.

7          "At some point the word 'Newport' was

8     engraved on one finial in catalogue 63 and 64.

9     The two thus engraved presumably formed a single

10    pair that belonged to the Newport congregation,

11    but subsequently became intermixed with a pair

12    belonging to Shearith Israel.

13          "In other words, each Congregation now

14    owns one finial originally from the Newport

15    pair, and one finial originally from the New

16    York pair.  As in New York, most of the Jews in

17    Newport fled the city prior to British takeover

18    in 1776, but unlike New York, the community

19    never returned in large numbers.  After the war,

20    the Touro Synagogue was used occasionally as a

21    house of worship.  In 1818 it was reported to

22    the parnassim of Shearith Israel."

23          And there is a quote, which I'll skip

24    and get to the other part.

25          "However, it was not until 1833 that

1          the four Torahs, and presumably their ornaments

2          were transferred to Shearith Israel, quote, for

3          safekeeping in our place of worship until they

4          should be required for the use of the Newport

5          shool.  At this time Newport may have been

6          engraved on each finial, and Jeshuat's Israel's

7          pair, to distinguish them from the nearly

8          identical pair already at Shearith Israel.  If

9          this scenario is correct, we may thereby infer

10         that both pairs were in their respective

11         congregations possession before 1833.  The

12         Torahs and Torah finials were returned from New

13         York in 1883 and the Congregation in Newport was

14         rechartered as Jeshuat Israel in 1894.  By this

15         time, however, the distinction between these

16         pairs had been forgotten resulting in the

17         present arrangement."

18     BY MR. NAFTALIS:

19  Q.   I think you were asked on cross-examination

20       about some minutes from 2009.  Do you remember

21       that?

22  A.   I do.

23  Q.   And we can put up Defendants Exhibit 385.  These

24       are the minutes of a special meeting of

25       Congregation Jeshuat Israel, March 29, 2009.

1         And if we can direct your attention to the

2         second page of 385.  I think you were asked a

3         question there about -- on cross-examination,

4         about the fact that when the sale or the

5         possible sale of assets belonging to the

6         Congregation was presented to the Congregation

7         in 2009, it was voted down.  Do you remember

8         that?

9    A.   I do.

10   Q.   And the resolution was authorized by the board

11        to sell or otherwise dispose of any real or

12        permanent property belonging to the

13        Congregation, right?

14   A.   Correct.

15   Q.   I think you wanted to explain on cross, but

16        under the rules, you get your chance now, to

17        explain -- tell us about that vote and what it

18        meant and what it led to afterwards?

19   A.   Well, the reason why the vote was denied was

20        because people felt it was too open-ended.  It

21        gave the committee the right or authority to

22        sell any piece of real estate or any personal

23        property, and it did not say what was going to

24        happen with the money.  So what the Congregation

25        asked for is, could you come back with a new

```
1              resolution that was more specific.  So the

2              resolution, ultimately, that we came back with

3              was, we want to sell one set of rimonims.  We

4              were very specific.  And we said when an

5              agreement is reached to sell, we would come back

6              to the Congregation, and they could vote on how

7              the proceeds were going to be used.  That was

8              what the resolution that ultimately passed.

9        Q.    And that was the resolution -- I don't have it

10             at my fingertips, the number, but that was the

11             June 2012 resolution about which you've

12             testified?

13       A.    Correct.

14       Q.    And that was the one that passed 31 to 6, I

15             think?

16       A.    Correct.

17       Q.    And a two thirds vote was required for this type

18             of a resolution?

19       A.    Correct.

20       Q.    And the one that was defeated, there were, what,

21             it reads 20 in favor and 14 opposed, so it

22             didn't pass.

23       A.    Correct.

24       Q.    And that was three years earlier?

25       A.    Correct.
```

1    Q.   You were also asked about a letter, Defendant's

2         Exhibit 383 -- if we could put that one up,

3         Toby.  Do you have that in front of you, sir?

4    A.   I do.

5    Q.   Do you want to take a peek at it for a second.

6    A.   Correct.

7    Q.   Again, on that one, you wanted to explain on

8         cross-examination why this letter was written

9         and why it said what it said, so fire away.

10   A.   Well, no, this just -- it says that --

11   Q.   Before I start, just so the court reporter has a

12        clear record.  Defendant's Exhibit 383 is a

13        letter from David Bazarskey -- I guess it's an

14        e-mail, technically, right?  To Richard Feigen,

15        F-E-I-G-E-N, dated December 13, 2008, at a

16        certain time.  I'm sorry, I didn't mean to cut

17        you off.  I just want to make sure the court

18        reporter --

19   A.   We were trying in our research to determine what

20        would be a fair market value for the set of

21        rimonim.  We were, in essence, asking for that

22        and I'm making the representation here, that

23        this probably will be the only set of rimonim

24        that will ever -- of the Myer Myers that will

25        ever be sold, because I doubt that the other two

```
 1              Congregations that have Myer Myers rimonim will

 2              put them on the market.  I was making that

 3              statement because, number one, we believed it,

 4              and number two, we were trying to establish that

 5              this was a once-in-a-lifetime opportunity in

 6              order to have the price be as high as possible.

 7      Q.      Now, subsequently when you -- I think you --

 8              just to put this all in context, you retained

 9              Christie's --

10      A.      We did.

11      Q.      Did Christie's indicate any concern about --

12              saying things about keeping things confidential

13              to make sure there was no competition?  I think

14              you may have said that already, but if you could

15              just say it so we have the context.

16      A.      Yes.  Christie's was saying to us that, in order

17              to bring the highest price when they approached

18              the five potential buyers, that they would like

19              to represent that this is a once-in-a-lifetime

20              opportunity.  And they said, You really should

21              keep it confidential and quiet, just out of fear

22              that one of the other two Congregations that had

23              a set of Myer Myers rimonim, that they might

24              say, Gee, if we had known it could bring this

25              amount of money, we would sell our set.
```

1              And so the fear was that either Shearith

2              Israel, or, I believe, it's Shearith -- Mikveh

3              Israel in Philadelphia -- which we had two

4              sets -- if we were to put one of their sets on

5              the market, it would dramatically lower the

6              price.  So it was that reason that we were asked

7              to keep it confidential.

8         Q.   And that was Christie's advice?

9         A.   That was Christie's advice, yes.

10        Q.   Now, you were shown on cross-examination a large

11             number of documents relating to insurance?

12        A.   Correct.

13        Q.   I'm not going to show them all to you.

14        A.   Thank you.

15        Q.   It's fair to say that a very substantial

16             percentage of those many documents were

17             documents -- probably most of them, were

18             documents that you had never seen before; is

19             that right?

20        A.   That is true.

21        Q.   And a very substantial percentage of them

22             antedated your serving or having a position of

23             responsibility at Congregation Jeshuat Israel,

24             the Touro Synagogue.

25        A.   That is true.

1  Q.  And indeed, some of them, were they not Shearith

2      Israel documents or their insurance broker's

3      documents, which you were not copied on or only

4      Jeshuat Israel was copied on, right?

5  A.  That is true.

6  Q.  And indeed, some of those documents went back a

7      long way, right?

8  A.  They did.

9          MR. NAFTALIS:  If we could put up 257.

10     Defendant's 257.

11     BY MR. NAFTALIS:

12 Q.  Defendants 257 was a document that you were

13     shown?

14 A.  Yes.

15 Q.  And for the record, these are board minutes from

16     Shearith Israel from December 5, 1956 and

17     January 9, 1957, right?  Is that correct?

18 A.  Yes.

19 Q.  And, obviously, you're not a member of the

20     Shearith Israel board, right?

21 A.  I am not.

22 Q.  And this almost 58-, 59-year-old document was

23     not anything you had seen before, right?

24 A.  Correct.

25 Q.  By the way, how old were you in 1956, early

```
 1              1957?
 2    A.    7 or 8.
 3    Q.    You weren't making insurance decisions?
 4    A.    I was not.
 5    Q.    Now, so whatever may have been happening or not
 6          happening almost 60 years ago -- let me just
 7          finish that -- when we questioned you on your
 8          direct examination on this subject of insurance,
 9          it was about stuff you had personal knowledge,
10          right?
11    A.    Correct.
12    Q.    Conversations that you participated in, right?
13    A.    Correct.
14    Q.    And just so it's clear, whatever may or may not
15          have happened 60 years ago, during the last 20
16          odd years, who has paid for the insurance on the
17          rimonim.
18    A.    Congregation Jeshuat Israel.
19    Q.    Has Congregation Shearith Israel paid a dime
20          towards that insurance?
21    A.    They have not.
22    Q.    And the insurance on the synagogue building, the
23          Touro Synagogue, who pays the insurance for
24          that?
25    A.    Jeshuat Israel.
```

1    Q.   And does congregation Shearith Israel pay a dime

2         towards that insurance?

3    A.   They do not.

4    Q.   And I think -- you were asked some questions, I

5         believe by Mr. Solomon, if my memory serves me

6         right, about -- you testified on direct about a

7         couple of conversations with a Mr. Deutsch, I

8         think?

9    A.   Alvin Deutsch, yes.

10   Q.   Who was initially, I think you said, the vice

11        president and then subsequently the president of

12        Shearith Israel during the time that you spoke

13        with him?

14   A.   Yes.

15   Q.   And during your conversations with Mr. Deutsch,

16        did he ever request at anytime that Shearith

17        Israel be named as a beneficiary on any policy

18        covering the rimonim?

19   A.   No, he never did.

20   Q.   Did he ever mention the rimonim to you?

21   A.   He never did.

22   Q.   As something he wanted covered, something he

23        owned, anything like that?

24   A.   No, he never did.  His sole concern, his sole

25        concern was --

1              MR. SOLOMON:  Objection.

2              THE COURT:  Sustained.

3              MR. NAFTALIS:  I guess he was going

4        beyond my question and it's probably a

5        repetition of direct so -- I think --

6              THE COURT:  Well, Mr. Bazarskey isn't

7        able to testify about another witness's sole

8        concern.  He can testify about what he saw or

9        heard, but he can't testify about somebody

10       else's sole concern.

11       BY MR. NAFTALIS:

12   Q.   Just focusing on the conversation, what was his

13        concern as articulated to you in a conversation?

14   A.   The only issue that Mr. Deutsch raised to me

15        was the concern of Shearith Israel that since

16        they were the trustees of the building, and his

17        words were, If somebody slipped and fell in the

18        synagogue and filed suit, they would be able to

19        sue Shearith Israel as well.  To which I said,

20        That is correct.  And he said, Would you mind

21        adding Shearith Israel onto your liability

22        policy as an additional named insured?  And I

23        said, No problem at all.  And we did.

24   Q.   I think on your direct examination -- on your

25        cross-examination, I apologize, Mr. Solomon

1      showed you a letter he wrote to my partner, Mr.

2      Wagner, which is Plaintiff's Exhibit 253.  Do

3      you remember that?

4   A.  I do.

5   Q.  And I believe you testified that you had

6      previously not seen that letter?

7   A.  I had not.

8   Q.  And I do want to just call a document to the

9      Court's attention, and then just ask you one

10     quick question and we'll move past that, like we

11     did with some earlier documents that you didn't

12     have personal knowledge on.

13          MR. NAFTALIS:  If we could display

14     Exhibit 252, Toby.

15          For the record, Plaintiff's Exhibit 252

16     is in evidence, is a letter dated February 26,

17     2014 from my partner, Jonathan Wagner to

18     Mr. Solomon.  May I read it into the record,

19     Judge?

20          THE COURT:  Sure.

21          MR. NAFTALIS:  "Dear Lou, on July 25,

22     2013, you represented to Judge Cedarbaum on

23     behalf of CSI that CSI has no interest in

24     pursuing its counterclaim asserted in the Rhode

25     Island action to evict CJI from the Touro

1      Synagogue.  Transcript citings 725, slash, 2013,

2      transcript 51, paren, quote, We have no interest

3      in evicting the congregants, closed quotes.  You

4      further represented on behalf of CSI at the

5      hearing that no federal court, including in

6      Rhode Island, has jurisdiction to adjudicate

7      such a claim, Id. at 37, quote, Your Honor and

8      the new judge in Rhode Island, he's not vested

9      in the case.  Neither one of you can handle an

10     eviction suit, eviction is the exclusive

11     jurisdiction of the state court, nobody is

12     getting an eviction in any federal court, close

13     quote.  Even though these representations were

14     made seven months ago, CSI has not withdrawn its

15     eviction counterclaim.  In light of these

16     representations, would you please let me, by the

17     close of business on March 3 whether and when

18     CSI will withdraw and dismiss its eviction

19     counterclaim?"

20          So the Court will know, that was the

21     letter to which Mr. Solomon was responding.

22     BY MR. NAFTALIS:

23  Q.  As we sit here today, Mr. Bazarskey, they have

24     not withdrawn that counterclaim of eviction,

25     have they?

1    A.    They have not.

2    Q.    On cross-examination --

3              MR. NAFTALIS:  We're getting close to

4         the end, Judge.  Although my time estimates have

5         been unreliable.

6              THE COURT:  True of most attorneys.

7         BY MR. NAFTALIS:

8    Q.    I think you were shown on cross-examination a

9         blowup by Mr. Solomon's friend, there, of a

10        picture of a plaque that your family had put up

11        on the gate at the Touro Synagogue.  Do you

12        remember that?

13   A.    Correct.

14             MR. NAFTALIS:  Do you remember, what's

15        the exhibit number of that?

16             MR. SOLOMON:  I don't know, but we'll

17        pull it up.  Do you want it put up?

18             MR. NAFTALIS:  Sure.

19             SPEAKER:  It's Exhibit 421.

20             MR. SOLOMON:  421.

21        BY MR. NAFTALIS:

22   Q.    Now, Mr. Bazarskey, I think you testified on

23        direct examination that three, actually four

24        generations of your family have been members of

25        the Touro Synagogue, correct?

1    A.    That's correct?

2    Q.    Beginning with your grandfather?

3    A.    Correct?

4    Q.    Your grandparents -- your parents?

5    A.    Correct.

6    Q.    You and your wife?

7    A.    Correct.

8    Q.    Siblings of yours?

9    A.    No.  Well, they were growing up.  I don't think

10         today they're committed members of Touro

11         Synagogue, my two sisters, but sons are.

12   Q.    Have you personally -- have you and your family

13         been significant financial contributors to the

14         Touro Synagogue in Jeshuat Israel?

15              MR. SOLOMON:  Your Honor, I don't have

16         any discovery on this and I don't want the door

17         opened.

18              THE COURT:  I'll be honest with you.  I

19         had no idea why this was shown in the first

20         place.  I didn't -- I couldn't tie it to

21         anything, I couldn't understand its relevance

22         when it came up on cross-examination.  So I'm

23         not really sure there is anything to

24         rehabilitate, Mr. Naftalis.  To avoid a door

25         opening on issues of Mr. Bazarsky's

```
1              philanthropic contributions to Touro or perhaps
2              to any other place, I'm going to sustain the
3              objection.
4                      MR. NAFTALIS:  We move to strike the
5              exhibit then, since it has no relevance to the
6              case.
7                      THE COURT:  Since there was no
8              objection at the time, I'm going to take it and
9              value it for what it's worth.
10        BY MR. NAFTALIS:
11        Q.   I'll just ask one question, which I think was
12             asked on cross, but I'm not sure.  Is this
13             plaque currently on the gates -- is it currently
14             up there?
15        A.   No, it has been removed.
16                     MR. NAFTALIS:  You can take it down now
17             forever.
18        BY MR. NAFTALIS:
19        Q.   Now, you were asked some questions on cross-
20             examination regarding whether Jeshuat Israel,
21             what Jeshuat Israel -- the basis for saying that
22             they were a trust beneficiary here.  Do you
23             remember that?
24        A.   Yes.
25        Q.   And you were shown certain documents.  Do you
```

1     remember that?

2  A.  Yes.

3        MR. NAFTALIS:  If we could put up

4     Plaintiff's Exhibit 31, please.

5        Your Honor, I was going to deal with

6     this particular document the same way I dealt

7     with a couple of other documents.  He obviously

8     would not be personally involved with?

9        THE COURT:  Sure.

10       MR. SOLOLOM:  Your Honor, this was not

11    shown to the witness, and so I think both

12    counselor --

13       MR. NAFTALIS:  That's actually quite

14    the point of the redirect.

15       MR. SOLOMON:  I don't know what this

16    document is, and I'm not quite sure point

17    Mr. Naftalis is trying to make on this

18    document.  I don't have it in my book from

19    plaintiffs, so I think it's probably a new

20    document.  So let's see if he can tie it to

21    something that came up on cross.

22       THE COURT:  Go ahead, Mr. Naftalis.

23       MR. NAFTALIS:  Your Honor, it should be

24    in your book.

25       THE COURT:  31?

1                    MR. NAFTALIS:  Plaintiff's Exhibit 31.

2                    THE COURT:  Begins at 33, I believe.

3                    MR. NAFTALIS:  It's not -- that's all

4          right.  I have it on the screen.  I can just

5          look on the screen.

6                    This is a -- paper is sometimes nice.

7          This is part of our exhibits, but wasn't part of

8          our -- it was not intended to go into it.

9                    THE COURT:  Right.  That's how I know

10         that it didn't come up because I've been using

11         the book as my documents to highlight.

12     BY MR. NAFTALIS:

13     Q.  You were shown a number of documents, old

14         documents that you had never seen before,

15         right?

16     A.  Yes.

17     Q.  One document that you weren't shown was

18         Plaintiff's Exhibit 31, which is the will from

19         1787 of Jacob Rodriguez Rivera, correct?

20     A.  Correct.

21                    MR. NAFTALIS:  Toby, could we put a --

22         I wanted to direct the Court's attention --

23         obviously, because this is, at least from the

24         plaintiff's point of view, one of the critical

25         documents on the existence of a trust -- to the

1    highlighted portions, actually, that whole

2    paragraph.

3         May I read this into the record, Your

4    Honor?

5         THE COURT:  To Mr. Solomon's point, you

6    haven't tied this to anything on cross, so if

7    you can at least direct me to what we're

8    respondent to on cross, that might allow me to

9    properly rule on Mr. Solomon's concern about

10   it.  Because clearly the document wasn't used,

11   but if it was the subject matter that it

12   addresses that was --

13        MR. NAFTALIS:  Mr. Solomon went on

14   cross and says, Are there any documents upon

15   which you can base a claim that there is a trust

16   here?  He showed, amongst other documents, a

17   subsequent document where the heirs, if you

18   recall, of Mr. Rodriguez Rivera conveyed their

19   rights -- or the rights that they inherited from

20   their -- to Shearith Israel.  This is the will

21   of Mr. Rivera.

22        THE COURT:  You can continue.

23        MR. NAFTALIS:  Okay.

24        "Also" -- reading here, for the benefit

25   of the court reporter, "Also, I do hereby

1          declare and make known unto all proper persons

2          that I have no exclusive right or title of, in

3          or to the Jewish public synagogue in Newport on

4          account of the deed thereof being made to

5          myself, Moses Levi and Isaac Hart, which the

6          same was done, meant and intended in trust only

7          to and for the sole use, benefit and behoof,

8          B-E-H-O-O-F, of the Jewish society of Newport to

9          be for them reserved as a place of public

10         worship forever.  Therefore, I do for myself and

11         my heirs, hereby remise, release and forever

12         quitclaim all exclusive right, title or interest

13         therein or thereto and to every part and parcel

14         thereof always saving as exception such right as

15         I have by being a single member of that

16         society."

17                  One other document and then I think

18         I'll finished with documents.

19                  Could we put up Exhibit 90?

20                  MR. SOLOMON:  Is that Plaintiff's 90?

21                  MR. NAFTALIS:  Plaintiff's 90.

22                  MR. SOLOMON:  Do you have an extra

23         copy?

24                  MR. JACOBY:  It was a Defense exhibit

25         also.

```
 1              THE COURT:  Do you have an extra
 2       copy? If you could just hand it up.  Just for
 3       future reference, I know we had copies of these,
 4       but I consider those the Court's copy that I
 5       don't want to be writing on, obviously, or
 6       highlighting, even though I'm ultimately the
 7       jury.  So I'm trying to make sure that any of
 8       the note-taking that I do on documents, isn't
 9       done on the official copies, so if when you have
10       hard copies, you can pass them up as you're
11       going to be referring to it like we did, pretty
12       much yesterday, that's pretty helpful.
13              MR. NAFTALIS:  We can give them to
14       you.  I'm sure our colleagues over there -- we
15       can give you an extra set.
16              THE COURT:  Just logistics.  You can
17       see the number of boxes over there that have all
18       the plaintiffs -- I can't get ready access to
19       those.  Either give me a binder when you expect
20       them to come up or hand them up.  Yesterday I
21       thought was incredibly efficient on cross, the
22       way to do it, that's fine.  That's the only
23       reason that I want hard ones so that I can
24       highlight -- some of them are rather thick and
25       you guys pull out one sentence where you want me
```

1          to focus on.  That's the only reason I ask for

2          extra copies.  Thanks.

3                    So this is Plaintiff's '90?  I also

4          recognize that it was also a Defense exhibit as

5          well.

6                    MR. NAFTALIS:  Your Honor, on this one,

7          this was one that was shown to the witness on

8          cross-examination, which, for the record,

9          Plaintiff's 90 and also has a Defense number on

10         it.  It is the tripartite agreement entered into

11         with the secretary -- the United States of

12         America through the Secretary of the Interior,

13         the Shearith Israel and Congregation Jeshuat

14         Israel in 1945.

15         BY MR. NAFTALIS:

16    Q.   Do you recall you were asked some questions

17         about it and shown parts of it?

18    A.   Yes, do I.

19    Q.   In connection with questions about whether or

20         not that document created any type of trust

21         relationship.  Do you recall that?

22    A.   I do.

23                    MR. NAFTALIS:  Your Honor, just in

24         trying to follow-up on that suggestion, what I

25         would do would be just to call Your Honor's

```
1        attention to different parts of the documents
2        and then --
3                 THE COURT:  That would be great.
4                 MR. NAFTALIS:  Yellow highlighted part.
5                 THE COURT:  Can I just ask, what is the
6        Defense number on this exhibit?  Do you know off
7        the top of your head?
8                 MR. SOLOMON:  Defendant's DX 240.
9                 THE COURT:  240.  Thanks.  You can go
10       ahead, Mr. Naftalis.
11                MR. NAFTALIS:  On the first page, it
12       indicates that the trustees of Shearith Israel
13       are signing as trustees under a deed of trust.
14       It's dated April 27, 1894.  We've highlighted
15       that language.  Do you want to highlight that
16       whereas clause?
17                It also goes on to say, "Whereas the
18       Shearith Israel trustees, the holders of the fee
19       simple title upon certain trusts in the Touro
20       Synagogue."
21                If we could go to -- now turning to
22       Article 4B.  "That the title to the Touro
23       Synagogue, Newport, Rhode Island and its
24       appurtenances subject to the covenants above set
25       forth and recorded deeds and declarations of
```

1      trust at pertaining thereto shall remain in the

2      Shearith Israel trustee, to be used for

3      religious purposes as set forth in Article 1.,

4      F.  Article 1., F, if we could go down to where

5      they use language talking about, "the public

6      shall be submitted" and so on.  "So far as

7      consistent with the preservation of the

8      synagogue for the use, benefit and behoof of the

9      Jewish society in Newport as a place of public

10     worship forever.

11             Your Honor, obviously, can compare that

12     language, which we represent as identical to the

13     language in the Rivera will.  The word "behoof"

14     makes that pretty obvious.

15     BY MR. NAFTALIS:

16  Q.  Now, you were asked on cross-examination about

17     what basis you would have for Congregation

18     Jeshuat Israel being the beneficiary of a trust

19     as the Jewish Society of Newport?  Do you

20     remember that?

21  A.  I do.

22  Q.  To your knowledge has Jeshuat Israel had any

23     dealings with the Jews of Newport other than

24     through Congregation Jeshuat Israel?

25             MR. SOLOMON:  Objection.  No

```
 1              foundation.
 2                   THE COURT:  Sustained.
 3          BY MR. NAFTALIS:
 4      Q.   You live in Newport, sir?
 5      A.   I do.
 6      Q.   You're active in the Jewish community in
 7           Newport?
 8      A.   I do -- I am.
 9      Q.   You participate in many aspects of Jewish life
10           and Jewish religious and philanthropic
11           organizations?
12      A.   I do.
13      Q.   Based on your own personal knowledge, are you
14           aware of Shearith Israel being involved with
15           anybody else in Newport, Rhode Island other than
16           -- with respect to Jews?
17                   MR. SOLOMON:  Objection.
18                   MR. NAFTALIS:  I haven't finished the
19           question.
20                   THE COURT:  Go ahead.
21                   MR. NAFTALIS:  Could you read back
22           where I was?  I'm sorry.
23                       (Whereupon, a portion of the record
24   was read back at this time.)
25                   MR. NAFTALIS:  Let me rephrase it.
```

 1          BY MR. NAFTALIS:

 2      Q.  Based on your own personal knowledge, are you

 3          aware of Shearith Israel having any dealings

 4          with the Jews of Newport other than through

 5          Congregation Jeshuat Israel?

 6                   MR. SOLOMON:  Objection, Your Honor.

 7                   THE COURT:  Sustained.

 8                   MR. NAFTALIS:  Is there for any way for

 9          me to rephrase that?  Could you help this

10          amateur with the grounds?

11                   THE COURT:  If I went down that path,

12          then I would try the case for both of you, which

13          I had done for 30 years.  But when I put this

14          robe on, I promised I wouldn't do that anymore.

15                   MR. NAFTALIS:  If I could try again,

16          sir?

17                   THE COURT:  I think that what any

18          witness observes or sees from their own personal

19          knowledge is probably admissible, what they

20          haven't, but others, probably isn't -- just a

21          guess.

22          BY MR. NAFTALIS:

23      Q.  Based on your own personal knowledge, your own

24          personal observations, your own personal

25          dealings, have you personally seen any dealings

1        by Congregation Shearith Israel with the Jews of

2        Newport other than through Congregation Jeshuat

3        Israel?

4    A.   I have not.

5    Q.   Tell us what your basis is for saying that you

6        are the Jewish Society of Newport and the

7        beneficiary of the trust?

8    A.   I think that all of the members of Congregation

9        Jeshuat Israel are the Jewish families and

10        members that live in Newport.  It is the only

11        Jewish organization for worship that you can

12        belong to, there is no other.  The Jews of

13        Newport -- and I had mentioned before, my

14        families, but so many other families that are

15        members, have been the sole group worshiping in

16        Touro Synagogue for the past century.  And it

17        dates back to myself and many other members,

18        their parents and their grandparents, and there

19        is no other group.

20            I'd also state that, as far as the state of

21        Rhode Island and the Abraham Touro fund, they

22        recognize Congregation Jeshuat Israel as the

23        Jewish Society of Newport in that they have said

24        that it is Congregation Jeshuat Israel that can

25        manage the money and receive the money.  So it

1        has never been a question in any mind, that I

2        have ever heard of, from a member of

3        Congregation Jeshuat Israel that they, in fact,

4        were not the Jewish Society of Newport and the

5        right recipients as established in the will of

6        Rivera Rodriguez and why Touro -- why it was

7        built.  Why the land was purchased and why the

8        synagogue was built.  There is nobody else.

9                 MR. NAFTALIS:  No further questions,

10       Your Honor.

11                MR. SOLOMON:  Your Honor, I do know

12       how irregular a recross is, but I do know how

13       irregular the redirect was and I seek relief for

14       a very brief recross.

15                THE COURT:  I'll give you leeway for a

16       recross.

17                     RECROSS-EXAMINATION

18       BY MR. SOLOMON:

19   Q.  Mr. Bazarskey, you do know that in the late 19th

20       century, Shearith Israel locked the doors to the

21       Touro Synagogue, right?  You know that.

22                MR. NAFTALIS:  Objection.

23                THE COURT:  Overruled.  You said the

24       late --

25                MR. SOLOMON:  19th century, 1899, 1900,

 1          1901.

 2          BY MR. SOLOMON:

 3     Q.   Shearith Israel locked the doors and the Touro

 4          Synagogue was not open, correct?

 5     A.   I'm actually not familiar with that history.

 6     Q.   And you do know that between 1881 and 1893,

 7          there was a Jewish community in Newport that was

 8          praying at the Touro Synagogue and CJI didn't

 9          even exist, you know that, don't you?

10               MR. NAFTALIS:  Objection.  That is way

11          beyond the scope of anything.

12               THE COURT:  Overruled.

13               THE WITNESS:  I know that the

14          Congregation Jeshuat Israel came into formation

15          in 1894?

16          BY MR. SOLOMON:

17     Q.   So that before 1984, and after 1881, the Jewish

18          Society of Newport didn't even involve CJI,

19          right?

20     A.   The Jewish Society of Newport --

21     Q.   Yes or no, sir, or you don't know.

22     A.   I can't answer that question yes or no.

23     Q.   Okay.  Thank you.

24               MR. SOLOMON:  Let's pull up the

25          agreement with the government, please.  We have

1          it as DX240.  It's the exact same language that

2          was being shown to the witness a minute ago.

3          Next page.  Next page.  Go to the language again

4          please -- yes, F, 1., F.

5      BY MR. SOLOMON:

6      Q.   This is one that your lawyer was reading,

7          correct?

8      A.   It is.

9      Q.   And we have "behoof" and the word "behoof" is in

10         the leases of 1903 and 1908, correct?

11              MR. NAFTALIS:  Your Honor, objection.

12         None of this was on redirect.

13              THE COURT:  Overruled.

14              THE WITNESS:  I'd have to look at the

15         leases to -- I don't know if the lease words

16         were exactly this terminology.

17      BY MR. SOLOMON:

18      Q.   I showed them to you, actually, yesterday, but

19         you also know that the language of "Maintenance

20         of divine services in accordance with the ritual

21         rights and customs, the Orthodox Jewish -- the

22         Spanish and Portuguese Jews as practiced and

23         observed in the synagogue of said Congregation

24         Shearith Israel," that's language that

25         paraphrases the leases, correct?

```
1    A.    I believe it does.

2    Q.    Okay.  And that language isn't in the will of

3          Jacob Rodriguez River, right?

4    A.    That's correct.

5    Q.    Thank you.  Now, you talked about an eviction

6          counterclaim.  What counterclaim -- what number

7          counterclaim is it eviction counterclaim?

8    A.    What number is it?

9    Q.    Yes, what number is the counterclaim?

10   A.    I don't know that.

11   Q.    But you've read it.  You've read -- have you

12         read it even though you didn't read the letter,

13         you did read the eviction counterclaim.

14   A.    Yes.

15   Q.    And you don't -- what does it say?  Do you have

16         it in mind?

17   A.    I have in mind that Shearith Israel is seeking

18         to evict Congregation Jeshuat Israel from Touro

19         Synagogue.

20   Q.    And then you saw two letters where there was a

21         representation by counsel that no member was

22         going to be evicted and then another letter that

23         said no member was going to be evicted, yet you

24         were willing to answer your lawyer's questions

25         that the eviction counterclaim still remains?
```

1            MR. NAFTALIS:  Objection.

2       BY MR. SOLOMON:

3   Q.   Are you testifying as a lawyer?

4            MR. NAFTALIS:  Objection.

5            THE COURT:  Sustained.

6       BY MR. SOLOMON:

7   Q.   In what capacity are you testifying when you say

8        that?

9   A.   Can I make a statement?

10           MR. NAFTALIS:  Objection -- my

11       objection was sustained, Judge.

12           THE COURT:  Sustained, Mr. Solomon.

13           MR. SOLOMON:  I apologize, I tried to

14       rephrase it.  I thought that was the issue.

15           THE COURT:  The documents speak for

16       themselves, the counterclaim speaks for

17       themselves.  Sustained.

18           MR. SOLOMON:  And when practiced in

19       Federal Court about withdrawing counterclaims, I

20       hope Your Honor will also know it speaks for

21       itself and that's an argument to Your Honor and

22       that's what I didn't ask the witness on his

23       cross.

24       BY MR. SOLOMON:

25   Q.   Mr. Bazarskey, is it your view that CJI was

```
 1              prohibited from disclosing to Shearith Israel
 2              that you were considering selling the rimonim
 3              because of your agreement with Christie's?  Is
 4              that your position?  Yes or no?
 5    A.        I can't answer it exactly yes or no.
 6    Q.        You can't answer that question yes or no?
 7    A.        Well, you're saying whether it was prohibited by
 8              -- it was not prohibited by Christie's.  It was
 9              highly recommend by Christie's.
10    Q.        Okay.  And you decided not to disclose it to
11              Shearith Israel, right?
12    A.        Other than to Roy Zuckerberg, who was --
13    Q.        You did disclose it then.  Did you disclose it
14              or didn't you disclose it?
15                   MR. NAFTALIS:  Your Honor --
16                   THE COURT:  Hold on.  Hold on.
17                   MR. NAFTALIS:  It's his
18              interpretations, he should let the witness
19              answer.
20                   THE COURT:  Continue, Mr. Bazarskey.
21                   THE WITNESS:  We new that a honorary
22              trustee of Shearith Israel had been notified
23              that this was something we were considering.  We
24              did not tell in any other way, Shearith Israel,
25              that we were attempting to sell property that we
```

1     believed we owned.

2     BY MR. SOLOMON:

3  Q. Did -- it was your view that you didn't want

4     them to know because you were concerned about

5     competition, right?

6  A. That is true.

7  Q. Okay.  And nothing prevented you from disclosing

8     to Christie's that Shearith Israel claimed

9     rights, correct?

10  A. We did not believe that Shearith Israel had any

11     rights.

12  Q. I know because you talked amongst yourselves and

13     you decided -- you talked about that yesterday,

14     I don't want to repeat that.

15       MR. NAFTALIS:  Objection.

16     BY MR. SOLOMON:

17  Q. But nothing prohibited you from disclosing to

18     Christie's that Shearith Israel claimed rights,

19     correct?

20  A. We didn't believe that -- we didn't believe that

21     they did have any rights.

22  Q. You were not under any obligation or -- were you

23     or not?  Was there anything that got in the way

24     of your disclosing the existence of Shearith

25     Israel?

1    A.    No.

2    Q.    Okay.  You know who Professor Yarofski is?

3    A.    I've heard his name.  I don't believe I've ever

4          met him.

5    Q.    He is one of the -- he wrote a book on the Touro

6          Synagogue, that's right?

7                 MR. NAFTALIS:  Objection, Your Honor.

8          Professor Yarofski's name never came up on

9          redirect.

10                 THE COURT:  Like I did with you, Mr.

11         Naftalis, I assume that Mr. Solomon is going to

12         use a new document that will tie back to the

13         redirect, and we'll see if that's the case.  But

14         just remember, this redirect should be quite

15         limited, Mr. Solomon.

16                 MR. SOLOMON:  I have two more items

17         after this, and they're both short, Judge.

18         BY MR. SOLOMON:

19   Q.    He wrote a book about the Touro Synagogue,

20         correct?

21   A.    I believe he did.

22   Q.    And he was given access by CJI to the records,

23         correct, of CJI?

24   A.    I don't know that personally?

25   Q.    You do know that he is one of the advisors to

```
 1                the website that we saw yesterday.  Do you know

 2                that?

 3      A.    I don't know that.

 4      Q.    Okay.  And you know that --

 5                     MR. SOLOMON:  Can we pull that up just

 6                so that the witness can see that?

 7      BY MR. SOLOMON:

 8      Q.    You know that his book was published by the

 9                George Washington Institute of Religious

10                Freedom?

11      A.    Okay.

12      Q.    Do you know what that is?

13      A.    I do.

14      Q.    What is it?

15      A.    This is a book that John Loeb has funded and put

16                together.  John Loeb has created this entity,

17                I'm not even sure of the name of it.  He has

18                created this entity to promote the story of

19                Touro Synagogue and the George Washington

20                letter.  He funded this book to be created.

21      Q.    Thank you.  And you don't know whether Professor

22                Yarofski was given access to CJI records to do

23                this?

24      A.    I actually don't know.  This was actually done

25                by John Loeb himself.  I'm not sure of any
```

1          involvement by our Congregation.

2    Q.    You do know that you all share the same

3          website?  You do know that?

4    A.    I do.

5    Q.    Okay.  And I was going to show you before where

6          he was given credit as one of the advisors on

7          the website.

8              MR. SOLOMON:  Could we put that up,

9          please?  It's on the website.  Yes.

10   BY MR. SOLOMON:

11   Q.    You see that he is there being thanked for his

12         historical and background information and other

13         research assistance on your website?

14   A.    I do.

15   Q.    Do you see that?

16   A.    Yes.

17   Q.    Let me read you from page DX451117, which is CSI

18         14494 in Professor Yarofski's book where he says

19         that -- the second column that, "The two

20         Congregations, Shearith Israel in New York and

21         Jeshuat Israel in Newport, signed an agreement

22         calling for the Newporters to lease the building

23         for an annual rental of one dollar a year.  Once

24         again, the key part of the agreement centered on

25         the mode of ritual.  Jeshuat Israel would use

1    and maintain the Touro Synagogue to conduct,
2    quote, religious services according to the
3    ritual rights and customs of the Orthodox
4    Spanish and Portuguese Jews at this time," and
5    he puts in 1903, "Practiced in the synagogue of
6    the Congregation Shearith Israel and the City of
7    New York."  That's the end of the internal
8    quote.  "Shearith Israel also retained a veto
9    over the appointment of a minister by Jeshuat
10   Israel."  And at the end of the next paragraph
11   he says, "The contract between Shearith Israel
12   and Jeshuat Israel has held for more than a
13   century."  Do you see that?
14   A.  I do.
15   Q.  Okay.  So your website says that a dollar a year
16       in rent, lease payment is made and Professor
17       Yarofski says that the contract for a dollar a
18       year rent has held for more than a century.  And
19       this book was published in 2013.  Do you know
20       that?
21   A.  Yes.
22   Q.  Okay.  Let's pull up DX414.
23            MR. SOLOMON:  Your Honor, this is a
24       document the other side has objected to.  I
25       intend to use it solely at this point for

```
1              purposes of cross-examination.

2                   MR. NAFTALIS:  We have an objection.

3         That's a totally inadmissible document.

4                   THE COURT:  We're on redirect now and,

5         I'm not going to allow you to use one when

6         there's an objection to it until the objection

7         is resolved.  So the objection is sustained.

8                   MR. SOLOMON:  I have nothing further,

9         Your Honor, thank you.

10                  THE COURT:  Thanks.

11                  Mr. Bazarsky, I have two questions.

12        The bases that the finials sit in.  From your

13        observations, and I assume that you handled

14        them?

15                  THE WITNESS:  I have.

16                  THE COURT:  Have you handled them?

17                  THE WITNESS:  I have, yes.

18                  THE COURT:  Are the bases

19        interchangeable?  That is, does one base fit on

20        the other base of the finials that you possess?

21                  THE WITNESS:  You know, because they

22        were handcrafted, I'm going to say they probably

23        -- they might not fit perfectly.  So I guess you

24        could interchange them, but I don't know if it

25        would be a perfect lining up.
```

1    THE COURT:  Is there any way by look or

2    style or color?  I know of one set has silver

3    bells and one set has gold bells, as I heard

4    earlier.  Is there any way to distinguish which

5    base goes with which finial bell from your

6    observations?

7    THE WITNESS:  I would think when the

8    right bell is fit into the right base, it would

9    fit perfectly.  And so I'm not sure if you were

10    to switch them whether it would be -- because

11    they're so detailed that I'm not sure.  I would

12    think that it wouldn't fit perfectly.

13    THE COURT:  And the other unrelated

14    question is:  The offer that Jeshuat Israel

15    received from the MFA for the purchase of the

16    finial bells, does that offer still exist to the

17    congregation today?

18    THE WITNESS:  It does not.  They have

19    withdrawn it.

20    THE COURT:  They've withdrawn it?

21    THE WITNESS:  They have withdrawn it.

22    THE COURT:  Do you currently have any

23    offer for the purchase of the finials bells

24    today?

25    THE WITNESS:  We do not.

 1                    THE COURT:  Okay.  Thank you.  You can

 2          step down.  Thank you, Mr. Bazarsky.

 3                    THE WITNESS:  Thank you very much.

 4                    THE COURT:  Why don't we take a little

 5          early morning break just so that you're not

 6          calling in new witnesses to only come up for

 7          five minutes, and we'll be back about 11:10.

 8                         (Brief break taken.)

 9                    THE COURT:  Plaintiffs call their next

10          witness.

11                    MR. JACOBY:  Yes, Your Honor.

12          Plaintiff calls Michael Pimental.

13                    MR. NAFTALIS:  Your Honor, Toby,

14             Mr. Jacoby, will conduct this examination.

15                    THE COURT:  Great.

16                    MR. JACOBY:  Your Honor, I have binders

17          if you'd like.

18                    THE COURT:  Yes.  If you want to pass

19          them up, that would be great.

20                    Remain standing, Mr. Pimental and

21          Ms. McGuire will swear you in.

22                    MICHAEL PIMENTAL, sworn.

23                    MS. McGUIRE:  Please state your name

24          and spell your last name for the record.

25                    Michael Pimental, P-I-M-E-N-T-A-L.

```
 1                    MS. McGUIRE:  Thank you.  You may be

 2            seated.

 3                    MR. JACOBY:  May I proceed, your Honor?

 4                    THE COURT:  Yes.

 5                        *   *   *

 6            DIRECT EXAMINATION BY MR. JACOBY:

 7       Q.   Mr. Pimental, can you tell us where you live?

 8       A.   I live at 81 Beagle Drive, Middletown, Rhode

 9            Island.

10       Q.   Where did you grow up?

11       A.   I grew up in Middletown, Rhode Island as well.

12       Q.   And can you tell us -- give us a brief

13            biogeographical sketch, where you went to

14            school, that type of thing.

15       A.   Sure.  So I grew up in Middletown, Rhode Island,

16            as I mentioned a moment ago.  Born and raised

17            into a family that owned its own business.  I

18            attended public high school.  Went off to

19            college, got a bachelor's degree in economics.

20                    My career has been largely in real

21            estate, financial services, and currently I work

22            in the treasury group at CVS Health Corporation

23            Headquarters here in Rhode Island.

24       Q.   And, Mr. Pimental, how old are you?

25       A.   I always have to think about this.  I'm 34.
```

1    Q.    Are you married?

2    A.    Yes, I am.

3    Q.    Do you have kids?

4    A.    I do.  I have a daughter who is about four and a

5          half, and a son who is about two and a half.

6    Q.    And are you familiar with the Congregation

7          Jeshuat Israel?

8    A.    Yes, very much.

9    Q.    Are you involved with that congregation?

10   A.    Yes, I am.

11   Q.    Could you please tell us about your involvement

12         with Congregation Jeshuat Israel?

13   A.    So I've been involved with the Congregation

14         Jeshuat Israel my entire life.  I was born into

15         the Congregation, my mom being a member prior.

16         As I grew up, I also was asked to become a

17         leader of the congregation in terms of serving

18         on the board of officers.  So I've been both a

19         member and a leader in serving that role.

20   Q.    Have you experienced any life cycle events at

21         Congregation Jeshuat Israel?

22   A.    Yes, several.  So I would say it starts with my

23         bar mitzvah back in 1994.  A little anecdote.  I

24         was bar mitzvahed on April 9, 1994, which I

25         think is called a palindrome, 4/9/94.  So I was

1          bar mitzvahed at Touro Synagogue and the

2          congregation.  I was married at Touro

3          Synagogue.  Don't ask me what year that was.  I

4          don't recall.

5                    My daughter had her baby naming

6          ceremony at Touro Synagogue, and my son had his

7          brisk at the Touro Synagogue.

8     Q.   And Touro Synagogue is for congregation; Jeshuat

9          is for worship, correct?

10    A.   That's correct.

11    Q.   And you mentioned you have been involved with

12         the leadership and governments of Jeshuat

13         Israel.  Can you tell us what roles you've had,

14         and give us -- put it in a time frame of when

15         you've held those roles?

16    A.   Yes.  So I believe I became involved around 2006

17         as the assistant treasurer.  I then served in

18         the capacity as treasurer for several years, up

19         until most recently probably about two years

20         ago, just coming on two years, I think it was

21         I've been in the role of active assistant

22         treasurer.

23    Q.   When you were first in the role of assistant

24         treasurer, can you tell us what your

25         responsibilities were?

    1    A.    So when I was brought in as assistant treasurer,

    2          a lot of the roles and responsibilities were

    3          really learning the organization underneath the

    4          current treasurer at the time.  Sort of like a

    5          transission period so that I could become the

    6          full treasurer when he wanted to step down from

    7          the role.

    8    Q.    What were your responsibilities when you became

    9          full treasurer?

   10    A.    So taking over really the financial reporting of

   11          the organization and all that entailed.

   12          Additionally, working on the insurance programs

   13          for the organization as well.

   14    Q.    And then I think you said you became assistant

   15          treasurer again; is that correct?

   16    A.    That's correct.

   17    Q.    Have your responsibilities as assistant

   18          treasurer changed from when you were treasurer?

   19    A.    No.  The role of assistant treasurer came about

   20          in -- I think just in terms of term limits and

   21          serving in the same capacity.  But as assistant

   22          treasurer, I've really worn the hat of the

   23          treasurers.  So I really haven't stepped out of

   24          the responsibilities in any capacity.

   25    Q.    I think you talked about the connection between

1        your family and Touro Synagogue.  Can you tell

2        us what meaning Jeshuat Isreal and Touro

3        synagogue has to you?

4    A.  Sure.  So as I expressed, I've had many life

5        cycle events.  So beyond even that, I mean, it

6        really created my Jewish identity.  You know,

7        it's really my Jewish home.  It's what I know.

8        Any time I've traveled and visited other places,

9        I always compare it to what I think Judaism to

10       be.  So it's a really special place for me.

11   Q.  Could you imagine Jeshuat Israel without Touro

12       Synagogue?

13   A.  No.

14   Q.  Now, let's talk about insurance for a second.

15       Can you tell us what are your responsibilities

16       with respect to insurance?

17   A.  So my responsibilities with insurance have been

18       both procuring coverage through insurance

19       advisors or insurance brokers and binding those

20       coverages and making sure that we're covering

21       the risks of the organization.

22   Q.  When did those responsibilities begin?

23   A.  They began in ernest, if I recall properly,

24       sometime around 2008, 2009.

25   Q.  Okay.  Are you familiar with the rimonim that

```
 1              are in dispute in this litigation?
 2    A.   Yes, I am.
 3    Q.   Does Jeshuat Israel have insurance covering
 4         those rimonim?
 5    A.   Yes, we do.
 6    Q.   Who pays the premium on the insurance?
 7    A.   Congregation Jeshuat Israel.
 8    Q.   And are you familiar with the Congregation
 9         Shearith Israel?
10    A.   Yes, I am.
11    Q.   Does Congregation Shearith Israel in New York
12         pay premiums on insurance covering the rimonim
13         to your knowledge?
14    A.   No, they do not.
15    Q.   Are you aware of any costs with respect to the
16         rimonim that Congregation Shearith Israel pays?
17    A.   No, I'm not.
18    Q.   Now, the insurance policies that Congregation
19         Jeshuat Israel has, what is the term of those
20         policies?
21    A.   It's a one-year policy.
22    Q.   So every year there is a new policy?
23    A.   That's correct.
24    Q.   Have you ever received an inquiry from
25         Congregation Shearith Israel about insurance
```

1              either directly or indirectly?

2     A.       No, I have not.

3     Q.       Why don't we take a look at Exhibit P258.

4              Mr. Pimental, do you see that document?

5     A.       Yes, I do.

6     Q.       Are you familiar with this document?

7     A.       Yes, I am.

8     Q.       Can you tell us what it is?

9     A.       So this is an insurance policy through AXA Art.

10             Its's technically a fine art policy.  It covers

11             the period October 28, 2014 to October 28,

12             2015.  It covers both the real property.  So the

13             real estate and also the fine arts of the

14             congregation.

15    Q.       Has Congregation Jeshuat Israel always had one

16             policy that covered both real property and fine

17             arts?

18    A.       No.

19    Q.       When was that change made?

20    A.       I believe 2009.

21    Q.       And why was that change made?

22    A.       So around that same time the congregation and

23             the leadership of the congregation endeavored to

24             evaluate every expense of the organization and

25             in an effort to reduce costs as much possible.

```
 1              One of the big costs of the organization

 2              obviously is insurance.  And so in 2009 or

 3              thereabouts we, in essence, bid out the

 4              insurance programs of the organization.

 5                   And we actually changed insurance

 6              brokers and insurance advisors, which resulted

 7              in a significant cost savings, but one of the

 8              results of that was the AXA Art viewed the real

 9              estate because of its antiquity and old nature

10              almost as fine art, which I hadn't heard of

11              before, but because of the cost savings, we went

12              down the path of actually consolidating the real

13              estate policy and the fine art policy into one

14              policy.

15       Q.     Mr. Pimental, if you look at the first page of

16              Exhibit P258, do you see the named insured is

17              Congregation Jeshuat Israel?

18       A.     Yes, I do.

19       Q.     Do you see below that additional insured it says

20              Shearith Israel of New York?

21       A.     Yes, I do.

22       Q.     Why is it Congregation Shearith Israel of New

23              York an additional insured on this combined

24              policy?

25       A.     They're named as an additional insured relative
```

1         to the Touro Synagogue property in keeping with

2         that, their interest as trustees of the

3         building.

4    Q.   The fact that they're also on a policy that

5         covers rimonim, how did that come about?

6    A.   So it's merely by nature of combining the

7         policies.  So if you actually go to the back of

8         the policy.

9    Q.   Why don't you direct us to that.

10   A.   Sure.  I apologize, let me just find the page.

11   Q.   Let me direct your attention to page CJI 2482.

12        It's the second to last page before the exhibit

13        sticker.  There it is.  I'm sorry, you were

14        saying something about this?

15   A.   So this is the additional insured endorsement.

16        So if you specifically read the language, it

17        says that their only additionally insured under

18        this poicy as their respective interests may

19        appear.  So that's to delineate that their

20        receptive interest is solely to Touro Synagogue.

21   Q.   Now, I think you said that the policies were

22        combined as a cost cutting measure; is that

23        correct?

24   A.   That's correct.

25   Q.   Were you personally involved in any other

```
1              efforts to cut costs at Congregation Jeshuat
2              Israel?
3      A.      Yes, I was.
4      Q.      Can you tell us about those efforts?
5      A.      So as a I mentioned a few moments ago, when the
6              organization endeavored to really go through
7              every line item of expenses, we went litterly
8              line by line through those expenses.  We looked
9              at every amount of detail we could get our hands
10             on in order to cut as many costs of the
11             organization as possible.
12     Q.      And did you look at every cost?
13     A.      Yes.
14     Q.      Some costs were cut; is that correct?
15     A.      That's correct.
16     Q.      Can you tell us some of the major costs that
17             were cut as a result of this effort?
18     A.      That were cut, I'm sorry?
19     Q.      That were cut, that's right, yes.
20     A.      All right.  So in an effort to reduce our costs,
21             as we've said a number of times, there were
22             costs that we knew we couldn't cut, but the
23             items that we really stepped out and
24             eliminated -- one was we had an at administrator
25             in the office.  I don't recall at the time.  I
```

1          think she was already reduced to part-time

2          hours, something like 20 hours a week, if I

3          recall.  We eliminated that position in an

4          effort to reduce costs.

5                    One of the other things we did was

6          closed the community center, the Levi Gale House

7          in the winter months to save on heating costs.

8          It's an old wooden building.  It's costly to

9          heat.  I will say that closing that building

10         didn't come without some pain.  We are a

11         community and we wanted to use our community

12         center, but we thought it would be a good

13         exercise in trying to reduce costs as much as

14         possible.

15                   And then we just talked about the

16         insurance programs.  We also went out and bid

17         those out to try to reduce those costs as much

18         as possible.  Those were large items that we

19         went after.

20   Q.    And you mentioned that the administrative

21         position was cut.  So who runs the Congregation

22         Jeshuat on a day-to-day basis now?

23   A.    So on a day-to-day basis it falls in the back of

24         a core group of volunteers.  So it could be Bea

25         Ross, one of our co-presidents who answers the

```
 1              phone and returns voice mails and sends emails,
 2              or Saul Woythaler and/or his wife that writes
 3              thank you notes for donations.  Another person
 4              pays the checks and writes the bills.  Another
 5              person deposits the donations into the bank.
 6                   So it's really and truly on the backs
 7              of a core group of volunteers who stepped up.
 8       Q.     Now, I think you mentioned some of the major
 9              expenses that were cut.  Can you just give us an
10              example of some of the smaller expenses that
11              were cut as a result of these efforts?
12       A.     So there is just so many.  I like to say that a
13              lot of small things can lead to big things.
14              That's a lot of what was done.  One of the
15              things that was cut, for example, as trivial as
16              it might sound, is we had at one point a  Pitney
17              Bowes mail machine that you would slide the
18              letter through and it would put the stamp on
19              it.  You know, we got rid of it.
20                   We just determined that we couldn't
21              afford it.  So now someone is licking stamps or
22              licking envelopes and literally getting to the
23              core of what was necessary.
24       Q.     Over the last several years, have costs been
25              steady, increasing or decreasing?  Could you
```

1           describe the trend there?

2    A.     So on a relative basis, relative to what we have

3           as an organization.  So, for example, having a

4           rabbi.  You know, there has been a slight

5           incremental cost in the rabbi when we had a

6           change in our rabbinic position.  Relatively

7           speaking, I would argue that the costs have been

8           pretty steady throughout the past five years,

9           plus or minus.

10   Q.     Now, in addition to cutting costs, were you

11          involved in any efforts to increase income?

12   A.     Yes, I was.

13   Q.     At Congregation Jeshuat Israel?

14   A.     Yes, I was.

15   Q.     Could you describe what involvement you had in

16          those efforts?

17   A.     So at the same time we endeavored to cut costs,

18          we also obviously looked at the income side of

19          the sheet.  You know, first and foremost we

20          looked at our membership and our membership were

21          dues structure to see if there was any

22          opportunity to increase dues.

23              We also, with great pain, instituted a

24          one-time assessment of our congregation.

25          Lastly, I also served on the committee that

```
 1              worked on the Abraham Touro Society, giving

 2              society.

 3      Q.      You said that the assessment was painful.  Can

 4              you describe why it was?

 5      A.      So our congregation is largely made up of, you

 6              know, an older population that may be on a fixed

 7              income, and so they don't always have access

 8              capacity in their budgets to absorb a

 9              significant increase in dues and a significant

10              assessment.

11      Q.      I think you mentioned Abraham Touro society; is

12              that right?

13      A.      Yes, I did.

14      Q.      So what is that?

15      A.      So the Abraham Touro Society was created as a

16              giving society or a donor circle for lack of a

17              better way to put it that was created in the

18              likeness of Abraham Touro himself, my

19              understanding, given a 10,000 bequest originally

20              many, many years ago.

21                   So we were working to create a society

22              or a way for donors to connect with the

23              synagogue and created the society.  Asking for

24              donations of $10,000, of which the proceeds

25              raised from that would be put in a revocable or
```

1               permanent endowment to support the synagogue.

2    Q.   So could you just flush that out for us?  What

3        was the purpose of the endowment?

4    A.   So the purpose of the endowment was to maintain

5        and to repair Touro Synagogue, keep a rabbi in

6        residence and keep Touro open for services.

7    Q.   And when was the society started?

8    A.   As I recall, it was approximately 2010, 2011,

9        somewhere thereabouts.

10   Q.   How much money has been raised through the

11       society?

12   A.   To date it's approximately $200,000.

13   Q.   Are those efforts to obtain donors through the

14       Abraham Touro Society continuing?

15   A.   Yes, it's still a tool that we have.  I would

16       say largely the givers that we've received so

17       far have been those close to the organization,

18       but some are -- I believe some may not even be

19       members of the organization.  I might be wrong,

20       but I believe there are also some outside

21       givers.

22   Q.   Where is the endowment principal located?

23   A.   For the Abraham Touro Society?

24   Q.   Yes, correct.

25   A.   So the congregation, the board decided to place

```
1              the proceeds of the Abraham Touro Society at the

2              Jewish Federation Foundation here in Providence,

3              Rhode Island.

4         Q.   Are there restrictions on the endowment?

5         A.   Yes, it's very clear, there's restrictions on

6              that.

7         Q.   What are the restrictions?

8         A.   As we mentioned before, the restrictions are the

9              proceeds can only be used for the repair and

10             maintenance of the synagogue, keeping a Rabbi in

11             residence and keeping Touro open for services.

12             And further to that, it's a permanent endowment

13             where the corpus cannot be touched.

14        Q.   Who is the beneficiary of the fund?

15        A.   Congregation Jeshuat Israel.

16        Q.   Is there a contingent beneficiary?

17        A.   There is not.

18        Q.   Was there ever a time that Congregation Jeshuat

19             Israel sought to name a contingent beneficiary?

20        A.   Yes, we did.

21        Q.   Can you tell us about those efforts?

22        A.   So as I recall, one of my colleagues on the

23             board reached out to Congregation Shearith

24             Israel to see if they would like to participate

25             as a contingent beneficiary for the fund to
```

```
 1                support Touro Synagogue.
 2        Q.    Were you involved in any communications with
 3                Congregation Shearith Israel on this subject?
 4        A.    Yes, I was.
 5        Q.    And to your recollection, who was -- was this a
 6                telephone call or in-person meeting?  Can you
 7                tell us?
 8        A.    So we had a telephone conference call.
 9        Q.    Who was on the call?
10        A.    So it was myself and Bea Ross from Congregation
11                Jeshuat Israel.  There were two participants
12                from Congregation Shearith Israel.  One I
13                remember to be Michael Katz.  I don't recall the
14                other person that was on the line at the time.
15        Q.    And during this call, did you inform
16                Congregation Shearith Israel what the purpose of
17                the Abraham Touro Society is?
18        A.    Yes, we did.
19        Q.    And did you ask them if they would want to be
20                named as a contingent beneficiary on this
21                endowment?
22        A.    Yes, we did.
23        Q.    Did they express any interest in being named
24                contingent beneficiary?
25        A.    No, they did not.
```

```
 1    Q.    I think you also referenced a membership at
 2          Congregation Jeshuat Israel.  Can you tell us
 3          what the classes of membership are at the
 4          congregation?
 5    A.    At the Congregation today?
 6    Q.    Yes, at the congregation today as we're sitting
 7          here -- I'm standing, you're sitting.
 8    A.    So as I recall, I believe there are seven
 9          classes of membership currently.  We have sort
10          of a traditional single membership and we have a
11          family membership.  We've sort of -- off of
12          that, we have a young single membership.  We
13          have a young family membership.  We also have
14          two other classes called associate singles and
15          associate family.  Lastly we have a life
16          membership.
17    Q.    So let's talk a little bit about some of these
18          classes of membership.  I think you mentioned
19          sort of -- I'll call it regular single or
20          regular family.  Let's put those to the side.
21          You mentioned young family and young single.
22          What are those?
23    A.    So I'm one of those, frankly.  The young single
24          and the young family was an effort, and is an
25          effort, to bring in younger folks who may not
```

1        have the means to pay the full fair of the

2        regular dues structure.  You know, they might be

3        raising young families.  They might not be

4        started in their careers, and so we saw an

5        opportunity to reduce the cost to try to bring

6        the younger Jews in the community into our

7        organization.

8    Q.  And associate membership, what is that?

9    A.  So the associate membership class was created,

10       again, to try to expand our membership base

11       beyond just the core.  The associate membership

12       differs in the other membership classes in that

13       I don't believe it has voting rights to the

14       congregation.  And so its purpose is to bring in

15       members -- for example, I think one of the

16       stipulations on it is that if you live in Rhode

17       Island, or I think it's Bristol County,

18       Massachusetts in order to qualify -- again, at

19       an even more reduced rate to become a member of

20       our organization, you have to be affiliated with

21       other synagogues.

22            So it's like, okay, you're affiliated

23       with another one.  We'd love for you to be a

24       part of a our community, but maybe you don't

25       want to pay for full two memberships.  So that's

1       the purpose of that.  So that's broken into both

2       single and family.

3   Q.  And life time membership, what's that?

4   A.  So a life membership might be for someone who

5       has the capacity to make a larger contribution.

6       And in essence is what they do is they endow

7       their membership.  So they write a large check.

8       They never have to pay dues again.  And the

9       proceeds from the life membership, again, are

10      treated as an endowment.  So the organization

11      would take the proceeds and only draw off the

12      interest from those proceeds.

13  Q.  And the life time associate and young membership

14      classes, when were those added?

15  A.  So I believe life membership has been around for

16      quite some period of time.  The associates and

17      the young membership structure were the changes

18      that were made around the same time.  I believe

19      my recollection dates -- I think it was around

20      2011 or 2010, somewhere thereabouts we added

21      those classes.

22          During this -- it was during the same

23      period where we were cutting costs and trying to

24      find what ways to drive up revenue.

25  Q.  Mr. Pimental, can you tell us what is the

1          current financial condition of Congregation

2          Jeshuat Israel?

3   A.  So I live and breathe that every day, frankly

4          beyond my full-time job.  And I guess the best

5          way to put it would be precarious.  You know, we

6          continue every day and every year when we go

7          through various budgeting process to look at

8          every expense of the organization.  We're really

9          -- we're one sort of large financial

10         responsibility away from insolvency.

11   Q.  You mentioned costs that have been cut.  Is

12         there anything left to cut?

13   A.  In our opinion we've cut everything we can.

14   Q.  Is the current situation sustainable?

15   A.  So for many reasons it's not.  You know, one of

16         the things, as I mentioned earlier, is the

17         day-to-day responsibility has fallen for many

18         years now on the backs of a core group of

19         volunteers that are getting burnt out.

20              Further to that, you know, the income

21         is just barely meeting the expenses on an annual

22         basis.  We have very little left at the end of

23         the day in the event that something more major

24         happens down the road.  So, no, I don't believe

25         it's sustainable.

```
 1   Q.   Why don't we turn to Exhibit P251.

 2        Mr. Pimental, you have before you what has been

 3        marked as Exhibit P251.  If you could take a

 4        second to flip through the pages here, and let

 5        me know when you've done that.

 6   A.   I have.

 7   Q.   Are you familiar with this document?

 8   A.   I am.

 9   Q.   What is it?

10   A.   So this is a set of financial reports for the

11        period ending June 30, 2014.

12   Q.   Why does it end June 30, 2014?

13   A.   That's the end of our fiscal year.

14   Q.   And you're familiar with this document?

15   A.   I am.

16   Q.   And to your knowledge, is it accurate?

17   A.   Yes.

18   Q.   Let's start on the first page.  It says balance

19        sheet.  What is a balance sheet?

20   A.   So the balance sheet is a snapshot in time as of

21        a particular date whereas other financial

22        reports might encompass a period of time.  A

23        balance sheet is a snapshot.  In this case it's

24        as of June 30, 2014 showing the assets,

25        liabilities and equity of the organization.
```

1   Q.   So I'm looking about half way down the page.  It

2        says total assets.  What are the total assets?

3   A.   Approximately 2.3 million dollars.

4   Q.   And what are Congregation Jeshuat Israel's

5        liquid assets?

6   A.   So of the 2.3 million dollars on the balance

7        sheet, there is held about $850,000 of

8        property.  You'll see the visitor center and

9        also the Avis Achim Chapel.  So the vestible

10       and/or cash assets, it's approximately -- and

11       just for approximation purposes, it's

12       approximately 1.4 million dollars.

13  Q.   So Congregation Jeshuat Israel has 1.4 million

14       dollars in liquid assets that it can use; is

15       that correct?

16  A.   No, that's not correct.

17  Q.   Why isn't it correct?

18  A.   So in order to analyze the 1.4 million dollars,

19       you have to go down to the equity section of the

20       balance sheet where you'll see that the funds

21       are broken out into various restricted buckets.

22       CJI, permanently restricted, temporarilly

23       restricted, et cetera.

24  Q.   So what's the relationship between the

25       restricted funds that are listed under the

1          liabilities and equities and the nonfixed assets

2          that are listed in the assets section?

3     A.   So it's just really reallocation showing, again,

4          how the funds -- we talked about the cash or

5          investable funds are broken into the various

6          buckets of various restrictions.

7     Q.   Let's take a look at these restricted funds.

8          The first category here says CJI perm restricted

9          funds.  What are these?

10    A.   So these funds are held in the form of a

11         permanent endowment.  So these funds are used

12         solely for income purposes.  Further to that,

13         each fund has a particular designation or

14         restriction for which the proceeds from that

15         fund can be used for.

16    Q.   I see ATS Jewish Federation Funds.  What's that?

17    A.   So we spoke about the Abraham Touro Society.

18         Those are the proceeds that are held at the

19         Jewish Federation Foundation in Providence.

20    Q.   What's the line item right above it that says

21         Abraham Touro Society?

22    A.   So rather than sending piecemeal checks up to

23         Providence, we sort of aggregate, for example,

24         if someone doesn't give the $10,000 all at once

25         and maybe gives over a period of time, we'll

1          aggregate them in our organization and then send

2          it up in a more lump sum manner.

3     Q.   Do you see a couple lines down where it says

4          baum fund?

5     A.   Yes, I do.

6     Q.   What is that?

7     A.   So the baum fund is a fund that was created by a

8          bequest many years ago.  It predates my

9          involvement with the organization.  The

10         treatment of the baum fund is to support the

11         poor of Newport County.  We weren't the only

12         organization that received part of that bequest,

13         but we were fortunate enough to recieve that

14         bequest and have treated it as a permanent

15         endowment.

16    Q.   So the restriction on the fund is you can only

17         use it for the poor of Newport?

18    A.   That's right.

19    Q.   How does Congregation Jeshuat Israel use the

20         proceeds from the baum fund?

21    A.   So how do we do that?  One of the ways we do

22         that is we have a volunteer group that --

23         actually we have a baptist church which is a

24         couple of doors down the road.  Runs a soup

25         kitchen.  And so any month that there is a fifth

```
 1              Tuesday -- it sounds kind of odd -- but any
 2              month that there's a fifth Tuesday, we'll take
 3              that Tuesday to run the soup kitchen for the
 4              homeless of Newport.
 5                   And then there has been also had hoc
 6              circumstances.  For example, let's say a
 7              Catholic organization just so happens that their
 8              soup kitchen falls on Christmas Eve, we'll often
 9              take that from them so that they can go and
10              celebrate their holiday with their family and
11              we'll step in that role and try to help out.
12    Q.        Can you turn the page to what is Bates Number
13              CJI 3058?
14    A.        Yes, I see it.
15    Q.        Do you see the first line item is general fund
16              balance?
17    A.        Yes.
18    Q.        What is that?
19    A.        So that's the true unrestricted assets of the
20              organization, $145,000.  That's our emergency
21              fund.
22    Q.        I neglected to go back and go through the other
23              restricted categories.  Could you turn the page
24              back one second?
25    A.        Sure.
```

1   Q.   CJI temp restricted funds.  What are those?

2   A.   Temporarily restricted funds are those funds

3        that have some restriction on them, but perhaps

4        aren't -- I shouldn't say perhaps.  They're not

5        treated as permanent endowments.  So there is a

6        timeline for which they can be used.

7   Q.   So if I understand correctly, the difference

8        between CJI perm restricted funds and CJI temp

9        restricted funds is that they both have

10       restrictions, but temp restricted funds, you can

11       invade principal and perm restricted funds you

12       can't?  Is that a fair assessment?

13  A.   Yes, that's correct.

14  Q.   And then the last category here.  Donor

15       designated restrict funds.  What is that?

16  A.   So those are funds that have been received by a

17       donor that the donor gets to advise on what the

18       proceeds are to be used for.  So we ask for

19       their approval before they're used for any

20       particular use.

21  Q.   Let's turn the page one more time.  Do you see

22       opening balance equity?

23  A.   Yes, I do.

24  Q.   What is that?

25  A.   So that ties back to the fixed assets, the

1          properties, the Avis Achim Chapel and the Loeb

2          Visitor Center.

3     Q.   Does Congregation Jeshuat Israel's assets sheet

4          list all of its property?

5     A.   No, it does not.

6     Q.   Let's turn to page CJI 3059.

7     A.   Yes.

8     Q.   What is this document, or this report I should

9          say?

10    A.   So this report, which is several pages, is a

11         detailed profit and loss statement from an

12         operating perspective showing the income and

13         expenses of the organization.

14    Q.   And it's for the same period of time?

15    A.   It's for the period ending -- or beginning July

16         1, 2013, through June 30, 2014.

17    Q.   And that's Congregation Jeshuat Israel's fiscal

18         year, correct?

19    A.   That's correct.

20    Q.   Let's turn to page CJI 3064.

21    A.   Yes, I see it.

22    Q.   And you see net income?

23    A.   Yes, I do.

24    Q.   What is the net income?

25    A.   On 3064 it's approximately $86,000.

1    Q.    I'm sorry, you're on 3064 or -- no, it's 3062,

2          correct?

3    A.    3063.

4    Q.    Right, okay.  Turn the page back to 3062, if you

5          would.

6    A.    3062.  Approximately $11,000.

7    Q.    All right.  And that's the net income after

8          cutting all of these expenses that you've talked

9          about?

10   A.    That's right.  So from an operating perspective,

11         the profit and loss statement, as I expressed,

12         the net income is $11,000 for the year.

13   Q.    Let's turn back to the beginning of this report,

14         which is on page 3059.

15   A.    Yes, I'm there.

16   Q.    Do you see total income?

17   A.    Yes.

18   Q.    What is the total income?

19   A.    Approximately $272,000.

20   Q.    And then if you turn a couple of pages, I guess

21         back to the page we were just on.  Do you see

22         total expense?  Do you see that?

23   A.    Yes, I do.

24   Q.    What's the total expense?

25   A.    Approximately $261,000.

1    Q.    So the net income is the difference between

2          gross income and total expense; is that right?

3    A.    That's correct.

4    Q.    I noticed that there is a lot more under the

5          expense section than there is under the income

6          section.  Why might that be at least in terms of

7          pages?

8    A.    So certainly the line item detail that we went

9          into -- this is part of our exercise in '09 and

10         into 2010, to get as granular in the detail as

11         we could wanting to identify all of the expenses

12         of the organization, track them.  And then also

13         be able to watch any particular trends over a

14         period of time.

15              So we built out a very robust chart of

16         accounts so that we could see at a granular

17         level where the money was going.

18   Q.    Okay.  Could you walk us through the major

19         sources of income for Congregation Jeshuat

20         Israel, and feel free to use this profit and

21         loss report to explain.

22   A.    Sure.  So as you'll see on the first page of the

23         profit and loss CJI only, the major buckets of

24         income would be in the contribution section.  So

25         that's where your general donations will appear,

```
 1              donations for various religious services.
 2                   Further down to that you have the
 3              endowment and investment income where the
 4              Abraham Touro fund, not to be confused with the
 5              Abraham Touro Society income, comes into the
 6              organization, as as well as the Touro fund.
 7              I'll skip -- if we do some outside life cycle
 8              events that we get some income from, but then
 9              the next large bucket in the last one would be
10              membership dues and income.
11        Q.   Could you similarly walk us through Congregation
12              Jeshuat Israel's major expenses?
13        A.   Yes, I can.  So on the expense side, from a
14              major materiality perspective, I'll move to page
15              2.
16        Q.   Sure.
17        A.   So really when you get into the operating
18              expenses, we have this large bucket called
19              operating expenses.  Really inside of that
20              you'll see items such as insurance.  And then it
21              really goes down further to the actual
22              operations of each of the individual
23              properties.
24                   So you'll see breakouts of the Levi
25              Gale House, our comminity center, the rabbis
```

```
 1              house, Touro Synagogue.  Again, getting as
 2              granular as fire box services and -- we get very
 3              detailed.  So total operating expenses is a
 4              large bucket.
 5                        The next really largest bucket would be
 6              salaries and wages, and that's where we break
 7              out the salaries and wages of the employees of
 8              the organization.
 9       Q.     Who are the employees of the organization?
10       A.     So we have a full-time rabbi, and we also have a
11              part-time maintenance person.  And
12              then additionally we have one third person who
13              serves in a ritual capacity on Shabbat and other
14              holidays.
15       Q.     What does he do on those holidays?
16       A.     So there is restrictions on items or things you
17              can do relative to turning off alarms and stuff,
18              for example on Shabbat.  So he's a person that
19              might open up the building, turn off the alarms
20              and do that type of stuff so we don't go against
21              any Orthodox Jewish laws.
22       Q.     Does Congregation Jeshuat Israel have any
23              deferred expenses?
24       A.     Yes, many.
25       Q.     First of all, why don't you tell us what
```

```
 1              deferred expense is to your understanding?

 2       A.    So I consider a deferred expense -- deferred

 3              maintenance really.  So as stewards to the

 4              properties, as owners of them, we endeavor to

 5              maintain them as we can, but there is things we

 6              just can't afford to do, and so we really look

 7              at deferred or maintenance or attacking deferred

 8              maintenance in sort of -- I'll equate it like a

 9              triage.

10                   So what can we afford and what's the

11              most critical thing to attack at any one point

12              in time so we can try to allocate the resources

13              and/or try to raise some money from general

14              donations and target that type of stuff.  So to

15              use another analogy, it's sort of like fighting

16              fires.

17       Q.    And if you had to put a total dollar figure on

18              all of the deferred expenses, what would it be?

19                   MR. SOLOMON:  Your Honor, if there's a

20              document, then I'd like to see it, otherwise it

21              calls for a hearsay response, to which there is

22              a document that we haven't seen.

23                   THE COURT:  Overruled.

24       A.    So I would safely assume there's hundreds of

25              thousands of dollars in deferred expenses at the
```

1           various properties that we maintain.

2    Q.    Does Congregation Jeshuat Israel have security?

3    A.    We do have some.

4    Q.    Could you describe to us what the security is?

5    A.    So as I understand, we have sort of a security,

6          a base security system and a few -- actually, we

7          just put in some panic buttons.  So in the event

8          of an incident, there is a button that would go

9          directly to authorities, local authorities to my

10         knowledge.

11   Q.    Have there been board discussions about getting

12         more security or additional security?

13   A.    Yes, often.

14   Q.    Just tell us what the nature of those

15         discussions are.

16   A.    So we understand and recognize the stature of

17         Touro Synagogue in the community and the larger

18         community, especially given sort of the context

19         of the global climate right now.  And I

20         certainly don't mean to overstate it, but the

21         events that happened in France --

22              MR. SOLOMON:  Your Honor, I don't think

23         the witness has been qualified to testfiy as to

24         what is happening in France.

25              THE COURT:  Overruled.

```
 1    A.   So relative to the global climate, it's

 2         something that's top of mind.  Even going so far

 3         as having discussions with various local -- we

 4         consistently have discussions with local

 5         authorities, even federal authorities, about you

 6         know, trying to maintain and secure Touro

 7         Synagogue.

 8    Q.   And so Congregation Jeshuat Israel wants to get

 9         more security, correct?

10    A.   We would love to have more security.

11    Q.   Is there any reason why you haven't gotten it?

12    A.   We can't afford it.

13    Q.   Now, I think you said that you've been on the

14         board since 2006 in one capacity or another?

15    A.   That's correct.

16    Q.   And during your time on the board, what

17         involvement has Congregation Shearith Israel had

18         with Touro Synagogue and Congregation Jeshuat

19         Israel?

20    A.   None to my knowledge.

21    Q.   And has Congregation Shearith Israel provided

22         Jeshuat Israel or Touro Synagogue with any

23         financial support?

24    A.   No.

25    Q.   Are you familiar with an entity called the Touro
```

1              Synagogue Foundation?

2    A.    I am.

3    Q.    Do you have any involvement with that

4          organization?

5    A.    I do.

6    Q.    What is your role?

7    A.    So I'm the treasurer of the Touro Synagogue

8          Foundation.

9    Q.    How long were have you been treasurer?

10   A.    Three or four years probably.

11   Q.    Before that time, did you have any office or

12         position at the foundation?

13   A.    I did not.

14   Q.    So during your time has Congregation Shearith

15         Israel given any money to the foundation?

16   A.    Not that I'm aware of.

17   Q.    Have they been involved with the foundation?

18   A.    Not that I know of.

19   Q.    Now, Mr. Pimental, you're aware that

20         Congregation Jeshuat Israel is seeking to raise

21         an endowment, correct?

22   A.    Yes.

23   Q.    What do you understand the purpose of the

24         endowment to be?

25   A.    So the purpose of the endowment is to preserve

1  and maintain Touro Synagogue and keep a rabbi in

2  residence.

3  Q.  What would an endowment mean?

4  A.  So the endowment would mean a lot.  Everything

5  really.  As we've talked about relative to the

6  financial report we just went through and --

7  we're truly in a precarious position.  You know,

8  we have limited resources beyond unrestriced

9  resources in the event of something happening.

10  And in essence we're hanging on.

11  We're working dilligently to do that,

12  but the endowment is to perpetuate the

13  organization as a living, breathing house of

14  worship and congregation.  And so that we don't

15  have the capacity to do currently, and so an

16  endowment would be a wonderful thing.

17  MR. JACOBY:  I have no more questions.

18  THE COURT:  Thanks, Mr. Jacoby.

19  Mr. Solomon.

20  MR. SOLOMON:  Thank you, Your Honor.

21  *  *  *

22  DIRECT EXAMINATION BY MR. SOLOMON:

23  Q.  Good afternoon, Mr. Pimental.

24  A.  Good afternoon.

25  Q.  You testified that you lived in Middletown?

```
 1    A.   Yes, I do.

 2    Q.   It's not hard for you to get to the Touro

 3         Synagogue, is it, when you go for services?

 4    A.   No, it's not.

 5    Q.   How long of a drive is it?

 6    A.   A few minutes.

 7    Q.   You don't know of anybody who lives IN your

 8         neighborhood who would have difficulty driving

 9         the few minutes, do you?

10    A.   No, I don't.

11    Q.   Now, I believe you graduated college, I think

12         you testified.  Do you have any degrees in

13         financial planning?

14    A.   I do not, but at one paint I had my Series 7

15         license for financial securities.

16    Q.   If you just answer my question, and then if your

17         lawyer wants to ask you some more questions,

18         he'll be able to, subject to what the Court

19         wants to do.  So thank you for answering my

20         question.

21              You don't have any graduate degrees at

22         all, correct?

23    A.   No, I do not.

24    Q.   So you haven't been trained in doing

25         projections; is that right?
```

1   A.   Formal training, no.

2   Q.   Okay.  And have you done any actual financial

3        projections for the Touro Synagogue's needs?

4   A.   We do them every year.

5   Q.   Okay.  Are they in writing?

6   A.   We create a budget.

7   Q.   But that's the budget for the year; is that

8        right?

9   A.   That's the projection for the next year,

10       correct.

11  Q.   All right.  And so have you done any projections

12       that go out into the future?

13  A.   We have not done a long-term forecast, no.

14  Q.   And I take it that the budget for the next year,

15       does it show that CJI is going to go out of

16       business?

17  A.   We're required to present a balanced budget to

18       the congregation on an annual basis.

19  Q.   Does the budget that we're now talking about, so

20       only one year forward, because you don't have

21       anything going any further forward than that,

22       does it show that you're going out of business?

23       Yes or no.

24  A.   I can't answer that yes or no.

25  Q.   Does it show that you're going to be in a loss

97

```
 1              position?  Yes or no.
 2     A.       The budget presented to the congregation needs
 3              to be balanced, but that does not mean that the
 4              actual build up of the budget creates a balanced
 5              budget.
 6     Q.       Does the budget that you have that we haven't
 7              seen, but that you have for this next year, does
 8              it include payments for the rabbi?
 9     A.       Yes, it does.
10     Q.       Does it include payments for the other -- the
11              sexton or the maintenance person that you
12              described?
13     A.       Yes, it does.
14     Q.       And does it materially cut back on anything
15              that's in the profit and loss statement here?
16     A.       No, because we've already cut it do the bone.
17     Q.       Yes, I know you want to say that.  Again, if you
18              just answer my question, then you can give your
19              lawyer the testimony that you want to give.
20                   Okay.  So for the next year, Touro
21              Synagogue, CJI is sustainable; is that right?
22     A.       After we plug the donations number in order to
23              get to a balanced budget.
24     Q.       Okay.  You plugged the donations number?
25     A.       As I expressed --
```

1    Q.    Yes or no.

2    A.    I can't answer that yes or no.

3    Q.    You can't.  You just that you plugged.  I asked

4          you if you plugged it, but you can't answer that

5          yes or no?

6    A.    We have to insert a donation number oftentimes

7          in order to present the balanced budget.

8    Q.    All right.  How much capital expenditures have

9          been recorded as being needed over the next 12

10         months?

11   A.    I don't recall off the top of my head.

12   Q.    A thousand?  A million?  Ten million?

13   A.    We discussed the deferred maintenance issues,

14         and so we only put into the budget what we can

15         try to afford and stretch to afford.

16   Q.    I asked you about cap ex.  Do you have a number

17         for the cap ex?

18   A.    I don't recall off the top of my head.

19   Q.    Okay.  With respect to this deferred

20         maintenance, where is the list of that deferred

21         maintenance?  Does the list exist?

22   A.    I don't know.

23   Q.    Okay.  So you have not prepared a list?

24   A.    We've discussed the list.

25   Q.    Have you personally prepared a list?

1    A.    I have not prepared a list.

2    Q.    And so to your knowledge, you don't know of a

3          list; is that right?

4    A.    I don't know of a physical list, no, but I do

5          know of a list that we've discussed at various

6          meetings.

7    Q.    These deferred maintenance expenses aren't

8          concrete enough to go and become contingent

9          liabilities on your financial statements, right,

10         because they're not there; isn't that right?

11   A.    I'm not an accountant, but we don't accrue

12         liabilities.  We really view our financial

13         statements as cash transactions and we do cash

14         accounting.  So we don't put on our financial

15         statements liabilities of that nature.

16   Q.    By the way, are these financial statements

17         audited?

18   A.    No, they're not.

19   Q.    Are they reviewed or certified by a public

20         accountant?

21   A.    They're reviewed by an accountant.

22   Q.    Is there a certificate that goes with them?

23   A.    I do not believe there is a certificate.

24   Q.    Now, I assume that if Congregation Jeshuat

25         Israel had an extra $75,000 a year for the next

```
 1              ten years, that would be quite a help, wouldn't

 2              it?

 3                   MR. JACOBY:  Objection, Your Honor.

 4                   THE COURT:  overruled.

 5    A.   Any amount of money would be a help.

 6    Q.   $75,000 would be a lot of help; is that right?

 7    A.   Not enough.

 8    Q.   Let's look at the fine arts policy that you

 9              began with, please.  That is Exhibit 258.

10    A.   Yes, I see it.

11    Q.   Okay.  This is a written insurance policy,

12              right, and the terms that are -- the terms are

13              set forthright here, right?

14    A.   Yes.

15    Q.   Okay.  There is no extra terms that you're aware

16              of of this policy other than what is in it; is

17              that right?

18    A.   Not to my knowledge.  I don't know.

19    Q.   Okay.  Now, the additional insured at

20              Congregation Shearith Israel, I looked through

21              it and did not see an endorsement that said that

22              it was a named insured or an additional insured

23              solely and respect of certain of the coverages.

24              Does that exist?

25    A.   It says it's an additional insured as its
```

1              insured interest appears as I recall.

2    Q.       That's right.  And that's all it says in the

3              whole policy about who is insured for what; is

4              that right?

5    A.       Perhaps.  I haven't read the entire policy?

6    Q.       You haven't read the entire policy?

7    A.       Not verbatim.

8    Q.       Ever?

9    A.       I reviewed it with the expert that I hired.  I'm

10             not an expert in insurance, and so I work with

11             an insurance advisor and an insurance broker to

12             make sure we're getting the adequate coverage we

13             need.

14   Q.       And are you familiar enough with insurance to

15             know that there is such a thing called

16             endorsements to policies?

17   A.       I'm familiar with endorsements, yes.

18   Q.       And are you familiar enough to know that an

19             endorsement could easily have been written that

20             identified the coverages that a particular

21             additional insured was on and was not on?  Do

22             you know that?

23   A.       To add an additional insured endorsement can be

24             added, yes.

25   Q.       You can add an additional insured just for

1          certain other coverages?

2     A.   Not according to my insurance broker.

3     Q.   I see.  Now, this fine arts policy I think arose

4          out of a brokers proposal back in -- was it

5          2009; is that right?

6     A.   It may have.

7     Q.   DX387.  You were working at CJI in 2009; is that

8          right?

9     A.   I was on the board of officers at the time.

10         I've not worked there.

11    Q.   Do you recognize this proposal?

12    A.   I don't remember it.

13    Q.   Is this the broker who is involved, Carrie

14         Richmond --

15    A.   I don't recall.

16    Q.   -- who is the broker on the fine arts policy?

17    A.   Not today.

18    Q.   Oh, so it was a broker on the policy.  The draft

19         of the policy is actually attached to this,

20         isn't it, if we go back to page 25 of 387?

21    A.   The proposal may have quoted the same insurance

22         company, but the broker we today is not Gary and

23         wasn't in 2009.  So I'm not familiar with the --

24    Q.   Who was the broker in 2009?

25    A.   We switched to Dan Dwyer, DF Dwyer Insurance.

1    Q.    This is what was produced by CJI, and I think

2          it's the only one that I have, and I wanted to

3          just get you to affirm that that this is a

4          proposal that's prepared for, and it lifts

5          Congregation Jeshuat Israel, Congregation

6          Shearith Israel, Society of Friends of Touro,

7          and then Touro Synagogue Foundation.  Do you see

8          that?

9    A.    I see that.

10   Q.    And if you go through the next pages, which

11         identified the particular coverages, I didn't

12         see any differentiation between CJI on the one

13         hand and Shearith Israel on the other as to who

14         was going to be on what coverages.  Can you

15         confirm that for me?

16   A.    Where are you seeing that?

17   Q.    I'm not seeing it, sir.  I am not seeing it,

18         meaning all of these insureds are on for all?

19   A.    That was not the structure of the insurance

20         prior, so -- I'm not familiar with this

21         proposal.

22   Q.    So you testified to --

23             THE COURT:  Mr. Solomon, just before

24         you get off that document, I got a little

25         confused.

1           Mr. Pimental, did Carrie Richmond and

2      Viking Insurance Brokers provide a policy to CJI

3      in October of 2009 as a result of this proposal,

4      do you know?

5           THE WITNESS:  I believe we changed

6      providers beginning October of 2009 to DF Dwyer

7      Insurance, which is where the -- we changed to

8      the AXA Art consolidated policy.

9           THE COURT:  So you don't know if this

10     proposal by Carrie Richmond and Viking resulted

11     in a policy coverage of CJI, et al.?

12          THE WITNESS:  I don't recall the

13     document, but -- Viking was the encumbant

14     provider prior to us switching to Dan Dwyer.  So

15     this was likely a proposal to try to keep the

16     business with Carrie Richmond and Viking when we

17     were bidding it out.

18     BY MR. SOLOMON:

19  Q.  And just so that the record is clear, sir, the

20      policy, though, the AXA policy, is the policy

21      that you now have, right?

22  A.  The AXA art combined policy we now have, yes.

23  Q.  And that's the policy that's attached here too

24      in draft and proposal form, right?

25  A.  That is not the policy attached here as I don't

1          -- this was bid by a different insurance broker,

2          and I don't know if there is a difference

3          between this policy and the one that we bound

4          with Dan Dwyer.

5     Q.   Okay.  And do you know if there is a written

6          proposal from Dan Dwyer that exists in CJI's

7          files?

8     A.   I don't know.

9     Q.   You personally have never told anybody at

10         Shearith Israel -- you personally have never

11         told anybody at Shearith Israel, by the way,

12         you're on only some of the coverage; is that

13         correct?

14    A.   I've not told Shearith Israel about insurance,

15         no.

16    Q.   There was a time in 2008 that the Congregation,

17         CJI, felt itself in dire financial need; is that

18         right?

19    A.   Likely, yes, that was when we endeavored to do

20         the cost cutting, yes.

21              MR. SOLOMON:  Excuse me, please, just

22         one moment.

23    Q.   Let me ask you to look back at DX 387, and thank

24         Ms. Chiang for calling this to my attention.

25              This is how the documents were produced

1           to us, and I'd like you to look at page 16.

2           So is this the Dwyer proposal that you were

3           referring to?

4    A.     I didn't refer to the Dwyer proposal.  I said I

5           didn't recall seeing one, but this does appear

6           to be a proposal from Dwyer Insurance.

7    Q.     This proposal for insurance is prepared for

8           Congregation Jeshuat Israel, Congregation

9           Shearith Israel of New York, Society of friends

10          of Touro Synagogue and Touro Synogogue

11          Foundation, correct?

12   A.     That's who it was prepared for, correct.

13   Q.     Okay.

14   Q.     The AXA Insurance proposal beginning on page 25

15          is actually the next document right after the

16          Dwyer proposal; isn't that right?

17   A.     Yes, it looks to be.

18   Q.     Thank you.  So to get back to 2008, we looked

19          through what was produced to us, sir, and we can

20          not find financial statements, the unaudited

21          ones -- the internal statements for 2009.  Do

22          they exist?

23   A.     I believe they do, yes.

24   Q.     Okay.  And did you participate in the production

25          of documents in this case?

1    A.    Yes.

2    Q.    Do you think that was produced in the case?

3    A.    I don't know.

4    Q.    All right.  So there was some dire financial

5          need felt in 2008.  Could we look at PX 181

6          please.

7                This is a board meeting of September 9,

8          2008 that be you attended, right?

9    A.    Yes, it says I was here.

10   Q.    All right.  In this board meeting you said that,

11         "If all things stayed exactly as they were, that

12         given your current resources, you had about

13         three to four years of expenses available,"

14         correct, at the bottom of page 1 to the top of

15         page 2?

16   A.    That's what I said, yes.

17   Q.    Was it accurate at the time?  Let me withdraw

18         the question.  Did you believe it to be accurate

19         at the time?

20   A.    Yes, I did.

21   Q.    Now, you say you've been affiliated with the

22         Touro Synagogue, the foundation for three, four

23         years?

24   A.    Correct.

25   Q.    And isn't it accurate, as Miss Pedrick says here

1       in the very next paragraph, that before 2008

2       that it was the foundation that was doing the

3       fundraising, not CJI; is that correct?  The very

4       next sentence.

5   A.  I know the foundation was doing fundraising,

6       yes.

7   Q.  You weren't aware of any that CJI was doing?

8   A.  In a capital capacity, no, but we were always

9       fundraising for donations to support the

10      operations of the organization.

11  Q.  Now, it's on the next page where there is a

12      discussion about selling the Myer Myers

13      rimonim.  And it says that, "Generally the

14      consensus was that no one wanted to sell them,

15      but that we would have to consider it in view of

16      our dire financial circumstances."

17          Do you see that?  It's at the bottom of

18      the next page, the page at the bottom has the

19      number 1327.

20  A.  Can you point me to that again?  I'm sorry.

21  Q.  Sure.  It may be easier to look at the screen.

22      There is a paragraph that begins,

23      "Mr. Bazarsky."

24  A.  Okay.  I see that there, yes.

25  Q.  Okay.  Was that the general consensus?  Is that

1        accurately reported here?

2    A.  We were in a dire financial circumstance, yes.

3    Q.  Was the consensus that no one wanted to sell

4        them, but that they would have to consider it in

5        view of the dire financial circumstances?

6    A.  I don't recall.

7    Q.  Okay.  And the dire financial circumstances were

8        that you had three or four years worth of

9        operating expenses available, correct?

10            MR. JACOBY:  Objection to form.

11            THE COURT:  Overruled.

12   A.  I don't recall if that was the specific dire

13       financial circumstances, but it was a very

14       challenging time for the organization.

15   Q.  All I was suggesting is it was the same meeting

16       inm which you said there is three or four more

17       years worth of operating expenses, correct?

18            MR. JACOBY:  Objection.  Mistates the

19       document.

20            THE COURT:  Overruled.

21   A.  Yes, I said that we had three or four more

22       years.

23   Q.  Now, let's look at a couple of documents that we

24       have put together at this point as

25       demonstratives, and maybe they'll become

```
1              summaries of the evidence if we did it

2              correctly.

3                   MR. SOLOMON:  Let's have all four

4              handed out, please.

5      Q.      What we've tried to do, Mr. Pimental, is go

6              through the internal financial reports that were

7              produced to us by CJI, and take and identify the

8              sources here on the column and take out the

9              numbers that we saw there.  And if over the

10             break you want to check it, that's fine.

11                  MR. JACOBY:  These demonstratives,

12             we've seen one of them before, the other three

13             we haven't, and we haven't been given notice.

14                  THE COURT:  Which ones have you seen?

15                  MR. JACOBY:  Yesterday we saw D3.  That

16             was given to us, but D4, 5 and 6, this is the

17             first time we've seen them.

18                  THE COURT:  Why don't we do this:

19             We're pretty close to the lunch break.  Why

20             don't we take the lunch break.  They've been

21             good enough to put underlying exhibit number

22             where the data was obtained from.  Why don't you

23             take a chance to match that up and continue

24             after lunch.

25                  Remember folks, today we're going to
```

1          restart at two o'clock.

2                    MR. SOLOMON:   Thank you, Your Honor.

3                    (Lunch Recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 112

(1)                STATE OF RHODE ISLAND

(2)

(3)     I, Tara L. Wosny, Certified Shorthand Reporter

(4) and Commissioner in and for the State of Rhode Island,

(5) do hereby certify that the witnesses whose testimony is

(6) herein before set forth, was duly sworn and that such

(7) testimony is a true record, to the best of my ability, of

(8) the testimony given by the witnesses.

(9)     I further certify that I am neither related to

(10) or employed by any of the parties in or counsel to this

(11) action, nor am I financially interested in the outcome of

(12) this action.

(13)     In witness whereof, I have hereunto set my hand

(14) and seal this 3rd day of June, 2015.

(15)

(16) _Tara L. Wosny_
     Tara L. Wosny

(17)
     Notary Public

(18)
     My commission expires:

(19)
     June 10, 2017

(20)

(21)

(22)

(23)

(24)

(25)

```
 1              AFTERNOON SESSION

 2          (Commencing at 2:00 p.m.)

 3              THE COURT:  Mr. Solomon, I think

 4    we were up and going to be using some

 5    demonstratives.

 6              MR. SOLOMON:  Thank you, Your

 7    Honor.  I was at my seat and wasn't sure

 8    if The Court wanted to take other

 9    scheduling.  I apologize, because I was

10    intending to use these at

11    cross-examination, and I didn't mean to

12    surprise the other side at all, and if

13    they felt that way, I'm glad they had the

14    lunch break.

15              THE COURT:  The timing turned out

16    to be perfect.

17              MR. SOLOMON:  I wanted to make

18    that clear, so thank you, Your Honor.  But

19    I think will I start with something else.

20          CROSS EXAMINATION BY MR. SOLOMON:

21    Q.  Mr. Pimental, you have been attending

22    the trial; is that right?

23    A.  I have been.

24    Q.  You have been, so you have heard --

25    A.  Occasionally.
```

1    Q.  Did you hear the openings?

2    A.  I did hear the openings.

3    Q.  Did you hear Mr. Bazarsky's testimony?

4    A.  His direct testimony.

5    Q.  Did you, sir?

6    A.  Very little.

7    Q.  Okay.  Were you here yesterday at all?

8    A.  I was here yesterday.

9    Q.  And you were here this morning?

10   A.  Yes, I was.

11   Q.  All right.  And, now, you talked about

12   getting to the core, getting to the core of

13   what was necessary in terms of the expenses

14   as a means of becoming more efficient as an

15   organization, correct?

16   A.  Yes.

17   Q.  Let's look at DX437, please.

18          (The witness complies).

19   Q.  I'm on page 003 of the DX437.  What is

20   DX437?

21   A.  The profit and loss statement to my

22   knowledge, when -- the operating profit

23   and loss statement for the period July 1,

24   2012, through June 30th, 2013.

25   Q.  And you agree with me there's a $12,290

1  charge that appears under promotions and

2  events; is that right?

3    A.  That's correct.

4    Q.  And it says special event, right?

5    A.  Yes.  Correct.

6    Q.  And a party for --

7    A.  Yes.

8    Q.  Who was the party for?

9    A.  The Rabbi Eskovitz was the Rabbi for

10  approximately 15 years, and we had a

11  tribute party.

12    Q.  The $12,290 was spent on a party for

13  him?

14    A.  Yes.  Which was offset by some

15  income the congregation received from the

16  donors.

17    Q.  How much?

18    A.  Approximately $3,000, as I recall.

19    Q.  Thank you.  So that often happens, if

20  you have a particular expense, you try and

21  get people to contribute for that particular

22  expense, right?  Isn't that sort of normal?

23    A.  For some of them, yes.

24    Q.  Now, you testified to a conversation

25  that you had with Michael Katz; when was that

1    conversation?

2    A.  Around the time we were setting up

3    the Abraham Touro Society Fund.

4    Q.  Give us the year, please.

5    A.  Probably in 2010, 2011.

6    Q.  And you testified that he expressed some

7    interest in Shearith Israel being a

8    contingent beneficiary, right?  Do you

9    remember what he said?

10    A.  There was concern on the Shearith

11    Israel side.

12    Q.  Do you remember what he said, is really

13    my question -- not to interrupt you.  Do you

14    remember what he said?

15    A.  I don't recall his exact language.

16    Q.  In substance you said he had a concern,

17    what was his concern?

18    A.  They were concerned about the

19    liability that they would assume by being

20    the contingent beneficiary on the fund.

21    Q.  And they were, I take it, slow in

22    getting back to you; is that right?

23    A.  I don't recall if they ever got back

24    to us.

25    Q.  So he never rejected it, you don't think

1  he -- you don't know if he ever got back to

2  you; isn't that right?

3    A.  They certainly didn't pursue it.

4    Q.  My question was, did he ever get back to

5  you, do you remember or not?

6    A.  We provided some follow-up

7  documentation, of which they never got

8  back to us on.

9    Q.  And I have seen no writings on this,

10  from either side, when you say that you

11  provided, how did you provide those?

12    A.  I don't recall.

13    Q.  What did you provide?

14    A.  There was a request of information

15  about where the money would be invested

16  by the Jewish Federation Foundation.

17    Q.  And you provided that?

18    A.  As I recall, we did.

19    Q.  You sent that by email?

20    A.  I don't recall.

21    Q.  You sent that with a letter?

22    A.  I don't recall.

23    Q.  Now, you've undertaken no study of

24  nonprofit organizations and their balance

25  sheets, have you?

1    A.  I have not studied that, no.

2    Q.  And have you done the kind of work that

3    you have done for CJI for any other nonprofit

4    organization?

5    A.  The non-profit?

6    Q.  Have you done the kind of work that you

7    have done for CJI for any other religious

8    organization?

9    A.  Not a religious organization, no.

10    Q.  You don't clam to be an expert in

11    actually knowing how nonprofits or religious

12    organizations stay afloat or balance their

13    books, or get money, or anything, do you?

14    A.  With my experience as being

15    assistant treasurer and treasurer, I

16    certainly have.

17    Q.  That's for CJI, correct?

18    A.  Correct.

19    Q.  But you don't have that experience with

20    any other nonprofit or religious

21    organization, correct?

22    A.  Well, I'm treasurer of the Touro

23    Synagogue Foundation.

24    Q.  Well, we will get to Touro Synagogue

25    Foundation.  But not on another --

1    A.  And both of the Jewish -- the

2    Jewish, now the Jewish Alliance of

3    Greater Rhode Island.

4    Q.  And do you see the books and records, I

5    asked you before --

6    A.  I have seen them, yes, I was not

7    even in a treasury capacity.

8    Q.  Okay.  But you don't have familiarity --

9    do you have any familiarity with nonprofits

10   or religious organizations that actually

11   existed for hundreds of years at levels of

12   profit and loss similar to what you are

13   showing here?

14             MR. JACOBY:  Objection to form.

15             THE COURT:  Overruled.

16   A.  Can you repeat the question.

17   Q.  Do you have any familiarity with any

18   religious organizations that have existed for

19   a very long time with income statements and

20   balance sheets that show the levels of profit

21   and loss as to what is shown here?

22   A.  I don't know.

23   Q.  I think I heard you testify, and correct

24   me if I'm wrong, that the financial, internal

25   financial statements here don't list all of

1    the property of CJI; is that correct?

2      A.  That's correct.

3      Q.  And so a property, those would be

4    assets, so not all the assets are listed,

5    right?

6      A.  That's correct.

7      Q.  And I think you -- again, correct me if

8    I'm wrong -- but, please, but I didn't see

9    there was a like a million dollar loan, a

10   borrowing that CJI did in tandem with the

11   Touro Foundation, there's been some testimony

12   to that event; did you know about that?

13     A.  I was aware of it, yes.

14     Q.  And that has been completely paid off,

15   correct?

16     A.  That has been, yes.

17     Q.  And I didn't see that any place on any

18   of the these income statements or the balance

19   sheets; is that correct, that --

20     A.  It was on the balance sheet of the

21   Touro Synagogue Foundation.

22     Q.  It was on only on their balance sheet,

23   not -- not off balance sheets of CJI?

24     A.  That's correct.

25     Q.  Okay.  So have you ever made an estimate

1    of the value of the assets that are not

2    recorded the on the financial statements of

3    CJI?

4       A.  So, the financial statements of CJI

5    as --

6       Q.  Have you ever made an estimate?

7              MR. JACOBY:  Objection.  I think

8     the witness should be allowed to answer

9     that question and not with your

10    interrupting.

11             THE COURT:  Hold on everybody.

12    Put a question to the witness, please.

13      Q.  Have you ever made an estimate of the

14    value of the assets that are not on the

15    financial statements of CJI?

16      A.  I cannot answer that yes or no.

17      Q.  Have you ever made an estimate of the

18    value of the liabilities at any given moment

19    that CJI had that are not reflected on these

20    internal financial statements?

21      A.  We don't have any other liabilities

22    other than the deferred maintenance that

23    I'm aware of.

24      Q.  But you had a million dollar loan that

25    wasn't on there, right?

1     A.  I didn't structure the original loan

2  agreement.  And I'm not familiar with the

3  specific language of the loan agreement.

4  I know it was held on the balance sheet

5  or reflected on the balance sheet of the

6  Touro Synagogue Foundation, that was the

7  organization that took the loan out, and

8  in order to complete the restoration of

9  the Touro Synagogue.

10     Q.  As far as you know, CJI had no liability

11  on that loan, as far as you know; is that

12  right?

13     A.  I believe we did have liability, but

14  I don't know if it was a primary or

15  secondary liability.

16     Q.  But you do not know it's if on any of

17  the financial statements?

18     A.  I don't know.

19     Q.  You don't know whether it was or not?

20     A.  I don't know if it predates my term

21  as assistant treasurer.

22     Q.  Okay.  And you talk about the

23  foundation, and there's been some testimony

24  about the foundation, has the foundation been

25  active in the last three or four years that

1   you have been involved with it?

2     A.  Relatively, yes.

3     Q.  What has it been doing for the last

4   three or four years?

5     A.  So it also went through a period, it

6   was a challenging financial time, and

7   during the time of the construction of

8   the visitor center and afterwards; but

9   it's been coming back to a level, in many

10  respects, and putting on the George

11  Washington letter reading and other

12  events.

13    Q.  Its purpose, still, is to assist the

14  Touro Synagogue financially, correct?

15    A.  Its purpose, as I understand it, is

16  to help preserve and maintain Touro

17  Synagogue and promote religious freedom.

18    Q.  And maintain -- the function in doing

19  that, is not to, not knocking in nails here,

20  but to raise money, right?

21    A.  Yes, that's part of the purpose.

22    Q.  And they are alive and well in trying to

23  do that; is that right?

24    A.  There are around and trying to do

25  that, yes.

124

1    Q.  And have you ever seen a membership list

2  of the Touro Synagogue Foundation?

3    A.  I don't believe I have.

4    Q.  And so you don't know whether Shearith

5  Israel members contributed to the Touro

6  Synagogue Foundation; is that right?

7    A.  I don't know if they do or not.

8    Q.  Okay.  Thank you.  We are ready now, you

9  had a chance to look at these.

10    A.  I have.

11    Q.  The Demonstrative No. 3 records CJI's

12  expenses from 2010 to 2014, did you record

13  them accurately?

14    A.  The total expenses, I believe, ties

15  too the exhibits.

16    Q.  It ties.  Good word.  Thank you.  And

17  what about DD004, CJI Net Income 2010-2014,

18  do those also tie?

19    A.  I didn't actually review the

20  demonstratives in terms of them tying

21  back to the original exhibits.

22        I reviewed them to understand the

23  context of what is trying to be shown

24  here.

25    Q.  Okay.

1    A.  So not actually tie them back, can't

2    opine about whether they tie.

3    Q.  I think you testified you studied them

4    enough to be able to know what they are

5    trying to show?

6    A.  The purpose of my review is to be

7    able to explain this demonstrative and

8    the context of the reports as I know

9    them.

10    Q.  Okay.  So if we look at the expenses

11    from 2010 to 2014, total expenses for the

12    five years running $237,000 to $261,000, with

13    a dip, with a trough and a height in the

14    middle, correct?

15    A.  The total expenses, you are

16    referring to?

17    Q.  Total expenses.

18    A.  Yes, as shown.  Yes.

19    Q.  And the operating expenses are also,

20    they are shown, right?

21    A.  They are all as they are shown, yes.

22    Q.  And salaries and wages varied from

23    $130,000 to $137,000 during this period,

24    correct?

25    A.  That's correct.

1    Q.  And, now, the net income, which is going

2    to demonstrative No. 4, this breaks out that

3    CJI only and restricted funds, and I would

4    like to talk to you about the restricted

5    funds in a minute.  But this, then, has

6    income summing -- and just adding them up,

7    right, and for the five year period, to

8    $115,000, if you just look at CJI, right?

9    A.  What demonstrative are you on,

10   sorry?

11   Q.  No. 4.  DD0004.

12   A.  Okay.

13   Q.  The one on the --

14           THE COURT:  On the screen, if

15    that helps.

16   A.  I apologize.  Sorry.  Yes, for the

17   period shown, assuming that the numbers

18   are accurate to the financial report,

19   then yes, it's -- I have not done the

20   math, but assuming the math is right, it

21   adds up to $115,000.

22   Q.  And on the restricted funds, it adds up

23   to $877,000, right?

24   A.  Yes.  And assuming the math is

25   right.

1    Q.  Absolutely.  Assuming the math is right.

2           So just so I'm clear and The

3    Court is clear on this, the restricted

4    funds that add these, this is the income

5    of those funds in each of these years,

6    right, this is not the corpus, this is the

7    amount of the income that is being thrown

8    off the --

9    A.  That is not right.

10    Q.  -- this is the total amount including

11    the corpus?

12    A.  This is the corpus, so, again, I

13    don't know where this data was taken

14    from, but assuming you are talking about

15    income that -- sorry, that the P&L

16    restricted funds, that's what this

17    activity is telling to, the income and

18    expenses going into and out of the

19    restricted funds for the particular use.

20           So this is not income from the

21    restricted funds.

22    Q.  My question is with respect to, for

23    example, 2011, there's a $685,000 number for

24    the restricted funds, okay, and that does not

25    include the 267 from the prior year, does it?

1    A.  No, that's the income into the

2   restricted funds for that year.

3    Q.  Okay.  Now, the next document, the next

4   demonstrative is DD0005, okay.

5              THE COURT:  What caused the

6    uptick in restricted funds, do you know

7    what the 685 represents?  It seemed out of

8    whack with the other years.

9    A.  There was a large gift that was

10   given to the organization, I believe that

11   year was a donor gift to the

12   organization, so, again, it has

13   restriction on it.

14             THE COURT:  Okay.

15   Q.  That happens somewhat, sort of

16   frequently, doesn't it, some low years, and

17   then get a bequest and a high year, isn't

18   that that the way that CJI works?

19   A.  But the restricted funds are all

20   restricted in some form or fashion.

21   Q.  You have not told us how they are

22   restricted, you are talking about -- but you

23   are using the phrase "restricted funds"?

24   A.  Right.

25   Q.  So DD005, what I was showing here, is

1   the income, we could not find -- by the way,

2   did you by any chance find the November 2009

3   financials?

4   A.  I don't believe -- I don't recall.

5   Q.    And we could not find the restricted

6   funds statements for the years prior to 2009,

7   were there restricted fund statements before

8   that?

9   A.  So as I recall in 2009, and into

10   2010, we switched to a new accounting

11   system, and with the new accounting

12   system, we had more robust reporting

13   ability.  The old accounting system was

14   no longer supported, even on computer

15   systems that we were using.  So I don't

16   know if there was an actual report.

17   Q.  Are you, sitting here today, aware of

18   any restricted fund reports for periods

19   before 2009?

20   A.  I don't know.

21   Q.  Okay.  So what we did here, we just took

22   the income and we took the expenses, and we

23   added them up, and then we took an average.

24        Now, in two of the years, 2013

25   and 2014, there are amounts that are shown

1    in the footnotes, which I don't need to

2    put into the record, the transcript, but

3    they are right here.  And for the rimonim

4    sale/legal, you agree with me, those are

5    nonrecurring expenses?

6    A.  Well, I hope we don't more

7    litigation.

8    Q.  These are the expenses for this

9    litigation; is that correct?

10   A.  Yes.

11   Q.  Thank you.

12        THE COURT:  Don't bet on it.

13   A.  Please.

14        MR. NAFTALIS:  As I said, 113

15   years from now.

16   Q.  If we did the addition correctly for all

17   the years we had financial statements, we

18   have income of 5 million, expenses of 3.9,

19   and then a net of one million dollars, right?

20   A.  So I think this chart needs some

21   explanation, so.

22   Q.  Just asking whether I added it

23   correctly.

24   A.  Based on the numbers provided on

25   this chart, the answer is yes.

1    Q.  Okay.  And that amounts include -- the

2  amounts that were paid out for the litigation

3  which are in the footnotes, right?

4    A.  (No response.)

5    Q.  It's net of those expense, correct?

6    A.  Well, your asterisk says it includes

7  the number.  So I don't know.

8    Q.  The expurses include the numbers, right,

9  so if we were to back them out, because

10  nonrecurring, the expense are lower, would be

11  lower, correct?

12    A.  I'm sorry, not following you.

13    Q.  If the $600,000 includes the number for

14  the litigation expenses for that year, okay,

15  if you don't have litigation expenses for

16  that year, then the 620 number is going to be

17  a lower number?

18    A.  Yes.

19    Q.  Okay.  And none of this includes the

20  additional million dollars of loan that CJI

21  either had or didn't, but the Touro

22  Foundation did, but was paid off, correct?

23    A.  It was not paid off by the

24  congregation, though, it was paid off by

25  the foundation.

1    Q.  And none of these numbers includes that?

2    A.  It would not if it was -- if it was

3    an income or an expense of the

4    congregation.

5    Q.  Any other big million dollar obligations

6    that have been paid off, not expenses of the

7    congregation?

8    A.  I don't know.

9    Q.  And then the last item here is

10   demonstrative 0006, and that's just your

11   current assets.  I think you went through

12   that on direct.  So, right, the current

13   assets, are going to be, this is current,

14   current assets, right?

15   A.  Are about 1.4 million, right.  Those

16   are the investable assets of the

17   organization, yes.

18   Q.  Okay.  And, now, do these numbers, by

19   the way, include the Touro, Abraham Touro

20   Fund?

21   A.  They do not.

22   Q.  So those are the additional $200,000

23   that you mentioned.

24   A.  The Abraham Touro Society Fund, is

25   that what you asking?

1    Q.  Yes, sir.

2    A.  That's the Jewish Federation

3    Foundation, ATS Funds.

4    Q.  Thank you.  So that's here in the

5    198,000.

6    A.  That's right.  That's right.

7    Q.  Thank you.  So you had that -- the

8    restricted funds, are there writings that

9    identify the restrictions for each of the

10   funds that you have categorized?

11   A.  I don't know.

12   Q.  And so sitting here, you cannot actually

13   testify what the restrictions are on the

14   funds?

15   A.  I took over as assistant treasurer

16   and treasurer.

17   Q.  May I have the answer to the question.

18   A.  I cannot answer yes or no.

19   Q.  You cannot tell us whether, sitting

20   here, whether you can tell us the

21   restrictions on any of the funds?

22   A.  I can tell you the restrictions to

23   my knowledge.

24   Q.  Please tell us the restrictions, which

25   funds are and what is easiest for you to look

1  at.

2   A.  Would you like me to just pull the

3  balance she sheet from 2013.

4   Q.  Please tell The Court what restrictions

5  there are?

6   A.  I don't have a balance sheet, hang

7  on.

8   Q.  Why don't we get you one.  Let's get a

9  balance sheet.  2014.

10   A.  I have one here.

11   Q.  You do have it, for what year?

12       MR. JACOBY:  Can we ask the

13  witness to identify the document for the

14  record.

15       THE COURT:  Plaintiff's 251.

16   A.  So do I have to say that for the

17  record, I apologize?

18       THE COURT:  I just did.

19   A.  Thank you.

20       THE COURT:  Incredible power I

21  have.

22   Q.  So --

23   A.  So relative to the Book of

24  Remembrances, is a book -- I'm not an

25  expert in all this, some of this stuff.

1    The Book of Remembrances, two books at --

2    in the front of the Synagogue.  They

3    commemorate all the folks that passed

4    away as part of the congregation, or even

5    families of those that have passed away.

6            And they are brass books, for

7    lack of a better way to put it.  And the

8    money -- there's money that has been

9    raised to restore those.

10           In fact, they are in the process

11   of being restored as we speak.

12   Q.  Always been restricted?

13   A.  I don't know.

14   Q.  Are you aware have of, sort of

15   recharacterizing some funds as being

16   restricted or not restricted, sometimes they

17   are characterized one way, and sometimes

18   characterized another way?

19   A.  Not while I have been involved, to

20   my knowledge.

21   Q.  Since we are talking about the Book of

22   Remembrances, let's look at Exhibit 540,

23   please.

24           On page 2 of that, this is a

25   detailed schedule of net assets as of

1    2006, correct?

2              (Witness reviews document.)

3    A.  Appears to be.

4    Q.  Okay.  And on page 2, you see that under

5    unrestricted funds, it says, Book of

6    Remembrances; do you see that on page 2?

7    A.  Yes.

8    Q.  All right.  So now what I would like you

9    to do is, go back to the balance sheet and

10   rather than describing the way they are, tell

11   The Court what the restrictions are.  Just

12   focus on what the restrictions are.  What can

13   the money be used for, if you know.

14              You can say you don't know, but

15    if you know, i want you to tell The Court.

16   A.  Sure.  So the Abraham Touro Society,

17   which we have already covered, has the

18   two lines there is for the preservation

19   of maintenance of the Touro Synagogue,

20   keeping the rabbi's in residence, and

21   keeping Touro open for the services.

22              The Ahavas Achim money for the

23    chapel located in the Levi Gale House, and

24    the repair of the Ahavas Achim Chapel, and

25    the bond funds covered for the poor of

```
 1    Newport County.  If the Hebrew School --
 2    restricted, but to support a Hebrew
 3    School, should we have one, and to support
 4    -- offset the costs of a Hebrew School.
 5              And the Israeli Officers Fund is
 6    to support and endow the members -- two
 7    memberships for the two officers from
 8    Israel that visit for the Naval War
 9    College, we invite the senior and junior
10    officers to be members of Touro
11    Congregation, so that fund is to offset
12    some of that cost.
13              The officers installation costs,
14    are to offset costs, as my knowledge, to
15    offset the installation of the officers
16    that is done -- I believe every two years
17    we elect a new board of officers.
18    Q.  Did you intentional skip life member,
19    because you don't know what it is?
20    A.  I apologize.  Sort of going -- so
21    you can hear me through the mic and down
22    to the book, and may have missed a line.
23              So the life member endowment, the
24    life member I spoke earlier, the
25    membership structure, that's where the
```

1    proceeds that are received from the life

2    member are put, and for a permanent

3    endowment to support their membership.

4         And then the rabbi's trust, is

5    donations that have been given to the

6    organization to support the cost of having

7    a rabbi in residence.

8         So that's the permanently

9    restricted bucket.

10   Q.  Okay.

11   A.  And the temporarily restricted, the

12   archive funds to support the preservation

13   or the organization, I'm sure there's

14   more words to describe the archives of

15   the organization.

16        And the Berlinger Bequest,

17   probably the most unrestricted of the

18   temporarily restricted, it was a bequest

19   given to the organization and that the

20   board decided that it wanted to not put

21   directly into the unrestricted assets of

22   the organization, so that if there was a

23   change in leadership, that at least the

24   full board would have a vote to -- for the

25   use of those assets, so it wasn't

1    something that just that there was a

2    desire to spend it immediately.

3          And the Eruv Fund, we have an

4    eruv, the eruv is a wire that encompasses

5    a circle that gives -- otherwise that

6    allows Jews to carry things and on

7    Shabbos.

8          The Mintz-Sach Activity Fund, was

9    to support programming, events, thing that

10   bring the congregation and community

11   together.  That was done by the Mintz

12   family, so it could be used for a Hanukkah

13   party or something to that effect, but

14   it's for events and programming.

15         The Rimonim Repair Fund, sort of

16   speaks for itself.  The repair to the

17   rimonim, should it be necessary.  And the

18   rimonim sale, legal fund, was a fund

19   created for what we are here to support,

20   the cost of the litigation.

21         And summer programs, again, I

22   think it's pretty self explicit, summer

23   programming, not exactly sure what the

24   specific -- if there was a specific summer

25   program in mind.  I apologize, just don't

1    recall.

2            And then the last one, Torah

3    repair, again, for the Torah Fund, to

4    repair the Torah should that be necessary.

5    It has to be kept Kosher, and it -- if a

6    letter gets worn off or something, it

7    needs to be repaired.

8            And so we have a fund

9    specifically set up so that if the donor

10   wants to give, maybe that's a passion of

11   theirs, they give specifically to that,

12   and not just the general operations of the

13   congregation.

14    Q.  Thank you.  And so all the ones that I

15   think that you have mentioned, have to do

16   with the expenses, the operation of the

17   Synagogue, so that's what these are being

18   used for, right?

19    A.  In some circumstances, yes.

20    Q.  Okay.

21            Well, other than the fund for the

22   impoverished, which I think is one of the

23   things a Synagogue should be doing, any

24   others that are not available for, sort of

25   general, you know, the maintenance of what

1    you are talking about here, so, you know,

2    the need for repair, you have the money

3    for it, right?

4                MR. JACOBY:  Objection to the

5    form of the question.

6                THE COURT:  Sustained.  And

7    rephrase that if want to.

8    Q.  Now, in the past CJI has gotten some of

9    the donors of these funds, and have asked

10   them to unrestrict them, correct?

11   A.  Not to my knowledge.  Not to my

12   knowledge.  Or not that I have been

13   involved in.

14   Q.  Okay.  Let's take a look at Exhibit 393,

15   please.

16               (The witness complies.)

17   Q.  In particular, a line entry for the

18   Corrigan Fund, what is the Corrigan Fund?

19   A.  So we talked about the investable

20   assets of 1.4 million dollars, of which

21   is broken into restricted buckets.  Some

22   of those assets are at an investment

23   manager, to try and grow the assets,

24   especially if they are serving a

25   permanent endowment, so Corrigan is a

1    financial firm in Middletown, Rhode

2    Island that invests some of the assets of

3    the organization.

4      Q.   Okay.  And I see that the investment

5    account is shown here on 393, this is your --

6    this is a profit and loss statement of 2010;

7    is that right?

8      A.   That's what we are looking at now.

9    So this is a partial year report.  This

10   is a profit and loss for the period July

11   1, 2010, to April 25th, 2011.

12     Q.   Okay.  And the endowment, the investment

13   account, the Corrigan account is listed right

14   there under the endowment and investment

15   income; is that correct?

16     A.   Yes.

17     Q.   And, now, if you look at Exhibit 443 for

18   us, this is a list of the restricted funds.

19             Here Corrigan is listed under the

20    restricted funds column, correct?

21     A.   That's booking the gain on the

22   investment at Corrigan Financial.

23     Q.   You have it under restricted in this

24   financial statement, correct?

25     A.   No.

1    Q.  Let's look at the top of the page, just

2  so that The Court can see what that is.

3    A.  So litigation --

4    Q.  Is this the page?

5    A.  Profit and loss restricted funds.

6  The restricted funds are invested at

7  Corrigan Financial.  So you are booking

8  the gain on the restricted -- the

9  allocation -- you are booking the gain on

10  the allocations of the restricted funds

11  held at Corrigan Financial -- you are

12  booking the gain on the allocated, sorry,

13  -- the funds held at Corrigan Financial,

14  if they have a gain in value, then you

15  need to book the value, the gain in the

16  value on those investment accounts.

17    Q.  Is the gain, the income comprising that

18  gain, are those also restricted?

19    A.  The gain -- say that again?

20    Q.  If the income -- is the income there the

21  investment account restricted, yes or no?

22    A.  This is not booking true income to

23  the organization, it's booking the value

24  in the incremental increases in value.

25    Q.  Answer the question, please.

1    THE COURT:  I think he needs to

2    try and explain it to me, because I'm not

3    following this line.  So I apologize,

4    either let him expand or explain it to me,

5    I'm totally missing the point here, sorry.

6    Nice that I can tell you that.

7    MR. SOLOMON:  In the financial

8    statement that -- this fund, it is not

9    shown as restricted, and here what I want

10   to establish is that, this fund is located

11   in a list as restricted, the only purpose,

12   Your Honor.

13   THE WITNESS:  Your Honor, it's

14   not a fund in the sense of a restricted or

15   unrestricted fund, so we have funds that

16   Corrigan --

17   THE COURT:  Corrigan the stock

18   broker?

19   THE WITNESS:  The investment

20   broker, right.

21   So the value of the account, if

22   that goes up, right, then you have to book

23   what the in incremental value of the

24   account is, and then it gets allocated

25   over the funds, over the period, we do

1      that once a year, not every month or every

2      quarter, we get the year ending value.

3              And then in June, we look at what

4      the -- we look across the portfolio to see

5      what had increased in value or the degree

6      of increase in value.

7              And some of the funds, for

8      example, it's an allocation, like, some of

9      the general funds, the $145,000, we talked

10     about the general fund, is from an

11     accounting perspective held at Corrigan as

12     well.

13             So the general funding has an

14     increase or decrease, so the $6,000

15     referenced on the P&L, that shows

16     unrestricted, is the allocation of the

17     gain or the loss on that unrestricted.

18             THE COURT:  Of what Corrigan

19     holds.

20             THE WITNESS:  That's right.  And

21     the rest of this, this is the allocation

22     for the gain or the loss on the restricted

23     piece.

24             THE COURT:  Yeah.  Thank you.

25     Q.  Exhibit 443, which I think you referred

146

1    to in you direct, shows a profit and loss

2    statement of the restricted funds, and it

3    shows that the income from Corrigan of

4    $7,864, is adding to the restricted income

5    that you show in -- on this page, right?

6    A.  (No response.)

7    Q.  It's part of the total on this page,

8    isn't it?

9    A.  Yes.

10   Q.  Okay.  Now, I want you to look at 419 --

11   418, please.  On the second page of this

12   document, at the top, you are here reporting,

13   this is a presentation that you made on

14   October 23, 2011, correct?

15   A.  It appears so, yes.

16   Q.  And at the top of the page, says the

17   statement indicates that for the fiscal year

18   ending June 30, 2011, the congregation

19   realized a net income of $63,471.40.

20           And then you go on to say, "As a

21    result, it is expected that outstanding

22    balances owed to the restricted funds will

23    be completely repaid by the end of the

24    current fiscal year"; do you see that?

25   A.  That's correct.

1    Q.  So that there was money, I guess,

2    borrowed from some of the restricted funds,

3    correct?

4    A.  Unfortunately, yes.

5    Q.  Okay.  And let's look at PX185, please.

6            (The witness complies).

7    Q.  This goes back to the 2009, a

8    congregational meeting, and here in the third

9    full paragraph, it's the fourth sentence

10   there says, "Currently we are borrowing

11   against some restricted funds which will have

12   to be repaid."

13           So there's another example of

14   borrowing against the restricted funds,

15   right?

16   A.  Yes.

17   Q.  By the way, before you borrowed against

18   restricted funds, do you make a filing or

19   report to the Attorney General's office; do

20   you know?

21   A.  Not that I'm aware of.

22   Q.  And then let's look at PX184, please.

23           This is a congregational board

24   meeting of March 11, 2009.  We have seen

25   this in other contexts, but calling your

148

```
1    attention to the second page, to the third

2    paragraph.  Which says, "A motion was made

3    to support Touro Synagogue Foundation to

4    ask the McBean Foundation to release

5    restrictions on funds for the endowment.

6    The vote was unanimous."  Do you see that?

7       A.  Yes.

8       Q.  And so I asked you before if you knew of

9    any instance where efforts were made to

10   reclassify or unrestrict some of the funds,

11   is that an example of that?

12      A.  The unrestricted was not an

13   unrestriction of our funds, unrestriction

14   is in support of the Touro Synagogue

15   Foundation funds being unrestricted.

16      Q.  So did CJI do this?

17      A.  It wasn't our funds to unrestrict.

18      Q.  Did you go and ask, is my question?

19      A.  We made a motion to support their

20   ask.

21      Q.  And were the funds unrestricted?

22      A.  I don't recall.

23      Q.  What expenses does CJI pay for the

24   visitor center?

25      A.  They are not reimbursed.
```

1    Q.  CJI pays fees, has to pay liability

2  insurance on the visitor center, correct?

3    A.  Which is reimbursed by the

4  Ambassador.

5    Q.  Just easier if you answer the question,

6  and then you can ask, or say anything that

7  your lawyer wants you to say when he is

8  asking.

9          I asked you, do you pay the

10  liability insurance?

11    A.  We pay liability insurance.

12    Q.  Okay.  Fine.  Now, is that reimbursed?

13    A.  As I recall, yes.

14    Q.  Okay.  And what other funds -- by the

15  way, what about the taxes, taxes paid by CJI

16  on the visitor center?

17    A.  Sorry, you are asking if we pay the

18  tax?

19    Q.  Does CJI pay taxes on the visitor

20  center, yes?

21    A.  No, I don't believe so.

22    Q.  Okay.  Let's take a look, please, at

23  DX177, please.  This is the Minutes of an

24  executive committee of August 5, 2008.

25          Paragraph 3 it says, there was --

1    had been a tax sale called by the City of

2    Newport for taxes due for the past three

3    years on the two buildings on Spring

4    Street, those are the buildings that

5    comprised the visitor center?

6      A.  One of them is the Barney House.

7    But I don't know if you call that the

8    visitor center.  I don't know.

9      Q.  Mr. Casten told Mr. Wyman that the

10   congregation has no money to pay for the

11   taxes, you see that?

12     A.  I do.

13     Q.  Okay.  Then, if you look with me at

14   DX376.

15             (The witness complies).

16     Q.  Look at page 6, please.  Would you look

17   at page 6.

18     A.  Yes.

19     Q.  There's property taxes shown there, what

20   are the property taxes of $10,000 and $8,000

21   shown for, looking under the actual columns?

22     A.  This is from 2006, I don't know what

23   they are referencing.

24     Q.  Okay.  Now, on a net basis, though, the

25   Loeb Center has started to flow off profit to

1  CJI, hasn't it?

2    A.  The Touro program has -- we have

3  received some income from the Touro

4  program, yes.

5    Q.  I think that was in 2012 or 2013, more

6  than $20,000, it was your share, your share

7  is for the Touro Synagogue Foundation; is

8  that correct?

9    A.  I don't recall the numbers off the

10  top of my head.

11    Q.  You share the income with the Touro

12  Foundation, correct?

13    A.  Some of the income, yes.

14    Q.  Well, who has -- who gets the income

15  other than the Touro Synagogue Foundation and

16  CJI?

17    A.  So we don't -- neither organization

18  actually runs the visitor center.

19          So there's an arrangement where,

20  sort of, the gross income of the Touro

21  program in total is split three ways

22  between the, I believe George Washington

23  Institute for Religious Freedom, that

24  actually runs to offset the cost of the

25  actual visitor center, and because they

 1    pay those costs, and then the other two

 2    parties, the Touro Synagogue Foundation

 3    and congregation.

 4      Q.  So just looking at net income, is that

 5    split between the foundation and CJI, or does

 6    that -- the George Washington Center get a

 7    piece of that, too?

 8      A.  It's split somewhat on a modified

 9    gross income basis, a gross income

10    expense that are taken off, and then it's

11    split -- I don't know if it's exactly a

12    third, a third, a third, but split

13    between the parties.

14      Q.  So if any money that goes to the Touro

15    Foundation is then available to the Touro

16    Synagogue, because you told us before what

17    the foundation purpose was, right?

18      A.  If there -- the board decides they

19    want to spend it on programming or

20    religious freedom type programming, they

21    can choose to spend it on other things as

22    well.

23      Q.  Excuse me just a minute.

24          Would you look at PX214.

25          (The witness complies).

1    Q.  These are minutes of the Board of

2    Directors that are redacted as produced of

3    April 13th, 2011.

4              And I want to call your attention

5     to the last paragraph on the page.  You

6     attended this meeting; is that correct?

7    A.  I believe so, yes.

8    Q.  And the last paragraph on the page,

9    says, "Co-president Ross reported that the

10   meetings with Touro Synagogue Foundation have

11   been very cooperative, and our share of the

12   Touro revenue for 2010, was $22,869.26, and

13   in addition TSF paid $14,395.86, which is

14   half -- one half of the annual appeal income

15   towards the principal of the loan with Bank

16   Newport; is that right?

17   A.  That's what it says, yes.

18   Q.  Is it accurate?

19   A.  (No response.)

20   Q.  Do you know?

21   A.  I believe it to be accurate.  I

22   don't recall off the top of my head.  I

23   believe it's accurate.

24              MR. SOLOMON:  Your Honor, I have

25    nothing further.

1                    REDIRECT EXAMINATION

2                    BY MR. JACOBY:

3              THE COURT:  Have you ever been

4    testified before?

5              MR. JACOBY:  I have not.

6    Q.  Mr. Pimental, just brief, can you remind

7    us what your college degree is in.

8    A.  Economics.

9    Q.  And you work for CVS; is that right?

10   A.  That's right.

11   Q.  What do you do for them?

12   A.  So I'm a senior manager in the

13   treasury department, and I have three

14   primary responsibilities.  One is to

15   aggregate the consolidated balance sheet

16   for the entire corporation.  And on a

17   forecast basis, not the book of records,

18   but we actually -- we consolidate the

19   balance sheet for the entire

20   organization, some of which actually the

21   treasury groups and for CVS as well.

22              And then take the balance sheet

23   and develop a free cash forecast that is

24   shared with the executives, management, to

25   guide them in activities such as

1   acquisition, share purchase, and dividends

2   and so forth.

3          And another of my

4   responsibilities is I run -- getting the

5   weeds in, in case you want to know -- but

6   it's called the sale lease-back program.

7   So we build many of our stores with our

8   own cash, and we buy the land, and we

9   build the building.  I aggregates them to

10  portfolios and sell to institutional

11  stores long term to capture the cash to

12  reinvest in the business.

13         And lastly, I manage equipment

14  leasing portfolio, we sometimes -- we

15  choose not to buy assets, and rather lease

16  them.  And examples are the many trucks

17  and trailers you see, are not owned by

18  CVS, we may lease a financing company,

19  again, to free up the cash for other uses.

20  Q.  Now, do you recall Mr. Solomon asked you

21  about the Loeb Visitor Center?

22  A.  I do.

23  Q.  And to your knowledge does Congregation

24  Jeshuat Israel have any net expenses, net or

25  reimbursement on the Loeb Visitor Center?

1    A.  No, we do not.

2    Q.  And see if I can find the document.  If

3    you turn to P251, the financial statements

4    have been referred to frequently during your

5    examination here today.

6    A.  I see it.

7    Q.  All right.  I think you went over this

8    with Mr. Solomon, the CJI permit restricted

9    funds, CJI temporary restricted funds, and

10   may have covered this on direct, I apologize

11   if I'm repeating.  Donor designated for

12   restricted funds, what are the restrictions

13   there?

14   A.  So those need donor approval to be

15   used for a particular use.

16   Q.  Now, could you turn to Exhibit P181,

17   which was shown to you on your

18   cross-examination.

19          These are the December 9th, 2008,

20   special board meeting minutes.  Do you see

21   that?  May not be marked on the front, but

22   it's going to have a bates number starting

23   with CJI13825.

24   A.  Yes, I have them.  Sorry.

25   Q.  And do you recall Mr. Solomon directed

1    your attention to the top of page 2 referring

2    to statements that you have made about the

3    financial condition of the congregation?

4      A.  Yes.

5      Q.  Could you turn back to page 1 for a

6    minute.

7      A.  Yes.

8      Q.  And do you see the fourth paragraph

9    down, that's starts with "Ms. Ross"?

10     A.  Yes.

11     Q.  And says, "Ms.  Ross also noted that the

12   congregation faces longer term issues," and

13   goes on from there?

14     A.  Yes, I see that.

15     Q.  At this time in December of 2008, was

16   the focus of Congregation Jeshuat Israel

17   solely on fixing it's deficit?

18          Well, let me strike that and

19    rephrase.

20          At this time the congregation was

21    starting to look into how they could cut

22    costs, correct.

23     A.  That's correct.

24     Q.  And looking how to increase income?

25     A.  That's correct.

1   Q.  And looking at assets they could sell?

2   A.  That's correct.

3   Q.  And the immediate trigger to this was

4   the financial crisis; is that correct?

5   A.  That's correct.

6   Q.  And do did -- and the Congregation

7   Jeshuat Israel was running a deficit,

8   correct?

9   A.  That's correct.  That's correct.

10   Q.  And Jeshuat Israel wanted to fix the

11   deficit; is that correct?

12   A.  That's correct.

13   Q.  It did there come a time when the focus

14   expanded to finding a long term solution to

15   the problems that Congregation Jeshuat Israel

16   was experiencing?

17   A.  Yes.

18   Q.  Why was the focus expanded?

19   A.  So there was -- obviously the

20   immediate emergent term need to cut costs

21   and rein in the organization to get that

22   on a level platform.  But we never lost

23   sight of the purpose of perpetuating the

24   congregation as a living, breathing

25   congregation in Touro Synagogue.

 1              Touro Synagogue is first and

 2      foremost, for the entire leadership of the

 3      organization, so we never lost sight of it

 4      then, and we have not lost sight of it

 5      today.

 6        Q.  And, in fact, currently -- well, at

 7      least as of fiscal year 2014, Congregation

 8      Jeshuat Israel has a net income of $11,000 or

 9      so, correct?

10        A.  That's correct.

11        Q.  But you have not stopped trying to raise

12      endowment; is that right?

13        A.  That is correct.

14        Q.  Why is that?

15        A.  Again, the organization is

16      precarious, to use the word from before,

17      so from a year to year basis, sort of,

18      eking by.

19              But an endowment, again, would

20      allow us to perpetuate ourselves as a

21      living, breathing congregation keeping a

22      residence for ourselves and for all Jews

23      of the world who wish to come and pray at

24      Touro Synagogue.

25        Q.  And there was a demonstrative that you

1    were shown today.  You are were shown

2    several.  This one is marked DD5.  Do you see

3    that?

4      A.  I see this.

5      Q.  Does cross examination you wanted to

6    give some further explanation as to, you

7    know, your reading of this demonstrative.

8    Could you do that now.

9      A.  Sure.  So, again, not knowing

10   exactly what was used to comprise this,

11   it would appear to me that the 2001 to

12   2008 is operating income and expense, no

13   net of any restricted, I know Mr. Solomon

14   asked about the reports that, that

15   appears to the operating income and

16   expenses.

17            Whereas in 2010, 2015, what

18    appears to be presented is both operating

19    and restricted income and expenses of

20    which we have talked about, how the income

21    to those restricted funds is restricted in

22    some form or fashion.

23            So the representation of the net

24    income to the organization while on a pure

25    basis is the numbers presented, the income

1    to the restricted funds is restricted, it

2    cannot be used for operation.

3            So this is not an accurate

4    representation of the operating net income

5    of the organization.

6    Q.  And I think you were shown something

7    where there was a substantial bequest, do you

8    recall something about that, one year a

9    substantial bequest?

10   A.  Correct.

11   Q.  So can Congregation Jeshuat Israel

12   anticipate bequests?

13   A.  No.

14   Q.  Would it be prudent to plan the

15   financial future based on bequests?

16   A.  No.

17   Q.  You need endowments, don't you?

18   A.  That's correct.

19   Q.  And some discussion about money being

20   borrowed from a restricted fund; do you want

21   that to happen again?

22   A.  It was regrettable as it was, and I

23   never want it to happen again.

24   Q.  And you are committed to make sure that

25   that never happens again?

1    A.  Absolutely.

2    Q.  There was some discussion about deferred

3  expenses, and you were asked whether there

4  was a written list to the deferred expenses;

5  do you remember that?

6    A.  I do.

7    Q.  The buildings that Congregation Jeshuat

8  Israel maintains, there are the two, aren't

9  there?

10    A.  Yes.  Very old.

11    Q.  And they are very, very old?

12    A.  That's right.

13    Q.  So have there been discussions about

14  what needs to be done to care for these

15  buildings?

16    A.  Yes.

17    Q.  And have those discussions included what

18  maintenance is necessary?

19    A.  Yes.

20    Q.  And as we sit here today, is there

21  currently necessary maintenance on -- that

22  needs to be done on these buildings?

23    A.  Absolutely.

24    Q.  And some of that maintenance is being

25  deferred; is that correct?

1    A.  That's right.

2    Q.  And why is it being deferred?

3    A.  We can't afford it.  Simply, we

4  can't afford it.

5    Q.  Can you give us one example of some sort

6  of maintenance -- or a major project that's

7  been deferred and maybe one that's, you can

8  be doing next.

9    A.  So, you know, one of the major

10  deferred maintenance issues is, in the

11  Synagogue itself, which underwent

12  restoration -- sure it's been talked

13  about, there's a ceiling, part of the

14  ceiling that we call the barrel seeing, a

15  rounded section of the ceiling that paint

16  has been peeling, and I wasn't a part of

17  it, but my understanding is the weight of

18  the paint is actually pulling some of the

19  plaster off the ceiling.  And needs to be

20  repaired.

21          The estimate that was provided,

22  not a written estimate, but in discussion

23  with the National Parks Service that come

24  down to take a look at it, to the tune of

25  150 to $175,000.  But we don't have the

1    money for that.

2         You know, one of the things we

3    are actually taking care of, next fiscal

4    year to be able to fit that into the

5    budget, in the Levi Gale House, there's a

6    gutter that sits over the main door, it's

7    old, a wooden gutter, and old wooden

8    building, and a lot of upkeep.

9         The gutter is rotted away and

10    needs to be repaired.  And there's a lot

11    of attorneys in the room, so hold your

12    ears, but the water would come down in the

13    wintertime, the snow would melt and it

14    would come down and drip right in front of

15    the front door.  And then freeze.  And so

16    we actually knew it was a liability.

17         And, unfortunately, the cost to

18    repair that, it would have to get staging,

19    it's -- the estimate we have, and we are

20    actually moving forward to do this, would

21    be 12 to $15,000, just to repair the

22    fascia and the gutter.  But we actually

23    deferred the project, because we had other

24    things we had to take care of.

25         So when I use the analogy of

1    triage, it's truly that way.  We have to

2    approach everything on a case by case

3    basis and allocate the dollars we have

4    accordingly.

5      Q.  And there was some discussion about

6    whether or not Congregation Jeshuat Israel's

7    financial statements are audited; do you

8    remember that?

9      A.  I do.

10     Q.  Now Congregation Jeshuat Israel has 130,

11   140 members?

12     A.  That's right.

13     Q.  Not very big.

14     A.  That's right.

15     Q.  Has the board ever talked about getting

16   their financials audited?

17     A.  Not that I recall.

18     Q.  And do you think that the congregation

19   would have the funds to pay for an auditing

20   company?

21     A.  No.

22             MR. JACOBY:  I have nothing

23    further, Your Honor.

24             MR. SOLOMON:  Nothing.

25             THE COURT:  You can step down.

 1    Thank you.  I hope your first experience

 2    doesn't keep you out of this line of

 3    business.

 4              THE WITNESS:  I hope it keeps me

 5    out.

 6              THE COURT:  We can take the

 7    afternoon break and back in 15 minutes.

 8              (Recess taken.)

 9              MR. JACOBY:  Your Honor, before

10    we move on to the next witness, I forget

11    to ask Mr. Pimental one question.  And I

12    beg -- I was shoveling papers, or

13    whatnot -- and I beg The Court's

14    indulgence to allow me to ask one to two

15    minutes of redirect.

16              THE COURT:  You couldn't just ask

17    the defense to stipulate to the facts?

18              I remain eternally optimistic

19    that the two of you can get along about

20    something at some point.  Call him back.

21              MR. JACOBY:  He said I can call

22    him back.

23              THE COURT:  Just get the two

24    questions.

25              MR. JACOBY:  Thank you, Your

1    Honor.

2              THE COURT:  You are still under

3    oath, Mr. Pimental.

4     A.  Thank you.

5     Q.  Mr. Pimental, do you recall there was

6    one diminutive chart that you saw that had

7    reference to the legal fees.

8     A.  Yes, I do.

9     Q.  Just so the record is clear, is

10   Congregation Jeshuat Israel paying any

11   continuing legal expenses in connection with

12   this lawsuit?

13    A.  No, we are not.  Your firm has taken

14   on the case pro bono for the past several

15   years.

16             MR. JACOBY:  Thank you.  That's

17    all, Your Honor.

18             THE COURT:  Thank you.

19             Welcome, Mr. Snow.  I have been

20    waiting for this day, anxiously awaited

21    this day.  And Mr. Sherman, are you going

22    to cross-examine?

23             MR. SHERMAN:  One procedural

24    matter I would like to briefly address

25    before we begin.

1           THE COURT:  Just come to the

2    front or pull the mic up.  I thought this

3    was an actual Rhode Island moment.

4           MR. SHERMAN:  On May 11th, we

5    filed our witness list, and one of the

6    witnesses that we listed was Dr. Oscar

7    Glieberman.  The name has come up a couple

8    of times, and we confirmed that on May

9    18th.

10          Last evening I received an email

11   asking for Mr. Glieberman to submit to a

12   deposition.  And my first reaction -- it's

13   a little day late in the day, I know that

14   under your order it was permissible to

15   take depositions of trial witnesses, but I

16   assumed that would be before the trial

17   actually started, not during the course of

18   trial.

19          So I need some guidelines from

20   The Court as to whether that's permissible

21   to do that.  Just to give you the full

22   picture, I did talk to Dr. Glieberman at

23   noontime today.  I had previously advised

24   him he probably would not be needed this

25   week, because of the anticipated length of

 1    the plaintiff's case.  And so I have him

 2    lined up for early next week, so.

 3         THE COURT:  Remind me, Mr.

 4    Sherman, names -- who -- remind me who he

 5    is and what the essence and subject matter

 6    is.

 7         MR. SHERMAN:  A member of the

 8    congregation, CJI congregation, and when

 9    the issue of the sale of the rimonim came

10    up, and there was a vote, the 31 to 6

11    vote.

12         THE COURT:  He was the one --

13         MR. SHERMAN:  He was one of the

14    6.  And there's some other matters he

15    would testify to, but that's the principle

16    one.  So I need guidance as to whether The

17    Court believes it's permissible to take

18    his deposition.  I asked him if he were

19    available so The Court ruled that he

20    needed to submit to a deposition, but it's

21    -- he is not an available, he is a doctor,

22    he has a partial practice in Worcester,

23    Massachusetts, as well as here.  I can

24    probably get him on Sunday, if that were

25    necessary.

1           THE COURT:  I have to hear from

2     the other side.

3           MR. SHERMAN:  Thank you.  Your

4     Honor.

5           MR. WAGNER:  Mr Gliberman was not

6     listed on Defendants original 26A

7     statement, was not listed on the amended

8     statement, which lists 22 people.  We did

9     get a witness list on May 11, and the

10    witness list continued to be revised, and

11    we got the final list on Monday night.

12          It's our position that he should

13    not be allowed to testify at all.

14          I don't know what's relevant

15    about the material that Mr. Sherman is

16    citing, but if he is going to testify,

17    and, again, today, we are here hearing of

18    this for the first time, hearing what he

19    may say, and entitled to the deposition

20    from your August order.

21          THE COURT:  Look, folks, I think

22    all good things must come to an end.

23          It is the last hour, and I think

24    he is a known entity to the plaintiffs,

25    and I don't really see the need for

```
 1   putting him or the parties through a

 2   deposition.

 3            So I'm not going to require a

 4   deposition, and he will be allowed to

 5   testify.

 6            MR. SHERMAN:  Thank, Your Honor.

 7            MR. SNOW:  Your Honor, the

 8   plaintiff calls B. Ross to the stand.

 9            MR. SOLOMON:  Your Honor, I

10   mentioned we are going to be submitting an

11   offer of proof of --

12            THE COURT:  I only skimmed this,

13   and will read it tonight and talk about

14   that in the morning.

15            MR. SOLOMON:  Friday morning.

16            Do it then, so we know.  Thank

17   you, Your Honor.

18   -----------------------------------

     BERTHA SCHLESSINGER ROSS, SWORN.

19   -----------------------------------

20            THE CLERK:  Please state your

21   name and spell the last name for the

22   record.

23            THE WITNESS:  Bertha Schlessinger

24   Ross.

25            THE CLERK:  Thank you.  You may
```

```
 1   be seated.

 2              MR. NAFTALIS:  I want to say

 3   something about submitting something.

 4              THE WITNESS:  These seats are

 5   more comfortable.

 6              THE COURT:  You are welcome to

 7   stay as long as you want.  I can assure

 8   you, they will continue to cross examine

 9   you as long as you sit there..

10              (Discussion off the record.)

11              MR. NAFTALIS:  Your Honor, I

12   didn't mean to interfere between two Rhode

13   Island moments, but in connection with the

14   application that Mr. Solomon is making, we

15   would like to put in papers opposing it,

16   so can we file that Friday morning, or

17   what would be good.

18              THE COURT:  If you want me to

19   read and think about it, get it in before

20   the end of the day tomorrow, and before

21   the end of a discussion or rule Friday

22   morning.

23              MR. SOLOMON:  Your Honor, I

24   was -- that was not an offer of proof.

25   It's an oral application.  We did the
```

1   offer of proof to identify what the

2   witness would be testifying to.

3           THE COURT:  But if he wants to

4   put something in writing -- as it stands

5   right now, I have excluded his testimony

6   based on the prior listing.  You are

7   asking me to allow him based on the new

8   one, see what they say, and look at it.

9           MR. SOLOMON:  And I would like to

10  respond.  We have no argument in the

11  submission I made, that is what I was

12  saying, we intend --

13          THE COURT:  As I said to your

14  Brother, all good things come to an end,

15  and at some point, cut the writing off as

16  well.

17          So how about we come in early

18  Friday and let you argue to your heart's

19  content.

20          Thank you.  Mr. Snow.

21      DIRECT EXAMINATION BY MR. SNOW:

22   Q.  Good afternoon, Mrs. Ross.  You are the

23  current co-president of Congregation Jeshuat

24  Israel; is that correct?

25   A.  Yes.

1    Q.  And how long have you held the position

2    of co-president or president of the

3    congregation?

4    A.  Since 2007.

5    Q.  And where do you live?

6    A.  I live in Newport.

7    Q.  And how long have you lived in Newport?

8    A.  About 40 years.

9    Q.  I'm going to guess by your accent you

10   are not a native Rhode Islander; is that

11   correct?

12   A.  No, no, I'm not.

13   Q.  Where were you born and raised?

14   A.  I was born in Brooklyn, New York.

15   Q.  And can you describe, briefly, your

16   educational background before coming to Rhode

17   Island 40 years ago.

18   A.  I went to Brooklyn College.  And

19   then to the University of Texas Law

20   School.

21          And after that I was a law clerk

22   for a judge on the Texas Court of Criminal

23   Appeals.  After that we moved to Rhode

24   Island.

25   Q.  What brought you to Rhode Island?

1    A.  My husband took a position at the

2    United States Naval War College.

3    Q.  And when did you first become involved

4    with Congregation Jeshuat Israel?

5    A.  I joined the congregation in 1985.

6    Q.  So that's approximately ten years after

7    you moved to Newport?

8    A.  Yes.

9    Q.  And were you -- did you have a Synagogue

10   affiliation during those years?

11   A.  We did.  We attended services at

12   Touro Synagogue, and we also briefly

13   belonged to Temple Shalom.

14   Q.  What is Temple Shalom?

15   A.  The conservative Synagogue in

16   Middletown.

17   Q.  Okay.  And when you were born and raised

18   in Brooklyn, were you raised in an orthodox

19   tradition?

20   A.  I was.

21   Q.  And what caused you to become a member

22   of Touro Synagogue Congregation Jeshuat

23   Israel?

24   A.  Well, when my son started Hebrew

25   School at Temple Shalom, we realized that

1    was not the appropriate place for us.

2              We wanted him to have an orthodox

3    Jewish education.  So then that's when we

4    joined Touro Synagogue.

5      Q.  And tell us about your first experience

6    with Touro Synagogue.

7      A.  Well, the first time I was ever in

8    Newport, we were staying at the Howard

9    Johnson, and when there was still a

10   Howard Johnson, when there was still such

11   a thing.

12             And they had a big sign at the

13   Howard Johnson that listed all the

14   churches.  And it said Touro Synagogue on

15   it.  And said there were services on

16   Friday night.

17             And this was a Friday.  And so I

18   went to the services this night.  And I

19   was immediately taken by the beauty of the

20   Synagogue.

21             And it has -- it's very small,

22   only one room.  The sanctuary is only one

23   room, but is perfect.  It's absolutely

24   perfectly proportioned, every detail is

25   just right.

1    Q.  Sorry.

2    A.  Well, I was just going to say, then

3    I also, right after that, I learned about

4    the history of the Synagogue, how it was

5    founded by people who were fleeing

6    persecution in the Caribbean, and who

7    came to Rhode Island because they heard

8    about Roger Williams, and that there was

9    religious tolerance here.

10           And they found this religious

11    tolerance.  And then they built this

12    wonderful synagogue.  And they built it

13    high up on a hill overlooking the city.

14           And it showed how comfortable

15    they were, and how well accepted they

16    were.  And that's particularly important,

17    when you look at other synagogues built in

18    the same era.  They are built behind -- in

19    Europe, synagogues were built in Europe

20    behind other buildings, in alleyways so

21    that they don't draw attention to them.

22           And here, here in Rhode Island,

23    they were able to build in such an open

24    location.  And then George Washington

25    writes this wonderful letter to the

1    congregation, and where he pledges

2    religious tolerance for everyone, and all

3    minorities.

4           And the synagogue becomes a

5    symbol of religious freedom.  It's just a

6    wonderful story.  But can I tell you why

7    for me, personally, what -- what the

8    synagogue means to me personally.

9    Q.  Sure.  Why don't you do that.

10          MR. SOLOMON:  Your Honor, it

11   would work better if there was a question,

12   and I would be able to interpose.

13          THE COURT:  I'm guessing, for Ms.

14   Ross, it would be better to give her a bit

15   more leeway.  Just guessing.  Thank you.

16   A.  I was going to say, for me,

17   personally, I'm not a third or fourth

18   generation member of the community, but

19   the synagogue has meaning for me, even

20   though I'm not a third or fourth

21   generation member.

22          The rabbi of Touro Synagogue,

23   came my son's briss, he walked five or six

24   miles on the Sabbath.  Couldn't drive.

25          And he walked the six miles to my

```
 1   house to attend that.  And my son has had

 2   his bar mitzvah at the Touro Synagogue.

 3   And in August, he is going to be married

 4   at Touro Synagogue.  So it's -- it's my

 5   families synagogue, too.

 6      Q.  Now, you told us you joined on or about

 7   -- around 1985; is that correct?

 8      A.  Yes.

 9      Q.  When did you become involved in the

10   leadership of the congregation?

11      A.  I joined the board in 1993.

12      Q.  What were your duties and

13   responsibilities as a board member at that

14   time?

15      A.  It was to participate in the

16   committee work and the activities of the

17   congregation.

18      Q.  Okay.  And when did you become an

19   officer of the congregation?

20      A.  I remained on the board for a couple

21   of years, and then -- then I began to

22   work for the congregation and the Society

23   of Friends.

24      Q.  Now, when you say you began to work, you

25   are talking about as an employee?
```

1    A.  Yes.

2    Q.  And when did you, when were you first

3  employed by the congregation?

4    A.  About 1995.

5    Q.  And in what capacity?

6    A.  I worked as the administrator of the

7  congregation, and as the director of the

8  Society of Friends of the Touro

9  Synagogue.

10    Q.  Were those two separate positions?

11    A.  No.  They were separate positions,

12  but they were one -- we worked out of one

13  office at that time.

14    Q.  Were you paid separately from the

15  Society of Friends versus the congregation?

16    A.  I think so.

17    Q.  And as administrator, can you describe

18  what your duties and responsibilities were?

19    A.  It was to do the general

20  administration of the congregation,

21  overseeing paying of the bills, and

22  repairs, and the newsletter of the

23  congregation, communicating with the

24  congregrants, sending out notices to the

25  congregants.  In those days, we still

1 used stamps and envelopes.

2   Q.  And was that a full-time or part-time

3 position?

4   A.  And it was -- the job of

5 administrator, and the director of

6 Society of Friends, was a full-time job.

7   Q.  Together?

8   A.  Together.

9   Q.  And what were your duties and

10 responsibilities as the executive director of

11 the Society of Friends?

12   A.  They were essentially the same as

13 the administrator of the congregation.

14   Q.  And how long did you hold those

15 positions of employment?

16   A.  Well, let's see.  That went on for a

17 couple of years.

18        And then in about 1998 we started

19 to think about restoration of the

20 synagogue, the renovation of the

21 synagogue.

22        And the Society of Friends would

23 be very involved in doing that, would be

24 running the campaign, that capital

25 campaign.  So we thought they needed to

1    have a full-time director.  And I became

2    that director.

3      Q.  And when you say director, this is for

4    the Society of Friends?

5      A.  Executive director of -- director of

6    the Society of Friends.

7      Q.  So it's the Touro Synagogue, the Society

8    of Friends, to be clear, it's called the

9    Touro Synagogue Foundation?

10     A.  Yes, that's right.

11     Q.  And when you left to become a full-time

12    executive director to the Society of Friends,

13    did someone replace you as the administrator

14    at the congregation?

15     A.  Yes, there was.

16     Q.  Who was that?

17     A.  Catherine Sorenson.  She had been

18    previously employed there, and just

19    stepped up to that role.

20     Q.  And was she performing that role on a

21    full-time basis after you went over to the

22    Society of Friends?

23     A.  I think so.  At least on a three

24    quarter basis.

25     Q.  We have heard testimony this week that

1    at the present time, or, actually, for the

2    last few years, the congregation has no

3    employees other than the rabbi and a

4    maintenance person; is that correct?

5      A.  Yes, that's correct.

6      Q.  The job that used to be performed by the

7    administrator of the congregation, who

8    performs that now?

9      A.  Well, a group of volunteers.

10     Q.  Okay.  And are you included in that

11   group?

12     A.  I am.

13     Q.  And what do you do now on a volunteer

14   basis for the congregation?  Besides

15   performing the functions that you described

16   as employee or co-president of the

17   congregation.

18     A.  The general office, the general

19   office work that is necessary to

20   administer a congregation, answering the

21   phones, answering the emails, sending out

22   the newsletter, staying in touch with the

23   congregants, answering their questions,

24   making sure that the buildings --

25   maintenance is being carried out.

1    Q.  So is fair to say that you're doing the

2    same job that you used to do for

3    compensation, except now you are doing that

4    as a volunteer?

5    A.  Yes.

6    Q.  Now, are you familiar as co-president of

7    the congregation with the demographics of the

8    membership of the congregation?

9    A.  Yes.

10    Q.  Can you describe those for The Court,

11    please.

12    A.  You mean the ages of the people or

13    where they are from, or what they do?

14    Q.  All of the above.

15    A.  All of the above.  I think, as far

16    as membership, you are asking about the

17    membership?

18    Q.  Yes.

19    A.  I think the membership, there are

20    140 members of the congregation right

21    now.

22            I think they are by and large an

23    older group of people.  Most of the

24    congregation is over 60 years old.

25            The membership is relatively

1    stable year to year, but in the aggregate,

2    over the long haul, it's getting smaller.

3    Q.  And what about geographically, where do

4    the members live?

5    A.  Well, members live, I think mostly

6    in Newport.  The active members live in

7    Newport.

8              A lot of members who have moved

9    away to other places, have kept their

10   memberships in the synagogue.  But not

11   active members.

12             Many go away in the wintertime.

13   And we also have some associate members

14   now that live in various places around the

15   country.

16   Q.  With respect to the members that you say

17   that live in Newport, are you referring to

18   the City of Newport, or something else?

19   A.  Well, in the City of Newport, and

20   many live in the City of Newport, but

21   also Middletown and Portsmouth.

22   Q.  And what about some other towns within

23   Newport County, such as Little Compton and

24   Tiverton?

25   A.  I cannot think of any members that

1    live in either Little Compton or

2    Tiverton.

3      Q.  Can we have Plaintiff's 244 on the

4    screen, please.  Can you read that in the

5    screen, also an exhibit book next to you.

6      A.  Oh, yes, I think I can read it on

7    here.

8      Q.  Are you familiar with what this document

9    is?

10     A.  It shows the membership from 2009 to

11   2013.

12     Q.  Okay.  And as far as you know, is this

13   information, this tabulations of information,

14   accurate?

15     A.  Yes, it is.

16     Q.  And does it show, basically, as you

17   described, a stable, but slowly declining

18   membership?

19     A.  Yes.

20     Q.  Now, are there any other synagogues or

21   Jewish congregations in the City of Newport?

22     A.  No.  Well, there is one group, the

23   Newport Havurah, an informal group of

24   people that meets in each other's homes

25   called the Newport Havurah

1    Q.  They don't have a building?

2    A.  No, they don't.

3    Q.  And are there any other orthodox

4    congregations on Aquidneck Island?

5    A.  No.

6    Q.  Are there any other Jewish congregations

7    on Aquidneck Island?

8    A.  Yes.  One conservative congregation

9    in Middletown.

10    Q.  And can you describe what the difference

11    is between an orthodox congregation and a

12    conservative congregation.

13    A.  Well, I think it is, in this case,

14    mostly a question of the fact that a

15    conservative congregation has family

16    seating.

17    Q.  What do you mean by that?

18    A.  Men and woman in a conservative or

19    formal congregation sit together for the

20    services.  That's not the case in an

21    orthodox synagogue such as Touro

22    Synagogue.

23    Q.  Now, you have already described to us

24    your own personal connection to Touro

25    Synagogue.  Can imagine Touro Synagogue --

1    Jeshuat Israel without Touro Synagogue?

2      A.  No.  Congregation Jeshuat Israel and

3    Touro Synagogue are synonymous.

4      Q.  Now, you told us that the Synagogue

5    building itself is basically one room; is

6    that correct?

7      A.  Yes.

8      Q.  Now, does the congregation Jeshuat

9    Israel have other real estate adjacent to the

10   one room Synagogue building?

11     A.  Yes.  Yes, it does.

12     Q.  We have heard some testimony about that,

13   but I don't think it's been described to The

14   Court, can you describe to us the property

15   owned by the congregation adjacent to the

16   Synagogue building?

17     A.  Yes.  Directly across the street

18   from the synagogue, across Touro Street

19   from the synagogue, is Levi Gale House.

20   That's our community house.  And it's our

21   administrative center.  It's where the

22   rabbi has his office.  It's where the

23   Touro Synagogue Foundation has its

24   office.  The congregation has its office,

25   and there's also a chapel in that

1    building.

2      Q.  Is there also like a library and a

3    conference room?

4      A.  There's a library and conference

5    room adjacent to the chapel.

6      Q.  And the congregation archives are also

7    there?

8      A.  Yes, the congregations archives are

9    also housed there.

10     Q.  In basement of that building, is there a

11   facility for congregrants to meet after

12   services?

13     A.  Yes.  The social hall is in the

14   basement of that building, and it's where

15   the congregation meets after the

16   services.

17     Q.  Is the social hall used for any other

18   purposes?

19     A.  It's sometimes used -- it's used for

20   meetings, and it's used for dinners,

21   shabbat dinners, community dinners for

22   the Sabbath or a Hannukah party or a

23   party or celebration for one of the

24   Jewish holidays.

25     Q.  And when did the congregation acquire

1    the Levi Gale house?

2     A.  The Levi Gale House originally was a

3    private residence owned by Levi Gale,

4    just not coincidentally.

5              And it stood in Washington

6    Square.  And then in the '20s, the state

7    wanted to build a courthouse on that

8    location.

9              And so it bought the house.  And

10   it then sold it to the congregation, and

11   the congregation moved it up to it's

12   present location, and at the corner of

13   Division Street and Touro Street.

14             And we have wonderful pictures in

15   our archives, speaking of our archives, of

16   how, when it was on the site, and then cut

17   in half, and then put on trucks.  And then

18   pulled out to Touro Street.  And then

19   reassembled, and put together on the site.

20   Very, very interesting.

21    Q.  Now, is Levi Gale House also a historic

22   structure?

23    A.  Yes.  Yes, it is.  It's one of the

24   three surviving Greek revival buildings

25   in Newport, and itself, is on the

1  national register.

2    Q.  Do you know when it was built

3  originally?

4    A.  In 1860-something.  1864 I think.

5    Q.  And are you familiar, you know, in your

6  capacity as co-president of the congregation

7  with the current condition of the Levi Gale

8  House?

9    A.  Well, unfortunately the Levi Gale

10  House has suffered over the last few

11  years, as we have had to defer

12  maintenance on it.  And it needs a good

13  deal of repair and renovation.

14        Let me give you just one example.

15  One example would be, we have an

16  antiquated heating system in that

17  building, and it's radiators.  And hot

18  water pipes going up and down the floors.

19  And those pipes are always getting these

20  pinprick holes in them, and the water, it

21  spurts out.  Not gushes out, but spurts

22  out in a continuous stream.

23        And it's happened before.  And

24  when that happens, and you don't catch it

25  right away, enough of the water streams

1    out so that it collapses the ceiling on

2    the floor below.  So what we have to do

3    now, is we have to have the maintenance

4    man every day in the winter, he has to go

5    through all the buildings before he leaves

6    to make sure that that hasn't happened in

7    one of those -- in one of the rooms.

8    Because by the next day, it would be a

9    disaster.

10   Q.  Now, we have had testimony in this case

11   that as a result -- for financial reasons,

12   since 2008 economic crisis, that the

13   congregation has had to limit the use of the

14   Levi Gale House during cold weather; is that

15   correct?

16   A.  Yes.  One of the cost cutting

17   measures has been to not heat the

18   building during several week days.  And

19   then to heat it again on Friday, so we

20   can use it.

21   Q.  Now, you told us about the Levi Gale

22   House, are there other properties that the

23   congregation acquired during the 20th century

24   that are adjacent to the area?

25   A.  Yes.  The rabbi's house, the rabbi's

1  house, which is directly in back of the

2  Levi Gale House, it's a little bit

3  further up Touro Street.

4    Q.  Is that also an old structure?

5    A.  It's a building from, I think from

6  the turn of the century.  It has a

7  mansard roof on it.  It's a Victorian

8  building.

9    Q.  Are you familiar with the condition of

10  that building?

11    A.  Well, that building, that, also, has

12  suffered from a lack of maintenance.  The

13  maintenance on it has been deferred, and

14  right now, I pass it every day, I drive

15  down that street every day, and the paint

16  is peeling off the fascia, off the trim.

17  It desperately needs to be repainted.

18        That's just not something --

19  that's an emergency right now.  Although

20  eventually if you don't do that, it's

21  going to affect the integrity of the wood.

22    Q.  Do you know when the congregation

23  acquired the rabbi's house?

24    A.  I think it was acquired in the

25  1930's.

1    Q.  Now, immediately adjacent to the front

2  of the Touro Synagogue building is a small

3  park; is that correct?

4    A.  Yes.  That's Patriot's Park.

5    Q.  Who owns Patriot's Park?

6    A.  The congregation owns Patriot's

7  Park.

8    Q.  What's the purpose and use of Patriot's

9  Park?

10    A.  Well, at that time Patriot's Park

11  was built, and is dedicated to Colonial

12  Jewish patriots, and in the park are --

13  there's a listing of all -- 13 patriots,

14  one for each of the Colonial, each of the

15  colonies.  And they are honored in that

16  park.

17    Q.  And does the congregation make use of

18  that park?

19    A.  Yes.  We use it very often.  We use

20  it for, whenever we can, we try and use

21  it.

22          It is a beautiful park that is

23  open to the public.  And we use it during

24  the George Washington letter reading.  We

25  had a reception there last summer, and we

1    had a Klezmer band concert in the park.

2      Q.  You said it's open to the public?

3      A.  It is open to the public.

4      Q.  Now, adjacent to the Patriot Park, is

5    that where the Ambassador Lobe Visitor Center

6    is?

7      A.  The Loeb Visitor Center is on the

8    other side of the park.  There's the

9    synagogue, the park, and then on the

10   other side, on Spring Street, the Loeb

11   Visitor Center.

12     Q.  When was that constructed?

13     A.  That was constructed in about

14   2000 -- I think opened in 2009.

15     Q.  We have heard testimony that it was

16   built and paid for by Ambassador Loeb; is

17   that correct?

18     A.  That's correct.  Yes.

19     Q.  Who owns the visitor center?

20     A.  The congregation owns the center.

21     Q.  And could you describe what the center

22   is used for?

23     A.  The center is used as an

24   introduction to the synagogue.  It

25   contains exhibits relating to religious

1    freedom, to the founders of the

2    congregation, and to Colonial America.

3    Q.   Are there any other properties owned by

4    the congregation in the immediate vicinity?

5    A.   Yes.   The Barney House, 18th century

6    Colonial structure is right next to the

7    Loeb Visitor Center.

8    Q.   And how long has the congregation owned

9    that Barney House.

10    A.   Since, I want to say, maybe the year

11    2000.

12    Q.   And what use, if any, does the

13    congregation make of the Barney House?

14    A.   It's not able to make any use now.

15    The building is not usable in its current

16    state.

17    Q.   Are there plans to make use of it in the

18    future?

19    A.   Well, we hope at some point to be

20    able to restore it to its 18th century

21    beauty.   But right now, that's on a long

22    term hold, while we try and secure the

23    financial future of the synagogue.

24    Q.   Now, in addition to the property that

25    you have just mentioned, that Jeshuat Israel

 1    and adjacent Touro Synagogue, is there also a

 2    Colonial cemetery nearby?

 3      A.  Yes.  Up Touro Street, going up the

 4    hill on Touro Street, there's a Colonial

 5    cemetery at the corner of K and Touro

 6    Street.

 7      Q.  And does the congregation own any of

 8    other cemeteries?

 9      A.  No.

10      Q.  Now, you have been in the courtroom

11    since Monday morning, correct?

12      A.  Yes, I have.

13      Q.  And you have heard testimony concerning

14    the congregation's loan to the Boston Museum

15    of Fine Arts of the rimonim that are in

16    question in this case?

17      A.  Yes.

18      Q.  And were you co-president of the

19    congregation at the time that that loan was

20    made?

21      A.  Yes.

22      Q.  Why did the congregation loan the

23    rimonim to the MFA?

24      A.  Because they asked.

25            At one point during the time we

```
 1   were talking about the possibility of

 2   selling the rimonim, I think the MFA heard

 3   about it through Christies.

 4           And at that time they were

 5   opening the Art of the America wing, their

 6   new wing.  And they asked if they could

 7   borrow them and make a showcase of the

 8   Newport room.  Which, we thought it was a

 9   wonderful idea, our ability to share these

10   beautiful finials with all the people that

11   were visiting the MFA during the opening.

12   And afterwards.

13    Q.  Can you explain to us why you thought it

14   was a wonderful idea.

15    A.  Well, the rimonim are beautiful.

16           But once we determined where --

17   what their valve is, that they were so

18   valuable, we didn't -- we couldn't keep

19   them in the synagogue and we didn't want

20   to use them, because they had just been

21   restored.  And they were so easily

22   damaged.  Its a very soft silver.

23           So we had to put them in a safety

24   deposit box at Bank Newport.  So they

25   lived in Bank Newport, 360 days a year,
```

1    and here was an opportunity to share them,

2    and to -- to showcase them.  And to let

3    people see them and as -- just for their

4    beauty.

5            But, also, to show the Jewish

6    community as part of the founding of

7    America, and the establishment of

8    religious freedom.

9    Q.  The rimonim were restored in

10   approximately 2001; is that correct?

11   A.  Yes.  That's right.  Just, yes.

12   Yes.

13   Q.  Just prior to the loan to Yale

14   University?

15   A.  Exactly.

16   Q.  And before they were restored, were they

17   in regular use at the synagogue?

18   A.  They had been in regular use in the

19   synagogue, and in my memory -- but at

20   some point I think it was a little

21   early -- earlier, maybe a couple of years

22   earlier than that, that we decided that

23   we were so concerned about security in

24   the synagogue, that we put them at the

25   Bank of Newport.  But this was all

1    about -- about the same time.

2     Q.  Okay.  And during the years that you

3    have been a member, before the time that you

4    started putting them away in a safety -- safe

5    deposit box, did you have an opportunity to

6    observe the rimonim get damaged?

7     A.  That was one of the reasons that we

8    were so concerned about them.  When you

9    take them from the arc and you take them

10   over to the reader's desk, you are

11   passing a lot of overhead chandeliers,

12   and people are always hitting the finials

13   against the chandeliers.  And they were

14   particularly banged up.  It is one of the

15   reasons they needed to be restored.

16    Q.  Can we have Exhibit 208, please.

17   Plaintiffs 206.

18          I show you Plaintiff's Exhibit

19   206, on the screen or the book, whatever

20   is more convenient for you.

21          Do you recognize this as the loan

22   agreement between the Boston Museum of

23   Fine Arts and Congregation Jeshuat Israel

24   with respect to the rimonim in question

25   here?

1    A.  Yes.

2    Q.  Okay.  Now, you notice that there's some

3  handwriting and some handwritten

4  interlineations on this document; do you see

5  that?

6    A.  Yes.

7    Q.  Is that your handwriting?

8    A.  Yes, it is.

9    Q.  And in some instances you were crossing

10  out the word, or the words Touro Synagogue

11  and replacing them with Congregation Jeshuat

12  Israel; do you see that?

13    A.  Yes.

14    Q.  And you did that in some places, but not

15  all?

16    A.  Right.

17    Q.  Is that correct?

18    A.  Yes.

19    Q.  Can you explain why you did that?

20    A.  Well, usually Touro Synagogue and

21  Congregation Jeshuat Israel are used

22  interchangeably.  We sometimes say Touro

23  Synagogue, and sometimes we say

24  Congregation Jeshuat Israel.  Most people

25  know Touro Synagogue by the name Touro

1    Synagogue and not by the congregation.

2             But in certain circumstances, you

3    know, the synagogue is a building, and the

4    synagogue is not that -- the legal entity

5    that can loan out something.  So when you

6    sign it as a receipt or a loan agreement,

7    it would be the congregation that owns the

8    rimonim, that signs for them.

9             But when you label them, you

10   often -- you label them Touro Synagogue,

11   at least Touro Synagogue.  Sometimes with

12   Congregation Jeshuat Israel.  But Touro

13   Synagogue because that's what people would

14   recognize.

15   Q.  In fact, is it common for people to make

16   donations to the congregation writing the

17   check out to Touro Synagogue?

18   A.  Yes, that happens often.

19   Q.  And do you deposit those checks?

20   A.  Yes, we do.

21   Q.  And does the bank accept them?

22   A.  Yes, they do.

23   Q.  And turn to the second page, towards the

24   bottom.  That's your signature on this

25   document?

1    A.  Yes, it is.

2    Q.  Have you had an opportunity to visit the

3    rimonim on display at the Museum of Fine

4    Arts?

5    A.  Yes.  Yes, I have.

6    Q.  And on more than one occasion?

7    A.  Yes.

8    Q.  And can you describe how they are

9    displayed?

10   A.  They are -- oh, they are just

11   displayed so beautiful.  We are so

12   pleased at how they are displayed.

13           There's a Newport room, it's a

14   room called the Newport room, and it has

15   Townsend and Goddard furniture in it, and

16   Gilbert Stuart paintings in it.

17           And in the middle of the room, as

18   you walk into the room, and you have to

19   walk into the room, and you have to walk

20   through the room to the next galley there,

21   there's a display, right there with the

22   rimonim, right in -- right in the center.

23   Star attraction of the room.

24   Q.  And in the display, is there a glassed

25   in display?

204

 1    A.  Yes, it is.  It's a pedestal, and at

 2   eye level, and then -- then the rimonim

 3   are on them, and then the plexi-case over

 4   them.

 5    Q.  And are you familiar with how the Museum

 6   credits, or gives credit with respect to the

 7   rimonim?

 8    A.  I think it's -- I'm not entirely

 9   sure but I think it says Congregation

10   Jeshuat Israel and Touro Synagogue.

11    Q.  Now, we briefly mentioned a few moments

12   ago the loan to Yale University that occurred

13   on or about 2001.  Do you recall that?

14    A.  I do.

15    Q.  Okay.  And, now, at this time you were

16   -- you were, in early 2001, you were still

17   the executive director of the Touro Synagogue

18   Foundation; is that correct?

19    A.  Yes.

20    Q.  And did you have an opportunity to have

21   a conversation with anyone on behalf of

22   Congregation Shearith Israel in New York

23   concerning the possible loan of the rimonim

24   to the Yale University art gallery?

25    A.  When we were thinking about loaning

1   the rimonim to Yale, we wanted to educate

2   ourselves about the process of doing

3   that.

4            And so we called various people.

5   And we called the art museum in Newport.

6   We called the historical society in

7   Newport.  And I called Alan Singer, who

8   was the executive director of Shearith

9   Israel.  Because I knew they had a set of

10  rimonim, and thought -- and I thought that

11  they may be lending them to Yale.

12   Q.  And this exhibit at Yale was

13  particularly an exhibit of Myer Myers silver?

14   A.  Only Myer Myers silver.

15   Q.  And it wasn't only Judaica created by

16  Myer Myers?

17   A.  Correct.  Correct.

18   Q.  And did you know Alan Singer before you

19  contacted him?

20   A.  I had spoken -- he was the executive

21  director of Shearith Israel, and I was

22  the executive director of the Society of

23  Friends.  So occasionally we had a reason

24  to talk to each other.

25   Q.  Anyway, tell me about that conversation.

206

1    What did you say to him, and what did he say

2    to you.

3      A.  Well, I asked him if they were

4    sending their rimonim to the Yale

5    exhibition.  And he said at first they

6    were not going to send them on loan.  But

7    then they decided that they would.

8            They would send their pair to

9    Yale, to Yale only.  It was a three --

10   there were three places that the exhibit

11   was going to go, to Yale, and then to the

12   Skirball Museum in Los Angeles, and

13   Winterthur in Delaware.

14     Q.  Okay.  And did he tell you anything

15   besides the fact that they had changed their

16   mind and decided to lend the Shearith

17   Israel's rimonim at least to the Yale

18   exhibit?

19     A.  Did he tell me why?

20     Q.  Did he say anything else in that

21   conversation?

22     A.  No.  No.  I told him that we were

23   going to, we were leaning towards sending

24   our rimonim to all three locations.

25     Q.  Did he raise any questions with you

1  about the ownership of the rimonim that you

2  were planning to loan to Yale University?

3    A.  No.  No.  He didn't.

4    Q.  He didn't say anything like, you can't

5  make that decision, they belong to Shearith

6  Israel?

7    A.  No, nothing like that.

8    Q.  Now, in 2007 when you first became

9  co-president of the congregation, did you

10  have an opportunity to have a conversation or

11  make contact with anyone at Shearith Israel?

12    A.  Yes.  When I first became president,

13  I called David Nathan, who was the

14  president of the congregation of Shearith

15  Israel to introduce myself, to say hello.

16    Q.  Did you speak to him?

17    A.  I wasn't able to reach him.  I left

18  him a message, and -- but he didn't call

19  me back.

20    Q.  Did anyone return that call?

21    A.  Well, yes.  Several days later

22  Michael Katz called me, called me back.

23  And he said that the David Nathan had

24  asked him to call me back.

25    Q.  Did you know Michael Katz at that time?

1    A.  I did.  But I was a little offended,

2  I have to say, because I called, you

3  know, I called -- I called David Nathan,

4  I said, Hi, you know, tell me what it's

5  like to be president of a historic

6  congregation.

7            And I was just -- as I said, I

8  was just a little offended that he didn't

9  call me back and say, "I don't know very

10  much about Touro Synagogue."

11            But Michael Katz did.  And let

12  him talk to me.  So Michael Katz did call

13  back.  And we had a very nice

14  conversation.

15    Q.  What was Michael Katz's position with

16  Shearith Israel if you know?

17    A.  I think at the time he was on the

18  board.  I think today he is a

19  vice-president, but at the time he was --

20  he was a board member.  I'm not certain.

21    Q.  What was the conversation that you had

22  with Mr. Katz in 2007?

23    A.  It was a just a pleasant

24  conversation about Touro Synagogue.  And

25  that I think he had been to read the

1    Seixas and the George Washington letter

2    reading at one time.  That was when I met

3    him personally.  I don't recall anything

4    specific about the conversation.

5      Q.  Okay.  And I would like to move onto the

6    year 2009, Exhibit P189 the, please.  Move

7    that to the bottom of the page.

8            Exhibit 189 is excerpts from a

9     newspaper known at the Forward dated June

10    5, 2009.  Are you the familiar with the

11    newspaper?

12      A.  Yes, I have seen this article.

13      Q.  Can you describe what that is?

14      A.  The Forward, it's a newspaper that

15    focuses on news about the Jewish world.

16      Q.  And it the editorial office in New York,

17    do you know?

18      A.  Yes, I think they are.

19      Q.  And do you see the article entitled,

20    Touro Struggles With It's Historic Legacy?

21      A.  I do.

22      Q.  Were you interviewed for that article?

23      A.  I was.

24      Q.  I would like to direct your attention,

25    move to page 2 of that, could you highlight

1  the second and third and fourth paragraphs on

2  the left side, please.

3            If I can read that a portion into

4   the record, Your Honor.

5            THE COURT:  Sure.

6   Q.  And I quote.  "But to the congregation,

7  Touro, is a different story.  One of prayer,

8  ritual and ongoing Jewish communal life, and

9  it appears that their story may lose out.

10            "So desperate is the synagogue's

11   financial situation, that it is quietly

12   making inquiries about potentially selling

13   some of its assets, including a 19th

14   century mansion that holds the synagogue's

15   offices and two sets of rare silver

16   rimonim, covers for the handles of the

17   Torah scroll.

18            "We're down to the tough decisions

19   now, congregation co-president Saul

20   Woythaler said.  But as tough as it would

21   be for the congregation to sell its most

22   treasured artifacts, the alternatives are

23   looking even tougher, perhaps fatal.

24   Without an infusion of cash from

25   somewhere, the congregation might not be

1    able even to afford its rabbi.

2            "The minute it doesn't have a

3    full-time rabbi, then it doesn't function

4    as a synagogue anymore, warned Bea Ross,

5    the congregation's other co-president.

6            "She added, "If it isn't open as

7    a house of worship, then it just becomes a

8    museum, and the world doesn't need another

9    museum."

10           Can we move to the last column on

11   this page, please.  Last column and

12   highlight the second paragraph.  Begin is

13   with meanwhile.

14           "Meanwhile, revenue from the

15   congregation's other source of income, a

16   pair of centuries-old endowments left by

17   Abraham and Judah Touro, has declined in

18   the down market.  Despite rising dues,

19   Woythaler estimates that the synagogue is

20   facing a deficit of roughly $50,000 this

21   year and another $100,000 next year."

22           This article appeared in the

23   Forward, did you receive a phone call from

24   anyone from Shearith Israel?

25    A.  Yes.  Michael Katz called me.

1    Q.  And what did Mr. Katz say.

2    A.  He said that he read the article.

3  And he wondered if it was true, and what

4  was happening, and what were the

5  circumstances.

6    Q.  And what did you tell him?

7    A.  I said that we were -- it was true,

8  that we were facing a serious budget

9  deficit, and that we had to do something

10  to shore up our finances and put them on

11  a stable long-term basis.

12    Q.  Did you discuss the possible sale of

13  assets including but not limited to the Myer

14  Myers rimonim?

15    A.  Yes.  Yes, we did.

16          I told him that we would were

17   thinking we had a committee and they were

18   looking into the sale of assets, trying to

19   determine which assets would be the most

20   logical one, the one that could help us

21   achieve our goal.

22    Q.  And did he respond to that information

23  in any way?

24    A.  He took it in, it was an

25  informational call.  He was asking me

1    what the circumstances were.  But he

2    didn't comment on any of -- any of it.

3       Q.  Did he follow-up that phone call in the

4    next months or so?

5       A.  No.  No, I didn't speak to him again

6    for some time.

7       Q.  When was the next time?

8       A.  That I recall --

9       Q.  When was the next time that you recall

10   having a conversation with Mr. Katz?

11      A.  He called me on June 25th, 2012.  I

12   remember that date because it was the

13   date of our congregation meeting where we

14   were going to vote on the resolution to

15   sell the rimonim.

16      Q.  Okay.  And do you recall what time of

17   day that you received the phone call?

18      A.  I think it was in the late morning.

19   I'm not sure.

20      Q.  What time was the congressional meeting

21   scheduled for.

22      A.  I think it was 7:00.

23      Q.  And so it was a few hours before that?

24      A.  Right.

25      Q.  And what did Mr. Katz say to you?

214

1    A.  He had said he had heard that we

2    were having a meeting, and that there

3    would be a resolution to sell the

4    rimonim, and he was interested in how

5    that would work, what was going on, how

6    it was structured and how it would take

7    place and play out.

8            And I told him there were a lot

9    of -- it was complicated, a lot of moving

10   parts to this, to this entire process that

11   we were doing.

12           And I would write him an email, a

13   quick email and -- where I thought I could

14   state it clearly for him.

15   Q.  What was his demeanor, was he hostile,

16   friendly, what?

17   A.  Very friendly.

18   Q.  And did he raise any objection at all

19   during this conversation?

20   A.  No.  No, he didn't.

21   Q.  Can we turn to Exhibit P229, please.

22           Showing you Exhibit P229, do you

23   recognize this as a chain of emails on

24   June 25, 2012, between you and Mr. Katz?

25   A.  Yes, I do.

215

1    Q.  Okay.  And like most emails, the

2    earliest one is at the bottom?

3    A.  Yes.

4    Q.  So can we go to the second page.  Right.

5    So the first email is from you to Michael

6    Katz dated Monday, June 25th, 2012, at 3:35

7    p.m., is that right?

8    A.  Excuse me, yes.

9    Q.  And do you see that well enough to read?

10   A.  I can.

11   Q.  Can you read what you wrote to Mr. Katz?

12   A.  The whole thing?

13   Q.  Yes, please.

14   A.  "Dear Michael, it was good to talk

15   to you on the phone about the sale of one

16   of our two sets of the Myer Myers

17   rimonim.  We understand and appreciate

18   Shearith Israel's interest in Touro

19   Synagogue, as sister synagogues we share

20   a long storied history and a commitment

21   to sustaining orthodox Jewish traditions.

22          "We only reached our decision to

23   sell the rimonim after a long reflection

24   and discussion.  At present, our income

25   and endowments are barely sufficient to

```
 1   meet our minimum needs.  It is our morale

 2   and fiduciary responsibility to plan for

 3   the future.

 4          "Selling the rimonim for the

 5   amount offered will enable us to secure

 6   the financial future of the synagogue and

 7   ensure that the synagogue and grounds are

 8   properly maintained, and that the

 9   synagogue will always be open for

10   services, and have a rabbi in residence.

11          "We would not consider selling

12   the rimonim if those objectives could not

13   have been met.  At the same time, the sale

14   offers us the opportunity to see the

15   rimonim showcased at the new art wing of

16   the Americas at the Museum of Fine Arts in

17   Boston.  And as a symbols of the Jewish

18   communities role in the founding of

19   America, and the establishment of

20   religious freedom.

21          "If a sale must take place, the

22   placement is ideal.  The entire net

23   proceeds from the sale will be put in an

24   irrevocable trust fund for -- from which

25   only the interest can be drawn, and in the
```

1    same way our Touro endowment funds have

2    sustained us until now, this new endowment

3    will help us sustain us in the future.

4            "As one of your board members has

5    said, this is a Touro moment where we --

6    Q.  "We will we measure up."  Go to the next

7    page, please.  You can continue.

8    A.  "The terms of the fund agreement

9    also provide that if the congregation in

10   Newport ceases to exist, the

11   responsibility for the synagogue returns

12   to Shearith Israel, the income from the

13   funds can you be used by Shearith Israel

14   to maintain the synagogue, if it chooses

15   to accept the responsibility.

16           "In any case, no immediate sale

17   will take place.  The resolution passed by

18   our board that will be presented to the

19   congregation, requires a second vote by

20   the congregation, approving the terms of

21   the endowment fund before any sale can

22   take place.

23           "We treasurer our Synagogue.  The

24   opportunity to secure its future while

25   seeing the rimonim displayed as part of

 1    the history and culture of America, is

 2    overwhelmingly positive.

 3              "I hope that you will share my

 4    thoughts which reflect those of our board

 5    with your board, and we look forward to

 6    talking to you and members of your board

 7    at a mutually agreeable time.  My best.

 8    B."

 9    Q.  And could you turn to the first page of

10    this exhibit.  And then did Mr. Katz responds

11    to that email.

12    A.  Yes.

13    Q.  And, in fact, just about an hour later,

14    at 4:45:00 p.m., he responded on the first

15    page, do you see that?

16    A.  I do.

17    Q.  Can you read Mr. Katz's response.

18    A.  "B.  Thank you for your letter.  In

19    our most recent telephone call I believe

20    you mentioned that your board decided to

21    use the meeting tonight to inform the

22    congregation membership of the board's

23    discussions regarding the sale of the

24    rimonim and to ask approval to take the

25    next step of formally engaging Christies

1    and of negotiating the precise terms of

2    the sale, but not to authorize the actual

3    sale.

4              "You have indicated that no

5    contract of sale has been prepared.  In

6    your letter, you wrote, quote, The

7    resolution passed by our board that will

8    be presented to the congregation requires

9    a second vote by the congregation, and

10   approving the terms of the endowment fund

11   before any sale can take place.  End

12   quote.

13             "Please confirm that by quote,

14   second vote by the congregation, unquote,

15   and you did not mean that the

16   conversations I assume you -- sorry --

17    Q.  First, you did not --

18    A.  "You did not mean that the first

19   vote was by the board and the second vote

20   will be tonight, based on your

21   conversations, I assume you meant that

22   tonight's meeting is not to confirm and

23   approve the sale, but only to proceed to

24   develop the terms of the sale and

25   endowment fund.

1          "And that the congregation will

2    have the opportunity to vote a second time

3    in some months to approve the sale.

4          Sorry to parse out the language,

5    but you know lawyers.  I have already

6    shared my understanding with our

7    leadership.  And we are considering the

8    issues.  Thank you."

9    Q.  Ms. Ross, when you received that

10   response from Mr. Katz, what was your

11   reaction?

12   A.  Well, it was -- it was a very busy

13   day.  This was a day where we were -- we

14   were getting ready for the meeting that

15   night.  I don't think I reflected on it

16   very long.

17          It just seemed like he was

18   confirming that he understood what I had

19   written him in the first place.

20          He was asking me to confirm one

21   of the elements of the email that I had

22   sent him.

23   Q.  And then you responded at about 6:02

24   that evening, just before the congregation's

25   meeting, to Mr. Katz?

1    A.  Right.

2    Q.  And in that, won't have you read the

3  whole thing, but, basically, you ended by

4  saying, again, "We welcome the opportunity to

5  talk to you and members of your board, and to

6  address any concerns that you may have"; is

7  that right?

8    A.  Yes.

9    Q.  Were you aware of any concerns that they

10  had at the time?

11    A.  I was not.  I was just taking that

12  as a friendly communication of interest

13  between us, or -- in their interest, in

14  us, as a sister synagogue.

15    Q.  Now, at the time of this congregational

16  vote, did you have an understanding as to who

17  owned the rimonim?

18    A.  Well, yes.  We owned the rimonim.

19  We had no reason to believe otherwise.

20    Q.  Why did you -- what was the basis of

21  your belief that you owned the rimonim?

22    A.  Well, they had been in our ark for

23  over a hundred years.  We used them

24  when we use them during services.  We now

25  use them during the High Holidays.

1          And we insure them.  We restored

2     them when was it necessary to restore

3     them.

4          MR. SNOW:  Your Honor, I'm about

5     to move on to something else.  Is this a

6     convenient time.

7          THE COURT:  Yes, thank you, Mr.

8     Snow.

9          I keep wanting to look over and

10    talk to the jury, which is what I do when

11    a jury is here.  I have to, like the rest

12    of the lawyers in the room, I have to

13    remember they are not there.

14          So Ms. Ross, you can step down.

15    Remember folks, tomorrow not meeting on

16    this case, a criminal jury to impanel

17    tomorrow.

18          I would ask the lawyers to tidy

19    up the desks a little bit, two defendants

20    and crowded room tomorrow.  Leave anything

21    in the peripheral, whatever you want.  See

22    you folks Friday morning.

23          (Whereupon the proceedings

24          were suspended at 4:30 p.m.)

25

Page 223

(1)          RHODE ISLAND
             (Providence)

(2)

(3)      I, Lisa Lee Gross, Registered Professional
     Reporter and Notary Public duly commissioned and
(4)  qualified in and for the State of Rhode
     Island, do hereby certify that this is a true
(5)  record of the testimony given in Re:  U.S.
     District Court, Jeshuat Israel vs. Shearith
(6)  Israel.

(7)      I further certify that I am neither attorney
     nor counsel for, nor related to or employed by,
(8)  any of the parties to the action in which this
     deposition is taken, and further that I am not a
(9)  relative or employee of any attorney or counsel
     employed by the parties hereto or financially
(10) interested in this action.

(11)     In Witness Whereof, I have hereunto set my
     hand and affixed my seal this 3rd day of June,
(12) 2015.

(13)

(14)         _Lisa L. Gross_____
             Notary Public
(15)         My Commission Expires:
             April 13, 2018

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)