TRIAL DAY 4

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF RHODE ISLAND

NO.:  12-822-M(LDA)

--------------------------------x

CONGREGATION JESHUAT ISRAEL,

                  Plaintiff

V.

CONGREGATION SHEARITH ISRAEL,

            Defendant.

----------------------------------x


                  TRIAL DAY 4,

            Friday, June 5, 2015, 9:30 a.m.

            Before:    Judge John McConnell

             United States District Court

        One Exchange Street, Providence, Rhode Island




            Reported by:

            Tara L. Wosny, CSR

```
 1                    JUNE 5, 2015, 9:30 a.m.

 2

 3              Trial, Day 4, held at the United States

 4         District Court, for the District of Rhode

 5         Island, One Exchange Street, Providence, Rhode

 6         Island, pursuant to Agreement before Tara L.

 7         Wosny, a Certified Shorthand Reporter, and a

 8         Commissioner within and for the State of

 9         Rhode Island.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          APPEARANCES:

 2          KRAMER LEVIN NAFTALIS & FRANKEL, LLP

 3          BY:  Gary P. Naftalis, Esquire,

 4          Jonathan M. Wagner, Esquire,

 5          Tobias B. Jacoby, Esquire,

 6          Daniel P. Schumeister, Esquire

 7          1177 Avenue of the Americas

 8          New York, NY 10036

 9          212.715.9253

10          gnaftalis@kramerlevin.com

11          tjacoby@kramerlevin.com

12          Counsel for the Plaintiff

13

14          PATRIDGE SNOW & HAHN, LLP

15          BY:  Steven E. Snow, Esquire

16          40 Westminster Street, Suite 1100

17          Providence, Rhode Island 02903

18          401.861.8200

19          ses@psh.com

20          Counsel for Plaintiff

21

22

23

24

25
```

```
 1          APPEARANCES CONTINUED:

 2          LOCKE LORD, LLP

 3          BY:  Deming E. Sherman, Esquire

 4          Providence, Rhode Island 02903

 5          401.274.9200

 6          deming.sherman@lockelord.com

 7          Counsel for the Defendant

 8

 9          CALDWALADER, WICKERSHAM & TAFT

10          BY:  Louis M. Solomon, Esquire,

11          Yan Grinblat, Esquire,

12          Colin Underwood, Esquire, and Jennifer Chiang,

13          Esquire

14          One World Financial Center

15          New York, New York 10281

16          212.504.6000

17          louis.solomon@cwt.com

18          yan.grinblat@cwt.com

19          jennifer.chaiang@cwt.com

20          Counsel for the Defendant

21

22

23

24

25
```

```
 1        APPEARANCES CONTINUED:

 2        RHODE ISLAND DEPARTMENT OF THE ATTORNEY GENERAL

 3        BY:   Adam J. Sholes, Esquire

 4        150 South Main Street

 5        Providence, Rhode Island 02903

 6        274.4400 x 2219

 7        Ajsholes@riag.ri.gov

 8        Counsel for the Attorney General of the State of

 9        Rhode Island

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6

```
 1                    I N D E X

 2    WITNESS:          Direct  Cross   Redirect   Recross

 3

 4    BERTHA SCHLESSINGER ROSS

 5

 6    By Mr. Snow           4                101

 7    By Mr. Solomon               56

 8

 9

10    LAURA PEDRICK

11

12    By Mr. Wagner      145              181

13    By Mr. Solomon            153

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                         *   *   *

 3              THE COURT:   Welcome back, everyone

 4              Mr. Snow, you have Ms. Ross now.

 5                         *   *   *

 6         EXAMINATION BY MR. SNOW:

 7    Q.   Good morning, Ms. Ross.  I'd like to start by

 8         trying to clarify something that I'm concerned

 9         that the Judge might be confused about.  You're

10         familiar with the rimonim?

11    A.   I am.

12    Q.   Okay.  And I want to focus on the two Myer Myers

13         set of rimonim in the possession of the

14         Congregation Jeshuat Israel, and the one set of

15         Myer Myers rimonim in the possession of Shearith

16         Israel in New York.

17              You're familiar with those three pairs,

18         correct?

19    A.   Yes.

20    Q.   Could you compare and contrast those three pairs

21         of rimonim, making it clear which ones you're

22         talking about when you're doing it?

23    A.   We have two sets at Touro Synagogue, one set --

24         and the way we distinguish them when we're just

25         looking at them or a quick glance, the way to
```

```
 1              distinguish them is, the set that we still have

 2              at the synagogue that's at the Bank of Newport

 3              has silver bells on it.  And the set that is at

 4              the of Museum of Fine Arts now, which Shearith

 5              Israel has an identical set, that is the one

 6              with the gold bells.

 7                   So two sets have gold bells, ours and

 8              Shearith Israel's have gold bells, and the third

 9              set that we have in Newport now has silver

10              bells.

11         Q.   Now, the torah finials, do they come apart for

12              polishing?

13         A.   Yes, they --

14                   MR. SOLOMON:  Objection, Your Honor.

15              Calls for expert testimony without laying the

16              foundation that --

17                   THE COURT:  The objection is

18              overruled.  Let's get through this.

19                   Have you ever seen them come apart?

20                   THE WITNESS:  I've seen pictures of

21              them apart.

22         BY MR. SNOW:

23         Q.   Okay.  And the bases come off, do they not?

24         A.   Yes.

25         Q.   Now, I believe you testified on Wednesday that
```

1          you had been involved in the leadership of

2          Jeshuat Israel since 1993?

3     A.   Yes.

4     Q.   And in that 22-year period, have you had an

5          opportunity to observe whether or not Shearith

6          Israel has been active in any way with respect

7          to Congregation Jeshuat Israel up until June of

8          2012 when this dispute began?

9     A.   Not with the congregation, no.

10    Q.   And to your knowledge, as the co-president of

11         Jeshuat Israel in the 22 years that you've been

12         involved in the leadership of the congregation,

13         has Shearith Israel provided any financial

14         support to Jeshuat Israel?

15    A.   No.

16    Q.   Now, were you in the courtroom when Attorney

17         Solomon asked questions about an offer of

18         $75,000 a year for up to ten years?

19    A.   Yes.

20    Q.   Okay.  Were you present when that offer was

21         made?

22    A.   Yes.

23    Q.   And can you tell us the circumstances under

24         which that offer was made?

25    A.   We had traveled -- David Bazarsky, myself, you,

1      and we met Bernie Aidinoff in New York, and we

2      went to the Cadwalader offices in Midtown, and

3      we were -- it was to be a discussion about the

4      situation and how to remedy it and how to come

5      to an agreement about how to proceed.

6           That offer -- Mr. Solomon made that

7      offer on behalf of the people from Shearith

8      Israel.

9   Q.   Now, did you have an understanding as to whether

10      there were any conditions being imposed upon

11      that offer?

12   A.   There were quite a number of conditions imposed

13      on that.  There was no certainty that it would

14      be paid and for how long, and it was conditioned

15      upon two things.  It was conditioned upon their

16      determination of our need of additional

17      assistance.  And if I remember correctly, that

18      we would have to acknowledge their ownership of

19      the building and the personal property.

20   Q.   So all claims would have to be waived?

21   A.   That was my understanding, yes.

22   Q.   Did the congregation turn down that offer?

23   A.   Yes, it did.

24   Q.   Why?

25   A.   It wasn't helpful.  It wasn't going to solve our

```
 1                 problem and it put an enormous amount of burden
 2                 on us.  And we believed that we owned the
 3                 personal property that was at issue there.
 4         Q.      Now, in addition to your leadership role at
 5                 Jeshuat Israel and your role as the former
 6                 executive director of the Touro Synagogue
 7                 Foundation, are you otherwise active in the
 8                 Jewish community in or about Newport?
 9         A.      I would say yes.
10         Q.      What other organizations, Jewish organizations,
11                 are you involved in?
12         A.      Well, I'm a member of the Chevra Kadisha of
13                 Newport County, which is the burial society, the
14                 Jewish Burial Society.  I am a member of the
15                 Jewish Seniors Agency Board.  And in the past,
16                 I've been a vice president of the Jewish
17                 Federation, the Jewish Alliance of Rhode Island.
18         Q.      Can you describe, just briefly, what the Jewish
19                 Alliance is?
20         A.      The Jewish Alliance of Rhode Island is the
21                 umbrella organization, in a manner of speaking,
22                 for all of the Jewish agencies and a coordinator
23                 of activities for the Jewish community.
24         Q.      Do they also serve as the major fundraising
25                 organization?
```

```
1    A.   Yes?
2              THE COURT:  How does that differ from
3         the federation?
4              THE WITNESS:  The Jewish Federation of
5         Rhode Island changed its name several years ago
6         to the Jewish Alliance of Greater Rhode Island.
7         BY MR. SNOW:
8    Q.   And you mentioned Jewish Senior Agency?
9    A.   Yes.
10   Q.   What is that?
11   A.   That's an agency whose main focus is to help the
12        senior community of Rhode Island.  It has -- it
13        runs, oversees -- or manages, maybe, is the
14        right word, the Shalom apartments, which is an
15        income-sensitive complex.  And it runs Tamarisk,
16        which a senior citizens assisted-living
17        facility, and it provides a kosher food bank for
18        Rhode Island citizens.  That kind of activity.
19   Q.   Now, leaving aside for the moment the Touro
20        Synagogue Foundation that we'll address in a few
21        minutes, based upon your involvement in the
22        Jewish community in and about Newport, Rhode
23        Island, have you had an opportunity to observe
24        whether or not Congregation Shearith Israel of
25        New York has had any activity with respect to
```

1          the Jews of Newport?

2     A.   I have not.

3     Q.   You have not?

4     A.   Seen any activity on the part of Shearith

5          Israel, any involvement in the Jewish community

6          of Newport.

7     Q.   Thank you.  By the way, Ms. Ross, have you ever

8          been to the Museum of Diaspora Tel Aviv?

9     A.   I have.

10    Q.   And did you have an opportunity to observe

11         whether or not that museum in Israel has a

12         display related to Touro Synagogue?

13    A.   It does.

14    Q.   Can you describe it?

15    A.   They have a model of Touro Synagogue, as they

16         have a model of a number of the world's most

17         important synagogues, the synagogues that have

18         had an impact on history or on the culture of

19         Jewish people.  Touro Synagogue is one of the

20         models in that room of maybe 15 models.

21    Q.   Now, Ms. Ross, can you describe the way in which

22         Congregation Jeshuat Israel governs itself

23         during the last 22 years that you've been active

24         in the leadership?

25    A.   Do you mean the board structure, the

```
 1              governance?
 2      Q.      Yes.
 3      A.      The governance of the congregation is a board of
 4              officers.  The board of officers consists of the
 5              executive committee and the board of directors,
 6              so to speak.  It's called the board of officers.
 7      Q.      And how many people compromise that board of
 8              officers?
 9      A.      On the executive committee it can vary because
10              it depends on the number of assistant vice
11              presidents.  Right now, I believe it's 12, and
12              there are 16 members of the board.
13      Q.      So in light --
14      A.      I'm sorry, 18 members.  Sixteen members of the
15              board, yes, that's right.
16      Q.      So we're talking about approximately 30 people
17              in total?
18      A.      Right.
19      Q.      Out of a total membership of approximately how
20              many?
21      A.      About 130.  I think 130 or so.
22      Q.      So it's about at least 25 percent of the
23              membership is part of the leadership?
24      A.      Right.  And associate members are not entitled
25              to be board members, so it would be something
```

| 1 | | less than that -- or eligible to be board |
|---|---|---|
| 2 | | members. |
| 3 | Q. | So in fact, in terms of voting members, the |
| 4 | | leadership is more than 25 percent, maybe a |
| 5 | | third? |
| 6 | A. | Yes, close to a third, I think. |
| 7 | Q. | And how often does the executive committee of |
| 8 | | the board meet? |
| 9 | A. | It meets generally once a month, except for July |
| 10 | | and August. |
| 11 | Q. | And the larger board, how often does that -- |
| 12 | A. | I'm sorry, I thought you were talking about the |
| 13 | | larger board.  The executive committee meets |
| 14 | | about the same.  It meets always before a board |
| 15 | | meeting. |
| 16 | Q. | Okay.  Now, the congregation itself, does it |
| 17 | | have a meeting of the whole, like a town meeting |
| 18 | | kind of a thing? |
| 19 | A. | Yes, it does.  It has three congregation |
| 20 | | meetings a year. |
| 21 | Q. | Okay.  What actions are taken up by the |
| 22 | | congregation as a whole as opposed to the board |
| 23 | | or the executive committee? |
| 24 | A. | I think the larger issues.  I don't think there |
| 25 | | is a set rule about what goes to the |

```
 1              congregation and what doesn't go to the
 2              congregation, but we would always take an
 3              important question to the congregation.
 4    Q.        Now, Ms. Ross, during the 19 years prior to June
 5              of 2012 that you were involved in the leadership
 6              of Congregation Jeshuat Israel, did there ever
 7              come a time, to your knowledge, that
 8              Congregation Shearith Israel of New York asked
 9              to participate in any way in the governance of
10              Jeshuat Israel?
11    A.        No.
12    Q.        During those 19 years, are you aware of
13              Congregation Shearith Israel in New York
14              appointing a representative of the New York
15              congregation to the Newport congregation?
16    A.        No.
17    Q.        Now, you told us that for a period of time, you
18              were the executive director of the Touro
19              Synagogue Foundation; is that correct?
20    A.        Yes.
21    Q.        And can you remind us of the period in which you
22              served in that role?
23    A.        Approximately from 1997 to 2001.
24    Q.        The Touro Synagogue Foundation formally was
25              known as the Society of Friends of Touro
```

1          Synagogue?

2    A.    Yes.

3    Q.    It's the same organization that just changed its

4          name?

5    A.    Yes.

6    Q.    And can you describe what the Touro Synagogue

7          Foundation is comparing it -- contrasting it to

8          Congregation Jeshuat Israel?

9    A.    The congregation is responsible for religious

10         services and for the communal life of the

11         congregation.  It maintains the synagogue.  It

12         pays the utilities.  It does everything from pay

13         the utilities, to mowing the lawn, to making

14         repairs on the synagogue.

15   Q.    When you say "it," you're referring to?

16   A.    The congregation.

17   Q.    And what does the Touro Synagogue Foundation do?

18   A.    The Touro Synagogue Foundation is responsible

19         for the synagogue as a national historic site.

20         It conducts the tour programs.  It arranges

21         educational programs relating to religious

22         freedom such as organizing the George Washington

23         letter reading.

24              And when there is a major project that

25         has to be done like the renovation of the

1           synagogue, we'll ask -- the congregation will

2           ask the foundation to help raise the money for

3           that.

4     Q.    Okay.  Now, am I correct that the members of the

5           congregation, as opposed to the foundation, are

6           made up of people who pray at Touro Synagogue?

7     A.    Yes.

8     Q.    The Touro Synagogue Foundation, is that made up

9           of a larger group than those who pray at

10          synagogue?

11    A.    It is.  It has a larger national audience, and

12          it's also able to -- this is the reason that we

13          ask the foundation to help us with the larger

14          project, it's able to go out to -- because it's

15          nonsectarian and nondenominational, it's able to

16          go out to grand tours and ask for grants for

17          these bigger projects that we have that we would

18          not be eligible for because a religious

19          organization can't apply for many grants.

20               I'll give you an example.  Right now we

21          are looking at restoring the gates of the -- the

22          historic gates in front of synagogue.  The big

23          Touro gate from the 19th -- early 19th century,

24          and the gates at the cemetery as well.

25          Originally we had intended to do it is part of

1          the restoration, the renovation, but because we

2          ran out of money, we did not do that.  And now

3          they need to be done.  They're just rusting.  We

4          will probably ask the foundation to help us

5          raise the money for that.  It's a six-figure

6          project.

7     Q.   And why would you use the foundation as opposed

8          to congregation?

9     A.   Because they have a wider audience and --

10          they're able -- this is something you can get a

11          grant for because it's architecturally

12          distinguished because these are architecturally

13          distinguished gates.

14               We can go to a foundation who would be

15          interested in helping us to restore these.

16     Q.   Now, to be a member of the congregation, you

17          have to be Jewish; is that correct?

18     A.   Yes.

19     Q.   Do you have to be Jewish to be active in the

20          Touro Synagogue Foundation?

21     A.   No.  The foundation has members who are not

22          Jewish.

23     Q.   Now, you were present on Monday when Mr. Solomon

24          gave his opening statement?

25     A.   Yes, I was.

1    Q.    And did you hear Mr. Solomon describe that

2          Congregation Shearith Israel is active in

3          Newport through the Touro Synagogue Foundation?

4    A.    Yes.

5    Q.    And in the years that you've been involved in

6          the Jewish community in Newport, and

7          particularly with the Touro Synagogue

8          Foundation, can you describe to us your

9          observations of Congregation Shearith Israel's

10         activities with respect to the foundation?

11   A.    I'm not aware that they were involved in any of

12         the activities of the foundation other than some

13         members of Shearith Israel came to some of the

14         George Washington letter readings.

15   Q.    And those are the letter readings that are open

16         to the public?

17   A.    Yes, they are.

18   Q.    Was there one member in particular who would

19         attend the reading of the George Washington

20         letter?

21   A.    Yes, Jonathan DeSola Mendes often came.  Now,

22         his great, great, great, great grandfather -- I

23         may be off by one "great" -- was a Rabbi at

24         Touro Synagogue.

25                THE COURT:  Is that the original Rabbi

1      Mendes?

2          THE WITNESS:  Yes, exactly, yes.

3      BY MR. SNOW:

4    Q.  And can you tell us about your observations

5      about what Mr. DeSola Mendes would do with

6      respect to the Touro Synagogue Foundation?

7    A.  Well, attended -- he occasionally attended

8      meetings when he was able to.  He came from New

9      York.  And on a number of occasions read the

10     seixas letter at the George Washington letter

11     reading.

12    Q.  Would he then attend the annual meeting of the

13     foundation?

14    A.  Yes.

15    Q.  Do you know if Mr. DeSola Mendes, with other

16     participants at the annual meeting of the

17     foundation, would walk up the hill to the

18     colonial Jewish cemetery?

19    A.  I don't know.  I imagine that.  I didn't

20     personally observe him, but he was very

21     interested in the synagogue.  He had a

22     connection with the synagogue because of his

23     family heritage and his family connection.

24    Q.  Now, is the president of Congregation Shearith

25     Israel an ex officio member of the board of the

```
 1              Touro Synagogue Foundation?

 2     A.   I'm sorry, could you just repeat that?

 3     Q.   Is the current president of Congregation

 4          Shearith Israel in New York an ex officio member

 5          of the Board of Touro Synagogue Foundation?

 6     A.   Yes, he is.

 7     Q.   And have you ever observed, during the years

 8          that you've been active, any president of

 9          Congregation Shearith Israel attending a board

10          meeting of the Touro Synagogue Foundation?

11     A.   No, not a board meeting.

12     Q.   Now, Ms. Ross, can you describe what efforts the

13          congregation undertook to raise an endowment

14          before 2008?

15     A.   Well, I think when we planned the capital

16          campaign and the renovation of the synagogue,

17          one of the components of that was to raise an

18          endowment so that the synagogue could be kept in

19          the condition it was renovated into.  But

20          because we had such difficulty raising the money

21          and then ran out of the money before we

22          completed the project, we were never able to

23          take that next step to raise the endowment.

24     Q.   Okay.

25                    MR. SNOW:  Could we have Exhibit P 170
```

1              on the screen, please?

2    Q.    Ms. Ross, I'm showing you, on the screen,

3          Exhibit P 170.  Do you know what that document

4          is?

5    A.    That is the campaign plan for the renovation of

6          the synagogue.

7    Q.    Okay.  And this was by the Touro Synagogue

8          Foundation; is that correct?

9    A.    Yes.

10   Q.    And was the Touro Synagogue Foundation the

11         leader in trying to raise funds with respect to

12         the renovation of Touro Synagogue?

13   A.    Yes.

14   Q.    If we could turn to the next page, page 2 of

15         this document.

16              MR. SNOW:  Your Honor, I'd like to read

17         just a portion of this.

18              THE COURT:  Go ahead.

19         BY MR. SNOW:

20   Q.    "It has been over 242 years since Touro

21         Synagogue was first dedicated.  Despite it's

22         outward appearance, the synagogue is in

23         desperate need of repair and renewal.  Moisture

24         has seeped into the walls and foundation.  Brick

25         joints have deteriorated.  Salt air has

1          adversely affected the artifacts.  Mechanical

2          systems are failing.  Electrical systems have

3          created a risk.  Mold has grown inside the

4          walls.  Much of the structure has been

5          compromised.

6                "It has become clear that if we fail to

7          act, we risk losing Touro Synagogue forever.  A

8          campaign to save Touro Synagogue, America's

9          symbol of religious freedom, is vital to its

10         ongoing presence.  The mandate of the capital

11         campaign is to assure the future of Touro

12         Synagogue in all its meaning as a model and

13         living landmark for religious freedom.

14                Additional plans included the

15         construction of a world-class visitor center, an

16         interactive exhibit, the building of an

17         education center and the reconfiguration of

18         Patriots Park.  While many of these items are

19         funded, we still need dollars to complete the

20         critical work to restore Touro Synagogue."

21                MR. SNOW:  Could we skip to page 6 of

22         this document.  That's it.

23    Q.   On page 6 it says, "Funding the project."  Do

24         you have that?  Can you see that in front of

25         you, Ms. Ross?

```
1     A.   Yes.
2     Q.   And the first item says, "Conservation of
3          synagogue," the goal at that time -- this was
4          2005 -- was $2,600,000; is that right?
5     A.   Yes.
6     Q.   And as of the time that this document was
7          written, which I believe was July 14, 2005,
8          there had been approximately 1.6 million dollars
9          already raised?
10    A.   Yes.
11    Q.   But there still needed to be another million
12         dollars raised for the conservation; is that
13         correct?
14    A.   Yes.
15    Q.   And if I could direct your attention to where it
16         says, "remaining needs" on the middle of this
17         page.
18    A.   Yes.
19    Q.   Could you read the list of items that needed to
20         be done to restore the Touro Synagogue as part
21         of phase 1 of this campaign?
22    A.   "Conservation efforts to address the following
23         issues:  Extensive deterioration of the
24         synagogue's southern wall, foundation erosion
25         from water seepage, structural cracks in the
```

```
 1              interior and exterior walls, extensive
 2              moisture erosion in pillars, structural
 3              stability of balcony and Washington room floors,
 4              restoration of interior and exterior to 1790
 5              appearance, reconfiguration of Patriots Park as
 6              the physical and visual link between the
 7              synagogue visitor center and Barney House.
 8              Artifact restoration and maintenance, climate
 9              control for ongoing conservation needs, security
10              provisions."
11    Q.    Okay.  Now, were all of those items eventually
12          completed?
13    A.    Yes.
14    Q.    Okay.  And, in fact, we've had testimony that
15          the money was raised between the congregation
16          and the foundation, correct?
17    A.    Eventually.
18    Q.    It took quite some period of time?
19    A.    There was a balance left after the project was
20          completed that we paid off over a number of
21          years of fundraising.
22              THE COURT:  Who is "we," Ms. Ross?
23              THE WITNESS:  I think the congregation
24          and the foundation together worked on that, but
25          the burden was on the foundation to raise it.
```

1    We tried to help by working with them to contact

2    people.

3    BY MR. SNOW:

4    Q.    Okay.  By the way, Ms. Ross, is there an overlap

5          in terms of the membership of the congregation

6          and the foundation?

7    A.    Well, there is.  All members of the congregation

8          are members of the foundation.

9    Q.    So the congregation is sort of a subset of

10         the --

11   A.    Of the larger group.

12   Q.    -- the foundation, correct?

13   A.    Yes.

14   Q.    Okay.  Now, in that section under "Remaining

15         Needs, phase 1" there is another bullet point

16         that refers to the restoration of Barney House

17         to street level in 1750s exterior, half a

18         million dollars?

19   A.    Yes.

20   Q.    Was that ever done?

21   A.    Well, it was lowered to street level because

22         there was a restaurant under it.  That building

23         in the 1920s had been raised to accommodate a

24         commercial space, that 18th century building.

25         And in the process -- in one of the steps in the

```
 1              process, was to lower it to take away that

 2              commercial space and put it back on the ground

 3              so it looked like the 18th century building it

 4              was from the exterior.

 5     Q.       But the reconfiguration of the space were

 6              traveling exhibits, a learning center and

 7              archives --

 8     A.       Nothing was done, nothing was done and still

 9              not.

10     Q.       Why not?

11     A.       Because we didn't have the funds to do it.

12     Q.       All right.  Now, the bottom of this page 6, it

13              says, "phase 2 endowment, 8 million dollars."

14              Do you see that?

15     A.       I do.

16     Q.       That was for securing Touro Synagogue's future

17              for both structures and programs.  Do you see

18              that?

19     A.       Yes.

20     Q.       Okay.  Was the foundation successful in raising

21              any of this endowment?

22     A.       No.

23     Q.       Was the congregation successful in raising this

24              endowment?

25     A.       No.
```

```
1    Q.   Why not?

2    A.   Well, by that time, we found it very difficult

3         to raise money just for the restoration, for the

4         renovation of the synagogue, the conservation of

5         the synagogue, and then we had the $500,000 loan

6         to pay off.  So we had to do that.  It just

7         didn't seem possible then to go out again and

8         start another campaign to raise the endowment.

9              It's very hard to raise endowment

10        dollars.  It's one thing if you're raising money

11        for a building or for a project that you can

12        see, but to raise money for an endowment is very

13        difficult.  It's challenging.

14   Q.   Now, let me direct your attention to the year

15        2008.  Did the congregation suffer some

16        financial setbacks that year?

17   A.   It did.  That was the year of the global

18        financial crisis and our income from our Touro

19        funds was cut significantly, as were donations.

20   Q.   What did the congregation or how did the

21        congregation respond to that budget deficit?

22   A.   Well, we realized that we had significant

23        financial problems and that if we didn't do

24        something about it, if we didn't find a way to

25        handle it, if we didn't find a way to increase
```

1         our income, we wouldn't be able to keep the

2         synagogue open for services.

3               So we formed a committee with the

4         permission of the congregation to examine the

5         situation and our assets and to see what we

6         could do to raise an endowment because we knew

7         we needed an endowment in order to have the

8         sufficient income into the future.

9    Q.   I neglected to ask you a question or series of

10        questions with respect to the Touro Synagogue

11        Foundation campaign.

12              MR. SNOW:  Can we move to page 9 of the

13        Plaintiff's 170.

14        BY MR. SNOW:

15   Q.   Do you see page 9?

16   A.   I see it, yes.

17   Q.   Okay.  There is a description of the campaign

18        leadership team.  Do you see that?

19   A.   I do.

20   Q.   Okay.  The foundation chair was Mr. Bernard

21        Aidinoff, correct?

22   A.   Yes.

23   Q.   Is he a member of Congregation Jeshuat Israel?

24   A.   He is a member of Congregation Jeshuat Israel.

25   Q.   He's someone who grew up in Newport?

```
 1   A.   Yes, he did.  He had his bar mitzvah at Touro
 2        Synagogue.
 3   Q.   Was Dr. Alan Feinberg the campaign committee
 4        chair?
 5   A.   Yes.
 6   Q.   Who is Dr. Feinberg?
 7   A.   He is a member of the community, a member of the
 8        congregation, a dentist in Newport.
 9   Q.   And Laura Pedrick, the president of Congregation
10        Jeshuat Israel at that time in 2005; is that
11        correct?
12   A.   Yes.
13   Q.   And then there is a list of the committee
14        members.  I'd like to run through that list.
15        The first name is Richard Casten.  Who is he?
16   A.   He is a long -- he was a long-time member of the
17        board.  He was treasurer of the congregation for
18        a number of years.  He's an accountant.
19   Q.   When you say "congregation," which congregation?
20   A.   Congregation Jeshuat Israel.
21   Q.   Barbara Epstein?
22   A.   Barbara Epstein is at least the second or
23        third -- third or fourth generation member of
24        the congregation who lives in Newport.
25   Q.   Linn Freedman?
```

```
 1     A.   She was a member at the time that the -- no, I
 2          don't believe she was a member.  She is a member
 3          of the Jewish community in Newport.
 4     Q.   Is she an attorney, do you know?
 5     A.   Yes, she is an attorney.
 6     Q.   Diane Hurley?
 7     A.   Diane Hurley is a member of the foundation.  She
 8          was a member of the foundation board.  She is
 9          today the chair of the Touro Synagogue
10          Foundation.
11     Q.   Is she in Rhode Island?
12     A.   Yes, she is.  She lives in Rhode Island.
13     Q.   Dr. Stephen Kaplan?
14     A.   He is an educator who lives in Rhode Island.
15     Q.   Marilyn Kaplan?
16     A.   I don't know Marilyn Kaplan.  I think she may be
17          Steve Kaplan's wife, but I don't know that.
18     Q.   Okay.  Irving Kessler?
19     A.   Irving Kessler was a resident of Newport for
20          many years.  He since has passed away.  He was
21          very active in the congregation and in Jewish
22          communal life.  He was a former Jewish
23          Federation professional.
24     Q.   James Leach?
25     A.   It James Leach is from a Rhode Island family.
```

1          His family also had been here for many years,

2          and he lives in Newport.

3     Q.   Ambassador John Loeb?

4     A.   Ambassador John Loeb has a long-time connection

5          to the congregation dating to -- he's

6          collaterally related to the Touro family and has

7          been coming to Newport for many years.

8     Q.   He's a member of the congregation?

9     A.   He is a member of the congregation, yes.

10    Q.   David Logan?

11    A.   David Logan is a member of the Foundation Board,

12         or at least at that time he was a member of the

13         Foundation Board, and he is the dean of Roger

14         Williams School of Law.

15    Q.   Or at least was in 2005?

16    A.   Yes.

17    Q.   But he's a resident of Rhode Island?

18    A.   He's a resident of Rhode Island, yes.

19    Q.   Donna Pimental?

20    A.   Donna Pimental is also a long-time member of the

21         congregation, a lifetime member of the

22         congregation, as are many members of her family,

23         and she is still active in the congregation

24         today.

25    Q.   Is she the mother of Michael?

```
1    A.   She is.

2    Q.   Paul Silver?

3    A.   Paul Silver was a member of the congregation at

4         the time, I believe, although I'm not 100

5         percent sure.  He was active in the foundation.

6    Q.   Okay.  He's a Rhode Islander?

7    A.   He is a Rhode Islander.

8    Q.   Is he also a lawyer, do you know?

9    A.   I don't know.  He was -- I did not know him

10        well.

11   Q.   Okay.  Rita Slom?

12   A.   Rita Slom is also a long-time member of the

13        congregation.  She is still a member of the

14        congregation today, very active member of the

15        congregation.

16   Q.   Keith Stokes?

17   A.   Keith Stokes at the time was the executive

18        director of the Newport Chamber of Commerce.

19   Q.   Is he active in economic development in the

20        state?

21   A.   And later on he was active in economic

22        development.  He then later also became the

23        chair of the Touro Synagogue Foundation.

24   Q.   Mr. Stokes is African-American?

25   A.   Yes, he is.
```

1    Q.    And Andrew Teitz?

2    A.    Andrew Teitz is the current chair of the Touro

3          Synagogue Foundation, also a long-time resident

4          of Newport, a lifetime resident of Newport,

5          although he now lives in Barrington.

6    Q.    Ms. Ross, to your knowledge do any of those

7          members of the campaign leadership team used to

8          raise the funds to restore Touro Synagogue or

9          any of them connected in any way to Shearith

10         Israel?

11   A.    No, none of them.

12   Q.    In 2008 did the Board of Jeshuat Israel form a

13         committee to investigate the potential sale of

14         assets?

15   A.    Yes.

16   Q.    And why was that committee formed?

17   A.    Well, as I said, we realized we had significant

18         financial problems and that we would need an

19         endowment in order to secure the future of the

20         synagogue, and we formed that committee to

21         examine the various ways we could raise the

22         endowment.

23   Q.    Who was on the committee?

24   A.    David Bazarsky, Alan Feinberg, Laura Pedrick,

25         Andy Segal, Louise Teitz, and myself.

1    Q.    Okay.  And what did the committee do to

2          investigate this?

3    A.    Well, we looked at the assets that we had.  We

4          looked at the Levi Gayle House.  We looked at

5          the rabbi's house.  We looked at the portrait

6          that we had of Abraham Touro by Gilbert Stuart,

7          and we looked at the rimonim.  Those were the

8          major assets that we had.

9    Q.    Did the committee come to a conclusion with

10         respect to the possibility of selling the Levi

11         Gayle house to raise funds?

12   A.    Yes, we did.

13   Q.    Tell us about that.

14   A.    Well, it turns out it's a beautiful building,

15         but as a realtor described, it's a beautiful

16         white elephant.  And it's just -- it's a big

17         Greek revival building, and its rehabilitation

18         into a commercial structure that somebody could

19         use is very limited.  So it turned out it was

20         only worth maybe $500,000 or $600,000, if we

21         could sell it.

22   Q.    And how much were you seeking to try to raise?

23   A.    We thought we had to raise at least 5 million

24         dollars at the beginning.  And then as time went

25         on and we realized how expensive things are to

```
1              do, and that -- it also became clear that not

2              only did we want an income, but we wanted an

3              income that would be sufficient so that some of

4              the income could be put back into the fund so it

5              would grow and as time went on not eaten up by

6              inflation.

7    Q.        And what was the projected purpose for the funds

8              or the endowment that you were trying to raise?

9    A.        What we were going to do with the money?

10   Q.        Yes.

11   A.        It was going to go into an irrevocable trust

12             from which we could draw only the income.  And

13             the income would be used to maintain the

14             synagogue to keep it open for services, to

15             assure that we had a rabbi in residence and to

16             maintain our other buildings as well, including

17             the Levi Gayle House and the rabbi's house.

18   Q.        You told us about the Levi Gayle House.  What

19             about the rabbi's house?  Did you look into the

20             possibility of selling that to add that to the

21             endowment?

22   A.        Yes, we did.  It's a Victorian, a commodious,

23             old Victorian with many small rooms in it.  It

24             is in serious need of work, as in serious needs

25             of some renovations.  So we found that it would
```

```
1              probably only bring $500,000 or so.  And if we

2              did end up selling it, the other side, the

3              balance, on that was we would have to find a

4              place for the rabbi to live or increase his

5              salary so he could live independently, so that

6              didn't make any sense to us.

7         Q.   You mentioned the Gilbert Stuart painting.  Can

8              you describe that?

9         A.   There is a Gilbert Stuart painting that we have

10             on the wall of our library of Abraham Touro.

11             It's a wonderful portrait.  It's one of those

12             portraits where the eyes move when you move

13             across the room.  So we have our board meetings

14             there and say, do the right thing, Abraham Touro

15             is watching you.

16                  So we did look into it.  And as

17             wonderful as it is, it's not as valuable as we

18             thought it would.  It would bring in under

19             $100,000.

20        Q.   The library you mentioned, is that in the Levi

21             Gayle House?

22        A.   It is.  It's adjacent to the chapel.

23        Q.   And the other items that you mentioned were the

24             rimonim --

25        A.   Yes.
```

1    Q.    Did you consider both sets of rimonim?

2    A.    We considered -- no, we didn't want to sell two

3          sets.  If we were going to sell a set of

4          rimonim, we were only going to sell one of them

5          as a last resort.  So we didn't look at one or

6          the other.  We looked at a set.

7    Q.    Did there come a time that this committee that

8          was investigating the potential sale of assets,

9          focused in on one particular asset?

10   A.    Well, yes.  After we evaluated all of the assets

11         that we had and saw that none of them would

12         bring us the kind of endowment we needed in

13         order to accomplish our goal, we then focused on

14         the rimonim because we thought that they would

15         bring the most.  We would have the greatest

16         chance of achieving our goal with the rimonim.

17   Q.    And once the committee focused on the rimonim as

18         perhaps the only way to raise a sufficient

19         endowment, what did the committee do?

20   A.    Well, we wanted to research the rimonim and see

21         if they were -- if they would serve the

22         purpose.  And we wanted to educate ourselves

23         about them.  So we consulted with experts.  We

24         went to the Philadelphia Museum of Fine Arts.

25         We went to someone at Yale.  We went to a

```
 1              scholar at Brandeis to discuss them and to see
 2              what they thought about them.
 3                   And then after we finished that process
 4              and we felt that we knew something about the
 5              rimonim, we went out to see about who could help
 6              us sell them.  We consulted with Christie's and
 7              we consulted with Sotheby's.  And I believe
 8              there was someone else there at some point that
 9              we had thought about talking to about them.
10                   We vetted them and we had them come and
11              talk to us about what they could do and how they
12              would sell them and what they recommended.
13        Q.    Were the approaches suggested by Sotheby's and
14              Christie's different from one another?
15        A.    Yes, they were quite different from one another
16              and they were dispositive in the end of why we
17              chose Christie's.
18        Q.    Can you explain that, please?
19        A.    Sotheby's --
20                   MR. SOLOMON:  Your Honor, I object to
21              the question, and I assume that Your Honor is
22              taking this for the state of mind as it took the
23              same testimony of the other witness?
24                   THE COURT:  I'll take it for that same
25              purpose.
```

1              MR. SOLOMON:  Thank you.

2         BY MR. SNOW:

3    Q.   Can you explain what --

4              MR. SNOW:  I'll withdraw that, Your

5         Honor.

6    Q.   Let's talk about Sotheby's.  What was Sotheby's

7         proposing --

8    A.   Sotheby's suggested that --

9    Q.   Let me just finish the question -- with respect

10        to the rimonim.  Go ahead.

11             THE COURT:  She's a lawyer remember.

12             THE WITNESS:  And she's from Brooklyn.

13   A.   Sotheby's suggested to us that we do a public

14        auction like you see on television.  They

15        thought that might bring us the most money

16        because they would be bidding and people would

17        get involved in doing that.  We didn't think

18        that was the right approach for us.  We didn't

19        want that kind of -- we didn't want to -- I'm

20        going to use the words "circus atmosphere"

21        involving the rimonim.

22             We wanted it to be thoughtful and

23        deliberate about what we were doing, so

24        ultimately we rejected that.

25   Q.   And what about the proposal by Christie's?  Can

1          you describe what they were proposing?

2    A.    Christie's suggested we do a private sale, that

3          we engage them to find a private buyer that

4          would be willing to buy them.

5    Q.    Did you eventually enter into a contractual

6          arrangement between the Congregation and Newport

7          and Christie's?

8    A.    Yes.

9               MR. SNOW:  May we have Exhibit P 195 on

10         the screen, please.

11         BY MR. SNOW:

12   Q.    Ms. Ross, is this a letter of agreement between

13         Congregation Jeshuat Israel or Touro Synagogue

14         and Christie's, Inc.?

15   A.    Yes.

16   Q.    And if you look at the last page of that, is

17         that your signature on behalf of Congregation

18         Jeshuat Israel of Touro Synagogue?

19   A.    Yes, it is.

20   Q.    Directing your attention to the first page, the

21         second paragraph.

22              MR. SNOW:  I'd like to read just a

23         small section of that, Your Honor.

24   Q.    I quote, "For the period from the date of this

25         letter through October 2, 2010, the term, you

1      appoint Christie's as your exclusive agent to

2      sell the property privately, subject to

3      termination as indicated below.  Unless

4      otherwise agreed between us, Christie's, in its

5      capacity as your exclusive agent, may only offer

6      the property privately and not at public

7      auction.

8           "During the term, you will not withdraw

9      our authority to sell the property, authorize

10     any other person to sell the property on your

11     behalf or take any steps yourself to market the

12     property.

13          "Furthermore, you will use your best

14     efforts not to disclose the fact that the

15     property is for sale.  We acknowledge that you

16     have no control over any third-party

17     disclosures."

18          Let me just stop there.  Were you aware

19     that the contract you signed with Christie's had

20     this provision requiring the congregation to use

21     its best efforts not to disclose the fact that

22     the property, the rimonim, were for sale?

23  A.   Yes.

24  Q.   And did you have an understanding as to why the

25     contract had such a provision?

```
 1    A.    Yes.  I think Christie's was concerned that

 2          since there were other Myer Myers rimonim in

 3          existence, four other sets in existence -- well,

 4          three other sets for this purpose -- that

 5          another might come on the market, which would

 6          reduce the value of ours if there were two sets

 7          on the market at the same time.

 8    Q.    Now, once Christie's became appointed as the

 9          exclusive agent in an effort to privately sell

10          the rimonim on behalf of Congregation Jeshuat

11          Israel, what happened next with respect to the

12          idea of selling the rimonim?

13    A.    Well, I think that Christie's then went and had

14          a list of people to talk to.  They went out to

15          talk to those people.  We had let them know that

16          we were very concerned about the placement, that

17          the placement of the rimonim had to be right.

18          It couldn't just go anyplace.  It had to be a

19          place that would be appropriate for them.

20    Q.    At some point in time -- I don't want to repeat

21          what we discussed on Wednesday, but at some

22          point in time Christie's suggested that the

23          congregation loan the rimonim to the Museum of

24          Fine Arts for the opening of their Art of

25          Americas Way; is that correct?
```

1    A.    Yes.

2    Q.    And eventually after the rimonim were on display

3          for some time at the museum, did the

4          congregation receive an offer to purchase

5          related to the rimonim?

6    A.    Yes.

7    Q.    Okay.  Actually, can you -- we know there were

8          two sets of rimonim.  How did the congregation

9          decide to sell the set that's at the Museum of

10         Fine Arts, the one with the gold-colored bells?

11   A.    I think we discussed with Christie's, which was

12         a more appropriate set to sell, and they

13         suggested that the ones that we chose were the

14         more appropriate set.

15   Q.    Did they give you a reason for that?

16   A.    I don't recall.

17               MR. SNOW:  Can we have Exhibit P 213,

18         please.

19   Q.    Ms. Ross, is Exhibit P 213 an April 27, 2011

20         letter from the director of the Museum of Fine

21         Arts Boston to Mr. Marc Porter, the chairman of

22         Christie's?

23   A.    Yes.

24               MR. SNOW:  If I may read this into the

25         record, please, Your Honor?

1                    THE COURT:  Please.

2        Q.    And I quote, "It has been an honor to have Myer

3              Myers finials for a Torah on loan to the Museum

4              from Touro Synagogue since the opening of the

5              New Art of the America's Wing in November 2010.

6              As the centerpiece of the gallery dedicated to

7              the MFA's renowned collection of Newport

8              furniture, they have aroused great interest for

9              their history and meaning as important works of

10             Jewish ritual art, as well as admiration for

11             their beauty as works of art.

12                    "We are very aware that even exploring

13             the idea of selling such important works is

14             being undertaken with the greatest seriousness

15             and purpose and intention by Touro Synagogue, a

16             sense of responsibility for these objects which

17             we share.  Seeing the finials in their setting

18             at the MFA encourages us to believe that they

19             would find an ideal home here for many points of

20             view.  They would remain available and visible

21             to a very large and varied audience not very far

22             from their home in Newport, and they would be

23             the focus of a wide range of interpretive and

24             educational programming calling attention not

25             only to their importance, but also to the

1  significance of Touro Synagogue in American

2  history and culture.

3      "The finials are objects of the highest

4  artistic quality that fulfill the standards of

5  excellence achieved by the encyclopedic

6  collections held by the museum.  And in this

7  way, they also fulfill a new mission here at the

8  Museum, one which adds to their great history as

9  works of Jewish ritual art and the history of

10  the Jews in America.

11      "This is a significant moment in the

12  history of the MFA with the opening of the New

13  Art of the America's Wing bringing American art

14  to the fore and presenting a broad view of

15  American art and culture.  The Myer Myers

16  finials bring a new aspect of American art,

17  history and culture to the wing, and they stand

18  as a beacon for the history of Jewish culture

19  and life in America.

20      "This also represents a new and broader

21  mission for the Museum mandated by a recent

22  endowment which calls for the, quote, 'study,

23  acquisition and display of Judaica,' at the MFA.

24  This has resulted in a new sense of purpose in

25  weaving Jewish ritual art into the wide scope of

1         our collections.

2            "We are in a unique position to seek

3         new ways to represent Jewish art and culture in

4         our galleries distinct from museums dedicated to

5         Jewish art or history, and the Myer Myers

6         finials would immediately become the most

7         significant works of Judaica in any encyclopedic

8         museum in America and beyond.

9            "The value and significance of the Myer

10        Myers finials for the future and the mission of

11        both Touro Synagogue and the MFA seem to have

12        come together in ways that seem almost

13        inevitable, and at the same time profoundly

14        right for the point of view of each

15        institution.

16            "Putting a price on them is clearly

17        more challenging.  Careful consideration leads

18        us to make an offer of 5 million dollars.

19        Included with this letter are two documents, one

20        which presents the reasoning behind our offer,

21        and another which gives a detailed account of

22        the possibilities for interpretive and

23        educational programming and community outreach

24        should the finials become part of the MFAs

25        collection.

1           "We assure you that this is a carefully

2       considered proposal and understand that you may

3       need a similar period of time and thought to

4       respond to it."

5           Now, Ms. Ross, following or attached to

6       this letter are a number of pages supplied by

7       the Museum of Fine Arts explaining why they

8       thought the rimonim were worth what they were

9       offering at the time; is that correct?

10   A.   Yes.

11           MR. SNOW:  Could we go to the page with

12       the Bates Number CJI 1040.  I'm just going to

13       read, for the record, a short excerpt from these

14       attachments from the Museum of Fine Arts.  In

15       particular, the last paragraph on this page,

16       1040.

17           And I quote, "The fact that these

18       finials belong to Touro Synagogue from their

19       earliest days adds to their significance for

20       American art and history given Newport's role in

21       the early years of Jewish settlement in

22       America.  Along with New York, Philadelphia,

23       Charlestown and Savannah, Newport was among the

24       earliest towns that had a significant Jewish

25       community in the colonial period.  The synagogue

1    was built by the renowned architect Peter

2    Harrison and opened in 1763, and is the oldest

3    surviving synagogue building in America and

4    still functions as a synagogue.

5            "Newport's role in the history of

6    American religious liberty was recognized by

7    George Washington and his famous correspondence

8    with Moses Seixas, warden of Newport Synagogue.

9    Following the president's visit to Newport in

10    1790, and resulting in one of the most famous

11    quotes in American history on this idea that

12    Washington was helping to establish a government

13    that gives, quote, 'to bigotry no sanction, to

14    persecution no assistance.'"

15            Let me skip to the last three

16    paragraphs on this page.  1041.  "Both shafts

17    are marked Myer Myers, and one bears the

18    inscription 'Newport,' while the other does not.

19    This seems to have been the result of the shafts

20    being mixed up while the finials were stored for

21    safekeeping in New York's Shearith Israel

22    Synagogue.

23            "These objects are of the highest value

24    and importance in the context of our

25    collections.  They would represent the most

1          significant piece of American Judaica in any

2          museum collection.  They would be the most

3          significant piece of Myer Myers silver in any

4          museum collection.  The MFA has a long and

5          distinguished history as the caretaker of

6          American church silver, and these would find

7          company along those objects.

8              "The finials would find an ideal home

9          here in the context of Newport furniture,

10         American silver, American colonial art and would

11         represent Jewish art and culture in the New Art

12         of the America's Wing.  Taking into

13         consideration all of these factors, it is

14         reasonable to propose a price of 5 million

15         dollars with room to negotiate."

16             MR. SOLOMON:  Your Honor, just so that

17         Your Honor is clear on this, this is a document

18         on the short list that we had objected to.  I

19         did think that we weren't going to be displaying

20         them.  I'm going to assume that Your Honor is

21         taking this for state of mind only.  We do have

22         an objection.

23             THE COURT:  I wish I --

24             MR. SNOW:  I actually wasn't aware of

25         that.

 1                    THE COURT:  Thank you for pointing that

 2          out.

 3                    How do you we propose we deal with

 4          that?  And I haven't officially ruled on that or

 5          the one document from CJI.

 6                    MR. SOLOMON:  And that's fine.  I

 7          frankly was assuming that you would take it for

 8          state of mind, and so at some point, we'll want

 9          to argue to Your Honor that it's not worth

10          anything.

11                    THE COURT:  Okay.  Thank you.

12                    MR. SNOW:  Just for the record, Your

13          Honor, I apologize.  I wasn't aware that they

14          had objected to this document.  I know there

15          weren't many, but I wasn't aware that this was

16          one of them.

17                    THE COURT:  I think there are four.

18          BY MR. SNOW:

19     Q.   Ms. Ross, after receiving this 5 million dollar

20          offer from the Museum of Fine Arts, was there a

21          period of negotiation, particularly in light of

22          the last statement, that there was room for them

23          to negotiate?

24     A.   Yes.  We didn't think that the 5 million dollars

25          was sufficient.  We just -- particularly in

```
 1              light, as you say, of the last line, and we

 2              ultimately rejected the offer.

 3       Q.     But was there -- did the negotiations continue?

 4       A.     Yes, after we rejected the offer.

 5       Q.     And if I could direct your attention to Exhibit

 6              P 223.  Is Exhibit P 223 a letter to you from

 7              Marc Porter, the chairman and president of

 8              Christie's, with respect to what was ultimately

 9              the final offer?

10       A.     Yes.

11       Q.     Okay.  And that was in the amount of $7,400,000

12              correct?

13       A.     Yes.

14       Q.     With $400,000 going to Christie's as a

15              commission and the congregation would receive

16              the net amount of 7 million dollars?

17       A.     Yes.

18       Q.     Now, as president of Congregation Jeshuat Israel

19              at the time that this offer was made, why did

20              you want to accept it?

21       A.     Well, I think we concluded that this was a good

22              offer and that accepting that offer would permit

23              us to achieve our goal of creating an endowment

24              that would secure the future of the synagogue.

25       Q.     Now, what was the next step after the offer had
```

```
 1                been received in order to accomplish the sale of

 2                the rimonim?

 3       A.       Our bylaws would require us to go to the

 4                congregation to authorize the sale of the

 5                rimonim.

 6       Q.       And did you do that?

 7       A.       Yes, we did.

 8       Q.       And did the congregation approve the sale?

 9       A.       Yes, they did.

10       Q.       And prior to that congregation meeting is when

11                you had the conversation with Mr. Katz that you

12                told us about on Wednesday?

13       A.       Yes.

14       Q.       After the congregation voted to approve the

15                sale, what happened next?

16       A.       Several days later we received a cease and

17                desist letter from Congregation Shearith Israel.

18       Q.       What was the impact of that cease and desist

19                letter on the potential sale of the rimonim?

20       A.       It brought it to a halt.  It brought it to a

21                complete standstill, a stop.

22       Q.       Okay.  Now, at the current time, you're

23                co-president of the congregation; is that

24                correct?

25       A.       Yes.
```

1    Q.    And can you describe the current relationship

2          between the Newport Congregation, Jeshuat Israel

3          and the New York Congregation, Shearith Israel?

4    A.    I would say there is a lot of friction, a lot of

5          tension between the organizations.  I think

6          Shearith Israel has been disloyal to us.

7    Q.    Why do you feel that way?

8    A.    Well, I think they have, as trustees, at the

9          very least an obligation to look at our

10         situation from the best way that we could handle

11         it, and they could help us to do that.  That it

12         would be in the best interest of the

13         congregations and the Jewish community in

14         America for us to -- for Touro Synagogue to stay

15         open, to have services.

16              I mean, that's the beauty of Touro

17         Synagogue is that it's wonderful.  That it's an

18         architectural treasure, and it's wonderful, that

19         it has this history with religious freedom.  But

20         what's most important about the synagogue is

21         that after 250 years, it still is an active

22         congregation.  It's still open for worship

23         regularly.  That is the most wonderful thing of

24         all.  That's what we feel Shearith Israel should

25         also want for us, as well as the trustees.

1    Q.   As the co-president of the congregation, do you

2         believe that Congregation Jeshuat Israel can

3         work with the current leadership of Congregation

4         Shearith Israel in New York?

5    A.   It doesn't seem like that, no.

6    Q.   Thank you.

7              MR. SNOW:  I have no further

8         questions.  Thank you, Your Honor.

9              THE COURT:  Thank you.  Mr. Solomon.

10             MR. SOLOMON:  Thank you, Your Honor.

11                      *   *   *

12        EXAMINATION BY MR. SOLOMON:

13   Q.   Good morning, Ms. Ross.  Since the dispute

14        arose, how many times have you picked up the

15        phone to call someone at Shearith Israel?

16   A.   I have not spoken to anyone at Shearith Israel

17        directly.

18   Q.   Meaning you haven't picked up the phone yourself

19        to initiate a call; is that correct?

20   A.   That's correct.

21   Q.   Okay.  And how many letters have you written to

22        Shearith Israel since this dispute began seeking

23        a rapprochement or somehow working together

24        while this litigation is pending?  Have there

25        been any of those?

1    A.    No.

2    Q.    You are not a silversmith; is that correct?

3    A.    I'm not.

4    Q.    And you're not a conservator of silver objects;

5          is that correct?

6    A.    I am not.

7    Q.    You personally have never removed the base of

8          any of the rimonim, correct?

9    A.    Correct.

10   Q.    And you personally have never seen anyone remove

11         the base, correct?

12   A.    I've seen pictures of it.

13   Q.    Yes, thank you.  You had testified to that.

14         Now, I get to ask my questions, and I'd like an

15         answer.

16              You have never seen anyone?  You have

17         not removed a base, and you've never seen anyone

18         remove the base, correct?

19   A.    Correct.

20   Q.    Okay.  And you don't know what it takes to

21         remove the base, right?

22   A.    I do not.

23   Q.    Okay.

24              THE COURT:  Could I just ask, Ms. Ross,

25         so that I've got the terminology.  I've seen

```
 1          pictures that are in evidence, of the rimonim
 2          with the beautiful bell on the top, and then a
 3          stick, for lack of a better term.  Is that what
 4          you're referring to is the base or is there a
 5          base that that sits in that holds it?
 6                   MR. SOLOMON:  What I was referring to,
 7          Your Honor, is the shaft at the bottom.  We
 8          actually have an expert who is going to explain
 9          to the Court that the rimonim are made in three
10          parts.  When the silversmith puts them together,
11          he solders them.
12                   THE COURT:  I'm trying to -- is there a
13          picture that could be pulled up?  I just want to
14          make sure I understand when you're using the
15          term what we're talking about.
16                   MR. SOLOMON:  I'll be happy to, Your
17          Honor.
18          BY MR. SOLOMON:
19     Q.   So the bells come off, right, the --
20     A.   Right.
21     Q.   Okay.  Do the bells sometimes find their way
22          into bags and then you have --
23     A.   They fall --
24     Q.   Those fall off?
25     A.   That's not one of the parts we're talking about.
```

1   Q.   Correct, those fall off.  The rest is not

2        detachable, the rest is one piece of silver

3        after it leaves the silversmith, correct?

4   A.   It can be taken apart, as I understand it.

5        They're taken apart into three pieces.

6   Q.   And when you say "can be taken apart," meaning

7        if it goes back to a silversmith or goes back to

8        a conservator, you can try to take off the

9        solder, you can --

10  A.   I don't believe they're soldered.  I believe

11       they can be taken apart for cleaning.

12  Q.   And so it's you're belief that they're not

13       soldered together when they leave the

14       silversmith?

15  A.   That has not been my understanding.

16            THE COURT:  Mr. Solomon, just to finish

17       with the picture when.  You use the term "base,"

18       are you talking about that piece (indicating.)

19            MR. SOLOMON:  Right.

20            THE COURT:  Okay, great.  Thank you.

21            MR. NAFTALIS:  Are you referring to the

22       black thing on the bottom to which it stands?

23            MR. SOLOMON:  No.

24            THE COURT:  That's where I was

25       originally confused, because when I was hearing

1          that term, I thought there was some other piece

2          that it sat in that held it as the base.

3                    MR. SOLOMON:  There is a shaft inside

4          this silver, and the top piece --

5                    THE COURT:  I've got it now.

6                    THE WITNESS:  This would be hollow

7          where it fits on the top of the -- this bottom

8          part would be hollow so it can fit into the

9          scroll.

10                   THE COURT:  I got it now.  Thank you.

11                   MR. SOLOMON:  All I wanted to

12         establish, actually, with this witness is this

13         witness has no personal knowledge of --

14         BY MR. SOLOMON:

15    Q.   You've never seen them taken apart, right?

16    A.   No.

17    Q.   And you don't know the process by which they can

18         be taken apart, right?

19    A.   No.

20                   THE COURT:  Could I ask where is the

21         word -- I've heard this a few times now.  Where

22         is the word "Newport" engraved on that,

23         approximately?

24                   MR. SOLOMON:  Your Honor, do you see

25         where I just made the --

```
1                    THE COURT:  Yes.  I was asking
2          Ms. Ross, but that's okay, either one.  I'm sure
3          it's not a disputed fact.
4                    THE WITNESS:  It's there.
5                    THE COURT:  So it's on that indentation
6          at the bottom that sort of circles around the
7          shaft?
8                    MR. SOLOMON:  No, it's above the
9          little --
10                    THE WITNESS:  The little bead.
11                    THE COURT:  Thank you.
12                    MR. SOLOMON:  And, Your Honor, I do not
13         know if this one has the word "Newport" or this
14         one has the word "Newport," but only one of them
15         does, but otherwise I think I pointed to the
16         right place.
17                    THE COURT:  Got it.
18         BY MR. SOLOMON:
19    Q.   Okay.  Now, Ms. Ross, you talked about the
20         $75,000 offer that was made at a meeting.  Did
21         CJI ever respond to that in writing?
22    A.   I don't think so.
23    Q.   And in your presence, did anyone on behalf of
24         CJI ever respond to that?
25    A.   I believe we looked at it and -- I think we did
```

```
 1              talk about it, that it was insufficient or that

 2              it was unworkable as given.

 3      Q.      So right at that meeting, right at that meeting,

 4              CJI rejected it, correct?

 5      A.      I don't recall.  I believe -- I know we talked

 6              about it.

 7      Q.      I asked whether in your presence, did anyone

 8              ever reject it.  And I thought you said yes.

 9              You were only at that one meeting, right?

10      A.      Right.  I don't know if it was an outright

11              statement, well, we reject this offer

12              categorically.  I think we thought it was not a

13              workable -- not workable as it was presented.

14      Q.      And what was the counteroffer that CJI made?

15      A.      I don't think that that was any part of the

16              discussion of a counteroffer.  I think the offer

17              was made at the beginning of the meeting and it

18              didn't seem appropriate.

19      Q.      And there was a writing that was actually handed

20              to your side, right?

21      A.      Yes.

22      Q.      All right.  Thank you.

23                    THE COURT:  Is that an exhibit,

24              Mr. Solomon?

25                    MR. SOLOMON:  It is, Your Honor.
```

1    THE COURT:  I don't need it right now,

2    but at some point, if you could just reference

3    that for my notes, that would be good.

4    MR. SOLOMON:  DX 405.

5    THE COURT:  Thank you.

6    BY MR. SOLOMON:

7  Q.  Now, you talked about your concern about the

8    rimonim being at the Touro Synagogue as you were

9    worried there is a low chandelier and you were

10    worried about how they were treated and held.

11    You did that on Wednesday?

12  A.  Right, and also the security.

13  Q.  Right.  You're aware that ceremonial religious

14    objects and very ancient and old and venerated

15    objects are used in houses of worship all over

16    the world?  You know that, don't you?

17  A.  Oh, yes.

18  Q.  And you know that Shearith Israel uses its set

19    of Myer Myers rimonim on appropriate occasions,

20    do you know that?

21  A.  Yes.

22  Q.  And you know that Mikveh Israel -- that's the

23    congregation in Philadelphia -- uses their Myer

24    Myers rimonim on appropriate occasions, right?

25  A.  We use ours on appropriate occasions as well.

```
 1   Q.   So you're aware that Mikveh Israel does as well?
 2   A.   I don't know that for a fact.  I imagine so.
 3   Q.   Now, there has been some -- in the literature --
 4        some thought that the Touro Synagogue itself was
 5        designed to feel like the Amsterdam Spanish and
 6        Portuguese Synagogue, do you know that?
 7   A.   I have read that it is -- as a model has some
 8        aspect on some architectural detail such as the
 9        rounded windows from the Amsterdam Synagogue.
10   Q.   And do you know that the Amsterdam Synagogue is,
11        for some of the western sephardic Jews, called
12        the mother synagogue?
13   A.   I have never heard that term.
14   Q.   But you know that they have ancient, ceremonial
15        ritual objects that are used there in that
16        synagogue?  Do you know that?
17   A.   I'm sure they must.
18   Q.   Okay.  And the Curaçao Synagogue, there has been
19        some mention of the travel of the Jews that left
20        Amsterdam right after they fled from Portugal.
21        They went up north and they went to South
22        America, and then went to the New World, right,
23        New York and Newport?
24   A.   Yes.
25   Q.   And are you aware that Curaçao Synagogue has
```

1              ancient, venerated objects that go back hundreds

2              of years that they use, still in use today,

3              during their services?  Do you know that?

4    A.    I don't have any personal knowledge of that.

5    Q.    Do you know that -- have you ever heard of the

6              St. John's Episcopal Church as holding a 1618

7              silver communion, a communion silver from 1618?

8              Do you have any knowledge of that?

9    A.    No.

10   Q.    It wouldn't surprise you that they would still

11             be using their 1618 silver?

12                   MR. SNOW:  Objection.  Calls for

13             speculation.

14                   THE COURT:  Sustained.  If she has no

15             knowledge, she has no knowledge.

16        BY MR. SOLOMON:

17   Q.    It wouldn't surprise you that other

18             congregations have found ways to use their very

19             old and ancient and even delicate silver for

20             ritual use?

21   A.    I imagine they could.

22   Q.    So when you testified that there was a committee

23             that was formed to monatize what ultimately

24             became the rimonim, was there ever a committee

25             that was formed about how to handle properly the

```
 1              rimonim at the Touro Synagogue?
 2    A.   Well, you know, when you use the word
 3         "monatize."
 4    Q.   I'm sorry, can you answer my question?
 5    A.   What was the question again?
 6    Q.   Was there ever a committee formed to figure out
 7         how to properly handle and use the rimonim that
 8         Touro has?
 9    A.   Yes.
10    Q.   What was the name of that committee?
11    A.   The committee that was formed in 2008, is that
12         the committee you're talking about?
13    Q.   Did that committee involve itself in how,
14         physically, to handle the rimonim so they're
15         treated properly and they don't get dented or so
16         they don't hit the chandelier?  Was that part of
17         the mandate of this committee?
18    A.   No.
19    Q.   Okay.  Thank you.  You talked about the meetings
20         and whether Shearith Israel members or trustees
21         attended the CJI board meetings or the
22         congregational meetings, I think you said, over
23         the last 22 years.  You have no evidence or
24         information, do you, that Shearith Israel was
25         actually invited to those meetings?  Do you know
```

```
 1              that one way or the other?

 2    A.    Could you repeat that question?

 3    Q.    Yes.  Was Shearith Israel ever invited to the

 4          board meetings of CJI?

 5    A.    No.

 6    Q.    Now, did you find in the files of CJI a set of

 7          1987 [sic] constitutional bylaws, correct?

 8    A.    Yes.

 9    Q.    And you didn't find any evidence in your files

10          that any Shearith Israel trustee ever amended

11          those bylaws; isn't that correct?

12    A.    Yes.

13    Q.    And you found no evidence in your records that

14          any Shearith Israel trustee was ever notified of

15          a meeting at which the constitution and bylaws

16          of 1897 were going to be amended; isn't that

17          correct?

18    A.    Yes.

19    Q.    And you know of no rule or procedure at CJI

20          where Shearith Israel trustees would have to

21          make themselves known to CJI; isn't that

22          correct?

23    A.    I'm not aware of that.

24    Q.    You mentioned a number of other properties

25          besides the synagogue that CJI owns.  You agree
```

1        with me that CJI's primary responsibility is to

2        the synagogue, don't you?  Can you answer that,

3        yes, no or you don't know?

4   A.   I can't answer that yes or no.

5   Q.   Okay.  Now, I did look at some of your financial

6        statements and the Levi Gayle House does attract

7        its own expenses, right?

8   A.   Yes.

9   Q.   And then there are some expenses that in

10       fairness if you wanted to -- that you could

11       allocate among all of the properties, for

12       example, insurance?

13  A.   Yes.

14  Q.   And the rabbi's house --

15  A.   We aggregate some of the insurance.

16  Q.   That's right.  Those are aggregated.  And those

17       create a benefit for all of the properties,

18       right, like insurance?

19  A.   Yes, they cover all of the properties.

20  Q.   The rabbi's house also attracts its own

21       expenses; is that correct?

22  A.   Correct.

23  Q.   And there are also some general expenses that

24       apply to it, right?

25  A.   Yes.

```
1    Q.   And the Patriot Park also attracts its own
2         expenses, correct?
3    A.   Yes.
4    Q.   And there is general expenses that also apply to
5         it, right?
6    A.   Yes.  I'm not sure I understand.  General
7         expenses and specific general expenses like the
8         insurance and specific expenses like mowing the
9         lawn or something like that.
10   Q.   That's a good example, right, you'd have the
11        Patriot Park that needs the lawn mowed.  So
12        that's specific to Patriot Park, right?
13   A.   Yes.
14   Q.   And then there are also some general expenses
15        like insurance that you buy for all of the
16        properties, including Patriot Park, right?
17   A.   Yes.
18   Q.   And the Loeb Center also attracts some expenses
19        by CJI, and not all of them are reimbursed,
20        correct?
21   A.   I don't know of any offhand.
22   Q.   Property taxes is one?
23   A.   Property taxes are reimbursed.
24   Q.   They are?  Fully?
25   A.   Yes.
```

```
1    Q.   And the Barney House, that also attracts its own

2         expenses or not?

3    A.   As I understand it, I'm not the -- as well

4         informed as others are about the insurances and

5         how the properties are -- how that's handled,

6         but the Barney House and the visitor center are

7         one parcel.

8    Q.   I see.  Thank you.  Would it surprise you, for

9         the year 2012, looking just at the expenses that

10        are specific to the non-synagogue houses, so

11        ignoring all of the general expenses, that more

12        than $50,000 was spent on these other properties

13        in 2012?

14   A.   I don't have knowledge of that.

15   Q.   Do you think that could be a right ballpark?

16   A.   I couldn't speculate on that.

17   Q.   All right.  Fair enough.

18             MR. SOLOMON:  Let's look at PX 181.

19        This is December 9, 2008's special board meeting

20        minutes.

21   Q.   I would like to the turn -- these are the board

22        minutes that -- you're familiar with these board

23        minutes, right?

24   A.   Yes.

25   Q.   And you've been in court all of the times when
```

1      I've confused these in the past, right?

2   A.    Yes.

3   Q.    All right.  So let's look at the last page.  I

4         think I haven't asked anyone about that yet.

5         The last page, please.  The sentence begins,

6         "The sale of the rimonim will be controversial

7         in the larger Jewish community, but we can

8         mitigate that controversy and make an

9         unassailable case by asserting that we are only

10        selling the rimonim because we must have a

11        certain amount of endowment to ensure that the

12        synagogue can remain open as a house of

13        worship."

14              Do you see that?

15  A.    I do.

16  Q.    Now, I listened to your testimony, and I didn't

17        hear you once say that these rimonim are sacred

18        objects.  Are they sacred objects in your mind?

19  A.    I don't know what you mean by sacred objects.

20  Q.    Okay.  Now, the board understood that there was

21        going to be a lot of controversy in the larger

22        Jewish community if CJI sold or tried to sell

23        the rimonim.  You did understand that, right?

24  A.    I don't know that that's what I meant when I

25        said that.  Whenever a nonprofit sells an object

1      from its collection, there is discussion about

2      that.

3   Q.  But what, in fact, you said -- this is signed by

4      Rita Slom.  Are you the one who said that?  Do

5      you remember saying that the sale of the rimonim

6      will be controversial in the larger Jewish

7      community?

8   A.  I don't remember saying that, but the minutes

9      reflect that was part of the conversation.

10  Q.  And it was also part of the conversation that

11     CJI could try to mitigate the controversy,

12     right, by asserting that you're only selling

13     them because you need a certain amount for an

14     endowment, right?

15  A.  For the synagogue to remain open as a house of

16     worship.

17  Q.  And was it because of the PR or the public

18     controversy that you were concerned about --

19     that led you not to disclose your efforts to

20     Shearith Israel?

21  A.  When we signed the agreement with Christie's,

22     Christie's had asked us not to discuss it, and

23     I'm not sure why -- why we necessarily would

24     have.

25  Q.  Right.  Well, you never disclosed it to anyone

1           at Shearith Israel, correct?

2     A.    I did not, no.

3     Q.    But you knew that you were going to have to talk

4           to Shearith Israel, you knew that, and you told

5           Christie's that, right?

6     A.    No.

7     Q.    No?  Let's look at PX 275.

8                THE COURT:  Before we do that, let's

9           take a break.  It's now 11:00 o'clock, so we'll

10          be back in 15 minutes.

11               (Brief break taken.)

12               MR. SOLOMON:  Thank you, Your Honor.  I

13          would like to show the witness PX 46 because I

14          was advised that instead of saying 1897, I said

15          1987 at least once.  It's the last page of the

16          document.

17               THE COURT:  So when you said 1987 you

18          did not mean 1987?

19               MR. SOLOMON:  Your Honor also heard

20          1987?

21               THE COURT:  Yes.  I wrote down 1987.

22               MR. SOLOMON:  Thank you, my error.  So

23          if Your Honor please, I'm showing you a

24          constitution and bylaws from 1897.

25               THE COURT:  Now that makes sense.

74

```
1              BY MR. SOLOMON:

2       Q.   This was in the files of CJI, correct?

3       A.   Yes.

4       Q.   Did you understand that I was asking you

5            about --

6       A.   There are 1987 bylaws also.  That's what I

7            thought you meant.

8       Q.   Fair enough.  So this was in the CJI files,

9            correct?

10      A.   Yes.

11      Q.   And there is nothing in the CJI files that

12           indicates that any Shearith Israel trustee ever

13           amended this constitution and bylaws; is that

14           correct?

15      A.   Yes, not that I'm aware.

16      Q.   And there is nothing in the CJI files that

17           indicates that any Shearith Israel trustee ever

18           received notice that this constitution and

19           bylaws were going to purportedly be amended; is

20           that correct?

21      A.   Not that I've seen.

22                 MR. SOLOMON:  Thank you.  That's what I

23           wanted to establish, Your Honor.

24                 THE COURT:  Thank you.

25              BY MR. SOLOMON:
```

```
 1    Q.    So I was going to ask you to look at PX 275,

 2          please.  This is a letter from Christie's to

 3          Mr. Segal, and you are CCd on it, correct?

 4    A.    Yes, I see that.

 5    Q.    This letter is undated, but it discusses whether

 6          or not CJI was going to engage Christie's.  So

 7          would you agree with me that this letter is

 8          dated sometime in 2009?

 9    A.    Yes.  I have not seen this letter.  I don't

10          believe I have.  If it was at the time that we

11          engaged Christie's in 2009, yes.

12    Q.    Okay.  Thank you.  On the last page of the

13          letter, Christie's says in this letter to Mr.

14          Segal -- I'm going to quote the second to the

15          last paragraph.  "Time is of the essence as

16          there has already been some discussion of the

17          possible sale online and among collectors in New

18          York.  If you agree to use Christie's as sole

19          advisor, we would proceed immediately with the

20          research, a condition report, the structure

21          discussions with Shearith Israel and very

22          importantly - play a deflecting role when it

23          comes to discussion about the sale."

24                Do you see that?

25    A.    I do.
```

1   Q.   And in 2009, you understood that someone was

2        going to need to play a deflecting role when it

3        came to a sale because of the -- whether it's

4        the community at large or the Jewish community,

5        there was going to be serious backlash to

6        announce a sale of the ritual objects, correct?

7   A.   I'm sorry, I was reading.  Please --

8   Q.   You understood that there was going to be some

9        political PR backlash, right?  Yes or no.

10  A.   I just have not read what this says.

11  Q.   Very importantly - play a deflecting role when

12       it comes to a discussion about the sale.  That's

13       the phrase I wanted to call to your attention.

14  A.   I probably would have to take it in context with

15       the whole paragraph.

16  Q.   Now, in 2008, the board minutes that we looked

17       at before the break said that there was going to

18       be controversy within the Jewish community, and

19       you said it was going to be broader than the

20       Jewish community, right?

21  A.   Yes.

22  Q.   And that's what this is referring to also, the

23       public controversy, correct?

24  A.   I don't know I read it exactly that way, but

25       that -- it says here that we would have to have

1          a strategy for selling them.  I think that

2          that's correct.

3     Q.   All right.  The strategy was to assert that you

4          needed to keep the doors open.  That was a

5          strategy that you came up with, correct?

6     A.   No, that was the truth.

7     Q.   And that was the strategy that was used

8          according to you because you thought it was

9          truthful; is that correct?

10    A.   We thought that that's what -- we thought we

11         were selling our rimonim in order to secure the

12         future of the synagogue.

13    Q.   There is a reference here to the structured

14         discussions with Shearith Israel.  So this is in

15         2009, and Christie's and CJI know that they're

16         going to need to be structured discussions with

17         Shearith Israel, right?

18    A.   You know, I understand that I was copied on

19         this.  I don't recall ever reading this document

20         before.  I don't know what they meant by that.

21    Q.   Okay.  But you do know that when you had the

22         discussion with Michael Katz in approximately

23         2009, you didn't reference the rimonim, the Myer

24         Myers rimonim as possible sale objects; is that

25         correct?

78

1   A.   You mean after the Forward article appeared,
2        that conversation?
3   Q.   Well, you say that it was after the Forward
4        article.  It was in 2009?
5   A.   It was in 2009.
6   Q.   You testified on direct to a discussion with
7        Michael Katz in 2009?
8   A.   I did mention the rimonim.  I mentioned that we
9        were looking at all of our assets, and I
10       mentioned what those assets were.
11  Q.   You did.  Let's take a look at your deposition,
12       please.  I'll put it up on the screen.  I want
13       to begin on page 247.
14            Now, your recollection of 2009 is that
15       Mr. Katz called you, correct?
16  A.   Yes.
17  Q.   But you don't have any recollection that the
18       Forward article was actually discussed during
19       the conversation; isn't that right?
20  A.   I don't recall whether it was or not, but it was
21       right in that same time frame.
22  Q.   And so you don't recall whether it was or not,
23       and you told him generally that you were looking
24       at selling assets, correct?
25  A.   Yes.

1    Q.    Okay.

2    A.    I can't read what's on the screen here.  It's a

3          little small.

4    Q.    So far I haven't shown it to you because you're

5          answering my questions and just at the moment I

6          can't show you.  There is no predicate to show

7          you this, so if you could just answer a few more

8          questions, and I may have to show this to you,

9          so thank you.

10                So you told him generally that you were

11         looking to selling assets, correct?

12   A.    Yes, that was the conversation.

13   Q.    And you didn't name specific assets, correct?

14   A.    I'm not sure what it says or how I said it or

15         whether we had an in-depth discussion.  I don't

16         recall the deposition -- that we talked about it

17         at the deposition, but we did talk about -- if

18         you're asking me what we did talk about.  He

19         asked me what it was about, that he heard we

20         were having financial problems, what was going

21         on.  And I told explained to him that we were

22         looking to create an endowment, sell assets.

23         That's my recollection of the conversation.

24   Q.    You don't recall discussing with him the sale,

25         the potential sale of the rimonim; isn't that

```
 1              correct?
 2    A.    As I recall the conversation.
 3    Q.    I'm sorry, yes or no.
 4    A.    I can't answer that yes or no.  As I recall the
 5          conversation --
 6    Q.    There is no question pending.
 7    A.    We discussed all the assets.
 8    Q.    You discussed all the assets generally?
 9    A.    The assets that we were thinking of using.
10    Q.    Did you specifically name the rimonim, yes or no
11          or you don't recall?
12    A.    My recollection is that I did mention them.
13    Q.    Okay.  So now I want you to look at page 250 of
14          your deposition.
15    A.    Okay.
16    Q.    This begins at the bottom of page 249, and I'm a
17          going to read this into the record and ask you
18          if you made the statement.
19              "QUESTION:  Can you describe what you
20          all talked about other than in general?
21              ANSWER:  Well, I think I told you
22          earlier what the conversation was.  I thought --
23          I went" --
24              THE COURT:  Hold on one second.  We're
25          not there, and you really have got to slow down,
```

1          Mr. Solomon, when you read.

2                MR. SOLOMON:  My apologies.

3                "ANSWER:  Well, I think I told you

4     earlier what the conversation was.  I thought I

5     went through that conversation.  He asked what

6     was going on.  I said that our income was

7     reduced because of the funds being lower, our

8     income from the funds being lower, and that we

9     were looking at ways to secure the future of the

10    synagogue.

11              And one of the things we thought of

12    doing was selling an asset if we had to and

13    creating an endowment from that asset.  I don't

14    think at the time I spoke to him -- I don't

15    exactly remember we had focused on the rimonim

16    at that point.  We had real estate and we had

17    other possessions.  We were looking at all of

18    them to see which would be the best to use to

19    create an endowment.

20              "QUESTION:  So you told him generally

21    that you were looking at assets?

22              "ANSWER:  Yes.

23              "QUESTION:  And you don't -- you didn't

24    name specific assets.

25              And you then said,

```
 1                    "ANSWER:  I think the article, the
 2             Forward article had mentioned the rimonim."
 3                    Did you give those answers to those
 4             questions at your deposition?
 5     A.      Yes.
 6     Q.      Thank you.  Over on page 251 I'm going to recall
 7             some more testimony to your attention.  It
 8             begins on line 16.
 9                    "QUESTION:  Do you remember him asking
10             you about the rimonim?
11                    "ANSWER:  I think he would have -- he
12             asked about selling the house and selling the
13             rimonim and selling -- we have a Gilbert Stuart
14             portrait, selling the portrait.  We were
15             thinking of selling those things.  And I said,
16             as I recall -- this is a long time ago and it
17             was a ten-minute conversation -- that we hadn't
18             decided exactly what we were going to do, but we
19             were committed to creating an endowment to
20             ensure the future of the synagogue.
21                    "QUESTION:  And it sounds like the
22             rimonim came out along with the other assets
23             considered for sale, correct?
24                    "ANSWER:  Yes.
25                    "QUESTION:  Do you recall any
```

1       specificity regarding which rimonim were going

2       to be sold?

3              "ANSWER:  No.  And I don't think at

4       that time it had been decided which would be

5       sold.

6              "QUESTION:  Just rimonim as a general

7       category?

8              "ANSWER:  We have two sets of Myer

9       Myers rimonim at Touro Synagogue.

10             "QUESTION:  And several others?

11             "ANSWER:  And several others, yes.

12             "QUESTION:  Non-Myer Myers, correct?

13             "ANSWER:  Yes."

14             And did you give that testimony at your

15      deposition?

16   A.  Yes.

17   Q.  Thank you.  After this meeting you did not call

18      or otherwise communicate with Mr. Katz until

19      June of 2012, correct?

20   A.  As I recall, yes.

21   Q.  Okay.  And you didn't write him or update him in

22      any way, either orally or in writing, correct?

23   A.  Correct.

24   Q.  And indeed at a congregational meeting, you

25      actually told the congregants that they should

```
 1          also not disclose CJI's efforts to try to find a
 2          buyer for the rimonim, correct?
 3    A.    I must have.  I mean -- it must be, yes.  I'm
 4          going to say yes, we didn't tell them.
 5    Q.    Thank you.
 6    A.    I don't have a specific recollection of that,
 7          but I'm certain that we must have.
 8    Q.    If there is a board minute that reflects that,
 9          then I think you would agree that you said it?
10    A.    If the minutes say, yes.
11    Q.    Thank you.  In the agreement that you were shown
12          on your direct testimony with Christie's, it is
13          you who are representing that CJI has good title
14          to the rimonim, correct?
15    A.    Yes, I thought that we did.  I think that we do.
16    Q.    And Christie's wasn't making any statements or
17          representation to you that it thought CJI had
18          good title; isn't that correct?  Yes or no or
19          you don't remember.
20    A.    That's not a full answer.  Yes or no would not
21          be a complete answer.
22    Q.    Did you in 2009 ever hear from Christie's that
23          they thought that CJI had good title?
24    A.    Not directly.
25    Q.    Well, did you directly ever hear from Christie's
```

1              that Christie's thought CJI had good title?

2     A.    No.

3     Q.    Now, you never supplied Christie's with any

4           documentation or information about the

5           provenance of the rimonim; is that correct?

6     A.    They told us that they would investigate the

7           provenance, that that was part of their due

8           diligence, part of their research in selling

9           them.

10    Q.    So my question was:  You never gave them any

11          information, did you?  Yes or no.

12    A.    About?

13    Q.    About the provenance of the rimonim?

14    A.    No.

15    Q.    Yes or no.

16    A.    No, other than the literature that the public

17          literature about them.

18    Q.    You didn't give them any public literature; is

19          that right?  CJI gave them nothing to your

20          knowledge, correct?

21    A.    I'm sure we talked about the Barquist book.

22                MR. SOLOMON:  I'm sorry, move to

23          strike.

24    Q.    What I'd like to know is not what you're sure

25          that you did, but what you can testify to under

1          oath that you did.

2                    Did you ever give them any information?

3     A.   No.

4     Q.   To your knowledge, did anybody at CJI give them

5          any information?

6     A.   About?

7     Q.   The provenance of the rimonim.

8     A.   No.

9     Q.   You did not notify Shearith Israel that you had

10         entered this agreement with Christie's, correct?

11    A.   Pardon me?

12    Q.   You at no point told anyone from Shearith Israel

13         that CJI had entered into the October 2009

14         agreement with Christie's, correct?

15    A.   Yes.

16    Q.   After October 2009, did you understand that

17         Christie's was relying on the representation

18         that you made that you had good title to and

19         right to possession of the rimonim?

20    A.   Did I think they were relying on that?

21    Q.   Yes.

22    A.   I don't know.

23    Q.   Okay.  The agreement with Christie's also says

24         that you have disclosed to Christie's all

25         information in sellers possession relating to

```
 1              the provenance of the property.  Did you believe
 2              after you signed this agreement that Christie's
 3              was relying on that representation?
 4    A.   I don't know.
 5    Q.   Now, when you first went to the congregation in
 6              2009 to get a blanket authorization to sell
 7              assets, that was rejected, correct?
 8    A.   Yes.
 9    Q.   And at that meeting, you didn't tell the
10              congregation that Christie's thought that CJI
11              had good title to the rimonim?
12    A.   Now, what was the date of that meeting?
13    Q.   2009.  Let's take a look at the document.
14              MR. SOLOMON:  I'm showing the witness
15              DX 385, which has been disclosed before.  Thank
16              you.
17    Q.   These are minutes of the congregational meeting;
18              is that right?
19    A.   Board meeting of March 29, 2009.
20    Q.   This was a special meeting of the congregation;
21              is that right?
22    A.   Yes.
23    Q.   Okay.  At this point you asked for an
24              authorization to sell or otherwise dispose of
25              any real and personal property that belonged to
```

1              the congregation at their discretion and in the

2              best interest of the congregation necessary to

3              raise an endowment and meet current expenses,

4              correct?

5        A.    Yes.

6        Q.    And that was defeated, correct?

7        A.    Yes.

8        Q.    And at this meeting you disclosed nothing to the

9              congregation anything about what Christie's said

10             or thought; is that right?

11       A.    I haven't read these, but if you say there was

12             nothing in here about that, I will say yes.

13       Q.    Okay.  That's fine.  Thank you.  The Court can

14             look at the document.

15                   But then in June of 2012, where you had

16             the next congregational meeting to discuss the

17             sale -- let me show you those, please.  At this

18             meeting -- I want you to turn to page 3 of the

19             document, Ms. Ross.

20       A.    Yes.

21       Q.    On page 3, that's DX 398.  At this meeting you

22             are reported to have said, "She asked added that

23             Christie's research indicates we have good title

24             to the items."

25                   Do you see that?

1   A.   I do.

2   Q.   Now, at that point you had not seen any of

3        Christie's research, correct?

4   A.   I understood that they were --

5   Q.   I'm sorry, yes or no, you had not seen any of

6        Christie's research?

7   A.   I had not, no.

8   Q.   And you were aware at that time that Christie's

9        was not making any conclusion about title at

10       all?  CJI was making the representation about

11       title, not Christie's?

12  A.   I don't know that.

13  Q.   Okay.  During this period, Mr. Segal had urged

14       you to call Shearith Israel during this period

15       meaning from 2008 to 2012; isn't that right?

16  A.   I don't recall that at all.

17  Q.   I'll read to you from his deposition to see if

18       it refreshes your recollection.  I'm reading

19       from page 70, lines 9 to 21.

20            MR. SNOW:  Objection, your Honor.  He's

21       certainly permitted to show the witness anything

22       to refresh her recollection, but it's not part

23       of the record.

24            THE COURT:  That's true.  You can show

25       it to her to see if it refreshes her

1    recollection, but you can't read it into the

2    record.

3              MR. SOLOMON:  I believe this is part of

4    the record, Your Honor.  We've designated this.

5              THE COURT:  The deposition isn't part

6    of the record unless it's a substitute for the

7    witness, but I haven't seen Mr. Segal's name on

8    a list of depositions.

9              MR. SOLOMON:  Maybe our other -- I

10   believe we designated his testimony, but I will

11   check.  So at this point so I can proceed, I'll

12   just be using this to refresh her recollection.

13             THE COURT:  Ms. Ross, you can see the

14   deposition of Mr. Segal in front of you, right?

15             THE WITNESS:  Yes.

16             THE COURT:  Read it to yourself and see

17   if it refreshes your recollection about whatever

18   is that we're talking about.

19             THE WITNESS:  Just that portion?

20             THE COURT:  That portion.

21             THE WITNESS:  So what is the question?

22   BY MR. SOLOMON:

23   Q.   Does it refresh your recollection that Mr. Segal

24        had urged you to call or communicate with

25        Shearith Israel?

```
 1    A.   I don't recall that.  I don't recall that
 2         conversation.
 3    Q.   Thank you.
 4              MR. SOLOMON:  Let's look at DX 351 and
 5         352, please.
 6    Q.   DX 351 is a letter from David Nathan to you
 7         dated January 28, 1999, correct?
 8    A.   Yes.
 9    Q.   And he's writing to you in your position at
10         Society of Friends of Touro Synagogue, correct?
11    A.   Yes.
12    Q.   And what he is giving you there is a letter for
13         you to submit, along with an application to the
14         national trust for historic preservation,
15         correct?
16    A.   Yes.
17    Q.   And you asked him for this letter, correct?
18    A.   I did.
19    Q.   And he helped you give you what you needed,
20         right?
21    A.   Yes.
22    Q.   And in this letter he says that the Board of
23         Trustees Congregation Shearith Israel of the
24         City of New York, the owner of the Touro
25         Synagogue located in Newport, Rhode Island
```

1          supports the efforts of the Society of Friends

2          of Touro Synagogue to compile a historic

3          structures report relating to the Touro

4          Synagogue and its application to the national

5          trust for historic preservation for funding to

6          compile such a report.  Do you see that?

7     A.   Yes.

8     Q.   Did you draft this for him?

9     A.   I'm sorry?

10    Q.   Did you draft this for him?

11    A.   No.

12    Q.   Did you tell him --

13    A.   I don't recall.  I don't think I did.

14    Q.   Did you tell him what you wanted him to say?

15    A.   Well, I told him what the purpose was.  The

16         purpose was we were applying for a grant.  And

17         in order to apply for a grant, all of the

18         parties that have an interest in the property

19         have to be on board because the grantors are

20         interested in seeing that the money is going to

21         be used for the purpose that the grant is being

22         given.

23    Q.   Did you ever in any capacity, whether at CJI or

24         at the foundation, ask Shearith Israel to file

25         something with the governmental agency when --

1          and they refused to do that?

2    A.    No.

3    Q.    And then the next letter which is DX 352 is your

4          letter to him thanking him for the letter of

5          support, correct?

6    A.    Yes.

7                MR. SOLOMON:  I'd like to pull up DX

8          503, and I think we may have to give The Court a

9          copy shortly.  It's just this one page.  Do we

10         have it?  Okay.

11               This is a document that was produced

12         out of the foundation's files, and it's headed

13         proposed slate 2003,2004.

14               Are you familiar with this document?

15   A.    Yes.

16   Q.    And was this the slate that was then voted in?

17   A.    So I don't think that I was working for the

18         foundation at this time any longer.

19   Q.    But you know the document?

20   A.    It looks like what it is, and I recognize some

21         of the names on it, but I don't have a personal

22         --

23   Q.    On your direct examination, you were shown a

24         document from 2005.  Were you working at the

25         foundation then?

1    A.    I wasn't working for the foundation at that

2          time.  The slate is a working document for, you

3          know, the organization.

4    Q.    Can you tell us whether this proposed slate was,

5          in fact, elected or appointed?

6    A.    I'm going to assume it was.  I'm not sure I was

7          at that meeting.

8    Q.    Okay.  Peter Neustadter who is under the heading

9          ex-officio, he was the president of Shearith

10         Israel at the time?

11   A.    Yes, he was ex-officio.

12   Q.    And Jonathan deSola Mendes, you've mentioned him

13         or your direct, he's listed here under the class

14         of 2004 as director?

15   A.    Yes.

16   Q.    Two below him is you, I think.  Isn't that you?

17   A.    Yes, that's me.

18   Q.    So you were director then?

19   A.    I was on the board then.

20   Q.    And then under the board of trustees --

21   A.    I didn't remember that.

22   Q.    Under board of trustees under New York?

23   A.    Yes.

24   Q.    There is a name Eliza deSola Mendes, she's a

25         Shearith Israel member, correct?

1    A.    She is Jonathan's daughter.

2    Q.    She was active in the foundation, wasn't she?

3    A.    I don't think she was active in the foundation

4          other than a member of the board of trustees

5          which was an honorary group of people.

6    Q.    And Edgar Nathan.  It says Edgar H. Nathan,

7          III.  He was also a former parnas of Shearith

8          Israel and is a member of Shearith Israel; is

9          that correct?

10   A.    Yes, he was.

11   Q.    Let's look at Exhibit 507, please.  There was a

12         meeting in 2005 at Shearith Israel to update the

13         board of Shearith Israel on the foundation's

14         fundraising efforts.  Were you aware of that?

15   A.    I know that a group went to see Shearith Israel

16         to update them as you say.

17   Q.    Okay.  You were not among that group?

18   A.    I was not.

19   Q.    Let me ask you to look at another document,

20         please.

21   A.    I probably should look since I know that I was

22         -- I never attended a meeting at Shearith

23         Israel.

24   Q.    Okay.  Thank you.  Let me ask you to look at DX

25         524.  That's the DX equivalent of PX that you

1     looked at during your examination.  170.  Your

2     counsel read parts of that into the record

3     during your examination, and I want to ask you

4     about a few pages here.

5               To begin the campaign to save Touro

6     Synagogue included the building and its

7     artifacts, correct?

8  A.  Please repeat that.

9  Q.  The campaign.

10  A.  Yes.

11  Q.  The name of the campaign was the campaign to

12     save Touro Synagogue, correct?

13  A.  Yes.

14  Q.  And it was a successful campaign, wasn't it?

15  A.  We accomplished our goal of restoring the

16     synagogue.

17  Q.  Okay.  And that was a campaign that included

18     funding to restore the Touro Synagogue and its

19     artifacts; is that correct?

20  A.  That was among the goals of the campaign.

21  Q.  Okay.  If you look at page 008 of this

22     document.  So it's page 8 of 22.  There is a

23     reference there to special gifts and it reads,

24     "Those who have the capacity to make gifts at

25     the $5,000 to $99,000 level, and those that have

97

```
 1              a unique connection to Touro Synagogue, such as
 2              members of Shearith Israel in New York, local
 3              preservation advocates."
 4                   Do you see that?
 5    A.   I do.
 6    Q.   And so the members of Shearith Israel in New
 7              York were among the targeted group that the TSF
 8              went to to try to raise funds, correct?
 9    A.   Well, it says prospective donors, so they were
10              prospective people that they could go to.
11    Q.   And then on page 10 of 22 -- we'll turn two
12              pages in.  It says the campaign leadership will
13              be responsible for the engagement and
14              participation of the following groups.  And then
15              again it lists as the fourth bullet, special
16              gifts.  And again says, "Those who have the
17              capacity to make gifts at the $5,000 to the
18              $99,000 level, and those that have a unique
19              connection to Touro Synagogue, such as members
20              of Shearith Israel in New York."  Correct?
21    A.   It says the leadership would be responsible to
22              engage them.
23    Q.   And if you look three pages into page 13, under
24              job descriptions.
25    A.   Please ask me again.
```

98

1    Q.    Turn to page 13 of the document, please.

2    A.    Yes.

3    Q.    And there it gives out responsibilities.  And

4          Keith had a responsibility to recruit three to

5          five members of the community who can identify,

6          cultivate and solicit at least three prospects

7          for each gift required in the required range.

8                So he's given the responsibility for

9          special gifts, right?

10   A.    Yes, that's what it says.

11   Q.    And we saw that the special gifts people

12         included the members of Shearith Israel,

13         correct?

14   A.    Yes.

15   Q.    If you look at page 15 of 22.  So that's page

16         524-015.  Under Keith's responsibilities are to

17         go to Shearith Israel members.  It says Shearith

18         Israel, October.  And that was going to be

19         October of 2005; is that right?

20   A.    I guess.  I'm not familiar with this document

21         any longer, but it says Keith.  And it says

22         Shearith Israel, and it says October, yes.  Now

23         I see it.

24   Q.    So during this period you understood that the

25         foundation was going to be going to the members

```
 1             of Shearith Israel, correct?
 2     A.      I see that it lists here that it was Keith's
 3             responsibility to do that.  Whether he did or
 4             not, I don't know.
 5     Q.      And so you don't -- do you know sitting here
 6             today whether members of Shearith Israel did or
 7             did not contribute to this campaign?  Members,
 8             not Shearith Israel, but members of Shearith
 9             Israel.  Do you know?
10     A.      I don't know how many or if any did.
11     Q.      Are you familiar with the liaison program that
12             Shearith Israel had with CJI?
13     A.      I've heard of it.
14     Q.      And who during your period as co-president, who
15             were the liaison from the CJI side?
16     A.      I'm not certain that anybody was identified to
17             me as the liaison.  There were individuals who
18             would come to the George Washington letter
19             reading I think as representatives of Shearith
20             Israel or because they had been asked by
21             Shearith Israel, perhaps, to communicate with us
22             as necessary or if necessary.
23     Q.      Was the liaison program one where there was a
24             line of communication that was open for the
25             communication between Shearith Isreal and CJI?
```

1   A.   The only member of Shearith Israel with whom I

2        had any conversations relating to the synagogue

3        was Michael Katz.

4   Q.   Did you know that Mr. John deSola Mendes was

5        also a liaison at some point in time?  Did you

6        know that?

7   A.   I think he was, but that was earlier.

8   Q.   Between Michael Katz and Mr. DeSola Mendes,

9        Lenny Groopman was a liaison, did you know that?

10  A.   I have heard that.  I don't have any knowledge

11       -- I don't think I was president or -- I was

12       working for the foundation at that time.

13  Q.   Do you know that Mr. Groopman participated in

14       the foundation, attended foundation meetings?

15  A.   I don't recall that he did.  I know he read the

16       seixas -- I believe -- I'm not even sure that he

17       may have read the seixas letter.  I don't know.

18  Q.   I probably should have said Dr. Groopman.  I'm

19       sorry.  Let me show you one more document.

20  A.   There's always room for one.

21  Q.   Can you identify this as minutes of the Society

22       of the Friends annual meeting in August of 2003?

23  A.   Yes, that's what its titled.

24  Q.   And you see that -- I want to make sure that

25       Dr. Groopman attended, the second to last

1    paragraph on the page.

2    A.    Yes.

3    Q.    Thank you.

4              MR. SOLOMON:  Your Honor, please, may I

5    have one minute.  I think I'm completed.

6              THE COURT:  Sure.

7              MR. SOLOMON:  Did I not say this was

8    X508.  Okay, thank you.

9              Your Honor, I have nothing further.

10   Thank you.

11             THE COURT:  Mr. Snow.

12             MR. SNOW:  Could I have Exhibit D 450,

13   please.  Your Honor, for the record, Mr. Solomon

14   had referred, but did not show Exhibit D 405

15   because that's one of the few documents that

16   plaintiffs had objected to, but we are

17   withdrawing our objection.  So that may be

18   entered as a full exhibit.

19             THE COURT:  Okay.

20                  *   *   *

21        REDIRECT EXAMINATION BY MR. SNOW

22   Q.    Ms. Ross, do you see Exhibit D 405 on the

23        screen?

24   A.    Yes.

25   Q.    Is this the writing that Mr. Solomon referred to

1          that contained a discussion of potential

2          contribution or annual contribution for up to

3          ten years in the amount of $75,000?

4     A.   Yes.

5     Q.   Okay.  If I could direct your attention to the

6          first paragraph.  It says, and I quote, "What

7          follows is a"  --

8               THE COURT:  Hold on a second.  Do you

9          folks have a copy?  I could get mine on my desk,

10         but if you have a handy copy it's easier for me

11         to highlight right on the documents.  Thank

12         you.

13              Thank you.  Go ahead, Mr. Snow.

14         BY MR. SNOW:

15    Q.   It says, and I quote, "What follows is a

16         non-binding list of discussion points, all of

17         which are without prejudice and subject to

18         actual and clearer documentations, approval of

19         the CSI board and any other necessary

20         approvals."

21              Do you see that?

22    A.   Yes, I do.

23    Q.   Did you understand that this was merely a

24         discussion point as opposed to an actual offer?

25    A.   I'm afraid I don't know how to respond to that.

1    I see what that says.  We were looking at it and

2    talking about it.

3  Q.  Well, do you know what the word "non-binding"

4    means?

5  A.  Well, of course.  It means that it's

6    non-binding.

7  Q.  Then paragraph A of these discussion points

8    says, "CSI will use reasonable efforts to donate

9    or have donated to Touro Synagogue enough to pay

10    up to" -- and then there is a bracket -- "50 to

11    75 percent of Touro's actual operating

12    expenditures up to a maximum of $75,000 in any

13    given year during the ten calendar years, 2013

14    to 2022 with no carry over between years and no

15    undertaking thereafter, unless agreed to in

16    writing by CSI."

17        Did I read that correct?

18  A.  Yes.

19  Q.  Okay.  Let's go down to paragraph C.  Paragraph

20    C, was this a condition that Shearith Israel was

21    placing on this potential donation?

22  A.  Yes.

23  Q.  Let me read that for the record.  "Touro

24    Synagogue will confirm both to CSI and to the

25    public that CSI owns the land, building,

1           improvements, personalty, et cetera, including

2           without limitation, all ritual objects,

3           including without limitation, the safir torah

4           and rimonim at or used at for Touro Synagogue.

5                 "The proposed sale of the rimonim to

6           the Boston Fine Arts Museum will be modified to

7           one where a long-term borrowing arrangement for

8           a period not to exceed ten years or the length

9           of time permitted under all applicable rules or

10          law will be negotiated with MFA, subject to

11          CSI's approval of all terms in its discretion."

12                Did I read that correctly?

13     A.   Yes.

14     Q.   Did the Board of Congregation Jeshuat Israel

15          believe that this was a viable alternative to

16          creating your own endowment?

17     A.   It wasn't a viable alternative.

18     Q.   Why not?

19     A.   Well, it took away all of our rights and all of

20          the responsibilities that we had been carrying

21          out over the years, as well as our property.

22     Q.   Now, on cross-examination Mr. Solomon asked you

23          about whether or not a committee was charged

24          with looking at how the rimonim could be used

25          without damaging them.  Do you recall that?

1    A.    I do.

2    Q.    Is there a ritual committee?

3    A.    It would be the ritual committee that was

4          responsible for the -- for taking care of the

5          ritual objects and -- for example, the rimonim.

6    Q.    Okay.  And what is the ritual committee at

7          Congregation Jeshuat Israel?

8    A.    The ritual committee is that committee that's

9          responsible for the synagogue's service and the

10         ritual objects and the use of the ritual

11         objects.

12   Q.    Now, in addition to the concerns that you

13         expressed earlier today about how the rimonim

14         could get damaged, were there any security

15         concerns concerning the rimonim?

16   A.    Well, that was one of our big concerns, that

17         they were so valuable that they would -- having

18         them in the synagogue, using them in the

19         synagogue all the time and it being known that

20         they were in the synagogue would jeopardize

21         their security.

22   Q.    What type of security is available at Touro

23         Synagogue to protect valuable objects such as

24         the rimonim?

25   A.    There is security.  There is an alarm system

1        that is engaged when the synagogue is not in

2        use.  The rimonim are right in the ark right in

3        the front of the building, and it would be easy

4        -- we were concerned that it would be easy to

5        penetrate the building, and we were concerned

6        that one of the personnel might be forced to go

7        into the building and relinquish the objects.

8    Q.  And as co-president of the congregation, do you

9        have concerns about -- security concerns about

10       the fact that Touro Synagogue is the oldest

11       synagogue in the United States?

12   A.  We're always concerned about security at the

13       synagogue for ourselves, for the service, for

14       the people who visit and for the people who

15       visit for tours.

16   Q.  Now, to your knowledge as part of the leadership

17       of the congregation, are you personally aware of

18       any Jewish organization other than Congregation

19       Shearith Israel of New York who has complained

20       about the potential sale of the rimonim to the

21       Museum of Fine Arts?

22            MR. SOLOMON:  Objection.  Calls for a

23       hearsay response.

24            THE COURT:  Overruled.

25   A.  Am I aware that anybody else objected to it?

1    Q.    Anybody besides Shearith Israel.

2    A.    No, no one.

3    Q.    Now, Mr. Solomon asked you about the 1897

4          bylaws, and it's fair to say that you weren't a

5          member of the congregation in 1897?

6    A.    Thank you, no.

7    Q.    Are you aware because of your leadership

8          position that those bylaws were amended in 1945?

9    A.    Yes.

10   Q.    That was also long before you were involved in

11         the congregation, correct?

12   A.    Correct.

13               THE COURT:  Tread lightly, Mr. Snow.

14               THE WITNESS:  Thank you, Your Honor.

15               THE COURT:  You're welcome.

16         BY MR. SNOW:

17   Q.    The 1945 amendments were done at or around the

18         time that the tri-partite agreement between the

19         United States of America, Jeshuat Israel and

20         Shearith Israel was entered into?

21   A.    Yes.

22   Q.    During the time that you had been involved in

23         leadership of the congregation, have you played

24         any role in amending the bylaws?

25   A.    Yes.

```
 1    Q.   Okay.  When were you first involved?
 2    A.   I was a chairman of the bylaws committee for a
 3         revision in 1994.
 4    Q.   And as of that time, the bylaws you were looking
 5         to revise, did they provide for any role by
 6         Congregation Shearith Israel and the governance
 7         of Congregation Jeshuat Israel?
 8              MR. SOLOMON:  I object to the question,
 9         particularly on redirect.  This is a witness who
10         doesn't have personal knowledge of this, and we
11         have the documents.
12              THE COURT:  I'm going to have to have
13         it read back, I'm sorry.
14              (Last question read back.)
15              THE COURT:  Overruled.  If you know.
16              THE WITNESS:  I'm sorry, could you
17         repeat the question.
18              (Last question read back.)
19    A.   No.
20    Q.   Now, Mr. Solomon was asking you on cross-
21         examination about the discussion you had in 2009
22         with Michael Katz.  Do you recall that?
23    A.   I do.
24    Q.   He asked you whether the discussion as it
25         related to rimonim just involved the possible
```

```
 1              sale of rimonim in general without focusing on
 2              any particular rimonim.  Do you recall that?
 3     A.       Yes.
 4     Q.       Now, you testified --
 5     A.       Of course we didn't know at that time.
 6     Q.       Right.  The congregation only has two sets of
 7              Myer Myers rimonim?
 8     A.       Right.
 9     Q.       But it does have other sets of rimonim?
10     A.       It does.
11     Q.       Are there any other sets of rimonim owned by the
12              congregation that have any significant value
13              approaching the value of the Myer Myers?
14     A.       No.
15     Q.       Does the congregation own any other sets of
16              rimonim that could be used to raise an endowment
17              to secure the foundation of the congregation?
18     A.       No.
19     Q.       Mr. Solomon on cross-examination asked you about
20              a March 29, 2009 meeting.  This was the meeting
21              of the congregation where the first vote about
22              selling assets in general did not receive a two
23              thirds approval.  Do you recall that?
24     A.       Right.
25     Q.       At that time had the congregation entered into a
```

```
 1                    contractual agreement with Christie's?

 2    A.    No.

 3    Q.    That came quite a bit later, correct?

 4    A.    That came later.

 5                    MR. SNOW:  May we have D 503 on the

 6          screen.

 7    Q.    Ms. Ross, I'm showing you Exhibit D 503.  This

 8          was the proposed slate for 2003/2004 for the

 9          Society of Friend of Touro Synagogue?

10    A.    Right.

11    Q.    Now, there appear to be two groups.  First of

12          all, let me ask you.  There are some ex-officio

13          members, including the parnas or president of

14          Congregation Shearith Israel, correct?

15    A.    Yes.

16    Q.    And do you have an understanding as to what an

17          ex-officio member is?

18    A.    It's a person who is a member of an organization

19          by virtue of their position.

20    Q.    And so to your knowledge did Mr. Neustadter play

21          an active role in the management of the Society

22          of Friends of Touro Synagogue?

23    A.    No.

24    Q.    Now, there are two groups.  One group is called

25          board of directors and the other is a board of
```

1      trustees.  Can you distinguish the roles of

2      those two groups at the Society of Friends now

3      known as Touro Synagogue Foundation?

4    A.  I think the board of directors are meant to be

5      the active members of the board in the direction

6      of its activities in a broad sense.  They are

7      voting members.  They vote on matters concerning

8      the organization.

9    Q.  Okay.  And what about the board of trustees?

10   A.  They are -- it's an honorary title.  It's an

11     honorary position.  More or less a honorary

12     position to gather support from around the

13     country, to have people all around the country

14     who are aware of the organization and can

15     promote it.

16   Q.  Okay.  Now, during cross-examination,

17     Mr. Solomon asked you about the campaign to save

18     Touro Synagogue, and in particular the 2005

19     document we looked at which was Plaintiff's

20     Exhibit 170, also Defendants Exhibit 524.

21         He asked you whether the campaign

22     included not just the building, but the building

23     and artifacts.  Do you recall that?

24   A.  Yes.

25   Q.  Okay.  And you responded that it did.  What type

1          of artifacts was the campaign dealing with?

2    A.   I'm not sure I understand your question.

3    Q.   Well, let me ask you this:  The Touro Synagogue

4          is a historic structure, correct?

5    A.   Yes, it is.

6    Q.   There are fixtures attached to that building,

7          such as chandeliers, correct?

8    A.   That's right.

9    Q.   Are those old chandeliers?

10   A.   Yes, they were all originals to the building.

11   Q.   Did they need to be restored?

12   A.   Yes.

13   Q.   Were they restored as part of the --

14   A.   Yes, they were.

15   Q.   Were the rimonim restored as part of this

16         campaign?

17   A.   They were restored, yes.

18   Q.   But not as part of this campaign?

19   A.   No, they were not restored as part of the

20         campaign.

21   Q.   In fact, they were restored in 2001?

22   A.   That's right.

23              THE COURT:  By CJI, not the Touro

24         Synagogue Foundation?

25              THE WITNESS:  No, the congregation

1       raised the money and restored the rimonim.

2                   THE COURT:  Okay.

3                   MR. SNOW:  No further questions.  Thank

4       you, Your Honor.

5                   THE COURT:  Mr. Solomon?

6                   MR. SOLOMON:  Nothing, Your Honor.

7                   THE COURT:  I have one question,

8       Ms. Ross.  On Defendant's Exhibit 405, which is

9       what I'll call the $75,000 per year proposal.

10      Do you remember that document?

11                  THE WITNESS:  Yes, I do.

12                  THE COURT:  CJI is not mentioned in

13      there at all and only the Touro Synagogue, TS.

14      Is that an instance that someone has testified

15      to in the past where the terminology between

16      Touro Synagogue and CJI are used

17      interchangeably?

18                  THE WITNESS:  I would read it as that.

19                  THE COURT:  Okay.  When this was being

20      offered or discussed, was there any reference to

21      CJI specifically or was it solely to Touro

22      Synagogue?

23                  THE WITNESS:  When we would have a

24      discussion like this, I see -- I understand them

25      to be synonymous because we think of ourselves

1          as synonymous.

2                    THE COURT:  Okay.  Thanks, Ms. Ross.

3          You can step down.  Thank you.

4                    THE WITNESS:  Thank you.

5                    THE COURT:  What would you like to do?

6          We could call the next witness.

7                    MR. SNOW:  She is the last witness.  I

8          think it would make sense to --

9                    THE COURT:  To do it now rather than

10         put someone up.

11                    MR. SNOW:  I think we'll be fine with

12         the time.

13                    MR. SOLOMON:  They had estimated that

14         they had 15 minutes with this witness.  If

15         that's still right, then that's fine.  Is that

16         still your estimate?

17                    MR. SNOW:  I hate to have --

18                    THE COURT:  I don't trust any of you.

19                    MR. SOLOMON:  Your Honor, the reason

20         that I was rising.  Was to see if it would be

21         possible to get some guidance from Your Honor

22         about Rabbi Soloveichik who we would call Monday

23         morning, or Monday late in the morning.

24                    We had proposed what his testimony

25         would be, and the other side submitted to Your

1          Honor a brief yesterday.

2                    THE COURT:  Why don't we take up that

3          issue as soon as we come back.

4                    MR. SOLOMON:  Thank you, Your Honor.

5                    THE COURT:  And then Ms. Pedrick can

6          take the stand.

7                    So why don't we come back at 1:30, and

8          take that up forthwith.  Thank you,

9          Mr. Solomon.

10                   (Lunch recess at 12:30 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 116

(1)          STATE OF RHODE ISLAND

(2)

(3)      I, Tara L. Wosny, Certified Shorthand Reporter

(4)   and Commissioner in and for the State of Rhode Island,

(5)   do hereby certify that the witnesses whose testimony is

(6)   herein before set forth, was duly sworn and that such

(7)   testimony is a true record, to the best of my ability, of

(8)   the testimony given by the witnesses.

(9)      I further certify that I am neither related to

(10)  or employed by any of the parties in or counsel to this

(11)  action, nor am I financially interested in the outcome of

(12)  this action.

(13)     In witness whereof, I have hereunto set my hand

(14)  and seal this 5th day of June, 2015.

(15)

(16)  Tara L. Wosny
      Tara L. Wosny

(17)

      Notary Public
(18)

      My commission expires:
(19)

      June 10, 2017
(20)

(21)

(22)

(23)

(24)

(25)

Rhode Island Court Reporting

```
 1                    AFTERNOON SESSION

 2                  (Commencing at 1:40 p.m.)

 3              THE COURT:  Mr. Solomon, you

 4    wanted to be heard on the plaintiff's

 5    objections to your offer of proof on the

 6    rabbi.

 7              MR. SOLOMON:  I can do that very

 8    briefly, Your Honor.

 9              THE COURT:  Would you mind coming

10    to the mic, it's easier for all of us to

11    hear you.  Go to the mic, thank you.

12              I can tell you what I think, if

13    you don't want to argue, I can compensate

14    for that when I said you can argue until

15    the cows come home, like when you asked me

16    if you should submit something in writing

17    and I said no, just come and argue it, so

18    you are welcome either way.

19              MR. SOLOMON:  I feel it's my job

20    here to help The Court, if Your Honor

21    doesn't need to hear on this, otherwise

22    just a minute and a half.

23              THE COURT:  I read your very

24    brief proffer, and then I read, you know,

25    a nine page brief in response.
```

1        So if you want to respond to

2   that, I would be glad to hear you.

3        MR. SOLOMON:  I would like The

4   Court to decide -- The Court will decide

5   what use is made of the testimony, but if

6   The Court doesn't have the testimony, then

7   The Court won't be able to do that.

8        And if The Court feels that

9   encroaches on a First Amendment issue, or

10  to rely on that or not, but it can't do

11  that if it doesn't have the testimony.

12       One thing I feel strongly about,

13  is that The Court shouldn't understand

14  what we intend to do with the evidence by

15  reading what CJI has said of it.

16       THE COURT:  Your proffer, at this

17  stage, and I continue to have a couple of

18  concerns, and maybe you can address those,

19  and you are making me think about whether

20  I take it subject to rulings on it, but...

21       MR. SOLOMON:  Of course I want to

22  hear your.

23       THE COURT:  As to the First

24  Amendment, the First Amendment issues, and

25  we are bound by that, it appears to me

1    there are areas that would violate my

2    prior ruling, and not allowing his

3    testimony seemed to be an overlap.

4           And then there was additional

5    testimony that you seemed to want to get

6    that I found in two areas, one of which

7    seemed to impinge on testimony that would

8    require expert testimony, that is, that is

9    whether CJI had available to them, and if

10   the rabbi were an expert on management,

11   congregation management, finance, or

12   something to that extent, then I could see

13   his testimony being beneficial to a fact

14   finder, but he has been the rabbi at CSI

15   for a year, year and a half, I think you

16   said.  He is listed as a fact witness.

17          So I didn't see anything -- so it

18   seems to me the testimony would be limited

19   to what he knows of facts as to the last

20   year and a half or so. And I didn't see

21   anything in the proffer that related to

22   the only relevant issue I think the

23   testimony would be, which is, has or is

24   CSI an appropriate and, if I can use,

25   "good trustee," position; and I didn't see

1   anything offered that he would know for

2   that year and a half that would go to that

3   issue.

4           In other words, you know, was he

5   going to say, well, I reached out to CJI

6   and in my capacity as rabbi of the trustee

7   and they didn't respond, or anything that

8   would be relevant factually, and that's --

9   that, I was trying to get my head around.

10          MR. SOLOMON:  And I thank, Your

11  Honor, for identifying those.

12          But with respect to the First

13  Amendment, there's no intention -- we have

14  the 44.18 issue, we actually tried quite

15  hard to set that aside and not call him

16  for those, and -- however, Your Honor,

17  there's a question of the bona fides of

18  Shearith Israel's objections --

19          THE COURT:  Where is that --

20  first of all, first of all, why is that

21  relevant?

22          MR. SOLOMON:  It may be at the

23  end of the day that Your Honor finds that

24  it is irrelevant; but if your Your Honor

25  finds it relevant, but not have -- only

 1    from the testimony we have heard this week

 2    you find it is irrelevant --

 3             THE COURT:  Well, no, the

 4    testimony -- some of the testimony -- some

 5    of the testimony this week, perhaps some

 6    didn't quite go to the issue, the primary

 7    week's worth of testimony seemed to me,

 8    the majority of it, seemed to go to the

 9    issue of fiduciary duty of CSI, CSI as

10    trustee of Touro Synagogue, and issues

11    that were raised accordingly on a number

12    of different levels where they have

13    attacked that, if I can use that term.

14             But the actions of CSI, as acting

15    in good faith, consistent with religious

16    ritual, I would call that law, you might

17    call that, practice, but I don't see how

18    that's relevant to that issue.

19             I cannot get my arms around that,

20    Mr. Solomon.

21             MR. SOLOMON:  If -- let's suppose

22    a stipulation that Shearith Israel

23    objected to the sale of the rimonim for a

24    number of reasons, but one that would be

25    stipulated to, was that Shearith Israel

1    reasonably believed that the sale of the

2    rimonim would violate Jewish law,

3    practice, and custom.

4           I, at least, would argue at the

5    end of the day were motives relevant, that

6    The Court should be swayed at least in

7    part by the fact that there was -- there's

8    no -- I don't believe there's a trust for

9    the benefit of CJI, and no one identified

10   what the obligations are under that trust,

11   but --

12          THE COURT:  A little bit of a

13   problem.

14          MR. SOLOMON -- so I'm trying to

15   react to what they might argue at the end

16   of the day.

17          We do know that the language of

18   the lease and the language of the

19   agreement with the federal government,

20   talks about a particular ritual being

21   applied in that space, and Your Honor has

22   no proof of what that ritual would or

23   would not allow with respect to these

24   rimonim.

25          And so I want to -- I do want to

1    call someone to tell Your Honor what that

2    ritual would, or would not allow, with

3    respect to the sale of the rimonim.

4              And I don't think this violates

5    the First Amendment, because, if Your

6    Honor will, it goes as much to the good

7    faith of the alleged trustee as it goes to

8    the reasonableness of the trustee's

9    conduct.

10             The reason we are saying no, in

11   part, is because Touro Synagogue, an

12   orthodox Synagogue, your destiny is to be

13   an orthodox synagogue, and be open to

14   Jews, and you are violating those,

15   desecrating those principles by trying to

16   sell -- sale is a mode of profanation,

17   right, and by trying to do that, you

18   profane this.

19             And I think is a religious issue,

20   yes.  I don't think it violates the First

21   Amendment.

22             I don't believe Your Honor has to

23   find Jewish law with respect to it, I

24   believe all your Your Honor would then

25   have to find, is that Shearith Israel had

 1    a reasonable belief, a reasonable motive

 2    for acting as it did, and --

 3             THE COURT:  You don't have any

 4    problems with a secular court evaluating

 5    the reasonableness of a person's religious

 6    motives and beliefs?

 7             MR. SOLOMON:  Your Honor --

 8             THE COURT:  Doesn't sit well with

 9    me, Mr. Solomon, that concept.

10             MR. SOLOMON:  Your Honor, I don't

11    know how else.  This one small issue -- I

12    don't know how else, Judge.

13             We communicated to The Court one

14    of the reasons why Shearith Israel acted

15    and why it -- were there no -- were there

16    no reference in the lease to exactly what

17    to do, and to reference in the agreement

18    with the federal government, right, one

19    wonders what the federal government had an

20    agreement like that in 2015 --

21             THE COURT:  Guessing not.

22             MR. SOLOMON -- but this is what

23    we have, and I tell you, Your Honor, with

24    all due sincerity, I feel there's been

25    nothing in this courtroom, other than the

 1    yammering of lawyers, and that doesn't

 2    matter, but to educate The Court on the

 3    fact that these are sacred objects, that

 4    Jews are not -- we are People of The Book,

 5    okay, and The Book is the Torah.

 6              And the Torah is the finials, and

 7    these finals sit in service of that Torah.

 8              And what matters is The Book, not

 9    the building.

10              Now, we are committed to the

11    building, but we are also committed to The

12    Book, committed to that.

13              And I would -- I don't think The

14    Court will have the record that it needs

15    to decide whether Shearith Israel acted in

16    a reasonable way -- this is, again,

17    assuming that the trust issue gets to that

18    point, without hearing that testimony.

19              I do think that is not all.  I

20    wanted to address, if I could -- sorry to

21    take up so much of The Court's time.

22              THE COURT:  It's an important

23    issue, I don't mind taking the time to

24    think this through.

25              MR. SOLOMON:  To us, it's quite

1   fundamental.

2         And not successful so far in

3   persuading The Court how to do that in a

4   way consistent with Your Honor's view of

5   the First Amendment, but I think we can.

6         As to whether or not this

7   requires expert testimony, that there are

8   alternatives, The Court heard a lot of

9   testimony this week that CJI felt that it

10  didn't have any alternatives, and I

11  thought, think we are allowed to rebut

12  that, it's not that --

13        THE COURT:  Not saying you cannot

14  rebut that, Mr. Solomon, the problem is

15  how you are to rebut.

16        If you have an expert that had

17  been properly listed and reviewed all of

18  CJI's -- reviewed all their filings and

19  whatnot, and came into opine that their

20  interpretations were wrong, in fact, the

21  money was flowing, or they could have --

22  or bring in fund raising officials saying

23  they did a lousy job, and could have

24  raised more funds with -- if they did X,

25  Y, or Z, or whatever, within that, and

1    that, that may have been more relevant.

2              I don't think if it's relevant or

3    not -- but may been more relevant.  What

4    clearly is not relevant, is for a

5    non-expert to come in, that has no

6    affiliation whatsoever, factually, with an

7    entity, the congregation Jeshuat Israel,

8    and opine, which is what they would do,

9    about alternatives that may be available

10   to them.  And that part, I'm clear on.

11             You got me thinking about the

12   other part, I have to tell you.

13             But on that part, I'm pretty

14   clear, he would have no role.  I will not

15   take his testimony on that.

16             MR. SOLOMON:  He has been the

17   rabbi, or the assistant rabbi, functions

18   in this capacity in 333 different orthodox

19   synagogues, all of whom face exactly the

20   same issues.

21             THE COURT:  Well, I doubt it's

22   exactly the same issue.  That's the point,

23   Mr. Solomon.

24             If there was something vastly

25   unusual about CJI's financial decision

 1   that one could come in and factually talk

 2   about, like, they didn't consider X, and X

 3   applies to every orthodox coverage of 130

 4   families, and he sat down and said -- then

 5   maybe we are getting closer to the

 6   relevance side of events; but I doubt you

 7   could get that.  But what you want to do

 8   is come in here and say, look, I have a

 9   rabbi, I know how the congregation works,

10   and here is what CJI is missing, this is

11   what they should have done.

12          And I don't think he is competent

13   to testify to that.  Nothing to him,

14   obviously, I mean as a fact witness.

15          MR. SOLOMON:  They missed

16   nothing, if they go -- fine, okay, they

17   missed -- CJI did nothing, they missed

18   nothing, they are doing fine, remarkably

19   well in fact, and I at least thought that

20   the The Court, hearing how other

21   synagogues -- I do think other synagogues

22   face similar -- but all I'm saying, Your

23   Honor, Your Honor is not going to know if

24   they are similar or not, if you don't hear

25   the evidence.

129

```
1              THE COURT:  I think, Mr. Solomon,
2    I think I'm pretty confident that the
3    rabbi is not -- the rabbi is not going to
4    testify about CJI's financial finances or
5    alternatives or whatnot, and I would like
6    to hear from CJI on the issue that you --
7    the First Amendment raised, which you have
8    at least brought me to a neutral category
9    to think about, which is the issue of
10   CSI's good faith as a trustee, and
11   exercises that good faith pursuant to the
12   alleged trust, and where that intersects
13   with the element of religious ritual and
14   practice ascertained in the historic
15   document.
16              MR. SOLOMON:  May I take 30 more
17   seconds.
18              THE COURT:  Of course.
19              MR. SOLOMON:  On the third of the
20   issues that Your Honor raised, what we
21   would intend to do is, Your Honor has
22   heard testimony from CJI that Shearith
23   Israel has tried to nuke CJI, and that we
24   have acted --
25              THE COURT:  Some hyperbole on
```

1    both sides that didn't, necessarily --

2    that has not sat well with me.

3            I didn't say negative, no effect

4    on me, I should say.

5            MR. SOLOMON:  I apologize if I'm

6    responsible for that, but I don't believe

7    I had any witnesses, but I think we do

8    want to have a witness tell The Court

9    that, not just the lawyer telling The

10   Court, that Shearith Israel cares about

11   the future of CJI and about the future of

12   Touro Synagogue.  And I think that would

13   be important evidence to rebut what has

14   been said about us.

15           Thank you, Your Honor.

16           THE COURT:  Thank you, Mr.

17   Solomon.  Does someone from -- Mr.

18   Naftalis, just on this issue of evidence

19   about CSI actions, and the issue of

20   relevancy and the consideration I should

21   give to Jewish law and practice in

22   evaluating CSI's good faith as a trustee

23   over these issues.

24           MR. NAFTALIS:  I can't stop

25   wandering when addressing The Court.

1           Your Honor, and what I would like

2       to do, to the extent Your Honor feels

3       would be helpful, is to respond to a

4       couple of the other points.

5           THE COURT:  Quit while your

6       ahead, is my general philosophy.

7           MR. NAFTALIS:  Who knows the ones

8       that I wasn't going to respond to.

9           What I was going to respond to,

10      was, the fact that this, plainly, this

11      plainly barred our view by the

12      establishment clause.

13          THE COURT:  But what if it's

14      limited -- clearly if I were to apply,

15      consider or whatnot, Jewish law as that

16      term has previously been used, I clearly

17      think that that's in First Amendment

18      prohibition territory, but Mr. Solomon's

19      argument that the evidence that the rabbi

20      is proposing to testify to, goes to their

21      good faith actions as a trustee; that is,

22      if the rabbi and the congregation were

23      acting consistent with their perception,

24      at a minimum, if not in reality, but at a

25      minimum their perception of appropriate

1    traditional Jewish law and beliefs on

2    their part, why isn't that testimony, even

3    though we are in that area of church and

4    state and the First Amendment, why is that

5    not -- those facts relevant to the issue

6    of CSI's good faith actions as trustee?

7            Assuming they -- there is a trust

8    and assuming it applies over either Touro

9    Synagogue or perhaps, as I think in one of

10   the arguments, that perhaps even over the

11   finial bells.

12           MR. NAFTALIS:  Well, it's our

13   understanding that the law, and we can

14   bring cases to Your Honor's attention, the

15   breach of the fiduciary duty issue is the

16   objective standard and it's -- we are

17   talking about a breach of a duty of

18   loyalty, which what is what we are talking

19   about here.

20           And it's the conduct that

21   matters.  And the conduct is forbidden

22   irrelevant of the trustee's good faith or

23   honest intentions.

24           THE COURT:  Well, let me ask you

25   this --

1           MR. NAFTALIS:  I can give you

2    Rhode Island cases on that, despite

3    finding that the trustee acted in good

4    faith, conduct putting the trustee in a

5    conflict situation, breaching his duty of

6    loyalty, he breached it, I think.

7           THE COURT:  That would be a true

8    conflict situation, because there's a

9    separate issue of breach and the conflict

10   itself; but in an issue of whether or not

11   this congregation is an inappropriate

12   trustee, again, assuming there's a trust

13   and assuming we figure out what that trust

14   means, assuming all that, why isn't their

15   actions from conformity, either A their

16   beliefs, or even B, the language of some

17   of these historic documents that clearly

18   go to certain religious issues, why isn't

19   that relevant to a determination of

20   whether they should remain as trustee?

21          MR. NAFTALIS:  Because I think it

22   is -- well, now we are talking about they

23   -- we found that they have breached

24   fiduciary duty, and the issue is do they

25   remain as trustees.

1              THE COURT:  Or another, even if

2    the underlying issue of that -- I have not

3    found anything yet.

4              MR. NAFTALIS:  I know.

5              THE COURT:  So you know where we

6    are.

7              MR. NAFTALIS:  Most respectively

8    I suggest, Your Honor, on the underlying

9    issue, it's totally irrelevant, because

10   either you breach your duty of loyalty, or

11   you don't.

12             And if it's a case of saying we

13   can give a memo on this, good intentions,

14   good faith and the like, don't have

15   anything -- you have breached your duty of

16   loyalty, you breach your duty of loyalty.

17             THE COURT:  But their argument

18   may be more narrow than that.

19             That it's not a breach of

20   loyalty, but they are acting in conformity

21   with the trust document, if, in fact,

22   there is one, that a rabbi would come in

23   here and say that the sale of the rimonim,

24   and in this instance, would violate the

25   Spanish and Portuguese traditions, may or

 1    may not be part of the trust document.

 2    That's their position.  Why doesn't that

 3    go to whether they are breaking their duty

 4    or not?

 5              MR. NAFTALIS:  Well, for one

 6    thing, we are talking about someone who is

 7    not a fact witness, who wasn't there, and

 8    has no firsthand knowledge, and he brings

 9    nothing as a fact witness or a firsthand

10    witness to the case.

11              He is at most, if allowed, to be

12    consistent with the First Amendment and

13    consistent with the law and fiduciary

14    duty, which we submit he shouldn't be, he

15    is at most an expert witness.

16              And what we have here is, Your

17    Honor recalled, when you made the First

18    Amendment ruling rejecting the argument,

19    and, by the way, these same arguments were

20    contained in their brief.  I can hand you

21    one.

22              THE COURT:  I saw the chart.

23              MR. NAFTALIS:  But even better,

24    even better -- I do my best work at 12:30

25    or at 5:00 in the morning -- even better,

1    I yellow highlighted the portions of the

2    offer of proof with the portions of --

3            THE COURT:  The chart was pretty

4    good, by the way, compliments to whoever

5    wrote that.

6            MR. NAFTALIS:  The judge can have

7    them.

8            MR. SOLOMON:  Can we have a copy.

9            MR. NAFTALIS:  It's your brief.

10           THE COURT:  Mr. Solomon, let me

11   -- pull yours out and I can at least show

12   you what's been highlighted so we are

13   looking at the same thing, that would be

14   on your proof, it's paragraphs 4.

15           And the second sentence applies

16   to 5, and on their brief, it's page 3,

17   last sentence, the second paragraph, and

18   the middle of the last sentence of that

19   last paragraph.

20           Go ahead, Mr. Naftalis.

21           MR. NAFTALIS:  This little chart,

22   I did this as I was sitting listening to

23   Mr. Solomon.

24           In their brief opposing the

25   motion, which Your Honor granted, they

```
 1   said, they made the statement on page 3,
 2   that the rabbi's testimony is crucial for
 3   Shearith Israel if only to show that
 4   Shearith Israel had bona fide colorable
 5   grounds for objecting to the sale of the
 6   sacred religious objects, which mirrors
 7   what they said in paragraph 4 of the offer
 8   of proof.
 9           I can take you through the
10   original two, which are exactly the same,
11   you know.
12           All they do -- they don't call it
13   Jewish custom, or law and rituals, they
14   relabel it as "governing rituals," calling
15   a Chevy a Ford, and now it's not a Chevy
16   anymore.
17           So this has been here, and an
18   argument, this is not new stuff.  And what
19   we have, one of the items, which you felt
20   that you didn't need to reach, was the
21   fact that this does prejudice us, and
22   that's what I would like to address for a
23   minute or two.
24           This is a man who has no
25   firsthand knowledge.  He is not a fact
```

138

1    witness.  He is -- putting aside the areas

2    which he is not qualified, on which Your

3    Honor, has ruled out -- I'm not going to

4    address.  He is at most, an expert witness

5    on the subject.

6            They chose -- and indeed, these

7    subjects, we --

8            THE COURT:  Expert witness if he

9    testified to the good, assuming good

10   faith, the good faith beliefs of the

11   congregation during its last year and a

12   half.

13           MR. NAFTALIS:  Well --

14           THE COURT:  That's the same

15   argument they made for the last, you know,

16   five years, of objecting to it going --

17   but limited to that, he would be a fact

18   witness, I would assume, basically --

19           MR. NAFTALIS:  That's not what he

20   is being proffered for.  He is being

21   proffered to give these grand opinions,

22   including governing, or -- you know, the

23   same thing, he said the First Amendment

24   time -- indeed, during the deposition when

25   my partner, Mr. Wagner was asking

1    questions along these lines of Rabbi

2    Angel, their counsel, counsel for CSI

3    blocked the examination.  Said, "You can't

4    ask those questions, those are questions

5    of an expert witness and we are not going

6    to let you ask those of Rabbi Angel."

7              And they directed him not to

8    answer.  And when -- then when we have the

9    decision and it's closure time for the

10   experts came along, they made no

11   disclosure of this witness as an expert.

12             There's no expert report, there's

13   been -- now we are talking about eight

14   months ago, right, that was in the fall --

15   or, I mean, I don't remember the exact

16   dates anymore.  But I think we finished --

17   we were required to finish taking the

18   expert depositions by some time in

19   January.

20             So we have no -- so they failed

21   to comply with the rules.  They gave us no

22   -- they made no disclosure of him.  And

23   the only disclosure they ever made, was to

24   amend their Rule 26A, a statement at the

25   end of March, with that Rule 44.1 stuff.

1              No report.  No deposition.  And

2     now -- and no opportunity for us to retain

3     a counter expert.

4              We don't agree, I say it most

5     respectively, I mean, I mean no disrespect

6     to Rabbi Soloveichik, entitled to believe

7     what he believes, we don't -- we don't

8     agree with that.

9              The testimony is correct or

10    accurate.  And in order to come in,

11    somebody parachuting in at the end of our

12    case, and beginning next week we need --

13    we would have to go and retain an expert

14    to help us prepare for cross-examination,

15    and we do have cross of six fact

16    witnesses, and two experts witnesses to

17    work on this weekend, so hoping to get a

18    few minutes with my grandson, but --

19             THE COURT:  Always take that

20    time.

21             NAFTALIS:  And then --

22             THE COURT:  This is about things.

23             MR. NAFTALIS:  And I think if you

24    don't comply with the rules, and it

25    prejudices the other side, we really are

141

1    prejudiced about this.  Indeed, they even

2    want to exacerbate the prejudice when they

3    first advise on Monday of this week that

4    they were going to try and re-argue their

5    position, or -- however, whatever label

6    they were going to put on it.

7           And they listed him as the

8    seventh witness in order.  This morning

9    they said, "Oh, we are going to put him on

10   Monday morning."

11          Quite frankly, you are supposed

12   to comply with the rules, the rules have

13   meaning, and in this instance, their

14   failure to comply with the rules and their

15   ever changing, ever changing putting the

16   labels on the same old wine, is really

17   prejudicial to us.

18          I'm not no expert on governing

19   ritual, what do I know about governing

20   ritual --

21          THE COURT:  If you don't,

22   think -- if you don't know about governing

23   ritual --

24          MR. NAFTALIS:  They have, also,

25   they have people who -- made the decision,

```
 1    they are here to testify, and, indeed,
 2    their 30(b)6 witness, Mr. Lustig, the one
 3    they put forward on why they blocked the
 4    sale, and issued C&D, this is the -- what
 5    do you call, the cease and desist, he
 6    didn't say anything about governing
 7    rituals.
 8             He said, "We blocked it because
 9    we owned it."  That was the testimony.
10    "That is why we blocked the sale, because
11    we own it."
12             It's not really fair, and I
13    say --
14             THE COURT:  I'm ready to rule.
15             I'm not going to allow the rabbi
16    to testify.  I think as I previously said,
17    the qualifications that have been offered
18    in the proffer, and the earlier motions
19    for the rabbi is either, A, not competent,
20    and I don't mean that as personal affront
21    at all, but as a fact witness, he is not
22    competent to testify to the matters that
23    have been proposed.  That's one.
24             Two, as a fact witness, The Court
25    finds that he would not have any relevant
```

1    fact information on any issue that's

2    before the trier of the fact.

3            And thirdly, that allowing him to

4    testify at this stage under these

5    circumstances would, in fact, open a

6    Pandora's box, that The Court is not

7    willing to allow to open.

8            MR. NAFTALIS:  Thank you.

9            MR. SOLOMON:  Thank you.

10           THE COURT:  Call the next

11   witness.

12           MR. WAGNER:  Your Honor, Jeshuat

13   Israel calls Laura Pedrick.
              ---------------------------
14         LAURA PEDRICK, SWORN.
              ---------------------------
15           THE CLERK:  Please state your

16   name and spell the last name for the

17   record.

18           THE WITNESS:  Laura Freedman,

19   F-R-E-E-D-M-A-N.

20           THE CLERK:  Thank you.  You may

21   be seated.

22           THE COURT:  The first question is

23   to clarify the name issue, right.

24           MR. WAGNER:  I was going to ask,

25   who is this Laura Freedman?

```
 1              THE WITNESS:  It's me.

 2              MR. WAGNER:  Do you have another

 3    outline.

 4              THE COURT:  When someone calls a

 5    witness and somebody else is sworn in, I'm

 6    not sure we follow.  You might want to

 7    begin by explaining.

 8              THE WITNESS:  My legal name is

 9    Laura Freedman, and I go by Laura Pedrick.

10              THE COURT:  Great.

11              MR. WAGNER:  The only thing is,

12    Ms. Pedrick Freedman is the only thing

13    standing between the weekend and a lot of

14    tired people, so I will take all the time

15    I want, but we go briefly.

16              THE COURT:  Good observation.

17              MR. WAGNER:  I would call the

18    witness Ms. Pedrick, if that's okay with

19    you.

20              THE COURT:  Whatever is okay with

21    her.  You want to have me decide an issues

22    of Jewish law, and now decide on someone's

23    name, I'm not competent to do either,

24    being an Irish/Italian Catholic.

25              MR. WAGNER:  The name may not be
```

 1    the easiest to decide in this case.

 2         DIRECT EXAMINATION BY MR. WAGNER:

 3     Q.  Can you give us your personal and

 4    professional background.

 5     A.  Sure.  I was born in Detroit,

 6    Michigan, and I grew up in the suburbs of

 7    Detroit.

 8              After high school I went to the

 9    University of Michigan, where I received

10    an undergraduate degree in French.

11              And then I went out to Arizona to

12    the Thunderbird School of Global

13    Management, and received an MBA.

14              After that I moved to Boston with

15    a friend and worked in the computer

16    industry for a few years, and in

17    international marketing, and also in

18    domestic, or national marketing of the

19    United States.

20              When I met my husband, he was

21    already living down in Newport, so I moved

22    down to be with him, and have been there

23    for 30 plus years.

24              We have two sons who have -- who

25    are since grown, in their 20's, and they

1  were raised at Touro Synagogue, and had

2  their Bar Mitzvahs there.

3          I have continued my professional

4  marketing career and currently market for

5  Partridge, Snow & Hahn.

6  Q.  How long have you been there?

7  A.  Eight and a half years.

8  Q.  What does your husband do?

9  A.  My husband is a naval architect.

10  Q.  And you mentioned Touro Synagogue, is

11  Touro and Jeshuat Israel --

12  A.   I see them as being the same thing.

13  Q.  And what's been your connection to the

14  congregation?

15  A.  I have been involved with the

16  congregation since the late '80s as a

17  member of the congregation.

18          And then soon after I joined, I

19  joined the board.  So I have been a board

20  member, assistant treasurer, treasurer,

21  assistant vice-president, vice-president,

22  co-president, and president.  And now I'm

23  a board member.

24  Q.  What years were you president?

25  A.  I was -- started in 2001 to 2004, I

1   believe, as co-president.  And then 2000

2   -- getting the dates confused.  2005 to

3   2007, I was president.  2005 to 2007.

4          MR. WAGNER:  Your Honor, two

5   subjects to cover.

6          The first is the document that

7   has come up, which I'm not going to show

8   Your Honor.

9          I show the witness.  That we

10  objected to on relevance, on authenticity

11  grounds.

12         THE COURT:  The one that purports

13  to have Ms. Freedman's signature on it?

14         MR. WAGNER:  Exactly.  I give it

15  to the witness.

16         THE COURT:  It was submitted to

17  me by somebody at some point.

18         MR. WAGNER:  I believe --

19         THE CLERK:  What is the document?

20         MR. WAGNER:  375.

21    Q.  Ms. Pedrick, when was the last -- when

22  was the first time that you saw this

23  document?

24    A.  The first time I saw this document,

25  was about a year ago, at my deposition.

148

1    Q.  Can you turn to the last page of the

2  document.

3            (The witness complies.)

4    A.  Yes.

5    Q.  Now, you see it says signature

6  applicable, Laura Freedman, you see that?

7    A.  Yes.

8    Q.  Is that your signature?

9    A.  That is not my signature.

10    Q.  Did you authorize anyone to sign this

11  document for you?

12    A.  I did not.

13    Q.  You can put that aside.  Thank you.

14            You were in court this morning

15   when you heard Ms. Ross testify about the

16   campaign to save Touro Synagogue?

17    A.  I was here.

18    Q.  And we won't repeat everything that she

19  said, but just general, what was that

20  campaign?

21    A.  The campaign was to, in fact, save

22  Touro Synagogue.  The building was in a

23  major state of disrepair, parts of it

24  were actually crumbling.  And we felt

25  that we, being the congregation, Jeshuat

1    Israel and the Touro Synagogue

2    Foundation, got together to put together

3    this campaign to raise funds to preserve

4    and maintain the synagogue.

5    Q.  And what year was that?

6    A.  2005.

7         MR. WAGNER:  This is Exhibit 170,

8    Plaintiff's Exhibit 170.

9    Q.  What is Exhibit 170?

10   A.  I beg your pardon?

11   Q.  What is the document that I just gave

12   you?

13   A.  Oh.  This is an internal document

14   called, "The Campaign to Save Touro

15   Synagogue."

16   Q.  What was your role in connection with

17   that campaign?

18   A.  At this time, I was the president of

19   the congregation, so I was part of the

20   leadership team of the campaign.

21   Q.  And just generally, what did you do in

22   connection with that campaign?

23   A.  I worked with other team members to

24   decide what we were going to do, and who

25   we were going to look to for funds to

1   fulfill the campaign process.

2    Q.  How much time and energy did you devote

3   to this campaign?

4    A.  A serious amount.  We had a lot that

5   we wanted to accomplish, and as I said,

6   the building, was in serious disrepair,

7   and we were eager to resolve that.

8    Q.  Can you turn to page 15 of the document,

9   15 of 22.

10             (The witness complies).

11    A.  Yes.

12    Q.  Do you see under campaign strategies,

13   special gifts, Keith -- first of all, that is

14   Keith Stokes?

15    A.  I believe so.

16    Q.  Who is Mr. Stokes?

17    A.  I believe at the time, if he wasn't

18   the chair of -- no, he was not the chair,

19   he was a board member of Touro Synagogue

20   Foundation.

21    Q.  What is this page all about?

22    A.  This page is dividing up the various

23   solicitation groupings, if you will, and

24   people assigned to each of the different

25   groups.

1    Q.  Now, Roman numeral III, special gifts,

2  what's that?

3    A.  Appears to me here, that there were

4  three groups, A, B and C identified as

5  contacts that we were going to solicit.

6    Q.  What is A.

7    A.  A is Jeshuat Israel.

8    Q.  Do you know why they were listed?

9    A.  They were listed because they were

10  the trustee of the building.

11    Q.  Did there come a time when you and

12  others in connection with this campaign from

13  Jeshuat Israel visited the trustees of

14  Shearith Israel in connection with this

15  campaign?

16    A.  Yes.  I was the president of the

17  congregation, Bernie Aidnioff, who is a

18  member of the congregation, but at the

19  time was the chair of the Touro Synagogue

20  Foundation, and Michael Balaban, who was

21  the executive director of the foundation,

22  the three of us went to New York and made

23  a presentation to the Board of Shearith

24  Israel.

25    Q.  Do you remember when you went?

1    A.  I remember it was warm.  I think it

2  was in the springtime.

3    Q.  Can you describe the presentation?

4    A.  We gave a PowerPoint presentation.

5         We made a presentation to the

6  board.  We had had photos that we were

7  using to demonstrate some of the

8  significant issues and why we needed their

9  financial support.

10    Q.  Did you ask for money?

11    A.  We did.

12    Q.  Did you ask for money at that meeting

13  from individuals, or from the institutions?

14    A.  The purpose of the meeting was to

15  ask of the institution.

16    Q.  And was that request made?

17    A.  Was the request made, yes.

18    Q.  Yes?

19    A.  Yes.

20    Q.  And what happened next?

21    A.  Nothing.

22    Q.  Did you get any money from Shearith

23  Israel?

24    A.  We did not get money.  And

25  personally, I was extremely disappointed

1    that we didn't even get a response to our

2    request.

3     Q.  Why you surprised?

4     A.  Shocked, actually.

5     Q.  Was the campaign ultimately successful?

6     A.  It was.  It took a lot of doing.  We

7    were able to conserve the building.

8    However, we never were able to fulfill

9    the endowment.

10                THE WITNESS:  Thank you.  Nothing

11     further.

12                THE COURT:  Mr. Solomon.

13                MR. SOLOMON:  Thank you, Your

14     Honor.

15                CROSS EXAMINATION BY MR. SOLOMON:

16     Q.  Pull up exhibit DX507.

17                THE COURT:  Can you see that in

18     front of you?

19     A.  There's nothing on my screen.

20                THE COURT:  Vicky, put that up.

21     Q.  507, Ms. Pedrick, is that in front of

22    you?

23     A.  Yes.

24     Q.  And good afternoon, by the way.

25                These are minutes of a meeting of

1    May 17th, 2005.  This is a meeting of the

2    Shearith Israel Board; do you see that you

3    are listed there?

4     A.  I do see that.

5     Q.  And would you care to tell The Court

6    whether this is the meeting that you were

7    just talking about?

8          MR. NAFTALIS:  Don't mean to

9     interrupt, Mr. Wagner left his glasses up

10    there.

11          (Discussion off the record.)

12     A.  It appears to be that meeting.

13     Q.  Okay.  Was the purpose of the visit, was

14    an update to the trustees on the fund raising

15    campaign; is that accurate?

16     A.  I don't know if I would have called

17    that an update.

18     Q.  Is there anything in this paragraph that

19    you think is inaccurate in describing the

20    meeting?

21          (Witness reviews document.)

22     A.  It appears accurate.

23     Q.  And when you said that you asked for

24    money, how much money did you ask for?

25     A.  I don't recall an exact dollar

1   amount.

2      Q.  Roughly?

3      A.  I don't know.

4      Q.  Within a million dollars, can you think

5   of it?

6      A.  I don't recall.

7      Q.  You just don't remember?

8      A.  Correct.

9      Q.  But it was very important that you asked

10  for money?

11     A.  It was important that we asked for

12  money.

13     Q.  And you were shocked when nothing was

14  forthcoming?

15     A.  I was shocked that we never got a

16  reply.

17     Q.  So did you follow-up with a letter

18  saying, where is my reply?

19     A.  I did not follow-up directly myself.

20     Q.  Did anyone from TSF follow-up with a

21  letter?

22     A.  I don't know.

23     Q.  In fact, no money was asked for at the

24  update meeting; isn't that right?

25     A.  I don't read it that way.  I'm not

1    saying no money was asked for, no.

2        Q.  Let's look --

3        A.  I think money was asked for.

4        Q.  Let's look at Exhibit 509.

5                (The witness complies).

6        Q.  Now, at the meeting, was it Mr. Balaban

7    who gave the presentation; is that correct?

8        A.  He was the primary speaker.

9        Q.  Did you do any speaking?

10       A.  I don't recall that I did much

11   speaking that evening.

12       Q.  Okay.  Well, here is an email from Mr.

13   Balaban to Alan Singer, at the time who was

14   with Shearith Israel, right?

15       A.  I don't know who Alan Singer is.

16       Q.  Okay.  What about Mr. Groupman, do you

17   know Dr. Groupman?

18       A.  I do know Dr. Groupman.

19       Q.  And he was at the meeting, wasn't he?

20       A.  Yes.

21       Q.  And he was also affiliated with the

22   foundation, correct?

23       A.  I think we saw that this morning.

24       Q.  So is that -- is that a yes?

25       A.  I don't think of -- my connection

1  with Dr. Groupman is that he was a member

2  of Shearith Israel, and was a liaison to

3  Congregation Jeshuat Israel.

4      Q.  Did you have the liaison role with him?

5      A.  I had a relationship with him, yes.

6      Q.  And what years was that?

7      A.  I'm thinking maybe 2005 or 2004.

8  Around 2005 or 2006.  I don't recall

9  exactly.

10     Q.  Did you have any relationship with any

11 one of the other liaisons?

12     A.  I did not.

13     Q.  Do you know of any of the other

14 liaisons?

15     A.  I don't.

16     Q.  And what was the liaison's role?

17     A.  I saw it as more of a social

18 connection between the two organizations.

19     Q.  You and he were there to align

20 communication between the two organizations?

21     A.  It is a connection between the two

22 organizations.

23     Q.  And in that role what happened, did you

24 do anything?

25     A.  I had him at my house for brunch.

1    Q.  Did you ever raise any issues with him?

2    A.  I don't recall.

3    Q.  You don't recall a single issue that you

4    ever raised with him?

5    A.  Correct, I do not recall a single

6    issue.

7    Q.  And you never raised a complaint with

8    him, either; do you remember any of that?

9    A.  I don't recall raising complaints

10   with him, no.

11   Q.  So this is a -- this is an email that is

12   dated May 26th.  So if the meeting is May

13   17th, 2015, this is May 26th, so this is just

14   shortly after the meeting, right?

15   A.  Uh-huh.

16   Q.  You have to answer audibly.

17   A.  Yes.

18   Q.  Thank you.

19        Mr. Balaban here is saying to the

20   Shearith Israel representative, "Attached

21   are the presentation notes that I used

22   during our visit to CSI," you know, that

23   would be the Shearith Israel Board

24   meeting?

25   A.  Yes.

 1    Q.  And so now let's look at this, please.

 2              And does this describe any of

 3    what was said orally of what was said, is

 4    it a faithful reporting of the meeting

 5    notes of the minute, meeting notes of the

 6    meeting?

 7    A.  I'm not -- is this the meeting notes

 8    here?  I mean, I'm just seeing this now

 9    for the first time.

10    Q.  Okay.  Why don't you take a look at the

11    document that is attached to it, please.  It

12    says project proposal, is that what was

13    discussed at the meeting?

14              (Witness reviews document.)

15    A.  It appears that way.

16    Q.  Okay.  Now, I don't see any asking here

17    for money.  And I'm asking you --

18    A.  What I seen this as, when it says

19    project proposal, I think it's an outline

20    of what the project is, not the outline

21    of our discussion with the board that

22    evening.

23    Q.  I thought you just told me that it was.

24    These are presentation notes, do you remember

25    the substance?

160

```
 1    A.  I have seen one page here, is that

 2  what we are looking -- the page that says

 3  project proposal.

 4    Q.  Can the witness be given the entire copy

 5  of this.

 6            MR. WAGNER:  I ask she be given

 7    the entire document in the paper and,

 8    please --

 9    Q.  The whole --

10            MR. WAGNER:  And look through the

11    entire document from the first page to the

12    last page before the questions are asked.

13    A.  I do have it here, and it's in tiny

14  print.

15    Q.  Is it too hard to read?

16            THE COURT:  Hold on.  Why don't

17    you put a question to her, and see if we

18    can focus on this.

19    Q.  Are these -- was this the -- were these

20  presentation notes, did they summarize the

21  presentation that was made?

22            THE COURT:  I think she had not

23    seen the document.

24    A.  I cannot answer that.  This

25  document, I think, is what, four or five
```

161

1    pages, so I don't have time to read the

2    whole document right now and answer that

3    question.

4        Q.  Well, do you remember at the meeting Mr.

5    Balaban describing that the project had

6    remaining needs of a million dollars for

7    conservation and $500,000 for the Barney

8    House; do you remember that, on the last

9    page?

10           THE COURT:  Page 6, Ms. Pedrick.

11       A.  Thank you.

12           THE COURT:  The last paragraph on

13    the line, below that, he is referring to.

14       A.  I see that.  Uh-huh.  Yes.

15       Q.  Yes, meaning that --

16       A.  I see.

17       Q.  Was that what was described at the

18    meeting?

19       A.  I don't recall the numbers that were

20    described at the meeting.

21       Q.  Okay.  And, now, the document that you

22    were looking at with your counsel, the

23    campaign plan that's Exhibit 524, this

24    document is dated in July, right, July 14th.

25       A.  Yes.

1    Q.  So this is after the meeting at Shearith

2  Israel, right?

3    A.  This document is from after the

4  meeting at Shearith Israel, yes.

5    Q.  And it's after the presentation notes

6  were given, right, because that was shortly

7  after the meeting, right?

8    A.  Yes.

9    Q.  That document still, I think in three

10  places, because you were here this morning,

11  right, you saw that they were three places

12  where this document after the meeting,

13  several months after the meeting, actually,

14  still talks about contacting members of

15  Shearith Israel, right?

16    A.  Yes.

17    Q.  And all three places, page 8, page 10

18  and page 15?

19          (Witness reviews document.)

20    A.  On Page 8 it says, "...such as

21  members of Shearith Israel in New York."

22    Q.  Right.  And then the same on page 13,

23  look there?

24          (The witness complies.)

25    Q.  Where Keith is being given the

1   responsibility to do that, right?

2     A.  Three to five key members of the

3   community.  Right.

4     Q.  And then on page 15, under special gifts

5   to Shearith Israel, is there again?

6     A.  Yes.

7     Q.  And, now, this, by the way, this talks

8   about the parlor meetings and meetings to be

9   taking place in New York and Newport, were

10   there meetings in New York?

11    A.  Other than the board meeting that I

12   attended?

13    Q.  Yes, foundation meetings, TSF parlor

14   meetings to raise money?

15    A.  I don't know.

16    Q.  Did Mr. Balaban prepare, this exhibit,

17   524 --

18    A.  Which one is 524?

19    Q.  The one we are on now.

20    A.  The campaign one?

21    Q.  Yes.

22    A.  He was there, the executive director

23   at the time.

24    Q.  So you would assume that he did, but you

25   don't know?

1    A.  I am sure he had a leading role in

2    that.

3    Q.  And he also attended the meetings,

4    correct?

5    A.  Correct.

6    Q.  And in July, he is still putting

7    Shearith Israel members as people to contact,

8    and indeed, he is identifying Keith as

9    somebody who should take that on as his

10   responsibility, right?

11   A.  Yes.

12   Q.  Thank you.  Let's look at the other

13   document that you were shown, 375.

14        THE COURT:  So the record is

15   clear, 375 has not been admitted, it's

16   just for identification purposes right

17   now.

18        MR. SOLOMON:  Correct.  Thank

19   you, Your Honor.

20   Q.  This is a document that was produced to

21   us pursuant to a subpoena served on the

22   state; and do you recognize the stamp on this

23   document, "RIHPH, July 30, 2004"; do you see

24   that?

25   A.  I see that.

165

 1    Q.  Is that an indication that that was

 2   filed with the state?

 3    A.  I have no idea.

 4    Q.  Okay.  You knew that the foundation was

 5   going to be seeking money from the state,

 6   didn't you?

 7    A.  I don't know if I knew that

 8   specifically.  I know they were seeking

 9   funds.

10    Q.  And you knew that the state was one of

11   the places that they be would looking?

12    A.  I don't recall.

13    Q.  You knew they would be seeking funds

14   from a governmental organization?

15    A.  Correct.

16    Q.  And they were authorized to do that on

17   behalf of the Touro Synagogue, weren't they?

18    A.  That the foundation was authorized

19   to seek funds, yes.

20    Q.  Okay.  And they were authorized to do

21   that on behalf of CJI, correct?

22    A.  They were authorized to do that as

23   Touro Synagogue Foundation, because the

24   congregation couldn't seek funds as a

25   religious organization.

1    Q.  So they were authorized on behalf of CJI

2    to seek funds from, among others,

3    governmental organizations?

4    A.  I don't know the answer to that.

5    Q.  But you know they did seek funds?

6    A.  I do know that they did.

7    Q.  All right.  And did you get any reports

8    from the foundation that they were, in fact,

9    doing what they were supposed to do, and that

10    is seeking funds on your -- on behalf of

11    Touro Synagogue and CJI?

12    A.  I'm not sure I can answer that

13    question.

14    Q.  In fact CJI did receive $120,000 from

15    the state based on this application, correct?

16    A.  CJI received $120,000?

17    Q.  Well, the foundation received for

18    purposes of assisting CJI in carrying out its

19    responsibilities to Touro Synagogue; is that

20    correct?

21    A.  I don't know that they did.

22    Q.  My minutes, get the exhibit.

23            Let's look at Exhibit 371,

24    please.

25            (The witness complies.)

1    Q.  This is a document that was received

2    pursuant to FOIA request from the State of

3    Rhode Island and Providence Plantation

4    Historical Preservation and Heritage

5    Commission.

6             If you look on page 004, at the

7    bottom, page 004, at the bottom and

8    towards the 2000's all the way down, under

9    Touro Synagogue, Newport, conservation and

10   establishment, $120,000 is what is being

11   reported as having been granted; does that

12   refresh your recollection.

13   A.  I see that.  It's in this document.

14   Q.  And in Exhibit 507, the one that we

15   started with, which is the board minutes of

16   May 17th, 2005.

17   A.  Yes.

18   Q.  It also reports that $120,000 was

19   received from the state preservation budget?

20   A.  I see that.

21   Q.  And that indicates that on the basis of

22   this application, the state granted $120,000,

23   correct?

24             MR. WAGNER:  Objection to form.

25             THE COURT:  Overruled.

1      A.  Could you repeat the date, please.

2    The question -- are you requesting --

3    asking me a question?

4      Q.  Yes, whether that doesn't confirm that

5    is correct, $120,000 was given on this, on

6    the basis of the application?

7      A.  I see that $120,000 was given from

8    the state.

9              MR. SOLOMON:  We offer this

10    document, it's a public record document.

11              THE COURT:  371.

12              MR. SOLOMON:  Sorry, I apologize,

13    I would like to examine the witness on the

14    document.

15              THE COURT:  My problem with it,

16    Mr. Solomon, not sure if there's --

17    there's no authorized signature from CJI

18    on this.

19              How is this document relevant, or

20    could be relevant if that were an

21    authorized signature -- perhaps admission,

22    if I could call them that -- I assume that

23    you want -- not the term -- use of the

24    term owner and co-owner, and various other

25    things in there, but no evidence before me

```
 1    that CJI -- CJI authorized this document.
 2    How is it relevant?
 3              MR. SOLOMON:  I think for several
 4    reasons, Your Honor.  The first is that,
 5    if this is a document -- start simply, the
 6    foundation was the agent of CJI for the
 7    purposes of obtaining funds.
 8              THE COURT:  I could rule that
 9    now, based on the record, not -- where is
10    the evidence of the agency relationship?
11              MR. SOLOMON:  Two different
12    places, Your Honor.  The first is, the
13    witness admitted --
14              THE COURT:  About the agent --
15              MR. SOLOMON -- that they were
16    acting on behalf of -- sorry, I thought
17    that's what the witness told me ten
18    minutes ago.  Maybe I --
19              THE COURT:  I think you testified
20    about that, Mr. Solomon.
21              MR. SOLOMON:  Well, may I
22    inquire.
23              THE COURT:  Sure.
24     Q.  Was the foundation authorized to go seek
25    funds for purposes of raising money to help
```

1    the Touro Synagogue?

2       A.   I believe what I said, when you

3    asked earlier, the Touro Synagogue

4    Foundation did seek funds, we, the

5    congregation, as a religious

6    organization, are not allowed to seek

7    state funds.

8       Q.   Right, so they were doing that on your

9    behalf; is that correct?

10      A.   I'm not sure on our behalf.   They,

11   as an organization, have the

12   responsibility to support Touro

13   Synagogue, and one of the ways they were

14   doing that, was this campaign and

15   requesting funds from the state.

16      Q.   Okay.   And there's also, pursuant to an

17   operating agreement, they can carry out the

18   obligation that CJI has to preserve and

19   conserve the property, correct?

20            MR. WAGNER:   Objection to form.

21            THE COURT:   Sustained.

22      Q.   Let's have 364 given to the witness,

23   please.

24            THE COURT:   Mr. Solomon, let me

25    further direct you about my problem with

 1   this.  Even if TSF were the agent of CJI,

 2   even if, and I see that's the avenue you

 3   are going to try and prove, I have a

 4   problem with this document.

 5            Even if they were the agent, they

 6   wouldn't be the agent authorized to

 7   describe their corporate status or their

 8   relationship or CSI's relationship, that

 9   is, the fact that it says that CSI is the

10   owner of the Touro Synagogue, unless

11   there's some admission by CSI to that

12   fact, I don't know that TSF could find CJI

13   to that admission, even if they were the

14   agent for the fund raising purposes.

15            So if I missing something else in

16   this document that you are attempting to

17   go get in, other than that -- because on

18   that fact, I don't think so, I don't think

19   proving agency by TSF would do it for me.

20            MR. SOLOMON:  There are other

21   parts of the document that I think are

22   important that, at a minimum, that there's

23   been a lot of testimony about, the public

24   perception of Touro Synagogue and CJI, and

25   CJI's relationship to that, and so I would

1    think --

2            THE COURT:  How is that relevant

3    to anything?

4            MR. SOLOMON:  This hadn't been

5    our case, Judge, what -- why do I think

6    that public perception is relevant?

7            Well, I didn't offer testimony in

8    our case, I don't think --

9            THE COURT:  I mean, normally, you

10   know, normally I would be much more

11   relaxed about that, in particular in light

12   of both folks incredible accommodation to

13   each other's documents.

14           The problem with this document,

15   in addition to the fact that I now have a

16   signature that we have no explanation for,

17   but, also, inserts a new term of

18   "co-owner," and that's the first time in

19   anything that I have read, and in all of

20   this, and all of the testimony I have

21   heard, and anyone has referred to, as a

22   co-owner of the building, which throws us,

23   you know.

24           We are not talking about the

25   ownership and trustee, and non-trustee,

 1    and now all of sudden co-owner, and an

 2    internal -- inconsistent with anything

 3    that I have heard in this case; and to

 4    attempt to use that as an admission

 5    against this defendant, whose signature

 6    doesn't even appear on this, I don't see

 7    how I can let that in.

 8         If Ms. Freedman said something --

 9    someone authorized, or someone from CSI

10    authorized it, clearly the question -- but

11    here, no evidence at all that they had

12    adopted this, or authorized this, or, in

13    fact, that this is their signature, and

14    from any of which would allow it to be

15    admissible.

16         I know that, not only to adopt

17    this, we could not get the money -- but

18    TSF was looking for the money, and that's

19    what the testimony is.  The foundation was

20    the one seeking the funds from the state,

21    somebody, we don't know whom, made

22    representations to the state on this last

23    page about ownership, and now to allow

24    evidence to damage CSI with that

25    designation, when there's no evidence

1   whatsoever that CSI authorized it, it

2   would not be appropriate, I don't think.

3   And then, again, I am not sure why you

4   want that.  CJI is a co-owner of the

5   building, why you want that in, that

6   raises all new issues on top of it.

7           MR. SOLOMON:  There's a claim of

8   estopple against our client, against

9   Shearith Israel, Shearith Israel is

10  presented with a document which it signs

11  --

12          THE COURT:  As co-owner --

13          MR. SOLOMON:  Well, signs as

14  co-owner -- well, signs it as an

15  admission -- it's admission of a valid

16  lease exists.

17          THE COURT:  Admission by whom?

18          MR. SOLOMON:  Admission by the

19  party that I believed was authorized to

20  speak, that the Touro Synagogue

21  Foundation --

22          THE COURT:  On the issue of a

23  lease, you think that the Touro Synagogue

24  Foundation could bind CJI on its corporate

25  issues on its legal document?

1          MR. SOLOMON:  As I read the

2    document.

3          THE COURT:  Mr. Solomon, I would

4    sustain the plaintiff's objection on this

5    document, far too many questions are

6    raised about it based on it.

7          If you have further evidence

8    about this document during your case in

9    chief, I would reconsider.  But as the

10   record stands now, I would sustain the

11   plaintiff's objection.

12          The fact that the initial

13   signature -- but for the argument, if Ms.

14   Freedman says it's her signature, it's in.

15   If she says it's not her signature, it's

16   not in.  I think my initial reaction was

17   correct.

18          MR. SOLOMON:  If Your Honor wants

19   to hear this evidence, I will not question

20   the witness on it, but there's been

21   earlier explained in this case, Exhibit

22   DX364 --

23          THE COURT:  Say that question

24   again, Mr. Solomon.

25          MR. SOLOMON:  In this case,

1    Exhibit 364, it's an agreement among CJI

2    and the foundation.  CJI, the National

3    Trust for Historic Preservation, and

4    pursuant to that agreement --

5              THE COURT:  Except that -- the

6    44, is that the 45 document?

7              MR. SOLOMON:  No, Your Honor.

8    This is Exhibit -- if Your Honor, please,

9    I can just ask the question to the

10   witness, questions -- but Exhibit 364.

11             But the purpose -- my purpose is

12   to show that the -- for the purposes of

13   conservation, CJI agreed that the Touro

14   Foundation was its agent and could carry

15   out its responsibility.

16             THE COURT:  Purpose of what?

17             MR. SOLOMON:  Conservation.

18             THE COURT:  Of the building?

19             MR. SOLOMON:  Yes.

20             THE COURT:  But even if that were

21   the case, that doesn't give the Touro

22   Synagogue Foundation carte blanche to bind

23   or serve as an admission to the legal

24   affairs of CJI on matters of the owner

25   leases or non-leases or whatnot.  I don't

1    know that any --

2          MR. SOLOMON:  If the state

3    requires a lease or a written agreement of

4    a lease, and you have an agent of CJI who

5    is trying to carry on out CJI's

6    obligations to conserve, knows there's a

7    requirement, that there would be a lease,

8    and then has to, obviously, has to do the

9    work necessary to represent that there's a

10   lease, and then so -- so says that the

11   lease, as of 2004, is still in effect, I

12   thought that was relevant and helpful for

13   Your Honor's decision.

14          THE COURT:  People told me that

15   you are an excellent lawyer, and you

16   proved it many times over this week, but

17   that's a stretch, and that was a very --

18   by a fine lawyer -- but I'm still going to

19   sustain the objection.

20          MR. SOLOMON:  Thank you, Your

21   Honor.  I would like the witness, at

22   least, to be shown Exhibit 364, which is

23   the agreement that I was just referring

24   to.  Let's see if that's her signature.

25          (Witness reviews document.)

1    Q.  Do you have the document?

2    A.  I do have it now, that is my

3  signature.

4    Q.  Thank you.  I would like the witness

5  shown 539, please.

6        You can identify this as board

7  meeting minutes that have been redacted by

8  counsel for CJI on October 12, 2010?

9    A.  Yes, I see that.

10   Q.  And part of the president's report, it

11 reports that, "We had a busy summer, many

12 visitors to Touro and to the visitor center.

13 A group from Congregation Shearith Israel

14 joined us for Shabbat during the GW, George

15 Washington letter weekend.  The donation

16 helps offset expenses.  Also had a successful

17 High Holiday season."  Do you know this, in

18 2010?

19   A.  I see here it says a group came from

20 -- for Shabbat and during the GW letter

21 weekend, yes.

22   Q.  And helped defray the expenses?

23   A.  I see it says that, yes.

24   Q.  And did you meet this group in 2010?

25   A.  I don't recall meeting with this

1  group in 2010.

2    Q.  Do you recall meeting groups from

3  Shearith Israel on other occasions?

4    A.  No.

5    Q.  Okay.  Let's look at Exhibit 181,

6  please.

7            (The witness complies.)

8    Q.  This is Plaintiff's Exhibit 181.  This

9  is the December 9, 2008, board meeting that

10  you have seen here through the trial, haven't

11  you?

12    A.  Parts of it, yes.

13    Q.  So you have seen, we have discussed this

14  document before?

15    A.  I'm not sure I have seen this

16  introduction before, unless it was this

17  morning, I don't know.

18    Q.  Take a look with enough care to tell us

19  whether you can recognize this as meeting

20  minutes from December 9, 2008?

21    A.  It's saying a special board meeting.

22    Q.  Yes.

23            (Witness reviews document.)

24    A.  Yes.

25    Q.  You are the Laura Pedrick that is

180

1    referred to there?

2        A.  Yes.

3        Q.  And on the second page, the first full

4    paragraph, it says, "Laura Pedrick, chair of

5    the fund raising committee, reported that we

6    have done no fund raising in the past because

7    the foundation had been doing it."

8              Is that what you said?

9        A.  That's what it says here.

10       Q.  Is that what you said?

11       A.  I don't recall exactly what I said.

12       Q.  Okay.  And then, finally, with respect

13   to the Loeb Center, CJI is responsible for

14   the taxes on the Loeb Center; is that

15   correct?

16       A.  Repeat that.  You are not referring

17   to this document now?

18       Q.  I wasn't.

19       A.  Sorry.  Go ahead.

20       Q.  CJI is responsible for paying taxes on

21   the Loeb Center, correct?

22       A.  My understanding is we are

23   responsible, yes.

24       Q.  Thank you very much.

25              MR. SOLOMON:  Your Honor, if I

1   may have a minute.

2          THE COURT:  Sure.  Of course.

3          MR. SOLOMON:  Your Honor, nothing

4   further.

5          THE COURT:  Thank you.  Mr.

6   Wagner.

7          REDIRECT EXAMINATION BY MR. WAGNER

8    Q.  Ms. Pedrick, just a couple of questions,

9   and thank you for your patience.

10         With respect to the Loeb Center

11   taxes, do you know whether the Loeb Center

12   reimburses the congregation for those

13   taxes?

14   A.  I wasn't aware of that.  I think I

15   heard something today to that -- this

16   morning.

17   Q.  You were shown Exhibit -- I don't know

18   the number, but it was the December 9

19   minutes, and Mr. Solomon quoted to you the

20   line, "Laura Pedrick chair of the fund

21   raising committee reported that we have done

22   no fund raising in the past, because the

23   foundation had been doing it."

24         What did you mean by that?

25         MR. SOLOMON:  Objection.  The

1    witness recalled she didn't recall saying

2    that.

3              THE COURT:  First of all, it's

4    Plaintiff's Exhibit 181, make sure the

5    record is clear on that.

6              And the objection was sustained.

7              She said she didn't remember

8    saying, so asking what she means about

9    something she doesn't remember saying, is

10   not appropriate.

11   Q.  Can you describe generally fund raising

12   at CJI through this date?

13   A.  I would say through even to this

14   day, we are always in the mode of fund

15   raising, and welcoming donations to the

16   congregation and to Touro Synagogue, yes.

17   Q.  I think you testified that it was Mr.

18   Stokes who was responsible for soliciting

19   individual members as individual contributors

20   from CSI as part of the campaign?

21   A.  I saw that he was responsible for

22   soliciting members, yes.

23   Q.  And to your knowledge did the individual

24   members of the CSI make any significant

25   contributions?

```
 1                 MR. SOLOMON:  Objection.  No

 2     foundation.

 3                 THE COURT:  Why don't you lay

 4     foundation with about knowledge of fund

 5     raising.

 6       Q.  Was it Mr. Stokes that was responsible

 7     for individuals?

 8       A.  Yes.

 9       Q.  And did you, at any point, see what

10     individual donations were made to the

11     campaign?

12       A.  I did see individual donations, I

13     don't recall the specific names of people

14     that contributed.

15       Q.  Do you recall any names of anyone at

16     CSI?

17                 MR. SOLOMON:  Objection, Your

18      Honor.

19                 THE COURT:  Sustained.

20       Q.  Now, in terms of your dealings with CSI,

21     with respect to the campaign, was your

22     contacted limited to the meeting in New York?

23       A.  That was my contact with CSI, yes.

24       Q.  And can you turn to 509, the last page

25     of the document.
```

1              (The witness complies).

2    Q.  Those are the notes from Mr. Balaban.

3    A.  Yes.

4    Q.  Do you have it there, it says at the

5    top, an email to Alan Dr. Alan Singer?

6    A.  Yes.

7    Q.  Mr. Solomon asked you about these notes

8    that were attached, do you remember that?

9    A.  Right.

10   Q.  And can you turn to the last page.

11   A.  Yes.

12   Q.  And can you read the sentence right

13   above the numbers at the bottom.  "We look

14   forward."

15   A.  "We look forward to the opportunity

16   to work with you as partners and hope

17   that you will consider making a

18   contribution to this exciting and

19   groundbreaking project."

20   Q.  And after that, did you get a

21   contribution?

22   A.  We did not get any contribution from

23   Shearith Israel that I'm aware of.

24              MR. WAGNER:  Nothing further.

25              THE COURT:  Mr. Solomon

```
 1                MR. SOLOMON:  Nothing further.
 2                THE COURT:  Ms. Pedrick, thank
 3       you.
 4                THE WITNESS:  Thank you.
 5                THE COURT:  Mr. Naftalis.
 6                MR. NAFTALIS:  Your Honor, I
 7       think that is the end of our live
 8       witnesses.  We have other remarks, we are
 9       not -- we are not going to burden with it
10       on Friday afternoon, deposition
11       designations and the like, as part of our
12       case, also, which I know Your Honor will
13       read, the way that you wish to have them
14       read.
15                THE COURT:  But at some point
16       before the defendants puts witnesses on,
17       and you rest, we need to get all the
18       evidence into the record.
19                So I don't want to hold people
20       up, I know there are issues this
21       afternoon, but maybe be prepared Monday
22       morning.
23                Two things, any depositions that
24       you are submitting in lieu of testimony,
25       let's put them on the record and move in,
```

```
 1      I, obviously, would not read them, but

 2   technically come into the record.

 3           And then I would like, meaning

 4   Vicky would like, that we get a complete

 5   list of exhibits that you are offering to

 6   which the defendants have entered

 7   stipulations concerning their admission

 8   and the conditions of their admission.

 9           Let's get that marked as a court

10   exhibit for ID so we have a complete

11   record of all the exhibits that the

12   plaintiff is presenting in its case in

13   chief.

14           I think maybe other things that

15   you want to do before you rest Monday

16   morning.  But I can think of at least

17   those two to do on the record.

18           MR. NAFTALIS:  So just so I'm

19   clear, we would not rest formally until

20   Monday morning, and then take care of all

21   these loose ends, but just so that The

22   Court is aware, and our -- and the

23   Shearith Israel lawyers are aware, you

24   know, we are done with the presentation of

25   any of our live witnesses.
```

1              THE COURT:  Great.  So subject to

2       that, and I assume that will take two

3       minutes Monday morning, then I think I

4       received a copy of the letter of the list,

5       is that the order, Mr. Solomon, the

6       intended order right now?

7              MR. SOLOMON:  It is with respect

8       to one or two of the witnesses who we

9       don't control, and we are doing our best

10      to get them on, when we said, and if

11      not --

12             THE COURT:  You can be as

13      accommodating to people's needs and

14      schedules, that's not a problem.

15             MR. NAFTALIS:  I don't know if

16      Mr. Solomon has reflected over the course

17      of the -- he has a couple of folks on his

18      list with asterisk.

19             THE COURT:  Let them know whether

20      you are going to call them live or by

21      deposition.  I think one you said for sure

22      was by deposition.  And two, you are not

23      sure if they are live, so as you know,

24      give a call.

25             MR. NAFTALIS:  Do you have an

1    idea before the weekend, if you do --

2            MR. SOLOMON:  We will know more

3    information from when I sent you that

4    letter this morning.  No more new

5    information.

6            THE COURT:  Anything else before

7    we adjourn?

8            MR. NAFTALIS:  Nothing.

9            THE COURT:  Okay.  Great.  Let me

10   just quick check the calendar.

11           (Discussion off the record.)

12           THE COURT:  So everybody 9:30

13   Monday morning.

14         (Whereupon the proceedings

15         were adjourned at 3:30 p.m.)

16

17

18

19

20

21

22

23

24

25

Page 189

(1)          RHODE ISLAND
             (Providence)

(2)

(3)          I, Lisa Lee Gross, Registered Professional
      Reporter and Notary Public duly commissioned and

(4)   qualified in and for in the State of Rhode
      Island, do hereby certify that this is a true

(5)   record of the testimony given in Re:  U.S.
      District Court, Jeshuat Israel vs. Shearith

(6)   Israel.

(7)          I further certify that I am neither attorney
      nor counsel for, nor related to or employed by,

(8)   any of the parties to the action in which this
      deposition is taken, and further that I am not a

(9)   relative or employee of any attorney or counsel
      employed by the parties hereto or financially

(10)  interested in this action.

(11)         In Witness Whereof, I have hereunto set my
      hand and affixed my seal this 5th day of June,

(12)  2015.

(13)

(14)         _Lisa L. Gross_____
             Notary Public

(15)         My Commission Expires:
             April 13, 2018

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

Rhode Island Court Reporting