```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF RHODE ISLAND



* * * * * * * * * * * * * * * * * * * * * * * * *
CONGREGATION JESHUAT       *    CIVIL ACTION
ISRAEL                     *    12-822M
                           *
VS.                        *    JUNE 8, 2015
                           *
CONGREGATION SHEARITH      *
ISRAEL                     *    PROVIDENCE, RI
* * * * * * * * * * * * * * * * * * * * * * * * *




          BEFORE THE HONORABLE JOHN J. McCONNELL

                   DISTRICT JUDGE

                  (Bench Trial)


                   VOLUME V
```

**APPEARANCES**:

```
 FOR THE PLAINTIFF:    STEVEN E. SNOW, ESQ.
                       Partridge Snow & Hahn LLP
                       40 Westminster Street
                       Suite 1100
                       Providence, RI  02903

                       GARY P. NAFTALIS, ESQ.
                       JONATHAN M. WAGNER, ESQ.
                       TOBIAS B. JACOBY, ESQ.
                       DANIEL P. SCHUMEISTER, ESQ.
                       Kramer Levin Naftalis & Frankel LLP
                       1177 Avenue of the Americas
                       New York, NY  10036
```

```
FOR THE DEFENDANT:      DEMING E. SHERMAN, ESQ.
                         Locke Lord LLP
                         2800 Financial Plaza
                         Providence, RI  02903

                         LOUIS M. SOLOMON, ESQ.
                         COLIN UNDERWOOD, ESQ.
                         YAN GRINBLAT, ESQ.
                         JENNIFER CHAING, ESQ.
                         Cadwalader, Wickersham & Taft
                         One World Financial Center
                         New York, NY  10281

Court Reporter:          Denise P. Veitch, RPR
                         One Exchange Terrace
                         Providence, RI  02903
```

I N D E X

DEFENDANT'S WITNESS                                    PAGE

Michael I. Katz
        Direct Examination by Mr. Solomon         18
        Cross-Examination by Mr. Naftalis         72

1   8 JUNE 2015 -- 9:30 A.M.

2           THE COURT:   Good morning, everyone.  Hope you

3   all had a nice weekend.

4           UNIDENTIFIED SPEAKER:  Yes, your Honor.

5           THE COURT:  Of course that's probably an

6   oxymoron when you're in the middle of trial, my memory

7   reminds me.

8           Let me just procedurally go through a couple of

9   things.

10          Mr. Solomon, thank you for the letter I received

11  this morning about the witness list.  We can

12  accommodate your witnesses in any way so that it flows

13  the way you want it to come in, if we need to, so take

14  that into consideration.  So we'll have Mr. Katz and

15  Dr. Herstoff this morning.  If, your call again, if we

16  end early, and you would rather start with Dr. Mann

17  before Dr. Fisher, we can hold off and start Dr. Mann

18  in the morning, followed by Fisher.  If there's too

19  much time and you'd rather fill the gap and want to go

20  with Dr. Fisher, your call.  Either way is fine.

21          MR. SOLOMON:  Thank you, your Honor.  We also

22  have depositions and documents which won't take long,

23  but we might be able to take that up.

24          THE COURT:  Great.

25          MR. SOLOMON:  But it just seems to me better

1    from your Honor's perspective to hear it in that order.

2    But I think --

3        THE COURT:  You know, I know we're not quite

4    done with the Plaintiff's case, but we're going to end

5    that soon, but you can sort of see the end; and the

6    fact that this has gone in far quicker and cleaner than

7    I had originally anticipated gives us the flexibility

8    do it more logically, if that makes more sense.  So

9    we'll play it by ear.  Just be in touch with each other

10   so we know which way it's going to go; but, perfectly

11   acceptable.

12       Toward that end, let me give you something to

13   think about and we can talk about either later in the

14   day or tomorrow.  But I'd like to keep a rather short

15   leash on post-trial briefing on the matter, so let me

16   give you some proposed dates on what I'm thinking, and

17   don't all groan and moan at first, but let's see if

18   this is feasible.

19       So what I'd like to do is simultaneous filings

20   and proposed finding of fact and legal briefs on the

21   matter and have those be due June 29th, which would be

22   a little better than two weeks after the anticipated

23   close; with each side being able to reply by July 10th,

24   with arguments sometime in the middle of July on that;

25   possibly the week of the 13th.  We can work with

1    counsel on finding the right date.

2            So it's probably a little more aggressive than

3    anybody would have thought or wanted, but talk amongst

4    yourselves at the lunch break and we can decide either

5    later in the day or tomorrow with whether that will

6    work or not.

7            MR. NAFTALIS:  You may have finally found an

8    area where there may be common ground.

9            THE COURT:  Great.

10           MR. SOLOMON:  That passes for leisure in some

11   courts, and we thank your Honor for the accommodation

12   to the end of June.

13           THE COURT:  Okay.  Oh, yes, let's see, and think

14   about it because I'm guessing there's a lot of other

15   people, besides the two that just spoke, that that date

16   will mean something to.  So, let's make sure we don't

17   have births of children going on during that on key

18   people that may be doing some drafting or whatnot.  So

19   talk among your teams, and let's, by the end of the

20   day, see if we can call it on a good schedule.  I think

21   that's it.

22           So, Mr. Snow, I saw you getting up.  Why don't

23   you come forward.  I know we have some at least

24   logistical issues before the Plaintiff has completed.

25           MR. SNOW:  Yes, your Honor.

1          THE COURT:  One other -- stay right there, but
2     one other thing I'd request sometime this week if
3     possible, what would be very helpful to me is if each
4     of you could take your exhibit lists and put it in an,
5     dump it into an Excel spreadsheet that has a field for
6     the date of the document, and if we only know the year
7     or an approximate, just plug it in with what the
8     document is and then if you have a brief description.
9          What it allows me to do, what I have found is
10    that the story has jumped a lot as I was reading
11    through pleadings, timewise, and I want the ability to
12    be able to sort and search by date, in essence.
13          So if it's not a major problem, if you can both
14    just dump it into an Excel spreadsheet and then, you
15    all have my e-mail address, just e-mail the actual
16    Excel spreadsheet to me and each other.  Ultimately
17    when we go looking at the facts that would prove to be
18    helpful.
19          Mr. Snow.
20          MR. SNOW:  First off, your Honor, we would like
21    to submit the deposition designations.  Now, we've
22    already actually designated portions of depositions.
23    That occurred on May 11th of this year, Docket Number
24    69-3.
25          But what we've done, to try to make it easier

1    for the Court, is we've taken the transcripts of the

2    depositions and we've color-coded them, so what we've

3    done is in yellow we've highlighted in the margin the

4    Plaintiff's designations.  We've put in blue the

5    Defendant's cross-designations.  And, believe it or

6    not, there were some areas that both parties

7    designated.  We marked those in green.  There aren't a

8    lot of those, but there is some.  So if I could pass

9    it.

10        THE COURT:  That's a thing of beauty.  Thank

11   you, folks, for that.  When I was a young lawyer I used

12   to sit with the highlights late at night trying to do

13   that.  I think it's probably a little bit more

14   computerized by now; well, it is.

15        MR. SNOW:  There is one very tiny addition that

16   we need to the designations we filed on May 11th.  It's

17   four lines of Rabbi Angel's deposition found at

18   Page 100.  Actually it's two substantive lines; it's a

19   one-line question and a one-line answer, actually a

20   one-word answer.  We neglected to mark those before,

21   but we've included that in the binder.

22        Now I don't know how the Court wants to deal

23   with the objections.  We're perfectly happy to deal

24   with them in essentially the same manner that we did

25   with respect to the stipulation for exhibits; that is,

1    the Court takes it and when you're writing your

2    decision if you, you know, choose to rule or however

3    you rule you can deal with it that way.  But I think

4    that's probably more efficient than trying to take them

5    up at this time.

6              THE COURT:  Mr. Solomon.

7              MR. SOLOMON:  Thank you, your Honor.  That was

8    our suggestion, your Honor will remember, on the

9    skunk call, and so, yes, we're happy with that

10   suggestion.

11             And we want to then be able to argue that the

12   designations shouldn't be given any weight because of

13   the objections that we've asserted.  And so as far as

14   that goes, that's perfectly acceptable.

15             We do have some objections to two of the

16   designations that are in there that are principled, and

17   we called that to the other side's attention, and so

18   I'd like to be heard on that at a convenient time.

19             THE COURT:  Would now be a convenient time?

20             MR. SOLOMON:  Sure.  With respect to -- I assume

21   that with respect to Rabbi Angel, you told us about

22   that designation before?

23             MR. SNOW:  Those two lines we did not.  That was

24   an error.  It's on Page 100.

25             THE COURT:  Hold on, folks.

1          Mr. Solomon, we're having a problem with your

2    mic.  We need to -- you might need to actually hold it,

3    or, when you speak point it right up.

4          There we go.  All right.  I'll watch and see

5    when he speaks.

6          MR. SOLOMON:  Let me take the principled

7    objection, your Honor.  They have designated, CJI has

8    designated from the depositions of our two experts,

9    Professor Fisher and Dr. Mann.

10          THE COURT:  I saw that, yes.

11          MR. SOLOMON:  And I don't believe that that's

12    appropriate.  I think they are not our agents, they are

13    not the party -- certainly not until they testify, and

14    they can then cross-examine.

15          *Kirk versus Raymark*, 61 F.3d 147 is a Third

16    Circuit case.  In light of the fact that expert

17    witnesses are supposed to testify impartially in the

18    sphere of their expertise, they are not considered

19    parties, and I think they should cross-examine the

20    experts with their depositions.  With those two, and

21    that relates to Professor Fisher and Dr. Mann.

22          THE COURT:  Mr. Snow.

23          MR. SNOW:  Your Honor, I just submit that since

24    it is a non-jury matter, it will expedite the

25    cross-examination of those witnesses to have the

1    designations on things that we don't necessarily have

2    to bring out on cross-examination.  It could be done on

3    cross-examination.  It will lengthen the testimony of

4    those witnesses' testimony.  They are going to be here,

5    so I see no harm to the Defendant to, as a matter of

6    expediting things, to designate portions of their

7    transcript.

8         THE COURT:  Let me do this.  Let me take a look

9    at *Kirk* and I'll let you know after the lunch break.

10        MR. SOLOMON:  Thank you, your Honor.  If I

11   could, your Honor, another case that follows *Kirk* that

12   I think is also instructive is *Pfizer, Inc. versus*

13   *Ranbaxy*, 2005 Westlaw 229 6613, at internal page one to

14   two.

15        And, your Honor, even were Mr. Snow correct,

16   these designations would not go in as part of this

17   case.  They made a strategic decision not to call any

18   experts as part of their case; and then to designate

19   our experts for their case I think will, would -- I

20   think it would be improper; not just hearsay, but it

21   would avoid the decision that they made because at that

22   point they could just fill in any hole in their case by

23   designating our witnesses.

24        THE COURT:  I'll take a look and let

25   you know.

1          MR. SOLOMON:  Thank you.

2          MR. SNOW:  In addition to the deposition

3     designation, we'd like to move for the introduction of

4     exhibits pursuant to the stipulation that was entered

5     into on June 1st.  So this is based upon the

6     Plaintiff's third amended exhibit list dated May 28th

7     that has been given to the clerk I think at the

8     beginning of the trial.

9          THE COURT:  Do you know offhand, does it have

10    any ECF number, Mr. Snow?

11         MR. SNOW:  I don't believe it has an ECF number.

12    We can file it through the ECF system.  I think we just

13    gave it to the clerk.  But if your Honor prefers, we

14    can file it through the ECF system.

15         THE COURT:  As I said before, I imagine many

16    eyes will be looking at this transcript some day, and

17    so why don't we get it filed.  Particularly because of

18    the stipulation that would make the record, I think, a

19    little bit clear.

20         MR. SNOW:  Happy to do that.

21         THE COURT:  Thanks.

22         MR. SNOW:  For the record, let me just give the

23    numbers of exhibit numbers.  There are basically five

24    gaps, which are five documents that the Defendant has

25    objected to.  So we, the ones that are offering as full

1    exhibits is Plaintiff's Exhibits 1 through 78

2    inclusive; exhibits, Plaintiff's Exhibit 80 through 92

3    inclusive; Plaintiff's Exhibit 94 through 2003

4    inclusive -- I'm sorry, Plaintiff's 94 through

5    Plaintiffs 203 inclusive; Plaintiff's Exhibits 205

6    through 212 inclusive; Plaintiff's Exhibit 214 through

7    318 inclusive; and, finally, Plaintiff's Exhibits 320

8    through 321 inclusive.

9         So the five documents that are excepted from

10    that list are Plaintiff's Exhibits 79, 93, 204, 213 and

11    319.

12         We do want to offer those.  Those are the five

13    that have been objected to.  I don't know if your Honor

14    wants to take up the objections now, or we could rest

15    subject to later argument and ruling on whatever the

16    Court desires.

17         THE COURT:  Why don't we let you rest, subject

18    to both the two experts, Drs. Mann and Fisher's

19    deposition designation, and these five documents, and

20    that way I can take a closer look at them and we can

21    find an opportunity to let both sides argue.

22         MR. SNOW:  That's fine.  So subject to that, the

23    Plaintiff rests.

24         THE COURT:  One more.

25         MR. SNOW:  Oh, I'm sorry, yes.  In addition,

1    there were five defense exhibits that we would like to

2    have marked in full.  It's Defendant's Exhibits 405,

3    503, 507, 509 and 564.

4              THE COURT:  Thank you.  So subject to those two

5    caveats, the Plaintiff is resting?

6              MR. SNOW:  Yes, your Honor.

7              THE COURT:  Great.  Thanks, Mr. Snow.

8              Mr. Solomon.

9              MR. SOLOMON:  Your Honor, we would like to move

10   to dismiss the Plaintiff's case.  Having read the cases

11   over the weekend, it used to be easier under Rule 50;

12   it's confusing now.

13             THE COURT:  Very.

14             MR. SOLOMON:  And I think our motion would be

15   both under Rule 50 and under Rule 52, and we'll do this

16   any way you want.

17             We have four grounds.  Important to our motion

18   is the decision that they made not to call an expert,

19   which is --

20             THE COURT:  Mr. Solomon, could you move to the

21   middle; it's just easier to pick up, please.

22             There's some cases out there that say that a

23   party needs to state the grounds at least minimally.

24   Why don't you state the four grounds.

25             I'm going to take it under advisement.  I assume

1    the Plaintiffs will object, and I'll take it under

2    advisement; but why don't you make sure the record is

3    clear by stating the grounds.

4            MR. SOLOMON:  Thank you, your Honor.  That was

5    all I was intending to do, and I think we both read the

6    same cases over the weekend.

7            The decision that they made not to call an

8    expert -- which is why in particular we have that

9    objection to their using our experts on their case --

10   leaves them in a position where they have offered no

11   evidence, certainly insufficient evidence of ownership

12   of the rimonim;

13           Second, no sufficient evidence of a trust, its

14   existence, its terms, its applicability, its alleged

15   breach, for the benefit of CJI;

16           Third, no sufficient evidence to remove Shearith

17   Israel as a trustee for the Jews of Newport, even

18   assuming the Court were to find that they offered

19   sufficient evidence of a trust and its terms.  And even

20   were your Honor to find that we had obligations

21   heretofore unidentified that were breached, there's

22   still insufficient evidence to remove Shearith Israel

23   as the trustee;

24           And, finally, there is no sufficient evidence

25   that a sale of the rimonim would be consistent with the

1      rites, rituals and customs, those provisions in the

2      lease, in the 1945 agreement including the federal

3      government, in the deed that they have both said is

4      null and void and they have, and they have embraced.

5              And those are the four grounds, your Honor.

6              THE COURT:  Just a brief clarification,

7      Mr. Solomon, on the second one.  Is it CSI's position

8      that there is no trust period?  And, secondarily, if

9      there is a trust that it's not for the benefit of CJI?

10     Or is that one sentence?

11             MR. SOLOMON:  As it relates to CJI in this case

12     it is one sentence.  Just because I think for the sake

13     of *Occam's razor* and not deciding issues that your

14     Honor doesn't have to decide, I believe there's no

15     reason for the Court to decide the trust issue as it

16     relates to the Jews of Newport.  But, as we have said,

17     we do feel responsibility to the Jews of Newport.  I'm

18     comfortable saying it's a trust with a lower-case "t."

19             THE COURT:  Keep looking for that distinction.

20             MR. SOLOMON:  In the cases, well --

21             THE COURT:  Not now.  That would be --

22             MR. SOLOMON:  Okay.  But to the extent that

23     Shearith Israel has the property as of 1820, right,

24     where title passes to us, and then it's just confirmed

25     in 1894, then the trust language in 1894, which doesn't

1    identify a beneficiary, it just says it's held in

2    trust, and I think is insufficient.  But then I think

3    that is the distinction that I'm drawing.

4         If your Honor were to determine that the only

5    basis were the 1894 deeds, and not the lease that comes

6    afterwards and not any other, and the other agreement

7    between the parties, then we do acknowledge trust

8    responsibility; whether it's called a safety net or

9    anything else.  But there's no writing that articulates

10   what has to be done with that trust.  I think Shearith

11   Israel has shown what it feel its obligations are and

12   has carried them out.

13        Does that help?

14        But as between CJI and Shearith Israel, there is

15   no trust relationship.

16        THE COURT:  Okay.  Thank you, Mr. Solomon.

17        MR. SOLOMON:  Thank you, your Honor.

18        THE COURT:  Prepared to call your first witness?

19        MR. SOLOMON:  We are, your Honor.  Thank you.

20   Michael Katz, please.

21        THE COURT:  Remain standing when you get there,

22   Mr. Katz, and Ms. McGuire will swear you in.

23        MICHAEL I. KATZ, DEFENSE WITNESS, SWORN

24        THE CLERK:  State your name and spell your last

25   name for the record.

1          THE WITNESS:  Michael I. Katz, K-a-t-z.

2          MR. SOLOMON:  Your Honor, we have handed out a

3    small set of documents, some of which I may be

4    referring to during the examination.  And may I

5    proceed?

6          THE COURT:  Yes.  Thank you.

7          MR. SOLOMON:  Thank you, your Honor.

8          <u>DIRECT EXAMINATION BY MR. SOLOMON</u>:

9    **Q.**   Mr. Katz, where were you educated?

10   **A.**   I was educated in the public schools in Chicago,

11   and then I went to Washington University in St. Louis

12   for my undergraduate degree.  I received a master's in

13   American history at the University of Virginia;

14   political science at the New School for --

15          (Interruption in proceedings)

16          THE COURT:  Can you pull the mic all the way in,

17   Mr. Katz.

18          THE WITNESS:  Do you need the whole thing again?

19          THE COURT:  Hold on one second; let me just

20   check with Denise.  Do you need that repeated?

21   **A.**   I went to the public schools in Chicago.  I went

22   to Washington University, St. Louis, for college.  I

23   received a master's in political science from the New

24   School For Social Research, another master's in

25   American history, University of Virginia, and returned

1    to the Washington University for law school.  A lot of

2    education.

3    **Q.**    And are you a practicing attorney?

4    **A.**    Yes, I am.

5    **Q.**    Where do you practice?

6    **A.**    I practice in New York in the law firm of

7    Frankenthaler, Kohn, Schneider and Katz.

8            THE COURT:  Hold on.  Mr. Katz, I know it's

9    going to seem uncomfortable, but if you can really just

10   bring that right up to your mouth.

11           THE WITNESS:  Is that better?

12           THE COURT:  Yes.  Thank you.

13   **Q.**    What type of law do you practice?

14   **A.**    I practice primarily trust and estates, estate

15   planning, and some residential real estate.

16   **Q.**    As hard as it is during my questions, Mr. Katz,

17   I'm not going to be asking you any questions as a

18   lawyer.  I'm not going to be asking you any questions

19   as a lawyer who does trust and estate work.  Try to

20   categorize your mind, put those out of your mind, and

21   I'm going to ask you questions as a congregant and

22   trustee.  Okay?

23   **A.**    Yes.

24   **Q.**    How long have you been a member of Congregation

25   Shearith Israel?

1    **A.**    We joined in 1984 when my daughter was born.

2    **Q.**    And did your wife belong or her family belong

3    before then?

4    **A.**    Yes.  My wife's family came to New Amsterdam, or

5    New York, in approximately 1680, having left Spain and

6    then the Netherlands as part of that migration of

7    Western Sephardic Jews.

8          The family tree, which is fun, shows two

9    important characters.  One was the original descendent

10    Gomez, and then Uriah Hendricks in the 1750s came from

11    England and married a Gomez, and the family name stayed

12    on as Hendricks or Henriques.  My wife's grandparents,

13    my wife's grandmother was, her last name was Hendricks

14    until she married George Frankenthaler.

15          But the family remained at Shearith Israel until

16    the 1920s, and we joined when we came back to New York

17    in 1984.

18    **Q.**    Do you hold any positions of leadership at

19    Shearith Israel?

20    **A.**    I'm the trustee and vice president.

21    **Q.**    When did you first become trustee?

22    **A.**    In 1995.

23    **Q.**    And a trustee continuously since then?

24    **A.**    Yes.

25    **Q.**    When did you become a vice president?

1    **A.**    Twelve years ago.

2    **Q.**    So that the Court understands the nomenclature,

3    are you called "vice president"?

4    **A.**    I'm called, the term is "segan," s-e-g-a-n.

5    **Q.**    And you're currently a segan --

6    **A.**    Currently a segan, yes.

7    **Q.**    Let me finish the question, and then pause briefly

8    so that the court reporter can get what you're saying,

9    okay?

10        What are your responsibilities as vice president

11    or segan?

12    **A.**    As vice president, there are formal and less

13    formal.  We're eligible to attend all committee

14    meetings.

15        I have special areas of interest, as does my

16    co-segan, and from a -- we have certain rituals and

17    practices and ceremonies in which the president and the

18    vice presidents are responsible for carrying out those

19    ceremonies.

20    **Q.**    Are you involved in fundraising?

21    **A.**    Yes.

22    **Q.**    Okay.  And have you been during the time that you

23    have been on the board?

24    **A.**    For the entire year that I've been, years that

25    I've been a member, not just a board member; a member

1    of the synagogue, not just a board member.

2    **Q.**    Is fundraising one of the tasks of all of the

3    trustees?

4    **A.**    It's a task of every trustee.

5    **Q.**    Now, have you ever acted as liaison between

6    Shearith Israel on the one hand and CJI on the other?

7    **A.**    Yes, I have.

8    **Q.**    When did you do that?

9    **A.**    In, I think it was 1998 I was invited as a

10    designated and invited to attend the George Washington,

11    the reading of the George Washington letters.  I don't

12    remember whether I was George Washington or whether I

13    was the rabbi, but it was a very important experience

14    for my family and I.

15         And during that visit I became friends with Bea

16    Ross, and that connection continued and we would speak

17    to one another from time to time about various

18    questions.

19    **Q.**    When you say you don't remember who you were,

20    meaning you participated in the program?

21    **A.**    Yes, I did.

22    **Q.**    Okay.  And you were announced as a member of

23    Shearith Israel?

24    **A.**    Yes.

25    **Q.**    And what were your duties as liaison?

1    **A.**    It was -- from time to time there would be various

2    questions would be raised about programs.  We would

3    speak from time to time about their plans, and

4    primarily I think Bea would call from time to time to

5    tell us of certain questions they had.

6         And I would -- it also goes back to when we were

7    in for the reading of the Washington letters, we went

8    through some of the buildings, she told me some of

9    their issues, and it was a very informative period.

10   **Q.**    Was the liaison function to create an open channel

11   of communication between the two congregations?

12   **A.**    It wasn't a formal position, but that was the

13   purpose of it.

14   **Q.**    You say it wasn't a formal position.  Was there a

15   liaison before you became liaison?

16   **A.**    There had been a series of people that served, who

17   either were on the board of Shearith Israel or were on

18   the staff of Shearith Israel who would be the contact

19   person for CJI to speak to.

20   **Q.**    And for how long has there been a liaison between

21   Shearith Israel and CJI?

22   **A.**    Based on stories that I've heard, it goes back

23   decades and decades.

24   **Q.**    Now, after you stopped being the formally informal

25   liaison, did someone else take over as liaison?

1    **A.**    Dr. Len Groopman became the liaison.

2    **Q.**    What is CJI's relationship to the Touro Synagogue?

3    **A.**    CJI, as I understand it, is a, is the congregation

4    that took or became the occupant of the Touro Synagogue

5    in the, at the end of the 19th century, the 1890s or

6    so, and they picked a name that was --

7        MR. NAFTALIS:  Objection.  He doesn't have any

8    personal knowledge of any of this stuff.

9        THE COURT:  Sustained.

10       MR. NAFTALIS:  I move to strike.

11       THE COURT:  Granted.

12   **Q.**    The question that I was asking is, is the

13   relationship that you understand -- again, not asking

14   you as a lawyer -- between CJI and the Touro Synagogue.

15   So let me pose another question consistent with the

16   judge's ruling.

17       Who owns Touro Synagogue?

18   **A.**    Shearith Israel owns Touro Synagogue.

19   **Q.**    Okay.  And is there a lease arrangement between

20   Shearith Israel on the one hand and CJI on the other?

21   **A.**    There are several leases, yes.

22   **Q.**    Okay.  And as of 2012 did you understand that the

23   lease remained in effect?

24       MR. NAFTALIS:  Objection.

25       THE COURT:  Overruled.

1    **A.**    Yes.  The lease has been in continuous effect.

2    **Q.**    Since?

3    **A.**    Since 1903 and 1908.

4    **Q.**    Prior to this dispute, you knew about the lease;

5    is that right?

6    **A.**    Yes.

7    **Q.**    With whom at CJI do you have the most frequent

8    communications?

9    **A.**    The most frequent would be with Bea Ross.

10    **Q.**    At the time what was her position?

11    **A.**    She was executive director when we attended the

12    Washington reading.  I believe she'd been the president

13    at one time.  I don't know what her formal position was

14    in 2012.

15    **Q.**    What was your, if any, personal relationship with

16    Ms. Ross?

17    **A.**    It was friendly.  We, just last week we were

18    talking about fun things in our families.

19    **Q.**    Prior to this lawsuit had there been any strain in

20    the relationship between you and Ms. Ross?

21    **A.**    None.

22    **Q.**    And to your knowledge had there been strains in

23    the relationship between Shearith Israel, on the one

24    hand, and CJI, on the other during the time that you've

25    been a board member?

1    **A.**   I wouldn't say strains.  There were always

2    discussions of various issues.

3    **Q.**   And --

4    **A.**   I beg your pardon?

5    **Q.**   Were they worked out?

6    **A.**   Yes, they always worked out.

7    **Q.**   Now, did others, to your knowledge, from Shearith

8    Israel visit the Newport synagogue?

9    **A.**   Frequently, is my understanding.  We have -- I've

10   seen letters or in reports from the Shearith Israel

11   League, that they would go up there for the weekend.

12   We have congregants who attended services there during

13   the summer.  Former trustees, Jon Mendes, would go

14   frequently.  Our parnas, Alvin Deutsch, went up there

15   more than once.  Victor Tarry, I believe, went.

16        We had people who would go there from time to

17   time even before I went, but I've read reports of their

18   having attended.

19   **Q.**   And were there occasions when CJI visited Shearith

20   Israel?

21   **A.**   My only recollection of a formal visit of anyone

22   from CJI was in 2005 wherein a delegation came to --

23   asked to attend one of our board meetings.

24   **Q.**   Let me ask you about responsibilities -- not as a

25   lawyer, not as a trust and estates lawyer, not as a

1    lawyer -- that you and to your knowledge Shearith

2    Israel felt to various objects that I'm going to

3    identify.

4          Did or does Shearith Israel have

5    responsibilities to CJI?

6    **A.**    Shearith Israel has no responsibilities to CJI as,

7    other than as a landlord.

8    **Q.**    And do you know whether as a landlord there is a

9    responsibility from CJI -- from Shearith Israel to CJI?

10   **A.**    It's a net net lease, a triple net lease.  They

11   are responsible for the building.  There's a $1 a year

12   rent.  And we're -- we do not have any other

13   obligations to them.

14   **Q.**    And by "triple net," that's two different words,

15   triple net.  What is your understanding?  That they're

16   responsible for all expenses --

17   **A.**    Correct.

18   **Q.**    -- of the --

19   **A.**    We charge them a dollar.  We don't charge them

20   anything, like it's not market rent, market-rate rent,

21   and so it's their responsibility to maintain the

22   building and to protect it.

23   **Q.**    When you say it's not market rent, was it your

24   understanding that it was below market rent or above

25   market?

1   **A.**   It's way -- it's a nominal rate.

2   **Q.**   Is it below or above?  Or do you have any --

3   **A.**   Below, it's below market rate.

4   **Q.**   Now, what about responsibilities that Shearith

5   Israel feels to the Jews of Newport?

6   **A.**   That's a different story because the deeds that we

7   have are to protect it for the community of the Jews of

8   Newport.

9   **Q.**   Okay.  What about obligations that CJI has to

10  Shearith Israel?  What responsibilities do they have to

11  Shearith Israel?

12  **A.**   First of all, it has the lease responsibility.  It

13  has the responsibility of maintaining a ritual practice

14  consistent with Western Sephardic practice.  And the

15  third is -- it just flew off for a second.

16  **Q.**   Does CJI have any responsibility to Shearith

17  Israel in terms of --

18  **A.**   Right.  We are supposed to -- we have the right to

19  have two board members on their board.

20  **Q.**   I think it may be -- is it two board members?

21  **A.**   Two or four, I'm not sure.

22  **Q.**   Does that come from the lease, or does it come

23  from some other written instrument?

24  **A.**   It comes from the lease, I believe.

25  **Q.**   In terms of the lease, is there any responsibility

1    on CJI's part to discuss or get approval for the
2    appointment of rabbis?
3    **A.**    Yes.  The lease requires that in addition to, as
4    part of maintaining the Western Sephardic Minhag, that
5    Shearith Israel have the right to approve any rabbi
6    that is designated by the CJI.
7    **Q.**    In the book in front of you there is an exhibit,
8    148.  I'm going to ask you to look at it just with
9    enough care to tell us whether it refreshes your
10   recollection about whether the source of the
11   responsibility to have two or four board members come
12   from this document or another instrument.
13   **A.**    (Pause)  I don't see it in this document.
14   **Q.**    If I suggested that there's a separate document,
15   the constitution and bylaws?
16           MR. NAFTALIS:  Objection to the leading.
17           THE COURT:  I've let all counsel lead, it's a
18   bench trial, to get us through this.  The documents
19   speak for themselves.  I could have testified where it
20   was located.
21           MR. SOLOMON:  That's fine.  Okay.  All right.
22           THE COURT:  So it's probably better just in the
23   order of who should be testifying, probably should be
24   the witness, the second should be the attorney, and the
25   third should be the judge.  So I think we'll go with

1    the second one and let Mr. Solomon testify about that

2    issue.

3         MR. SOLOMON:  I think we are where we need to

4    be, Judge.  I think I'm going to ask the next question.

5    Q.   Has anybody from CJI, in the 21 years you've been

6    a board member, or at any time, ever said to you that

7    there were obligations, responsibilities, that Shearith

8    Israel had to CJI?

9    A.   Not to CJI.

10   Q.   Has anybody from CJI ever in writing said, Look,

11   you've got these responsibilities, Shearith Israel?

12   A.   No.

13   Q.   Has anyone from CJI orally, whether in a

14   conversation over the telephone, or whether when you

15   were up in Newport, or whether when they were down in

16   New York, has anyone on behalf of CJI ever identified

17   any responsibilities that Shearith Israel has to CJI?

18   A.   Not responsibilities under this lease.

19        MR. NAFTALIS:  I take it he's talking from his

20   own personal knowledge, as opposed to --

21        THE COURT:  I think what is clear, and

22   Mr. Solomon referred to this at the beginning, is that

23   information that is coming in right now and has been

24   coming in this morning comes in not for the truth of

25   the matter asserted, but for the state of mind of both

1    Mr. Katz and potentially CSI.  So with that caveat, you

2    can continue, Mr. Solomon.

3         MR. SOLOMON:  And I agree with that.

4         MR. NAFTALIS:  I wasn't objecting; I was just

5    saying only that the witness can only testify as to

6    what he personally knows, as opposed to what he heard

7    from somebody else.

8         THE COURT:  And we've had officers of CJI

9    testify about their knowledge of CJI; and similarly

10   Mr. Katz is in the same position, I think, to give us

11   similar testimony with CSI's.

12   Q.   In your presence has anyone ever raised the issue

13   of a responsibility that Shearith Israel has to CJI?

14   A.   Not to my knowledge.

15   Q.   Has anyone, to your knowledge, ever asserted that

16   Shearith Israel has breached any responsibility or

17   obligation, hasn't lived up to any responsibility or

18   obligation that Shearith Israel has to CJI, or to the

19   Touro Synagogue, or to the Jews of Newport?  Has anyone

20   ever said to you, Listen, you're not doing what you're

21   supposed to?

22   A.   No.

23   Q.   Has anyone done that in writing?

24   A.   No.

25   Q.   Anyone done that orally?

1    **A.**    No.

2    **Q.**    Has anyone ever reported to you that CJI said that

3    to somebody else?

4    **A.**    No.

5    **Q.**    In any of the communications that you have had in

6    the 21 years as a board member, has anyone on behalf of

7    CJI asserted that Shearith Israel has some trust

8    relationship with CJI?

9    **A.**    No.

10    **Q.**    Anyone asserted Shearith Israel has not honored or

11    violated any relationship of trust that Shearith Israel

12    has with CJI?

13    **A.**    No.

14    **Q.**    Has anyone asserted that Shearith Israel has not

15    honored any responsibility in trust that Shearith

16    Israel feels to the Jews of Newport?

17    **A.**    No.

18    **Q.**    Does Shearith Israel feel any responsibility to

19    support CJI financially?

20    **A.**    No.

21    **Q.**    Does Shearith Israel or its members support CJI or

22    the Touro Synagogue financially?

23    **A.**    Yes.

24    **Q.**    Tell the judge what you know.

25    **A.**    We have individual members who have contributed to

1    various, either funding or other requests by, from CJI

2    and, such as we had a trustee who helped them restore

3    the rimonim.  He was a former trustee of ours.  He

4    helped them find the proper craftsman, and he

5    contributed I believe it was $10,000 to the

6    restoration.

7            THE COURT:  Who was that, Mr. Katz?

8            THE WITNESS:  That would be Roy Zuckerberg.

9    **Q.**   While we're talking about Mr. Zuckerberg, he is an

10    honorary trustee?

11    **A.**   Yes.  He was a trustee before I started, but he

12    has been a retired and is now -- has been an honorary

13    trustee for many years.

14    **Q.**   All right.  And has Mr. Zuckerberg attended any

15    board meetings in the last decade?

16    **A.**   I would say it's more than that that he hasn't,

17    longer than that that he hasn't attended.

18    **Q.**   And Mr. Zuckerberg doesn't speak for Shearith

19    Israel.

20    **A.**   Not at all.

21    **Q.**   The question is does he speak to Shearith Israel.

22    No, but --.

23    **A.**   It's a good relationship.

24    **Q.**   Okay.  All right.  So you said that under the

25    lease there's a mode of ritual, rites, rituals and

1    customs.  And to your knowledge, has there been any

2    issue between Shearith Israel and CJI concerning the

3    rites, rituals and customs that are observed at the

4    Touro Synagogue?

5    **A.**    There's been no issue between us on that, that

6    they continue -- to my understanding is they continue

7    to follow those practices.

8    **Q.**    Now, you also mentioned that there's a dollar a

9    year in rent.

10   **A.**    Yes.

11   **Q.**    And during the time that you have been a trustee,

12   has that been paid?

13   **A.**    We -- it's been paid for the most part, as far as

14   I know.

15   **Q.**    And has it ever come to your attention that CJI

16   has said, We're not paying the rent, We refuse to

17   acknowledge or honor this lease?

18   **A.**    No.

19   **Q.**    Okay.  And in terms of rabbi approval, I think you

20   also mentioned that that's a responsibility --

21   **A.**    Correct.

22   **Q.**    -- that CJI has.  During the time that you have

23   been a board member, has CJI come to Shearith Israel

24   for approval of its rabbis?

25   **A.**    Yes.  And I know that because our rabbi, Marc

1    Angel, would report either to the officers or sometimes

2    to the board --

3              MR. NAFTALIS:  Your Honor, at this point I would

4    object because that's pure hearsay what Mr. Angel,

5    Rabbi Angel reported to him.

6              THE COURT:  Overruled.

7    **A.**    Rabbi Angel would report to us that he had

8    received a call from CJI, he said for, as I understand

9    it, from what he told me, that as long as they picked

10   someone from, who had gotten *smichut* ordination through

11   the Yeshiva University, he would be open to meeting

12   with them and to consider them.  And so far all of

13   their rabbis have met that test and the process has

14   worked out.

15   **Q.**    Was the board looking, even if in an informal

16   delegation to Rabbi Angel, to vet the candidates?

17   **A.**    That's my understanding.

18   **Q.**    Okay.  And to your knowledge CJI has never chosen

19   a rabbi other than one that was either ordained or

20   processed through Yeshiva University; correct?

21   **A.**    Correct.

22   **Q.**    What is the Touro Synagogue Foundation?

23   **A.**    The Touro Synagogue Foundation, as I understand

24   it, is an independent, nonsectarian, not-for-profit,

25   whose primary purpose is to raise funds for the Touro

1    Synagogue.

2    **Q.**   And do you know what, if any, role Shearith Israel

3    has had in the Touro Synagogue Foundation?  And it used

4    to go by a different name.  Decades ago I think the

5    record is that it was called Friends of Touro

6    Synagogue.

7    **A.**   Right.  We have members who have contributed.

8    We've helped in their applications to the various

9    federal agencies or other granting institutions to sign

10   applications for grants, and we did it as owners of the

11   Touro Synagogue.

12   **Q.**   I'm going to ask you to look at Exhibit 507 in the

13   book in front of you.  There is there a redacted

14   portion of the Minutes from 2005.  Can you identify

15   that?

16   **A.**   Could you repeat that one.

17   **Q.**   Yeah.  What are you looking at there on

18   Exhibit 507?

19   **A.**   It's a trustee meeting, I don't see the --

20   May 17th, 2005.

21   **Q.**   And did you attend that meeting?

22   **A.**   Yes, I did.

23   **Q.**   Was there a presentation made by the Touro

24   Synagogue Foundation?

25   **A.**   Yes, there was.

1    **Q.**    Would you look at Roman Numeral I under Touro

2    Synagogue Presentation.

3    **A.**    Yes.

4    **Q.**    And tell the Court whether this, to your

5    recollection, accurately reflects what went on there.

6    **A.**    Yes, it does reflect.

7    **Q.**    Okay.  At this meeting did the Touro Synagogue

8    Foundation make a specific ask for a particular amount

9    of money from Shearith Israel?

10            MR. NAFTALIS:  Objection.  I think the

11   presentation was made by Touro Synagogue, not the Touro

12   Synagogue Foundation.

13            THE COURT:  Overruled.

14   **A.**    The presentation included Ambassador Loeb, and he

15   laid forth his plans to build a visitor center at, on

16   the grounds adjoining the Touro Synagogue.  And he

17   asked, and there were several people there who were

18   from Friends of Shearith -- of Jeshuat Israel, and they

19   described this and they asked for help and asked us to

20   give if we would be able to support them.

21   **Q.**    And did they ask, by the way, did they ask for a

22   membership list?

23   **A.**    We told them we couldn't give money directly from

24   our own funds.

25   **Q.**    Mr. Katz, I'm sorry.  Did they ask for a

1    membership --

2    **A.**    Yes, they did ask for a membership.

3    **Q.**    They did ask for a membership list --

4    **A.**    Yes.

5    **Q.**    -- or did they ask for access to members?

6    **A.**    I beg your pardon now?

7    **Q.**    I want to know whether they asked for a membership

8    list or access to the Shearith Israel members.

9    **A.**    I believe they asked for access to the Shearith

10    Israel members.

11    **Q.**    Did -- Shearith Israel has a membership list?

12    **A.**    Yes, we do.

13    **Q.**    Has Shearith Israel given its member list out to

14    outside organizations?

15    **A.**    We don't even give it to inside organizations.

16    **Q.**    And by "inside organizations," tell the judge what

17    you mean.

18    **A.**    We have various entities within the synagogue

19    family, the Sisterhood, there's a social club that is

20    part of Shearith Israel, and because we believe that

21    the membership list is confidential, if the Sisterhood

22    or the League, which it's called, wants to send out a

23    mailing, we have them send us the mailing, and then we

24    send it out so that the membership list remains sacred.

25    **Q.**    Okay.  These other organizations, are they

1    sometimes called "societies"?

2    **A.**    Yes.  Uh'huh (affirmative).

3    **Q.**    So did Shearith Israel refuse any request by the

4    Touro Synagogue Foundation or by CJI to assist in its

5    fundraising?

6    **A.**    No.  We told them if they gave the materials, we

7    would send out the materials to our members.

8    **Q.**    To your own personal recollection did anyone from

9    the Foundation or CJI follow up?

10   **A.**    I don't know.

11   **Q.**    Okay.  Did you have an understanding of whether

12   the fundraising effort by the Foundation in 2005 was

13   successful?

14   **A.**    Yes, it was.

15   **Q.**    Now, during this time period was Shearith Israel

16   doing its own fundraising?

17   **A.**    We were engaged in a $10 million fundraising to

18   better restore our hundred-year-old building, and it

19   took several years of fundraising.  The trustees were

20   all, all had responsibilities to make calls, to raise

21   funds.  We sought out outside funding sources.  And it

22   was a difficult, painful period.

23   **Q.**    Did Shearith Israel have excess cash to give to

24   the Foundation?

25   **A.**    We never have excess cash.

1    **Q.**   Is Shearith Israel a not-for-profit organization?

2    **A.**   Yes, it is.

3    **Q.**   As a not-for-profit organization, what is the

4    expectation about whether Shearith Israel will operate

5    at a profit?

6    **A.**   The expectation is that we don't do anything to

7    make a profit.  And we really can't -- we've never made

8    a profit.  We're always in debt at some level and raise

9    funds to make that up.

10    **Q.**   What is the deficit dinner or the deficit

11    breakfast?

12    **A.**   When I joined the board, there was a practice of

13    many years standing that every three years the board of

14    trustees would have a breakfast or a dinner, and during

15    the course of that dinner pledges would be made and

16    gifts would be made to fill three years' worth of

17    deficit; not three years going forward of profit, but

18    to make up three years' worth of deficit.

19    **Q.**   And how much -- what was typically raised?

20    **A.**   It was typically a million dollars.

21    **Q.**   So the deficit each year was about a million?

22    **A.**   A third of a million, yes.

23    **Q.**   Now, does Shearith Israel need to defer its

24    expenses, some of its expenses?

25    **A.**   Yes.

1    **Q.**    Okay.  Does Shearith Israel have maintenance needs

2    that can't always be immediately filled?

3    **A.**    All you have to do is walk around the building and

4    see things where there's deferred maintenance.  It's

5    very expensive and everything, you know, it's an old

6    building that is in constant use, to keep up the

7    maintenance on a hundred percent basis.

8    **Q.**    Next to the main synagogue there is a small room.

9    What is it called?

10    **A.**    It's called the Little Synagogue.

11    **Q.**    What is it?

12    **A.**    It's a replica of our 1730 building in Lower

13    Manhattan.  And it has benches.  We don't have

14    individual seats.  We have benches going back to the

15    1730 synagogue as well as to some other, the successor

16    synagogues, and these are all used on a daily basis.

17         It has the ark that was in either the 1730

18    building or subsequent building.  And there's also four

19    candlesticks that legend has it came from Spain, and

20    these are on the four corners of the reader's desk, and

21    readers desk and the bench behind the reader's desk go

22    back go to the 1730 building.

23    **Q.**    Does the Little Synagogue have maintenance needs?

24    **A.**    The Little Synagogue leaks.  There's heating

25    issues.  There's water infiltration.  The roof is

1    constantly being patched because we can't afford to

2    replace it.

3    **Q.**    But what is Shearith Israel doing about that?

4    **A.**    We're raising money whenever possible and going to

5    donors to ask for support.

6    **Q.**    Does Shearith Israel have a rabbi's house or a

7    parsonage?

8    **A.**    There's a parsonage on Central Park West at

9    99 Central Park West.  This was built a couple of years

10   after the 1897 building, and from the earliest days it

11   was the parsonage or the residence of the rabbi, of

12   whoever was the head rabbi at the time.

13   **Q.**    And in the last 21 years that you've been a board

14   member, has the rabbi lived there?

15   **A.**    No, he has not.

16   **Q.**    Why not?

17   **A.**    Well, it was in very bad disrepair.  It was going

18   to be very expensive to fix.  But we saw that there was

19   an economic opportunity, and we fixed it up, and we've

20   been renting it out at very significant rents over the

21   last 10 years, I would say.

22   **Q.**    Does Shearith Israel have an endowment?

23   **A.**    We do not have an endowment.

24   **Q.**    Does Shearith Israel have what you believe are

25   valuable religious artifacts?

1    **A.**   When our ark is opened, there are 19 sacred Torahs

2    that are lined on three levels.  It's staggering and

3    beautiful to see.  And each one of these has a velvet

4    cloak of a color either for the Sabbath, for holidays,

5    for the high holidays.  Underneath, and this is --

6    these bronze doors close and they're locked whenever

7    the services are not open.

8         Underneath, underneath the Torah scrolls, but

9    within this vault, are drawers where our silver ritual

10   objects are, that we aren't using, are stored.

11        Each Torah scroll, by the way, has its own set

12   of rimonim.  Some are as recent as 1970; others go back

13   to the 19th century or older, but they're all

14   beautifully maintained.

15   **Q.**   Actually my question was, is, do you believe that

16   Shearith Israel has some valuable religious artifacts?

17   **A.**   They're very valuable, but there's no price on

18   them, so.

19   **Q.**   Why is there no price on them?

20   **A.**   Because we don't believe in selling ritual

21   objects.

22   **Q.**   And to your knowledge has Shearith Israel ever

23   sold a ritual object?

24   **A.**   I've never heard of it.

25   **Q.**   Has Shearith Israel assisted CJI or the Touro

1  Synagogue Foundation in making grant applications?  I

2  think you mentioned it briefly.

3  **A.**    Right.  CJI would come to us from time to time

4  through the nineties and beyond, and more recently,

5  because as owner, the form required that the owner sign

6  the application, and they came to us and asked us to

7  sign.

8  **Q.**    And have we ever refused to do that?

9  **A.**    Never.

10  **Q.**    Are you aware of instances where we have assisted

11  them in the fundraising, making grant applications, for

12  example, to the state government in Rhode Island?

13  **A.**    Yes.  Our executive director or the president

14  wrote letters from time to time for these applications.

15  **Q.**    And what about to the federal government?

16  **A.**    Similar to the federal government, to the, I think

17  it was the Interior Department.

18  **Q.**    The Court has seen a couple of times some

19  correspondence that I'm not going to bother showing

20  you.

21       I do want you to look at DX365, please.  What is

22  this.

23  **A.**    That's 36-what?

24  **Q.**    365.

25  **A.**    This is a letter signed by our executive director

1    Alan Singer, to the, must be related to the Getty Art

2    Museum, but it says the Getty Grant Museum in Los

3    Angeles; and it's an explanation of our relationship to

4    Shearith Israel in support of the application by CJI

5    for the support that the Friends of Touro Synagogue are

6    doing in preservation of the Touro Synagogue.

7    **Q.**    The second sentence of this letter begins:

8    (Reading)  As legal owner and historic steward of Touro

9    Synagogue, Congregation Shearith Israel is concerned

10    with the conservation of the site, so that it may be

11    enjoyed by and inspiring to many generations of

12    visitors and congregants to come.

13        Is that your understanding in 2003 of the role

14    that, that Shearith Israel was playing?

15    **A.**    Not just in 2003, but as far as -- as long as I've

16    been around.

17    **Q.**    Have you ever had any communications with CJI

18    representatives about fundraising strategies?

19    **A.**    Bea would describe to me what their fundraising

20    program was.

21        And I recall a meeting that David Bazarsky was

22    at, and he was complaining about how hard it was for

23    them to raise funds in Newport.

24        And I have been on a couple of national boards.

25    And I was also familiar with a fundraising program that

1    was conducted at the Plum Street Synagogue in

2    Cincinnati, and one of the members there told me that

3    they had to set up an independent not-for-profit that

4    was not affiliated with the synagogue directly, but

5    which sought funds nationally from people of all

6    religions to support the restoration of the Plum Street

7    Synagogue.  And I mentioned this to David and I said,

8    Why don't you do it?  And he said, It's too hard.

9    Q.    At the board meetings that you attended, was there

10   ever any discussions about Shearith Israel being

11   covered under CJI insurance policies?

12   A.    Say that again.

13   Q.    At any board meeting that you attended, was there

14   any discussion about insurance by CJI --

15   A.    Right.

16   Q.    -- covering Shearith Israel?

17   A.    Right, right.  We became concerned that as owners

18   of the building --

19          MR. NAFTALIS:  Can we get a time for this

20   conversation?

21          THE COURT:  Sure.  What period of time were you

22   talking about, Mr. Katz?

23          THE WITNESS:  This was -- would you repeat the

24   question?  I was thrown off there.

25   Q.    Yes.  That's what -- okay.  Shearith Israel

1  believed that it owned the building; is that right.

2  **A.**    Yes.  Uh'huh (affirmative).

3  **Q.**    Believed that Shearith Israel had about the

4  contents of the building?

5  **A.**    Yes --

6       MR. NAFTALIS:  Objection, your Honor.  At some

7  point the leading on the critical issues shouldn't

8  happen.  The witness can testify.

9       THE COURT:  Okay.  Let's back it up.  I'm going

10  to sustain the objections, Mr. Solomon, and give you a

11  new shot at asking questions, and we'll do this

12  orderly.

13       MR. SOLOMON:  Okay.

14  **Q.**    Did one -- what understanding did you have about

15  whether Shearith Israel owned any of the contents at

16  the Touro Synagogue?

17  **A.**    That was my understanding from the time I became a

18  board member.

19  **Q.**    And did you hear anyone at the board echo any

20  disagreement?

21  **A.**    Never.

22  **Q.**    So --

23       MR. NAFTALIS:  Objection to foundation.

24       THE COURT:  Overruled.

25       MR. NAFTALIS:  I know you overruled it, Judge,

1    but I'd like to find out if there was ever such a
2    conversation, as opposed to this conclusory stuff.
3              THE COURT:  You'll have an opportunity to
4    cross-examine.  Overruled.
5              MR. NAFTALIS:  Okay.  I'm sorry, your Honor.
6              I didn't mean to interrupt you, Mr. Solomon.
7    Q.    So were there discussions at the board level at
8    Shearith Israel --
9    A.    Yes.
10   Q.    -- about being covered by insurance that CJI was
11   taking out for the Touro Synagogue and the contents of
12   the building?
13   A.    The question was raised whether as owners we
14   had -- we should be protected in the event that the
15   building needed to be rebuilt or if there was damage
16   that needed to be repaired.
17             And so our executive director, or one of the
18   officers, contacted probably Bea and asked if we could
19   be named as a co-insured.  And I've seen the
20   application where our name is added.
21   Q.    Did anyone from Congregation Jeshuat Israel ever
22   ask you or, to your knowledge, the board of Shearith
23   Israel to pay any insurance premiums?
24   A.    I've never been told of that.
25   Q.    Did anyone from Jeshuat Israel ever tell you, or

1  to your knowledge anyone on the board, that the

2  purchase of a particular policy was a mistake?

3  **A.**  I've -- I don't know for sure.  I believe that I

4  had -- I believe I did see a document that it was told

5  that they felt it was a mistake, somebody thought that

6  it was a mistake for them to have named us.

7  **Q.**  Well, did anyone ever say to you or to the board,

8  to your knowledge, of Shearith Israel that Shearith

9  Israel was not covered for the contents of the

10  building?

11  **A.**  Right.  Because they --

12  **Q.**  No.  I'm sorry.  Did anyone ever say that to you?

13  **A.**  Yes, yes.

14  **Q.**  Who?  When?

15  **A.**  I'm sorry; did anyone ever ask me if --

16  **Q.**  Did anyone from CJI ever tell you, By the way,

17  you're not --

18  **A.**  No, no one ever said anything.

19  **Q.**  Shearith Israel, does Shearith Israel loan any

20  of --

21  **A.**  Yes.

22  **Q.**  -- its objects?

23  **A.**  Yes.

24  **Q.**  You're going to need to let me finish the

25  question, if you don't mind, Mr. Katz, okay?

1      Did anybody -- does Shearith Israel loan any of

2   its objects --

3   **A.**   Yes.

4   **Q.**   -- to museums?

5   **A.**   Yes.

6   **Q.**   And to your knowledge does CJI loan Shearith

7   Israel objects to museums?

8   **A.**   Yes.

9   **Q.**   Did Shearith Israel ever object to CJI's loaning

10  Shearith Israel objects to museums?

11  **A.**   No.

12  **Q.**   Did you ever have an objection to that that you

13  knew about but didn't assert?

14  **A.**   No.

15  **Q.**   And in light of the fact that you believe that

16  Shearith Israel owns them, did you ever think about not

17  letting them loan the objects?

18      MR. NAFTALIS:  Objection.

19  **A.**   No.

20      MR. NAFTALIS:  Objection to what he thought.  I

21  don't have a problem with him if there were any

22  conversations, but what he thought?

23      THE COURT:  Most, if not all, of the evidence

24  has come in on state of mind, as would the answer to

25  that question, so the objection is overruled.

1    **Q.**   You had no objection?

2    **A.**   No objection.

3    **Q.**   Why not?

4    **A.**   Why not?  Because first of all these were

5    beautiful objects.  I thought it inured to the benefit

6    of the Jewish people for these objects to be displayed.

7    And it didn't, it was -- for most -- for most people's

8    interest the, whether we owned the Touro building and

9    the artifacts and the paraphernalia, that was not

10   relevant to their being posted, to their being on

11   exhibit.

12   **Q.**   Were you aware that CJI had the rimonim restored

13   in the early 2000s?

14   **A.**   Yes.

15   **Q.**   And did Shearith Israel ever object to that?

16   **A.**   No.

17   **Q.**   Why not?

18   **A.**   Because the, they -- the restorer was recommended

19   by our honorary trustee, Roy Zuckerberg, who has a

20   famous colonial silver collection.  He helped support

21   the repair.  He, I believe, as I mentioned, gave them

22   $10,000 or 15.  And we were very comfortable that if

23   they were having a restorer that was suggested by Roy

24   do this, that the rimonim would be repaired in the

25   finest way possible.

1    **Q.**    When did you first learn that CJI was attempting

2    to sell the Shearith Israel rimonim?

3    **A.**    In June of 2012.

4    **Q.**    You didn't know about it before then?

5    **A.**    I have no recollection of hearing it before.

6    **Q.**    Did anyone bring it to your attention before then?

7    **A.**    I don't recall that.

8    **Q.**    And did anyone else at Shearith Israel tell you

9    before June of 2012 --

10    **A.**    No.

11    **Q.**    -- that --

12    **A.**    I'm sorry.

13    **Q.**    -- that CJI was looking to sell the rimonim?

14    **A.**    No.

15    **Q.**    Let me ask you to look at what's been marked as a

16    Plaintiff exhibit, 187, so that will be at the back end

17    of your book.

18    **A.**    Okay.

19    **Q.**    This is a print-out of an article from the

20    *Forward*?

21    **A.**    Yes.

22    **Q.**    Prior to this litigation, did you ever see this

23    article?

24    **A.**    I don't remember when I first saw it, but I've

25    seen it more recently.  But I don't, I don't recall

1    seeing it before the litigation.

2    **Q.**    And did you and Ms. Ross ever discuss this article

3    before the litigation?

4    **A.**    I don't recall that.

5    **Q.**    When you learned that CJI was considering selling

6    the, what you thought were the Shearith Israel rimonim,

7    what did you do?

8    **A.**    I convened a conference call of our executive

9    committee, and we discussed the situation and decided

10    on a, what our response should be.

11    **Q.**    And what was the response?

12    **A.**    The response was that we would try to get more

13    information.  I believe I wrote to Bea or called Bea

14    and asked her for an explanation of what was happening.

15    **Q.**    Did you get a satisfactory explanation?

16    **A.**    It wasn't satisfactory, but it was an explanation.

17    **Q.**    And as a result of that, did you have an

18    understanding or a belief that CJI was going to proceed

19    to sell the rimonim?

20    **A.**    That was our understanding.

21    **Q.**    And that as a result of that, did you engage

22    counsel?

23    **A.**    We did.

24    **Q.**    Would you look at Exhibit 399, please, DX399.

25    **A.**    Yes.

1    **Q.**   Is this a letter that your counsel wrote on your

2    behalf on June 29, 2012?

3    **A.**   Yes.

4    **Q.**   In the last paragraph of Page 1, even in this

5    letter it says:  (Reading)  Representatives of

6    Congregation Shearith Israel are willing to meet with

7    you and other members of your congregation forthwith to

8    discuss this demand.

9         That was an authorized statement by your lawyer,

10   wasn't it?

11   **A.**   Yes.

12   **Q.**   Was it a genuine and sincere offer to meet?

13   **A.**   Absolutely.

14   **Q.**   And was there a meeting?

15   **A.**   We had a meeting by Skype.

16   **Q.**   Do you recall whether that was sometime in July of

17   2012?

18   **A.**   It was in that period.

19   **Q.**   And at that meeting -- did you attend that

20   meeting?

21   **A.**   Yes.

22   **Q.**   And did your counsel attend that meeting?

23   **A.**   Yes.

24   **Q.**   And do you remember anything that was discussed?

25   **A.**   We, we asked for an explanation of what their

1    intentions were, of why they were doing this, and how

2    could they proceed.

3          We were aghast that they could do this without

4    informing us in advance.  We considered it a violation

5    of the lease.  We considered it a violation of trust.

6    And it just upset us very, very much and we -- go

7    ahead.  I'm finished.

8    Q.    You're finished?  During this time did Shearith

9    Israel try to gather facts?

10   A.    We began a, we began a search for documents.  As

11   it so happened, I had -- I kept all of my Shearith

12   Israel/Touro papers on a corner of my desk, and I was

13   out of town, but a clerk from my office collected all

14   these papers; it was the deed, the deeds, the leases,

15   and he made copies and circulated them.

16   Q.    Okay.  And during this time who was acting on

17   behalf of Shearith Israel?  Was it the full board or

18   was it --

19   A.    It was the executive committee.  The summer had

20   already begun, and we convened an executive committee

21   of the officers and one or two people who were familiar

22   with the ritual objects.

23   Q.    And who appointed that committee?

24   A.    It was David Nathan, who was the parnas at the

25   time.

1    **Q.**   Did you form a belief, as the summer is going on

2    in 2012, that a sale of the rimonim would, was

3    prohibited by the rites, rituals and customs language

4    of the lease?

5            MR. NAFTALIS:  Objection.

6            THE COURT:  Overruled.

7            MR. NAFTALIS:  Your Honor --

8    **A.**   We believed that --

9            THE COURT:  Hold on, Mr. Katz.

10           THE WITNESS:  Oh, I'm sorry.

11           THE COURT:  Did you want to say something

12   further, Mr. Naftalis?

13           MR. NAFTALIS:  Your Honor, at the deposition of

14   this witness that my colleague Toby Jacoby was

15   conducting, they precluded, on the advice of counsel,

16   questioning as to the reasons why they objected, and on

17   grounds of attorney-client privilege.  And, therefore,

18   I think if we could give your Honor a memo about that

19   having used -- you can't have it both ways.  You can't

20   preclude questioning on this subject and then try and

21   get into this reasoning here.

22           In addition, in addition, this, you know, the

23   trying to get this religious stuff in, which we think

24   is through the side door, but this --

25           THE COURT:  This isn't.  I'm going to hear

1    Mr. Solomon in a minute on the first issue, but I don't

2    see this as a backdooring attempt to keep what the

3    Court has kept out.

4         Much of this information goes to the issue of

5    CSI's state of mind as known and stated by this

6    witness, not for the truth of the matter asserted.

7         What Mr. Katz believes may be the legal or not

8    legal rights as it relates to whether that's true or

9    not is irrelevant.  What is true is perhaps the state

10   of mind of CSI in taking certain actions that it took

11   and the reasons that it took certain actions.  Hold on.

12   That's on the second issue.

13        On the first issue, if Mr. Solomon would just

14   briefly respond to the issue of being prohibited at

15   deposition, we're then going to take an early break,

16   and I ask you to send in that portion of the deposition

17   where it took place.  I don't need memos.  Just send in

18   that portion of the deposition where the prohibition on

19   questioning on this area took place.

20        MR. NAFTALIS:  We did, if it would be helpful, I

21   think it's two pages, it maybe goes to a third page

22   which has that, and I can give it to your Honor.

23        THE COURT:  Send it up.

24        Mr. Solomon, do you want to briefly respond?  I

25   know you haven't read this, but just on the issue of

1    the prohibition at the deposition.

2            MR. SOLOMON:  Right.  I object to the

3    interference with my question because he could ask

4    these questions, and your Honor is able to then take a

5    motion to strike.  So I think procedurally I object.

6            I was at the deposition, and what I recall is

7    that the witness was instructed not to disclose legal

8    advice, because he's acting in a number of different

9    capacities.

10           But they were not, the witnesses were not

11   instructed to not discuss what the reasons were, why

12   Shearith Israel objected.

13           Indeed, it was a 30(b)(6) witness who was asked

14   for and put up about the reasons.  The board had a

15   memo, at least an addendum to a memo that went through

16   some of those reasons, and so I don't agree.

17           THE COURT:  Okay.  We're going to take an early

18   break.  I'll take a look at this.

19           Mr. Solomon, if you or other folks on your team,

20   if there are additional references to the deposition

21   that aren't cited in this three-page memo that I should

22   see, just tell Vickie, and maybe you can send a copy of

23   it in and I'll look at that.  If not, I'll let you know

24   when I come back out though.

25           I'm thinking that Mr. Solomon's suggestion,

1   regardless of what I rule substantively, I'm letting it

2   in and then entertaining a motion to strike may be the

3   most appropriate way to proceed.

4           MR. SOLOMON:  And, your Honor, we're not trying

5   to end run your Honor's meeting.  I remember that

6   ruling very clearly.

7           But the board still made decisions, and I

8   believe your Honor would benefit from knowing what they

9   were.

10          THE COURT:  I think I'm going to agree with you

11   on that piece of it, Mr. Solomon.

12          We'll take a break, and I'll see you back

13   shortly.

14          (Recess)

15          THE COURT:  Hold on, everyone, for a second.

16   Thank you for the memo and thank you for sending in the

17   addition.

18          I'm going to overrule the objection.  It appears

19   that Mr. Katz was prohibited, or refused on advice of

20   counsel, to discuss the cease and desist letter and

21   went into it because of his dual role as attorney and

22   perhaps as a fact witness.

23          That area concerning the cease and desist

24   letter, it would be wrong to allow him now to testify

25   to in light of the fact that he didn't during

1    deposition.  I agree with the Plaintiff on that.

2         However, that wasn't what the question was that

3    was posed.  It was not geared toward nor related to the

4    cease and desist letter, so the objection is overruled.

5         For future reference, I'm not going to allow

6    Mr. Katz to testify about the cease and desist letter,

7    because of the prohibition that was imposed at his

8    deposition; but on these general areas, including the

9    last question you asked, Mr. Solomon, the Court

10   overruled any objection.

11        MR. SOLOMON:  Thank you, your Honor.  I don't

12   intend to ask about the cease and desist letter.  But I

13   wanted the record to have it; that's why we talked

14   about it.

15   **Q.**  So, Mr. Katz, of light of what the Court has said,

16   first at the executive committee level, and then at the

17   board level, what were the objections to CJI trying to

18   sell the rimonim?

19   **A.**  Well, we objected strongly because first of all we

20   own them, and they had no right to sell objects which

21   we own in whatever capacity we own.

22        Just as importantly, we do not sell our

23   religious objects.  As I mentioned before, we have 19

24   Torah scrolls in the ark.  We even have Torah scrolls

25   that are damaged that we keep because they cannot be

1    repaired, and we keep those.

2            It's a very very strong principle that these

3    things are not to be sold.  It's certainly not -- my

4    understanding is that if you're paying ransom of a

5    kidnaper you can sell religious objects, but otherwise

6    you cannot.

7    **Q.**  Are there any other reasons that the executive

8    committee and the board objected?  Does the fact that

9    the rimonim are at Touro Synagogue, was that important

10   to the board?

11           MR. NAFTALIS:  Objection.

12           THE COURT:  Basis, Mr. Naftalis?

13           MR. NAFTALIS:  I think at this point on this

14   critical stuff Mr. Solomon should let the witness

15   testify, not lead.

16           THE COURT:  Sustained.  Why don't you rephrase,

17   Mr. Solomon.

18   **Q.**  Were there any other grounds that the board

19   objected to CJI's proposed sale of the rimonim?

20   **A.**  We own them, and they weren't theirs to sell.  And

21   we were holding them for the, for the Jews of Newport.

22   They hadn't told us about it and -- about their

23   prospective sale.

24   **Q.**  And when you say that you were holding them for

25   the Jews of Newport, was that communicated to the CJI

1    representatives?

2    **A.**    Of course.

3    **Q.**    And what was your thinking about that?  Tell the

4    judge.

5    **A.**    Our reason was we had been given possession and

6    ownership of the bells and the building in 1830 and

7    then, or 1820, and then by deed in the 1890s.  And we

8    took it very, very seriously.  Our rabbis were

9    always -- it was a teaching process.  The rabbis were

10    making clear to us our responsibility and how seriously

11    they took it, to the point that they would travel in

12    horse and buggy to attend weddings and funerals in the

13    1800s.  And when Dr. Mendes who was a rabbi, and

14    Dr. Pool, they made it very clear that traveling to

15    Newport in, even as late as the 1890s was something

16    that was onerous, but that they undertook because they

17    felt a responsibility to the Jewish community.

18    **Q.**    Did the board of Shearith Israel ever consider

19    removing the Myer Myers rimonim from the Touro

20    Synagogue?

21    **A.**    At what point?  Or ever?

22    **Q.**    Ever.

23    **A.**    No.

24    **Q.**    And I guess I'm talking about the time that you

25    have personal knowledge of.

1    **A.**    Right.

2    **Q.**    Okay.  Does the board of Shearith Israel have any

3    intention of removing the rimonim from the Touro

4    Synagogue, assuming that there is a Touro Synagogue?

5    **A.**    They would -- we would never remove them as long

6    as there is a community there that respected the

7    customs and subscribed to the requirements that are

8    laid out in our deeds.  And we would never kick anyone

9    out as long as they conformed to the lease.

10   **Q.**    Now, does Shearith Israel use its Myer Myers

11   rimonim?

12   **A.**    On a regular basis.

13   **Q.**    Okay.  And did you have any knowledge or

14   information about whether CJI used the rimonim, the

15   Myer Myers rimonim, at the Touro Synagogue?

16   **A.**    I was told that, by Bea, or I believe that they,

17   that the rimonim are, particularly after they were

18   repaired, are kept in a vault in a bank, and they're

19   brought out for various events such as the high

20   holidays, and then they're brought back into the vault.

21   **Q.**    Okay.  And does Shearith Israel take steps to

22   protect its ritual objects?

23   **A.**    We have not only, we not only have -- the ark is

24   not only locked with a security system, but from time

25   to time when they need to be repaired, we repair them.

**Q.**    Now, did you have any communications with the CJI
representatives about the 1945 agreement between and
among CJI, Shearith Israel and the federal government,
the Department of the Interior?

**A.**    That's my recollection, yes.

**Q.**    When did you have that conversation?

**A.**    I don't remember exactly when, but it -- I don't
remember exactly when.  We would talk about the fact
that it reconfirmed the lease that we had given to CJI
and the obligations that it imposed on.  It reconfirmed
the obligations.

**Q.**    And what, if anything, did the CJI representative
say to you?

        MR. NAFTALIS:  Can we get a time and an identity
of who he presumably was talking to?

        THE COURT:  Why don't you put a time period on
that, Mr. Katz.

        THE WITNESS:  I would say since the litigation
began.

**Q.**    Okay.

**A.**    And I was told that the agreement with the
government was irrelevant.

**Q.**    Meaning the CJI representative said to you that
they thought the agreement with the government was
irrelevant?

1    **A.**    Yes.

2           MR. NAFTALIS:  Your Honor, I object and move to

3    strike regarding the post-litigation conversation with

4    an unnamed person.

5           THE COURT:  Overruled and denied.

6    **Q.**    With whom did you have the conversation, even if

7    you can't remember exactly when?

8    **A.**    I think it was with Bea.

9    **Q.**    Thank you.  I'm going to ask you to look at DX402

10   in the binder in front of you.  What is this?

11   **A.**    These are, this is a piece that -- this is a brief

12   note that Zachary Edinger, who is our shamas, prepared

13   for the board regarding issues of ownership of ritual

14   objects.

15   **Q.**    And did this memorandum inform the executive

16   committee and the board's consideration of what

17   objections, if any, they had to CJI's proposed sale of

18   the rimonim?

19   **A.**    Yes.  It was very important to us that we have

20   these sources because the -- if there was

21   prescriptions -- proscriptions against sale of items

22   that are used in our religious ceremonies, and which

23   particularly touch the Torah, we wouldn't want to sell

24   these things; certainly not to a, certainly not to a

25   museum or to a private individual.

1    **Q.**    As part of the efforts of Shearith Israel to raise

2    funds, does Shearith Israel use volunteers?

3    **A.**    Yes.

4    **Q.**    Is there some effort to continually get new

5    volunteers to help in the effort?

6    **A.**    Well, everything that we do by committee is done

7    by volunteers, except on the rare occasion where it has

8    to be done by an outside expert, a contractor or a

9    builder.

10    **Q.**    Now, there was a meeting, you said, in or about

11    July of 2012, and was there a subsequent meeting with

12    the --

13    **A.**    There was an in-person meeting in November of

14    2012.

15    **Q.**    November or October?  Do you remember?

16    **A.**    November.

17    **Q.**    Okay.  And who attended that meeting?

18    **A.**    It was representatives of Shearith Israel and

19    representatives of CJI.

20    **Q.**    And at that meeting did you summarize the

21    objections, that you've told the Court about, that the

22    executive committee and then the board had to the sale?

23    **A.**    We objected on the grounds that, number one, we

24    owned them; we would not sell them; that they had been

25    given to us for, to be held in safekeeping; that it was

1    a violation of our ritual practice and of our belief as

2    an orthodox synagogue as to what one does with ritual

3    objects.  They're not to be sold.  They're not to be

4    put -- taken outside of the sacred environment other

5    than for brief periods of display.  That's not

6    transferring ownership in any way.

7         And we were very offended.  We were appalled

8    that they didn't let us know and were offended that

9    they were trying to do it.

10   **Q.**   Now, Mr, Katz, did Shearith Israel ever suggest a

11   confidential arbitration to resolve the dispute?

12   **A.**   Yes.

13        MR. NAFTALIS:  Your Honor, objection.  No, never

14   mind.

15   **A.**   We asked for --

16        MR. NAFTALIS:  I object on relevance grounds.

17        THE COURT:  Overruled.

18   **A.**   We suggested that we convene a *beit din*, which is

19   a rabbinical court, and they refused.  We thought we

20   could try mediation.  It didn't work.

21        And while we were meeting for the couple of days

22   after we had our last meeting, they -- we were hit with

23   the lawsuit.

24   **Q.**   At the meeting was there any discussion about

25   CJI's financial needs or professed financial needs?

1    **A.**    Yes.

2    **Q.**    Okay.  And what, if anything, that you can recall

3    was discussed by Shearith Israel in response to that?

4    **A.**    We proposed that in order to provide them with

5    funds in which they could operate, that is, as an

6    alternative to selling the rimonim, we would raise

7    money within our congregation and give them funds based

8    on what their budget was, that we would give them up to

9    $75,000 a year.

10    **Q.**    And did you have a clear idea of what their budget

11    was?

12    **A.**    It was about $300,000 a year.

13    **Q.**    And that -- how did you come to understand that?

14    **A.**    They provided us with the documentation on that.

15    **Q.**    And did you have full transparency in what their

16    financial needs were?

17    **A.**    Not to the extent that we should have.

18    **Q.**    Well, at the time did you know, for example, about

19    any role that the Loeb Center was playing in the

20    finances?

21    **A.**    Right, right.  At that point we didn't fully

22    understand the relationship between the Loeb Center and

23    Jeshuat Israel.  We only later came to find out that

24    they share in the proceeds of ticket sales at the Loeb

25    Center, and that changed the picture a great deal.

1    **Q.**   What conclusion did you reach at the meeting about

2    whether or not the meeting was constructive?

3    **A.**   We thought it was constructive.  There were two

4    people appointed to work out a settlement issue:

5    Bernie Aidinoff, who attended the meeting and who was a

6    very esteemed New York lawyer, and Lou Solomon, as our

7    lawyer, was supposed to meet and work out a proposal

8    based on certain parameters that had come up during the

9    discussion and which both sides agreed on, on the

10   parameters.

11   **Q.**   And then Shearith Israel was sued?

12   **A.**   And within a day or so we received notice of a

13   lawsuit filed against us.

14   **Q.**   Take a look at DX405.

15          MR. SOLOMON:  This is a document, for the

16   record, your Honor, that the Plaintiff said it wanted

17   to offer from our exhibit list, and we have no

18   objection.  So with your Honor's permission, I think

19   your Honor has seen this already.

20          THE COURT:  Uh'huh (affirmative).

21          MR. SOLOMON:  Okay.

22   **Q.**   What is this, Mr. Katz?

23   **A.**   This is the proposal that we reached in July --

24   I'm sorry -- November of 2012, a basis for a settlement

25   between the parties.

1    **Q.**    The Court asked the question last week that I'd

2    like you to focus on, please.  It refers to the Touro

3    Synagogue as "TS" throughout this.  It has proposed

4    terms between Touro Synagogue, TS, and Congregation

5    Shearith Israel, CSI.

6    **A.**    Yes.

7    **Q.**    Do you see that?

8    **A.**    Yes.

9    **Q.**    And is the reference to "TS," is that intentional?

10   Or is it Touro Synagogue, as opposed to CJI, is that

11   intentional or a mistake?  Can you speak to that?

12   **A.**    Well, it was probably intentional, and it is a

13   mistake in the sense that the rimonim, TSI -- CSI

14   doesn't own the rimonim or this sacred Torah scrolls.

15   **Q.**    You just said CSI.

16   **A.**    What?

17   **Q.**    You just said CSI.  Is that what you intended?

18   **A.**    No, no, I meant --

19   **Q.**    CJI?

20   **A.**    CJI --

21   **Q.**    Okay.

22   **A.**    -- does not own the rimonim or the Torah scrolls

23   or the Touro Synagogue building.

24   **Q.**    Was the reference to the Touro Synagogue intent on

25   Shearith Israel's part to make sure that any funds went

1    to the Touro Synagogue as opposed to CJI?

2            MR. NAFTALIS:  I object to the leading.

3            THE COURT:  I'm going to sustain.  I think

4    you're leading on some crucial issues a little more

5    than you should, Mr. Solomon.  The objection is

6    sustained.

7    Q.    If you can explain to the Court why is it that

8    "TS" was used for Touro Synagogue as being the

9    recipient of the funds?

10   A.    Because we own the Touro Synagogue.  They were

11   complaining that they're having trouble with

12   maintenance and with support of the building, and we

13   felt that that was something that we could help them

14   with their funds, that by providing the $75,000 a year,

15   that it would be something that -- they were

16   complaining they had trouble maintaining the building.

17   This was something that we could do.  And we owned the

18   building.  Since we owned the building, it was an

19   appropriate thing.

20   Q.    Does Shearith Israel want to evict the congregants

21   who pray at the Touro Synagogue?

22   A.    That's never been our intention.

23   Q.    And I think you answered me before.  Does Shearith

24   Israel want the rimonim back in New York?

25   A.    No.

1    **Q.**    Where does Shearith Israel want the Myer Myers

2    rimonim that it owns and that have been at the Touro

3    Synagogue?

4    **A.**    For a hundred years we've wanted them to be at --

5    in the Touro Synagogue.

6    **Q.**    And going forward into the future, where does it

7    want them?

8    **A.**    At the Touro Synagogue, as long as there's a

9    viable congregation there.

10        MR. SOLOMON:  Thank you.  Your Honor, I have

11    nothing further.

12        THE COURT:  Thanks, Mr. Solomon.

13        Mr. Naftalis.

14        MR. NAFTALIS:  Yes.  If I could have a couple of

15    minutes to set my papers up.

16        THE COURT:  Sure.

17        (Pause)

18        MR. NAFTALIS:  May I inquire, your Honor.

19        THE COURT:  Yes.

20        CROSS-EXAMINATION BY MR. NAFTALIS:

21    **Q.**    Good morning, Mr. Katz.

22    **A.**    Good morning.

23    **Q.**    Mr. Katz, I think you testified you're an

24    attorney; right?

25    **A.**    Yes.

1    **Q.**    And you've been a member of Shearith Israel

2    30-plus years?

3    **A.**    Yes.

4    **Q.**    I think you told us that you've served on the

5    board of Shearith Israel; correct?

6    **A.**    Yes.

7    **Q.**    And you've served on that board for 20-plus years?

8    **A.**    Twenty.

9    **Q.**    Since 1994?

10    **A.**    '94, '95, yup.

11    **Q.**    I'll take your --.  And you've also had another

12    title at the synagogue?

13    **A.**    Yes.

14    **Q.**    You're a vice president of the synagogue?

15    **A.**    Yes.

16    **Q.**    And you've had that title for what?

17    **A.**    Twelve.

18    **Q.**    Twelve years?

19    **A.**    Yes.

20    **Q.**    And I think there are two vice presidents?

21    **A.**    Yes.

22    **Q.**    Yourself, you're one of them?

23    **A.**    Yes.

24    **Q.**    And a Mr. Michael Lustig is the other one?

25    **A.**    Yes.

1    **Q.**    And then there's a president?

2    **A.**    Yes.

3    **Q.**    That's Mr. Solomon currently?

4    **A.**    Yes.

5    **Q.**    And I think you've given the names of certain of

6    his predecessors.

7    **A.**    Uh'huh (affirmative).

8    **Q.**    The three of you are on the executive committee of

9    Shearith Israel; is that correct?

10   **A.**    Yes.

11   **Q.**    Now, I think you told us that for a period of time

12   you served as liaison between the two congregations.

13   **A.**    Yes.

14   **Q.**    And you were asked to do that, were you not, by

15   the president of the, the then-president of Shearith

16   Israel; correct?

17   **A.**    Yes.

18   **Q.**    And in that respect, that was in, I think in 1998;

19   is that correct?

20   **A.**    That sounds right.

21   **Q.**    And in that respect as the liaison, you made a

22   visit, did you not?

23   **A.**    Yes.

24   **Q.**    And you made a visit in 1998 to participate in the

25   reading, the ceremony that goes on every year regarding

1    the George Washington letter; true?

2    **A.**    Yes.

3    **Q.**    And, indeed, you were asked to read one of the

4    documents?

5    **A.**    Yes.

6    **Q.**    And that's an honor, is it not?

7    **A.**    It's a great honor.

8    **Q.**    And you came up with your family for that weekend?

9    **A.**    Yes.

10    **Q.**    And you attended services while you were there?

11    **A.**    We did.

12    **Q.**    And I believe you told us, I think on your direct

13    examination, you found the services at the synagogue

14    very familiar to you?

15    **A.**    Yes.

16    **Q.**    You were comfortable in the services, given your

17    traditions?

18    **A.**    Yes.

19    **Q.**    They were similar to the rites and rituals

20    practiced at Shearith Israel; is that correct?

21    **A.**    Yes, yes.

22    **Q.**    Okay.  And you never objected at any time to the

23    way that Jeshuat Israel conducted its services at the

24    Touro Synagogue; true?

25    **A.**    That's correct.

1    Q.    Now, in the -- you continued -- were you replaced

2    as the liaison by Mr. Groopman, or did you still

3    continue to perform some sort of contact role with

4    Touro Synagogue and Congregation Jeshuat Israel?

5    A.    It was not a formal position, and Lenny Groopman

6    was, I believe, invited to the Washington letter

7    ceremony also, and he became more involved as the

8    liaison; but from time to time I would hear from Bea at

9    various points.

10    Q.    Now, in the beginning in 1998 when you became the

11    liaison, and up to 2012 when this current dispute

12    occurred, is it fair to say that your visit to the

13    Touro Synagogue and Congregation Jeshuat Israel in

14    Newport, Rhode Island, in 1998 was the only time you

15    ever went there?

16    A.    Correct.

17    Q.    And after your visit in 1998 you never went back

18    to Newport again; true?

19    A.    Correct.

20    Q.    And you said that -- so apart from that one visit

21    in the 14 years, you testified that you had some

22    telephone conversations over the course of the years

23    with Ms. Ross; is that correct?

24    A.    Correct.

25    Q.    And again I'm restricting ourselves to the period

1    of time before this current dispute arose.  Okay?

2    A.    Uh'huh (affirmative).

3    Q.    Just for the sake of clarity.  I want to be sure

4    you understand the question.  Thank you.

5          So just to repeat it, just so the record is

6    clear, so you say during this period of time where you

7    visited the Touro Synagogue on only one occasion in the

8    14 years, you said you had certain phone conversations

9    with Ms. Ross over the years; true?

10   A.    Yes.

11   Q.    And is it fair to say that Ms. Ross is the only

12   person with whom you communicated with at CJI prior to

13   this dispute?

14   A.    I believe so.

15   Q.    And, in fact, your telephone conversations with

16   Ms. Ross were only a few.  They were very infrequent;

17   correct?

18   A.    Correct.

19   Q.    And you can count on your, on one hand, can you

20   not, the number of calls that you had with Ms. Ross

21   over that 14-year period; true?

22   A.    I couldn't tell you how many we had, but I -- they

23   were not very frequent.

24   Q.    And by the way, you were, I think you've said '94,

25   '95, one or the other -- and I'm not trying to pin you

1   down to a precise date -- it was one of those other

2   dates that you became a board member?

3   **A.**   Right.

4   **Q.**   At the time you became a board member, and during

5   the time that you served as a board member, did you

6   have any -- did you ever give any thought to how

7   Congregation Jeshuat Israel, praying in the Touro

8   Synagogue, was governed?

9   **A.**   I knew that they had a congregation.  I knew that

10  they had a board.  But that was really the extent of

11  any, any knowledge I had.

12  **Q.**   Well, as a matter of fact, isn't it true that you

13  never even knew or thought about whether they had a

14  board or board meetings during this period of time;

15  correct?

16  **A.**   I thought about it, but it -- in other words, I

17  knew that they had board meetings, but I didn't know

18  when or what the subject matters were.

19  **Q.**   Do you remember, Mr. Katz, you had your deposition

20  taken?

21  **A.**   Uh'huh (affirmative).

22  **Q.**   And you were accompanied by counsel at your

23  deposition?

24  **A.**   Yes.

25  **Q.**   I think Mr. Solomon and two of his other

1    colleagues, Ms. Chaing and Mr. Shinerock, from his law

2    firm?

3    **A.**    Yes.  And I can see where you're going.  I assumed

4    they had board meetings.

5    **Q.**    Well, let me try my best to go there.

6    **A.**    Okay.

7    **Q.**    And do you remember my colleague, Mr. Jacoby --

8    **A.**    Yes.

9    **Q.**    -- over there, was asking you certain questions.

10    Do you remember that?

11    **A.**    Yes.

12    **Q.**    And when you testified, sir, you took an oath, did

13    you not?

14    **A.**    Yes.

15    **Q.**    And you took the same oath that you took here;

16    correct?

17    **A.**    Yes.

18    **Q.**    To tell the truth; right?

19    **A.**    Yes.

20    **Q.**    And do you recall being asked these questions and

21    giving these answers under oath at your deposition on

22    July 14th, 2014 on Page 29 Line 18:

23         Question:  And as a functioning congregation,

24    you understood that Congregation Jeshuat Israel was

25    holding board meetings; correct?

1            And Mr. Solomon jumps and said, Did you?

2            The Witness:  How would I know that?

3            Do you recall being asked that question and

4       giving that answer?  Yes or no.  It's a yes or no

5       question.

6       **A.**   Yes.

7       **Q.**   And then there's some colloquy.  Objections by

8       Mr. Solomon.

9            (Reading)  Yes.  Now I had no understanding that

10      they had board meetings, no knowledge of their having

11      board meetings.

12           Do you recall giving that answer under oath?

13      **A.**   Yes.

14      **Q.**   Question:  Did you give it any thought?

15           Answer:  I assumed that.  It never occurred to

16      me.

17           Do you recall giving that answer under oath?

18      **A.**   Yes.

19      **Q.**   Question:  It never occurred to you that they were

20      holding board meetings?

21           Answer:  It didn't occur to me.  I don't think

22      about what other -- whether other organizations hold

23      board meetings.

24           And then there's some colloquy.

25           So I can't tell you what I thought at that time.

1   It was just -- it just was not something that I gave

2   thought to.

3        Do you remember being asked those questions and

4   giving those answers?

5   A.   Yes, yes.

6   Q.   And so how CJI, Congregation Jeshuat Israel, was

7   governed was not on your radar.  Isn't that correct?

8   A.   Yes, it was, in terms of the specifics.

9   Q.   By the way, during your time, and I say it with

10  respect, you know -- let me strike.

11       You're very active in Shearith Israel.  The

12  congregation means a great deal to you, and I say that

13  with great respect to you.

14  A.   Right.

15  Q.   And you've served on the board for 20-odd years,

16  20 years one way or the other; right?

17  A.   Right.

18  Q.   Now, during your time on the Shearith Israel

19  board, the Shearith Israel board has never at any time

20  voted to appoint a member to be on the board of

21  directors of Congregation Jeshuat Israel or become a

22  trustee of Congregation Jeshuat Israel; correct?

23  A.   Yes.

24  Q.   And during your time on the Shearith Israel board,

25  Shearith Israel has never appointed anyone from its

1  ranks to serve on the board of Jeshuat Israel; true?

2  A.   Correct.

3  Q.   And you don't recall ever receiving notice of any

4  Jeshuat Israel board meetings; correct?

5  A.   Correct.

6  Q.   You never received any notice of any Jeshuat

7  Israel congregational meetings, right, while you served

8  on the board of Shearith Israel?

9  A.   The only congregational meeting that I can recall

10  is the one that took place in June of 2012.

11  Q.   Apart from that, and we'll get to that, but prior

12  to 2012, prior to this dispute, did you ever recall

13  receiving notice of any Jeshuat Israel --

14  A.   No.

15  Q.   -- congregation meetings?

16        All right.  And you have no awareness whatsoever

17  of Shearith Israel ever complaining, or anyone from

18  Shearith Israel on behalf of Shearith Israel,

19  complaining that they weren't receiving notices about

20  Congregation Jeshuat Israel board meetings, did you?

21  A.   No.

22  Q.   And you never -- you were never aware that

23  anybody, again, prior to this dispute, that anybody at

24  Shearith Israel ever complained about not receiving

25  notice about congregational meetings at Congregation

1    Jeshuat Israel; correct?

2    A.    Correct.

3    Q.    And you never, and you're not aware at any time

4    prior to this dispute of Shearith Israel ever

5    complaining to Congregation Jeshuat Israel about not

6    being given an opportunity to participate in board

7    votes; right?

8    A.    Correct.

9    Q.    And they never complained at any time about not

10   participating in congregational votes; correct?

11   A.    Correct.

12   Q.    And before this dispute, you never objected to how

13   Congregation Jeshuat Israel, praying in the Touro

14   Synagogue, was governed; right?

15   A.    Correct.

16   Q.    And you never, prior to this dispute, never

17   objected to the way that the Touro Synagogue building

18   was being used by Congregation Jeshuat Israel; correct?

19   A.    Correct.

20   Q.    By the way, you told us about your liaison to

21   Congregation Jeshuat Israel.  You weren't a liaison to

22   anybody else in the city of Newport, were you?

23   A.    No.

24   Q.    Or the county of Newport?

25   A.    No.

1    **Q.**    Now, I think you were asked some questions about

2    what obligations that you felt or believed Congregation

3    Shearith Israel had to Congregation Jeshuat Israel,

4    were you not?  You were asked -- that was the subject

5    that --

6    **A.**    Yes.

7    **Q.**    -- my esteemed opponent, Mr. Solomon, asked you

8    about; right?

9    **A.**    Yes.

10    **Q.**    Do you remember that?

11    **A.**    Yes.

12    **Q.**    And I believe you indicated that your obligations

13    essentially were those of the landlord; right?

14    **A.**    Yes.

15    **Q.**    And beyond that, beyond being a landlord, you had

16    no other obligations to Congregation Jeshuat Israel or

17    the Touro Synagogue; correct?

18    **A.**    No.  We had obligations.

19    **Q.**    No.  It's a yes or no question.  Is the answer no?

20    **A.**    Would you repeat the question?

21        MR. NAFTALIS:  Could you read it back, ma'am.

22        (Question was read)

23    **A.**    We had no other obligations to Jeshuat Israel.

24    **Q.**    Now, as far as your obligations were to

25    Congregation Jeshuat Israel and the Touro Synagogue, at

1    the time you were a trustee, and we're talking about

2    from --

3         MR. NAFTALIS:  I've got to stop wandering.  I've

4    been admonished for wandering, Mr. Katz; has nothing to

5    do with you.

6         THE COURT:  "Admonish" is too strong a term.

7    When you're admonished, you'll know it.  Mildly

8    suggested to stick by the microphone.

9         MR. NAFTALIS:  I hope the reporter got the fact

10   that I wasn't admonished.

11        THE COURT:  You were not.

12   **Q.**   Let me start again, Mr. Katz.

13        During the time that you have served as a

14   trustee from 1994 up until when this dispute began, did

15   you believe that Congregation Shearith Israel had an

16   obligation to preserve and maintain the Touro

17   Synagogue?  Yes or no, sir.

18   **A.**   No.

19   **Q.**   Did you, as a trustee of Shearith Israel, believe

20   that Congregation Shearith Israel had any obligation to

21   restore the Touro Synagogue if necessary?  Yes or no.

22   **A.**   That, it can't be a yes or no question -- answer,

23   because if necessary and there --

24   **Q.**   Well, if you can't answer it yes or no, and again

25   I'm not trying to go off.

1   **A.**   Right, right.

2   **Q.**   If you have a problem with it, please tell me; I'm

3   happy to rephrase it so it's --.

4         Did you believe, during the time that you served

5   as a trustee, that Shearith Israel had an obligation to

6   restore the Touro Synagogue as necessary?  Yes or no,

7   sir.

8   **A.**   I can't answer that as a yes or no question.

9   **Q.**   So is it your view that there were circumstances

10  that you had an obligation, Shearith Israel, to help

11  restore the Touro Synagogue?  Yes or no, sir.

12  **A.**   There could be circumstances.

13  **Q.**   And as a trustee, not simply the synagogue, not

14  simply Congregation Shearith Israel, did you feel as a

15  trustee that you personally had any obligation to help

16  preserve and maintain the Touro Synagogue?  Yes or no.

17  **A.**   Never -- could you repeat the question.

18        MR. NAFTALIS:  Please read it back, ma'am.

19        (Question was read)

20  **A.**   No.

21  **Q.**   Did you personally feel as a trustee that you had

22  any obligation to restore the Touro Synagogue as

23  necessary?  Yes or no.

24  **A.**   Depends on the circumstances.

25  **Q.**   I think you testified that you had some documents

1    on the corner of your desk.

2    **A.**    Yes.

3    **Q.**    And these were documents that related to the Touro

4    Synagogue?

5    **A.**    Yes.

6    **Q.**    And I think you started to tell us something about

7    those documents.

8    **A.**    Yes.

9    **Q.**    About something, you said there was a lease and a

10   deed?

11   **A.**    Yes.

12   **Q.**    And these were documents you had --

13   **A.**    Yes.

14   **Q.**    -- prior to this dispute?

15   **A.**    Yes.

16   **Q.**    Do you remember any other documents you had on

17   your desk besides the lease and the deed?

18   **A.**    There were some letters contemporaneous with the

19   document, the lease and the deed.

20   **Q.**    And to the best of your memory, as you sit here

21   now, Mr. Katz, were those the only documents that you

22   had in your little corner of your desk?

23   **A.**    Those are the only ones that I remember

24   relating -- those are the only ones that I remember.

25         MR. NAFTALIS:  Wait, wait, wait.  We'll get

1      there.  I'm the slowest in the room.

2      **Q.**    Now, when you became a trustee of Shearith Israel,

3      did you ever, did you then -- did you read at that time

4      the 1945 agreement between the United States of America

5      on one side, the trustees of Congregation Shearith

6      Israel on the other, and Congregation Jeshuat Israel?

7      Did you read it at or around the time you became a

8      trustee of Congregation Shearith Israel?  Yes or no.

9      **A.**    No.

10     **Q.**    When was the very first time you ever read the

11     1945 agreement, which is in evidence as Plaintiff's

12     Exhibit 90?

13     **A.**    It was at some point before the litigation.  And

14     this document, you reminded me, was on my corner of my

15     desk with the other papers relating to Touro and CJI.

16             MR. NAFTALIS:  Now, please.

17             THE COURT:  Thank you.

18     **Q.**    Mr. Katz, if we can put up, we'll put up on the

19     screen for you this document, which is Plaintiff's

20     Exhibit 90, as well as you have an actual, a copy and

21     paper, do you not?

22     **A.**    Yes.

23     **Q.**    And if we could yellow highlight the language.

24     Now let me direct you to the first paragraph of this

25     document.

1          By the way, as you're sitting here now, has your

2     memory been refreshed as to when was the very first

3     time you ever read Plaintiff's Exhibit 90, the 1945

4     agreement with the United States of America?  Has it

5     refreshed your memory on the date?  Yes or no.

6     **A.**    It hasn't refreshed my recollection as to the

7     first time, but I knew that I -- I know that I had read

8     it before, which is why it was in the pile of papers on

9     my desk in June of 2012.

10    **Q.**    Now, sir, looking at Plaintiff's Exhibit 90, you

11    can see that one of the three parties to this agreement

12    in 1945 are the trustees of Congregation Shearith

13    Israel; correct?

14    **A.**    Yes.

15    **Q.**    And that's a position you hold; true?

16    **A.**    Yes.

17    **Q.**    And it refers to -- you see the yellow highlighted

18    language?

19    **A.**    Yes.

20    **Q.**    And it says, after giving their names,

21    (Reading) Being the members of the board of trustees

22    and the clerk of the trustees of Congregation Shearith

23    Israel in the city of New York, a religious corporation

24    organized under the laws of the State of New York,

25    close paren, as trustees under the deed of trust dated

1    April 27th, 1894 and recorded in the Book of Land

2    Evidence, Newport, Rhode Island, Volume 67, Page 274,

3    hereinafter collectively referred to as the Shearith

4    Israel Trustees.

5        Do you see that, sir?

6    **A.**    Yes.

7    **Q.**    Now if we go down to the bottom of the page.

8        MR. NAFTALIS:  If we could highlight the last

9    "whereas" clause.

10   **Q.**    You want to read that, sir.

11   **A.**    (Reading)  Whereas the Shearith Israel trustees,

12   the holders of the fee simple title upon certain trusts

13   is the -- in the Touro Synagogue.

14   **Q.**    So the document indicates, does it not, that the

15   Shearith Israel trustees are holding title of the

16   synagogue based upon certain trusts; correct?

17   **A.**    Yes.

18       MR. NAFTALIS:  And if we could go over to again

19   in Exhibit 90, to the next page, Page 2, which bears

20   Bates Number 094 in the lower right.  And if we could

21   go down, sir, my friend here, to the, I'm going to go

22   down to the paragraph beginning the second full

23   photograph.

24   **Q.**    Mr. Katz, I want to sure you and I are on the same

25   wavelength, that begins "Now therefore."

1    **A.**    Yes.

2    **Q.**    And I want to highlight the language beginning

3    with "The said parties have covenant and agreed," --

4    **A.**    Yes.

5    **Q.**    -- the rest of that, okay?   And could you read

6    that, sir.

7    **A.**    (Reading)  The said parties have covenanted and

8    agreed and by these presence do covenant and agree to

9    and with each other, in consideration of the mutual

10   promises expressed, as follows.

11        MR. NAFTALIS:  And now could we just highlight

12   the rest of the language on that page.

13   **Q.**    Could you read now Article 1.

14   **A.**    (Reading)  Article 1, the Shearith Israel trustees

15   and the Congregation Jeshuat Israel agree for

16   themselves, their respective successors and assigns,

17   (a) that they will preserve, protect, maintain and when

18   necessary restore, so far as lies within their power,

19   the Touro Synagogue, Newport, Rhode Island, and the

20   grounds immediately about the synagogue building, which

21   grounds are described as follows.

22   **Q.**    So under the 1945 agreement, the trustees have

23   agreed, have agreed to preserve the Touro Synagogue;

24   right?

25        MR. SOLOMON:  Objection.  Misstates the

1    document.

2         THE COURT:  Overruled.

3    Q.   Yes or no.

4    A.   It's the trustees collectively with CJI.

5    Q.   I'm talking about the obligation.  I'm now only

6    asking you not about CJI's obligation.  We'll get to

7    that.  I'm asking you about the Shearith Israel

8    trustees' obligation.

9         Didn't the Shearith Israel trustees covenant and

10   agree with the United States of America that they would

11   preserve the Touro Synagogue?  Yes or no.

12        MR. SOLOMON:  Your Honor, I object to showing

13   the witness only a part of the document.

14        THE COURT:  The witness has the whole document

15   and can refer to it as needs be.  It's

16   cross-examination.  The objection is overruled.

17   Q.   I'm asking you --

18   A.   Yes, it says that --

19   Q.   Thank you.

20   A.   -- the trustees did agree.

21   Q.   They also agreed to protect and maintain the Touro

22   Synagogue, did they not?

23   A.   Yes.

24   Q.   And when necessary restore, so far as lies within

25   their power, the Touro Synagogue; correct?

1    **A.**    Yes.

2    **Q.**    And that obligation on the Shearith Israel

3    trustees wasn't solely restricted to the men and women

4    who were the trustees in 1945, were they?

5    **A.**    Correct.

6    **Q.**    As a matter of fact, this agreement explicitly

7    binds the successor trustees of Congregation Shearith

8    Israel; correct?

9    **A.**    Yes.

10    **Q.**    And you are one of the successor trustees who is

11    bound by these obligations; correct?

12    **A.**    Yes.

13    **Q.**    Now, I think you have been in court for certain of

14    the days here.

15    **A.**    Last Monday.

16    **Q.**    Did you stay until Tuesday, or just Monday?

17    **A.**    No.

18    **Q.**    Do you recall, I think Mr. Bazarsky was on the

19    stand.  Do you remember he was there?

20    **A.**    Yes.

21    MR. NAFTALIS:  And if we could display exhibit,

22    in a minute, Exhibit P140 in a second.

23    **Q.**    So my recollection may be wrong whether he

24    testified to this on Monday or Tuesday.  Do you

25    remember being here when he testified about journeying

1    to meet with people at Shearith Israel in 1996 or so

2    when he became the president?

3    A.    Yes.

4    Q.    And do you remember that he testified that he and

5    a number of people from Jeshuat Israel journeyed to New

6    York; right?

7    A.    Yes.

8    Q.    And they journeyed to New York for, amongst other

9    things, to see if you can be of help to them; right?

10   A.    It was on behalf of the Loeb Center and the Touro

11   Synagogue Foundation is my, was my recollection.

12   Q.    Well, we're talking about 1996.

13   A.    I'm sorry.  Go ahead.

14   Q.    There was no Loeb Center in 1996, was there?

15   A.    I was thinking, I was thinking of the 2005

16   meeting.

17   Q.    We'll get to that.

18   A.    But I'm saying I may have responded incorrectly.

19   Q.    That's fine; I'm not looking to --.

20         MR. NAFTALIS:  In any event, if we can display

21   Plaintiff's Exhibit 140.

22   Q.    And, do you remember, were you present at this

23   meeting in 1996 when Mr. Bazarsky, Mr. Casten,

24   Mr. Feinberg, and Ms. Slom from Congregation Jeshuat

25   Israel journeyed to New York City to meet with the

1     board of, or members of the board of Congregation

2     Shearith Israel?

3     **A.**   I don't.  I honestly do not remember.

4     **Q.**   And do you remember whether you got a report from

5     anybody in power or authority at Shearith Israel about

6     this meeting?  You were a trustee at the time; right?

7     **A.**   Yes, I was.

8     **Q.**   Did anybody in power, authority, at Shearith

9     Israel give you a report about what happened in this

10    meeting?

11    **A.**   I don't recall.

12    **Q.**   Did you come to learn, either by being personally

13    at this meeting or getting, or hearing conversation

14    with anyone at Shearith Israel about the meeting, that

15    Congregation Jeshuat Israel, with Mr. Bazarsky,

16    Mr. Casten, Mr. Feinberg and Rita Slom, had come to

17    Shearith Israel to ask for help?  Were you aware of

18    that, sir?  Yes or no.

19    **A.**   I don't recall.

20    **Q.**   You're not denying that you knew that; you just

21    don't recall one way or the other.

22    **A.**   Correct.

23    **Q.**   And did you come to learn that they asked, during

24    the course of this meeting, if Shearith Israel could

25    share with them lists of donors and members to be of

1    assistance to them in their fundraising to help

2    preserve and maintain the Touro Synagogue?

3    **A.**    As I say, I don't recall.

4    **Q.**    And to the best of your knowledge and information,

5    after this meeting in 1996, which is the subject of

6    Plaintiff's Exhibit 140, Congregation Shearith Israel

7    did not write any checks to Congregation Jeshuat

8    Israel, did they?

9    **A.**    No.  As far as I know they didn't.

10   **Q.**    And they did not, Shearith Israel didn't provide

11   them with the names of potential donors that they might

12   try and tap to help them preserve and maintain the

13   Touro Synagogue, did they?

14   **A.**    I have no idea.

15   **Q.**    You have no information --

16   **A.**    I don't.

17   **Q.**    -- that would in any way indicate that Shearith

18   Israel ever did that; correct?

19   **A.**    I have no recollection.

20   **Q.**    As a matter of fact you told us, did you not,

21   Mr. Katz -- and please, if I'm in any way inaccurate --

22   in response to a question by Mr. Solomon, that we don't

23   give out our donor lists to anybody; right?  Didn't you

24   say that?

25   **A.**    Correct.

1    **Q.**   We don't give out our membership lists to anybody;

2    right?

3    **A.**   But I said that we tell people to give us their

4    materials and we will send it out to our members.

5    **Q.**   By the way, after this meeting in 1996, did you

6    write any check to Congregation Jeshuat Israel to help

7    them maintain the Touro Synagogue?

8    **A.**   No.

9    **Q.**   Now, I think there were other meetings, were there

10   not, or other times that people from Congregation

11   Jeshuat Israel either came directly to your

12   congregation or there were -- let me start again.

13          There were other times, were there not, where

14   the financial plight and problems that were being had

15   at the Touro Synagogue were brought to your board's

16   attention; correct?

17   **A.**   There was the 2005 visit with members of CJI, of

18   the Touro Synagogue Foundation, and of Ambassador

19   Loeb's group.

20   **Q.**   And, but there were other times, were there not,

21   when the financial plight and problems of Congregation

22   Jeshuat Israel and the Touro Synagogue were brought

23   directly or indirectly to your board's attention;

24   correct?

25   **A.**   I don't recall.  I don't know.

1    MR. NAFTALIS: Well, could we put up 168,

2    please, Plaintiff's 168.

3    Q.    Now, who is Leonard, Dr. Leonard Groopman?

4    A.    He's a physician. He's a member of the synagogue,

5    and he was appointed probably, as we have two positions

6    that rotate every year, the secretary and treasurer, I

7    believe, I forget; and those are honorary appointments

8    for one year to serve on the board, and I think Lenny

9    served on the board at one point.

10   Q.    And he also for a couple of years, did he not, did

11   some of this liaison --

12   A.    Yes.

13   Q.    -- function or carried on this liaison function

14   with Congregation Jeshuat Israel; is that correct?

15   A.    Yes.

16   Q.    And he, like you, made a trip up to Congregation

17   Jeshuat Israel and the Touro Synagogue, did he not?

18   A.    Yes.

19   Q.    And this would have been sometime around 2004; is

20   that correct?

21   A.    Presumably.

22   Q.    And Dr. Groopman made a report, did he not, about

23   his visit, his trip to Newport, and the issues and

24   problems surrounding the Touro Synagogue; correct?

25   A.    Yes.

1   **Q.**   And if we could -- and by the way, it lists the

2   people who are present, that is, Plaintiff's

3   Exhibit 168 are your Minutes, are they not, of the

4   board of trustees --

5   **A.**   Yes.

6   **Q.**   -- for November 6, 2004; right?

7   **A.**   Yes.

8   **Q.**   And Exhibit 168, the Minutes, reflects, do they

9   not, who was in attendance; correct?

10  **A.**   Yes.

11  **Q.**   And if we look down at the bottom lower left-hand

12  column of the attendees, do you see Mr. Michael Katz?

13  **A.**   Yes.

14  **Q.**   That's you.

15  **A.**   Absolutely.  There's several other Michael Katz's

16  in New York, but this one is me.

17  **Q.**   Right.  The right Michael Katz.

18  **A.**   This one, yes.

19       THE COURT:  Michael I.

20       THE WITNESS:  Michael I., yes.

21  **Q.**   Well, I'll assume hopefully correctly that any

22  time we refer to a document to Michael Katz, we got the

23  right guy.

24  **A.**   Yes.

25  **Q.**   Now, Dr. Groopman reported, did he not --

1        MR. NAFTALIS:  And I want to go on Page 2, in

2    the second paragraph of Exhibit 168.  This one here, if

3    you can highlight and yellow this one, the paragraph

4    that begins "I have found."

5        You want to read the second paragraph, sir, I

6    mean that paragraph, the one that's --

7    A.    Highlighted?

8    Q.    Yes, the highlighted paragraph, please, Mr. Katz.

9    Thank you.

10   A.    (Reading)  I have found the Touro Synagogue and

11   the Foundation to both be an active, alive Jewish

12   congregation (in a relatively small Jewish community)

13   and committed to the preservation and mission of the

14   synagogue and its historical and cultural significance.

15   Q.    That was a quite positive endorsement of

16   Congregation Jeshuat Israel; right?

17   A.    Yes.

18   Q.    And that was consistent with your observations

19   when you visited the Touro Synagogue and Congregation

20   Jeshuat Israel in 1998; true?

21   A.    Yes.

22   Q.    And by the way, I think there was a question by

23   Mr. Solomon about you might have been, you said, a

24   mistake or, referring to Touro Synagogue and

25   Congregation Jeshuat Israel interchangeably.

1           Did you say something like that on your direct

2    examination?

3    **A.**   That -- what?

4    **Q.**   I can understand why you didn't understand my

5    question.  Let me just start again.

6           He basically -- Dr. Groopman refers to the Touro

7    Synagogue synonymously with Congregation Jeshuat

8    Israel, does he not, in his report?  Yes or no.

9           MR. SOLOMON:  Objection.

10          THE COURT:  Overruled.

11   **Q.**   It's a yes or no question, sir.

12   **A.**   Yes.

13   **Q.**   And as a matter of fact on the earlier page he's

14   referred to, when he's being introduced, doctor --

15   Mr. Peter Neustadter, he was the president at that

16   point in time?

17   **A.**   I thought Alvin Deutsch.  I don't remember if it

18   was Alvin Deutsch, whatever is on the front page there.

19   **Q.**   Again, if you'll -- will you take my

20   representation?

21   **A.**   Yes, uh'huh (affirmative).

22   **Q.**   It says on the front page of Exhibit 168,

23   president, Mr. Peter Neustadter.  "Parnas" means

24   "president"?

25   **A.**   Then he was president, yes.  Right, right.

1    Q.    So Mr. Peter Neustadter, on the first page,

2    introduced Dr. Leonard Groopman, a liaison to the Touro

3    Synagogue from Congregation Shearith Israel.  Do you

4    remember that?

5    A.    Yes.

6          MR. NAFTALIS:  Now if we look down -- can we go

7    back to the bottom of the first page.

8    Q.    Do you remember Dr. Groopman reporting that when

9    he visited the leadership of Touro, meaning

10   Congregation Jeshuat Israel, that his first purpose,

11   first and foremost purpose was a way to maintain and

12   safeguard our interests as landlords.  Do you remember

13   him saying that?

14   A.    Is it in this document here?

15   Q.    It is.

16         MR. NAFTALIS: If we could highlight the last

17   four lines, sir.

18   A.    I see it.

19   Q.    Do you see it?

20   A.    Yes.

21   Q.    "First and foremost," beginning with "first and

22   foremost."

23   A.    Right.

24   Q.    It says, (Reading)  I found that my first order of

25   business has been trying to build a relationship with

1    the leadership of Touro.

2         Leadership of Touro, he's using that

3    interchangeably with Congregation Jeshuat Israel;

4    right?

5    A.    Yes.

6    Q.    Both the synagogue and the foundation.

7         Did I read that accurately?

8    A.    Yes.

9    Q.    (Reading)  First and foremost, as a way to

10   maintain and safeguard our interest as landlords of the

11   property and the building of the Touro Synagogue and

12   cemetery.

13        Is that correct?

14   A.    Yes.

15   Q.    And you have no reason to believe that these

16   Minutes, Exhibit 168, do not accurately reflect the

17   report that Dr. Groopman made to you trustees?

18   A.    Yes.

19   Q.    And then he said, (Reading)  Secondarily, as a way

20   to facilitate potential educational and cultural

21   exchanges between our congregations.

22        Correct?

23   A.    Yes.

24   Q.    Now Dr. Groopman, the big bulk of his report to

25   the trustees related to the fact that Touro Synagogue

1    was in dire need of major expensive repairs; correct?

2         MR. SOLOMON:  Objection.  Misquotes the

3    document.

4         THE COURT:  Overruled.

5    **A.**   Is that reported?  I don't remember exactly what

6    he reported.  Is that in this summary -- is this in the

7    Minutes of the meeting?

8    **Q.**   Well, I can show you Minutes of the meeting.  But

9    as you sit here now, based on your own memory as a

10   trustee, isn't it true, sir, that Dr. Groopman reported

11   extensively about the economic problems facing the

12   Touro Synagogue and the problems that were needed to

13   restore and maintain and preserve the building;

14   correct?

15   **A.**   My recollection is that he reported on the fact

16   that the building needed to be repaired, and that the

17   membership of Touro had declined so it was harder for

18   them to raise the funds necessary.

19   **Q.**   And if we could --

20        MR. NAFTALIS:  Do you want me to continue?

21   **Q.**   If we could go on to the next page, which would

22   be -- I guess it is Page 2?

23        THE COURT:  Mr. Naftalis, why don't we, if we're

24   switching to a new page, why don't we break now, if

25   that's okay, for the lunch break.

1      MR. NAFTALIS:  That's fine, your Honor.  Thank

2  you.

3      THE COURT:  Mr. Katz, let me remind you, I don't

4  know if you were here when I reminded under another

5  witness.  You're under cross-examination now.  That

6  means you're not allowed to speak with your attorneys

7  or any attorneys from CSI about any of the substance or

8  procedural matters of your examination.

9      All right.

10      We'll stand adjourned and be back at 1:30.

11      (Lunch Recess)

12      THE COURT:  Before we begin.

13      Mr. Solomon, it was very helpful this morning

14  when the Plaintiffs listed the exhibits that came in

15  under the stipulation into the record and helps us

16  administratively.

17      Is it possible maybe sometime tomorrow morning

18  for you to do something similar?

19      MR. SOLOMON:  Absolutely.

20      THE COURT:  Because once we move them in, then

21  the court's clerk's office can begin to deal with them

22  administratively.  It won't bind you to that, but if we

23  can get the bulk of them moved in.

24      MR. SOLOMON:  Of course.

25      THE COURT:  Or today, whenever.

1        MR. SOLOMON:  No, no, no; I'm happy to do that,

2    Judge.

3        THE COURT:  Appreciate it.  Thank you.

4        Mr. Naftalis.

5        MR. NAFTALIS:  Thank you, your Honor.

6    BY MR. NAFTALIS:

7    **Q.**    When we broke -- good afternoon, Mr. Katz.

8    **A.**    Good afternoon.

9    **Q.**    When we broke we were discussing Plaintiff's

10   Exhibit 168, which were the trustees' Minutes of the

11   November 6, 2004 Congregation Shearith Israel board of

12   trustees meeting.  Do you remember?

13   **A.**    Yes.

14   **Q.**    And that was the meeting in which you, amongst

15   others, were in attendance?

16   **A.**    Yes.

17   **Q.**    And Dr. Groopman -- I think we had begun, and we

18   had covered some of the things that Dr. Groopman had

19   reported based upon his trip as a liaison up to

20   Congregation Jeshuat Israel and the Touro Synagogue; is

21   that correct?

22   **A.**    Yes.

23   **Q.**    And I had shown you a couple of portions of the

24   Minutes which reflected Dr. Groopman's report.  Do you

25   remember that?

1    **A.**    Yes.

2    **Q.**    And I think where we left off, I think I either

3    started to ask you or was about to ask you, and it

4    doesn't matter which one it is, but let me ask you

5    about a different topic or a different part of his

6    report.  Is that okay?

7    **A.**    Yes.

8    **Q.**    Dr. Groopman reported, did he not, to the trustees

9    on November 6th, 2004, about some of the dire

10    conditions, the fact that the Touro Synagogue was in

11    dire need of major expensive repairs; correct?

12    **A.**    Yes.

13    **Q.**    And he indicated that both the interior and the

14    exterior of the building were in need, were they not,

15    of major, major work; right?

16    **A.**    Yes.

17    **Q.**    And indeed he said, did he not, that the building

18    hadn't been restored and worked on for 35 years?

19    **A.**    That's what he wrote.

20    **Q.**    And if we could turn to Page 2.  Is that in front

21    of you, sir, the third paragraph?

22    **A.**    Yes.

23    **Q.**    Start with the word "This major project," and why

24    don't we go down to --

25    **A.**    Yes.

1    **Q.**    -- "maintenance," et cetera.  Okay?

2            Have you had a chance to read that to yourself,

3    the highlighted portion of Plaintiff's Exhibit 168?

4            (Pause)

5    **A.**    Yes.

6    **Q.**    And Dr. Groopman told the board, of which you were

7    a member, that the Touro Synagogue needed major

8    conservation and restoration work; right?

9    **A.**    Yes.

10   **Q.**    And both the interior, right, --

11   **A.**    Uh'huh (affirmative).

12   **Q.**    -- as well as the exterior?

13   **A.**    Yes.

14   **Q.**    And did he talk about there was -- and his report

15   points out there was extensive -- and this is Groopman,

16   your fellow congregant -- there was extensive,

17   reporting extensive deterioration of the eastern wall;

18   right?

19   **A.**    Yes.

20   **Q.**    Foundation erosion from water seepage; right?

21   **A.**    Yes.

22   **Q.**    Drainage damage?

23   **A.**    Yes.

24   **Q.**    Structural cracks in the interior and exterior

25   walls; correct?

1    **A.**    Yes.

2    **Q.**    Moist, extensive moisture erosion of the interior

3    pillars; right?

4    **A.**    Yes.

5    **Q.**    Structural -- moisture erosion, structural

6    stability of the balcony; right?

7    **A.**    Yes.

8    **Q.**    And that they wanted to deal, that the folks at

9    Congregation Jeshuat Israel wanted to do, have a major

10   restoration project to restore the Touro Synagogue to

11   the grand building it once was.

12   **A.**    Yes.

13   **Q.**    And they indicated, did they not, during the

14   course of this meeting, or Dr. Groopman indicated in

15   his report of his conversations with the Touro

16   Synagogue, Jeshuat Israel folks, that raising the full

17   amount of money necessary for the synagogue restoration

18   project was becoming very, very difficult; right?

19   **A.**    Yes.

20   **Q.**    And indeed he reported that people from Jeshuat

21   Israel had raised with him the question of Shearith

22   Israel's contributing to the conservation of the

23   historic fabric for future generations; right?

24   **A.**    Yes.

25   **Q.**    And essentially what he was reporting was that

1    Congregation Jeshuat Israel, the Touro Synagogue, were

2    in need of financial assistance and wanted financial

3    assistance from Congregation Shearith Israel to do this

4    project, to restore and save the synagogue; true?

5    **A.**    Yes.

6    **Q.**    And, in fact, Shearith Israel, after

7    Dr. Groopman's report, contributed no funds, no money,

8    to Congregation Jeshuat Israel or towards the

9    restoration project; true?

10    **A.**    Our members contributed.

11    **Q.**    Well, forget your members for a second.  I didn't

12    ask you about your members.  I will get to that.

13          Did Congregation Shearith Israel send one dime

14    to the Touro Synagogue or to Congregation Jeshuat

15    Israel to do this multi-million dollar restoration

16    project?  Yes or no.

17    **A.**    No.

18    **Q.**    And, as a matter of fact, you didn't personally

19    send any money, did you?

20    **A.**    No, I did not.

21    **Q.**    And by the way, during the course of this meeting

22    where Dr. Groopman is making his report, did anyone

23    indicate in words or substance that don't we have an

24    obligation under the 1945 agreement to preserve,

25    protect, maintain and when necessary restore the Touro

1    Synagogue?  Anybody say that during this meeting?

2    **A.**    I don't recall.

3    **Q.**    You have no recollection of anyone making such a

4    statement, do you?

5    **A.**    No, I don't.  We were in the midst of our own

6    fundraising program to restore our building.

7    **Q.**    So in any event, whether they said that or didn't

8    say that, let me ask you about something that may have

9    been said.

10         Didn't your president say, in words or

11    substance, that Congregation Shearith Israel wasn't

12    fulfilling those obligations to preserve, protect,

13    maintain and when necessary to restore the Touro

14    Synagogue?  Didn't he say that in words or substance at

15    the meeting?

16    **A.**    I don't believe so.

17    **Q.**    You deny he said anything about that?

18    **A.**    I don't recall him saying that.

19    **Q.**    And do you remember your president saying anything

20    at that meeting -- your president, Mr. Neustadter;

21    right?

22    **A.**    Yes.

23    **Q.**    Do you remember your president at that meeting

24    indicating that, in words or substance, that Shearith

25    Israel was getting a free ride in connection with their

1    obligations towards Touro Synagogue?  Yes or no.

2    A.    I don't recall.

3         MR. NAFTALIS:  Could we turn to Page 3 of the

4    report, last sentence.  Highlight the last sentence at

5    the end of the first, the first run-over paragraph on

6    Page 3, which is Bates Number 032 of exhibit,

7    Plaintiff's Exhibit 168.

8    Q.    Why don't you read that out loud, please.

9    A.    (Reading)  In our meeting the other day, Peter

10   wondered out loud if we had been having a free ride and

11   whether now we need to reevaluate the nature of our

12   relationship commitment.  Thank you.  Let me stop

13   there.

14   Q.    And Peter is your president, Mr. Neustadter;

15   correct?

16   A.    Yes.

17   Q.    And this was Dr. Groopman quoting your president's

18   comment that Shearith Israel was getting a free ride

19   regarding their commitments?  Yes or no.

20        MR. SOLOMON:  Objection.

21        THE COURT:  Overruled.

22   Q.    Yes or no, sir, please.

23   A.    That's what he said.

24   Q.    Thank you.  Now, I think you told us there was

25   another occasion where representatives from

1    Congregation Jeshuat Israel came to seek help from

2    people at Shearith Israel; true?

3    **A.**    When was that?  Do you recall the date when

4    that -- the date?

5    **Q.**    Well, I think you may have testified, did you not,

6    that there was a meeting with -- I think you testified

7    to this on direct examination.  You testified that in

8    2005 --

9    **A.**    Yes, yes.

10   **Q.**    -- a delegation from Congregation Jeshuat Israel

11   and the Touro Synagogue Foundation came?

12   **A.**    And it was with Ambassador Loeb of the Loeb

13   Center.

14   **Q.**    And I think you mentioned, did you not --

15       MR. NAFTALIS:  If we could put up Exhibit 507.

16   This is a Defendant's exhibit, your Honor.

17       THE COURT:  Okay.

18   **Q.**    Now, I put in front of you, do you see your

19   trustees' Minutes of May 17, 2005?

20   **A.**    Yes.

21   **Q.**    And it lists the trustees.  First it starts with

22   Mr. Neustadter; right?

23   **A.**    Yes.

24   **Q.**    And Mr. Neustadter is the gentleman who is the

25   president of your synagogue about whom you just

1    testified, and he gave the remarks about you guys

2    getting the free ride?

3    A.    Yes.

4    Q.    Says he was there, does it not, Defendant's

5    Exhibit 507?

6    A.    Yes.

7    Q.    And it lists next the trustees who were present?

8    A.    Yes.

9    Q.    And amongst the trustees who were present at the

10   meeting was Michael Katz.

11   A.    Yes.

12   Q.    The right Michael Katz.

13   A.    Correct.

14   Q.    And then it indicates that there were certain

15   guests there; right?

16   A.    Yes.

17   Q.    And these were guests, a number of whom were from

18   Newport, Rhode Island; right?

19   A.    Yes.

20   Q.    Or on behalf of Newport, Rhode Island; right?

21   A.    Correct.

22   Q.    And I think you mentioned one of them was

23   Mr. Aidinoff; right?

24   A.    Yes.

25   Q.    And Mr. Aidinoff, I think you testified on your

1    direct examination, is a lawyer of great esteem and

2    repute, to your own knowledge?

3    **A.**    Yes.

4    **Q.**    One of the leading tax lawyers in the United

5    States?

6    **A.**    Yes.

7    **Q.**    And he's a member of Congregation Jeshuat Israel?

8    **A.**    Correct.

9    **Q.**    And Mr. Balaban is -- he was then the executive

10    director of, up in Newport?

11    **A.**    I don't remember exactly, but.

12    **Q.**    And Ms. Pedrick, Laura Pedrick was one of the

13    co-presidents of Congregation Jeshuat Israel; correct?

14    **A.**    Uh'huh (affirmative).

15    **Q.**    And Dr. Groopman was there.  And there's a

16    Mr. Singer; right?

17    **A.**    Yes.

18    **Q.**    And Mr. Singer is your executive director?

19    **A.**    Correct.

20    **Q.**    He's your paid administrative, your highest

21    paid -- other than the rabbi, I presume --

22    administrative person; right?

23    **A.**    Yes.

24    **Q.**    Now they made a lengthy presentation.  When I say

25    "they," the people from Touro and Congregation Jeshuat

1    Israel made a lengthy presentation, did they not?

2    **A.**   My recollection is that it was a report on the

3    visitor center of Mr. Loeb.

4    **Q.**   Let me see if I can help you refresh your memory a

5    little bit.  Did they show a PowerPoint?

6    **A.**   I don't recall.  I don't recall specifically.

7    **Q.**   Did they bring to your attention during this

8    meeting, the delegation from Touro Synagogue and

9    Congregation Jeshuat Israel, the fact that the dire,

10   serious problems they were having with the Touro

11   Synagogue building?

12   **A.**   I believe so.

13   **Q.**   And they asked, did they not, they indicated they

14   were in the, in part of a major fundraising effort to

15   restore the Touro Synagogue building?

16   **A.**   Among other projects on that side.

17   **Q.**   So the answer is yes?

18   **A.**   Yes, uh'huh (affirmative).

19   **Q.**   And you had had an earlier report from the year

20   before from Dr. Groopman about the serious nature of

21   the deterioration that was going on at the Touro

22   Synagogue; right?

23   **A.**   Yes.

24   **Q.**   And they were looking, were they not, for an

25   additional million dollars above and beyond the

1    millions they had already raised?

2    **A.**    Yes.

3    **Q.**    And they were calling on Shearith Israel, the

4    congregation, to make a financial contribution?  Yes or

5    no, sir.

6    **A.**    Yes.

7    **Q.**    And, as a matter of fact, if we could, see if I

8    can help refresh your memory as to the length of the

9    presentation.

10    MR. NAFTALIS:  Let's put up 509.  It's a Defense

11    exhibit.

12    **Q.**    Defendant's Exhibit 509, sir, is an e-mail from a

13    Michael Balaban, <u>Michael@Touro Synagogue.org</u>, to Alan

14    Singer, with a copy to Mr. Groopman.  Do you see that?

15    **A.**    Yes.

16    **Q.**    And what's the subject, sir?

17    **A.**    Materials from Touro's Presentation.

18    **Q.**    And could you read the first paragraph.

19    **A.**    (Reading)  Alan, attached are the presentation

20    notes that I used during our visit to the SI board

21    meeting.  I apologize that it has taken me this long to

22    get this to you.  Hopefully we didn't ruin your meeting

23    by taking so much time, but in the rabbinic tradition I

24    tend not to give up the *bema* easily.  I would like --

25    **Q.**    And then you'll see there's a little thing in the

1    upper left, like an attachment thing, you know, what do

2    they call that, an app or -- you and I come from an age

3    we didn't know it.  The thing where you hit it and a

4    thing comes out -- a link.

5    A.    Right.

6          THE COURT:  I think it's actually an attachment

7    of a Word document, but call it anything you want.

8          MR. NAFTALIS:  Well, if you hit the attachment,

9    it's a Word document.

10   Q.    What is produced, if you take my representation,

11   it's one, two, three, four, I think it's five pages

12   that follow; right?

13   A.    Yes.

14   Q.    And which is called, titled Project Proposal?

15   A.    Yes.

16   Q.    And in these purported, as you can see from the

17   covering e-mail, that these are the notes, the

18   presentation notes that they used in making their

19   significant presentation to your board; right?

20   A.    Yes.

21   Q.    And they're five pages long, single-space,

22   typewritten?

23   A.    Yes.

24   Q.    And you notice there under Project History, --

25   A.    Yes.

1    **Q.**   -- see the first paragraph?

2    **A.**   Yes.

3           MR. NAFTALIS:  We can put up the notes.

4    **Q.**   It says, (Reading)  Maintaining this property in

5    the spirit of the Touro Synagogue is a formidable task.

6           Do you remember they said something like that to

7    you?

8    **A.**   Yes.

9    **Q.**   While tens of thousands of visitors come to hear

10   its inspiring story every year, unbeknownst to them

11   Touro Synagogue has had to deal with a tremendous level

12   of physical deterioration, despite its surface

13   appearances.

14          Do you see that?

15   **A.**   Yes.

16   **Q.**   The historic structure is in dire need of critical

17   repairs and costly improvements.  Rehabilitation

18   efforts must address long-term structural problems as

19   well as the requirements of accessibility and

20   conformity with current safety standards.

21          Did I read that accurately, sir?

22   **A.**   Yes, you did.

23   **Q.**   And you recall, this refreshes your recollection,

24   that was the gist or part of the gist of the

25   presentation that they made to you; right?

1    **A.**   Yes.

2    **Q.**   And if you go up two paragraphs, they reiterate,

3    do they not, no major work has been done on the

4    building in more than 35 years and it now requires

5    immediate rehabilitation to ensure its physical

6    integrity.

7         Do you remember they said things like that to

8    you?

9    **A.**   Yes.

10   **Q.**   They also told you, did they not, that they had

11   gone out and gotten an historic structure report by

12   some major architects in Boston, Claude Emanuel

13   Menders?  Do you remember that?

14   **A.**   I see it here, yes.

15        MR. NAFTALIS:  And we can go to that one, which

16   is on the next paragraph.

17   **Q.**   And do you see it?  Their work identified serious

18   concerns about the deterioration, the erosion of the

19   foundation.

20        Do you remember that?

21   **A.**   I see it here, yes.

22   **Q.**   The deterioration, the Menders report and the

23   National Park Service report about the deterioration of

24   the eastern wall and the erosion of the foundation;

25   right?

1    **A.**    Yes.

2    **Q.**    Plaster substructure problems; right?

3    **A.**    Uh'huh (affirmative).

4    **Q.**    Moisture exposure problems.  Do you recall that?

5    **A.**    I see it here, yes.

6    **Q.**    Substandard electrical infrastructure; right?

7    **A.**    Uh'huh (affirmative).

8    **Q.**    Fire, problems with fire notification and

9    suppression, artifact conservation and accessibility;

10   right?

11   **A.**    Yes.

12   **Q.**    Now if we look on Page 6, using D5090006, they

13   ask, do they not, directly, these representatives led

14   by Mr. Aidinoff, right, ask directly for you,

15   Congregation Shearith Israel, to make a significant

16   financial contribution to restore the synagogue; right?

17   **A.**    Where do you -- where is that in the --

18          MR. NAFTALIS:  Well, let's yellow highlight the

19   language above the little chart at the bottom.

20   **Q.**    "We look forward" --

21   **A.**    Right, I see it now.

22   **Q.**    They said to you, reading from their presentation

23   notes, We look forward to the opportunity to work with

24   you as partners and hope you will consider making a

25   contribution to this exciting and groundbreaking

1    project.

2           And they indicate what their remaining needs

3    are; right?

4    A.   Yes.

5    Q.   And they have a dollar number on the remaining

6    needs that they asked you to help on; right?

7    A.   Yes.

8    Q.   A million dollars; right?

9    A.   Uh'huh (affirmative).

10   Q.   Did Congregation Shearith Israel make any

11   contribution after this meeting?

12   A.   I don't believe so.

13   Q.   Did you, Michael Katz, make any contribution after

14   this meeting?

15   A.   No, I did not.

16   Q.   And I think there's some -- by the way, both in

17   this document and the document before, 507,

18   Congregation Jeshuat Israel is again referred to as

19   Touro Synagogue, isn't it?

20   A.   That's one of its common names, yes.

21   Q.   And these are your Minutes, that is, the Minutes

22   of Shearith Israel.  Shearith Israel; right?

23          MR. SOLOMON:  I object to the question.

24          THE COURT:  Sustained.

25   Q.   Exhibit 507 are the Minutes of Shearith Israel;

1    right?

2    **A.**    Yes.

3    **Q.**    And in the Minutes of Shearith Israel they refer

4    to Congregation Jeshuat Israel as Touro Synagogue;

5    right?

6    **A.**    Yes.

7         MR. SOLOMON:  I'm sorry, where is that?

8         THE COURT:  507.

9    **Q.**    Now --

10        MR. SOLOMON:  I object to the question, your

11   Honor.

12        THE COURT:  Overruled.

13   **Q.**    Now, after they made this presentation, either in

14   their presence or outside their presence, did any

15   trustee of Shearith Israel say, Shearith Israel ought

16   to write a check in a meaningful amount because we have

17   an obligation to preserve, maintain and restore the

18   Touro Synagogue?

19        Yes or no, sir.  Did anyone say that?

20   **A.**    Yes.

21   **Q.**    Who said that?

22   **A.**    There were discussions.  I don't remember who said

23   it.  But we were in the middle of our own fundraising,

24   and we discussed whether we could afford to help them;

25   when we thought they should be doing the same thing we

1    were doing, which was to fundraise.

2    **Q.**    Did any trustee say in words or substance that

3    it's time for Shearith Israel to stop getting a free

4    ride and do something to help the Touro Synagogue?  Yes

5    or no.

6    **A.**    No, not in those terms.

7    **Q.**    Now, by the way, this presentation that was made

8    in 2005 was part of something called the Campaign to

9    Save Touro Synagogue.  Did you ever hear about that?

10    **A.**    I don't recall the name.

11         MR. NAFTALIS:  If we could put up Exhibit 170,

12    Plaintiff's 170.

13    **Q.**    Do you see the exhibit?  Do you have that exhibit

14    in front of you --

15    **A.**    Yes.

16    **Q.**    -- which is Plaintiff's Exhibit 170?  Do you see

17    that?

18    **A.**    Yes.

19    **Q.**    And the title of that document is the Campaign to

20    Save Touro Synagogue, America's Symbol of Religious

21    Freedom; right?

22    **A.**    Yes.

23    **Q.**    Campaign Plan July 14, 2005.  Do you see that?

24    **A.**    Yes.

25    **Q.**    Now if we turn to Bates Number, see the Bates

1    Number, the little numbers on the right-hand corner,

2    lower right, 6802?

3    A.   Yes.

4         MR. NAFTALIS:  Can you turn to 6810.  Move up on

5    that a little, just up to where it lists the campaign

6    leadership.

7    Q.   Do you see that?

8    A.   Yes.

9    Q.   And it lists Mr. Aidinoff, who is chair of the

10   Touro Synagogue Foundation?

11   A.   Yes.

12   Q.   And also a member of Congregation Jeshuat Israel,

13   as the chair?

14   A.   Yes.

15   Q.   It lists a Dr. Alan Feinberg as the campaign

16   committee chair, right, and he's from Congregation

17   Jeshuat Israel; correct?  He's one of the people who

18   was at one of these meetings; remember?

19   A.   Yes.

20   Q.   And it lists Laura Pedrick, the president of

21   Congregation Jeshuat Israel; right?

22   A.   Yes.

23   Q.   And then it has a list of committee members there.

24   Do you see that?

25   A.   Yes.

1    **Q.**   Are any of the members of the committee for the

2    Campaign to Save Touro Synagogue, members of Shearith

3    Israel?

4    **A.**   Not that I recognize.

5    **Q.**   And you didn't join the committee, did you?

6    **A.**   No, I didn't.

7    **Q.**   Now, I think there was some testimony that you

8    gave about an article that was written in a major New

9    York Jewish publication called the *Forward*.  Remember

10   that?

11        MR. SOLOMON:  Objection.  Now he's testifying

12   it's not major at all.

13        THE COURT:  Overruled.

14   **A.**   What was the question?

15   **Q.**   I'll rephrase it.  Do you recall on your direct

16   examination being asked questions by your counsel,

17   Mr. Solomon, about an article that appeared in a

18   publication called the Jewish *Forward* or the *Forward*;

19   right?

20   **A.**   Yes, uh'huh (affirmative).

21   **Q.**   And the *Forward* is a, as far as Jewish news goes,

22   it's published in New York?

23   **A.**   I believe so.

24   **Q.**   And the *Forward* is one of the two major

25   periodicals in New York devoted to Jewish news; the

1    other one being *The Jewish Week*; right?

2    **A.**    Right.

3    **Q.**    And the Jewish *Forward* comes out every week;

4    right?

5    **A.**    I believe so.

6    **Q.**    And it comes out in print; right?

7    **A.**    Uh'huh (affirmative).

8    **Q.**    Print copies.  And it also comes out online;

9    right?

10   **A.**    Yes.

11   **Q.**    You can read it electronically.  As a matter of

12   fact, when you read the *Forward* --

13   **A.**    I don't read the *Forward*.

14   **Q.**    But when you've read the *Forward*, you read it

15   online generally; right?

16   **A.**    I usually print it out after.  I can't read it

17   online, so.

18   **Q.**    All right.  You go to your computer?

19   **A.**    Right.

20   **Q.**    You print it --

21        THE COURT:  There's that little app.

22        THE WITNESS:  Right.

23   **Q.**    You hit the thingamajig; right?

24   **A.**    It's the same button you push.

25   **Q.**    And as far as you know Congregation Shearith

1    Israel subscribes to the *Forward*, do they not?

2    **A.**    I would imagine so.

3    **Q.**    And based on your own knowledge, Rabbi Angel was a

4    regular reader of the *Forward*; correct?

5    **A.**    I don't know that for sure.

6         MR. NAFTALIS:  Why don't we -- let's put up

7    first Exhibit 189, Plaintiff's 189.  If you could

8    distribute 189 and 187 to the witness, his Honor, and

9    our friends over there.

10   **Q.**    And Mr. Katz, I put up for you Exhibit 189, which

11   is a copy of the print version of the *Forward* dated

12   June 5th, 2009.  Is that not correct?

13   **A.**    Yes.

14   **Q.**    And this is, Exhibit 189, what I have here is the

15   front page?

16   **A.**    Yes.

17   **Q.**    And 189 has the front page stories from the

18   *Forward*; right?

19   **A.**    Yes.

20   **Q.**    And they include, there's one on the right which

21   says, "Latest Study Supports View That Iran Attack

22   Unlikely to Work;" right?

23   **A.**    Yes.

24   **Q.**    And that's an issue of concern to a lot of people

25   in the world; right?

1    **A.**    Yes.

2    **Q.**    And there's one about, an article about opposing

3    Israeli settlement policy; right?

4    **A.**    Yes.

5    **Q.**    Do you see that?  And if we go down a little on

6    the front page, on the lower right there's a

7    three-column story, is there not?

8    **A.**    Yes.

9    **Q.**    Why don't we --

10        MR. NAFTALIS:  Can you focus that up just on

11    there up further with the picture.

12    **Q.**    And the three-column story is titled what?

13    **A.**    "Touro Struggles With Its Historic Legacy."

14    **Q.**    And the three columns on the front page; right?

15    **A.**    Yes.

16    **Q.**    And then it continues, right, the story?  Do you

17    see that?

18    **A.**    Yes.

19    **Q.**    And then there's a big picture on, also on the

20    front page of Exhibit 189, Plaintiff's 189, called,

21    "Building the Future?"

22    **A.**    Yes.

23    **Q.**    And there's a picture of the Touro Synagogue, is

24    there not?

25    **A.**    Yes.

1    **Q.**   And then there's, like, a big bulldozer next to

2    it; is that correct?

3    **A.**   Yes.

4    **Q.**   Now, we can now -- that's the print version,

5    right, of that particular story?

6    **A.**   If you say so, yes.

7         MR. NAFTALIS:  And let's go to Exhibit 187.

8    **Q.**   And Plaintiff's Exhibit 187 is the online version,

9    right, of the same story?

10   **A.**   Yes.

11   **Q.**   And in connection with your preparation for both

12   your deposition and your testimony here, you've looked

13   at one or both of these versions; right?

14   **A.**   I've looked at the online version.

15   **Q.**   A little easier to read; right?  Correct?

16   **A.**   Yes.

17        MR. NAFTALIS:  And in the online version, if we

18   could go down to, if we could highlight in yellow the

19   paragraph which begins, "But to the congregation," and

20   through the next two paragraphs ending with "another

21   museum."

22   **Q.**   Do you have that in front of you, sir?

23   **A.**   Yes.

24   **Q.**   Now, in this story, this front page story which

25   was also online in 2009, it says, does it not:  But to

1    the congregation, Touro is a different story, one of

2    prayer, ritual, and ongoing Jewish communal life, and

3    it appears that their story may lose out.

4        Did I read that accurately, sir?

5    A.    Yes.

6    Q.    So desperate is the synagogue's financial

7    situation, that it is quietly making inquiries about

8    potentially selling some of its assets, including a

9    19th century mansion that holds the synagogue's

10   offices, and two sets of rare silver rimonim (covers

11   for the handles of the Torah scroll) that were crafted

12   by the colonial area Jewish silversmith Myer Myers and

13   it belonged to the synagogue since that era.

14       Did I read that accurately?

15   A.    Yes.

16   Q.    And then apparently for the story.  The

17   congregation co-presidents, a Mr. Saul Woythaler and

18   Bea Weiss (sic), were interviewed; right?

19   A.    Yes.

20   Q.    In other words they spoke publically on the record

21   to a major Jewish publication about their financial

22   problems; right?

23   A.    Yes.

24       THE COURT:  You meant Bea Ross, I assume.

25       MR. NAFTALIS:  Yes.  What did I say?

1          THE COURT:  Bea Weiss.

2          MR. NAFTALIS:  It isn't just the computer I'm

3    having trouble with.

4    **Q.**   But you knew who you I -- you knew who I meant;

5    right?

6    **A.**   Yes.

7    **Q.**   So Mr. Woythaler, co-president, and Ms. Ross, the

8    other co-president, spoke openly and on the record to a

9    major Jewish publication in the New York area about

10   their financial problems; true?

11   **A.**   Yes.

12   **Q.**   And then Mr. Woythaler and Ms. Weiss spoke

13   openly -- Mr. Woythaler and Ms. Ross, forgive me, Bea,

14   spoke openly on the record to a major publication,

15   which is published in print and online, that they were

16   considering selling some of their precious assets in

17   order to solve these financial problems; correct?

18   **A.**   That's what the article says, yes.

19   **Q.**   And they told the Jewish *Forward* in no uncertain

20   terms that amongst the assets they were considering

21   selling to deal with their dire economic problems at

22   the Touro Synagogue were the two sets of Myer Myers

23   rimonim; correct?

24   **A.**   Yes.

25   **Q.**   And Ms. Ross, in her statement or interview with

1  the Jewish *Forward* says, (Reading)  But as tough as it
2  would be for the congregation to sell its most
3  treasured artifacts, the alternatives are looking even
4  tougher, perhaps fatal.  Without an infusion of cash
5  from somewhere, the congregation might not even be able
6  to afford its rabbi.
7       Do you see that?
8  **A.**   Yes.
9  **Q.**   Quote, quoting Ms. Ross, (Reading)  The minute it
10 doesn't have a full-time rabbi, then it doesn't
11 function as a synagogue anymore, warned Bea Ross, the
12 congregation's other co-president.
13      You see I read that correctly; right?
14 **A.**   Yes.
15 **Q.**   And if you don't have a rabbi, you can't function
16 as an active synagogue, can you?
17 **A.**   I disagree with you.
18 **Q.**   Okay.  She added, If it isn't -- quote, she being
19 Ms. Ross -- If it isn't open as a house of worship,
20 then it just becomes a museum, and the world doesn't
21 need another museum.
22      Correct?
23 **A.**   That's what she wrote.
24 **Q.**   That's what she said?
25 **A.**   That's what she said.

1   **Q.**   And you, around this time, you had a conversation

2   with Ms. Ross, did you not?  Yes or no.

3   **A.**   I don't recall specifically when we had a

4   conversation.

5   **Q.**   Well, I think you told us you had very few

6   conversations with her on the phone; true?

7   **A.**   Yes.

8   **Q.**   And during the course of -- and you had a

9   conversation with her, which it was sometime between

10  2005 and 2010, right, on this subject?

11  **A.**   I don't remember the dates.  I'm sorry.

12  **Q.**   But you had a conversation with her; true?

13  **A.**   I believe so.

14  **Q.**   And in the conversation with Ms. Ross, she told

15  you, did she not, some of the major financial problems

16  that the synagogue was having; correct?

17  **A.**   Uh'huh (affirmative).  Yes.

18  **Q.**   And she told you much of what is in the Jewish

19  *Forward* article; correct?

20          MR. SOLOMON:  Objection.

21          THE COURT:  Overruled.

22  **A.**   I recall her telling me that --

23  **Q.**   It's a yes or no question.  Did she tell you much

24  of what --

25  **A.**   Yes.

1    **Q.**    -- is in the Jewish *Forward* article?

2    **A.**    Yes.

3    **Q.**    In terms of their serious economic problems;

4    correct?

5    **A.**    Yes.

6    **Q.**    Their having to cut back on their office help?

7    **A.**    Yes.

8    **Q.**    That being an extraordinarily bad position

9    financially?

10   **A.**    Yes.

11   **Q.**    Did she --.  And she told you, did she not, that

12   they were having, that the situation was so bad that

13   they were considering selling some of their assets?

14   **A.**    I don't recall that.  I'm sorry.

15   **Q.**    Well, well, do you remember being -- do you

16   remember testifying in a deposition?  You do.  Do you

17   remember that?

18   **A.**    I recall.

19   **Q.**    It's a yes or no question.

20   **A.**    Yes, uh'huh (affirmative).

21   **Q.**    And you were under oath in that deposition?

22   **A.**    Yes.

23   **Q.**    And do you recall being asked this question, these

24   questions, and giving these answers under oath in that

25   deposition.

1          MR. NAFTALIS:  I'm starting at, Mr. Solomon,

2     Page 31 Line 22.  Question -- ready?  When you got it

3     just tell me.

4          If you could put it up, Line 22.

5     Q.   (Reading)  Did there come a time when you learned

6     that Jeshuat Israel was considering selling any

7     rimonim?

8          Answer:  At some point I received, after the

9     visit from the Jeshuat Israel group to our board, I had

10    a phone call with Bea Ross and, as I recollect, she

11    mentioned that they were, that they had assets which

12    they thought they might sell, but that it was a very

13    premature plan.

14         Do you recall being asked that question?

15    A.   Yes.

16    Q.   And giving that answer?

17    A.   Yes, I do.

18    Q.   And you were sworn to tell the truth, sir?

19    A.   Yes.

20    Q.   And the question had the word "rimonim" in it

21    which, to which you gave that answer; right?

22    A.   It had that, but my --

23    Q.   Please, sir.  I don't mean to interrupt, just,

24    please.  If you can't understand it, you know.

25         Did the word "rimonim" appear in the question to

1    which you gave that answer?  Yes or no.

2    **A.**   Yes.

3    **Q.**   And, by the way, during the course of this call,

4    did you ever say to Ms. Ross, You can't sell any assets

5    in your synagogue, whether it's a rimonim or anything

6    else, because Shearith Israel owns the whole shooting

7    match?

8         Did you say that in that conversation?  Yes or

9    no.

10   **A.**   No.

11   **Q.**   Did you ever say in that conversation to Ms. Ross

12   that Shearith Israel owns the contents of Touro

13   Synagogue and the building?  Yes or no.

14   **A.**   I don't recall.

15   **Q.**   Well, let me ask you about your deposition again.

16        MR. NAFTALIS:  Reading from Page 83, beginning

17   at Line 14, Mr. Solomon.

18   **Q.**   Question from Mr. Jacoby:  I think I know the

19   answer to this, but in your telephone call with

20   Ms. Ross sometime between 2005 and 2010, did you state

21   or express that Shearith Israel owned the contents of

22   Touro Synagogue?

23        Answer:  It never came up.

24        Do you recall being asked that question?

25   **A.**   Yes.

1    **Q.**   And making that answer?

2    **A.**   Yes.

3    **Q.**   By the way, did as you sit here now, do you deny

4    that the rimonim, the Myer Myers rimonim were mentioned

5    during this call?  Yes or no.

6    **A.**   I can't give a yes or no answer.

7    **Q.**   Okay.  Are you aware that Ms. Ross has testified

8    here?

9    **A.**   Yes.

10   **Q.**   And in connection with her testimony, she

11   testified about this conversation with you and her?

12   **A.**   Yes.

13   **Q.**   And that was brought to your attention, I take it,

14   by your counsel in your preparation?  Because I don't

15   think you were in the courtroom during that day; right?

16   **A.**   Yes.

17   **Q.**   Do you dispute Ms. Ross's testimony?

18        MR. SOLOMON:  Objection.  No foundation the

19   witness has any idea what she testified about.

20        MR. NAFTALIS:  I think I laid the foundation.

21        THE COURT:  I thought -- Mr. Katz, you were only

22   here on Monday last week; is that right?

23        THE WITNESS:  Right.

24        THE COURT:  You weren't here for Ms. Ross's

25   testimony?

1        THE WITNESS:  Right.

2        THE COURT:  Sustained.

3        MR. NAFTALIS:  My foundation was he had

4   discussed it with his counsel.  If that's not a good

5   enough foundation, I'll move on.

6        THE COURT:  Move on.

7        MR. NAFTALIS:  Thank you.

8   **Q.**   By the way, in your conversation with Ms. Ross,

9   your concern really wasn't whether or not Jeshuat

10  Israel might have to sell assets in order to survive,

11  was it?  That wasn't your concern or focus, was it?

12  Yes or no.

13  **A.**   I'm not sure that, I mean --

14  **Q.**   Can you answer that question?

15  **A.**   I, I had -- I was listening to her and we -- one

16  of the articles she mentioned selling was a real

17  estate, as I recall.  They had some buildings, and I

18  recall that there was a discussion on that.  I do not

19  recall a mention of the rimonim.

20  **Q.**   You don't recall one way or the other, is that

21  correct, the rimonim?

22  **A.**   Correct.

23  **Q.**   Now, the concern that you had had less to do, if

24  anything, with the sale of the assets; but you thought,

25  did you not, that Jeshuat Israel was once again trying

1    to help -- trying to get Shearith Israel to help it out

2    financially; correct?

3    **A.**   I don't think that I thought that at all.

4    **Q.**   Well, let me again ask you about your deposition,

5    sir.

6         MR. NAFTALIS:  If we could go to Page 38

7    beginning, Mr. Solomon, on Line 19.  Let me know when

8    you get there.  Thanks.

9    **Q.**   Do you recall being -- let me read you some more.

10   I'll read you some more questions, if that's okay.

11        Mr. Katz, do you recall testifying in your

12   deposition as follows, beginning at line, at Page 38

13   Line 19:

14        Question:  Do you recall whether any particular

15   assets were discussed during your conversation with

16   Ms. Ross?

17        And Mr. Solomon makes an objection.  Let me

18   object to the question, and says, I think it's the

19   third or fourth time you're trying to explore, in

20   general we object to the stuff that happened a while

21   ago, but, if you have anything more to add.  Tell him

22   if you don't.

23        Answer:  I think my sense was that Bea was

24   hoping that Shearith Israel would contribute something

25   to their, to their program.

1          Question:  But my question was whether specific

2     assets were discussed.

3          I don't remember whether specific assets were,

4     but I do remember describing to her our own financial

5     situation.

6          Do you recall being asked those questions --

7     **A.**    Yes.

8     **Q.**    -- and making those answers --

9     **A.**    Yes.

10    **Q.**    -- under oath in your deposition on July 16th,

11    2014?

12    **A.**    Yes.

13    **Q.**    I take it after that -- in that conversation you

14    never offered to write a check for her; correct?

15    **A.**    Correct.

16    **Q.**    You never offered to have CSI write a check, did

17    you?

18    **A.**    Correct.

19    **Q.**    You never offered any suggestions to her how to

20    raise money, in that conversation; correct?

21    **A.**    I don't recall.

22    **Q.**    And after that call with Ms. Ross, Shearith Israel

23    did not give any money to help Jeshuat Israel; correct?

24    Yes or no.

25    **A.**    Members did, but Shearith Israel as a congregation

1    did not.

2    Q.   And do you know which members gave?

3    A.   Dr. Groopman gave.

4    Q.   After that call?

5    A.   Oh, after the call I don't know, but people told

6    me that they had, so.

7    Q.   And you didn't follow up with Ms. Ross after that

8    call, did you?

9    A.   No.

10   Q.   You never called her up and asked her how are you

11   coming along with these problems, did you?

12   A.   No.

13   Q.   And you're trying to sell any assets to deal with

14   these problems.  You never had that follow up

15   conversation?

16   A.   No.

17   Q.   And did you report this conversation to the board

18   of Shearith Israel?

19   A.   I would assume I did.

20   Q.   Do you have any recollection of reporting it to

21   the board?

22   A.   I'm sure I did.

23   Q.   Now, in 2012 you had additional conversation with

24   Ms. Ross?

25   A.   Correct.

1    **Q.**    Do you remember that?

2    **A.**    This was after -- in June of --

3    **Q.**    June of 2012.

4    **A.**    Yes, yes.

5    **Q.**    So you and I are on the same page.

6    **A.**    Right.

7    **Q.**    And you initiated this conversation; right?

8    **A.**    Correct.

9    **Q.**    Do you remember who initiated the conversation

10    before, the one you just told us about?  Did she call

11    you, or did you call her, or don't you remember?

12    **A.**    I don't remember.  I believe it was Bea.

13    **Q.**    And you had --

14         MR. NAFTALIS:  Let's put up Plaintiff's 229.

15    **Q.**    You had an e-mail -- you had conversation -- you

16    called Ms. Ross; right?  Or did you send her an e-mail

17    first or did you call her?

18         MR. SOLOMON:  Hold on.  What document?

19         MR. NAFTALIS:  I'm sorry.

20    **Q.**    Exhibit 229 is a series of e-mails between you and

21    Ms. Ross in June of 2012?

22    **A.**    Yes.

23    **Q.**    And you're familiar with that document, are you

24    not?

25    **A.**    Yes.

1  **Q.**    And before those e-mails were generated, you had a

2  conversation with Ms. Ross?

3  **A.**    Yes.

4  **Q.**    And I believe you testified earlier this morning

5  that --

6  **A.**    Long time ago.

7  **Q.**    I believe you testified earlier this morning that

8  in, when Mr. Solomon was asking you some questions,

9  that it had come to your attention, or people in

10  authority at Shearith Israel, that you had heard that

11  Congregation Jeshuat Israel was involved with a

12  potential sale of the rimonim to the Museum of Fine

13  Arts; is that right?

14  **A.**    Yes.

15  **Q.**    And as a result of that information, you were

16  deputized by your colleagues at Shearith Israel to

17  reach out to Ms. Ross to find out what was happening?

18  **A.**    Correct.

19  **Q.**    I think you indicated you had a conversation with

20  Ms. Ross in which you raised the subject with her?

21  **A.**    Yes.

22  **Q.**    And during the course of that conversation,

23  Ms. Ross said to you I'm happy to let you have all the

24  facts about it; right?

25  **A.**    Yes.

1    **Q.**    And she said to you let me put it all in writing

2    so you have it, you have the whole complete story;

3    correct?

4    **A.**    Yes.

5    **Q.**    And she didn't try and evade talking to you, did

6    she?

7    **A.**    No.

8    **Q.**    And did she delay getting back to you in writing,

9    or did she get back to you that very, very same day?

10    **A.**    It appears that it was the same day.

11    **Q.**    And she sent you a detailed e-mail, did she not?

12    **A.**    Yes.

13    **Q.**    And if we go to the e-mail chain, like most e-mail

14    chains the oldest one is at the bottom; right?

15    **A.**    Yes.

16    **Q.**    Which is Exhibit 229, and she starts by -- with

17    some pleasantries; right?

18    **A.**    Correct.

19    **Q.**    (Reading)  Michael, it was good to talk to you on

20    the phone about the sale of one of our two sets of Myer

21    Myers rimonim.  We understand and appreciate Shearith

22    Israel's interest in Touro Synagogue.  As sister

23    synagogues, we share a long, historic history and a

24    commitment to sustaining orthodox tradition.

25         We only reached our decision to sell the rimonim

1  after long reflection and discussion.  At present our

2  income and endowment are barely sufficient to meet our

3  minimum  needs.  It's our moral and fiduciary

4  responsibility to plan for the future now.  Selling the

5  rimonim for the amount offered will enable us to secure

6  the financial future of the synagogue and ensure that

7  the synagogue and grounds are properly maintained and

8  the synagogue will always be open for services and have

9  a rabbi in residence.  We would not consider selling

10  the rimonim if those objectives could not have been

11  met.

12         Did I read what she wrote to you accurately?

13  **A.**   Yes.

14  **Q.**   And she goes on:  At the same time, the sale

15  offers us the opportunity to see the rimonim showcased

16  at the new Art of the Americas wing of the Museum of

17  Fine Arts in Boston as symbols of the Jewish

18  community's role in the founding of America and the

19  establishment of religious freedom.  If a sale must

20  take place, the placement is ideal.

21         Did I read that accurately?

22  **A.**   Yes.

23  **Q.**   And then she went on to tell you what they're

24  going to do with the proceeds; correct?

25  **A.**   Yes.

1    **Q.**    The entire net proceeds from the sale will be put

2    into an irrevocable endowment fund from which only the

3    interest can be drawn.    In the same way our Touro

4    endowment fund has helped sustained us until now, this

5    new endowment fund will help sustain us in the future.

6    As one of our board members had said, this is a Touro

7    moment, will we measure up.

8         Did I read that accurately?

9    **A.**    Yes.

10    **Q.**    The terms of the fund agreement will also provide,

11    if the congregation in Newport ceases to exist and

12    responsibility for the synagogue returns to Shearith

13    Israel, the income from the fund can be used by

14    Shearith Israel to maintain the synagogue if it chooses

15    to accept the responsibility.

16         Did I read that accurately, sir?

17    **A.**    Yes.

18    **Q.**    In any case -- she then assured you that an

19    immediate sale was not imminent; right?

20    **A.**    Yes.

21    **Q.**    (Reading)  In any case, no immediate sale will

22    take place.

23         Right?

24         The resolution passed by our board that will be

25    presented to the congregation requires a second vote by

1    the congregation approving the terms of the endowment

2    fund before any sale can take place.  We treasure our

3    synagogue, the opportunity to secure its financial

4    future, while seeing the rimonim displayed as part of

5    the history and culture of America is overwhelmingly

6    positive.

7         I hope that you will share my thoughts, which

8    reflect those of our board, with your board.  We look

9    forward to talking to you and members of your board at

10   a mutually-agreeable time.  My best, Bea.

11        So Ms. Ross was very open and detailed about

12   what their plans were; correct?

13   **A.**   Yes.

14   **Q.**   And, as a matter of fact, what she told you during

15   the course of this conversation was very, very similar

16   to what she told the Jewish *Forward* back in 2009; true?

17   **A.**   It's similar.

18        MR. NAFTALIS:  We have a small demonstrative

19   which I'll give to Mr. Solomon and to the Court and to

20   the witness.

21        THE COURT:  Sure.  Let's mark this as some

22   number for ID by the Plaintiffs.

23        MR. NAFTALIS:  We marked it, unless you want a

24   special numbering system for demonstratives.  We marked

25   it as Plaintiff's Exhibit 400.

1          THE COURT:  For ID only.

2          MR. NAFTALIS:  Yes, for ID only.  It's only a

3    demonstrative.

4          THE COURT:  Do you need an extra one?  She's all

5    set.  Thank you.

6          THE CLERK:  No, I need one.  Thank you.

7    Q.   I place in front of you, this is a demonstrative.

8    This is a document just -- although you're a lawyer,

9    you're not a trial lawyer.

10   A.   Right.

11   Q.   This is not a piece of regular evidence in the

12   case.  This is something we created, Mr. Katz.  Okay?

13        And you'll see that our demonstrative,

14   Plaintiff's Exhibit 400 for identification only,

15   contains, does it not, two columns?

16   A.   Yes.

17   Q.   And one column on the left side references what

18   exhibit?

19   A.   The article from the *Forward*.

20   Q.   Which is Plaintiff's Exhibit 187.  And on the

21   right side, what document is that?

22   A.   That's Bea's e-mail to me of June 25th, I think.

23   Q.   Which is Plaintiff's Exhibit 229.  And could you

24   read the left side on the first page from the *Forward,*

25   the quotes in the *Forward* article.

1    **A.**    (Reading)  How desperate is the synagogue's

2    financial situation.  Without an infusion of cash from

3    somewhere, the congregation might not even be -- might

4    not be able even to afford its rabbi.

5    **Q.**    And the -- if you can now read the right side of

6    Page 1 of Plaintiff's Exhibit 400 for identification.

7    **A.**    At present our income and endowment are barely

8    sufficient to meet our minimum needs.

9    **Q.**    That's what she said to you in the e-mail in 2012?

10   **A.**    Yes.

11   **Q.**    Now let's go to the second page of Plaintiff's

12   Exhibit 400 for identification, going to the column

13   from the *Forward* article.

14   **A.**    You want me to read it?

15   **Q.**    Yes.

16   **A.**    (Reading)  Touro is quietly making inquiries about

17   potentially selling some of its assets, including two

18   sets of rare silver rimonim.  They were crafted by

19   colonial era Jewish silversmith Myer Myers.

20   **Q.**    And now if you could read what's on the other side

21   of the demonstrative from the 2012 e-mail from

22   Ms. Ross, Plaintiff's Exhibit 229.

23   **A.**    (Reading)  It was good to talk to you on the phone

24   about the sale of one of our two sets of Myer Myers

25   rimonim.  We only reached our decision to sell the

1      rimonim after long reflection and discussion.

2      **Q.**   If you could now go to Page 3 of the

3      demonstrative.  Now read what's on the left side of

4      Page 3 of Plaintiff's Exhibit 400 for identification,

5      the text from, the quotes from the Jewish *Forward*

6      article of 2009.

7      **A.**   (Reading)  But the synagogue also has a much

8      greater concern, which is how to remain an active

9      congregation that could not only pay the bills, but

10     also continue to support a full-time rabbi in

11     perpetuity, which congregants says is essential in a

12     small Jewish community like Newport.

13     **Q.**   And now, what did Ms. Ross say to you in the 2012

14     e-mail, Plaintiff's Exhibit 229, which is reflected on

15     the right side?

16     **A.**   (Reading)  It is our moral and fiduciary

17     responsibility to plan for the future now.  Selling the

18     rimonim will enable us to secure the financial future

19     of the synagogue and ensure that the synagogue and

20     grounds are properly maintained and that the synagogue

21     will always be open for services and have a rabbi in

22     residence.

23     **Q.**   And the last page of this demonstrative,

24     Plaintiff's Exhibit 400 for identification, if you

25     could read what's on the left side of the page

1    reflecting what's in the 2009 *Forward* article.

2    **A.**    (Reading)  The congregation is hoping to raise a

3    new endowment.

4    **Q.**    And now on the right side, what Ms. Ross wrote to

5    you in her e-mail in 2012.

6    **A.**    (Reading)  The entire net proceeds from the sale

7    placed in an irrevocable endowment fund.

8    **Q.**    Thanks, Mr. Katz.

9         Now, when you got Ms. Ross's e-mail, which is in

10   Plaintiff's Exhibit 229, you shared this.  You shared

11   it with whom?

12   **A.**    I shared it with probably, most likely the small

13   committee that was put together in June to deal with

14   this problem.

15   **Q.**    And was a decision made for you to write her back?

16   **A.**    That must have been the course of it.

17   **Q.**    And let's look at the e-mail, your e-mail back to

18   her, which would be the next document above that;

19   right?

20        What was your agenda in writing back to her?

21   What was your mission?

22   **A.**    It was to get some sort of a sense as to when they

23   would be taking a vote.

24   **Q.**    Now, did you --

25   **A.**    And then to what the terms that they were looking

1    for; we needed those.  We needed some more information.

2    Q.   And did you say to Ms. Ross, after you got her

3    first e-mail, Hey, you guys can't sell the rimonim.

4    We're the owners; you know, I feel sorry for your

5    economic problems, but you can't sell them.  We own

6    them.

7         Did you say that to her in words, in either a

8    conversation then or in this e-mail that you wrote

9    back?  Yes or no.

10   A.   No.

11   Q.   In fact, the e-mail that you sent back to her, you

12   wrote it to be a quite innocuous document; right?

13   A.   The one that I wrote back on the 25th?

14   Q.   Yes.

15   A.   It was, it was asking for more information.

16   Q.   And nowhere in that document did you say that

17   Shearith Israel owned the rimonim; right?

18   A.   Correct.

19   Q.   Nowhere in that e-mail did you write back to her

20   that you can't sell that; right?

21   A.   We weren't sure who owned them at that point.

22   Q.   And Ms. Ross, you asked her some questions,

23   right -- is that correct -- in there?

24   A.   Yes.

25   Q.   About the procedures they were engaged in and when

1    the votes would be and how binding they were and so on?

2    A.    Yes.

3    Q.    And did Ms. Ross write you back?

4    A.    Yes.

5    Q.    I mean, she didn't delay or evade your questions

6    in any shape or form, did she?

7    A.    No.

8    Q.    And did she write you back:  (Reading)  Michael,

9    I'm a lawyer myself, so I appreciate your attention to

10    detail.  Right?

11    A.    Yes.

12    Q.    And she said -- and she made it clear that it

13    was -- there were a lot of steps in the process that

14    had to be taken before there would be a transaction;

15    correct?

16    A.    Yes.

17    Q.    And she said, (Reading)  The sale of the rimonim

18    is a complicated process and requires us to work at

19    details on every level.

20         Right?

21    A.    Yes.

22    Q.    The vote tonight will authorize the sale, which we

23    must do to draft the contract with the MFA; however,

24    the same resolution also contains the stipulation that

25    no sale shall take place until the congregation has

1    voted on the terms of the trust agreement.

2         You saw that; right?

3    A.    Yes.

4    Q.    In reality, the vote tonight permits us to move

5    forward to arrange the details of a proposed sale, but,

6    in effect, no sale will take place at this time.  A

7    committee of the congregation will now begin work on

8    arranging the details of the sale and the endowment,

9    which the congregation must vote on for a sale to

10   occur.

11        So she laid out all the procedural steps that

12   remained, and that irrespective of whether the vote was

13   yay or nay that night, that the deal was not in any way

14   complete; correct?

15   A.    Yes.

16   Q.    And she then concluded:  Again, we welcome the

17   opportunity to talk to you and members of your board to

18   address any concerns you may have.  Thanks, Bea.

19        Right?  So her note was friendly, open, candid;

20   right?

21   A.    Yes.

22   Q.    Which is how she's -- she had always been with

23   you; right?

24   A.    Yes.

25   Q.    And the next step that happened in our chronology

1    is you fellows, you retained an excellent lawyer;

2    right?

3    A.    Yes.

4    Q.    Mr. Sherman.  Happy always to be a character

5    reference for him.

6          THE COURT:  Why don't we end on a high note like

7    that, and always a good way when one of the local guys

8    gets a compliment.  We'll end before Mr. Naftalis says

9    his next thing, which may take us elsewhere.  We'll be

10   back in 15 minutes.

11         (Recess)

12         THE COURT:  Mr. Naftalis.

13   Q.    Good afternoon, Mr. Katz.

14   A.    Hello.

15   Q.    I think we ended with the indisputable fact about

16   Mr. Sherman being an excellent and well-respected

17   lawyer; right?  Is that correct?

18   A.    Yes.

19   Q.    And you retained, after you got Ms. Ross's e-mail,

20   sometime shortly after that Shearith Israel retained

21   Mr. Sherman; correct?

22   A.    Yes.

23   Q.    To be your counsel in the matter?

24   A.    Yes.

25   Q.    And Mr. -- there came a time shortly after that

1    that Mr. Sherman sent a letter on behalf of Shearith

2    Israel to Congregation Jeshuat Israel; right?

3    **A.**    Right.

4    **Q.**    And that's the cease and desist letter, which

5    is --

6         THE COURT:  231.

7    **Q.**    Which is 231.

8         THE COURT:  Plaintiff's exhibit.

9    **Q.**    Plaintiff's 231.  You've seen that document

10   before?

11   **A.**    Yes, I have.

12   **Q.**    And I think -- and this decision to retain eminent

13   outside counsel and to send the cease and desist letter

14   was sent by the executive committee; is that correct?

15   **A.**    Yes.

16   **Q.**    And the full board of Shearith Israel had not been

17   notified about this, correct, at this point in time?

18   **A.**    I'm not sure.  I don't recall whether the board

19   was.

20   **Q.**    Do you recall that the full board did not meet on

21   this matter or ratify this matter until sometime in

22   September?  Is that correct?

23   **A.**    I don't recall.  Our next full board meeting was

24   probably then, but we would often have interim

25   meetings.

1    **Q.**    So, well --

2    **A.**    I'm sure that's correct.

3    **Q.**    But you remember testifying about this in your

4    deposition, sir?

5    **A.**    No.

6    **Q.**    Well, let me see if I can ask you some questions.

7    I bring to your attention --

8           MR. NAFTALIS:  Reading first from Page 98,

9    Mr. Solomon, Line 18.  You tell me when you're ready.

10          MR. SOLOMON:  Thank you.

11   **Q.**    (Reading)  question:  You talked about the

12   executive committee making a decision to engage counsel

13   and have this cease and desist letter issued.  That is

14   in the June 2012 period.

15          Answer -- Question:  Did the board of directors

16   ever -- did the board of trustees subsequently ratify

17   that decision?

18          Answer:  Yes.

19          Question:  By the way, why didn't the board of

20   trustees act in the summer?

21          We had -- first of all, we had to act very

22   quickly, and our understanding was that a sale was

23   imminent, and the board wasn't going to have the

24   regular in-person meeting until the fall, and the

25   people were away.

1    Question:  So the initial decision, we will call

2    it, was made by the executive committee of the board;

3    is that right?

4    Answer:  Uh'huh.

5    You have to answer.

6    Yes, yes.

7    And the decision was later ratified by the full

8    board of trustees of Shearith Israel; is that correct?

9    **A.**   Yes.

10   **Q.**   And do you recall him making those questions --

11   **A.**   Yes.

12   **Q.**   And before the board ratifies the decision, you

13   don't know, do you, whether or not board members who

14   were not on the executive committee were ever advised

15   of the decision in advance of the board meeting in

16   September?  Yes or no.

17   **A.**   Could you repeat the question.

18   MR. NAFTALIS:  Do you want to read it back,

19   ma'am.

20   (Question was read)

21   **A.**   I don't know whether all of them were.

22   **Q.**   As a matter of fact, you don't recall whether any

23   of the members of the board who were not on the

24   executive committee were ever advised of the decision

25   until the board meeting in the fall, do you?

1    **A.**   I know there were some.  I believe there were some

2    members that we were able to speak with.

3    **Q.**   And do you recall being asked this question and

4    making this answer when you testified in your

5    deposition, Page 100 Line 19:

6            Before the board ratified, the full board

7    ratified the executive committee's decision, were

8    members of the board who were not on the executive

9    committee informed of the executive committee's

10   decision?

11           Answer:  I don't recall.

12           Do you recall being asked that question and

13   making that answer?

14   **A.**   Yes.

15   **Q.**   Now, you said you had to move fast because, you

16   testified in your deposition, because, quote, a sale

17   was imminent.  Do you remember I just read that piece?

18   **A.**   Yes.

19   **Q.**   Well, Ms. Ross had told you there were an awful

20   lot of steps before there was a sale; correct?  Yes or

21   no.

22   **A.**   Yes.

23   **Q.**   And so a sale was not imminent; correct?  Yes or

24   no.

25   **A.**   We weren't sure that it couldn't happen very

1    quickly.

2    **Q.**    Now, you said, I think on your direct examination,

3    that after you had issued the cease and desist letter

4    through your counsel, that you then engaged in some

5    research activities; right?

6    **A.**    Correct.

7    **Q.**    And the research activities that you engaged in

8    was assigned to Mr. Edinger; correct?

9    **A.**    Yes, as part of it, yes.

10    **Q.**    And Mr. Edinger is an employee of Shearith Israel?

11    **A.**    Yes.

12    **Q.**    And a full-time employee of Shearith Israel?

13    **A.**    Yes.

14    **Q.**    And his -- he went to see if there was documentary

15    support for the position that you own the rimonim?

16    **A.**    Yes.

17    **Q.**    He was deputized to determine if he could find

18    records that would support Shearith Israel's position?

19    Yes?

20    **A.**    I did not deputize him or give him his

21    instructions.

22    **Q.**    Someone else gave him the instructions?

23    **A.**    Uh'huh (affirmative).

24    **Q.**    But that was his mission, as you understood it;

25    correct?  Yes or no.

1    **A.**    Yes.

2    **Q.**    And you seen Mr. Edinger's memo?

3    **A.**    I've read it, yes.

4    **Q.**    Which is an exhibit as Plaintiff's Exhibit 231 --

5         MR. NAFTALIS:  I'm sorry, 231, that's the cease

6    and desist.  I apologize.

7         233, Plaintiff's Exhibit 233.

8    **Q.**    I show you Plaintiff's Exhibit 233, Mr. Edinger's

9    memo.  It's a document you're familiar with; right?

10   **A.**    Yes.

11   **Q.**    And you testified about it on your direct

12   examination?

13   **A.**    I believe so, yes.

14   **Q.**    Now, if we -- Edinger says at the very beginning

15   that the board of trustees believes that these bells

16   are actually our property; right?

17   **A.**    Yes.

18   **Q.**    And he was asked, was he not, to see if there are

19   any records to support that position; correct?

20   **A.**    Yes.

21   **Q.**    And he collects some materials in aid of your

22   position and writes up a report; correct?

23   **A.**    Correct.

24   **Q.**    And he makes a number of comments along the way;

25   correct?

1    **A.**    I believe so, yes.

2    **Q.**    And I'd like to ask you about a couple of

3    comments.  If we could turn to Page 389 of this

4    exhibit, and if we could look at the last paragraph

5    beginning "In 1946."  Do you see that?

6    **A.**    Yes.

7    **Q.**    It says:  In 1946 the Touro Synagogue was

8    designated as a national historic site.  In the

9    agreements reached between the U.S. government,

10   Shearith Israel and Jeshuat Israel, Shearith Israel's

11   ownership of the synagogue was reconfirmed.

12        Do you see that?

13   **A.**    Yes.

14   **Q.**    And that's, that document, the 1945, it says '46,

15   I think it's 19 -- I think he's off by a year; right?

16   It's the '45 agreement, the one we showed you earlier.

17   Remember?

18   **A.**    I'm sorry, what?  Yes.

19   **Q.**    And then he goes on to say:  Shearith Israel's

20   involvement from that time, 1946, to today, meaning

21   with the Touro Synagogue, has been only occasional;

22   mainly having to do with the repair and upkeep of the

23   synagogue building.

24        Am I reading that accurately?

25   **A.**    Yes.

1    **Q.**   And that was a finding that Mr. Edinger, who was

2    deputized to find information for you guys, reached;

3    correct?

4    **A.**   Correct.

5    **Q.**   And now I think he has -- and I'm not going to

6    engage in a historical hunt with you, but I want to

7    call your attention to something else he wrote, all

8    right?

9         MR. NAFTALIS:  If we go to the bottom of

10   Page 390, the language, the last two sentences, "In

11   1833," if we could highlight that.

12   **Q.**   Do you see the highlighted parts of Mr. Edinger's

13   memo, --

14   **A.**   Yes.

15   **Q.**   -- Exhibit 233, Plaintiff's?  Is that correct?

16   You see that?

17   **A.**   Yes.

18   **Q.**   And one of Mr. Edinger's findings, after looking

19   at the documents, were that two additional -- in 1833

20   two additional or possibly four scrolls of the Newport

21   congregation were deposited for safekeeping in New

22   York; right?

23   **A.**   Yes.

24   **Q.**   And you know what the word "safekeeping" means;

25   right?  It's when you ask someone to hold it for you;

1    right?

2    A.    Yes.

3    Q.    It doesn't mean that they own it; they're holding

4    it for you.  Correct?

5    A.    But I'm not sure that that's what Zach -- whether

6    Zachary's description there is correct.

7         MR. NAFTALIS:  Whether Zachary's description is

8    correct or not we leave to his Honor.

9    Q.    But the words "safekeeping" is when you're giving

10   something that belongs to you to someone else to hold

11   for you; right?

12   A.    Not necessarily in this situation.

13   Q.    Okay.  Well, let's go on.  It is likely, your

14   employee, Mr. Edinger, says, It is likely that the

15   rimonim adorning those scrolls were brought to New York

16   for safekeeping at that time.

17        Did I read that accurately?

18   A.    Yes, you did.

19   Q.    And now -- by the way, you were asked something

20   about Yale; right?  You were asked a question I think

21   about Yale or loaning stuff out to museums.  If I'm

22   wrong about Yale, forgive me.

23        But you were asked about, on your direct

24   examination, about loaning rimonim out to museums,

25   loaning which objects out to museums, loaning objects

1    out to museums.  And I think you said something to the

2    effect that you didn't really have any objection, you

3    personally didn't have any objection to Jeshuat Israel

4    loaning out the rimonim or any other objects to

5    museums; correct?

6    **A.**    Correct.

7    **Q.**    Now, when Shearith Israel -- Shearith Israel in

8    the past has loaned out property that it owns to

9    museums or the Library of Congress or places like that,

10   for display or exhibition; correct?

11   **A.**    Yes.

12   **Q.**    And when Shearith Israel loans out property that

13   it is the owner of, before it does that it requires a

14   resolution or approval or a vote by its board of

15   directors, does it not?

16   **A.**    It's not a requirement, but it's our practice.

17   **Q.**    So your practice at Shearith Israel is before you

18   loan out your rimonim, or any other objects of the

19   synagogue, to any museum or university, the board would

20   have to say yes before you could do it; correct?

21   That's the practice?

22   **A.**    Yes.

23   **Q.**    And the reason is because you regard these

24   items -- you own them; right?

25   **A.**    Correct.

1    **Q.**    You regard them as valuable; right?

2    **A.**    Yes.

3    **Q.**    And you want to make sure that your interests are

4    protected; correct?

5    **A.**    Correct.

6    **Q.**    And as a matter of fact, Shearith Israel's board,

7    before it lent out its rimonim for exhibition at Yale

8    University, took a vote on that, did they not?

9    **A.**    It's my recollection.

10    **Q.**    And as a matter of fact, if you recall correctly,

11    the rimonim, this exhibition of Myer Myers silver

12    started at Yale, right, but after the exhibition ended

13    at Yale, pieces of that exhibition were then sent to

14    two other museums to be displayed; right?

15    **A.**    I don't know for sure.

16    **Q.**    Well, you were aware, were you not, that they --

17    there was an exhibition at the Skirball Center and at

18    the Winterthur Museum in Delaware and that your board

19    said no; right?  About putting the rimonim there.

20    **A.**    I don't recall.  I don't recall, but that's -- if

21    that was the resolution, that's what we decided.

22    **Q.**    And no, there was no resolution or vote at

23    Shearith Israel to approve Jeshuat Israel's loaning

24    their rimonim out to Yale for exhibition, was there?

25    **A.**    We were never informed.  We were -- we weren't

1    informed specifically of that.  But we did not take a
2    vote on that, no.
3    Q.    Well, as a matter of fact, Jeshuat Israel never
4    asked Shearith Israel for permission to loan the
5    rimonim, the Myer Myers rimonim in its possession to
6    the Yale exhibition, did they?
7    A.    No, but that did not preclude -- that wasn't an
8    indicia of ownership.
9    Q.    No.  My question is Jeshuat Israel never asked
10   Shearith Israel for permission to loan the Myer Myers
11   rimonim in its possession to the Yale exhibition, did
12   they?
13   A.    Not that I'm aware of.
14   Q.    Right.  And Shearith Israel never complained to
15   Jeshuat Israel, did they, about not being asked in
16   advance before Jeshuat Israel loaned the Myer Myers
17   rimonim for the Yale exhibition, did they?
18   A.    Correct.
19   Q.    And by the way, you never, you never spoke to
20   anyone at Jeshuat Israel about loaning objects to
21   museums, did you?
22   A.    No.
23   Q.    And you never spoke to anybody at Jeshuat Israel
24   about their loaning the Myer Myers rimonim to Yale, did
25   you?

1    **A.**    No.

2    **Q.**    And I think you went to Yale to see the

3    exhibition, didn't you?

4    **A.**    Yes.

5    **Q.**    And as a matter of fact you looked at the catalog

6    and you looked at the exhibit; right?

7    **A.**    Yes.

8    **Q.**    And Catalog Number 63 in the exhibit are Shearith

9    Israel's rimonim; right?

10   **A.**    Correct.

11   **Q.**    And right next to it in the catalog and at the

12   exhibit are Jeshuat Israel's rimonim, Number 64; right?

13   **A.**    Yes.

14   **Q.**    You saw that; correct?

15   **A.**    Yes.

16   **Q.**    And you saw that in the exhibit, the provenance of

17   Jeshuat Israel's rimonim is attributed to Congregation

18   Jeshuat Israel, Touro Synagogue; correct?

19   **A.**    Yes.

20   **Q.**    It doesn't say on loan from Shearith Israel, does

21   it?

22   **A.**    They weren't on -- it does not say that.

23   **Q.**    Whereas your rimonim, the provenance states

24   Shearith Israel, New York City; right?

25   **A.**    Right.

1   **Q.**   Neither you nor anybody else at Shearith Israel

2   made any complaints to Jeshuat Israel about claiming

3   ownership, about being attributed as the owners of the

4   Myer Myers rimonim at Touro Synagogue, did they?

5          MR. SOLOMON:  Objection.  Misstates the record.

6          THE COURT:  Overruled.

7   **A.**   In all these instances --

8   **Q.**   It's a yes or no question, sir.

9   **A.**   We did not object.

10   **Q.**   And by the way, you mentioned on your direct

11   examination something about a man named Roy Zuckerberg.

12   **A.**   Yes.

13   **Q.**   And Mr. Zuckerberg is a longtime member of

14   Shearith Israel?

15   **A.**   Yes.

16   **Q.**   And he at one time was a trustee of Shearith

17   Israel?

18   **A.**   Yes.

19   **Q.**   And he is an honorary trustee of Shearith Israel

20   as we speak today; right?

21   **A.**   Yes.

22   **Q.**   And Mr. Zuckerberg is someone who has had a

23   longtime interest and expertise in silver?

24   **A.**   Colonial silver.

25   **Q.**   And a longtime interest, amongst other things, in

1    colonial silver rimonims?

2    **A.**    I don't know that there's specific interest in

3    that.

4    **Q.**    Well, when there was a time that Shearith Israel

5    needed to have their own rimonim restored, you went to

6    Mr. Zuckerberg; correct?

7    **A.**    Correct.

8    **Q.**    And he was helpful --

9    **A.**    Yes.

10    **Q.**    -- to your congregation.  And, as you've

11    testified, Mr. Zuckerberg, as an individual, helped

12    Jeshuat Israel restore its rimonim; correct?

13    **A.**    Yes.

14    **Q.**    And, as a matter of fact, he paid personally a

15    portion of the costs; correct?

16    **A.**    Yes.

17    **Q.**    And the money that Mr. Zuckerberg paid for

18    restoring the rimonim of Jeshuat Israel was his own

19    personal money; right?

20    **A.**    Yes.

21    **Q.**    None of the money he gave towards that project

22    came from the treasury of Shearith Israel, did it?

23    **A.**    None.

24    **Q.**    And Shearith Israel was not involved in any effort

25    to raise money for the restoration of the rimonim at

1    Jeshuat Israel; correct?

2    **A.**   Correct.

3    **Q.**   Now, you told us that, that you kept important

4    documents relating to Touro Synagogue on your desk;

5    right?

6    **A.**   Yes.

7    **Q.**   And, indeed, they've been there for a while?

8    **A.**   Yes.

9        MR. NAFTALIS:   And want to put P31 up.

10   **Q.**   And I'm going to show you a document and show you

11   a couple of documents.   I want to show you what's been

12   marked as P31, which is the extract of the Last Will

13   and Testament of Jacob Rodrigues Rivera.

14       Do you see that document?

15   **A.**   Yes.

16   **Q.**   And Mr. Rivera was one of the original holders of

17   the Touro Synagogue; correct?

18   **A.**   It's my understanding, yes.

19   **Q.**   And indeed one of the documents you said you

20   looked at was the documents referencing the transfer

21   from his heirs to Shearith Israel; right?

22   **A.**   Yes.

23   **Q.**   And was one of the documents that you kept on your

24   desk relating to the Touro Synagogue, Plaintiff's

25   Exhibit 31, the Last Will and Testament of Jacob

1    Rodrigues Rivera?

2    **A.**    Is that a question?

3    **Q.**    Yes, it is.

4    **A.**    No, this was not one of the documents I had.

5         MR. NAFTALIS:  Now if you'd put that on the

6    screen, if we could.  Blow up this language.  You can

7    stop there.

8    **Q.**    Start with the top there.  I want to direct your

9    attention to the yellow highlighted portion of

10   Plaintiff's Exhibit 31.

11        Do you see that, sir?

12   **A.**    Yes.

13   **Q.**    And have you seen this document before today?

14   **A.**    I don't recall seeing it.

15   **Q.**    Why don't you read the yellow highlighted portion

16   into the record.

17   **A.**    (Reading)  Also I do hereby declare and make known

18   unto all proper persons that I have no exclusive right

19   or title, of, in, or to the Jewish Public Synagogue in

20   Newport on account of the deed thereof being made to

21   myself, Moses Levy and Issac Harte, which the same was

22   done, meant and intended in Trust only, to and for the

23   sole Use, Benefit and Behoof of the Jewish Society of

24   Newport, to be used for them reserved as a Place of

25   Public Worship forever.

1    **Q.**   And the word "trust" in this document, Plaintiff's

2    Exhibit 31, is with a capital T, not a small "t;"

3    right?

4    **A.**   Yes.

5         MR. NAFTALIS:  Can we put up Plaintiff's 90,

6    which I think has been distributed.  If we could turn

7    to Bates Number Age 96.  You can stop after "forever."

8    Go all the way from the top to there.  Okay.  Thanks.

9    **Q.**   Now, one of the documents that you did keep on the

10    corner of your desk was Plaintiff's Exhibit 90, which

11    is the 1945 agreement between the United States of

12    America, Shearith Israel through its trustees, and

13    Congregation Jeshuat; right?

14    **A.**   Yes.

15    **Q.**   And we've asked you some questions earlier about

16    certain obligations Shearith Israel's trustees have

17    under this document; right?

18    **A.**   Uh'huh (affirmative).

19    **Q.**   Do you see the language in paragraph 1(f) in

20    Plaintiff's Exhibit 90; right?

21    **A.**   Yes.

22    **Q.**   You want to read that, the yellow highlighted

23    language.

24    **A.**   (Reading)  That the public shall be admitted to

25    all parts of said Touro Synagogue, excepting such rooms

1    or space as may be reserved for the keeping of

2    religious vestments, vessels, monies, and historical or

3    valuable personal properties, at all reasonable times,

4    so far as consistent with the preservation of the

5    synagogue for the use, benefit and behoof of the Jewish

6    society in Newport as a place of public worship

7    forever.

8    **Q.**    Now, the last part of that sentence, talking about

9    "use, benefit and behoof of the Jewish Society of

10   Newport as a place of public worship forever," is word

11   for word, isn't it, out of Plaintiff's Exhibit 31, the

12   Rivera will?

13   **A.**    Yes.

14   **Q.**    Can we now distribute Plaintiff's Exhibit 86.

15   **A.**    It's not completely word for word.

16   **Q.**    There's an "in" as opposed to an "on;" right?

17   **A.**    I don't see where the public shall be admitted.

18   **Q.**    The words with the preservation of the synagogue

19   for the, the words "for the use, benefit and behoof of

20   the Jewish society of Newport as a place of public

21   worship forever," isn't that the same words?  Yes or

22   no.

23   **A.**    Right, but the paragraph in --

24   **Q.**    I was only asking you about that, sir.

25   **A.**    Okay.

1          THE COURT:  Just so the record is clear, the

2     will says "of Newport" and the '45 agreement says "in

3     Newport."  That's the one-word difference between the

4     two.  I'm not claiming it means anything, but the words

5     are different.

6          MR. SOLOMON:  It's not the only difference.

7          THE COURT:  Say that again.

8          MR. SOLOMON:  It's not the only difference, your

9     Honor.

10          THE COURT:  Of that sentence, is what I meant,

11     that he was reading from.

12          MR. NAFTALIS:  Now can we put up Plaintiff's

13     Exhibit 86, please.

14     Q.   I show you Plaintiff's Exhibit 86, which is a

15     letter on the letterhead of William MacLeod, Attorney

16     At Law, 165 Thames Street, Newport, Rhode Island, dated

17     September 24th, 1945.

18          Was Plaintiff's Exhibit 86 one of the documents

19     that you kept on the pile in the small corner of your

20     desk relating to the Touro Synagogue in Newport?

21          (Pause)

22          My question was, was Plaintiff's Exhibit 86,

23     this letter by Mr. MacLeod dated September 24th, 1945,

24     was this one of the documents that you kept on the

25     small corner of your desk relating to issues relating

1    to the Touro Synagogue?

2    **A.**    I don't know.  I don't know.

3    **Q.**    Well, let me just show you certain parts of it.

4    Mr. MacLeod, he's identified as an attorney at law?

5    **A.**    Yes.

6    **Q.**    And he's writing a letter to the president of the

7    Congregation Jeshuat Israel in Newport, Rhode Island?

8    **A.**    Yes.

9         MR. SOLOMON:  Your Honor, I object to the

10   question.  He said -- the witness has never seen the

11   document before.  Your Honor is not getting any

12   evidence from the witness.

13        THE COURT:  You know, I think we had this

14   discussion back with Mr. Bazarsky.  So if he's never

15   seen this, this witness, he certainly wasn't around to

16   have opined at the time.

17        If there are sections of this, Mr. Naftalis,

18   that you want to point out to the Court or publish to

19   the Court by way of reading from it, I think that would

20   be the more efficient and effective way to do it.

21        MR. NAFTALIS:  That's fine.  It was only on

22   direct examination he offered these opinions about that

23   they had no obligations to us, and he's looked at all

24   the documents and all that kind of stuff; and he gave

25   a, you know, and I'm saying not critically of him, he

1    just, you know, talked about a couple of documents.

2    And we think that -- and he said he kept in the corner

3    of his desk what supposedly were the important

4    documents relating to it, and here's some pretty

5    critical stuff that wasn't there.

6              And yes, I'm happy to point out to your Honor

7    the important parts of it and then --

8              THE COURT:  Why don't you do that; because if

9    your attempt is to change Mr. Katz's mind while he's on

10   the stand, I don't think that's going to happen.  So if

11   you want to point out the inconsistencies to me through

12   highlighting that --

13             MR. NAFTALIS:  I will do that.  Although Perry

14   Mason does it.  I'm still waiting for my first Perry

15   Mason moment with a witness.

16             THE COURT:  The door keeps opening.  I keep

17   waiting for him to walk through.

18             MR. NAFTALIS:  Can we highlight the sentence

19   there.  That's for the judge's benefit.  You want to

20   highlight that one, just that sentence.  Okay, those

21   two sentences are fine.

22             Can I read them into the record?

23             THE COURT:  Yes, please.

24             MR. NAFTALIS:  (Reading)  In my opinion,

25   however, the Congregation Shearith Israel are the

1    holders of fee simple title upon certain trusts.  The

2    most authentic definition of that trust is the one

3    contained in the will of Jacob Rodrigues Rivera.

4              I know your Honor will have time to look at the

5    whole thing.

6              If we go to Page 3 now of Exhibit 86, and I'm

7    talking about the paragraph which begins "I regret,"

8    and he is talking about the proposed draft of the 1945

9    agreement, is what he's referencing.

10             He said:  (Reading) I regret that because

11   paragraph Article 4 subsection (b) relates back to

12   Article 1 subsection (f), and that said Article 1

13   subsection (f) does not wholly represent the trusts on

14   which, in my opinion, the Congregation Shearith Israel

15   holds the title to the property, I cannot recommend the

16   signing of the proposed contract in its present form.

17   I feel, however, that if paragraph 1 section (f) were

18   amended as indicated below, the full picture of the

19   trusts upon which the Congregation Shearith Israel

20   holds the legal title to the property will be recited

21   for the benefit of prosperity -- posterity.  To

22   perpetuate both recorded declarations of trust, I

23   suggest that Article 1 subsection (f) of the contract

24   with the Secretary of the Interior be phrased as

25   follows.

1          And there is a long quote which sounds, which if

2     your Honor goes to Exhibit 90 subsection (1)(f) is what

3     finally appears in the 1945 agreement I think word for

4     word.

5          THE COURT:  In all relevant places.  There's a

6     couple of changed words, but nothing that appears to be

7     relevant.  That appears to be the case.

8          MR. NAFTALIS:  And then I want to read into the

9     record, call your Honor's attention to the last

10    sentence of the document:

11         (Reading)  I feel with this revision of

12    Article 1 subsection (f), that Congregation Jeshuat

13    Israel will not be prevented from presenting in any

14    future legal action the full story of the trusts

15    originally established for the Jewish society of

16    Newport.  Respectfully submitted.

17         And I just wanted to show you two other

18    documents which we'll hand out now,

19    Plaintiff's Exhibit 87 and Plaintiff's Exhibit 88.

20         I suppose I could ask him that I assume, unless

21    I ask, that these documents would not have been on his

22    desk either, if I could ask him that, but.

23         Plaintiff's Exhibit 87 is a letter, your Honor,

24    on the letterhead of Hendricks Robbins and

25    Buttenwieser, Counselors of Law, Seven Dey Street, New

1    York, to Captain N. Taylor Phillips, 100 Broadway, New

2    York, New York.  N. Taylor Phillips was at Shearith

3    Israel, he was --.

4         And it says:  (Reading)  The trouble with the

5    Newport congregation seemed to have been a tempest in a

6    teapot, and I'm enclosing the proposed contract between

7    the Secretary of the Interior and the two congregations

8    establishing the Newport synagogue as a national

9    shrine, with the modifications suggested by Newport.

10        I also thought you might be interested in the

11   legal opinion which they secured, a copy of which I am

12   enclosing.  I would appreciate your returning these

13   papers to me at your earliest convenience with any

14   comments you care to make.  Signed, Henry Hendricks.

15        And the legal opinion that was sent to Shearith

16   Israel is Plaintiff's Exhibit 86, that I had just read.

17        And Plaintiff's Exhibit 88 is a letter from

18   N. Taylor Phillips to Mr. Hendricks.  Hendricks appears

19   to be both a lawyer and the president of Shearith

20   Israel.

21        THE COURT:  Not much has changed.

22        MR. NAFTALIS:  And he says, I've examined the

23   papers which you sent me, and he makes comments on the

24   legal opinion.

25        Your Honor obviously will have more to say about

1    this, you know, in connection with other things.

2              THE COURT:  Thank you.

3              MR. NAFTALIS:  But those were the documents I

4    wanted your Honor to see on the trust issue.

5              THE COURT:  Great.  Thank you.

6    **Q.**   On your direct examination you had told us that

7    you wanted the rimonim to stay in Newport, right; not

8    to go to New York?

9    **A.**   What was the question?  What was the context in

10   which I said that?

11   **Q.**   If my memory is correct -- let me rephrase it.

12             You want the rimonim, the Myer Myers rimonim

13   which is the subject of this dispute, to remain at the

14   Touro Synagogue or to go to, to be returned to -- or to

15   be in New York City?

16   **A.**   We own the --

17   **Q.**   No; it's --

18   **A.**   We own the bells, and if they're in Touro it's

19   because the synagogue is thriving and we don't need

20   them back.  If they're in New York, it's because the

21   synagogue has failed.

22             So we obviously, we prefer for the synagogue to

23   prevail, to be strong and healthy.

24   **Q.**   Well, did you testify on your direct examination

25   this morning, that as far as you were concerned as a

1    trustee of Shearith Israel, you wanted the rimonim to

2    stay in Newport?  Yes or no.

3    **A.**   That's the question that -- I don't want them

4    sold.

5    **Q.**   No, no, no.  That's not my question.

6         The question is, did you testify that you want

7    the rimonim to remain in the Touro Synagogue?  Yes or

8    no.

9    **A.**   Yes.

10   **Q.**   As a matter of fact, though, in the counterclaim

11   that was filed by your lawyers, you asked that the

12   rimonim be returned to New York; right?  Yes or no.

13        MR. SOLOMON:  I object.  Misstates the document

14   which is in front of your Honor.

15        THE COURT:  Well, I don't know the answer to it,

16   so you'll bring that out on redirect, I assume, and

17   I'll -- you're going to withdraw the question?

18        MR. NAFTALIS:  No.  I'm going to show him the

19   document in a minute.

20        THE COURT:  I'm going to overrule the objection.

21        THE WITNESS:  I'm sorry.  What?

22        MR. NAFTALIS:  You may read the question back.

23        (Question was read)

24   **Q.**   It's a yes or no question, sir.

25   **A.**   There are conditions on that.

1    **Q.**   No.

2    **A.**   I would have to see what the circumstances on

3    which I -- we said that, that I said it.

4    **Q.**   No.  You're familiar with the pleadings that have

5    been filed by your lawyers on your behalf; right?

6    **A.**   I'd have to see what, what the context is.

7    **Q.**   It's a general question.  Are you familiar with

8    the --

9    **A.**   Generally familiar.

10   **Q.**   Did you review the filings, the counterclaims, --

11   **A.**   No, I didn't.

12   **Q.**   -- the claims -- time out.

13        Did you review the counterclaims that your

14   lawyers filed, with them, before they filed them?  Yes

15   or no.

16   **A.**   I don't recall.

17   **Q.**   Did they show you the legal filings that they were

18   making before they filed them?  Yes or no.

19   **A.**   What do you mean?  I'm not a litigator.  I need to

20   know what you're referring to by "the legal filings."

21        MR. NAFTALIS:  You want to put the numbers, 241

22   up on the screen.  Turn to Page 19.  Highlight

23   paragraph 52.

24   **Q.**   Read paragraph 52 out loud.

25   **A.**   The rimonim shall be returned forthwith to the

1    possession of Defendant in New York, or to such other

2    place as Defendant determines, absent an agreement

3    between Shearith Israel and MFA, on terms satisfactory

4    to Shearith Israel.

5    Q.    Would you now also turn to the paragraph on

6    Page 23, paragraph four.

7    A.    That this Court order the immediate --

8    Q.    Sorry.  Start again.  I'm sorry.

9    A.    (Reading)  That this Court order the immediate

10    return of the rimonim to Congregation Shearith Israel

11    in New York, unless Shearith Israel agrees otherwise.

12    Q.    And to your knowledge these parts of the

13    counterclaim have never been withdrawn by Shearith

14    Israel; correct?

15    A.    I would have to ask my counsel that.

16    Q.    Well, you also said, did you not, that we're not

17    looking to evict the congregation and its congregants;

18    right?  Yes or no.

19    A.    We've said that, yes.

20    Q.    Well, are you aware what your counterclaim says on

21    that subject?  It's a yes or no question.

22    A.    No, it's not.  The behavior that they exhibited in

23    doing, in taking this to Christie's violated our sense

24    of what their rights were; and that's why we wanted the

25    rimonim returned to New York, because we felt that we

1    couldn't trust them.

2    **Q.**    Now could you read on Page 23, go down to the next

3    paragraph, paragraph five.

4    **A.**    That this Court declare Plaintiff to be in breach

5    of the indentures and agreement with the United States

6    and order the eviction of Plaintiff from the Touro

7    Synagogue and related property.

8    **Q.**    And also would you read into the record

9    paragraph 63 of your counterclaim.

10   **A.**    As a result, Jeshuat Israel should be removed as

11   trustee of Touro Synagogue and related real property,

12   and as trustee of all personal property, including all

13   religious objects owned by Shearith Israel.

14   **Q.**    And just so I'm clear on that; Shearith Israel is

15   the congregation; right?

16   **A.**    Yes.

17   **Q.**    And the members of the congregation are its

18   congregants; right?

19   **A.**    Right.

20   **Q.**    So the congregants are what populate the

21   congregation; right?

22   **A.**    Right.

23   **Q.**    You gave some testimony about financial matters at

24   Shearith Israel, a little bit about that.  Am I right?

25   **A.**    Yes.

1    **Q.**    And just so it's clear, on your books of account

2    and your records, the financial reports of Shearith

3    Israel do not reflect rimonim as being assets; right?

4    **A.**    I don't know that.

5    **Q.**    Well, the -- well, I'll move it along a little

6    faster.  Do you recall testifying in your deposition at

7    Page 63 --.

8        And you get financial reports, as a trustee?

9    **A.**    Yes.

10   **Q.**    Okay.  And, Question --

11       MR. NAFTALIS:  Page 63, Lou, Line 2.  I'm sorry.

12       MR. SOLOMON:  Thank you.

13   **Q.**    Question:  Are you provided with a list of assets?

14       No.  Our own, you know, we don't list our own

15   Touro scrolls are in our own building.  We don't list

16   our own rimonim that are in our building.

17       Do you list the real estate property owned by

18   Congregation Shearith Israel in this asset list?

19       Answer:  No.

20       Do you list the real property owned by

21   Jeshuat -- I'm sorry -- Shearith Israel in any

22   financial reports?

23       I don't think we do.

24       Do you recall being asked those questions and

25   making those answers in that deposition?

1    **A.**    I don't recall it, but I see it here, so.

2    **Q.**    Just one other question on your financial, on the

3    finances.  I think you testified in response to

4    questions by Mr. Solomon that you don't have a formal

5    endowment at Shearith Israel.

6    **A.**    Correct.

7    **Q.**    But you do have a capital account; right?

8    **A.**    We have a reserved, a cemetery fund, and we -- I'm

9    not a finance person, I don't remember what the terms

10   are, but we do have funds that we use.

11   **Q.**    And you have --

12   **A.**    Most of them, many of them are restricted.

13   **Q.**    And you also have a capital account, which most

14   synagogues do have, --

15   **A.**    Yes.

16   **Q.**    -- which they do that often as a substitute for an

17   endowment; correct?  Is that true?  Yes or no.

18   **A.**    I think endowment is treated differently than

19   capital accounts.

20   **Q.**    But you do have a capital account?

21   **A.**    Of course we have funds.

22   **Q.**    And now, you were asked about the dollar a year

23   payments for rent --

24   **A.**    Yes.

25   **Q.**    -- and under the terms of the lease.  Do you

1    remember that?

2    **A.**    Yes.

3    **Q.**    And you said that it's been paid on, it's being

4    paid on a current basis.  Wasn't that your testimony?

5    **A.**    There are payments that we received, that we have

6    received, and it's not necessarily every year, but we

7    receive payments.

8    **Q.**    Now, are you aware -- you were here when

9    Mr. Solomon gave his very fine opening address.  Do you

10   remember that?

11   **A.**    Uh'huh (affirmative).

12   **Q.**    And I think he had slides.  Do you remember that?

13   And he had slides, which I can put up if it will

14   help, --

15   **A.**    I recall them.

16   **Q.**    -- which indicated payments of one dollar a year.

17         (Pause)

18         THE WITNESS:  Thank you.

19         MR. NAFTALIS:  I guess I should -- what I'm

20   referring to, your Honor, for the record, I'm just

21   using this as a demonstrative.  These, these are a part

22   of the slides that Mr. Solomon used in his opening

23   statement.

24         THE COURT:  I don't remember if we marked these

25   for ID.

1          Mr. Solomon, do you remember?

2          MR. SOLOMON:  I think they ought to be marked.

3   If he wants to offer these at this point, I'm all ears.

4          MR. NAFTALIS:  He always has a constructive

5   suggestion.

6          THE COURT:  Let me check.  Vickie, did we mark

7   either set of opening slides as ID?  Do you remember?

8          MR. SOLOMON:  I don't believe so.

9          MR. NAFTALIS:  I'm just using it as a

10  demonstrative.  Obviously I'm not offering it in

11  evidence.

12         THE COURT:  I think it's probably good for the

13  record.  Why don't we mark both the Plaintiff's opening

14  slides as Plaintiff's Exhibit 401 for ID, and the

15  Defendant's slides as Defendant's -- help me out,

16  Mr. Solomon.

17         MR. SOLOMON:  DD, DX, Demonstrative D Set

18  Number 7, zero seven.

19         THE COURT:  Both of those will be marked for

20  identification only.

21         MR. NAFTALIS:  DDX?

22         THE COURT:  401 is Plaintiff's for ID only.

23         MR. SOLOMON:  I'm sorry.  I think there's a

24  little confusion, your Honor.  We're going to have to

25  get your Honor the number.

1          THE COURT:  Okay.  That's fine.

2          MR. NAFTALIS:  You want to call it A?  Is A

3    better?

4          THE COURT:  You can go on with the questioning.

5    We'll straighten out the identification of it later.

6          Is that all right, Mr. Solomon?

7          MR. SOLOMON:  It is, your Honor.  Thank you.

8          THE COURT:  Thanks.

9          MR. NAFTALIS:  Mr. Solomon, I'm going to, and

10   for the Court, just to, briefly; I've taken pages

11   excerpted out of Defendant's Demonstrative

12   Exhibit 7 -- assuming that's the right number we end up

13   with -- and I've taken Pages 63 through 74 from

14   Mr. Solomon's slides to use as a demonstrative in

15   connection with his examination, so hopefully the

16   record reflects the right thing.

17         THE COURT:  Okay.

18   **Q.**  You have this excerpt from Defendant's

19   Demonstrative Exhibit 7 in front of you, sir?

20   **A.**  Yes.

21   **Q.**  And these pages reflect or purport to reflect rent

22   payments that were made; is that correct?

23   **A.**  Yes.

24   **Q.**  And let's just look at -- and that's done by your

25   able attorney, Mr. Solomon; right?

1   **A.**    Yes.

2   **Q.**    You see there was a payment in 1903 and in 1904;

3   right?

4   **A.**    Yes.

5   **Q.**    And then they skip until 1910, so there's no --

6         MR. SOLOMON:  The demonstrative skips, is what

7   you mean.

8         MR. NAFTALIS:  I'm assuming the demonstrative is

9   accurate for the sake of this examination.

10         MR. SOLOMON:  It's an accurate demonstrative,

11   Judge.

12         THE COURT:  Proceed.  It's not evidence until it

13   becomes evidence.  It's only for ID now, so you can ask

14   away, but it's not having much of an effect until it

15   becomes evidence.

16   **Q.**    And you see there's various dates:  1910 to 1920;

17   right?  And then it skips to 1924.  And then it skips

18   to 1959.  So that's 35 years, right, skipped; right?

19   **A.**    Yes.  But they didn't have xerox machines in those

20   days to make copies of checks.

21   **Q.**    And in 1960 there's a payment; is that correct?

22   **A.**    Yes.

23   **Q.**    Which appears to be paid by the City of Newport?

24   **A.**    We can't see the whole letter from the Newport

25   Deputy of Finance.

1    **Q.**    It says it on there, if you look in the upper,

2    (Reading) 1960 CJI rent paid by the City of Newport.

3    Do you see that?

4    **A.**    Yes.

5    **Q.**    And then there's a payment in 1968.  And there's

6    one, the next one that comes is '68; right?  And

7    there's a next payment comes in 1980; right?

8    **A.**    Yes.

9    **Q.**    And then there's a gap.  And then the next payment

10   is 1984; right?

11   **A.**    Yup.

12   **Q.**    And then 1986 and '85 -- do you see that?  Right?

13   **A.**    Yes.

14   **Q.**    And then there's a payment in 19, well, there's a,

15   there's a correspondence in 1995 requesting payments,

16   that the dollar hasn't been paid; right?

17   **A.**    Yes.

18   **Q.**    And then you can see the next time there is any

19   kind of payment is not until 2012 when the dollar is

20   paid; right?

21   **A.**    That's --

22   **Q.**    Correct?

23   **A.**    But that -- this may not be complete though.

24   **Q.**    It's a yes or no answer.

25   **A.**    This may not be complete though.  It's, all that

1    it's evidencing is what you have, is what you've put

2    together.

3    **Q.**    Isn't it true, sir, that there wasn't a single

4    dollar paid between 1995 and 2012 in rent?

5    **A.**    I don't know.

6    **Q.**    You have no -- in any event, irrespective of what

7    you may have said on your direct examination, you have

8    no personal knowledge at all on this subject; right?

9    Do you have any personal knowledge?

10   **A.**    Only what was reported at meetings or --

11   **Q.**    No.  My question is do you have any personal

12   knowledge?

13   **A.**    No.

14        MR. NAFTALIS:  I was about to start something

15   new.

16        THE COURT:  Then we're going to break for the

17   day.  Thank you, Mr. Naftalis.

18        MR. NAFTALIS:  Thank you, your Honor.

19        MR. SOLOMON:  Your Honor, may I briefly be

20   heard.  This has gone on a good longer than I had

21   anticipated, and if I don't know how --.  Our next

22   witness will be Dr. Mann.  She's also somewhat

23   time-constrained; if this witness ever does get off the

24   stand.

25        How much more does counsel have?

1        MR. NAFTALIS:  I don't have that much more.  I

2    will finish relatively briefly in the morning, I hope.

3        THE COURT:  Great.

4        MR. SOLOMON:  Given the fact that the witness

5    will then have to be here overnight, I have to talk to

6    him about that, we would like to be able to communicate

7    with him about his redirect and be able to give him

8    whatever advice of counsel that you think that he is

9    entitled to.

10        THE COURT:  Well, the rule that we followed here

11    and that I have imposed is that attorneys can't talk

12    during cross-exam.  He's still under cross-exam, so I

13    think we're going to have to live with that rule until

14    cross-exam ends.

15        I think for one of the Plaintiff's witnesses, if

16    memory serves me correct, they asked for a brief break

17    after cross, before redirect, and I afforded them that,

18    because I think they went to the courtroom next door

19    and used it.  So if you request the same thing, I would

20    afford you the same opportunity.

21        MR. SOLOMON:  Thank you, your Honor.

22        THE COURT:  All right.  We'll see everyone back

23    at 9:30.

24        Oh, one other thing while we're on the record.

25    The Plaintiff's memorandum concerning Mr. Katz's

1    testimony about matters involving questions on his,

2    from his deposition, it's a three-page memo that was

3    not filed on ECF.  I've read it.  It's been referred

4    to.  I'm going to mark it as Court's Exhibit Number 1.

5              MR. NAFTALIS:  Should we file it on ECF?  Would

6    that be better for the record?

7              THE COURT:  Sure.

8              MR. NAFTALIS:  Both, but we'll do that.

9              THE COURT:  Just file it on ECF.  No need to

10   respond.

11             THE CLERK:  Is it a Court exhibit then?

12             THE COURT:  No.  It is not, no.

13             Great.  Thanks, everyone.

14             (ADJOURNED)

C E R T I F I C A T I O N

        I, Denise P. Veitch, RPR, do hereby certify
that the foregoing pages are a true and accurate
transcription of my stenographic notes in the
above-entitled case.

                /s/  Denise P. Veitch
        _____
                Denise P. Veitch, RPR

                June 24, 2015
        _____
                Date