IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * * * * * * * * * * * * * *
CONGREGATION JESHUAT      *    CIVIL ACTION
ISRAEL                    *    12-822M
                          *
VS.                       *    JUNE 9, 2015
                          *
CONGREGATION SHEARITH     *
ISRAEL                    *    PROVIDENCE, RI
* * * * * * * * * * * * * * * * * * * * * * * * *
```


BEFORE THE HONORABLE JOHN J. McCONNELL

DISTRICT JUDGE

(Bench Trial)

VOLUME VI



**APPEARANCES**:

```
FOR THE PLAINTIFF:    STEVEN E. SNOW, ESQ.
                      Partridge Snow & Hahn LLP
                      40 Westminster Street
                      Suite 1100
                      Providence, RI  02903

                      GARY P. NAFTALIS, ESQ.
                      JONATHAN M. WAGNER, ESQ.
                      TOBIAS B. JACOBY, ESQ.
                      DANIEL P. SCHUMEISTER, ESQ.
                      Kramer Levin Naftalis & Frankel LLP
                      1177 Avenue of the Americas
                      New York, NY  10036
```

FOR THE DEFENDANT:    DEMING E. SHERMAN, ESQ.
                      Locke Lord LLP
                      2800 Financial Plaza
                      Providence, RI  02903

                      LOUIS M. SOLOMON, ESQ.
                      COLIN UNDERWOOD, ESQ.
                      YAN GRINBLAT, ESQ.
                      JENNIFER CHAING, ESQ.
                      Cadwalader, Wickersham & Taft
                      One World Financial Center
                      New York, NY  10281


Court Reporter:       Denise P. Veitch, RPR
                      One Exchange Terrace
                      Providence, RI  02903

I N D E X

DEFENDANT'S WITNESS                                    PAGE

Michael I. Katz
   Continued Cross-Examination by Mr. Naftalis    12
   Redirect Examination by Mr. Solomon            54
   Recross-Examination by Mr. Naftalis            93

Vivian Mann
   Direct Examination by Mr. Solomon              97

E X H I B I T S

| PLAINTIFF | FOR ID | FULL |
|-----------|--------|------|
| 79 | | 11 |
| 93 | | 11 |
| 213 | | 9 |
| 319 | | 8 |

1    9 JUNE 2015 -- 9:30 A.M.

2         THE COURT:  Good morning, everyone.  Come on up,

3    Mr. Katz.  While Mr. Katz is coming up, there were --

4    you all gave me my homework to do.

5         So on the two depositions that the Plaintiff

6    tendered in their case in chief concerning Dr. Mann and

7    Professor Fisher, I'm not going to allow the Plaintiff

8    to introduce those depositions during its case in

9    chief; however, I will allow them to be deemed admitted

10   in the Defendant's case.  There doesn't appear to the

11   Court to be any reason to require certain things like

12   that to be repeated.

13        So the Plaintiff's -- the objection to keep them

14   out of the Plaintiff's case is sustained.  The

15   Plaintiff's request to introduce them into the

16   Defendant's case as cross-examination of the two

17   experts will be upheld.

18        There are, I think, four or five undecided

19   documents, and I didn't, I don't want lengthy

20   arguments, but let me tell you what I'm thinking, and

21   whoever is going to lose can try and talk me out of it;

22   how does that work?

23        Plaintiff's Exhibit 319, it's a letter from a

24   silversmith/goldsmith in Maplewood, New Jersey, Ubaldo

25   Vitali, U-b-a-l-d-o V-i-t-a-l-i.  I don't see any --

1    it's hearsay.  I don't see any exception to the hearsay

2    rule, and I can't imagine how it would be introduced.

3          Mr. Snow.

4          MR. SNOW:  Your Honor, actually the only part of

5    that exhibit that we're really interested in are the

6    photographs, which are not hearsay.  In particular,

7    there were photographs showing the rimonim apart, taken

8    apart, and that's really all we're interested in.

9          THE COURT:  Is there anyone that would -- how do

10   you get those in, Mr. Snow?

11         MR. SNOW:  Well, the document itself would

12   authenticate the photographs.  In the report he

13   describes that he took the photographs while he did it,

14   and that's not for hearsay purposes; that's --

15         THE COURT:  That's an appropriate way to

16   authenticate.

17         MR. SNOW:  That's right.

18         THE COURT:  But get beyond authentication and

19   now get into its admissibility.  The photographs are

20   clearly relevant.

21         MR. SNOW:  Yes.

22         THE COURT:  There's no timetable on the

23   photographs that --

24         MR. SNOW:  I think the report indicates when

25   they were taken.  It was clearly when Mr. Vitali, who

1   did the restoration of the rimonim, was working on

2   them.

3        THE COURT:  Let me hear from Mr. Solomon.

4        MR. SOLOMON:  Thank you, your Honor.  We

5   actually take particular exception to the photographs.

6   We don't know what they are of.  Even if your Honor

7   will take the hearsay statement for the authentication,

8   it's not --

9        THE COURT:  Which I'm allowed to do.

10       MR. SOLOMON:  I agree with that under 104, your

11  Honor.  But there are four or six different possible

12  rimonim.  We don't know when they were taken.  The

13  authenticating document that your Honor is looking at

14  dates of 2010, and the work was done in 2001, so we

15  have no idea what happened between 2001 and 2010, and

16  we actually do not know which rimonim they are talking

17  about.

18       THE COURT:  Well, but why would that be relevant

19  on the lapse in time, Mr. Solomon, in terms of whether

20  it's admissible?  The letter merely authenticates or

21  attempts to authenticate, according to the Plaintiffs,

22  the photographs.

23       The purpose of the photographs is relevant to

24  the Plaintiff's case to show -- I assume somewhere

25  we're going to tie all this together and I'm going to

1    understand the distinction you're all trying to make

2    about the bases and whatnot.

3        The question I've really got as to them is, is

4    it relevant if we don't know how the base piece came

5    detached from the bells themselves?  In other words,

6    you know, Mr. Solomon posited the other day that they

7    were soldered and through removing solder, I think,

8    then perhaps the base could be taken off.  But there's

9    no evidence just in the pictures about how that

10   occurred.  We don't know if he sawed it off.  We don't

11   know if they pulled solder off.  We don't know if he

12   just popped it out.  And not knowing that, how is it

13   relevant?

14       MR. SNOW:  Well, it's relevant to show, in fact,

15   that the bases do come off, regardless of how they're

16   removed.

17       You know, the only issue relative to the bases

18   is whether or not it's possible that over the 60-year

19   period that Shearith Israel had the rimonim in their

20   possession in the mid-19th century, whether one base

21   that had the name "Newport" may have gotten switched.

22   And that's what it's offered for.

23       So it does show that, in fact, that the bases

24   are removable because they're shown removed in the

25   photograph.

1          THE COURT:  You know, I'm going to allow a

2     redacted version of 319; that is, I'll allow the

3     pictures in for whatever weight it might be worth, in

4     light of that.  I will not allow the three-page letter

5     attached to it.

6          (Plaintiff's Exhibit 319 (Redacted) was admitted

7     in full)

8          MR. SNOW:  Thank you.

9          THE COURT:  Mr. Solomon, correct me if I'm

10    wrong, but 213, which is the letter from the Museum of

11    Fine Arts to Christie's marked Court -- I believe it's

12    already in.  Wasn't it used either on direct or cross?

13         MR. SOLOMON:  It was used on direct by the other

14    side, and what I said with respect to that, and

15    reaffirm, is we did have this objection and we think

16    that we will argue that it goes to weight, if your

17    Honor should give it, at the appropriate time.

18         MR. SNOW:  Your Honor, I would just add for the

19    record that it's not hearsay.  This is a verbal act.

20    It is actually the offer from the Museum of Fine Arts,

21    the offer to purchase; so it has independent

22    significance.  It's not being offered to prove the

23    truth of it.  It's a verbal act.

24         THE COURT:  Well, there doesn't appear to be any

25    objection to it coming in, and for whatever weight I

1   give it, so 213 will be admitted.

2       (Plaintiff's Exhibit 213 was admitted in full)

3       THE COURT:  204 is an e-mail with an attachment

4   from Christie's which begins to tell the story of the

5   alleged switch or non-switch of the bases.

6       Mr. Snow, who is Marietta Cambareri?

7   C-a-m-b-a-r-e-r-i.

8       MR. SNOW:  I know she's an employee of the

9   Museum of Fine Arts.  I don't think I can be any more

10  specific.

11      THE COURT:  And you want to explain to me how

12  this is not hearsay then?

13      MR. SNOW:  Yes.

14      THE COURT:  It appears to be an e-mail from

15  Christie's, from Christie's to the Museum of Fine Arts

16  attaching notes that posit, I would call them, an

17  opinion about the handles and base.

18      MR. SNOW:  One moment, please.

19      THE COURT:  Sure.

20      MR. SNOW:  Actually the reason we wanted this in

21  really relates to Dr. Mann's testimony because she --

22  this is one of the documents that Dr. Mann references

23  in her report, so perhaps it could come in during

24  Dr. Mann's testimony.

25      THE COURT:  Why don't we defer on that until we

1    hear Dr. Mann's testimony.

2            Exhibit 79, which is "A List of Early American

3    Silversmiths and Their Marks," with silver collectors'

4    glossary, and Exhibit 93, which is American

5    Silversmiths & Their Marks by Stephen G.C. Ensko,

6    E-n-s-k-o, both appear -- I'll ask Mr. Solomon.

7            What's the basis for either of those not coming

8    in?  Both would be 803(16) ancient documents on what

9    could potentially be a relevant issue, which I assume

10   is Myer Myers marks.

11           MR. SOLOMON:  I'm sorry, your Honor, I actually

12   do not know the date of the documents themselves.

13           THE COURT:  So Exhibit 79 is from 1917, and

14   Exhibit 93 is from 1948.

15           MR. SOLOMON:  So, your Honor, I do believe it's

16   inadmissible hearsay.  The other side is trying to use

17   this to offer expert opinion on what silver marks were

18   available.  We don't know anything about the authors.

19   We don't know anything about their competence.  And

20   there's nobody who can actually attest to it.  So even

21   though the documents were more than 20 years old, it

22   itself is full of hearsay, which is not going to --

23   just isn't governed by the 20-year exception.

24           THE COURT:  I'm going to allow both documents

25   under 803(16).  I think this is precisely why 803(16)

1    exists, for this very reason.  The Court will give

2    whatever weight it will to it, but I think for

3    admissibility and non-hearsay purposes they come in

4    under 803(16).  They may even come in under 803(15), I

5    was thinking, but I'm going to rely on 803(16).

6            (Plaintiff's Exhibit 79 was admitted in full)

7            (Plaintiff's Exhibit 93 was admitted in full)

8            THE COURT:  I think that's it.  All right.

9            <u>MICHAEL I. KATZ, DEFENSE WITNESS, RESUMES STAND</u>

10           THE COURT:  Oh, there you are.  Welcome back,

11   Mr. Katz.

12           THE WITNESS:  Thank you.

13           THE COURT:  You remember you're still under

14   oath, sir.

15           THE WITNESS:  Yes, I do, sir.

16           THE COURT:  Okay.  Great.

17           I'm sorry, Mr. Solomon.

18           MR. SOLOMON:  Your Honor had asked that we read

19   into the record the DXs, the Defendants exhibits.

20           THE COURT:  That would be beautiful.

21           MR. SOLOMON:  Would now be a convenient time --

22           THE COURT:  Excellent.

23           MR. SOLOMON:  -- so we can all remember it was

24   at the beginning of the day?

25           THE COURT:  Yes.

1      MR. SOLOMON:  Thank you, your Honor.  So what is

2  not --

3      THE COURT:  No; Mr. Solomon, could you come up

4  here.  It's so much easier for everyone to hear.

5      MR. SOLOMON:  What has not been objected to are:

6  DX1 to DX71.  D73 to D76.  D78 to D79.  D81 to D148.

7  D150 to D154.  D156 to D374.  D376 to D412.

8      And I note, your Honor, there had been an

9  objection to D405.  It was withdrawn by the Plaintiff

10  yesterday.

11      So D376 to D412 is the next clump.  D415 to

12  D485.  D487 to D505.  D507 to D525.  And D527 to D570.

13      THE COURT:  Thank you, Mr. Solomon.  That goes a

14  long way to helping keep the record straight and

15  avoiding unnecessary problems.  I want to again

16  publically thank both counsel for their cooperation in

17  the admissibility of the vast majority of exhibits.

18  Hats off to all of you on that one.

19      Mr. Naftalis.

20      MR. NAFTALIS:  May I inquire, your Honor.

21      THE COURT:  Yes.  Thank you.

22      <u>CONTINUED CROSS-EXAMINATION BY MR NAFTALIS</u>:

23  **Q.**  Good morning, Mr. Katz.

24  **A.**  Good morning.

25  **Q.**  Mr. Katz, when you were on direct examination by

1    your counsel, you recall he showed you a number of

2    documents; correct?

3    **A.**    Yes.

4    **Q.**    And I want to put up on the screen Defendant's

5    Exhibit 365.  Do you see that document, sir?

6    **A.**    Yes, I do.

7    **Q.**    And that was a document, do you recall, that

8    Mr. Solomon asked you questions about on your direct

9    examination?  Do you remember that?

10    **A.**    Yes.

11    **Q.**    And this document was a letter dated, Defendant's

12    Exhibit 365 was a letter dated April 3rd, 2003 from

13    your executive director, Mr. Singer, to someone at the

14    Getty Grant Program; is that correct?

15    **A.**    Yes.

16    **Q.**    And that was a letter written by Mr. Singer in

17    2003 in support of Touro Synagogue, Congregation

18    Jeshuat Israel's application to get funds from the

19    Getty Foundation; correct?

20    **A.**    Yes.

21        MR. NAFTALIS:  And if we could highlight

22    beginning "In 1946."  Not the first sentence --

23    actually leave it both; that's okay.

24    **Q.**    Do you see the yellow highlighted language?

25    **A.**    Yes.

1    **Q.**   By the way, this underlining I think is just

2    things on our copy.  I don't think that's on the

3    original.

4         But let's go to the highlighted language.  It

5    says:  (Reading)  In 1946 Shearith Israel and

6    Congregation Jeshuat Israel dedicated themselves to

7    preserve, protect, maintain and restore the synagogue

8    as a National Historic Site.  In return, the Secretary

9    of the Interior agreed, on behalf of the United States,

10   to cooperate with the congregations in the

11   preservation, protection and restoration of the Touro

12   Synagogue property.

13        MR. SOLOMON:  I object.  I think first with

14   respect to the underscoring, I agree with Mr. Naftalis

15   that there are some documents that may have been

16   underscored much more recently, and before anybody

17   relies on underscoring I think that the parties ought

18   to talk.

19        But I think you skipped a line.  I think you

20   skipped a line in your reading.

21        MR. NAFTALIS:  No, I don't -- I'll read it again

22   just so it's clear.  I'm happy to have a

23   non-underscored copy put up.

24        THE COURT:  The underscore is not the issue.

25   Why don't you just read as it appears in the document,

1    so the record is clear, the yellow highlighted portion.

2    Q.   In 1946 Shearith Israel and Congregation Jeshuat

3    Israel dedicated themselves to preserve, protect, and

4    maintain and restore the synagogue as part of a

5    cooperative agreement when Congress designated the

6    Touro Synagogue a National Historic Site.  In return,

7    the Secretary of the Interior agreed, on behalf of the

8    United States, to cooperate with the congregations in

9    the preservation, protection and restoration of the

10   Touro Synagogue property.

11        Did I read that accurately, sir?

12   A.   Yes.

13   Q.   Now, so it was -- the executive director, I think

14   you indicated, is a paid senior employee at the

15   synagogue, --

16   A.   Yes.

17   Q.   -- Shearith Israel?  So it was no secret at

18   Congregation Jeshuat Israel that -- withdrawn.

19        It was no secret at Congregation Shearith Israel

20   that it had these obligations under the 1945 agreement

21   to preserve, protect, maintain and restore the Touro

22   Synagogue; true.

23        MR. SOLOMON:  Objection.

24        THE COURT:  Overruled.

25   A.   The language as I --

1    **Q.**    It's a yes or no question, sir.

2    **A.**    It doesn't have to be.

3    **Q.**    It will.

4          MR. NAFTALIS:  Your Honor --

5    **A.**    The language in the interior --

6          THE COURT:  Mr. Katz, as was true with other

7    witnesses, Mr. Naftalis is entitled to either a yes or

8    a no answer, or, I can't answer that yes or no.

9    **A.**    I can't answer that.

10   **Q.**    Well, the executive director knew, did he not,

11   that Congregation Shearith Israel had an obligation to

12   preserve, protect, maintain and restore the Touro

13   Synagogue?  Yes or no, sir.

14         MR. SOLOMON:  Objection.

15         THE COURT:  Overruled.

16   **A.**    I can't answer that question.

17   **Q.**    Well, we showed you the 1945 agreement.  Remember

18   that yesterday?

19   **A.**    Yes, I do.

20   **Q.**    And I think you even indicated, did you not, that

21   the 1945 agreement, which is Plaintiff's Exhibit 90,

22   is, was one of the documents, the small number of

23   documents you had on the corner of your desk as

24   important documents relating to the Touro Synagogue;

25   correct?

1    **A.**    Yes.

2    **Q.**    And if you recall, as you see the language that

3    the executive director -- withdrawn.

4         The executive director is your highest

5    non-religious employee at the synagogue; correct?

6    **A.**    Right.

7    **Q.**    And he uses in his letter the same language, does

8    he not, as in the 1945 agreement imposing an obligation

9    on the trustees of Shearith Israel.  Yes or no.

10    **A.**    Yes, but it's a continuation.

11    **Q.**    It's a yes or no question, sir.

12         And by writing this letter to the Getty

13    Foundation, the executive director is acknowledging

14    this obligation, is he not?  Yes or no.

15    **A.**    I can't answer that question.

16    **Q.**    And that obligation, as we've seen, is an

17    obligation that is personally imposed, is it not, on

18    the trustees of Congregation Shearith Israel; correct?

19    **A.**    Subject to other conditions.

20    **Q.**    So the answer is yes.

21    **A.**    No; I can't answer yes.

22    **Q.**    Well, you testified yesterday about, you were

23    shown on direct examination a document which is -- let

24    me find it here somewhere.  (Pause)  Defendant's

25    Exhibit 148.  Remember that?

1          MR. NAFTALIS:  If we could put that up on the

2     screen.

3     **Q.**    Do you remember being shown that document by your

4     counsel, Mr. Solomon, on your direct examination,

5     Defendant's Exhibit 148?

6     **A.**    Yes.

7     **Q.**    And that is a lease dated 1903; is that correct?

8     **A.**    Correct.

9     **Q.**    And just so it's clear, you weren't personally

10    involved in writing this lease; correct?

11    **A.**    Not this one, no.

12    **Q.**    Negotiating this lease?

13    **A.**    No.

14    **Q.**    You weren't even born; right?

15    **A.**    Correct.

16    **Q.**    And you testified on -- so you have no personal

17    firsthand knowledge of this document; true?

18    **A.**    Other than having seen copies of it, no.

19    **Q.**    And you testified, in response to a question by

20    Mr. Solomon, that you said this is a triple net lease.

21    You said that?

22    **A.**    Yes.

23    **Q.**    Would you look at Exhibit 148, Defense

24    Exhibit 148.  Do the words "triple net lease" appear

25    anywhere in that document?

1    **A.**    I only see the cover page of the -- but the effect

2    of it is --

3    **Q.**    No, no.  Mr. Katz, please.

4         THE COURT:  Why don't we get the witness a

5    complete copy of 148, please.

6         MR. NAFTALIS:  Do you have another copy of your

7    document?  Oh, we have one?

8         THE COURT:  And the question, Mr. Katz, is where

9    in here do you -- what is the basis contained in this

10   document -- hold on.

11        The question, Mr. Katz, is based on this

12   document, what is it in this document that forms the

13   basis of your opinion that it's a triple net lease?

14        MR. NAFTALIS:  That wasn't my question.

15        THE COURT:  No, that's mine.  You can ask yours

16   after mine; how's that?

17        MR. NAFTALIS:  I stand totally corrected.

18        THE WITNESS:  You want me to --

19        THE COURT:  Yes, please.

20        THE WITNESS:  In the sense that the -- for a

21   dollar a year they have access and control subject to

22   the lease and subject to other provisions, without any

23   other obligations to the lessor.

24        Normally a lease would have a reasonable rent

25   payable that where the rent would be appropriate to the

1    use of the building; and, here, we gave them the lease

2    for just a dollar a year.

3         And my understanding is that without their

4    having to pay us anything else, it's -- that is a term

5    that I thought was triple net lease.

6         THE COURT:  So you're inferring a triple net

7    aspect based upon your read of the entire document,

8    primarily the payment of only a dollar?

9         THE WITNESS:  Yes.

10        THE COURT:  Okay.  Thank you.  Mr. Naftalis.

11   **Q.**   And the words "triple net lease" do not appear in

12   this document?

13   **A.**   No.

14   **Q.**   And you were asked this question by Mr. Solomon at

15   Page 31 Line 19:

16        Question:  And by "triple net," that's two

17   different words, triple net.  Is your understanding

18   they are responsible for all expenses?

19        Answer:  Correct.

20        Would you show us in the document where it says

21   that Jeshuat Israel is responsible for all expenses?

22   **A.**   Well, I would say we're not -- the lessor is not

23   responsible and the, under any lease.  All they have,

24   here --

25   **Q.**   No.  My question is can you show me in the

1    document words which say that Jeshuat Israel is

2    responsible for all expenses?

3    **A.**    Please give me a minute to read through this.

4         (Pause)

5    **A.**    Well, I would say here that in, without having

6    finished the reading of the document --

7    **Q.**    Finish the reading.  I'd like you to see if you

8    can find anything which explicitly says that

9    Congregation Jeshuat Israel is responsible for all

10   expenses, as you so testified on your direct

11   examination.

12        (Pause)

13   **A.**    On page three of the document, the paragraph, the

14   second one from the bottom, it says: (Reading)  And at

15   the expiration of the said term, the said party of the

16   second part will quit and surrender the premises hereby

17   demised in as good state and condition as reasonable

18   use and wear thereof will permit, damages by the

19   elements excepted.

20        So to me --

21   **Q.**    No, no.

22        THE COURT:  Let him finish the answer.

23   **A.**    So to me that means that the lessee is responsible

24   for the maintenance of the facilities.

25   **Q.**    Isn't that a standard provision in any lease that

1    you're, that the lessee is supposed to return to the

2    lessor your apartment or your house or your office in

3    good condition; not destroyed?  Isn't that a pretty

4    standard provision in any lease, sir?  Yes or no.

5    **A.**   It is, but --

6    **Q.**   It's a yes or no question.  I'm sorry.

7    **A.**   I can't answer it that way then.

8    **Q.**   So you don't know whether that's a standard

9    provision in any lease, whether an apartment, a

10   residence or an office?  Yes or no.

11   **A.**   Yes, with that limitation that you stated.

12   **Q.**   And there is no explicit provision in this lease,

13   is there, that says Congregation Jeshuat Israel is

14   required to pay every single expense, as you so

15   testified on direct, in connection with the Touro

16   Synagogue building.  Yes or no, sir.

17   **A.**   I don't believe I can answer that question.

18   **Q.**   You're unable to answer the question?

19   **A.**   Because there are other --

20   **Q.**   Isn't it a fact, sir, that those words do not

21   appear in this document?  Yes or no.

22   **A.**   They do not appear in this document.

23   **Q.**   Now --

24         THE COURT:  Mr. Naftalis, before you leave this

25   document, could I just ask if the parties are in

1    agreement as to what the handwriting on Page 2

2    represents.  I can read maybe some of the words, but

3    I'm wondering if you folks that have spent more time

4    with these documents, it's after the word

5    "appurtenances," it looks to me like it says "and

6    paraphernalia belonging therein"?

7         MR. SOLOMON:  Thereto.

8         THE COURT:  Thereto.  Do all the parties --

9         MR. NAFTALIS:  I don't think there's any dispute

10   as to the handwriting.

11        MR. SOLOMON:  There's agreement, your Honor,

12   because there's a separate writing that it says at

13   these and then --

14        MR. NAFTALIS:  I don't want him to --

15        THE COURT:  Go ahead, Mr. Solomon.

16        MR. SOLOMON:  And then in the subsequent lease

17   in 1908 those words were added.  And the last page of

18   this document the handwriting says and these were added

19   here.

20        THE COURT:  And I had thought I had seen it

21   somewhere, and then I just thought maybe I was reading

22   that.  But that clears it up.  Thank you.

23        MR. NAFTALIS:  We have no, there's no dispute

24   what those words say.  Obviously there is a -- you can

25   use your own disagreement about what, if any,

1    significance they may have.

2         THE COURT:  I'm going to take it as a victory

3    that we can agree on what they say.  Look for the

4    little things here.

5         MR. NAFTALIS:  My generation, when Senator Aiken

6    said we should declare victory in Vietnam and go home.

7         THE COURT:  You can't go home just yet.

8    Q.   I think you -- I asked you some questions on

9    cross-examination about -- withdrawn.

10        I think you testified both on direct and a

11   little earlier on cross-examination about a 2005

12   presentation that was made to your board of trustees to

13   get financial help in connection with the campaign to

14   save Touro Synagogue.  Do you remember that?

15   A.   Yes.

16   Q.   And I think we showed you documents yesterday; I

17   think Exhibit 507.  Do you remember that?

18   A.   I couldn't tell you which one that was.

19   Q.   But we showed you the Minutes --

20   A.   Right.

21   Q.   -- reflecting that meeting?

22   A.   Yes.

23   Q.   And we also showed you the PowerPoint, or the

24   notes of the presentation, which is Exhibit 509.

25   Remember we went through that?

1    **A.**    Right.

2    **Q.**    Now, on your direct examination you testified that

3    an Ambassador Loeb was at that 2005 presentation and

4    that he, and had asked for money for the Loeb visitor

5    center.

6          Do you recall saying that on direct?  Yes or no,

7    sir.

8    **A.**    Yes.

9    **Q.**    And as a matter of fact at Page 42 in response to

10   a question by Mr. Solomon, you said:  (Reading)  The

11   presentation included Ambassador Loeb, and he laid

12   forth his plans to build a visitor center on the

13   grounds adjoining the Touro Synagogue.  He asked, and

14   there were several people there who were from the

15   Friends of Shearith -- of Jeshuat Israel.  They

16   described this, and they asked for help and asked us to

17   give if we would be able to support them.

18          Do you remember giving that answer?

19   **A.**    Yes.

20   **Q.**    Well, in fact, Ambassador Loeb wasn't even at that

21   meeting; true?

22   **A.**    My recollection was that he attended a meeting at

23   the synagogue with a delegation from the Friends of the

24   Touro Synagogue and possibly some board members from

25   the synagogue.  I distinctly remember meeting him at a

1    meeting.

2        MR. NAFTALIS:  Why don't we put up Exhibit 507,

3    Defense Exhibit 507.

4    Q.    You remember I showed you this document yesterday?

5    A.    Yes.

6    Q.    This is your Congregation Shearith Israel's

7    Minutes of the trustees meeting of May 17th, 2005.  Do

8    you see that?

9    A.    Yes.

10   Q.    And it lists the people who are present; correct?

11   A.    Yes.

12   Q.    The top part lists the trustees who were there?

13   A.    Yes.

14   Q.    You're one of them?

15   A.    Yes.

16   Q.    Lists the honorary trustees who were there?

17   A.    Yes.

18   Q.    And it lists the guests; right?

19   A.    Yes.

20   Q.    And the guests include Mr. Aidinoff, the

21   distinguished lawyer about whom you've testified?

22   A.    Yes.

23   Q.    Mr. Balaban, the executive, the then-executive

24   director of Touro Synagogue, Congregation Jeshuat

25   Israel; correct?

1   **A.**   Yes.

2   **Q.**   Laura Pedrick, who was then the co-president of

3   the Touro Synagogue, Congregation Jeshuat Israel?

4   **A.**   Yes.

5   **Q.**   Dr. Groopman, right, and others; right?

6   **A.**   Yes.

7   **Q.**   There's no listing that Ambassador Loeb was there;

8   correct?

9   **A.**   I see that.

10  **Q.**   Now, and as a matter of fact, at the time of this

11  presentation they weren't asking for any money for the

12  Loeb visitor center, were they?  Yes or no.

13  **A.**   I can't answer that question.

14  **Q.**   Well, let's turn to Exhibit 509, another document

15  we showed you yesterday, and if we could go to the very

16  last page of it.  And I'm referring to, this is

17  Defendant's Exhibit 509.  Before we get to that --.

18        These were the notes, by the way, 509 you

19  identified yesterday as the notes of the presentation

20  that was made by the representatives of Touro

21  Synagogue, Congregation Jeshuat Israel; correct?

22  **A.**   Yes.

23  **Q.**   And lays out all the problems they're having and

24  their needs for funds to do the restoration of the

25  synagogue; correct?

1    **A.**    Yes.

2    **Q.**    And the yellow highlighted language, We look

3    forward -- you see that?

4    **A.**    Yes.

5    **Q.**    And that's their request for funds for the

6    restoration project of the Touro Synagogue; correct?

7    Is it?  Yes or no.

8    **A.**    No, it's not.

9    **Q.**    Well, why don't we look down further.  There's a

10    list of all the projects; right?  Do you see that?

11    **A.**    Yes.

12    **Q.**    And then there's a list on the right-hand side of

13    something called -- first it has the Project, right, on

14    the left-hand column?

15    **A.**    Yes.

16    **Q.**    It has the total cost in the middle?  Do you see

17    that?

18    **A.**    Yes.

19    **Q.**    And then it has Remaining Needs.  Do you see that?

20    **A.**    I see that.

21    **Q.**    And it lists -- there's a number of projects there

22    which say Funding Complete.  Do you see that?

23    **A.**    Yes.

24    **Q.**    And one of the projects which says Funding

25    Complete is the visitor center; correct?  That's what

1    it says?

2    **A.**    Yes.

3    **Q.**    And then remaining needed is a dollar number of a

4    million dollars; true?

5    **A.**    Yes.

6    **Q.**    And that's under Conservation; correct?

7    **A.**    Yes.

8    **Q.**    And this was all part of a campaign which was

9    called the Campaign to Save Touro Synagogue; correct?

10    **A.**    Yes.

11    **Q.**    Sir, I think you testified on your direct

12    examination by Mr. Solomon about the fact that you have

13    and that your synagogue, Shearith Israel, itself faces,

14    you know, fundraising issues and maintenance issues and

15    other things that any synagogue or not-for-profit has

16    to deal with.  Is that right?

17    **A.**    Yes.

18    **Q.**    And I just want to get some sense of Shearith

19    Israel, a little bit about Shearith Israel.  You're a

20    much bigger congregation than Congregation Jeshuat

21    Israel, Touro Synagogue, aren't you?

22    **A.**    Larger membership, yes.

23    **Q.**    You have close to a thousand members?

24    **A.**    No.

25    **Q.**    How many members do you have?

1    **A.**   We run 350, 400 members.

2    **Q.**   Those are families?

3    **A.**   Those are individuals.

4    **Q.**   Well, member units also include family units,

5    correct, as well as individual units?

6    **A.**   I'm not sure on that.

7    **Q.**   In any event, you, and I think you indicated that

8    you have, like Touro Synagogue, Congregation Jeshuat

9    Israel, you have a historic building; correct?

10   **A.**   Yes.

11   **Q.**   A beautiful building that you care about?  It's on

12   Central Park West in Manhattan?

13   **A.**   Yes.

14   **Q.**   I think you also testified on direct examination

15   that you also, you, by "you" I mean, you're not that

16   rich, by "you" I meant Shearith Israel, that Shearith

17   Israel also owns adjoining properties next door on

18   Central Park West to the synagogue; correct?

19   **A.**   It's our school building.

20   **Q.**   And maybe properties elsewhere; correct?

21   **A.**   Only cemeteries.

22   **Q.**   Now, I think you indicated that you raise a

23   million, I think you testified that every third year

24   there would be a breakfast where you would raise a

25   million dollars to deal with your deficits.  Is that

1    correct?

2    **A.**    When I first joined the board, there was a

3    practice where some of the wise men from the old, from

4    old families would come and raise a million dollars

5    every three years.  It's no longer the practice.

6    **Q.**    The old days sometimes were better.

7          And I think there's been testimony about the

8    budget of Jeshuat Israel.  Do you remember that?

9    **A.**    Yes.

10   **Q.**    And you know that it's in the neighborhood of,

11   before they cut back and terminated all their paid

12   employees, it was in the $350,000 range?

13   **A.**    Yes.

14   **Q.**    And what's your budget?

15   **A.**    Our budget, I am not -- I wouldn't be precise to

16   give any number, but it's somewhere under a million

17   dollars, I believe, but I could be incorrect on that.

18   **Q.**    Now, you have, and I think there's been testimony

19   in terms of comparing the financial needs of the --

20   that you remember that Jeshuat Israel, in order to cut

21   back to meet its expenses, had to let go its paid

22   executive director.  Do you remember that?

23   **A.**    Yes.

24   **Q.**    And secretary?  Do you remember that?

25   **A.**    Yes.

1    **Q.**    And cut -- and stop heating their community house

2    and shutting it down in the winter to save money?

3    **A.**    Yes.

4    **Q.**    And essentially the synagogue, other than the

5    rabbi and maybe the maintenance man, are run by

6    volunteers?

7    **A.**    Yes.

8    **Q.**    Now, Shearith Israel has a number of paid people;

9    correct?

10    **A.**    Correct.

11    **Q.**    You have three rabbis; correct?

12    **A.**    There is outside funding from members directly for

13    the rabbis.

14    **Q.**    Whatever it be, you have three rabbis; correct?

15    **A.**    Yes.  We have two main rabbis and we have our

16    hazzan is a rabbi.

17    **Q.**    And you have a paid executive director?

18    **A.**    Yes.

19    **Q.**    You have a paid program director?

20    **A.**    Yes.

21    **Q.**    You have a paid ritual director?

22    **A.**    Yes.

23    **Q.**    You have a paid facilities manager?

24    **A.**    That's a very fancy title for what he is.

25    **Q.**    You have paid office assistants?

1    **A.**    Yes.

2    **Q.**    You have paid executive assistants?

3    **A.**    Yes.

4    **Q.**    You have paid financial associates?

5    **A.**    I'm not sure what you mean by "paid financial

6    associates."

7    **Q.**    It's on your website.  Do you have paid financial

8    associates?

9    **A.**    I don't know what the term means.

10   **Q.**    Do you have paid communication associates?

11   **A.**    Yes.

12   **Q.**    Do you have an office manager?

13   **A.**    I'm not sure whether the office manager has more

14   than one job.

15   **Q.**    And you have a choir master, paid?

16   **A.**    Yes.

17   **Q.**    And I think you told us you became a member of

18   Congregation Shearith Israel in the mid eighties?  I

19   think; again, I'm not trying to pin you down on dates.

20   **A.**    '84, I believe.

21   **Q.**    And I think you said your wife's family had been a

22   member?

23   **A.**    Yes.

24   **Q.**    You, you yourself, had never been a member before?

25   **A.**    Correct.

1    **Q.**    Your parents hadn't been members; your

2    grandparents?

3    **A.**    No.

4    **Q.**    And I take it your synagogue is welcoming.  You

5    don't have to be descended from the people of the

6    Jewish faith who started Shearith Israel in the

7    17th century to be a member of Shearith Israel?

8    **A.**    Not at all.

9    **Q.**    I mean, Shearith Israel is open to anyone who

10    prays in the same manner with the same adherence --

11    **A.**    Open to anyone who is Jewish.

12    **Q.**    Right.  And, indeed, a very substantial number of

13    your members do not in any way trace themselves back to

14    colonial times?

15    **A.**    Most do not.

16    **Q.**    In fact, many come from people fleeing from

17    eastern Europe, persecutions there, and the like;

18    right?

19    **A.**    Yes.

20    **Q.**    And I take it that the fact that Jeshuat Israel,

21    that they have a lot of members whose families descend

22    from fleeing persecution from Poland and Russia and

23    eastern Europe too; right?

24    **A.**    Yes.

25    **Q.**    And I would take it you agree that's not a

1    legitimate basis for denying their rights to be a

2    congregation praying in the Touro Synagogue; correct?

3    **A.**    That's not a legitimate right.

4    **Q.**    And I take it you would also agree that's not a

5    legitimate right to say that they're not beneficiaries

6    under any trust for the benefit of the Jewish society

7    of Newport; is that --

8    **A.**    I'm sorry, what's not a legitimate right?

9    **Q.**    I mean, the fact that the membership comes in

10    large measure from eastern Europe is not a legitimate

11    right for them not being beneficiaries, is not a

12    legitimate basis for saying they're not beneficiaries

13    of a trust for the benefit of the Jewish society of

14    Newport, is it?

15    **A.**    Correct.

16    **Q.**    By the way, I think you told us about your visit

17    to Newport in 1998, --

18    **A.**    Correct.

19    **Q.**    -- the one time you went.  And I think you

20    testified on your visit, your one visit there you

21    participated in the George Washington letter reading

22    thing.  You were honored, you got to read one of the

23    letters, the Seixas letter, probably.

24    **A.**    I don't -- I would think I read the Seixas letter,

25    and Bernie Aidinoff read the Washington response, but I

1    don't remember exactly.

2    **Q.**    And then you went to services?

3    **A.**    The day before.

4    **Q.**    And when you walked into the synagogue on those

5    two occasions, did you see that there is a big plaque

6    right on the wall?

7         MR. NAFTALIS:  We want to put up Exhibit 260,

8    Plaintiff's 260.  I apologize; I gave you the wrong

9    number.  320.

10   **Q.**    Showing you 320.  It's a picture of the Touro

11   Synagogue, is it not, sir?

12   **A.**    Yes.

13   **Q.**    And you notice there's, where I'm pointing --

14        MR. NAFTALIS:  Would you point with the red

15   arrow here, right here.

16   **Q.**    -- that's the gate where you enter; right?

17   **A.**    Yes.  Uh'huh (affirmative).

18   **Q.**    And then you walk by a plaque on the wall on the

19   right side there?  You see it?

20   **A.**    Yes.

21   **Q.**    To get into the synagogue.  And --

22   **A.**    I also see the plaque on the left of the doorway

23   of the entrance there that's -- but I see that one.

24   **Q.**    I know you're anxious, but let me just --.

25        MR. NAFTALIS:  If we could put up 261.

**Q.**    That's the plaque on the right side, Plaintiff's Exhibit 261 is the plaque on the right side of the synagogue as you enter it; correct?

**A.**    Yes.

**Q.**    And that's the plaque which identifies Touro Synagogue of Jeshuat Israel Congregation Founded 1658 as a National Historic Site.

**A.**    Yes.

**Q.**    Did you see that plaque when you entered the synagogue that time?

**A.**    I assume I did, but I don't remember it specifically.

**Q.**    And did you read it?

**A.**    I'm sure I did.

**Q.**    You didn't find anything objectionable on the plaque, did you, when you read it?

**A.**    I wasn't, um --

**Q.**    No.  My question is based on your memory.  Did you find anything objectionable on the plaque when you read it?

**A.**    In 1998 I didn't know enough to find anything objectionable.

**Q.**    And you certainly didn't complain to anybody about any language on this plaque being in any way incorrect or inaccurate; right?

1    **A.**    That's correct.  But I had very little; just

2    regular knowledge of a visitor at that point.

3    **Q.**    By the way, during the George Washington letter

4    reading, they open the cemetery so anybody can go up

5    and see it?

6    **A.**    That's true.

7    **Q.**    Did you make an effort to go up and visit the

8    colonial cemetery on that trip?

9    **A.**    I have an aversion to a lot of cemeteries, so I

10   don't remember whether I went in.

11           MR. NAFTALIS:  If we could put up --.

12   **Q.**    Now, during your direct examination, you were

13   shown, you were asked about -- withdrawn.

14           I think on your direct examination, I think you

15   were asked about the fact that you folks met and issued

16   a cease and desist letter.  Do you remember that?

17   **A.**    Yes.

18   **Q.**    And you did that shortly after you got Ms. Ross's

19   response?  Do you remember that?

20   **A.**    Yes.

21   **Q.**    And I think after you issued the cease and desist

22   letter, I think we -- and I'm not going to repeat the

23   testimony, I'm just using it just to focus on

24   something -- I think you testified that Mr. Edinger,

25   who is one of your employees at the synagogue, at

1    Shearith Israel synagogue, was given an assignment;

2    right?

3    A.    Yes.

4    Q.    And was Mr. Edinger at that time given an

5    assignment to prepare any written materials as to what

6    was in the best interest of the Touro Synagogue?  Yes

7    or no, sir.

8    A.    I can't answer that question.  He was -- can I

9    tell you what my understanding of what his assignment

10    was?

11    Q.    Let me start again.  You've already testified

12    about his assignment.  Let me just -- I'm putting a

13    very simple question to you.

14        Did you or anybody else, after the cease and

15    desist letter was issued, also ask Mr. Edinger to

16    prepare any written materials as to what was in the

17    best interest of --

18    A.    My understanding was that he was --

19    Q.    Please, please, Mr. Katz.  Let me start again just

20    because my question may have been unclear, and you may

21    have thought I finished, so I apologize.

22        You testified yesterday about the assignment

23    that Mr. Edinger was given to find historical materials

24    to support your position; true?  Okay.  Let me ask

25    you -- and we've testified, and I don't want to repeat,

1    burden his Honor with hearing it again.

2         And we showed you his report.  Remember?

3    **A.**    Right.

4    **Q.**    Okay.  My question is a simple, narrow one.  Did

5    you also at that time ask Mr. Edinger to prepare any

6    written document as to what was in the best interest of

7    the Jewish society of Newport, Touro Synagogue, or

8    Congregation Jeshuat Israel?  Yes or no.

9    **A.**    I have no idea.  I was not the person who assigned

10   it.

11   **Q.**    So you have no knowledge.  So as you sit here now

12   you have no knowledge whether such an assignment was

13   ever given to Mr. Edinger; correct?  It's a yes or no

14   question, sir.

15   **A.**    No; I'm sorry.  I was told that he was asked to --

16        MR. NAFTALIS:  Your Honor.

17        THE COURT:  You have to answer it yes or no,

18   Mr. Katz.

19   **A.**    He, he was asked -- he was given an assignment to

20   go through the documents, and I don't recall that it

21   had, that he was asked to give a preference one way or

22   the other, but he was asked to go through the

23   documents.

24   **Q.**    Did you ever see a written report at that time

25   from Mr. Edinger as to what would be in the best

1    interest of the Congregation Jeshuat Israel, the Jewish

2    society of Newport, or the Touro Synagogue?  Yes or no.

3    Did you ever see such a report?

4    **A.**    I did not see such a report.

5    **Q.**    By the way, on your direct examination I believe,

6    I think you were asked the question regarding the

7    period after the cease and desist letter, and as to the

8    reasons that you gave, the reasons why you killed the

9    sale to the Museum of Fine Arts.  Do you remember that?

10         MR. SOLOMON:  Objection.

11         THE COURT:  Sustained.

12         MR. NAFTALIS:  I know the reason; I know the

13    reason why that's sustained.  Let me rephrase it.

14    **Q.**    I think you testified in response to questions by

15    Mr. Solomon as to the reasons why Congregation Shearith

16    Israel opposed the sale of the one set of Myer Myers

17    rimonim to the Museum of Fine Arts.  Do you remember

18    that?

19    **A.**    Yes.

20    **Q.**    And I think you testified, you gave -- I think the

21    first reason you gave is:  We own it, they don't;

22    right?  We own it; not Congregation Jeshuat Israel or

23    the Touro Synagogue.  We're the owners.  Right?

24    **A.**    Right.

25    **Q.**    That was reason number one.  You also said that

1    you opposed selling religious articles.  That was

2    reason number two?

3    **A.**    Yes.

4    **Q.**    And reason number three is, you said something

5    about we were holding them for the Jews of Newport.  Do

6    you remember saying that?

7    **A.**    Yes.

8    **Q.**    And is there a document?  There's no document that

9    says that Congregation Shearith Israel is holding the

10   rimonim for the Jews of Newport, is there?  There's no

11   such document?

12   **A.**    The document that --

13   **Q.**    No.  It's a yes or no question, sir.

14          Have you ever seen a document that says

15   explicitly that Congregation Shearith Israel holds the

16   rimonim for the Jews of Newport?  Yes or no.

17   **A.**    I've seen a document that says we're holding --

18   the deeds say that.

19   **Q.**    It uses the words Jews of Newport?

20   **A.**    For the Jewish -- I believe it says for the Jewish

21   community of Newport.

22   **Q.**    It says for the Jewish society of Newport?

23   **A.**    Society of Newport.

24   **Q.**    Okay.  And the Jewish society of Newport is a

25   different phrase and a different term than the Jews of

1    Newport; correct?

2    **A.**    Depends on the period.

3    **Q.**    Could you please answer my question yes or no.  Is

4    it a different -- are those different words?  Yes or

5    no, sir.

6    **A.**    Different words, but similar meaning.

7         MR. NAFTALIS:  Move to strike.

8         THE COURT:  The motion to strike is granted.

9    You have to answer the question yes or no, Mr. Katz.

10   **A.**    Yes.

11   **Q.**    And the document that you referenced, as well as

12   the other document that was on the little pile of

13   documents on the corner of your desk, the 1945

14   agreement, Plaintiff's Exhibit 90, talk about the

15   Jewish society of Newport; right?

16   **A.**    Yes.

17   **Q.**    And the 1945 agreement was signed by three

18   parties; correct?

19   **A.**    Correct.

20   **Q.**    It was signed by the trustees of Shearith Israel;

21   correct?

22   **A.**    Right.

23   **Q.**    It was signed by the United States of America?

24   **A.**    Yes.

25   **Q.**    And it was signed by Congregation Jeshuat Israel;

1    correct?

2    **A.**    Yes.

3    **Q.**    And nobody else from Newport signed that document;

4    right?

5    **A.**    Correct.

6    **Q.**    And, in fact, and I think we showed you yesterday

7    Plaintiff's Exhibit 31, the will of Mr. Rivera; right?

8    **A.**    Yes.

9    **Q.**    With the same language that appears in the 1945

10    agreement; correct?

11    **A.**    Yes.

12    **Q.**    And we also showed you Plaintiff's Exhibit 86, 87,

13    and 88, which show the history of how that language got

14    into the agreement.  Remember?

15          MR. SOLOMON:  Objection.

16          THE COURT:  Overruled.

17    **Q.**    You may answer.

18    **A.**    I beg your pardon?

19    **Q.**    Oh, you did answer?

20    **A.**    What was the question?

21          MR. NAFTALIS:  Did he answer?

22          THE COURT:  There's no answer on the record.

23          MR. NAFTALIS:  You want to read back the

24    question.

25          (Question was read)

1    **A.**    Yes.

2    **Q.**    And Mr. Lustig is a colleague of yours?

3    **A.**    Yes.

4    **Q.**    And he's one of the three most, the three --

5    **A.**    He's a co-officer.  He's a vice president.

6    **Q.**    And you know, and you know Mr. Lustig has referred

7    to Congregation Jeshuat Israel as the incarnate, the

8    present incarnation of the Jews of Newport; right?

9    **A.**    I do not know that.

10   **Q.**    Now, while we're finding that.

11        The Touro Synagogue has been around a long time;

12   right?

13   **A.**    The synagogue has, yes.

14   **Q.**    And the building, and it's a place where the Jews

15   of Newport have prayed for over a quarter -- over

16   250 years; right?

17   **A.**    No, that would be incorrect.  They came in 1658,

18   and by 1820 there were almost no Jews in Newport; so

19   it's under 200.  It's 170 years.

20   **Q.**    Well, let me direct you, let me go back to show

21   you from Mr. Lustig's deposition transcript --

22        MR. NAFTALIS:  Which I think has been part of

23   the designations, your Honor, and testimony here.

24        THE COURT:  It's actually technically considered

25   his testimony at this trial now.

1    MR. NAFTALIS:  Yes.

2  **Q.**   And the question -- what page is this?  73 Line 8:

3    Question:  Right.  And you didn't believe that

4  Shearith Israel owed a fiduciary duty to Congregation

5  Jeshuat Israel; isn't that right?

6    Objection by Mr. Solomon.

7    Answer:  I can't speak from a legal perspective,

8  but there is a historic connection between the two

9  congregations.  There is, more to the point, an

10  historic connection between Congregation Shearith

11  Israel and I'll call it generally the Jews of Newport,

12  of which it appears that CJI is the current incarnation

13  of that.

14    Does that refresh your recollection, sir?

15  **A.**   I don't remember seeing it before, but.

16  **Q.**   You don't dispute what he said about CJI being the

17  current incarnation --

18  **A.**   I would underline current.

19  **Q.**   Let me just finish my question.  You don't dispute

20  Mr. Lustig's view, who is one of your most senior

21  officers, that Congregation Jeshuat Israel is the

22  current incarnation of the Jews of Newport, do you?

23  Yes or no.

24  **A.**   I do.

25  **Q.**   And the Jewish society of Newport, those are the

1    words; right?

2    **A.**    Yes.

3    **Q.**    Not the Jews of Newport.  The Jewish society of

4    Newport, that refers to the Jews and congregation that

5    has prayed and prays in the Touro Synagogue, doesn't

6    it?  Yes or no.

7    **A.**    No.

8    **Q.**    Have you ever heard of anybody else other than

9    Congregation Jeshuat Israel referred to as the Jewish

10   society of Newport?  Yes or no.

11   **A.**    Yes.

12   **Q.**    By whom?

13   **A.**    It's the society -- it's the synagogue that was

14   started by the Jews in 1654 and which went out of

15   existence in 1820 or so.  That's, to me, the Jewish

16   society of Newport.

17   **Q.**    And so the words that were put in the agreement in

18   1945 about the trust for the Jewish society of Newport

19   had no meaning?  Is that your testimony?  Yes or no,

20   please.

21        MR. SOLOMON:  Objection.  Misstates the

22   document.  The document never says that.

23        THE COURT:  It's cross-examination.  You can

24   correct that on redirect.  The objection is overruled.

25   **A.**    What was the question again?

1          MR. NAFTALIS:  You may read it back.

2          (Question was read)

3     **A.**   Yes.  That's my testimony.

4     **Q.**   Now, I think --

5          MR. NAFTALIS:  Can I just have one minute just

6     to consult with my --.

7          (Pause)

8          MR. NAFTALIS:  Can we put up 168.

9     **Q.**   Mr. Katz, you ready?  I think it's perfectly clear

10    you have strong, positive feelings about your

11    synagogue; right?

12    **A.**   Yes.

13    **Q.**   And you've been actively involved in that

14    synagogue?

15    **A.**   Yes.

16    **Q.**   And you care very much about how it does; right?

17    **A.**   Yes.

18    **Q.**   And that, I take it, that's one of the reasons

19    you're a trustee there?

20    **A.**   Yes.

21    **Q.**   And you know and have no reason to believe that

22    the folks at Jeshuat Israel don't love their synagogue,

23    Touro Synagogue; correct?

24    **A.**   Absolutely.

25    **Q.**   Indeed, you seem -- you saw Mr. Bazarsky testify

1    about how strongly he feels about it?

2    A.    Yes.

3    Q.    You've had conversations with Ms. Ross, and you

4    know how strongly she feels about it?

5    A.    Yes.

6    Q.    You've seen the folks in the audience from the

7    synagogue here who feel so strongly about it; right?

8    A.    Yes.

9    Q.    And indeed, if we could go to page, indeed in

10   Mr. --.

11         And do you remember we showed you yesterday

12   Plaintiff's Exhibit 168, which was the trustee report?

13   A.    Yes.

14   Q.    And if we could go to Page 2.

15         MR. NAFTALIS:  Bill, just highlight the top

16   paragraph here.

17   Q.    And this was Mr. Groopman; he was reporting on a

18   visit to the Touro Synagogue?

19   A.    Yes.

20   Q.    And this Exhibit 168; I think we've shown you a

21   number of documents.  You saw a number of other

22   documents where Touro Synagogue and Congregation

23   Jeshuat Israel are used interchangeably; right?

24   A.    Right.

25   Q.    In your own writings; right?  What did

1    Mr. Groopman write in the yellow highlighted part?

2    **A.**   You want me to read it?

3    **Q.**   Yes, please.

4    **A.**   (Reading)  I have found the Touro Synagogue and

5    the Foundation to be both an active, alive Jewish

6    congregation in a relatively small Jewish community and

7    committed to the preservation and mission of the

8    synagogue and its historical and cultural significance.

9    **Q.**   You know that this congregation, Jeshuat Israel,

10   has prayed at the Touro Synagogue for 120 years?

11   **A.**   Yes.

12   **Q.**   And they, as you remember from the, your own

13   testimony about the trips, including the 2005 trip of

14   the Campaign to Save Touro Synagogue and their efforts;

15   right?

16   **A.**   Yes.

17   **Q.**   And they've worked to preserve, maintain and

18   restore the Touro Synagogue, haven't they?

19   **A.**   Yes.

20   **Q.**   And you really don't want that congregation to

21   die, do you?  Yes or no.

22   **A.**   There will be a congregation there regardless of

23   what happens to the present community.  And the,

24   their -- I don't want the community -- I don't want the

25   synagogue to become just a museum.

1    **Q.**   My question is do you want, do you really want

2    that congregation, Jeshuat Israel, to die?  Yes or no,

3    sir.

4    **A.**   I do not.

5           MR. NAFTALIS:  Thank you.  I don't have anything

6    else.

7           MR. SOLOMON:  I have redirect, your Honor.

8           THE COURT:  Excuse me?

9           MR. SOLOMON:  I would like to redirect.

10          THE COURT:  Right.  But we had talked yesterday

11   about maybe you wanting some time.  Maybe we should

12   take the mid-morning break.

13          MR. SOLOMON:  That's fine.

14          THE COURT:  Mr. Katz, you can step down.

15          I've got, Mr. Solomon, though, before we break

16   I've got a couple of document questions for you, just

17   so the record is clear.

18          You had admitted, and Plaintiffs can check on

19   this as well, you had admitted Exhibits 1 through 71,

20   and included in 1 through 71 are what appear to be

21   documents that are demonstrative of or for ID only, so

22   let's just double check our exhibits.

23          So was the rent payment pack, if I can call it

24   that, of documents that I believed we called

25   Defendant's 3 for ID, and there's, in the material that

1    you sent up, another Defendant's 3.

2         MR. SOLOMON:  So I can try to clarify, if your

3    Honor please.

4         THE COURT:  That would be great.  Can you pull

5    the mic up, Mr. Solomon, or come to the middle.

6         MR. SOLOMON:  Yes.  Of course.

7         THE COURT:  It might be better for you to stay

8    there with the people that have document knowledge.

9         MR. SOLOMON:  That might actually have the

10   answers?  Thank you, you Honor.

11        So the documents that I read into the record

12   before are marked D for DX1 through 71, and those are

13   all documents in.

14        THE COURT:  Those are in as full exhibits?

15        MR. SOLOMON:  As full.

16        THE COURT:  Okay.

17        MR. SOLOMON:  We also began, as the trial began,

18   with some demonstratives.  We've tried to be clear

19   about that by identifying those as DDXs, or DDs,

20   1 through, and we were up to Number 7 when your Honor

21   yesterday, I think, correctly suggested that we should

22   mark as a demonstrative for ID only the opening slides.

23        And I had understood that DD7, the rent portion

24   of that, which is just a portion of the opening

25   demonstratives, and I was going to -- it was my job to

1    check to see whether we were up to Number 7, and we

2    were, your Honor.

3            And so your Honor can either call the totality

4    of the opening slides DD7, or we can mark that as DD8

5    and then just this excerpt as DD7.  But the reason

6    why -- but I do think that there is a separate D3, and

7    that's a document that's in in full.  And then there

8    are a number of demonstratives running up to Number 7

9    that are not evidence that have been used for

10   identification only.

11           THE COURT:  So why don't we do this.  That

12   explanation makes perfect sense.

13           Why don't you or your folks get with Ms. McGuire

14   during the break or lunch or tonight and just verify,

15   and maybe someone from the Plaintiff just to verify

16   that we have the correct demonstrative exhibits --

17   because we clearly have the correct ones that you've

18   put in the box -- so we can look through those 1

19   through 7.

20           I don't see a reason for marking the rent

21   payment-only pullout from DD7 as a separate exhibit.

22   It's contained in the original slides.  That isn't a

23   problem.

24           MR. SOLOMON:  Thank you, your Honor.

25           THE COURT:  Vickie, does that make sense?

1          THE CLERK:  We'll do the demonstratives as DD.

2          THE COURT:  Beautiful.  And DD for ID only.

3      Great.  Anything else?

4          THE CLERK:  That's it.

5          THE COURT:  Thanks.  We'll see you folks back at

6      11:15.

7          Today is going to be one of those days that

8      we're back at two o'clock from lunch, for planning

9      sake, so we'll break 12:30 to two today.

10         (Recess)

11         THE COURT:  Mr. Solomon, redirect.

12         MR. SOLOMON:  Thank you, your Honor.

13     And, Mr. Katz, thank you so much for all of the time

14     this has taken.  I've got to get you out of here, I

15     appreciate that, but I do have some questions.

16              REDIRECT EXAMINATION BY MR. SOLOMON:

17     Q.   You are not -- you are a lawyer, but you're not a

18     litigator; right?

19     A.   This is the first time I've been in a litigating

20     courtroom.

21     Q.   And it's the first time you've testified; is that

22     right?

23     A.   Yes.

24     Q.   And you're also within a subsect of Jews that

25     don't visit cemeteries; correct?

1    **A.**    Correct.

2    **Q.**    All right.  Now, you were shown DX365.  I would

3    like that put up.  This is the letter to Getty, and

4    language I think that was skipped the first time, but

5    then read, said that the preserve, protect and maintain

6    and restore the synagogue was a part of a cooperative

7    agreement when Congress designated Touro Synagogue, and

8    so this language points you to a cooperative agreement;

9    right?

10   **A.**    Yes.

11   **Q.**    That cooperative agreement is the 1945 agreement;

12   is that right?

13   **A.**    Yes.

14   **Q.**    Let's look at Exhibit 240.  Now, these were, I

15   think these were handed out, but let's get them --

16          THE COURT:  I've got it.

17          MR. SOLOMON:  Okay.  Fine.  If you need it just

18   let us know, your Honor, or Mr. Katz.

19   **Q.**    And counsel read to you a part of this agreement,

20   and I want to call your attention to another part.  He

21   read to you from Article 1, which says that they will

22   preserve, protect, maintain and when necessary restore.

23          I want you to look at Article 2, which reads:

24   The Shearith Israel trustees and Congregation Jeshuat

25   Israel mutually agree for themselves, their respective

1    successors and assigns, that in carrying out the

2    provisions of this agreement, their obligation shall be

3    performed in accordance with, and subject to, their

4    respective rights and obligations as lessor and lessee

5    as heretofore established.

6         Do you see that?

7    **A.**   Yes.

8    **Q.**   And was that your understanding of what the 1945

9    agreement did?

10   **A.**   Yes.

11   **Q.**   Did the 1945 agreement create, in your

12   understanding, more or additional rights as between the

13   parties?

14   **A.**   None at all.

15   **Q.**   Okay.  It sends us back to the lease; correct?

16   **A.**   Correct.

17   **Q.**   And you testified about the lease; right?

18   **A.**   Yes.

19        MR. SOLOMON:  Now I want to pull up the lease,

20   if we could, and that is DX148.

21   **Q.**   Now, is there any provision of this lease that

22   requires Shearith Israel to provide maintenance?

23   **A.**   No.

24   **Q.**   Is there any provision of this lease that requires

25   Shearith Israel to provide utilities?

1   **A.**   Not that I'm aware of.

2   **Q.**   Insurance?

3   **A.**   No.

4   **Q.**   Taxes?

5   **A.**   No.

6   **Q.**   Is that your understanding of what a triple net

7   lease is?

8   **A.**   Yes, it is.

9   **Q.**   In the lease you had pointed to one specific

10  provision that required the lessee to maintain, to

11  return the premises when done; correct?

12  **A.**   Yes.

13  **Q.**   Let me call your attention to another provision

14  where, it's in this lease, it's the paragraph

15  beginning, This lease and the term hereby granted.

16          MR. SOLOMON:  It's on Page 3, or DX148003.

17  **Q.**   (Reading)  This lease and the term hereby granted

18  is made upon the express covenant and condition that

19  the party of the second part -- and that's CJI;

20  correct?

21  **A.**   Yes.

22  **Q.**   -- will cause the same to be used and occupied for

23  the maintenance therein of the usual and stated

24  religious services, according to the rituals, rites and

25  customs of the orthodox Spanish and Portuguese Jews, as

1    at this time practiced in the synagogue of the

2    Congregation Shearith Israel in the City of New York.

3         Do you see that language?

4    **A.**   Yes, I do.

5    **Q.**   Is that another provision that, in your mind,

6    supports the obligation in CJI to maintain the

7    property?

8    **A.**   Yes.

9         MR. NAFTALIS:  Objection.  I think Mr. Solomon

10   is just testifying, not the witness.  The witness was

11   asked the question and he gave it there.  He's not

12   being asked an open-ended question.  If there's

13   anything else you missed or anything like that,

14   Mr. Solomon is just asking leading questions.

15        THE COURT:  Overruled for the reasons I've

16   stated in the past, the leeway that I've afforded all

17   counsel.

18   **Q.**   Mr. Katz, earlier today you testified that there

19   are a number of employees who work for Shearith Israel;

20   correct?

21   **A.**   Yes.

22   **Q.**   And Shearith Israel pays them?

23   **A.**   Yes.

24   **Q.**   So those people need to make a living too?

25   **A.**   Yes.

Q.   All right.  Now, if you -- roughly how much of the budget of Shearith Israel's expenses is taken, is accounted for by dues?

A.   A very small percentage.  Maybe one-third, I believe.

Q.   And how does Shearith Israel then satisfy its budgetary requirements to pay its employees?

A.   We have constant fundraising.  Those of us who have access to funds are constantly being hit on and implored to donate more.  And it's a constant, it's a constant barrage from the officers and the board.

Q.   Does Shearith Israel have a functioning separate, independent 501(c)(3) organization like the Touro Synagogue Foundation?

A.   We started one years ago, but it's really not -- we weren't able to do much with it.  The 1654 Society.

Q.   And does that provide funds?

A.   Provides, it provides nothing.  It's just some historical material.

Q.   And does Shearith Israel have a visitor center that throws off income?

A.   No.

Q.   When the board -- first of all, reference has been made to the executive committee.  This is the group that considered the issue in the summer of 2012.

1    **A.**    Yes.

2    **Q.**    Just so the record is not unclear, that committee

3    included you?

4    **A.**    Correct.

5    **Q.**    And Mr. Lustig?

6    **A.**    I believe so, yes.

7    **Q.**    Mr Sutton, Ralph Sutton?

8    **A.**    Yes.

9    **Q.**    And he's a lawyer?

10    **A.**    Yes.

11    **Q.**    And a trustee?

12    **A.**    Yes.

13    **Q.**    And did it include Gabe Goldstein?

14    **A.**    Yes, it did.

15    **Q.**    And who is Mr. Goldstein?

16    **A.**    Gabe Goldstein is a, he's an archivist familiar

17    with and he works with the Yeshiva University Museum

18    which is in the Center for Jewish History in New York

19    City.

20    **Q.**    And you also consulted Mr. Edinger, the sexton;

21    right?

22    **A.**    Yes.

23    **Q.**    Now, did that executive committee, and later the

24    board, consider the best interests of the Jewish

25    society of Newport or the Jews of Newport in deciding

1    whether or not to oppose the sale?

2    **A.**    Yes, it did.

3    **Q.**    Okay.  And tell the Court what the consideration

4    was.

5    **A.**    The consideration was based on the obligations we

6    have under the deeds, that when the building and the

7    contents were given to us in the 1820s, we became

8    responsible for maintaining the building.

9         We hired someone to do the -- to make sure that

10   it was safe and that there was a lock on it; and

11   periodically our rabbis would travel from New York to

12   Newport to conduct funerals, to conduct marriages.

13        So there was a, there was a, a movement back and

14   forth between our synagogue  and the few Jews who were

15   remaining there.  But, more importantly, there was a

16   strong sense that the building was under our guard and

17   maintenance.

18        And we had their sacred Torahs.  When I say

19   "they," I mean the Jews of Newport, where the Torahs

20   and rimonim and other ritual objects, which had been in

21   the Touro Synagogue, we took them for safekeeping; and

22   that continued until the early 1880s when there was a

23   growing community of Jews, and they asked permission to

24   use the building and some of the contents.

25   **Q.**    Mr. Katz, you don't actually know whether the Myer

1    Myers rimonim were among those that were up there and

2    then came back, do you?

3    **A.**    I have no idea.

4    **Q.**    But since CJI has been in residence as lessee of

5    the Touro Synagogue, has the Shearith Israel board kept

6    in mind its responsibilities to the Jews of Newport or

7    the Jewish society of Newport?

8         MR. NAFTALIS:  Objection.

9         THE COURT:  Overruled.

10   **A.**    It's been, it's a discussion that the board -- if

11   you go into the, into the historical documents there

12   are, there are presidents of the synagogue who go up

13   there in the 1920s, I believe.  Our rabbis would

14   participate and go to services --

15        MR. NAFTALIS:  Your Honor, I object to anything

16   he doesn't have personal knowledge about and move to

17   strike these comments about what happened in the 1920s

18   and the 1800s and stuff.  He obviously has no personal

19   knowledge of that.

20        THE COURT:  And I would take that into

21   consideration in weighing the evidence.  But the

22   objection is denied.  The objection is overruled.

23        We've allowed what is basically a historical

24   paper on many of the issues, a historical paper case to

25   be put in through witnesses without personal knowledge.

1    I think this is quite similar to that.

2         He's an officer of the Defendant in this case

3    who has access to its information.  So I'm going to

4    overrule the objection and allow him to testify.

5    **Q.**    Let me ask another question.

6         THE COURT:  But I think he was more asking

7    Mr. Katz about the present time.

8         MR. SOLOMON:  I actually was.

9    **Q.**    So the Court sustained an objection to a question,

10   so I'm asking it only because I think it was the way

11   that is it was phrased, or you answered it, so I'm

12   going to ask it again.

13   **A.**    Uh'huh (affirmative).

14   **Q.**    When the board or the executive committee was

15   considering these issues, --

16   **A.**    Right.

17   **Q.**    -- did it differentiate the Jewish society of

18   Newport from the Jews of Newport?

19   **A.**    No.

20   **Q.**    Okay.  And in your mind is there a temporal

21   quality to thinking about the Jewish society or the

22   Jews of Newport?

23   **A.**    When you say "temporal," what do you mean?

24   **Q.**    Meaning expanding over time, --

25   **A.**    Of course.

1    **Q.**    -- not just focused on today.

2    **A.**    Of course.  It's something that goes, in my mind

3    as a trustee and with my responsibilities are, it goes

4    back, it starts in 1658 and goes through 1900 and up to

5    today.

6    **Q.**    Okay.  And into the future?

7    **A.**    And into the future.

8    **Q.**    If Mr. Lustig, whose testimony you were read, had

9    said that CJI is one of the incarnations of the Jews of

10    Newport, the Jewish society of Newport, would you have

11    disagreed with that?

12    **A.**    Not at all.

13    **Q.**    Now, you were asked about the language of the 1945

14    agreement and you were asked whether the language in

15    the 1945 agreement that says that the property is held

16    in trust for the "Jewish Society of Newport," and you

17    said you don't recognize that at all.  Let me pull up

18    the 1945 agreement.

19        Let me show you where the language is, where the

20    language is on paragraph 1(f) on Page 24004.  And in a

21    provision that talks about the public using the Touro

22    Synagogue, it has a phrase there that it says that,

23    (Reading) The public shall be admitted to all parts of

24    the said Touro Synagogue, excepting such rooms or space

25    as may be reserved for the keeping of religious

1    vestments, vessels, monies, and historical or valuable

2    personal properties, all at reasonable times, so far as

3    consistent with the preservation of the synagogue for

4    the use, benefit and behoof of the Jewish society in

5    Newport, as a place of public worship forever.  And,

6    for the maintenance of divine services in accordance

7    with the rituals, rites and customs of the orthodox

8    Spanish and Portuguese Jews, as practiced and observed

9    in the synagogue of said Congregation Shearith Israel.

10           Now, that is the language that refers to the

11   Jewish society of Newport; right?

12   A.    Right.

13   Q.    And that language has no language of trust;

14   correct?

15   A.    Correct.

16   Q.    Let me ask you.  You were shown a piece of my

17   opening that had rental payments; okay?  You don't know

18   whether, you don't know whether I intended to have all

19   of the rental payments that we have evidence of shown

20   there, do you?

21   A.    No.  I was surprised by how few there were,

22   because I had seen more.

23   Q.    And you don't even know if I even tried, that I

24   did it right.  You don't even know that.  Okay?

25   A.    Right.

1    **Q.**   And I don't know if you were here for the

2    openings, but the judge said the openings are not

3    evidence.  And you understood that; right?

4    **A.**   Yes.

5    **Q.**   I'm going to show you another demonstrative we put

6    together last night.

7          MR. SOLOMON:  This is of documents that are in

8    evidence, your Honor.  And this is going to run from

9    DD70 through DD88, and this is a short time line with

10    the documents attached.

11    **Q.**   What I'm showing you now is just DD70.  This is a

12    demonstrative for identification only marked Number 70,

13    and it's also up on the screen.

14          When you were asked about rental payments, you

15    were not shown the CJI website, were you?

16    **A.**   No.

17    **Q.**   And that website says a lease amount of $1 per

18    year is still paid by the current Newport congregation

19    to Congregation Shearith Israel for use of the building

20    and grounds which are still owned by the New York

21    group.

22          And you were not shown Professor Urofsky's text,

23    were you?

24    **A.**   No.

25    **Q.**   And that provides in 2013 that the dollar a year

1    rent was part of a lease agreement for the building and

2    an annual rental of $1 a year, quote, The contract

3    between Shearith Israel and Jeshuat Israel has held for

4    more than a century.

5         Were you shown that?

6    **A.**    No.

7    **Q.**    And you were not shown the deposition testimony of

8    Mr. Edinger where he says on Page 219 Lines 25, to

9    220 Line 19:

10        Question:  And what about rent paid in the

11   nineties?

12        Answer:  Yes.

13        Question:  And in the aughts?

14        Answer:  Yes.

15        Question:  You said it was paid as recently as

16   2012?

17        Answer:  That is correct.

18        Were you shown that?

19   **A.**    Yes.

20   **Q.**    Were you shown that on cross?

21   **A.**    No.  I see it here now.

22   **Q.**    Okay.  And were you shown a declaration of

23   Mr. Edinger from July 15, 2013 -- which is for

24   identification only, it is not in evidence -- where he

25   said Shearith Israel records in New York also reflect

1    that rent --

2         MR. NAFTALIS:  I object.  I object.  I think

3    this is a total hearsay document which is not in

4    evidence.

5         MR. SOLOMON:  As I said, your Honor --

6         MR. NAFTALIS:  He's using a hearsay -- that's

7    not --

8         THE COURT:  Hold on.  Mr. Naftalis, which of the

9    documents are you alleging is hearsay and not in

10   evidence?

11        MR. NAFTALIS:  He started with a question, and

12   the reporter can probably help me, help the Court, he

13   said I'm reading now from a declaration by Mr. Edinger

14   which is not in evidence.  So it's a piece of hearsay

15   which is not in evidence here, by his own statement,

16   and I don't know how he can use that in examining his

17   own witness.

18        THE COURT:  I think the objection is a valid

19   one.  Sustained.

20        MR. SOLOMON:  Thank you, your Honor.

21   **Q.**   Did he show you the operating agreement which CJI

22   was a signatory to and which says that the lease with

23   Congregation Shearith Israel remains in effect?

24   **A.**   No.

25   **Q.**   Did he show you a cover letter to that from the

1    lawyer, Mr. Teitz, to Alvin Deutsch, from 2001, which

2    says that the lease with Congregation Shearith Israel

3    is explicitly acknowledged?

4    **A.**    No, he did not.

5    **Q.**    Did he show you that?  Did he show you Minutes

6    from 1986 where CJI's president, Mr. Herstoff,

7    overrules a motion, defeats a motion that was made and

8    requires the $2 rent to be paid?

9    **A.**    No.

10    **Q.**    Did he show you a memo from Adrian Baumgart?  You

11    know who he was?

12    **A.**    I forget at the moment.

13    **Q.**    He was one of the counsel to Shearith Israel in

14    the 1950s.

15    **A.**    Oh, right, right.

16        MR. SOLOMON:  It's DX -- I don't have it; I

17    think 260, your Honor.

18    **Q.**    When he says the rent has been paid continuously

19    down to the present time.  Did he show you that?

20    **A.**    No.

21    **Q.**    Okay.  Now, let's suppose that the rent wasn't

22    paid.  You understand that under the lease if the rent

23    isn't paid, CJI must surrender, quit and vacate the

24    premises; correct?

25    **A.**    Yes.

**Q.**    And did you have an understanding, since they haven't surrendered, quit or vacated the premises, that CJI acknowledged that the lease remained in effect?

MR. NAFTALIS:  Objection to the form.

THE COURT:  Sustained.

**Q.**    What understanding, if any, did you have about whether CJI was asserting -- agreeing that the lease was in effect, continued in effect?

**A.**    There were a variety of instances.  The fact that they would list the agreement on their website; that we would get -- I looked at it a couple weeks ago, and I saw that.  They said that --

MR. NAFTALIS:  Your Honor, I object to something he looked at a couple of weeks ago on a website as to forming the basis of testimony where he's supposed to be testifying about things that he knew on a contemporaneous basis.

THE COURT:  You know, Mr. Naftalis, I have tried to tell all counsel that I don't think I need to hear witnesses agree or disagree with their basic testimony. I've told you that.  I've sold Mr. Solomon that.  I've also tried to remind you that there is no jury here, that many of the things that you might pull -- and I have used in the past as a trial attorney when it's a jury here -- don't work when a judge is the one

1    deciding the facts.

2         I've given you both great leeway, probably to my

3    error, but that's how we've tried this case for a week.

4    I've allowed this to proceed in that fashion, and I'm

5    not going to unduly pull the plug at this point while

6    for some odd reason it continues.

7         So the objection is overruled.

8         MR. SOLOMON:  Your Honor, we've tried to adhere

9    to what your Honor had told us, and I apologize, but

10   there was a whole lot of testimony being given

11   yesterday by Mr. Naftalis reading from documents that

12   the witness knew nothing about, and I thought your

13   Honor was agreeable to having him do that.

14        THE COURT:  No.  I'm going to end it here by

15   just saying that we had a conference last week in

16   chambers that then got put on the record somewhat where

17   I said there was no reason to do that, that I promised

18   I would read the documents; that standing there,

19   reading documents and asking the person do they agree

20   or not agree with them; whether they agree with them or

21   don't agree with them is completely irrelevant to the

22   facts that I have to determine in this case, and I

23   thought we had some agreement on that.  We then went

24   down a different path and went back to the old way of

25   doing things.

1          Again, I've allowed both sides, both sides

2     equally to do it.  I'm not going to pull the plug now.

3     Shame on me for allowing it to happen.

4          So I'm overruling the objection.

5          You can proceed as you wish, Mr. Solomon.

6          MR. SOLOMON:  Thank you, your Honor.  And since

7     your Honor is able to grant motions to strike, I would

8     request that the witness not be interrupted in the

9     middle of an answer because -- unless there's some

10    inappropriate hearsay that the Court shouldn't hear;

11    because no one can now remember, I cannot now remember

12    what the question even was.  So with your permission,

13    may I ask it be read back.

14         THE COURT:  Particularly without a jury here,

15    Mr. Naftalis, you can wait until the witness completes

16    his answer before moving to strike.

17         MR. NAFTALIS:  I apologize, your Honor.  I

18    didn't --

19         THE COURT:  Thanks.

20         MR. SOLOMON:  I don't remember the question.

21         (Question was read)

22  A.   What evidence did I have?

23  Q.   What was your understanding based on?

24  A.   My understanding was that the relationship was the

25    same, that they acknowledged our ownership of the

1    building, and that they understood their role as

2    lessee.

3    **Q.**    You were shown a number of -- you were shown a

4    document relating to the will of Mr. Rivera.  Do you

5    recall that?

6    **A.**    Yes.

7    **Q.**    Were you aware that there was a separate will from

8    Mr. Levy, who was one of the three owners?

9    **A.**    I believe that I was aware of it.

10   **Q.**    You weren't shown that on your cross-examination.

11   **A.**    Right.

12   **Q.**    And were you aware that that will did not have any

13   trust language in it at all?

14   **A.**    Yes.

15   **Q.**    Okay.  And you were shown a deed from the late

16   1890s, 1894; right?

17   **A.**    Right.

18   **Q.**    Were you aware that there were 24, 24 transfers,

19   transfers by 24 people to Shearith Israel in 1894?

20   **A.**    No, I was not.

21   **Q.**    Okay.

22        MR. NAFTALIS:  Your Honor, on this, I object.  I

23   never showed him -- he represented I showed him this

24   deed, which I did not.  This is beyond the scope of

25   cross.

1          THE COURT:  I think he actually clarified the

2     Levy, which again I think speaks for itself.  But I

3     think he clarified he did not see that.  You did ask

4     about other documents.

5          MR. NAFTALIS:  He just mentioned a deed.  He

6     said you were shown this deed on cross.  He was not.

7          MR. SOLOMON:  Of course he was.  Your Honor --

8          THE COURT:  Guys, stop.  The objection is

9     overruled.

10    **Q.**   Mr. Katz, were you aware that 21 of the 24

11    transfers, the transferees, the transferors, okay, did

12    not use any language of trust in 1894?

13    **A.**   No.

14    **Q.**   At the beginning of your cross-examination,

15    towards the beginning you testified and wanted to

16    finish an answer about you thought there might be some

17    circumstances where Shearith Israel might have an

18    obligation to maintain the Touro Synagogue and its

19    contents.

20         Do you recall, just in general, that discussion?

21    **A.**   Just vaguely.

22    **Q.**   Okay.  Well, can you tell the Court what

23    circumstances would you envision where Shearith Israel,

24    in your mind, should be on the front line in

25    maintaining the Touro Synagogue.

**A.**   If, and I think the first one would be if the Jewish community, or Jeshuat Israel -- I'm making two distinctions.

       If there was no Jewish community in Newport, or if Jeshuat Israel -- if there was a community, but Jeshuat Israel went out of business, then we would be obligated to maintain the building.

**Q.**   And the contents of the building, as well?

**A.**   And the contents of the building, we would have to protect them in the same way that we protected them in the, after 1820 or so.

**Q.**   Okay.  On cross-examination you testified about the board seats, and you'll recall the Court knows what documents that comes from.  You thought there were either two or four board seats?

**A.**   Right.

**Q.**   Okay.  Were you aware that Shearith Israel did avail itself of board seats at some time during the history between these parties?

**A.**   Yes.  Early on there were people who attended, board members from Shearith Israel attended, been at Jeshuat Israel.

**Q.**   Jeshuat Israel?

**A.**   Yes, Jeshuat Israel.

**Q.**   And, more recently, has Shearith Israel felt that

1    it was protected by the lease?

2    **A.**    We thought we were protected by the lease, and we

3    trusted them.

4    **Q.**    Okay.  You were asked about the Yale University

5    exhibit.  Did you actually read the catalog?

6    **A.**    No, I didn't read the catalog.

7    **Q.**    And did anything that you saw when you went to

8    visit indicate that CJI claimed ownership in the

9    rimonim?

10   **A.**    It just showed under the -- on the card, as I

11   recall, under the identification card it said

12   Congregation Jeshuat Israel, Newport.

13   **Q.**    Okay.

14   **A.**    Which I knew that it didn't mean much, and that I

15   don't know what other people thought.

16   **Q.**    All right.  Now, you had, I think you said, some

17   infrequent calls with Ms. Ross; right?

18   **A.**    Yes.

19   **Q.**    Did you ever refuse to take her call?

20   **A.**    No.

21   **Q.**    And did you ever fail to return a call that she

22   made?

23   **A.**    Not that I'm aware.

24   **Q.**    And did you ever refuse anything that she asked in

25   a call with you concerning -- did she ever make an ask

1    in a call with you concerning the Touro Synagogue?

2    **A.**    When you say ask for something, --

3    **Q.**    Yes.

4    **A.**    -- sometimes she would just tell us what they

5    were -- who was going to be -- that somebody was coming

6    up to visit.  But we never refused anything.

7    **Q.**    Okay.  You were shown a packet of e-mails,

8    Plaintiff's Exhibit 229, from June 25, 2012.

9            MR. SOLOMON:  Let's look at that, please.

10   **Q.**    I think you testified that you thought at the time

11   that Ms. Ross was being candid with you; correct?

12   **A.**    Yes.

13   **Q.**    She was communicating with you, this is in writing

14   for the first time, right, on the subject of these

15   rimonim?

16   **A.**    Yes, yes.

17   **Q.**    And this was the same day that their board and

18   congregation were to meet; is that right?

19   **A.**    That's correct.

20   **Q.**    Did you feel that you were being a little bit

21   jammed?

22            MR. NAFTALIS:  Objection to the form.

23            THE COURT:  Sustained.

24   **Q.**    What reaction, if any, did you have in terms of

25   the timing of the call in relation to what they were

1  going to be doing?

2  **A.**   We were very offended.  We couldn't believe that

3  they would do this without notifying us at all, and it

4  was only because someone else told us that we found out

5  about it.  We felt that we, without any knowledge of

6  what was going on, we had to take action immediately to

7  foreclose any issues.

8  **Q.**   In any of your calls with her, did you ask her to

9  wait so that you could learn the facts?

10  **A.**   I said, Why is it happening so suddenly?  Why is

11  this all of a sudden that we're learning about this?

12  **Q.**   And did she commit to waiting to give Shearith

13  Israel time to learn the facts?

14  **A.**   No.

15  **Q.**   So you felt you needed to act?

16  **A.**   We acted.

17  **Q.**   Now, during this call did she tell you that CJI

18  had established a committee in 2008 to think about what

19  then became the sale of the rimonim?

20  **A.**   I don't recall that.

21  **Q.**   Did she tell you that they'd been thinking about

22  this for years?

23  **A.**   No.

24  **Q.**   Did she tell you that they had hired Christie's in

25  2009?

1    **A.**    No.

2    **Q.**    Did she tell you during that call that various

3    congregants of CJI had raised the issues of, Gee, does

4    Shearith Israel own these, or doesn't Shearith Israel

5    own these?

6    **A.**    No, she did not.

7    **Q.**    Did she tell you that -- did she tell you anything

8    at all prior to this exchange of e-mails?

9    **A.**    No.  Prior to my calling her, she didn't tell me

10   anything about the rimonim.

11   **Q.**    Her last e-mail to you says that she welcomes the

12   opportunity to talk to you and members of your board to

13   address any concerns you may have.

14          Did you communicate some initial concerns when

15   you spoke to her?

16   **A.**    I beg your pardon?

17   **Q.**    Did you communicate some, at least, initial

18   concerns when you spoke to her?

19   **A.**    I told her we were surprised and needed to know

20   more.

21   **Q.**    You testified that at the time you weren't sure

22   about the ownership issue; correct?

23   **A.**    Correct.

24   **Q.**    But did you know which rimonim she was talking

25   about?

1   **A.**    She said one of the two sets of rimonim by Myer

2   Myers, but we didn't know which one.

3   **Q.**    Okay.  And there was no discussion about where

4   those rimonim were in 1903; right?

5   **A.**    No.

6   **Q.**    Did she tell you that they, that CJI had done any

7   research into ownership?

8   **A.**    No.

9   **Q.**    Okay.  Now, after you spoke with Ms. Ross, and

10  before the cease and desist letter, I think that's

11  about four days, --

12  **A.**    Yes.

13  **Q.**    -- was there any research that was done, at least

14  preliminary research?

15  **A.**    We began looking at the documents that we had, but

16  it was, it was too soon to come to any conclusions as

17  to exactly what the status was.

18  **Q.**    Now, did you circulate, in that time period, the

19  documents on your desk?

20  **A.**    Yes.  Those documents were made available to the

21  committee on the first day that we heard about it.  I

22  was out of town and someone from my office distributed

23  them to David Nathan.

24  **Q.**    And did those documents go to your counsel before

25  the cease and desist letter was sent?

1    **A.**    Yes.

2    **Q.**    You were shown a demonstrative, exhibit -- I'm not

3    sure it's an exhibit.  It was a demonstrative, P400.

4    I'd like to show you that, please.  May I have this --

5    do you have this from yesterday?

6    **A.**    I beg your --.  I don't have it on the screen.

7         MR. NAFTALIS:  I think she gave you our last

8    copy.

9         MR. SOLOMON:  Can you switch.  Pull it up on the

10    screen, please.

11    **Q.**    So in the article that you don't -- that you

12    testified that you don't recall seeing; right?

13    **A.**    Right.

14    **Q.**    In the demonstrative that they showed you there's

15    language:  So desperate is the synagogue's financial

16    situation.

17         When you spoke to Ms. Ross in 2012, did she say

18    anything about the synagogue's financial situation

19    being desperate?

20    **A.**    No.

21    **Q.**    And in the article that you were shown it says

22    that the congregation might not be able even to afford

23    its rabbi in 2012.

24         Had the congregation continued to pay its rabbi?

25    **A.**    Yes.

1   **Q.**   Then on the next page it says:  Touro is quietly

2   making inquiries into the, about potentially selling

3   some of its assets.  And then on the right, the other

4   side of the page is an e-mail.

5        And I'm wondering, isn't that kind of a big

6   difference between an article that you don't recall

7   seeing and an e-mail that was actually sent to you?

8        MR. NAFTALIS:  Objection to the form.

9        THE COURT:  Sustained.

10  **Q.**   Did she send you any e-mail in 2008 or 2009?

11  **A.**   Not that I recall or have a record of.

12  **Q.**   If she had sent you in 2008 or 2009 the e-mail

13  that she sent you in 2012, would you have acted the

14  same way as you did in 2012?

15       MR. NAFTALIS:  Objection.

16       THE COURT:  Sustained.

17  **Q.**   What would you have done, sir?

18  **A.**   I would have --

19       MR. NAFTALIS:  Objection.

20       THE COURT:  Sustained.

21       MR. SOLOMON:  Oh, I apologize, Judge.

22       THE COURT:  Okay.

23  **Q.**   Looking at the last page of this document that

24  talks about the proceeds being placed into an

25  irrevocable endowment fund did you consider -- did the

1   board of the executive committee consider an endowment

2   an appropriate use of any proceeds for sale of the

3   rimonim?

4   **A.**   No.  Our own endowment is nonexistent at this

5   point, and we thought that selling ritual objects just

6   for the use of creating endowment was not an

7   appropriate use, not an appropriate thing to do under

8   the circumstances.

9   **Q.**   Thank you.  You were a couple of times yesterday

10  and today shown Minutes of a board meeting where

11  Mr. Groopman, Dr. Groopman, gave a report.

12  **A.**   Yes.

13  **Q.**   And at the time did you understand that

14  Dr. Groopman was, if you will, speaking as a liaison,

15  meaning he was advocating for CJI?

16       MR. NAFTALIS:  Objection to the form.

17       THE COURT:  Sustained.

18  **Q.**   Let me ask you.  I'm going to read to you from the

19  deposition of Dr. Groopman which is --

20       MR. SOLOMON:  As I understood what your Honor

21  said before.

22  **Q.**   -- in evidence and ask whether you agree with this

23  as what you were thinking at the time.  It said,

24  Answer: --

25       MR. SOLOMON:  This is at Page 30 Lines 8 to 15.

1          (Reading)  My report itself includes touches of

2     humor on my part in the raising of questions which, to

3     the best of my recollection, people at CJI and the

4     Touro Synagogue Foundation wanted raised, since I was

5     the channel between them and Shearith Israel; so I was

6     speaking here as liaison, which in my view meant also

7     speaking for them.

8          Was that what you understood?

9     **A.**   Yes.

10    **Q.**   When the CJI -- when Dr. Groopman described all of

11    the work that needed to be done, that was part of the

12    renovation project; isn't that right?

13    **A.**   Yes, it was.

14    **Q.**   Okay.  And a lot of time was spent on your

15    cross-examination going through each of the items

16    individually.

17         Do you remember we talked about the

18    deterioration of the eastern wall?

19    **A.**   Right.

20    **Q.**   And the foundation erosion?

21    **A.**   Yes.

22    **Q.**   Now, wasn't all of that fixed as part of the

23    renovation?

24    **A.**   That's my understanding.

25    **Q.**   And the funds were raised for that; right?

1   **A.**   Raised, as I heard, $2 million, and they took a

2   loan of $1 million.

3   **Q.**   By the way who, do you know who actually took that

4   loan of a million dollars, whether it was CJI or the

5   Foundation?

6   **A.**   I've been told it was the Foundation.

7   **Q.**   And do you know who paid it off, CJI or the

8   Foundation?

9   **A.**   I would assume the Foundation.

10  **Q.**   Do you know whose balance sheet --

11        MR. NAFTALIS:  Objection.

12        THE COURT:  Overruled.

13        MR. NAFTALIS:  Move to strike what he assumes.

14        THE COURT:  Motion is granted.

15  **Q.**   Do you know whose balance sheet or financial

16  statements were burdened by the million dollars?

17  **A.**   I assume -- it would be my understanding that it

18  was the Foundation's.

19        MR. NAFTALIS:  Objection.  Move to strike.

20        THE COURT:  Sustained.

21  **Q.**   Well, did anybody from CJI, as opposed to the

22  Foundation, ever tell you that they were taking out the

23  loan for the million dollars?

24  **A.**   No.  No one ever told me they were taking out a

25  loan.

1    **Q.**   And sitting there in 2004, 2005, did you have any

2    knowledge of actual payments being made by CJI for the

3    renovation, as opposed to the Foundation?

4            MR. NAFTALIS:  Objection.

5            THE COURT:  Overruled.

6    **A.**   Say the question again.

7    **Q.**   Did you have any knowledge of what -- whether CJI

8    was making any payments for this renovation, as opposed

9    to the Foundation?

10   **A.**   No.

11   **Q.**   In the 2004 meeting where Dr. Groopman gives his

12   report, there is reference to the phrase "free ride"

13   and it's words that are in quotes.

14           Did anybody use that language at the meeting?

15   **A.**   I don't recall that.  I can't imagine someone

16   would say that.

17   **Q.**   At the end of the 2004 meeting there was -- the

18   board decided to have another meeting, this time with

19   the representatives of the Foundation; correct?

20   **A.**   Yes.

21   **Q.**   And that's the 2005 meeting that there are Minutes

22   of; correct?

23   **A.**   Correct.

24   **Q.**   And your recollection is that Ambassador Loeb

25   attended; right?

1    **A.**   Yes.

2    **Q.**   Okay.  Now let's look at the document, please.

3        MR. SOLOMON:  It's 507, it's 50 -- no, it's the

4    e-mail.  509.

5    **Q.**   You were shown this document on your

6    cross-examination.  This is an e-mail from Mr. Balaban,

7    who was at the Foundation; right?

8    **A.**   Yes.

9    **Q.**   To Alan Singer and Dr. Groopman.  Just recently

10    this morning you were asked, well, about the references

11    to the visitor center.  Do you remember that?

12    **A.**   At this point I don't.

13    **Q.**   Fair enough.  Fair enough.  What understanding, if

14    any, did you have about whether the presentation that

15    was made, was made specific to Shearith Israel, or

16    whether it was the general fundraising presentation

17    that they were making?

18    **A.**   We -- I assumed that it was being, it was part of

19    a general fundraising support effort that they were

20    making and that we were one of the people that, one of

21    the groups that they came to.

22    **Q.**   Did anybody on behalf of the Foundation, or anyone

23    else at CJI, say during that meeting we're looking to

24    Shearith Israel because you have special obligations

25    under a trust?

1    **A.**    No one said that.

2    **Q.**    Okay.  Now, did you have a spare million dollars

3    then?

4    **A.**    We had a spare negative million dollars at that

5    point.

6    **Q.**    And if money is not budgeted, and Shearith Israel

7    feels that it needs to try to help raise funds, what

8    does it do?

9    **A.**    We raise funds.  We have dinners.  We go to

10    donors.  We do what a not-for-profit has to do.

11    **Q.**    And in this document, Page 3, D509003, under the

12    paragraph Project Scope, the paragraph begins, The

13    Campaign to Save Touro Synagogue.  I'm going to read

14    just the second sentence there.

15        It says:  The campaign will also fund the

16    development of the progressive world class visitor

17    center exhibit and expand educational program and

18    curriculum.

19        You see that?

20    **A.**    Yes.

21    **Q.**    Okay.  Is that consistent with your recollection

22    of what was said during the meeting?

23    **A.**    No.  We were -- my understanding was that

24    Ambassador Loeb, that was his responsibility, and that

25    the synagogue was on its own.

1    **Q.**    I guess my question was at the meeting --

2    **A.**    At the meeting, yes.

3    **Q.**    -- that Ambassador Lobe attended --

4    **A.**    Yes.

5    **Q.**    -- were they talking about this fundraising --

6    **A.**    Right.

7    **Q.**    -- in part was going to be for the visitor center?

8            MR. NAFTALIS:  Objection to the form.

9            THE COURT:  Sustained.

10   **Q.**   Do you have a recollection of whether the visitor

11   center came up as part of that meeting?

12           MR. NAFTALIS:  Objection.

13           THE COURT:  Sustained.

14   **Q.**   Can you tell the Court what either Ambassador Loeb

15   or someone on behalf of the Foundation said about the

16   visitor center, if anything.

17   **A.**   They described the campus idea, that the synagogue

18   restoration was a piece of that, but that the visitor

19   center was going to focus on Ambassador Loeb's concept

20   of the religious freedom of America aspect of the

21   visitor center.

22   **Q.**   Thank you.  You were also shown the document

23   marked as DX524, the Campaign Plan for the Campaign to

24   Save Touro Synagogue.  You were shown this on your

25   cross-examination.  Do you remember that?

1    **A.**    Yes.

2    **Q.**    And can I point you to Page 8.  That's DX524008.

3    Flip there quickly, under Special Gifts.

4         Now, this is July of 2005, so that's after the

5    meeting; correct?

6    **A.**    I would -- I think so, yes.

7    **Q.**    Okay.  Under Special Gifts it talks about

8    approaching those who have the capacity to make gifts

9    at the 5,000 to 99,000 level, and those that have a

10   unique connection to Touro Synagogue, such as members

11   of Shearith Israel in New York, local preservation

12   advocates.  Do you see that?

13   **A.**    Yes.

14   **Q.**    And was there discussion at the May 2005 meeting

15   of contacting, accessing the Shearith Israel members?

16   **A.**    Yes.

17   **Q.**    And what was said, in general?  What was said?

18   What can you remember?

19   **A.**    We asked them to provide us with materials, and we

20   would distribute it to our members; fundraising

21   materials which we would distribute to our members.

22   **Q.**    Thank you.  In Exhibit 507, we just looked at

23   that, right, before 509.  07, that's the Minutes.

24   I apologize; it was shown to you on your cross and not

25   by me.

1    So these are the meeting Minutes.  Do you have

2    that?

3    **A.**    Yes.

4    **Q.**    There's a phrase in here -- bless you -- a phrase

5    in here that says, toward the bottom, (Reading)  Two

6    grants have been received, 375,000 from the Department

7    of the Interior and 120,000 from the state preservation

8    budget.

9        Do you see that?

10   **A.**    Yes.

11   **Q.**    Did you know at the time that Shearith Israel

12   assisted the Foundation in obtaining those grants?

13   **A.**    I didn't know it at the time.

14   **Q.**    Did anyone at the meeting tell you that the

15   Foundation's application for the $120,000 was in any

16   respect unauthorized?

17   **A.**    No.

18   **Q.**    Okay.

19       MR. SOLOMON:  Thank you.  One moment, please,

20   your Honor.

21       THE COURT:  Sure.

22       (Pause)

23       MR. SOLOMON:  One last document to show you,

24   please, and it is Exhibit 458.

25   **Q.**    Because you're not a litigator, you don't know the

1    role that pleadings play in this proceeding; correct?

2         MR. NAFTALIS:  Objection.  Objection.

3         THE COURT:  Overruled.

4    **Q.**   And I'm going to show you a letter --

5    **A.**   Correct.

6    **Q.**   I apologize.  I'm going to show you a letter,

7    Exhibit 458.  This is a letter from counsel, to counsel

8    for CJI, dated February 28, 2014.  It says, in part:

9    (Reading)  As is clear from the transcript that you

10   cite, we are not seeking eviction of the congregants.

11   In fact, we see no present dispute with the congregants

12   at all.  As you know, our dispute is with CJI and CJI's

13   conduct.

14        Does that reflect your view?

15   **A.**   It reflects my view and it reflects the view of

16   the board of trustees.

17   **Q.**   Thank you.

18        MR. SOLOMON:  Thank you very much, your Honor.

19        THE COURT:  Thanks, Mr. Solomon.

20        Anything on recross, Mr. Naftalis?

21        MR. NAFTALIS:  If I could have just a moment.

22   If I have any recross, it will be very, very brief.  If

23   I could just get a minute or two to talk to Mr. Snow.

24        THE COURT:  Sure.

25        (Pause)

1  MR. NAFTALIS:  If the Court will permit, I will

2  be very, very brief.

3  THE COURT:  Okay.  Great.

4  RECROSS-EXAMINATION BY MR. NAFTALIS:

5  Q.  You were asked questions on cross-examination and

6  then by your lawyer on redirect examination about a

7  meeting of the board of trustees that occurred on

8  November 6th, 2004.  Do you remember that?

9  A.  Yes.

10  Q.  And that's the subject of Plaintiff's Exhibit 168.

11  Do you remember that?

12  A.  Yes.

13  Q.  As a member of the board of trustees, you know

14  that Minutes are kept; right?

15  A.  Yes.  Uh'huh (affirmative).

16  Q.  And the Minutes that are kept are meant to be

17  accurate; correct?

18  A.  It's hoped.

19  Q.  And they are circulated to the members of the

20  board of trustees on a regular basis, including

21  yourself; true?

22  A.  Yes.

23  Q.  And if there's anything inaccurate in the Minutes,

24  it's your obligation, as a trustee, to bring it to the

25  attention of the board to get the Minutes corrected;

1    correct?

2    **A.**    If I notice it, yes, I always report it to the

3    board.  If I notice it.

4    **Q.**    And you take your duties as a trustee seriously?

5    **A.**    I do.

6    **Q.**    And you care?

7    **A.**    I do.

8    **Q.**    And you're a lawyer?

9    **A.**    I am.

10    **Q.**    And Exhibit 168 are the Minutes of this, one of

11    the board of trustees' meetings involving pleas for

12    help from Touro Synagogue in connection with their

13    economic problems; correct?

14    **A.**    It's a report.

15    **Q.**    So the answer is yes; right?  And this is the one

16    where Mr. Groopman made a report to you folks?

17    **A.**    Yes.

18    **Q.**    And these Minutes, which are in Exhibit 168, are

19    detailed and they take place over three pages; correct?

20    **A.**    Yes.

21    **Q.**    And Mr. Neustadter was the president of your

22    synagogue; right?

23    **A.**    Yes.

24    **Q.**    And if we would go to Page 3 of Exhibit 168 of the

25    Minutes.  And you were present at this meeting;

1    correct?

2    **A.**    Yes.

3    **Q.**    You were there; right?

4    **A.**    Yes.

5    **Q.**    So if we go to Page 168 -- I mean, Exhibit 168,

6    Page 3 of the Minutes, you see the yellow highlighted

7    there?

8    **A.**    Yes, I do.

9    **Q.**    Read the yellow highlighted section.

10    **A.**    (Reading)  In our meeting the other day, Peter

11    wondered out loud if we had been having a free ride.

12    **Q.**    You can continue.

13    **A.**    It's not lit up.

14    **Q.**    Oh, I'm sorry.

15    **A.**    (Reading)  And whether now we need to reevaluate

16    the nature of our relationship and commitment.  Thank

17    you.  Let me stop there.

18    **Q.**    And Mr. Neustadter used the, according to the

19    Minutes, the words "free ride" attributed to

20    Mr. Neustadter, the president of your synagogue, are in

21    quotes; correct?

22    **A.**    Yes.

23    **Q.**    And you never made, at any time, any effort to say

24    to anybody that those Minutes reflecting

25    Mr. Neustadter's statement that Shearith Israel was

1    getting a free ride regarding its obligations towards

2    Touro Synagogue were in any way inaccurate, incorrect,

3    and needed to be corrected; correct?

4    **A.**    Correct.

5         MR. NAFTALIS:  I have nothing else.

6         THE COURT:  Thanks.

7         Mr. Katz, you can step down.

8         THE WITNESS:  Thank you very much.

9         THE COURT:  It's close enough to the lunch hour.

10   Remember, folks, we'll be back at two o'clock.

11        (Lunch Recess)

12        THE COURT:  Good afternoon, everyone.

13        Mr. Solomon, your next witness.

14        MR. SOLOMON:  Thank you, your Honor.  We call

15   Dr. Vivian Mann.

16        THE COURT:  Dr. Mann, just stand by the seat and

17   remain standing while Ms. McGuire swears you in,

18   please.

19        <u>VIVIAN MANN, DEFENSE WITNESS, SWORN</u>

20        THE CLERK:  Please state your name and spell

21   your last name for the record.

22        THE WITNESS:  Vivian Mann, M-a-n-n.

23        THE CLERK:  Thank you.  You may be seated.

24        THE COURT:  Dr. Mann, once you get comfortable,

25   if you'd just pull that microphone as close as you can

1    and speak right into it.  The whole base moves.

2         THE WITNESS:  Okay.

3         THE COURT:  Thank you.

4         MR. SOLOMON:  Your Honor, we have a binder that

5    includes some of the documents that we might make

6    reference to.

7         THE COURT:  Thank you.

8         MR. SOLOMON:  If you could hand that to the

9    Court, counsel and witness.

10        DIRECT EXAMINATION BY MR. SOLOMON:

11   **Q.**   Dr. Mann, can you hear me okay?

12   **A.**   Uh'huh (affirmative).

13   **Q.**   Okay.  The first request, you're going to have to

14   answer audibly so that the court reporters can get what

15   you're saying.  Okay?

16        Describe your education for the Court, please.

17   **A.**   I have a B.A. from the University of Washington in

18   art history.  I have an M.A. from Wichita State

19   University in art history, and a Ph.D. from the

20   Institute of Fine Arts of New York University.

21   **Q.**   And what is your current position?

22   **A.**   I'm currently a professor at the Jewish

23   Theological Seminary in New York.

24   **Q.**   And professor of what?

25   **A.**   I am professor of Jewish Art and director of the

1    master's program in Jewish Art and Visual Culture.

2    Q.    And have you founded any journals in the subject

3    matter of your expertise?

4    A.    Yes.  I was one of the founding editors of

5    "Images:  A Journal in Jewish Art and Visual Culture,"

6    which was the first journal devoted to the subject in

7    the United States.

8    Q.    How long have you held your position at the Jewish

9    Theological Seminary?

10   A.    1995.

11   Q.    Since 1995 what courses have you taught?

12   A.    I regularly teach a course on Jewish Ceremonial

13   Art in Context.  I teach the History of Synagogue

14   Architecture.  I've just taught a course on Jewish Art

15   Under Islam, teaching the Art of the Court Jews, and so

16   forth.

17   Q.    Have you taught elsewhere?

18   A.    Yes.  I was a visiting professor at Wesleyan

19   University, at Case Western and at Stern College of

20   Yeshiva University.

21   Q.    And you used the reference, you made reference to

22   the word "ceremonial art."  What is that?

23   A.    Ceremonial, Jewish ceremonial art is art which is

24   used in the practice of Judaism.

25   Q.    What positions, if any, did you hold before you

1    became a professor at the Jewish Theological Seminary.

2    A.    Well, part of it was concurrent.  For 29 years I

3    was the Chair of the Judaica Department at the Jewish

4    Museum in New York.

5    Q.    And what is "Judaica"?

6    A.    Judaica is another word -- one word for Jewish

7    ceremonial art.

8    Q.    And when you were at the Jewish Museum, what

9    positions did you hold?

10   A.    Basically I had the same position, but I was --

11   you're asking whether -- what I did as part of that?

12   Q.    Sure.

13   A.    I mounted exhibitions.  I was in charge of

14   acquiring objects for the collection.  I did research

15   on the collections.  And I also wrote scholarly

16   articles and catalogs.

17   Q.    We may make reference to the word "provenance,"

18   which I usually don't pronounce correctly.  What is

19   provenance?

20   A.    Provenance is the history of a work of art from

21   the time of its making until the present moment.

22   Q.    And what kind of analysis is done in making a

23   provenance, in researching the provenance of an object?

24   A.    There's research into the history of the time

25   period, into documents relating to the making of the

1   work, and also examination of the work carefully.

2   **Q.**   Does it include ownership and transfers of the

3   work?

4   **A.**   It can include the sequence of ownership, the fact

5   that it was part of private or public collections, and

6   also when it was exhibited.

7   **Q.**   Okay.  Have you been recognized for your work in

8   the field of ceremonial art?

9   **A.**   Yes.

10   **Q.**   Can you tell the Court about it.

11   **A.**   Basically I founded the field in the United

12   States, and I was honored by the National Foundation

13   for Jewish Culture for starting a new subject matter

14   under the rubric of Jewish studies.

15   **Q.**   What was the subject matter that you were

16   accredited for?

17   **A.**   The study of Jewish art.

18   **Q.**   While you were at the Jewish Museum, did you do

19   provenance research?

20   **A.**   Absolutely.

21   **Q.**   How did that fit into the work that you did?

22   **A.**   Whenever one publishes a catalog or a scholarly

23   article, one has to research the objects that is being,

24   that are being discussed.

25   **Q.**   Okay.  Now, have you published in your field?

1   **A.**   Yes.

2   **Q.**   And let me ask you to look in the binder there at

3   Exhibit 484, and can you identify that as a relatively

4   recent copy of your CV?

5   **A.**   Yes.

6   **Q.**   And have you published on the subject of rimonim,

7   specifically rimonim or finials?

8   **A.**   Yes.

9   **Q.**   And can you tell the Court, please.

10  **A.**   I wrote an essay for a catalog of our entire Torah

11  ornaments collection, detailing the history of the

12  development of each type of object.

13      I've contributed catalog entries to various

14  exhibitions; I've researched them, some of them from

15  our collection and some of them from other collections

16  worldwide.

17      MR. SOLOMON:   Your Honor, I believe all the

18  documents that are in the binder are in evidence, so I

19  don't need to separately offer the CV.

20      MR. WAGNER:   It's not accurate.

21      MR. SOLOMON:   Tell me which one --

22      MR. WAGNER:   The one that I specifically notice

23  is Exhibit 414, which is a hearsay declaration of

24  Dr. Barquist.   There may be others.

25      MR. SOLOMON:   You're okay with the --

1          MR. WAGNER:  The CV is fine.

2          MR. SOLOMON:  Thank you.  We will do that and

3    check on the rest.  Thank you.

4    **Q.**   When were you first contacted in connection with

5    this matter?

6    **A.**   Mid-August 2014.

7    **Q.**   And what was your -- what were you asked to do?

8    **A.**   I was asked to trace the provenance of the Myer

9    Myers rimonim that he made for Shearith Israel.

10   **Q.**   And did the request or charge expand or contract

11   at any time, or can we just think of it as provenance

12   of the rimonim?

13   **A.**   Well, it turns out that there was a third pair

14   that were, that was made later than the two under

15   discussion, and that belonged to a family named Myers,

16   the son of Myer Myers, and then subsequently to his

17   granddaughter, Caroline Cohen, and that was a further

18   enlargement of the subject.

19   **Q.**   If you will look behind Tab D50.  That's going to

20   be at the back of the Ds.  These are demonstratives

21   that have been put together.

22         MR. SOLOMON:  These are not in evidence,

23   although the pictures, your Honor will see, have been

24   separately offered.

25   **Q.**   Did I ask you to try to find -- okay.  DD50.

1    **A.**    It's not in the last section, so let's -- next.

2    **Q.**    Just before the Ps.

3    **A.**    Just before the Ps.  Okay.  I'm not finding it.

4          THE COURT:  Would someone check.

5          THE WITNESS:  I'm sorry?

6          (Pause)

7          THE WITNESS:  Thank you.

8    **Q.**    Thank you.  Tell the Court, if you would, what DD,

9    this is Defendant's Demonstrative 50, is.

10   **A.**    This is basically a slide show of the finials in

11   question.

12   **Q.**    And I'm just looking at the first page now.

13   **A.**    The first page are conclusions -- are the listing

14   of the six finials.

15   **Q.**    All right.  So I'd like to be able to keep them

16   straight as we go through the examination.

17   **A.**    Uh'huh (affirmative).

18   **Q.**    So why are these numbered the way we are, or how

19   can we refer to them so that we can be really very

20   clear what finials we're talking about?

21   **A.**    Until the last third of the 19th century there

22   were two pairs.  Identical finials constituted a pair.

23   So there was a pair, a first pair and a second pair,

24   made for Shearith Israel.

25          The third pair, which are numbers 5 and 6, is

1   the pair that was made later for Samuel Myers and

2   inherited by Caroline Cohen.

3        MR. WAGNER:  Your Honor, I'm sorry to interrupt,

4   but she hasn't been qualified.  And I don't know what

5   her -- I don't know what she's going to be qualified

6   for, but she seems to be giving conclusions now.  So I

7   think it would be helpful to get her qualified before

8   permitting her to go forward, get her expertise and get

9   what the conclusions are going to be.

10       THE COURT:  Mr. Solomon, are you offering her as

11  an expert?

12       MR. SOLOMON:  Offering her as an expert on

13  Judaica, Jewish ceremonial art, and provenance

14  research; in particular, the research into silver

15  objects that are at issue here, Judge.

16       THE COURT:  Do you wish to inquire on her

17  qualifications?

18       MR. WAGNER:  I renew the objection that we set

19  out in the *in limine* motion.  I understand your Honor's

20  ruling, so I'm going to hold my questions on that

21  score.

22       THE COURT:  Fine, and thank you for that.  That

23  makes it more convenient.

24       So as I stated in some pretrial matters, the

25  objection to the Defendant, to Dr. Mann's offering

1    expert testimony is overruled.

2    **Q.**    Okay.  So I just want to make sure that we know

3    which rimonim we're talking about at any given time.

4    So you've artificially numbered them 1 to 6; is that

5    right?

6    **A.**    Correct.

7    **Q.**    And you said that there were two identical --

8    there were two sets, two pair, one identical, and then

9    another that was identical; right?

10    **A.**    Yes.  And let's just understand that when objects

11    are handmade, they're never exactly identical.

12          But there are two that form a pair.  They were

13    made by the same craftsman.  And a second pair, which

14    were made by a variance group of craftsmen.

15    **Q.**    So one pair we're going to number 1 and 2, --

16    **A.**    Correct.

17    **Q.**    -- in your opinion were at Shearith Israel in

18    1869; is that correct?

19          MR. WAGNER:  Objection.  Leading.  I think it's

20    important with respect to the experts in particular not

21    to read -- not to lead.

22          THE COURT:  Sustained.

23    **Q.**    Just tell the Court, if you could, how you number

24    the rimonim, just so that we can identify which ones

25    we're talking about.

1    **A.**    I had to number them separately because at a late

2    point, somewhere in the late 19th century, one piece

3    from each pair was taken and ended up in Newport as a

4    loan to the congregation there.

5         So instead of a whole pair being sent, one from

6    each was sent, and that's why they're numbered

7    separately.

8         MR. WAGNER:  Your Honor, I'm sorry, just one

9    more note; and that is, we renew the objection we made

10   in our *in limine* motion to testifying about facts,

11   state of mind.  But, again, I understand your Honor's

12   ruling.

13        THE COURT:  Right.  And I said earlier, I think

14   your objection goes to the weight; so it will be

15   overruled, as it was stated earlier.

16   **Q.**    Can you look at DD, that's Defendant's

17   Demonstrative Exhibit 51, which is the next document in

18   here.  What is that?

19   **A.**    The picture?

20   **Q.**    Yes.

21   **A.**    This is a picture of the pairs as they are now, or

22   the sets.  I call them sets when they are, when they

23   constitute one from each two original pairs.

24        So this is a photograph of the two sets as they

25   now exist; one that is in Shearith Israel, and the

1    other which is now in the MFA.

2    **Q.**   And so just for convenience, have you labeled it

3    number 3 and number 1 being the ones that are in New

4    York, and number 4 and number 2 being the ones at the

5    MFA?

6    **A.**   Yes.

7    **Q.**   And look at the next demonstrative, please, DD52.

8    **A.**   This is a photograph of the pair that was made for

9    Samuel Myers and was inherited by Caroline Cohen's

10   granddaughter.

11   **Q.**   Now I'd like you to --

12        THE COURT:  Who was named Hays?

13        THE WITNESS:  Yes.  Hays married Myers.

14   **Q.**   And going about the work that you did in response

15   to Shearith Israel's request, what did you do?

16   **A.**   As a professor at the Jewish Theological Seminary,

17   I have access to one of the two best libraries of

18   Jewish material in the world.  And first I went and

19   took out all the books on Shearith Israel and on Touro

20   and read them so that I would come to the physical

21   examination of the objects with knowledge of the

22   context.

23        I then asked Shearith Israel for the records of

24   the 18th century, and I was shown the ledger, which is

25   the disbursements and income.  The actual Minutes no

1    longer exist.

2          I also read and was given the 19th century

3    Minutes.

4          I then went to the historical society where the

5    pair was, the set was on view.  They took them out for

6    me, and I examined them.

7          I did a subsequent examination about three weeks

8    ago of the -- spending a lot of time with the two

9    finials that are now in Shearith Israel.

10         And I also saw, from outside the case, I had

11   seen the ones in the MFA.

12   **Q.**   Okay.

13   **A.**   And then subjecting this to an analysis, I put it

14   together with the documentation in the 18th century

15   ledger.

16   **Q.**   Did you do research independent of the documents

17   that counsel had supplied you with?

18   **A.**   Absolutely.

19   **Q.**   What did you do?

20   **A.**   I, first of all I asked for the ledger myself.  It

21   was not given to me.  It was given to me after I asked

22   for it.

23         I also read, as I said, the 19th century

24   Minutes.  And I also was given old microfilms, and I

25   found a lot of material in those as well.

1          So basically I started off by reading the
2    historical context, and then I asked for documents; but
3    the requests initiated with me.
4    **Q.**   Did you review any museum catalogs as part of your
5    research?
6    **A.**   Yes.
7    **Q.**   And did you find those useful to your endeavor?
8    **A.**   Some.
9    **Q.**   We'll get to those.  Did you, on the basis of the
10   research that you did, both the physical inspection and
11   of the rimonim, the knowledge that you had and the
12   experiences that you have, form any conclusions
13   concerning the provenance of these 1 through 6 finials?
14   **A.**   Well, I'd like to deal with the Caroline Cohen
15   first because it's very clear-cut.
16   **Q.**   Just so that the record is clear, Doctor -- I'm
17   sorry.  Did you reach some conclusions?
18   **A.**   On -- oh, I'm sorry.
19   **Q.**   Did you reach any conclusions?
20   **A.**   I reached conclusions about them all.
21   **Q.**   Yes.
22   **A.**   But, if you don't mind, I would like to start with
23   the last two because it's a very clear-cut and dried
24   issue.
25          These belonged in the family.  They were

1    deposited by Samuel Myers in the Sephardic synagogue in

2    Richmond, Virginia.

3        In 1892 that congregation disbanded, and

4    Caroline Cohen, the granddaughter who had inherited

5    them, offered them as a personal loan to the

6    then-minister in Touro because her family had

7    originated in Newport, and she felt ties to that place.

8        Subsequently, within some months the minister

9    died, and she then wrote another letter to Shearith

10   Israel, offering them to them with the express wish

11   that they, if it was possible and they approved, for

12   them to be used in Newport.

13       So this is the -- this is very clear-cut in

14   terms of provenance and the use of them.

15   **Q.**   Okay.  Now, with respect to finials 1, 2, 3 and 4,

16   did you have -- did you offer -- did you reach any

17   conclusions with respect to the provenance of those

18   finials?

19   **A.**   Yes.

20   **Q.**   What are your opinions?

21   **A.**   First of all --

22   **Q.**   What are your opinions?

23   **A.**   My opinions are that they were commissioned and

24   paid for by Shearith Israel in the period 1764 to '75;

25   that they were both, according to the inventory of

1    1869, both pairs, not sets, but pairs, real pairs, were

2    still in Shearith Israel.  And the notations

3    specifically say they belong to the congregation under

4    the care of the sexton, meaning those of Shearith

5    Israel.

6            And I also traced payments to -- for these in

7    the ledger of the 18th century.

8    Q.   Did you reach any conclusions as to whether

9    Shearith Israel ever relinquished control over rimonim

10   1, 2, 3 and 4 after the 1869 inventory that you just

11   made reference to?

12   A.   I saw no documents to that --

13           MR. WAGNER:  Objection, your Honor, on the

14   grounds that "control" is a legal concept, and that's

15   barred by your Honor's opinion on the experts barring

16   legal conclusions.

17           THE COURT:  I'm going to assume that the word

18   "control" meant in the vernacular in that instance and

19   overrule the objection.

20   A.   Yes.  I didn't -- wouldn't say that any term I

21   used that's also used legally; it's done in the

22   vernacular, as you said.

23   Q.   Is it in the vernacular -- I agree with the Court.

24   We're not asking you for any legal conclusions;

25   correct?

1    **A.**    No.

2    **Q.**    Okay.  You're not a lawyer.

3    **A.**    No.

4    **Q.**    You haven't offered any legal conclusions.

5    **A.**    No.

6    **Q.**    Okay.  But in provenance research are there

7    concepts of dominion, control?

8    **A.**    There's concepts of, I would say, ownership.

9    **Q.**    All right.  So --

10    **A.**    I don't think those are the words.  I've never

11    come across them in provenance research.

12    **Q.**    All right.  So if you use that word, then the

13    Court will understand that you're using it only in the

14    context of your expertise.

15    **A.**    Correct.

16    **Q.**    All right.  Now, in reaching your conclusions, did

17    you need to either learn about or know about the

18    history of the congregation at Newport synagogue?

19    **A.**    Yes.

20    **Q.**    Okay.  And what did you do to learn about that?

21    **A.**    I read all the material that I could find about

22    it, and there were no records extant from the 18th

23    century.  So there were no -- basically there was one

24    record that was brought to attention, but that's it.

25    And so for the 18th and the 19th century, there really

1    are no records there.

2    **Q.**   So by way of background, when did Jews become a

3    congregation in Newport?

4    **A.**   They -- there was a number of Jews by 1658, which

5    is four years after the establishment of the community

6    in New York.

7         They didn't build a synagogue until, it began in

8    1759.  They probably worshiped in a home before that,

9    but they didn't have their own building.

10   **Q.**   What ritual was used by those Jews?

11   **A.**   These people were of the same heritage as Shearith

12   Israel.  They were Spanish Portuguese Jews.

13   **Q.**   And for purposes of building the building, did the

14   Jews of Newport solicit funds from other congregations?

15   **A.**   Absolutely.  One of the things that emerged from

16   the ledger was the close connections between Sephardic

17   congregations all in the United States and in the West

18   Indies and northern South America, and they sent

19   letters to all of these asking for funds to help them

20   build.

21   **Q.**   In the binder in front of you, would you look at

22   Exhibit D36, please.  Tell the Court what --

23   **A.**   Okay.  Yes, I have it.

24   **Q.**   What is D36?

25   **A.**   D36 is a publication of the American Jewish

1    Historical Society; specifically, the second volume of

2    the Lyons Collection.

3            Lyons was the prayer leader of Shearith Israel

4    for a good part of the 19th century, and he collected

5    various papers about both Touro and Shearith Israel.

6    Q.   Okay.  Would you look at Page 4 to 5 and tell the

7    Court what that is.

8    A.   It's the appeal letter from Touro, from the

9    synagogue in Newport to Shearith Israel.

10   Q.   And so that the record is clear, in the

11   publication someone other than the people who initially

12   wrote the letter put the heading on there, 5519 Letter

13   From Congregation at Newport to Congregation at New

14   York Asking Assistance to Build Synagogue; correct?

15           MR. WAGNER:  Objection.  Leading.

16           THE COURT:  Overruled.

17   A.   That was, it was an appeal letter from Newport to

18   New York asking them for help and money.

19           THE COURT:  Dr. Mann, what's the date of the

20   publication, the Lyons Collection volume?  I just can't

21   read it.

22           THE WITNESS:  It says 1920, 1920 or '29.  I

23   think it's 20.

24           THE COURT:  Okay.  So the 1920s.  I couldn't

25   tell if that was a 9 or an 8 actually.

1          THE WITNESS:  I would say zero.  Okay.

2          THE COURT:  Thank you.

3          THE WITNESS:  Uh'huh (affirmative).

4    **Q.**    And was the appeal responded to by Congregation

5    Shearith Israel?

6    **A.**    Yes.  They held an appeal to the members on the

7    seventh day of Passover, and over a hundred 49 pounds

8    was pledged in response to this appeal.  And there is a

9    receipt subsequently.  There's a record of it being

10   sent to Newport, the more than hundred 49 pounds

11   subsequent to this appeal letter and, you know, a

12   statement of receipt.

13         Ironically, the president at the time of the

14   sending of the money was Myer Myers.

15   **Q.**    Would you look at Page 6 and 7 of Exhibit DX36.

16   **A.**    Uh'huh (affirmative).

17   **Q.**    And tell the Court what is being set out here.

18   **A.**    The first letter is the transfer that they raised,

19   this 149 pounds and six pence, towards the building at

20   Newport of a place of worship to almighty God and how

21   they agreed with their pious wishes to build such an

22   edifice.

23         And then the second one is thanks, a letter of

24   thanks from, signed by 10 members of the Newport

25   congregation sent to Shearith Israel.

1    **Q.**    And then I think let's look at the receipt.  This

2    is Page 8 of the same volume.

3    **A.**    Yes.  The Naphtali Hart was the person who

4    actually who actually transferred -- I'm sorry.

5    Naphtali Hart, who signs this note, was actually the

6    person who transferred the money.

7    **Q.**    Are you looking at the top of the page --

8    **A.**    Yes.

9    **Q.**    -- under Receipt?  And it says Received --

10    **A.**    Receipt of N. Hart, Naphtali Hart, of 149 pounds

11    six pence towards building synagogue in Newport, from

12    Gia Cardosa.  There's abbreviations from the holy

13    Congregation Shearith Israel.

14    **Q.**    Are you on Page 8008?

15    **A.**    Yes.

16    **Q.**    And you're at the top of that page?

17    **A.**    Uh'huh (affirmative).

18        THE COURT:  It's on your screen, Mr. Solomon,

19    that she's reading from.

20        MR. SOLOMON:    Thank you, Judge.

21    **Q.**    And underneath that does the actual, the language

22    of the letter says -- please, would you read that to

23    the Court.

24    **A.**    This is dated two years later, in 1761.  The

25    congregation at Newport ran out of money in the midst

1    of building, and they made a second appeal to Shearith

2    Israel for funds, and that's the second letter on that

3    page on the 008.

4    **Q.**   Does the fact that the Newport congregation ran

5    out of funds before the building was built, does it --

6    is it relevant to any of the opinions that you have

7    here?

8    **A.**   Yes, because it means that at the time that the

9    first pair of finials were made by Myer Myers, they

10   didn't have enough money to finish the building and

11   wouldn't have had money left over to buy silver.

12         And, in fact, Ezra Stiles, who was a minister in

13   Newport and then later president of Yale University,

14   when he describes the consecration of the synagogue in

15   Newport doesn't mention any finials.  He mentions that

16   he had scrolls of the Torah.  He describes the

17   building, but that's it.

18   **Q.**   Now, were there any gifts or loans of objects that

19   were documented in the historical record?

20   **A.**   Yes, there is.  Prior to the consecration, the

21   people in Newport wrote again to Shearith Israel and

22   said we need furnishings, we don't have -- you know, to

23   put into the synagogue.  And so various donations came

24   from New York members.  There was a hundred pounds of

25   wax for candles.  There was -- they sent a *Ner Tamid*,

1    internal light for in front of the ark, candelabra,

2    et cetera.

3    **Q.**   In that record is there any reference to the

4    transfer of rimonim?

5    **A.**   No.

6    **Q.**   Let's look at D5, DX5, please.

7        THE COURT:  Just before you get off that,

8    Mr. Solomon.

9        Dr. Mann, the transfer of goods from New York --

10       THE WITNESS:  I'm sorry.

11       THE COURT:  That's okay.  Over here.  I'm sorry.

12   The transfer of goods that you just described from New

13   York, where in Exhibit 36 did you take that from?

14       THE WITNESS:  It's not -- is it in -- I don't

15   know if it's in here or not, but there was --

16       THE COURT:  I should --

17       THE WITNESS:  -- reported all the historical;

18   there were actually inscriptions on each of the objects

19   saying who donated them, and they were mostly members

20   of Shearith Israel.

21       MR. SOLOMON:  Your Honor, may I?

22       THE COURT:  That would be helpful Mr. Solomon,

23   sure.

24   **Q.**   Dr. Mann, would you look at Page 11 of the DX36

25   and tell the Court what that is.

1    **A.**    Here, here is the request for subscription of

2    furniture dated July 25th, 17 --

3        (Interruption)

4    **A.**    I'm sorry.  There's a letter from people in

5    Newport to members of Shearith Israel asking for gifts

6    of furnishings, and we said we have now contracted for

7    the finishing of the work, we are getting ready such

8    furniture and utensils that are needed.  And then they

9    go on to say but they need help with furnishing the

10   synagogue.

11       MR. SOLOMON:  Your Honor, may I look at the

12   witness's binder for a second?

13       THE COURT:  Certainly.

14   **Q.**    I asked you to look at Page 11.

15   **A.**    Right.

16   **Q.**    And there's some text highlighted on the screen.

17   Maybe that will help.  What is it?

18   **A.**    It basically says the internal light.  First it's

19   a *Ner Tamid,* which means internal and then refers to an

20   eternal light.  And then there are the candlesticks I

21   mentioned, which were given for both the ark and the

22   reader's desk, which was the *teva*, and then the hundred

23   pounds of wax.

24       MR. SOLOMON:  Thank you, Judge.  Please ask the

25   witness any questions your Honor has.

1    Q.    I want you to look at DX5, please.

2              MR. SOLOMON:  And a number of the documents,

3    your Honor, as I mentioned earlier in the trial, we

4    attempted to have certified transcriptions made of the

5    documents that were hard, at least for me, hard to

6    read, and for those that we had that done to we have

7    identified them as A tabs, or As, for each of the

8    exhibits.  So this one would be D5A, and then behind

9    the blue sheet in the binder is the actual document.

10   Q.    And so, Dr. Mann, looking at either of those, can

11   you tell the Court what this is, please.

12   A.    Benjamin Gomez, who signed, was a parnas, a

13   president of Shearith Israel, and he records in 5520,

14   which is the Hebrew year equivalent to 1760, that the

15   congregation, the elders of the congregation agreed to

16   lend a Torah scroll -- that formerly belonged to a

17   synagogue in Georgia -- to the synagogue in Newport.

18             In other words, like the one in Richmond, the

19   Georgia congregation ceased to exist, and they gave the

20   congregation in New York the Torah scroll, which they

21   are now transferring to Newport.

22   Q.    In this document, I'm reading language at the

23   bottom that says, "To be returned when demanded."  Do

24   you see that?

25   A.    Yes.  It says -- it tells how it's going to be

1    shipped, that it's going to be shipped by the *Sloop*

2    *Hanover*, the captain was Stephen Wanton, and to be

3    returned when demanded, meaning this is a loan, and

4    this is not a gift.

5    **Q.**    Have you seen any evidence that any rimonim from

6    any place in America were sent to the Newport

7    congregation before the end of the 18th century?

8    **A.**    No.

9    **Q.**    Now, in 1769 were there rimonim at the Newport

10   synagogue?

11   **A.**    Yes.  This is -- I'm sorry.

12   **Q.**    How do you know that?

13   **A.**    I know that because Ezra Stiles then in 1769 wrote

14   about a ceremony he witnessed at the synagogue in

15   Newport; and he said that unlike at the original

16   consecration, they now own six scrolls of the Torah,

17   and the two final ones were donations, one from

18   Mr. Lopez, Aaron Lopez, who was a resident of Newport,

19   and one was given by the Sephardic congregation in

20   London.  And both of those had silver bells and small

21   bells that were, that were gilt.

22           THE COURT:  They were what?

23           THE WITNESS:  They were gilt.  They were covered

24   with gold, but underneath is silver, and then because

25   gold is so expensive they only put a thin layer.

Q.    Look at DX7, please.  Tell the Court what this is.

A.    This is an excerpt from the diary of Ezra Stiles

that we just mentioned, and -- yes.

Q.    If you look at Page 4, what is that?

A.    This is the description of the consecration which

took place on December 2nd, 1763.  And he says in the

afternoon was the dedication of the new synagogue in

this town.

       And then in the second paragraph he describes

the synagogue, and he said at one end there was an

apartment vulgarly called the ark in which were

deposited three copies and rolls of the Pentatute --

that is, he's referring to Torah scroll -- written on

vellum, or, rather, tanned calfskin; one of the rolls,

I was told by Dr. Touro, is from Amsterdam and is

200 years old.

       The letters have Rabbinical Flourishes, which

means they have -- there's a whole system of

highlighting letters by putting little crowns, what

looks like little crowns on top of the letters.

Q.    And is that the basis for the conclusion that

you've offered that at the time of the dedication of

the Touro Synagogue in 1763 there were no rimonim?

       MR. WAGNER:  Your Honor, I object on two

grounds.  Number one, it's leading.  Number two, this

1    document was not referenced in Dr. Mann's report, her

2    addendum report or her declaration.

3        It was only referenced in her rebuttal, and in

4    her rebuttal report she specifically stated that the

5    materials set out in that rebuttal is only in rebuttal

6    to whatever CJI's expert might testify to.

7        THE COURT:  On the first question, the objection

8    is sustained.

9        Mr. Solomon, you want to address the second

10   question, or you want to try a different one?

11       MR. SOLOMON:  We have tried to be careful that

12   the documents the witness is relying on have been

13   disclosed to the other side.

14       The nuance about when we showed it to them, I'm

15   sorry, your Honor, I do not have that.  I don't have

16   that here.  I'm going to have to check.

17       I can move on from the document, and we can look

18   at that at a break.

19       THE COURT:  I think that would make sense.

20       MR. SOLOMON:  Okay.  Thank you, Judge.

21   Q.   Who is Myer Myers?

22   A.   Myer Myers was a native New Yorker.  He was a Jew.

23   He studied silversmithing, went through a whole

24   apprentice course.  And in around the early fifties

25   he's certified, and at that point he becomes a member

1    of the Guild of Silversmiths of the entire British

2    empire, and he's the first Jew to be a member since the

3    founding of that guild in 1327.

4            He was also very active in Shearith Israel,

5    which at that time was the only synagogue in New York.

6    He was president five times.  Parnas, president, five

7    times.

8            And he had the largest silversmith's workshop in

9    New York, in which he employed other people, as well as

10    working himself.

11    **Q.**    And did he, and did he make Judaica?

12    **A.**    Yes.  He's the only silversmith in colonial

13    America who made Judaica.  He made the five pairs of

14    finials that we talked about, six examples of the

15    five -- of three -- that is, three pairs, and two pairs

16    additionally he made for Mikveh Israel, the first

17    congregation in Philadelphia.

18            And then he made -- I'm sorry; I said six.  And

19    the sixth item was a shield used for circumcision to

20    protect the head of the penis, and he made that for

21    Moses Seixas who lived in Newport and served as the

22    circumciser in that community.

23    **Q.**    What is the purpose of the rimonim in a Sephardic

24    synagogue?

25            MR. WAGNER:  Objection.  That's nowhere in

1    Dr. Mann's report.

2        THE COURT:  Overruled.  I think we're back, area

3    of background.

4    **A.**    The purpose of the rimonim is to enhance the

5    appearance of the Torah.  The Torah is considered the

6    holiest object in Judaism, and the silver makes it more

7    beautiful and is considered to be -- once it's used,

8    once the finials are used they are considered, like

9    other things to be, that are used in conjunction with

10   the Torah, to be, to partake of the holiness of the

11   scroll.

12       THE COURT:  Are all rimonim silver?

13       THE WITNESS:  No.

14       THE COURT:  Okay.

15       THE WITNESS:  In north Africa they're usually --

16   they can be, or they can be brass or bronze.

17       THE COURT:  How about in this country?

18       THE WITNESS:  In this country, yes, they're

19   all -- the ones that are made here were all silver.

20       THE COURT:  And the second question, we've used

21   the terms interchangeably:  Finial, finial bells, and

22   rimonim.  Do they all have the same meaning?

23       THE WITNESS:  Yes.  The word "finial" means the

24   top of something.  So these are ornaments at the top of

25   the scroll.  Where the scroll is so long, the Torah

1     scroll is so long, it needs two staves to support it.

2     It can't be supported, as Roman scrolls were, on one

3     stave.  So therefore there are two staves, and the end

4     of the staves are covered with the finials.

5          We also use the word "finial" to mean a small

6     decoration at the top of the larger finial.  I mean

7     any, any piece furniture or whatever that has a little

8     ornament at the top, that's also called a finial.

9          The rimonim are the same term.  And "bells" is a

10    term that is specific to Sephardic Jews when referring

11    to these.

12         THE COURT:  Thank you.

13    **Q.**   Would you look at the Demonstrative D51 and point

14    out to the Court.  So this finial is sometimes called a

15    bell?  The whole object is called a bell?

16    **A.**   The whole object is called a bell.

17    **Q.**   But they also have bells on them; right?

18    **A.**   Correct.

19    **Q.**   Okay.

20    **A.**   The bells are removable.  They hang on a hook.

21    **Q.**   Where are rimonim typically kept within a

22    synagogue?

23    **A.**   In the ark on the staves of the scroll.

24    **Q.**   Is there a non-synagogue purpose, is there a

25    non-religious purpose to finials, to rimonim?

1    **A.**    No.    The only instance I know is in Spain, when

2    the Jews were expelled from Spain in 1492 there was a

3    pair of finials used on Majorca, the Island of Majorca,

4    which belonged to Aragon in Spain, that were the same

5    form as the finials on bishops' staffs, staves; and so

6    they were taken over into the cathedral of treasury on

7    Palma de Majorca and used as ornaments on the bishops'

8    staves.

9    **Q.**    But other than that?

10    **A.**    Other than that one incident -- I'm sorry, I

11    didn't conclude.    Other than that one striking

12    incident, I don't know of others.

13    **Q.**    Okay.

14    **A.**    If they were confiscated they would have been

15    melted down.

16    **Q.**    Okay.    Now, the rimonim that Myer Myers made, who

17    were they made for?

18    **A.**    The five pairs?

19    **Q.**    Yes.

20    **A.**    Two were made for Shearith Israel, according to my

21    research.    One was made for Samuel Myers, his son, that

22    passed on to Caroline Cohen.    And two were made for

23    Mikveh Israel.

24    **Q.**    I think you told the Court before --

25          (Interruption)

1    **A.**    Mikveh, the congregation in Philadelphia, which

2    was M-i-k-v-e-h, new word, Israel.

3    **Q.**    Now, at the time, when were these five made?

4    **A.**    They were all made between 1764 and '75, according

5    to the marks that are on them.  The silversmith uses

6    hallmark to indicate that he made the object, and

7    sometimes over the period of his activity the mark

8    changes.  So by looking at the mark you can also tell

9    the date.

10          MR. WAGNER:  Your Honor, I just didn't hear.

11    Did she say 1764 to '65 or --

12          THE WITNESS:  No, I'm sorry if I did.  1764 to

13    '75.

14          MR. WAGNER:  Thank you.

15    **Q.**    Now, did the Newport synagogue exist during that

16    period?

17    **A.**    Yes.

18    **Q.**    Do you have an opinion as to whether Myer Myers

19    made any rimonim for the Newport synagogue?

20    **A.**    My opinion is that they did not; he did not.

21    **Q.**    Have you seen a secondary literature that

22    attributes some of the making of rimonim to the Touro

23    Synagogue?

24    **A.**    Yes.

25    **Q.**    Have you seen any original documentation --

1    **A.**    I don't --

2    **Q.**    -- that supports that?

3    **A.**    I don't see any documents contemporaneous with

4    making of the finials that indicates they were made for

5    Newport.

6    **Q.**    Okay.  And have you seen any evidence that Myer

7    Myers gave any of these finials away, gifted them,

8    rather than selling them?

9    **A.**    No.  To the contrary; he seems to have charged

10   both congregations whenever he did something relatively

11   minor like mending a pair.  He charged Newport

12   12 shillings, I believe, and that's the one record we

13   have of his mending.

14   **Q.**    Are the Myer Myers finials of particular

15   significance to your expertise to art history?

16   **A.**    They're very significant in that they are the only

17   finials made in colonial America.  He was the only one

18   making Judaica until the end of the 18th century.

19       The other thing is he's the only silversmith --

20   he did, he did very innovative things.  He's the only

21   silversmith who combined the two techniques of, it's

22   called chasing and piercing.  The chasing is pushing

23   the tool along the surface of the silver so that you --

24   it's relatively soft and you can push it and make

25   slight reliefs, low relief.  And piercing means to cut

1    out portions, which was done with a hammer and chisel.

2         And on the upper portions, the body of the

3    finials that he made, the four that we're talking

4    about, the play between the empty parts that were

5    pierced and the positive parts that were chased

6    contributes to the beauty of the silver.

7    **Q.**    Does the ritual quality or religious quality of

8    the rimonim feature, is it relevant to your opinions

9    expressed here today?

10   **A.**    No.

11   **Q.**    Okay.  What about --

12   **A.**    They're --

13   **Q.**    Go ahead.  I'm sorry.

14   **A.**    No; I'm just saying that my conclusions are based

15   on documents and examination of finials.

16   **Q.**    And now, what about the context of the making, the

17   historical year in which they were made.  Is that

18   relevant to your opinion?

19   **A.**    Yes, because the -- aspects of the style of the

20   ornaments can be found on other works by Myer Myers

21   that he made for the domestic market, so that ties in

22   their dates to the marks and to other pieces.

23        There are very few dated pieces, frankly, of his

24   silver because he didn't keep any records, not the way

25   Paul Revere did.

1  **Q.**   Are there other pieces of Judaica that have been

2  at synagogues for a long time and in use?

3  **A.**   Yes.  Before the Holocaust there were -- I could

4  give you many examples.  Just one of them is Italy,

5  where Jews arrived in 200-BC and were on -- are still

6  there.  And they actually, they used, well, the

7  synagogues, for example, in Venice are all 16th century

8  and they use works that were made from the beginning

9  till today.

10       And there are records also -- one of the reasons

11  that the Jewish population survived in Italy was

12  because it was divided up into all these little dutches

13  and kingdoms, so if they got thrown out of one they

14  could just go across the border; and there are records

15  of them taking with them ceremonial objects, even the

16  arks of the synagogues, and then depositing them in

17  their new city.

18  **Q.**   I want to focus on what we've artificially

19  numbered 1 and 2, the first pair of finials.  Okay?

20  **A.**   That was tab what?  I forgot.

21  **Q.**   Well, right now I want to focus on the first pair,

22  okay?

23  **A.**   Okay.

24  **Q.**   What is the basis for your opinion that -- do you

25  have an opinion about whether -- who that first pair

1    was made for?

2    **A.**   Yes.

3    **Q.**   Do you have an opinion about who paid for that

4    first pair?

5    **A.**   Yes.

6    **Q.**   What's your opinion?

7    **A.**   I would like to just say that there's a, there's a

8    payment specifically for the second pair, at the right

9    time, in 1774.

10           Going back in the ledger, there is a, an

11   anomalous payment to Myer Myers of something over

12   36 pounds.  The question is that payment ties in with

13   the date of the finials and is unlike any other payment

14   made to him by the synagogue, by the synagogue,

15   Shearith Israel.

16   **Q.**   Let's look at --

17           THE COURT:  Doctor, just pull the mic in closer.

18           THE WITNESS:  Oh, I'm sorry.

19   **Q.**   Let's look at DX9, please.  Tell the Court what

20   this is.

21   **A.**   This is one of the pages of the ledger, it's dated

22   1765, and the top line reads:  Cash paid to Myer Myers,

23   balance of his account past, and it says that it is for

24   36 pounds four shillings and one pence, and this was in

25   1765.

1    **Q.**   And is this the evidence of payment of the bells 1

2    and 2?

3          MR. WAGNER:  Objection.  Leading.

4          THE COURT:  Sustained.

5    **Q.**   Tell the Court what is being paid for here.

6    **A.**   I conclude because of the date -- I want to make

7    one correction.

8          There are two pairs of finials that he made in

9    this 10-year period.  I know that there are two pairs

10   because the workmanship is entirely different, not

11   entirely, but totally different.

12         It looks as if there were two piercers and two

13   chasers who worked one -- one set worked on one pair,

14   and one set worked on the other.

15         So given the fact that we know that there was a

16   payment in 1775, the partial amount against a pair of

17   finials, I would argue that this amount, which is

18   unlike other payments to him, was for the first pair.

19         But which is the first pair and which is the

20   second, I can't tell you; what was made first and what

21   was made second.

22   **Q.**   So I was just being quite arbitrary in calling it

23   1 and 2, and thank you for that.

24         In your answer you said that you would argue.

25   Is this arguable, or have you reached an opinion to the

1      satisfaction of the standard used in your profession?

2              MR. WAGNER:  Objection to form and leading.

3              THE COURT:  Overruled.

4              THE WITNESS:  Oh, it's overruled.

5              THE COURT:  That means you can answer it.  We

6      have our own rituals in the courtroom.  That's what

7      that means.

8      **A.**   Okay.  I want to describe the type of payments

9      that was made to him to show you how strange this one

10     is.

11             So there were two types of payments.  One was in

12     remuneration for goods or services that he paid for.

13     Like, if he paid somebody's wages for carpentry work,

14     he was reimbursed.  If he bought a notebook to record

15     records of the synagogue, he was reimbursed.

16             And then there's a second type of payment which

17     was made to the presidents.  Each parnas, each

18     president was required to cover whatever outstanding

19     pledges there were under his presidency.  So if five

20     people made pledges that they didn't pay, and the

21     presidency ended, that president had to lay out the

22     money.  Hopefully in the next presidency, the next

23     year, these people would pay up and he would be

24     reimbursed.  So that is another type of payment, and

25     those are accompanied by the phrase "for the late,"

1    meaning the latest parnas.  Okay?  They use the word

2    "late" meaning latest.

3         This is unlike either of those two kinds of

4    payments, and the amount is substantial.  He was

5    paid -- Myer Myers was paid 20 pounds for a piece of

6    plate, meaning a household piece of silver, in 1759,

7    because the congregation wanted to honor somebody.

8    They ordered this plate from him, and they paid him

9    20 pounds.

10        So a payment of 36 pounds is of much more -- is

11   a substantial; it's almost twice as much.  And I

12   calculated what the finials would cost based on the

13   number of ounces of silver used in them, which are

14   recorded, against the price of -- I did once against

15   the price of silver, and then added the amount that

16   would have been paid to the chaser and the piercer.

17        And then I did a whole new calculation, because

18   I found in this Barquist catalog that a chased piece of

19   silver cost 18 shillings an ounce.  So if you multiply

20   18 shillings by the 40 and a half or 46 ounces that

21   each pair had, you end up virtually with 36 pounds.

22   Q.   Would you look at --

23   A.   Both cases.

24        THE COURT:  One question, Mr. Solomon, before

25   you get off this exhibit.

1    Whose ledger is Exhibit Number 9?  Is that
2    Shearith Israel?
3    THE WITNESS:  Shearith Israel's.  And if you
4    look at -- do you have the blue pages?
5    THE COURT:  I do.
6    THE WITNESS:  So if you look over, turn a blue
7    page you will see the actual photograph that I took of
8    the document in the ledger.
9    THE COURT:  Thank you.
10   **Q.**  Let's stay on this for a second.  The top reads
11   the Holy Sedakah; is that right?
12   MR. SOLOMON:  Sedakah, s-e-d-a-k-a-h.
13   **A.**  Sometimes spelled t-z-e-d-a-k-a-h.
14   **Q.**  What is the significance of that?
15   **A.**  Sedakah normally, in the vernacular in Hebrew,
16   means charity.  But the Holy Sedakah was the name given
17   to all the incoming disbursements of the synagogue.  It
18   was not just charitable.  It includes charity, like
19   money given to a poor person, but it is not only
20   charity.
21   **Q.**  Now, you were about to explain to the Court -- let
22   me just ask you to look at Demonstrative D53, please.
23   So that's in your pile of demonstratives.  It may be
24   easier to take that out of your binder; it may be
25   easier.

1    **A.**    You mean the photographs?

2    **Q.**    Yes.  I want to look at what's up on the screen

3    now.

4    **A.**    Right.

5    **Q.**    And can you explain this to the Court, please.

6    **A.**    This is a diagram showing what I just talked

7    about.  And there's a record in the ledger that in

8    1738-9 Shearith Israel owed somebody silver, and they

9    paid nine shillings three pence per ounce of silver

10   that they owed this person, and they sent it to I think

11   it was Barbados or something.

12        So reckoning on that price of silver, the cost

13   of silver would, for the rimonim, would have been

14   22 pounds.  And then the engraver received 5 percent of

15   the total and he -- that's approximately one pound two

16   shillings.  The silversmith would have gotten

17   nine pounds, 25 percent, and the piercer and chaser.

18   And you can see that the total is very close to what's

19   recorded in the ledger.

20        And then I used -- the second way that

21   18 shillings was the price of chased silver -- that's

22   silver that had been worked with designs.  And this

23   pair of 1764 was 40.8 ounces, 8/10 ounces, and when you

24   multiply that by 18 shillings you end up -- I won't go

25   through the calculations -- with 36 pounds 14 shillings

1    and four pence.

2         So the amount recorded here of 36 pounds, I

3    mean, we're really talking, we're in the ballpark, no

4    matter how I calculated the cost of the rimonim.

5    Q.   The reference to 5 percent and 25 percent on the

6    left-hand side, --

7    A.   Uh'huh (affirmative).

8    Q.   -- on what basis did you use those?

9    A.   I based myself on Barquist, who wrote the catalog

10   for the Yale exhibition.  It was a major exhibition at

11   Yale in 2000, 2001.

12        THE COURT:  Mr. Solomon, is this a good time to

13   break?

14        MR. SOLOMON:  It's fine.

15        THE COURT:  Great.  We'll be back in 15 minutes.

16        (Recess)

17        THE COURT:  Mr. Solomon.

18        MR. SOLOMON:   Thank you, your Honor.

19   Q.   Dr. Mann, we were in the middle of your giving the

20   Court the reasons why you concluded that the reference

21   in the ledger to 36.4.1 is the payment for the first

22   set of the rimonim.

23        And you talked about the date of the payment.

24   Did you cover that?

25   A.   I believe so.

1    **Q.**    Okay.  And you talked to the Court about the

2    different techniques that were used?

3    **A.**    I don't think we got into that yet.

4    **Q.**    All right.  Does your opinion in part rely on the

5    different techniques used?

6            MR. WAGNER:  Objection.  Leading.

7            THE COURT:  Overruled.

8    **A.**    Yes.  The difference in techniques which I

9    observed, just to put a heading on this, indicate that

10   they were made at different times.  No workshop would

11   have been large enough for Myer Myers to have more than

12   one chaser and more than one piercer at any one time.

13           So in a way it's like looking at handwriting;

14   when you look at the way that the artist handles the

15   tools, and the lines he makes and the way he forms his

16   shapes, you can see differences between the first pair,

17   just not date-wise, but just pair one and pair two.

18   You can see these differences, which indicates that

19   they weren't made at the same time; that they had to be

20   spaced apart.  And the terminus for both of those dates

21   is the use of this mark 1764 to 1775, so within that

22   10-year period there were two different sets of

23   artists.

24   **Q.**    Did you consider whether Myer Myers had any

25   relationship with the Newport congregation, in reaching

1    the conclusion that you did?

2    **A.**    No, it was based on -- my conclusions were based

3    on the evidence in the ledger, on an examination of the

4    finials, the dating and so forth.

5    There were no documents produced by CJI to

6    support any kind of activity in the 18th century with

7    Myer Myers, with the exception of the one repair bill.

8    **Q.**    Okay.  So did you see any evidence on the CJI side

9    of payment for rimonim?

10   **A.**    No.  All the evidence I saw indicated donated

11   pairs of rimonim, and we were not talking about Myer

12   Myers.  We're talking about those that were given with

13   the Touro scroll, let's say by Lopez and by the London

14   congregation.

15   **Q.**    You were explaining the, what you described I

16   think as an anomalous ledger entry, and that is the

17   36.4.1; correct?

18   **A.**    Uh'huh (affirmative).

19   **Q.**    Let me ask you to look at Exhibit D10.

20   MR. SOLOMON:  And, your Honor, so that I can

21   respond to one of the objections as to D7 that was

22   made, and I wasn't able to answer your Honor's question

23   about using it only in rebuttal, --

24   THE COURT:  Uh'huh (affirmative).

25   MR. SOLOMON:  -- on March 4th of this year we

1    sent a revised appendix to the other side and said that

2    we reserve the right to use at trial as well as in

3    rebuttal.  So I think maybe there's a mistake on the

4    other side.

5         MR. WAGNER:  No.  But the point is it's not

6    referenced in any of the reports.  It's not referenced

7    anywhere.

8         MR. SOLOMON:  Your Honor, we supplemented the

9    Appendix Bs repeatedly.  This was supplemented at the

10   beginning of March.

11        MR. WAGNER:  Right, which was three, two or

12   three months after the deposition.

13        THE COURT:  Continue to move on, Mr. Solomon.

14        MR. SOLOMON:  Thank you, Judge.

15   Q.   Do you have the DX10 in front of you?

16   A.   Yes.

17   Q.   What is this and what is its significance?

18   A.   Well, I can't read it on the screen, so I'm

19   getting it here.

20        This is an example, on Page 1, of an amount that

21   was paid back or an amount received from Myers, the

22   late, that is, the latest parnas, and it's 23 pounds 17

23   shillings six pence.

24   Q.   Okay.

25   A.   And this is the kind of payment that we talked

1    about where the parnas covers unfulfilled pledges.

2    **Q.**   Would you look at page -- Exhibit Number P78,

3    please.

4    **A.**   Yes.  This is the 1913 publication of the Lyons

5    Collection.

6    **Q.**   If you look at the bottom of the document you're

7    going to see some numbers, and I wanted you to turn to

8    Page 378.  The last three digits are 378.

9    **A.**   Yes.

10   **Q.**   Tell the Court what is shown there and what, if

11   any, relevance it has to your opinion.

12   **A.**   I think the wrong page is on the screen.

13   **Q.**   That's for sure, yes.

14   **A.**   On page -- this is Page 40 of this publication of

15   Lyons' papers, and beneath the first listing of amounts

16   it says:  For balance due me, and the "me" here is

17   Daniel Gomez, who was the parnas in 1738, '39.  And

18   then there's the word consiertto -- which elsewhere

19   Lyons admitted he doesn't know what it means; it's

20   either, it's -- I think it's a Portuguese word --

21   (Reading) For balance due me per agreement of the holy

22   synagogue on account of another item which is charged

23   here.

24        So this is an example parallel to the 36 pounds,

25   where the item being paid for is not specified, and

1   with another parnas.

2   **Q.**   I'd like you to look at DX15, please.

3   **A.**   Uh'huh (affirmative).

4   **Q.**   What is that?

5   **A.**   This is a whole listing of expenses that Myer

6   Myers paid from April 13th to September 26th, 1788.

7   And if you look down them you'll see that some of them

8   are salaries, and some of them are actually for work

9   done like repairing a kettle and for a load of wood,

10  which is a goods.

11  **Q.**   And what relevance, if any, does this have to your

12  opinion?

13  **A.**   This is the other kind of payment made to Myer

14  Myers.  So we have two; one is parnas, to cover

15  pledges, and the second for actual reimbursing him for

16  things he paid for.

17  **Q.**   Have you given the Court all of the reasons why

18  you concluded that the 36.4.1 payment was for a set of

19  the Myer Myers rimonim?

20  **A.**   Well, the reasons are the following:  One is that

21  the date of the payments accords with the date of the

22  period, of the mark that was used on both pairs of

23  rimonim; that the amount, by two means of calculation,

24  is an amount that would have paid for a pair of rimonim

25  of 40 plus ounces of silver; the 1869 inventory, which

1    lists both pairs as being the property of Shearith

2    Israel.  And may I add another reason?

3    **Q.**   If you have another, please.

4    **A.**   Whoever sent those, one from one pair and one from

5    the other back to Newport, was obviously blind to the

6    esthetics of the fact that there were two different

7    pairs.

8          But also he must have considered both pairs to

9    be the property of Shearith Israel; otherwise -- so it

10   didn't make any difference to him whether he chose 3

11   and 4, or 1 and 2, or 1 and 4, because he viewed

12   them -- he must have viewed them as all being the same,

13   the property of Shearith Israel, because if they

14   weren't, he would have sent one complete pair or

15   another.

16   **Q.**   And, Dr. Mann, I actually was going to ask you

17   that question a little bit later.

18          Did you see any evidence that the Newport

19   congregation, during the time period that we're talking

20   about, 1764 to 1774 or 5, could afford a pair of the

21   rimonim?

22   **A.**   No.  As I mentioned, they couldn't pay for the

23   building, so.

24   **Q.**   And if someone else had purchased and donated

25   them, was there some practice back then to notate the

1   gift?

2        MR. WAGNER:  Objection.  Leading.

3        THE COURT:  Overruled.

4   A.   All the notations of gifts that have to do with

5   the scroll of the Torah and the finials are always --

6   if it's only the scroll of the Torah, that's all that's

7   mentioned.  If they're given with bells, with finials,

8   that is always mentioned; the sefer, the book, and the

9   finials.

10  Q.   Really what I was talking about, there were other

11  gifts that you made reference to.

12  A.   Yes.  All those have actually inscribed

13  dedications of the donor.

14  Q.   Inscribed on the gift?

15  A.   Yes.

16  Q.   Okay.  And did you observe any of that, any such

17  inscription on --

18  A.   No --

19  Q.   -- 1, 2, 3 and 4?

20  A.   No, there's such inscription.

21  Q.   Let's look at D12, please, DX12.  Tell the Court

22  what that is.  First of all, when is this dated?

23  A.   It's dated 1774.

24  Q.   So this is 10 years later --

25  A.   Uh'huh (affirmative).  Yes.

1    **Q.**    -- than the ledgers that you were talking to the

2    Court about before.

3          Okay.  And this is also a page of the ledger?

4    **A.**    Correct.

5    **Q.**    And point the Court, if you will, to the

6    information in here that relates to the second pair of

7    rimonim.

8          MR. WAGNER:  Objection.  Leading.

9    **A.**    All right.  I'd like to note --

10          THE COURT:  Hold on, Dr. Mann.  Overruled.

11          THE WITNESS:  Oops.

12          THE COURT:  Now you can answer

13    **A.**    In the middle of the list there are, there's a

14    line that says to cash paid Mr. Myer Myers due him on a

15    pair of rimonim, 10 pounds 15 shillings.

16          I interpret this to mean this was a partial

17    payment because it nowhere is equal to the full cost,

18    and this was a partial payment for the second pair.

19    **Q.**    With respect to the second pair I'm calling

20    finials 3 and 4, is there any other evidence that

21    Shearith Israel paid for them?

22    **A.**    No.  This is the primary evidence, plus the 1869

23    inventory where they are listed as being the property

24    of the congregation.

25    **Q.**    Is there any evidence that the Newport

1    congregation paid for the finials 3 and 4?

2    **A.**    There is inscribed on two of the finials the word

3    "Newport" next to the mark, but they're not stamped in.

4    It was a later addition.  Why, I have no idea.

5    **Q.**    Did you see any evidence that Yeshuat Israel, or

6    the Newport synagogue, paid for a pair of rimonim?

7    **A.**    No.

8    **Q.**    But you did say that you saw reference to a repair

9    of rimonim; correct?

10    **A.**    Yes.

11    **Q.**    So let's look please at D14, please.

12    **A.**    Uh'huh (affirmative).

13    **Q.**    What is this?

14    **A.**    This is the records -- this is the only page I've

15    seen of the 18th century records of the income and

16    disbursements for Congregation Yeshuat Israel in

17    Newport, Rhode Island, and the last item in the first

18    set of payments is to pay Myer Myers mending rimonim,

19    and the price is 12 shillings.

20    **Q.**    Is there any evidence that these rimonim were made

21    by Myer Myers?

22    **A.**    No.

23    **Q.**    Do you have an opinion as to why rimonim that were

24    not made by Myer Myers would be sent down to Myer Myers

25    in New York for repair?

1          MR. WAGNER:  Objection, your Honor.  This

2     document was not referred to in any of her reports

3     except the rebuttal, and the rebuttal was only in

4     rebuttal to a witness who hasn't testified yet and may

5     never testify.

6          THE COURT:  Mr. Wagner, I'm having a hard time

7     following why if something was disclosed ultimately in

8     rebuttal, that that should exclude her from now

9     testifying in direct about it.

10          MR. WAGNER:  Because she wrote on her report

11     that the, that her rebuttal report is solely rebuttal

12     to an expert who we haven't presented and may never

13     present.

14          THE COURT:  This is contained in Dr. Mann's

15     response to Dr. --

16          THE WITNESS:  Diner.

17          THE COURT:  -- Diner's criticism of Dr. Mann and

18     Dr. Fisher's expert reports that I received at some

19     point quite a while ago.

20          MR. WAGNER:  I think that's right.

21          THE COURT:  And this document itself doesn't

22     appear in Dr. Mann's report?

23          MR. WAGNER:  No, it doesn't.  The first

24     reference to it was in her rebuttal report, her

25     rebuttal, which she says is solely to address

1    Dr. Diner, and we haven't presented Dr. Diner.  If she

2    wants to wait till rebuttal if we do present her,

3    that's fine.  But she specifically said that it was

4    only in rebuttal to Dr. Diner.

5           THE COURT:  Did you have the rebuttal report

6    when you deposed Dr. Mann?

7           MR. WAGNER:  No.

8           MR. SOLOMON:  No, your Honor.

9           THE COURT:  Okay.

10          MR. SOLOMON:  No, but unless this document from

11   my very able colleague is wrong, it is disclosed on the

12   Exhibit B.  It was disclosed in the amended Exhibit B;

13   not for the first time in rebuttal.  It was disclosed

14   as being one of the documents that the doctor reviewed.

15          THE COURT:  Here's what I want to know.  Did the

16   Plaintiff have notice, before deposing Dr. Mann, that

17   she was relying on or using Defendant's Exhibit 14?

18          MR. WAGNER:  No, that was nowhere referenced.

19   We did not.

20          THE COURT:  Mr. Solomon.

21          MR. SOLOMON:  I don't know the date of our

22   amended Exhibit B, and I will check that, your Honor,

23   and I will at this point move on.

24          THE COURT:  Great.  Thank you.

25          MR. SOLOMON:  Just for the record, your Honor, I

1    do know there were a number of documents that were

2    called to the witness's attention at her deposition,

3    and there was a motion afterwards, and the documents

4    that we relied on were all given to the other side, and

5    this particular one I do not know the timing, and so I

6    am moving on.

7           THE COURT:  Okay.

8           MR. SOLOMON:  But there are other documents that

9    we have that I think were not, that were not, that were

10   not identified to the other side prior to her

11   deposition, but that she's, in fact, relying on because

12   they were called to her attention by the other side.

13          MR. WAGNER:  I can represent this was not a

14   document that was called to Dr. Mann's attention at the

15   deposition.

16          THE COURT:  Here's my basic thought for this

17   ruling and all the other objections that come up on

18   this kind of issue.  It's one of fairness, and that is,

19   the Defendant had a right to fully -- the Plaintiffs

20   had a right to fully interrogate Dr. Mann on her

21   opinions and what she might rely on, based on notice

22   that they had.

23          If there's material that either subsequently was

24   drawn to her attention or came about after that, I'm

25   not going to allow you to go into that because I don't

1    think it's fair to one party; and the same would be

2    true for you, if they didn't otherwise have notice of

3    her reliance on that prior to deposing her.  That's

4    sort of the line I'm looking at.

5         MR. SOLOMON:  And we will obviously respect your

6    Honor's directive.  The time of her deposition in

7    general is a fairly early time when there are documents

8    that are called to her attention at her deposition, and

9    she then wants to be able to respond to them.  But I --

10        THE COURT:  If they were called to her attention

11   at the deposition by the other party, fair game.  I

12   don't have a problem with that.

13        But the line I'm drawing is, did they have a

14   fair opportunity to inquire of Dr. Mann about specific

15   reliance or materials at the deposition.

16        If they inquired about it at her deposition,

17   fair game to you, Mr. Solomon.  If they didn't, then we

18   may have other arguments, but I'm inclined not to let

19   it in.

20        MR. SOLOMON:  Thank you, Judge.

21   Q.   Okay.  We've finished finials 1, 2, 3 and 4, and I

22   think you already talked to the Court about the

23   Caroline Cohen set.

24   A.   Yes.

25   Q.   Let me show you a couple of documents.  Please

1    look at D55 and D63.  Are these the documents that you

2    talked to the Court about earlier?

3    **A.**    Yes.

4    **Q.**    Can you just go quickly through them.

5    **A.**    I'm sorry?

6         MR. WAGNER:  I'm sorry.  What are the numbers?

7    **Q.**    D55 --

8    **A.**    D55 and 63.

9    **Q.**    Yes.  What is 55?

10    **A.**    55 is the letter that Caroline Cohen wrote to

11    Reverend A.P. Mendes, offering him the bells that had

12    been used in Richmond, which were no longer being used

13    in that synagogue, and asking whether they have a need

14    for them in Newport.

15    **Q.**    And D63?

16    **A.**    D63 is a subsequent letter.  Between these two

17    letters he dies, A.P. Mendes dies.  And she then, she

18    then offers them to Shearith Israel stating:

19    (Reading)  Gentlemen, I desire you to take charge of

20    the silver bells lent by me to the late Reverend

21    A.P. Mendes.  And then she goes on to say that she

22    prefers that they be used in Newport because her family

23    ties are there.

24    **Q.**    And then at the end of that?

25    **A.**    She says subject to -- and all of this is subject

1    to your, that is CSI's, approval.

2    **Q.**    Now, you've made reference to the inventory, and

3    what's the date of the inventory?

4    **A.**    1869.

5    **Q.**    Okay.  So between the time period for rimonim 1,

6    2, 3 and 4, which we already went through the

7    documents, and 1869, did you see any evidence of

8    rimonim or -- of rimonim transferring back and forth

9    between New York and Newport?

10    **A.**    No.

11    **Q.**    Okay.

12    **A.**    The Newport synagogue closed in 18 twenty -- the

13    last Jew left Newport in 1822.

14    **Q.**    And when did services stop there?

15    **A.**    In 1790, '91.

16    **Q.**    Okay.  So let's turn to the inventory, please.

17    Now, I think you said that at some point the words

18    "Newport" were engraved on two of the rimonim; right?

19    **A.**    Correct.

20    **Q.**    Do you know when that happened?

21    **A.**    It had to be prior to 1869, because it's listed in

22    the inventory as, on Page 36 of D34.  It says on --

23    this is -- it says at the top, Articles of Silver.

24    **Q.**    And so hold on just a second.  You want to turn us

25    to D36?

1    **A.**    Correct.  D34 Page 36.

2    **Q.**    I was asking -- let me get my question out,

3    please.  The word "Newport" is engraved on two of the

4    four rimonim; --

5    **A.**    Uh'huh (affirmative).

6    **Q.**    -- right?  And have you seen any evidence as to

7    when that happened?

8    **A.**    No.

9    **Q.**    And I think what you said is that happened before

10    1869?

11    **A.**    Correct.

12    **Q.**    Okay.  And do you know an earliest date when it

13    happened?

14    **A.**    No.

15    **Q.**    Is there any evidence that you have seen as to

16    where it was done?

17    **A.**    No.

18    **Q.**    Okay.  Do you have any reasonable basis to

19    conclude that it was done during the 19th century as

20    opposed to the 18th century?

21    **A.**    Not really.

22    **Q.**    Okay.  All right.

23        THE COURT:  So one opinion you have on it is

24    that the "Newport" inscription was not put on there

25    originally?  Is that --

1      THE WITNESS:  Absolutely, because the mark is

2   stamped, you know, with a hot stamp in the silver.  And

3   this is engraved; it means you take a sharp instrument

4   like a burin, it's called, and has a sharp tip, like

5   what the dentists use to clean your teeth, and you make

6   a line in the silver with that.  And that's the way

7   this was made.

8      THE COURT:  Well, just because there are two

9   different methods of making an impression on this, what

10   leads you to believe that they weren't done at the same

11   time, but by different methods?

12      THE WITNESS:  Because the "Newport," it's

13   sloppy, and no silversmith like Myers -- the other

14   finials are not in any way marked or -- not marked --

15   they're not defaced, in a sense, like these two are.

16      The Caroline Cohen ones, all the other ones just

17   have marks, stamps.

18      THE COURT:  All right.

19   **Q.**   I'd like to look at Demonstrative D55, so it's

20   DD55.

21   **A.**   Uh'huh (affirmative).

22   **Q.**   Okay.  I wonder if that would be of help to the

23   Court.  Can you explain, when you say "marked," do you

24   mean the reference to Myers?

25   **A.**   Yes.

1    **Q.**    That's a mark?

2    **A.**    A silversmith's mark identifies the work as his,

3    and it's a stamp which is put into the metal, which is

4    put into the mold.

5    **Q.**    And for finial one on this page, is that word

6    "Myers" --

7    **A.**    On the left?

8    **Q.**    -- marked?

9    **A.**    Yes.

10    **Q.**    Yes.

11    **A.**    Notice that it's parallel to the base, okay?  And

12    the other finial, which comes from the second pair, the

13    "Myers" is perpendicular to the base.

14    **Q.**    And underneath that, is that the engraving of

15    "Newport" that you were referring to?

16    **A.**    Correct.

17    **Q.**    Okay.

18    **A.**    And notice on this slide that there are

19    differences in the bases, that the base on the left

20    with just the Myers mark is stepped with one, two,

21    three, four steps, and the other one is relatively

22    plain and simpler.

23    **Q.**    Now let's look at DX33, please.  What is DX33?

24    **A.**    These are Minutes.  You were asking me what they

25    are?

1    **Q.**    Yes.

2    **A.**    They're Minutes of Shearith Israel from 1869.

3    **Q.**    Okay.  Yes, please go ahead explain them to the

4    Court.

5    **A.**    It's the request of Reverend Lyons to prepare an

6    inventory of everything in the building, --

7    **Q.**    And --

8    **A.**    -- everything belonging to the congregation or in

9    its keeping.

10   **Q.**    Based on your research or experience, do you know

11   what it means to say, A complete inventory of all the

12   property and effects belonging to the congregation or

13   in its keeping?

14        MR. WAGNER:  Your Honor, objection.  This is a

15   document that was not referenced by Dr. Mann in any of

16   her various reports at all.

17        THE COURT:  And it shan't be used.

18        MR. SOLOMON:  Now, your Honor, it is on the

19   Appendix B that we served on the other side of the

20   documents read, reviewed and relied upon, and so I'm

21   going to move on.

22        THE COURT:  When you take a step back, look, the

23   line I'm drawing is the deposition, Mr. Solomon.

24        MR. SOLOMON:  I understand.

25        THE COURT:  Thanks.

1      MR. SOLOMON:  But unfortunately this handy sheet

2   of paper isn't allowing me to answer that question, so,

3   but we may be back.

4      THE COURT:  Okay.

5      MR. SOLOMON:  Pardon me just a minute, your

6   Honor.

7      THE COURT:  Sure.

8   **Q.**   All right.  Let's look at the inventory, please.

9   **A.**   Uh'huh (affirmative).

10   **Q.**   And that's DX34.  This is, again, the

11   transcription that we had certified, and then the

12   original.

13      Can you explain this to the judge, please.

14   **A.**   This is the contents of the inventory in which

15   Mr. Lyons prepared subsequent to the request by the

16   board, and he did it within a couple of months.  After

17   that they thanked him for being so speedy in carrying

18   it out.

19   **Q.**   Okay.  Now, what's your understanding of what

20   "inventory of all property and effects belonging to or

21   in keeping of" means?

22   **A.**   There are various items listed that were used by

23   the congregation but actually belonged to members.

24   There are certain scrolls of the Torah that are listed

25   as belonging to so-and-so, to three different people,

1    and they had put them in the synagogue, and they were

2    used by the congregation.

3    Q.    On the first page, that I've read only a part of

4    it, of the title, underneath that it says "KK Shearith

5    Israel," right, so that --

6    A.    That is an abbreviate --

7         THE COURT:  Hold on.  Hold on.  Go ahead,

8    Mr. Solomon.

9    Q.    "KK Shearith Israel," in Hebrew.  What is that?

10   A.    Is that my --

11   Q.    Yes, please.  Translate it.

12   A.    It means kehillah kedosha, the holy congregation,

13   Shearith Israel, which means the remnant of Israel, and

14   it's an allusion to the faith of Spanish and Portuguese

15   Jews.

16   Q.    But for today is Shearith Israel?

17   A.    Yes.

18   Q.    Okay.  And then underneath that it says "prepared

19   by Reverend JJ Lyons," and there is another Hebrew word

20   after that?  Hazzan.

21   A.    Hazzan.

22   Q.    What is that a reference to?

23   A.    He's the prayer leader of the congregation.

24   Q.    Okay.  And then underneath that it says, See

25   Minutes of Trustees, and then there's a, I think a

1    Hebrew date; is that right?

2    **A.**   Right.  There's a date of 5629, which is 1869, in

3    the month of Sivan, which is the Hebrew month, and the

4    date is 13th of Sivan, which corresponds to May 23rd,

5    1869.

6    **Q.**   And down at the bottom of this page it says

7    "reported," and then again there is a Hebrew date and

8    an English date.  Is the Hebrew date the equivalent of

9    the English date?

10   **A.**   Yes.  And so you notice he was asked to do it in

11   May, and he finished it by mid-August.

12   **Q.**   Now turn, if you will, to Page 36.  This is headed

13   "Articles of Silver;" is that right?

14   **A.**   Correct.

15   **Q.**   I can actually read the original.  I can't read

16   any of these, but on this one I can.  But use either

17   one you want, and please explain to the Court what this

18   inventory is and what this page in particular shows.

19        MR. WAGNER:  Your Honor, can I just make one

20   notation.  We, for the most part, don't have any issues

21   with the transcriptions.  If I do, I'll let you know.

22   But in this particular one, the ditto marks on the

23   transcription don't line up with what's -- in small

24   part, but I think in significant part -- don't quite

25   line up with what's --

1          MR. SOLOMON:  So why don't we use -- I do think

2     this is legible.  But I don't actually know what

3     counsel is talking about, but I'm happy to look at that

4     also.

5          But the purpose of the transcriptions, Judge,

6     was to just be of help to the Court.  We had them

7     certified.  We're not offering them as anything other

8     than aids to English documents, and these are documents

9     in English.

10         THE COURT:  Though I think your suggestion is

11    good, why don't we use Defendant's Exhibit 34 Page 36,

12    which is the original.

13    **A.**   Okay.  So what does this page show?

14    **Q.**   Right.

15    **A.**   It shows first of all a listing of all the items

16    under "Articles of Silver."  They start with pointers

17    and various basins, and it goes on to the rimonim.

18         The other interesting thing is in the left-hand

19    column there are listed the names of owners of things

20    that are in Shearith Israel, but not owned by Shearith

21    Israel.  And there are, at the top you see it says

22    "Property of Hazzan," which is Lyons, he's the prayer

23    leader.  Twice it says "Property of Hazzan."  And what

24    these, belong to him are the pointers for following the

25    text.  Okay.

1          Then below you have a listing of rimonim which
2     are, after the first mention of rimonim, which are in
3     Hebrew, you get ditto marks, "D-o" is "ditto."
4     Q.   Dr. Mann, I want you to point the judge to where
5     the word "rimonim" is.
6     A.   It's the first -- in the middle it says "one
7     pair," and then in Hebrew, do you see the --
8     Q.   Yes.
9     A.   -- pineapple shape?
10          THE COURT:  I do.
11    A.   Okay.  That's Hebrew for "rimonim."  And then it
12    goes on to say in Hebrew the date that's marked on
13    those, on that particular pair, which equals 1730,
14    which was the year of the consecration of the first
15    stone building that was used as a synagogue by Shearith
16    Israel.
17    Q.   And what's the reference, the next reference?
18    A.   Then we have a reference to bells, or rimonim,
19    that are known as the Ephraim Hart bells.  We know from
20    other documents that these were sold by Ephraim Hart to
21    the synagogue.  So they're only referred to by a
22    nickname that they once belonged to Ephraim Hart.
23          Then under that are the listing of the two pairs
24    of Myer Myers finials, and the -- starting with Ephraim
25    Hart it says, after, it says, "Known as Ephraim Hart

1  bells," it says, "property of kahal," which means the

2  congregation, "in the keeping of the shamas."

3       And all the dittos below that repeat that same

4  phrase, that they belong to the congregation and are in

5  keeping of the sexton.

6  **Q.**   Shamas is the Hebrew word for "sexton"?

7  **A.**   For "sexton."

8  **Q.**   And the kahal is the Hebrew word for --

9  **A.**   Kahal is the Hebrew word for "congregation."

10 **Q.**   And in this case which congregation is being

11 referred to?

12 **A.**   It's the inventory of Shearith Israel, so it

13 belongs to Shearith Israel.

14 **Q.**   Okay.  So in this document I'm now looking at the

15 one pair of ditto marked "Myers."

16 **A.**   Yes.  And then he says, "the maker."

17 **Q.**   Uh'huh (affirmative).  And then underneath that?

18 **A.**   It says, "Myers Newport," and that's --

19 **Q.**   The whole line says, "One pair of ditto," meaning

20 one pair of rimonim --

21 **A.**   Rimonim marked "Myers Newport."

22 **Q.**   And you read the ditto marks after each of those

23 as what?

24 **A.**   Property of kahal, congregation, in keeping of the

25 shamash, or sexton.

1    **Q.**   Is it relevant to your opinion that there is
2    nothing to the left of those entries?
3    **A.**   Absolutely, because if you look below them you
4    have entries to the left which says:  (Reading)  These
5    four pairs of rimonim, finials, are broken and must be
6    repaired.
7         Then it says:  (Reading)  Property of LI Cohen,
8    Property of P. Freedman, and Property of M. Barsexias.
9         So these indicate, the last three notations
10   indicate that the rimonim do not belong to the
11   synagogue but are there for, in use.
12        A lot of people did that because the
13   congregation, the synagogue building was more secure
14   than their homes.
15   **Q.**   And the absence of that, those references in
16   relation to the Myer Myers rimonim, what relevance is
17   that?
18   **A.**   That they belong to the congregation, not to an
19   individual.
20   **Q.**   Okay.  Let me ask you to look at --
21        THE COURT:  Before you get off that page,
22   Mr. Solomon.
23        MR. SOLOMON:  Yes.  Of course, Judge.
24        THE COURT:  The "D-o" reference on there, one
25   pair of "D-o" --

1          THE WITNESS:  That's the abbreviation they use

2     for "ditto."

3          THE COURT:  Like ditto marks?

4          THE WITNESS:  Yes.

5          THE COURT:  Thanks.

6          THE WITNESS:  Saves writing.

7          THE COURT:  But on one side they use the word

8     "D-o," and then on the other side they seem to use

9     marks.  No explanation?

10          THE WITNESS:  No.  In the 18th century they used

11     "D-o" also.

12     **Q.**   Is this the -- but in each of the "D-o"s that

13     you're referencing here on Page DX34 at 36, under the

14     Hebrew word "rimonim," in each of those cases what is

15     your opinion as to what "D-o" refers to?

16     **A.**   The "D-o"s below refer to rimonim.  It says, One

17     pair of rimonim and then one pair of "D-o," ditto; same

18     thing.  Means more of the same.

19     **Q.**   I wanted you to look at another document.  Maybe

20     keep your finger on this one.  Let me call to your

21     attention DX28.

22     **A.**   Uh'huh (affirmative).  Yes.

23     **Q.**   And in particular I want you to go to Page 7.

24          MR. WAGNER:  Your Honor, this is another

25     document; the first time it was referenced was in the

1    Dr. Mann rebuttal report which we received in March.

2    The deposition was in December.

3        MR. SOLOMON:  I have this being discussed on

4    Page 301 of her deposition, so.

5        MR. WAGNER:  I'm sorry.  What page?

6        MR. SOLOMON:  301.

7        MR. WAGNER:  Hold on.

8        THE COURT:  Okay, you accept that, Mr. Wagner,

9    or, okay, you'll check?

10       MR. WAGNER:  Why doesn't he go on while --

11   actually just give me a minute.  301?

12       MR. SOLOMON:  This is getting a little bit

13   herky-jerky, Judge.

14       I'm going to move on, and we may have to ask the

15   Court for a brief adjournment so that I can get the

16   right Exhibit B, but, okay.

17       MR. WAGNER:  I think that's a different document

18   that was used at Page 301.

19   Q.   All right.  So we're in 1869, and using the

20   numbering that we have used, is the reference on page

21   D34 at Page 36 to the Myer Myers rimonim finials 1, 2,

22   3 and 4?

23   A.   Correct.

24   Q.   Now, at or after -- you actually made reference a

25   little bit earlier to the fact that the finials were

1  switched.  Okay?  Do you remember that discussion,

2  brief discussion you had with the Court?

3  **A.**   No.

4  **Q.**   Well, is there a pair of finials -- the pair of

5  finials that are now in Shearith Israel in New York,

6  are they an identical set?

7  **A.**   No.  I call them a set because they consist of one

8  from one pair and one from a second pair.  So I don't

9  use the term "pair" for them.  Neither do I use the

10  term "pair" for the other two which are in MFA.

11  **Q.**   Okay.  And on what basis have you --.

12        So I think you said in your earlier testimony

13  that somebody took one from one pair and one from the

14  other; right?

15  **A.**   I suppose that's what happened, because one each

16  ended up in Newport, so somebody had to choose them.

17  **Q.**   And is that fact important to your opinion?

18  **A.**   Yeah.  Yes.

19  **Q.**   Your provenance opinion, is that --

20  **A.**   Because why would a person do that?  And the only

21  answer I can come up with is that he looked at them all

22  and they were all the same to him because they all

23  belonged to the congregation, and it didn't matter to

24  him.  You know, he had no esthetic sense of the

25  differences, and therefore it didn't matter to him

1    which two he sent up.

2    **Q.**    Okay.  So we were on this demonstrative, and does

3    this demonstrative show the different rimonim that are

4    now in New York?

5    **A.**    Yes.

6    **Q.**    Okay.  And there's the matching, the mirror set

7    is --

8    **A.**    On display at the MFA.

9    **Q.**    At the MFA.  All right.  And have you considered

10    the possibility that only the bases were switched, that

11    these are detachable objects?  Have you considered

12    that?

13    **A.**    I only considered it because it was brought up by

14    the other side.  But they are not made to be

15    detachable.  They are made in parts.  And the reason

16    they are made in parts is because it's simpler to cast

17    them, instead of trying to create a mold, to cast the

18    complicated shapes, and you do it in parts.  And then

19    the silversmith would solder them together with other

20    silver, with silver solder, and they would be one

21    whole.

22         But there's no point in which anyone, anyone

23    other than a silversmith or restorer could remove the

24    bases.

25    **Q.**    And did you see, in the ones that you examined,

1    evidence that they had been sort of broken apart and

2    resoldered?

3    A.    No.

4    Q.    Did you consider whether there's -- you actually

5    held these in your hand?

6    A.    I examined them two different times.

7    Q.    And did you try to detach the base?

8    A.    No.

9          MR. WAGNER:  Objection, your Honor.

10   A.    No, I did not.

11         MR. WAGNER:  But let me explain the objection.

12   I don't know when she did this.  I don't know whether

13   she did it before the report.  If she didn't do it

14   before the report, I didn't have the opportunity to

15   depose her.  It could be that one was before, one was

16   after, but --

17         THE WITNESS:  I believe I was deposed in

18   November.

19   Q.    All right.  And you did an inspection before then?

20   A.    And the inspection, the first study of them I did

21   was in the middle of October.

22   Q.    Can you -- did you actually examine the objects;

23   not just the bases, but the tops?

24   A.    Yes.

25   Q.    All right.  And are the ones that are in New York,

1    the tops, are they identical?

2    **A.**    I want to state that the photograph of the ones at

3    the top -- the ones in New York which are on, which,

4    well, they're the second page of this slideshow.

5    THE COURT:  DD51 there.

6    **A.**    Right.  On DD51 you will see that the right-hand

7    finial of the Shearith Israel, the pair in Shearith

8    Israel now, or the set in Shearith Israel, is lacking

9    the top of the crown and lacking this pineapple finial.

10    Now, I examined all the photographs, that are in

11    the Jewish Museum, of this pair of finials.  And it was

12    a practice of the Jewish Museum, it had a resident

13    photographer in the sixties, and anything that came

14    into the building he took photos of, no matter who it

15    belonged to.  It was a loan, it belonged to the museum;

16    he took photos.

17    And the condition that you see here is the

18    condition as it was in the sixties.  And this was

19    reused in the most current catalog, which I suppose

20    means that they were under restoration.  They couldn't

21    get a new picture in on time; that's all.

22    So what I'm saying is that now they have -- they

23    look the same because of the restorer.

24    **Q.**    Do you have an opinion as to whether the tops are

25    identical as between the pair in New York?  Is there

1    any evidence that there was only a switching of the

2    bases?

3         MR. WAGNER:  Objection.  Leading.

4         THE COURT:  Sustained.

5  **A.**   The --

6  **Q.**   You have to let me -- no, no, no.

7         THE COURT:  Hold on.  Dr. Mann, hold on.  I

8    sustained it.  That's okay.

9         THE WITNESS:  Am I allowed to say something?

10        MR. SOLOMON:  No, no.  Just a minute, please.

11 **Q.**   Do you have any other basis for the conclusion

12   that you have given that the bases were not switched,

13   but that the entire finials were switched?

14 **A.**    What do you mean, the entire finials were

15   switched?

16 **Q.**   That number 1 and 2, so 2 got separated from 1,

17   and you have 1 and 3 in New York, 2 and 4 at the MFA.

18   Okay?  All right?  Is that your view?

19 **A.**   Yes.

20 **Q.**   Okay.  You've concluded that?

21 **A.**    By comparison of the styles of the two different

22   rimonim and the difference in the hallmarks, yes.

23 **Q.**   All right.  So you've already told the Court about

24   the bases.

25        You want to tell the Court about the rest that

1    form the basis of your opinion that we have a full

2    finial, not just a switched base, in New York, and

3    switched -- and a full finial, not just a switched

4    base, in Boston.

5    **A.**    I have to tell you that on my last examination I

6    realized that the -- I was looking at the tops, the

7    crown and the pineapple finial, and I realized they

8    were exactly the same.

9         And then, when I looked at the photographs

10    again, I realized why; because this -- they were

11    made -- this is a photograph before restoration and

12    that Vitali, who restored them, must have duplicated

13    the one that existed and made a cast and then put the

14    new cast on the second one.  There are no differences.

15    **Q.**    You told the Court you had --

16         MR. WAGNER:  Your Honor, I just object to the

17    reference to what Mr. Vitali might or might not have

18    done.

19         THE COURT:  Yes, I was a little nervous on the

20    answer, Mr. Solomon, where if she's testifying as an

21    expert her opinions have to be couched as such, so I'm

22    going to strike that answer as not appropriate in that

23    regard.

24         MR. SOLOMON:  Thank you, your Honor.

25    **Q.**    You talked about chasers; right?

1    **A.**    Uh'huh (affirmative).

2    **Q.**    And what is the other worker who helps create?

3    **A.**    Piercer.

4    **Q.**    And a piercer.  Okay.  With respect to the finials

5    that are in New York, did the same chaser do both of

6    those finials?

7    **A.**    No.

8    **Q.**    And did the same --

9    **A.**    Piercer?

10    **Q.**    -- piercer do both of those finials?

11    **A.**    No.

12    **Q.**    Okay.  Now just tell the Court how you concluded

13    that.

14    **A.**    Can you turn to the --

15    **Q.**    No.  Just tell the Court, please.

16    **A.**    I compared the style of the flowers, I compared

17    the shape of the piercing, and I concluded that they

18    were by two different hands.  Because, as I mentioned

19    previously, the way that the artist holds the tools,

20    and the marks that he chooses to make to delineate the

21    way the leaves fall, these are all personal to him.

22    It's like his handwriting.  And they are different on

23    the two finials.

24    **Q.**    Okay.  After 1869, did you review the historical

25    record to determine whether Shearith Israel ever

1    relinquished control or ownership of any of the finials

2    1, 2, 3 or 4?

3            MR. WAGNER:  Objection, your Honor.  That's

4    beyond her expertise.

5            THE COURT:  Excuse me.  Sustained.

6            MR. SOLOMON:  Let me try it again, your Honor,

7    If your Honor pleases.

8            THE COURT:  Sure.

9    Q.   As part of your provenance research, did you look

10   at the provenance of finial 1, 2, 3 and 4 after 1869?

11           MR. WAGNER:  Objection.

12   A.   Yes.

13           MR. WAGNER:  Same objection.

14           THE COURT:  Overruled.

15   Q.   Okay.  Tell the Court what you did.

16   A.   I read all the Minutes after that point, and I

17   found no records that said that -- I found, rather,

18   affirmations of control over the thing, over its

19   finials, rather than relinquishing of control by

20   Shearith Israel.

21   Q.   Did you see any evidence of relinquishment?

22   A.   No.  I said I saw affirmations that they were

23   controlling everything, but not -- no affirmations that

24   they relinquished control.

25           MR. WAGNER:  Your Honor, I ask that be stricken.

1    It's beyond her expertise, and it's just reading a

2    documentary record and coming to factual conclusions.

3         THE COURT:  I think I said earlier, when I

4    allowed Dr. Mann's testimony in general, that in a

5    document-driven case oftentimes experts can almost

6    summarize more so than even give an expert opinion

7    about it.  I think this is one of those areas where she

8    did just that.  So the objection is overruled.

9    **Q.**  Would you look at DX45, please.  Can you tell the

10   Court what this is.

11   **A.**  Just a minute.  Yes.  These are Minutes of

12   Shearith Israel from 1881.

13   **Q.**  Tell the Court what significance, if any, this has

14   to the opinion that you just expressed.

15   **A.**  These Minutes date the 25th of October 1881, and

16   that is, it is -- these are subsequent to the lending

17   of Torah scrolls to Newport for the high holidays.  The

18   high holidays fall before this date.  There were enough

19   people in Newport to have services, and they asked for

20   the loan of Torah scrolls.

21        This, these Minutes say the shamas was directed

22   to bring from Newport the sefardim, et cetera, he

23   loaned to the synagogue there for services during

24   recent high holidays.

25   **Q.**  What, if any, significance do you place on the

1    "&c"

2    **A.**    I don't know what that means, frankly.  It may --

3    I don't know what other objects they sent up.

4    **Q.**    But does that refer to the other objects?

5        MR. WAGNER:  Objection.  It's leading.

6        THE COURT:  Sustained.

7    **A.**    I don't know.

8        THE COURT:  Sustained.

9    **Q.**    Okay.  Have you seen other references in other

10    documents to "&c"?

11    **A.**    No.

12    **Q.**    Okay.  Let's look at DX58, please.

13    **A.**    Yes.

14    **Q.**    What is this?

15    **A.**    These are Minutes of Jeshuat Israel -- they're

16    Minutes of the congregation in Newport announcing the

17    formation of a congregation.

18    **Q.**    Okay.  If you look at the second page, there's a

19    "Resolved"?

20    **A.**    Yes.

21    **Q.**    And it reads -- I'll read it into the record:

22    Resolved that the 19th Street synagogue of the City of

23    New York be informed of the formation of the

24    congregation, and its properly elected officers, and

25    its application to the general assembly for the state

1    for a charter, that we request of them the further

2    assistance which they have in the past rendered, in the

3    loan of such property as has formally been in use in

4    the services.

5         Do you see that?

6    **A.**   Yes.

7    **Q.**   And what relevance, if any, does this have to your

8    opinion that Shearith Israel didn't relinquish any

9    control over rimonim 1, 2, 3, 4?

10   **A.**   It specifically is an acknowledgment by Jeshuat

11   Israel -- by the congregation forming as Jeshuat Israel

12   that previously Shearith Israel had loaned them

13   ceremonial objects.

14   **Q.**   And let's look at DX60, please.  Tell the Court

15   what this is, please.

16   **A.**   This is a letter from H. Pereira Mendes, who was

17   the longtime prayer leader in New York at Shearith

18   Israel, to David Baruch, who became the prayer leader

19   in Newport around 1892-3.  And he, Mendes gives

20   permission; he says: (Reading)  You are hereby

21   empowered to use the sefardim, that is the Torah

22   scrolls, bells, books, shofar, and all other

23   appurtenances for worship, now in the Newport synagogue

24   or in storage at the Newport bank, quote, Bank of Rhode

25   Island, as minister.

1          And then it says, at the end it says:  Upon

2     termination of your appointment, you will return to us

3     or to our agent or legal representative, the custody of

4     the buildings and their appurtenances.

5     Q.    And what relevance, if any, does this have to your

6     opinion that after the 1869 inventory Shearith Israel

7     did not relinquish control over the rimonim?

8     A.    This is a clear statement that they empowered one

9     minister to use it, to use the appurtenances, and

10    afterwards when he finishes his tour of duty, that he

11    was then to return them.

12    Q.    Let's look at DX96, please.  What are these?

13    A.    This is an excerpt from a book about "The Old

14    Silver of America Churches" by a name named Alfred

15    Jones, and it was published in --

16    Q.    I'm sorry, this is DX96?

17    A.    No.  I'm sorry.  I apologize.  It's the one after

18    that.

19         Okay.  So these are Minutes of Jeshuat Israel

20    from 1897.

21    Q.    I would like to call your attention to the last

22    paragraph which says:  (Reading)  President stated that

23    a pair of bells in the synagogue were claimed as the

24    property of Congregation Shearith Israel of New York,

25    and that the board of trustees of that body made

1    request that the same be forwarded to them.  We voted

2    to comply with this request.

3        Is this relevant to your opinion that after 1869

4    Shearith Israel did not relinquish control of the

5    rimonim 1, 2, 3 and 4?

6    **A.**    They did not relinquish control.

7    **Q.**    Is this document relevant to that?

8    **A.**    It is an expression of control.  But I believe,

9    based on other evidence, that it does not refer to

10   1, 2, 3 and 4.  I believe it refers to another pair.

11   **Q.**    Right.  Is it relevant to your opinion on 1, 2, 3

12   and 4 --

13   **A.**    It's an example of control.

14   **Q.**    And tell the judge why.

15   **A.**    It's an example of control.

16   **Q.**    Okay.  Let's look at DX101, please.  What is this?

17   **A.**    This is Minutes from the board of trustees in

18   Newport of which Eugene Schreier, on which Eugene

19   Schreier was presiding.  And he records the fact that a

20   letter was received from Shearith Israel stating that

21   the congregation sent a pair of silver bells for

22   temporary use, until they can procure a pair for

23   permanent use.

24        And since this date is subsequent to the

25   previous Minutes, I would surmise that they're -- they

1    provided the temporary replacement to replace the ones

2    they asked for back.

3    **Q.**   Whether or not you surmise that, I'm actually

4    interested in whether this is relevant to your opinion

5    that after 1869 Shearith Israel did not relinquish

6    control with respect to rimonim 1, 2, 3 or 4.

7           MR. WAGNER:  Objection.  Leading.

8           THE COURT:  Overruled.

9    **A.**   I don't know what they refer to, which rimonim

10   they refer to.

11          In other words, they asked for something back

12   and then they said they're going to -- obviously what

13   this shows is they felt responsible to provide Jeshuat

14   Israel with appurtenances and a replacement for that

15   which they asked back in the previous Minutes.

16   **Q.**   Have you seen evidence of rimonim that were at the

17   Newport synagogue at one point in time, then being

18   returned back to Shearith Israel at another point in

19   time?

20   **A.**   Yes.

21   **Q.**   Okay.  And is that evidence relevant to the

22   opinion that you've offered to the Court?

23   **A.**   Yes.

24   **Q.**   Why?

25   **A.**   Photograph --

1    **Q.**   Why is it relevant?

2    **A.**   Why is it relevant?

3    **Q.**   Yes.

4    **A.**   Because it shows that, what the Minutes are

5    recording is attested to by photographic evidence.

6    **Q.**   Let's take a look please at, I guess, two

7    different photographs.  One is DD1.  That should be in

8    your binder.

9    **A.**   Uh'huh (affirmative).

10   **Q.**   And in your binder do you have two different

11   photographs of DD1?

12   **A.**   No.  I have two different photographs.  I have one

13   DD102 and, I'm sorry, DD104.

14   **Q.**   Can you explain what this is to the judge.

15   **A.**   All right.  The first photograph was published in

16   the book dated 1936, and then subsequently on the

17   website -- no -- in a, like a bulletin of the

18   congregation in Newport.  They republished this

19   photograph, this is in the fifties, sixties, and they

20   said that this photograph was dated on the reverse

21   1895.  Okay?

22        THE COURT:  Which photograph?

23        THE WITNESS:  The first, 002.  You see that with

24   the --

25        THE COURT:  I do.

1      THE WITNESS:  Okay.  Then if you go to the next

2  paragraph --

3      MR. WAGNER:  Your Honor, just certainly the

4  first photograph was not referenced in her deposition,

5  the bulletin.

6      THE WITNESS:  This is not in the bulletin.  This

7  is from "Stories of the Jews of Newport" by Morris

8  Gutstein.  He reproduced the photograph.

9      THE COURT:  I think she dated it by the

10  bulletin.

11      THE WITNESS:  Yes.

12  **A.**   Okay.  Then when you go to the second paragraph,

13  if you count up the pairs starting from the outside

14  finials, you see four pairs.  Okay?  The two outer

15  ones, the next two inner ones, the next two inner ones,

16  and finally, at the center, the set of Myer Myers under

17  contention.

18      What's missing from the second photograph are

19  the pineapple, so-called pineapple-shaped finials,

20  which in the first photograph flank the Torah shield in

21  the middle and the top of the menorah.

22      Now, these were start finials, they're the first

23  that were owned by Shearith Israel, and they were used

24  at the consecration of the synagogue on Mill Street in

25  1730.  And they are no longer there, so I presume --

1    obviously this is an example of a pair that went up to

2    Newport and were returned to Shearith Israel.

3    **Q.**   Is that relevant to your opinion?

4    **A.**   Yes.

5    **Q.**   Why?

6    **A.**   Because it's an example of control over objects

7    that were lent to Newport.

8    **Q.**   And I had asked you earlier today whether the

9    references in catalogs, museum catalogs, had any

10   relevance to the opinions that you offered.  Did you

11   rely on any of those?

12   **A.**   In searching provenance?

13   **Q.**   In the opinions that you offered here today, did

14   you rely on any of those?

15   **A.**   I relied on costs, the costs that I quoted in

16   calculating the 36 pounds.  But other information I

17   know is erroneous in those, in catalogs.

18   **Q.**   Okay.  And do you have an opinion about whether

19   any of the catalogs that have been referred to in this

20   case make any reference to provenance ownership, as

21   opposed to who did the lending?

22            MR. WAGNER:  Objection, your Honor.  That's not

23   an opinion she offered in her report.

24            THE COURT:  Sustained.

25            MR. SOLOMON:  Your Honor, this witness was

1    deposed on these.  Counsel said that it wasn't in her

2    report, but I think the rule that your Honor

3    articulated; she was deposed on these museum catalogs,

4    she there answered the questions, and I wanted the

5    Court to have the benefit of her views with respect to

6    those.

7              THE COURT:  Was that your understanding,

8    Mr. Wagner?

9              MR. WAGNER:  She didn't give an opinion about

10   what it means to reference that something comes from

11   somewhere in a catalog.  That's not something that

12   she -- I don't believe that's something she testified

13   to at her deposition, and I think that's something that

14   she's about to do.

15             THE COURT:  Well, I wasn't there, so before I'm

16   going to let her testify I'm going to have to see,

17   Mr. Solomon, what you're referring to at the

18   deposition.  And, Mr. Wagner, if there's anything you

19   want me to look at.

20             MR. SOLOMON:  She was shown exhibit, it was

21   Exhibit 15 to her deposition.  She was shown P172 and

22   asked questions about it.  It was Exhibit 8 to her

23   deposition.  She was shown the Jewish Museum catalog at

24   Exhibit 25 to her deposition.  She was shown the Rhode

25   Island School of Design catalog.

1           THE COURT:  Why don't you get me a copy of her

2     deposition, Mr. Solomon, and the pages you believe

3     cover the area that you're about to ask her on, and

4     I'll take a look at it.

5           MR. WAGNER:  Yes, and if that could be shared

6     with us, that would be great.

7           THE COURT:  Of course.

8           MR. SOLOMON:  And I'll be happy to do that, your

9     Honor, and it's explicitly on Page 13 of her report, so

10    we'll supply this to the Court.

11          THE COURT:  Okay.

12          MR. SOLOMON:  Other than the various hiccups,

13    Judge, I've completed my examination.

14          THE COURT:  So why don't we break for the day.

15    You can send that back either in the morning when you

16    get here, or if you have it that handy I could look at

17    it shortly.

18          Dr. Mann, you can step down.  Thank you.

19          We'll stand adjourned until 9:30 tomorrow

20    morning.

21          (ADJOURNED)

22

23

24

25

C E R T I F I C A T I O N

       I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

                   /s/  Denise P. Veitch
_____
                   Denise P. Veitch, RPR


                   June 25, 2015
_____
                   Date