```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF RHODE ISLAND




     * * * * * * * * * * * * * * * * * * * * * * * * *
     CONGREGATION JESHUAT        *    CIVIL ACTION
     ISRAEL                      *    12-822M
                                 *
     VS.                         *    SEPTEMBER 18, 2015
                                 *
     CONGREGATION SHEARITH       *
     ISRAEL                      *    PROVIDENCE, RI
     * * * * * * * * * * * * * * * * * * * * * * * * *




           BEFORE THE HONORABLE JOHN J. McCONNELL

                     DISTRICT JUDGE

                     (Bench Trial)


                      VOLUME IX
```

**APPEARANCES**:

```
 FOR THE PLAINTIFF:    STEVEN E. SNOW, ESQ.
                       Partridge Snow & Hahn LLP
                       40 Westminster Street
                       Suite 1100
                       Providence, RI  02903

                       GARY P. NAFTALIS, ESQ.
                       JONATHAN M. WAGNER, ESQ.
                       TOBIAS B. JACOBY, ESQ.
                       DANIEL P. SCHUMEISTER, ESQ.
                       Kramer Levin Naftalis & Frankel LLP
                       1177 Avenue of the Americas
                       New York, NY  10036
```

```
FOR THE DEFENDANT:     DEMING E. SHERMAN, ESQ.
                        Locke Lord LLP
                        2800 Financial Plaza
                        Providence, RI  02903

                        LOUIS M. SOLOMON, ESQ.
                        COLIN UNDERWOOD, ESQ.
                        YAN GRINBLAT, ESQ.
                        JENNIFER CHAING, ESQ.
                        Cadwalader, Wickersham & Taft
                        One World Financial Center
                        New York, NY  10281


Court Reporter:        Denise P. Veitch, RPR
                        One Exchange Terrace
                        Providence, RI  02903
```

```
 1    18 SEPTEMBER 2015 - 9:00 A.M.
 2          THE COURT:  Good morning, everyone.  We're here
 3    this morning for closing arguments in the case of
 4    Congregation Jeshuat Israel versus Congregation
 5    Shearith Israel, Civil Action Number 12-822.
 6          Would counsel identify themselves for the
 7    record.
 8          MR. NAFTALIS:  Gary Naftalis, Kramer Levin
 9    Naftalis & Frankel, and with me from the law firm is
10    Jonathan Wagner, Toby Jacoby, Dan Schumeister.
11          And my colleague, Steve Snow, Partridge, Snow &
12    Hahn, the same Snow in the name.
13          THE COURT:  Welcome back, counsel.
14          MR. SOLOMON:  Good morning, your Honor.
15          THE COURT:  Good morning.
16          MR. SOLOMON:  Louis Solomon.  Obviously with me,
17    Mr. Sherman; and my colleagues, Mr. Underwood,
18    Mr. Grinblat, and Ms. Chaing.
19          THE COURT:  Great.  Welcome back to everyone.
20    You have been very busy, and the Court received all of
21    the post-trial material.  And the Court has been very
22    busy; it should be obvious by the fact that I had to
23    cancel the first time because of the number of
24    documents that the court had to get through and the
25    amount of legal papers that had come forward.
```

1          For everyone else's benefit, the Court doesn't

2     regularly follow our docket perhaps, and the Court's

3     order on the schedule this morning, I've given each

4     side -- we've parsed the argument into two phases.  The

5     first phase will involve the issue of the ownership of

6     the rimonim and other issues that are involved in the

7     ownership of the rimonim.

8          Newport will argue initially for an hour.  New

9     York will argue -- if I can call them "Newport" and

10    "New York" for ease -- will argue for an hour, and then

11    each side will be given 15 minutes rebuttal.

12         The second phase will be the issue involving the

13    ownership and/or trusteeship of the Touro Synagogue

14    itself.  We'll follow 30 minutes for each side in

15    arguments, with a 15-minute rebuttal for that.

16         I hadn't offered to counsel the option of

17    changing that.  I think in an e-mail to Mr. Deming.

18    I assume that counsel is sticking with that schedule?

19         MR. NAFTALIS:  Yes, your Honor.

20         THE COURT:  Okay.  And because of travel issues

21    and restrictions that I've been told about, we're going

22    to stick to those time limits strictly.  We don't

23    normally do that in the District Court like they would

24    in an appellate court.

25         So, for your ease I've asked Vickie, she'll give

 1    you a five-minute warning, and then she'll give you the

 2    stop sign.

 3         (Laughter)

 4         THE COURT:  And it will be a violation of a

 5    whole lot of rules if you violate the stop sign.  So

 6    we'll try to stick to that both because we have to, at

 7    some point all good things must come to an end, but

 8    also to make sure that everyone gets home safely and

 9    timely.

10         With that, Mr. Naftalis.

11         MR. NAFTALIS:  Before we start, your Honor, we

12    have some demonstrative slides for the assistance of

13    the Court and counsel which my colleague, Mr. Jacoby,

14    who does all the hard work in the case, will hand out.

15         THE COURT:  Great.

16         MR. NAFTALIS:  I don't want the clock to start.

17         THE COURT:  It started already, Mr. Naftalis.

18         MR. NAFTALIS:  Oh, dear.  Well, it's nice to be

19    back, Judge.

20         THE COURT:  Thank you.  Nice to have you.

21         MR. NAFTALIS:  As your Honor said, there's a lot

22    of paper in this case.  We've done a lot of ecological

23    damage to the trees of America, and we think the paper

24    in this case is important and supports our position.

25    But the case is about a lot more than paper.  It's

1    about a lot more than documents.  It's about people.

2            It's about a small, struggling Jewish

3    congregation, who you've seen four witnesses,

4    representing a reasonably good cross-section of the

5    synagogue, come here and testify about their devotion

6    to the Touro Synagogue, their devotion to their faith;

7    how important the Touro Synagogue is in their lives.

8    The Touro Synagogue, which is indisputably the most

9    important as well as the oldest Jewish synagogue in the

10   United States, is a beacon of religious freedom and

11   tolerance.

12           And they've told you about the blood, sweat, and

13   tears about which they've given to the synagogue, and

14   how this case started for a good reason; to set up an

15   endowment to fulfill the trust purposes.

16           I'm not going to get into the trust thing other

17   than in a most general way now, which was in the

18   Rodriguez Rivera will and the 1945 agreement, to make

19   this a living and active place of Jewish worship

20   forever.  And that was the reason for this.  And to

21   preserve the synagogue not only for the members of

22   Jeshuat Israel as a functioning synagogue, not as a

23   museum, but for all the thousands of people who come

24   from the rest of America and indeed from all around the

25   world, to pray there.

1            THE COURT:  Mr. Naftalis, would you agree with

2       me that if the Court were to find as a matter of fact

3       and law that CJI owned the rimonim outright, as opposed

4       to the alternative argument you've made, that CSI owned

5       it from trust, that none of that that you just went

6       through, while was beautifully said and meaningful, is

7       relevant?  That is, if the Court finds, as you've

8       argued, that CJI owns the rimonim, you can do whatever

9       you want to it.  Is that CJI's position?

10           MR. NAFTALIS:  I think that's correct.

11      Absolutely.  We would be the absolute owners and would

12      have the right to do what we please with it, obviously,

13      consistent with the law.

14           As I said, our witnesses came forward, subjected

15      themselves to cross-examination from the very able and

16      skillful lawyer whose skills I respect on the other

17      side.  They said what they did, and they also said,

18      told us what CSI, the New York congregation, didn't do;

19      about how their lack of care, the New York

20      congregation's, their lack of attention, how they

21      essentially were faithless fiduciaries for decades and

22      decades and decades.

23           And I suggest, and I want to say this at the

24      beginning, there was a real contrast between our

25      witnesses and the live witnesses that the New York

1    congregation chose to put on.  I mean, they had a long

2    list of witnesses.  I think there was, once you take

3    off the experts and the duplication between their

4    witnesses and our witnesses, they had 16 witnesses they

5    said they were going to call at trial.  They ended up

6    only calling one; Mr. Katz.

7        THE COURT:  Right.  But we had an agreement for

8    expediency sake that a number of the witnesses that

9    they would otherwise call would be submitted by

10   deposition; so you're not asking me to factor in the

11   fact that you came to this efficient way of handling

12   this matter as holding it against it, or to somehow

13   weigh numbers of witnesses against the other,

14   particularly not on the issue of the ownership of the

15   rimonim.

16       MR. NAFTALIS:  Well, no, I think on that --

17   well, on how people behaved in terms of who thought who

18   owned what and who didn't, I think then the witnesses

19   matter because of what happened in the 20th century.

20   And indeed -- no, on a macro level of course I agree

21   with your Honor.  The fact that they produced somebody

22   by deposition, fine.  And no one -- and I'm not arguing

23   any adverse inference from that.

24       What I'm saying is there were witnesses they

25   could have called who they didn't call, either who were

1    on their list or within their control who could have

2    refuted if they had, if they -- if that were the truth,

3    what our witnesses said or the documents said, and they

4    chose not to call them.

5         For example, there's been testimony of this man,

6    Mr. Zuckerberg, the one who restored the rimonim for us

7    or -- he didn't actually do the work; he put us in

8    touch with it and out of his own pocket paid for half,

9    and we paid for half.

10        And he also, Mr. Zuckerberg, was the man who our

11   people, Mr. Segal, spoke to in the first instance when

12   we were looking to sell the rimonim back in 2008-2009,

13   asked Mr. Zuckerberg, who is not only simply a trustee,

14   longtime regular trustee, honorary trustee of Shearith

15   Israel, but someone who is very knowledgeable about

16   silver and asked him if he was interested in buying it

17   from us.  And he said, this CSI honorary trustee, I'm

18   not, but go talk to Christie's and maybe they can help

19   you find a buyer to sell it.

20        And I think if Mr. Zuckerberg, who was

21   originally on their witness list, would in any way

22   refute that testimony about his knowledge of our plans

23   to sell it, his help facilitating it, if he was in any

24   way contradicting that, they could have produced him.

25   Indeed, he was on their witness list.  They didn't

1   choose to produce him.  Indeed, they withdrew him after

2   we served the deposition notice.  So, therefore, I

3   think there is some relevance in that situation.

4          Similarly, we put in evidence their Minutes, if

5   you recall, where the president, the then-president of

6   the synagogue who is alive and well and living in New

7   York said, in terms when being told about the needs of

8   the Touro Synagogue and the need for financial

9   assistance for the Touro Synagogue, and that report by

10  the liaison, Mr. Groopman, reported; he said, No, we're

11  getting a free ride in terms of our responsibilities up

12  here.

13         THE COURT:  Mr. Naftalis, you can argue any way

14  you want, but let me see if I can focus you a little

15  bit, because those arguments may well have some

16  application in what I consider, at least the way I'm

17  thinking about this, the second phase of the argument.

18         And you have the luxury today of hearing from

19  the jury, which you normally can't in closing

20  arguments, so I can kind of direct you like a jury

21  never can as to some thinking.  And it should be clear

22  from the way I set the phases up is that the Court is

23  initially focused on the ownership of the rimonim,

24  because I think that drives a lot of the causes of

25  actions and probably that's why we're here in the first

1    place.

2          And so what I'd like you to do is to focus on

3    the evidence that's before me as to who owns the

4    rimonim, how they were owned, and if that ownership

5    interest changed at all, and how they were owned over

6    time, and sort of walk me through that, because there's

7    a dearth of information at times, and the Court is

8    going to have to make findings of fact based on the

9    evidence that's before it.

10          And then there's other very definitive evidence

11   I want to talk to you and to the other side about where

12   we do have documents, you know, we have wills, and we

13   have the leases, and we have the indentures, and we

14   have the settlement agreements, and we have the 1945.

15   We have some very specific documents that will help

16   guide the Court in its determination of who owns those

17   sacred objects, and it would be very helpful to me if

18   we focus on the evidence that leads to your contention,

19   at least a number of your counts, that CJI owns those.

20          MR. NAFTALIS:  Having got a note from the jury,

21   I will respond the best I can.

22          And before I start in that, let me just make one

23   point about that.  One of our themes, as we discussed

24   the evidence on the rimonim, is what do the documents

25   show, what do the witnesses show; but it's the theme of

1    what does common sense and logic show, the same thing

2    that you instruct the juries and take into account in a

3    bench case.

4         THE COURT:  Let me tell you, Mr. Naftalis and

5    Mr. Solomon, it is clear to this Court, and I will

6    state emphatically, that there is no smoking gun.

7    There is no, as I joked with my interns, Apple did not

8    e-mail us a receipt or did not e-mail anyone a receipt

9    for the ownership of the rimonim.  How we think about

10   ownership doesn't exist.

11        We have to patch together 250-odd years of

12   little bits of evidence, and how I perceive it is that

13   there are buckets, and there's evidence from both sides

14   that are supportive of their buckets, and the Court is

15   going to have to determine and weigh those buckets.

16   And at times those buckets are going to weigh heavily

17   for New York, and at times those buckets are going to

18   weigh heavily for Newport.

19        There is no, as the Court has perceived it so

20   far -- and you can try and convince me otherwise --

21   that there is no smoking gun that answers this

22   definitely that the receipt was e-mailed to somebody.

23   But that's not how I see it.

24        It's a matter of walking through history and

25   looking at the evidence and figuring out, when you look

1    at all of that evidence, which weighs more on the

2    simple ownership of -- on the simple question,

3    difficult to decide, but the simple question of who

4    owns the rimonim.  Because that's why I began by asking

5    if I do find that CJI owns it on the issue of what you

6    do with them, and the issue of endowments and the issue

7    of whatnot goes away.  If in fact I find that CSI owns

8    them or that CSI owns them, as you argue in the

9    alternative, legally for equitable reasons sort of in a

10   trustee relationship, then that raises a whole slew of

11   other questions about what can and cannot be done, and

12   you would still argue the ability to sell it.

13        So help me walk through the evidence that shows

14   that, absent a receipt, that CJI owns the rimonim and

15   how you get there from, I don't know, the mid 1700s to

16   today.

17        MR. NAFTALIS:  I'll do that right now, but let

18   me start with one preliminary thing.  Burden of proof.

19        THE COURT:  Legitimate.  I appreciate that.

20        MR. NAFTALIS:  On the trust issue it is

21   assuredly our burden, and we've never deviated from

22   that.  With respect to the ownership of the rimonim, it

23   is assuredly their burden of proof.  And I say that

24   because, as the Supreme Court said, a declaratory

25   judgment action is a procedural one, in the

1    *Mechatronics* case, and it's not determined by who

2    brought suit and certainly not determined that this

3    suit went forward, whereas their mirror image suit,

4    which got thrown out in New York, didn't.

5         The burden of proof in this case both as a

6    matter of the presumption from ownership and as a

7    matter of logic and common sense is assuredly on them.

8    And let me just spend a minute or two on that.  First

9    there's the presumption of ownership which, you know,

10   is like the first thing I learned in law when I was a

11   kid; possession is nine-tenths of the law, however it

12   goes.

13        The presumption places the burden on the party

14   not in possession, and that they have to affirmatively

15   prove they own the rimonim.  And the reasons for it we

16   cite on the slides, and they've been in the papers, and

17   I won't waste any of my precious minutes reading them

18   all.

19        But, in addition, even if there was no

20   presumption, the general guidelines on how you assign

21   the burden of proof means it falls squarely on them;

22   because if you think about it like this, who would have

23   to accept an adverse judgment in the absence of any

24   evidence?  In other words we produce not a shred of

25   evidence, they produce not a shred of evidence; who

1    would win?  We would win, because they're the ones who

2    are challenging the status question.

3         THE COURT:  I own this pen because I'm holding

4    it until proven otherwise --

5         MR. NAFTALIS:  Yes.

6         THE COURT:  -- is your argument.

7         MR. NAFTALIS:  And if you think about it, just

8    common, I have my watch.  Let's assume hypothetically I

9    had this watch for 30 years.  I got it from my dad, who

10   got it from his grandfather.  So we've owned the watch,

11   let's use a magic number, a hundred and 20 years in our

12   family, and I'm about to give it to one of my kids.

13   It's the stage in life; I want to pass on the heirloom.

14   And some second cousin comes along and says, Wait a

15   second, I really own this watch, and he sends me a

16   cease and desist letter saying I can't give this watch

17   to my kid.  So I go to court and bring a declaratory

18   judgment action.  I don't have a receipt from 1800 or

19   1750 or 1890 or whenever my grandfather bought it.  The

20   burden is on him to show by some evidence that would

21   overcome the presumption that we've had possession of

22   it for 120 years.  And I think that's an all-fours

23   analogy, and the burden obviously should be on the

24   challenger to the status quo.  I mean the burden thing

25   makes sense, is what I'm saying, as a matter of logic,

1    not only as a matter of law.

2          Now let's start with our reasons in answer to

3    finally try and answer your Honor's question.  We feel

4    there are like five independent reasons why we own it.

5    First, CYI, our predecessor congregation, was the

6    original owner of the rimonim.  As your Honor said, no

7    smoking gun.  No direct evidence.  There's no direct

8    evidence on this issue.  And that's not surprising,

9    given the passage of time and the fact that the CYI

10   records are not complete from the 1700s.

11         THE COURT:  Are you going to go through each one

12   of these, or should I question you now on them,

13   Mr. Naftalis?  Do you want to get through them all and

14   then you're going to support each one of them?  Because

15   I have questions about --

16         MR. NAFTALIS:  The history?  Let me deal with

17   the history, your Honor, and then go back to the other

18   four.  I think that's probably what your Honor would

19   prefer I do.

20         THE COURT:  Sure.

21         MR. NAFTALIS:  Why do we say that CYI was the

22   original owner?  First, you have the words "Newport"

23   engraved on there.  People don't write words -- I'm

24   talking now, we're dealing with circumstantial

25   evidence, obviously.

1          Why was it there?  It's been there.  Even their

2     own expert, Dr. Mann -- who I'll have a few words to

3     say about what she doesn't contribute to this party --

4     admitted that the rimonim were in Newport before 1818

5     and the inscription was a means of identifying what had

6     been in Newport.

7          Secondly, Myers, Myer Myers had connections to

8     Newport.  That is to say, his sister lived up there;

9     his brother-in-law Hayes was there, moved to Newport at

10    or around the time he made the rimonim.  He had made

11    other things for people connected with the Newport

12    congregation:  Moses Seixas, the one who made the

13    famous Seixas letter to George Washington, got a

14    circumcision shield made by Myer Myers.  And in

15    addition here's a ledger from 1787 which is almost

16    readable; it shows that Myer Myers was paid for mending

17    rimonim in Newport; right?

18         Now, why would Myer Myers in Newport -- as bad

19    as Amtrak is on some days, it's a heck of a lot better

20    than riding a horse in those days from New York to

21    Newport.  Why would he be mending rimonim unless it was

22    rimonim that he made for that synagogue?  After all,

23    there were plenty of silversmiths in Providence and the

24    environs and Boston, et cetera, et cetera, et cetera.

25    I think that's a very powerful piece of circumstantial

1    evidence.

2         Secondly, although there's no record of the

3    transaction, there were wealthy members, as we pointed

4    out, in the Newport Touro Synagogue who could afford to

5    make a donation.  Indeed, there was mention of this

6    man, Aaron Lopez, and it's in evidence that Aaron Lopez

7    in 1769 did donate rimonim to Yeshuat Israel.  Those

8    rimonim match the description of the rimonim at issue

9    in this case.  I can't close the circle by saying

10   there's -- but I think you have a fair inference from

11   that.

12        In addition, we have all their admissions in

13   their pleadings.  And it wasn't just once, it wasn't

14   just twice, it wasn't just three times.  We counted

15   nine times that they admitted that CYI was the original

16   owner or possessor of the rimonim.

17        THE COURT:  Which we don't have to get into now,

18   but we know they've attempted to amend to remove that

19   information in the Rhode Island action.

20        MR. NAFTALIS:  A little late.

21        And even then you can't eliminate -- we say they

22   can't do that, so it's a judicial admission.  But even

23   if they could, it's still a party admission.  You know,

24   you can't wipe the slate clean.  They've admitted it.

25        THE COURT:  Well, it also exists in the New York

1    material, which hasn't been moved to amend.

2    MR. NAFTALIS:  Yes.  And there are other party

3    admissions.  They have a ritual director, Mr. Edinger,

4    here.  He was the person they first assigned in 2012 to

5    see if there was evidence to support their case of

6    ownership.  He testified in his deposition, referring

7    to CYI, it's your understanding they were the original

8    possessor of the rimonim?  He was a 30(b)(6) witness.

9    His admissions bind them.  He was designated by them as

10    the 30(b)(6) witness on this issue.  He also, he also

11    wrote this in his report that he wrote at the time.

12    In addition, the rabbi, who was their rabbi when

13    this case was brought, who was their longtime rabbi,

14    Rabbi Angel, he was their rabbi for 37 years.  He

15    testified at his deposition that Jeshuat Israel was the

16    original possessor of the rimonim.

17    He also wrote a book during the time he served

18    as the rabbi of the New York congregation that Myer

19    Myers created the rimonim for the congregations in

20    Newport and Philadelphia.  He made a speech at Yale in

21    which he said the same thing.

22    In addition, every scholar who has ever looked

23    at this issue, the real experts -- not experts, you

24    know, I have a view about their experts -- real experts

25    who actually are experts on Myer Myers and these issues

1    all agree that the rimonim were made for CYI.  David

2    Barquist from Yale; the Jewish Museum, Jeannette

3    Rosenbaum, the other major scholar on Myer Myers; the

4    Library of Congress; Guido Schoenberger, the Museum of

5    Fine Arts.  The beat goes on.  And CYA (sic) never

6    claimed before this lawsuit that they were the original

7    possessors or owners until Dr. Mann entered the field

8    with her theories.  So I think that, one, no smoking

9    gun, but the weight of the evidence is assuredly on our

10   side.

11       And let me now, let's talk about their, what

12   I -- and I think I used the word in my opening.  It's

13   always nice to try and say everything you say in your

14   opening you prove.  I think we came pretty close.

15       We referred that their position was revisionist

16   history.  So, they put on a couple of experts.

17   Dr. Mann, she wasn't one of these experts who had no

18   skin in the game who had been studying the subject.

19   She's an art historian on European Jewish art.  She's

20   not a real historian, not someone who has ever studied

21   Myer Myers.

22       She purported to give opinions on colonial

23   ledgers.  She didn't even know where debit -- I mean, I

24   thought it was funny when Mr. Wagner said, Well, which

25   side is the debits and which side are the credits?  And

1    she didn't even know the old joke, you know, debits by

2    the window, credits by the door, the one I always used

3    to say.

4         And, of course, she admitted on

5    cross-examination that her job was to build a case for

6    ownership for CSI, and she carried out her mission and

7    used kind of made up methodologies.

8         We counted at least -- I think your Honor still

9    remembers it, an endless number of times Mr. Wagner had

10   to confront her with her deposition testimony, as she

11   tried to change it for the trial.  We counted more than

12   a dozen times on significant issues.

13        In addition, she tortured the evidence with her

14   deletions.  There is a document which is really

15   important:  Their Minutes from 1832 and 1833.  Those

16   are the Minutes which said that they took possession of

17   the Torahs for safekeeping, to be redelivered back to

18   us, all right, or to a congregation that would be

19   praying in the Touro Synagogue, meaning they were

20   bailees, that they were holding them for safekeeping.

21   Indeed, Dr. Mann and even Mr. Katz admitted they held

22   them for safekeeping.

23        THE COURT:  Mr. Naftalis, let me ask you about

24   the bailment period that you referred to.  Putting

25   aside the question, which I'm sure you'll argue shortly

1    for a second, as to whether CJI is the successor to

2    CYI, putting that aside for a second, and I know you

3    put together evidence for the Court to make that

4    conclusion.  But taking that away for a second, if the

5    scenario were that CYI owned the rimonim and in and

6    through the middle of the 1800s, and then entered a

7    bailment arrangement with CSI for safekeeping, and when

8    CSI was ready to give them back, in this case when the

9    Jews returned to Newport and began publically

10   worshipping later on in the century, CYI doesn't exist

11   any more, under my scenario.  And I understand you

12   don't, you don't -- this isn't your position.  But CYI

13   doesn't exist anymore, and CSI gives it back to a new

14   entity, brand new entity with no relationship to CYI.

15        What's the effect of that legally?  What's the

16   effect of a bailee return of the chattel to a

17   non-bailor?

18        MR. NAFTALIS:  Well, what I put up on the slide

19   here are the 1833 Minutes of theirs which define, in

20   our judgment, the scope of what they were to do.  And

21   the words, what's interesting, that she deleted, are

22   the critical words.

23        First, she deleted the words "belonging to the

24   Newport synagogue."  Pretty critical.  We're talking

25   about whose property it is.  It's not the property of

1    CSI.  And then in the receipt --

2            THE COURT:  It doesn't help; if that were the

3    case, it doesn't help as to whose property it is.  It

4    doesn't say to return to CYI or to CJI or to a new

5    group worshipping.

6            MR. NAFTALIS:  Well, if you look at the receipt,

7    it says to be deposited -- to be redelivered, right,

8    when duly requested.

9            THE COURT:  Just show me where you're reading

10   from, Mr. Naftalis.

11           MR. NAFTALIS:  If you look at the very -- I have

12   the slide, Dr. Mann's deletions.

13           THE COURT:  Yes.  I have it up in front of me.

14           MR. NAFTALIS:  Let's go to the second one, the

15   second, the 1833 receipt.

16           THE COURT:  There we go.  Got it.  Thanks.

17           MR. NAFTALIS:  It says received these four

18   Torahs and it says -- let's put it in blue at the end,

19   Toby -- "to be redelivered when duly requested for the

20   use of the congregation hereafter worshipping in the

21   synagogue at Newport, Rhode Island."

22           That's, most respectfully, pretty clear of what

23   the intendment was.  And since CYI, the

24   then-congregation wasn't in existence when the new

25   successor congregation comes in, they're supposed to

1    get it back.  That's clear.

2         And of course in terms of her credibility,

3    leaving out the magic words I think reflects, these

4    kinds of deletions, the critical language, reflects on

5    her.

6         And I think the Rhode Island law supports us

7    there in our post-trial memo.  If you look at Page 6,

8    *Don-Lin Jewelry versus The Westin Hotel*, "bailment is a

9    delivery of personalty for some particular purpose.

10   After the purpose is fulfilled it shall be delivered to

11   the person who delivered it or otherwise dealt with

12   according to his directions."  Otherwise dealt with

13   according to his directions.

14        So we think these documents, their admissions,

15   they're critical.  And in reflecting on Dr. Mann's

16   testimony, the fact that she would delete the most

17   critical language in the documents, I think, reflects

18   quite badly on her.

19        Indeed, it occurred to me as I was listening to

20   her -- and just a minute on the experts before I get

21   back.  Professor Fisher, who also didn't really have

22   the expertise here; I mean, I'm sure he's great in his

23   field.  He's an expert on native American matters.

24   He's an expert on the Christian religion.  But this

25   isn't his field.  This isn't calling any one of those

1    people on the list -- well, they couldn't call them,

2    the ones that were alive, because they all come out our

3    way.  But, you know, he was not exactly a historian of

4    stature in this field.  He wasn't Gordon Wood or James

5    Patterson or any of the great historians.  I thought he

6    was someone up there, and that's one of the reasons we

7    objected, you know our legal position on that;

8    shouldn't have taken it.  But now that you've taken it,

9    you shouldn't give it any weight, because what they

10    were doing?  They were trying to interpret the

11    documents; right?  That's not expert stuff.

12         What I thought about, with all due respect, was

13    as I listened to Fisher I thought I was listening to

14    Fox News.  I thought I was listening to Hannity or

15    O'Reilly talking about Hillary Clinton.  It was hardly

16    fair and balanced.

17         THE COURT:  Or Rachel Maddow.

18         MR. NAFTALIS:  Well, I like her better.

19         THE COURT:  Equal time.

20         MR. NAFTALIS:  Okay.  I'll take that.

21         And remember, he couldn't even answer that

22    question.  You had, by the Court, you used this word

23    "appurtenances;" can you tell me, other than the

24    documents, any other time in the United States in the

25    1600s, the 1700s, the 1800s, we quote the endless, you

1    know, pursuit of him trying to get him to answer, and

2    he came up with, Well, there was a synagogue in

3    Jamaica.  Okay?  Which I mean, I know, I don't think

4    Jamaica is the 51st state.

5         THE COURT:  I'm more intrigued, when we get to

6    it, about the word "paraphernalia," but we'll get

7    there.

8         MR. NAFTALIS:  We'll get there.  And spending a

9    minute about Dr. Mann's, which is their only theory to

10   try and rebut that somehow they paid for it, based on

11   her analysis of the ledger.  And the only problem with

12   her analysis of the ledger, apart from the fact she

13   doesn't know the difference of where debits versus

14   credits go --

15        THE COURT:  To defend her, neither do I.  I'm

16   learning it, by the way, through this case, but neither

17   did I.

18        MR. NAFTALIS:  Well, I got a bad grade in

19   accounting for lawyers in law school, too.

20        But she came up with this theory with this crazy

21   methodology, which I can talk about for a minute, but

22   on cross-examination it all fell apart because I

23   remember, I was thinking about it as it was happening,

24   and I'm thinking about it now, and I remember there was

25   a time we had an exchange about Perry Mason moments.  I

1    think I was cross-examining Mr. Katz and made a point

2    or two, and you said, Well, you know, really you're not

3    going to get him to confess, and I said, Well,

4    everybody's waiting for a Perry Mason moment.

5          I think as close to a Perry Mason moment in the

6    trial occurred when Mr. Wagner, and I think it was the

7    best piece of lawyering in the case -- no disrespect to

8    Steven, Toby, me, or Lou Solomon -- that when he

9    cross-examined her about the ledgers, and the ledgers

10    made it clear that what the number was all about was

11    that the parnas, the head of CYI in those days, would

12    lay money out for expenses and get reimbursed.  They

13    didn't have the full amount to pay him in 1764, and the

14    magic number that was missing was 36.4.1, and it was

15    repaid to him in 1765.  That's what the next ledger

16    shows.

17          And there was a resolution, and there's the

18    magic number, 36.4.1, and then there was a resolution

19    saying that he may be paid for the balance of his

20    sedakah account.  That's the next slide, 36.4.  And it

21    had nothing to do with the purchase of rimonim.  And

22    her formulas to try and get there were all flawed.  She

23    used a price of silver from 25 years before the rimonim

24    were made, even though we showed that silver prices had

25    gone up 500 percent.

1    The second formula, she used the weight after

2    the pieces had fallen off, instead of the earlier and

3    more accurate weight, even though they had it.  She

4    also used the silver price from four or five years

5    before.

6    And indeed what's interesting is their records,

7    and I give them with some respect, the old CSI, New

8    York records they maintained.  They retained many more

9    of them than CYI, and they kept pretty meticulous

10   records, pretty meticulous records.  So when they

11   bought their pair of rimonim from Myer Myers, it's in

12   the ledger:  Cash paid Myer Myers due on pair of

13   rimonim.  That's the 1774.  That's 10 years later.

14   That's the rimonim that they own.  And there's no

15   record -- there's no record of them paying anything for

16   the rimonim which is the subject of this case.

17   So I say to your Honor that they -- and that was

18   this newly-minted position with their expert that

19   doesn't hold water, and all the circumstantial evidence

20   points in our direction on this, and that's what --.

21   Now, I had shown you the 1833 repair.  That only

22   refers to Torahs; does not refer to rimonim, even

23   though --

24   THE COURT:  I'm sorry; I meant the receipt, not

25   the repair.

1          MR. NAFTALIS:  Even though everybody who had

2     looked at this issue before the trial, and indeed even

3     in the depositions said that the rimonim likely

4     traveled with the Torahs.  They're ornaments of the

5     Torahs.  Why wouldn't they travel with the Torahs?  Why

6     would they be treated differently?  What principled

7     reason would there be for holding the Torahs in

8     safekeeping to be redelivered, but the ornaments on the

9     Torahs would be treated differently?  There's no

10    principled reason for this.  There's no evidence of

11    that.  And it makes no sense that indeed everybody who

12    has ever looked at it came to this conclusion.

13         Look at Dr. Barquist; that was his conclusion,

14    a leading Myer Myers scholar.  Their own ritual

15    director, Mr. Edinger, who was their 30(b)(6) witness,

16    he testified it's likely the rimonim were brought to

17    New York for safekeeping in the 1820s and 1830s.  The

18    internal Shearith Israel memo he wrote, It is likely

19    the rimonim adorning these scrolls were brought to New

20    York for safekeeping.

21         Safekeeping doesn't mean ownership.  It means

22    safekeeping.  That's what it clearly means.

23         And indeed their own witness, Mr. Katz, admitted

24    both on his, on redirect and cross that Shearith Israel

25    held the rimonim in safekeeping, and we quote his

1    testimony here on this next slide:  (Reading)  When I

2    say "they," I mean the Jews of Newport.  The Torahs and

3    rimonim, other ritual objects which had been in the

4    Torahs, we took them for safekeeping.

5         Direct from his own lawyer:  The rimonim had

6    been given to us to be held in safekeeping.  Another

7    admission to add to the pile of admissions there.

8    Their longtime rabbi, Rabbi Poole, talking about the

9    Torahs.  And being a rabbi, you last a long time; 1907

10   to 1970 is good for your health, the job.  In his book

11   he talked about the scrolls and other, these and other

12   scrolls temporarily deposited with Shearith Israel have

13   been returned to their owners.

14        And now I want to talk a little bit about

15   something else about Dr. Mann, which is our spoliation

16   point.  We're asking the Court to draw an adverse

17   inference from their loss of a critical exculpatory

18   document.

19        CSI, the New York congregation, said yeah, but

20   that stuff only talks about Torahs; right?  Doesn't say

21   rimonim; right?  Even though their own people admit and

22   every scholar has admitted how can the rimonim not

23   travel with the Torahs.  It's an ornament for it.

24        But there was a document that would have said

25   that.  And by Dr. Mann's own admission at her

1    deposition on December 31st, 2014, she had a document

2    that was given to her by them evidencing the transfer

3    of the silver that had been used in Newport -- that's

4    the rimonim, the silver -- from the family of Moses

5    Seixas to CSI for safekeeping.  She testified the

6    document came from CSI's files and she said she lost,

7    she lost the critical exculpatory document.

8         Well, we then asked CSI for it, and we first

9    asked for it on December 31st at the deposition.  They

10   never produced it or responded.  January 5th, we sent

11   them an e-mail saying could you please give us this

12   important document.  Again they ignored us, never

13   bothered responding.  January 16th, we sent them

14   another e-mail asking for them to produce this again.

15        THE COURT:  Mr. Naftalis, again, you can argue

16   what you want, but let me give you this little hint.  I

17   loathe to decide this case based on a legally-imposed

18   adverse inference that well might apply in other cases.

19   It may well be that you've set forth other critical

20   needs for it, but the Court is far more focused on what

21   we actually know, because we know a lot.  As I said,

22   there's no smoking gun.  And you can continue to argue

23   it if you'd like, and I think you've done an

24   outstanding job in your papers on it, but in terms of

25   it being a determinative factor in this Court's

1    determination of who owns the rimonim, it's not going

2    to play that big a role.

3            MR. NAFTALIS:  We're hoping it will play some

4    role, but, your Honor, I know when I'm supposed to move

5    on to another argument.

6            You had indicated that you wanted us to respond

7    to, one of the questions on the Court's mind was, you

8    mentioned the word "paraphernalia."

9            THE COURT:  Well, so we're just about to get to

10    the part now where it gets, you know, we get to the

11    1869 inventory, which I assume you're going to want to

12    talk about, the CSI inventory, and then we're going to

13    get to the, I think perhaps at times, critical juncture

14    at the turn of the century where we have a lot going on

15    with a lawsuit and perhaps in this building or

16    somewhere around here, in this court at least, and we

17    have indentures, and we have settlement agreements, and

18    we have leases, so.

19            MR. NAFTALIS:  Let me deal quickly then with the

20    1869 inventory, which is one of their things that they

21    try and put a lot of reliance on.  And our view on

22    that, it is a document which, properly analyzed,

23    doesn't help them and is of very limited probative

24    value, and let me tell you why.

25            The inventory was of property belonging to or in

1    keeping of, safekeeping, meaning you didn't own it but

2    you held it; right?  And we've got admissions all over

3    the place they're holding this critical stuff in

4    safekeeping.

5        And even Dr. Mann admitted in keeping doesn't

6    mean ownership.  And obviously CSI does not own the

7    property it was holding in keeping.

8        The ditto marks which they make really have

9    something to do with keeping of Shamas; it doesn't say

10   that we own it.  Indeed, it doesn't say it's the

11   property of.  Indeed, it's discredited by their own

12   marginal note, because one of the items is property of

13   L. Cohen.  Well, it couldn't be owned by CSI and

14   L. Cohen, for those ditto marks to mean what they say

15   it does.  Obviously he wouldn't have needed a special

16   notation.

17       And by the way, the fact that we didn't need a

18   special notation that they were ours, because the word

19   "Newport" is right on the property, is right on the

20   rimonim.

21       And indeed, it's perfectly clear, and they can't

22   be contesting that they held the Torahs in safekeeping,

23   even though there was no marginal note there.  As Rabbi

24   Poole said, they were returned to the rightful owners.

25   And there's no evidence how this, the person who wrote

1    this, because he's not available here to be

2    cross-examined, what he looked at.  Did he look at the

3    1833 Minutes showing the bailment?  There's no evidence

4    his inventory was ever shared with anybody outside of

5    CSI.  Three or four-inch document rule would probably

6    be not here as a piece of hearsay; right?  In any

7    event, I don't think it proves a whole heck of a lot.

8    And the --

9            THE COURT:  Actually you want me to interpret it

10   that it proves a lot, that is, that they held it in

11   safekeeping.

12           MR. NAFTALIS:  Yes.

13           I can go -- I'm asking the Court what would you

14   prefer.  I was going to then go and finish up the

15   history and then go to the leases and that language.

16   Or you want me to get right to the paraphernalia and

17   the lease and stuff?  I'll do it, whatever is the most

18   helpful to the Court.

19           THE COURT:  You've got about 18 minutes left,

20   from what I can see.  You're welcome to do it any way

21   you want.  It should be sort of clear to you where I

22   see some critical junctures that I'd like to discuss

23   where I've got questions about.

24           MR. NAFTALIS:  Okay.  Let me -- let's talk about

25   the leases then.

1          THE COURT:  And what led up to them.

2          MR. NAFTALIS:  And what led up to them.  There

3     was this dispute, and on some of the legal issues -- I

4     meant to say this at the beginning.  We're going to get

5     into Judge Brown's opinion and stuff.  If it doesn't

6     bother the Court, my colleague, Steve Snow, who knows,

7     who has gotten more about Rhode Island law than I'll

8     ever know, will address any of that, your Honor's

9     questions.

10          THE COURT:  You can divvy up arguments any way

11     you want, sure.

12          MR. NAFTALIS:  Three fundamental points about

13     the resolution -- the settlement, resolution, the

14     lease.  First, these were documents concerning real

15     property and things that became real property by virtue

16     of being physically attached to the Touro Synagogue.

17     Second --

18          THE COURT:  That's what the settlement agreement

19     says.  The settlement agreement says premises and

20     fixtures.

21          MR. NAFTALIS:  And let me work it, but my

22     fundamental point is all of these documents are

23     documents, in my judgment and our opinion, that deal

24     with real property.  That's my point and I'll walk

25     through it.

1          Secondly, the term "rimonim," "bells" and

2     "finials," terms, they don't appear in the settlement

3     agreement.  They don't appear in the resolution.  They

4     don't appear in the lease.  And I posit this:  The

5     rimonim, it is clear, are the most valuable things in

6     the Touro Synagogue.  Indeed, they may be the only

7     things of any real monetary value.  We know that and

8     it's been known for a long time.

9          If somebody is leasing premises and in the

10    premises there's a valuable piece of personal property

11    which you intended to be included in the lease, you

12    would identify it.

13          THE COURT:  Well, let's dig down on that a

14    little bit, because let me tell you how I perceive,

15    from looking at the documents in this little period on

16    these issues; and that is that a settlement agreement

17    was reached after the split of two different Newport

18    congregations and the occupying and whatnot.  And the

19    settlement agreement came with what people seem to

20    accept at that time was the trustee of the Touro

21    Synagogue itself, that being CSI.  And CSI entered a

22    settlement agreement with one of the two groups.  They

23    entered it with your group, CJI, as opposed to the

24    other congregation that was worshipping there.  And in

25    that settlement agreement it was a, if I can use the

term surrender by CJI, saying we give; premises and the
fixtures are owned by, in trust by CSI.  That's the
settlement agreement.

Very shortly thereafter, two days, I think two
days later, CJI passes a resolution that's printed, not
handwritten, and in that resolution CJI changes the
words and they change "fixtures," I believe, to
"paraphernalia," and they add the word "paraphernalia"
to it.  And then there's discussion at CSI internally
amongst I think a couple of members or whatnot.
There's two or three documents on that where they
immediately raise concern that the settlement agreement
does not include paraphernalia.  Okay?  A couple of
letters that say that.

And it appears therefore after that, and in
effect I think even the lease, preprinted lease -- the
lease itself, indenture and lease didn't have that in
there, and they handwrite in "and paraphernalia," and
they separately notarize at the end of that lease "and
paraphernalia," signifying, one could assume, a concern
by both parties at that stage that "paraphernalia,"
whatever that term means, are included in this lease
relationship between the CJI and CSI.  And one could
therefore assume one could use as, one could consider
as a factor that if they were leasing it to you, that

1    they had ownership interest in the paraphernalia.

2         So my question to you is what is the legal

3    effect of the CJI resolution on "paraphernalia"?

4    What's the legal effect of the inclusion of the word

5    "paraphernalia" in the lease?  And what the heck does

6    "paraphernalia" mean?

7         MR. NAFTALIS:  Okay.  Let me try and answer all

8    three of them at the same time or together, and let me

9    start with how I think the whole issue should be

10   properly looked at by your Honor.

11        What does CSI own at this time?  Well, if you

12   throw out Dr. Mann's magical theories, which I think

13   should not be credited, most respectfully, by your

14   Honor, there's no evidence whatsoever that at this

15   point in time they ever owned the rimonim, and you

16   can't lease something you don't own.

17        And they in 1894 without any legal documents to

18   give them anything, they scurried around and got deeds,

19   three of them, the deeds basically from the heirs which

20   conveyed the interests of Levy, Rodriguez Rivera and

21   Hart.  Well, Levy, Rodriguez and Hart never owned the

22   rimonim, never purported to own the rimonim.  All they

23   owned in trust was the Touro Synagogue building.

24        THE COURT:  You know --

25        MR. NAFTALIS:  That's all they could convey.

1          THE COURT:  I meant to ask you about that

2     before.  When do you claim the rimonim were originally

3     owned?  Were they owned by the three original, well,

4     for lack of a better term call them trustees of Touro

5     Synagogue initially and then transferred to CYI, or

6     originally owned by CYI?

7          And I realize there's no documents that talk

8     about that period in time, but what do you believe the

9     evidence or the reasonable inference is I should take

10    from the evidence as to whether in fact they were

11    originally owned in trust by the three of them, or

12    doesn't it matter?

13         MR. NAFTALIS:  I don't think it matters.

14    There's no evidence that the three trustees owned

15    anything other than the synagogue in trust.  That's all

16    the documents say, that they never purported to have

17    ownership of the rimonim.  And so all that their heirs

18    had was the trustee relationship to the synagogue, and

19    that's all the New York congregation could have gotten.

20         And remember the lease, the lease in 1903 is a

21    lease, it's a trust lease.  They're leasing -- assuming

22    you accept our position where they are, except how the

23    Attorney General viewed it -- that they stand there as

24    trustees, not absolute owners of the synagogue.  It's a

25    lease of them and their positions as trustees, and you

1    can't lease something you doesn't own.  And we agree

2    with the Attorney General's view that the rimonim are

3    not part of any trust, that we just own them all along.

4              And on the issue of "paraphernalia," we point

5    out, your Honor, the sequence of the documents, and

6    "paraphernalia" replaces "fixtures."  "Fixtures" is in

7    the original.

8              First of all I think you start with the notion

9    that the resolution can't expand the settlement and the

10   lease can't expand the settlement.  They're basically

11   an aid of the settlement.  The settlement talks about

12   premises and fixtures.

13             THE COURT:  Your argument is that the settlement

14   agreement controls that period of time, not the other

15   documents, because on its face and on its all fours the

16   terminology "premises" and "fixtures" are not ambiguous

17   and so the resolution and actually probably the lease

18   are irrelevant to the issue; right?

19             MR. NAFTALIS:  Yes.  And we know what the

20   fixtures are.

21             THE COURT:  Even if you did own the rimonim --

22   and I realize that's your position -- prior to entering

23   the lease, couldn't one -- and if one believed the

24   paraphernalia, that the rimonim are included in the

25   definition of "paraphernalia," it's not inconceivable

1    that CJI could have bargained away its ownership

2    interest in the rimonim in exchange for a lease and the

3    purpose and the right to use after a hotly contested

4    battle as part of an agreement to enter into this

5    long-term lease to conduct worship services there.

6    That's not an inconceivable explanation that would be

7    consistent with your ownership into that point, is it?

8         MR. NAFTALIS:  Yes; but, number one, we don't

9    think that the facts substantiate that, and we don't

10   put much weight on internal things.  And I think one of

11   the things we argued is we asked them for proof of

12   certain ownership things, and they never told us about

13   the 1833 Minutes, and we indicate there's something to

14   be said about that legally.

15        But I say two or three things.  First, their own

16   witnesses tell you that "paraphernalia" aren't the

17   rimonim.  And Dr. Mann, she does know about ornaments.

18   She may not know much about Myer Myers.

19        Have you ever in any of your writings ever

20   referred to rimonim as paraphernalia?  I don't think

21   so.

22        Their own 30(b)(6) witness, their witness,

23   Edinger, their ritual director, their expert on these

24   things, he was the one -- he couldn't carry out the

25   missions.  They hired Mann, who was sent out to find

1    evidence that would support their case in 2012.  He

2    said, Do you ever recall any instance in which rimonim

3    are referred to as paraphernalia?  I don't recall.

4          Even Fisher in his deposition said, I couldn't

5    find anything out there like that.

6          THE COURT:  Right.  But Mr. Naftalis, if

7    "paraphernalia" as used in the lease and in the

8    resolution and in the CSI correspondence doesn't

9    include rimonim, what does it include?  It has to have

10   some meaning.  What else could -- clearly CSI was

11   concerned post-settlement agreement with ensuring that

12   "paraphernalia" is included in this agreement with CJI.

13   It clearly evidenced that in the post-agreement

14   writing.  They had something in mind.  There was some

15   concern.

16         And if the only valuable things in the

17   synagogue, other than the building itself, were the

18   rimonim, how can't I conclude that the, that when the

19   term "paraphernalia" was used it included rimonim?

20   What else -- tell me what is CJI's position that

21   "paraphernalia" included then.

22         MR. NAFTALIS:  Well, I would say two things to

23   that.  If you look at the --

24         THE COURT:  It's just the orange one.  You have

25   five minutes.

1          MR. NAFTALIS:  If you look, comparing the

2     resolution and the settlement, see that there,

3     "fixtures" is replaced by "paraphernalia."  Assuredly

4     the fixtures are included.

5          THE COURT:  But I get that.  But why would CSI

6     be concerned about changing a word that you say has the

7     exact same meaning?  There was clearly something going

8     on.  They don't say what they mean by it.  They don't

9     say we got to make sure that the rimonim are included.

10     They say we got to make sure the paraphernalia is

11     included.

12          MR. NAFTALIS:  Well --

13          THE COURT:  And I can't, and I'm not yet buying

14     that it's a substitute for "fixtures."  It clearly was

15     on somebody's mind and concern at that time.  It's

16     something else being included.  And I guess I'm asking,

17     what else is it?  I understand your argument about

18     fixtures.  Let's assume I'm not buying that, that it

19     was a substitution for the word "fixtures."

20          What else could it have included, if it didn't

21     include the rimonim?

22          MR. NAFTALIS:  Well, I start with three things

23     here.  Number one -- I'm backing up.  If the rimonim

24     were really, then you should have said them.  The word

25     "rimonim" doesn't appear; "bells" don't even appear,

1    "finials" don't even appear, "personal property"

2    doesn't even appear.  "Chattels" --

3         THE COURT:  Does appear in a CSI document.

4         MR. NAFTALIS:  No, but I'm talking about in the

5    operative documents here.

6         THE COURT:  Right.

7         MR. NAFTALIS:  Whatever things that they might

8    have wanted to accomplish, that's one of the reasons we

9    put those two telegrams in there.  They were trying to

10   scheme to get some things back, but they got, well, we

11   only have one there.

12        The answer is, we weren't there.  We don't know.

13   But, you know, you construe these things --

14        THE COURT:  No, but I have to decide.

15        MR. NAFTALIS:  You construe these things against

16   the draftsmen, number one, and the telegrams cast real

17   doubt on their internal stuff.

18        And then we get to the presumption and why the

19   presumption is important, because they talk about

20   avoiding these historical wild goose chases about what

21   somebody meant in some document that may not have been

22   shared with anybody, an internal CSI document written

23   between them and about lists that never got created and

24   the like.

25        Remember, there's one thing; how people behave

1    under a lease, under a contract, is really strong

2    evidence of what the contract means.  For 120 years we

3    have held ourselves out, the world has held us out as

4    the owners of the rimonim, and no one has held out CSI

5    as the owners.  We have the slides.  Every exhibition,

6    catalogs, books; Mr. Katz's conversations with

7    Ms. Ross.  We've exclusively -- we've exhibited every

8    indicia of ownership and they have --.

9         And if you think about it, how does an owner

10   behave?  If they truly owned or believed they owned the

11   rimonim, would they really be letting us hold ourselves

12   out as the owners of it?  If I had a Picasso and it was

13   supposedly part of a lease, first of all, I wouldn't

14   call it paraphernalia.  First of all, I would be so

15   lucky.  If I had a Picasso worth $7.4 million, I would

16   say the lease includes Picasso Blue Water, blah, blah,

17   blah, blah, and I leased it to my pal Steve Snow, I

18   would say it.

19        And secondly, if you look at the patterns there,

20   if I saw that Steve Snow took my Picasso and lent it to

21   a museum and claimed it was his, I would go through the

22   roof if I believed, if I thought it was really mine.

23   Or if I thought that -- or if I had a conversation like

24   Mr. Katz had in 2009 with Ms. Ross where they discussed

25   the contents of the Jewish *Forward* article, in the

1    Jewish *Forward* article we're announcing we own it.  We

2    gave an interview in their hometown paper where we say

3    we own it and we're thinking of selling it, and

4    Mr. Katz doesn't utter a peep.  Nobody -- and he

5    reports this conversation to the CSI board.  They don't

6    utter a peep.  That's not how an owner behaves.  An

7    owner behaves -- an owner would go through the roof.

8    Indeed, if you think about his only concern was, Oh, we

9    don't want to have to give you any money.  That's not

10   how an owner behaves.

11         And indeed, on June 25th, 2012 when they hear

12   we're about to sell it for $7.4 million to the Boston

13   Museum of Fine Arts, Mr. Katz's testimony, I put it on

14   the slide here, as of June 25th, 2012 in his

15   conversation with Ms. Ross, we weren't sure who owned

16   them at this point.  They send out cease and desist

17   letter.  They still don't believe that they own them.

18   It was June 29, 2012.

19         THE COURT:  Mr. Naftalis, you have to wrap up.

20         MR. NAFTALIS:  It was too soon to come to any

21   conclusions as to what the status was.  That's not how

22   an owner behaves, how the people, how they construe

23   things.

24         Mr. Katz was at the Yale exhibit.  He saw it.

25   Their rimonim were right next to ours.  It was listed

1   there:  Provenance, Congregation Jeshuat Israel, Touro

2   Synagogue.  He never, never occurred to him that they

3   owned it.

4       Our view is there was 7.4 million reasons why

5   they got interested in it, and that's when they got

6   interested in it in June of 2012.

7       And absent -- I think I've passed my yellow

8   light, my red light, my blue light, unless your Honor

9   has any other questions.

10      THE COURT:  I have a million questions, but not

11  for now apparently.

12      MR. NAFTALIS:  Okay.  Thank you, your Honor.

13      THE COURT:  Thanks, Mr. Naftalis.

14      As Mr. Solomon comes up here, lawyers know this,

15  but I'll tell the rest of the folks gathered, that

16  Judge Berman in New York was an oddity, my colleague

17  Judge Berman during his oral arguments on the Tom Brady

18  matter, where it was quite obvious to the lay press how

19  Judge Berman was thinking and then it turned out to

20  actually be true.  Rarely, if ever, when a judge speaks

21  during oral argument is anyone able to decipher what

22  the judge is particularly thinking about a case.  Judge

23  Berman perhaps was the one time exception to that where

24  in fact people seemed to have -- he seemed to have

25  telegraphed exactly where he was coming from when he

1    ruled.  But such is not the case, as you'll probably

2    find out shortly, when I question Mr. Solomon on it.

3             MR. SOLOMON:  Thank you, your Honor.

4             May it please the Court, we also have some

5    demonstratives.  I would be delighted not to go through

6    any of them in answering your Honor's questions for my

7    full hour.  I do have some that try to address some of

8    the Court's questions.

9             Right now my dilemma is to respond to what I

10   think are really rank distortions by counsel that go

11   beyond, I think, fair argument.  I didn't hear any that

12   are not addressed in the papers, and so I would like to

13   leave most of that.

14            I would like to spend 90 percent of my time on

15   what I believe are the critical bookends, that some of

16   this is through a glass darkly, which I thought was

17   Milton, and I was told it's I Corinthians.  But some of

18   it is clear, and we have some clear guideposts, and

19   bookends of the 1869 inventory, and the 1903 and 1908

20   indentures I think are clear road marks.

21            I'm going to quickly go through some of the

22   erroneous comments that were made.  I want to hold the

23   disparagement of the experts.  The critical point there

24   is, Judge, they didn't call any, and the idea this

25   Court didn't need the assistance of experts for these

1   ancient documents and what was going on between these

2   congregations and what was going on in America

3   generally, I think it underscores the fact that your

4   Honor reminded them and admonished them, cautioned them

5   to be very careful before you don't call any experts.

6   And so, of course, all they have is the disparagement

7   and denigration of people who have come up and given

8   your Honor their best expert ideas.

9       We have to focus on what its case, CJI's,

10  consisted of.  We do not agree on the question of

11  burden of proof.  That is in the papers.

12      Whence rimonim 2 and 4, okay, that's what we're

13  talking about.  So, there were four rimonim, and we

14  know when they were made.  They were made between 1764,

15  1774.  That's agreed.  That's 1, 2, 3 and 4.

16      We don't hear about 5 and 6 until a century

17  later.  And we have the documents conveying those to

18  Shearith Israel, so we can set aside 5 and 6 for a

19  moment.

20      What Dr. Mann did was 1 and 2 have been in New

21  York, don't have the words "Newport" on them; 3 and 4

22  do.

23      Okay.  And so now we have a case where we have

24  CJI claiming that it owns one rimon, that's the

25  singular, without the word "Newport" on it, and one

1    rimon with the word "Newport" on it.

2         And, you know, your 10-year old comes home and

3    she has, you know, she finds a beautiful watch.  Well,

4    honey, where did you get the watch?  Well, no, daddy,

5    I've had it.  No, honey; where did you get it?  And by

6    the time they're 10 they understand that they have to

7    answer that question.

8         And your Honor didn't get an answer to that

9    question.  Where did they get rimonim 2 and 4?  CJI,

10   which didn't exist at the time those rimonim were made;

11   CJI, which didn't exist at the time that they were in

12   the inventory of Shearith Israel.  Owned, certainly

13   claimed to be owned, and those are two different

14   issues, and I think the second is equally prevalent,

15   equally important because it casts, it allows the Court

16   some insight into what the state of mind was.  And they

17   were not -- and CJI didn't exist when Jews, they didn't

18   return.  Jews in a large sense returned; right?  These

19   were different Jews, different, completely different

20   congregations, completely different communities from

21   completely different parts of Europe started coming to

22   Newport in the late 19th century.

23        Your Honor asks did they acquire rights from

24   Yeshuat Israel?  It needs to be addressed.  But as of

25   1903, and why do I focus on 1903?  It's because that's

1    when the marriage happened.  And when you want to go

2    back to what happened, what covenant was made, we go

3    back to Mount Sinai.  Other people go back to the turn

4    of sort of the, you know, of the common era.  A lot of

5    things that are important happened then and rights are

6    set then.

7         And this idea of sort of this slow accretion of

8    property rights in someone who doesn't have them,

9    because he's holding on to something for a hundred

10    years, when your Honor observes that there is evidence

11    here of some sort, the presumption under the cases

12    bursts, it's over, it serves no more useful purpose.

13    That's what the cases have said.  So the presumption

14    exists in the absence of any evidence, and there is

15    evidence and I believe enough evidence.

16         I'm going to pass this; I'm going to pass the

17    fact that the Court did need and found, I think should

18    find helpful the experts.

19         I think what has happened instead is we get

20    Mr. Naftalis and his colleagues, able, all of them,

21    becoming the witnesses and becoming the experts.  And

22    he says things about facts that he has no idea of, and

23    there are cases about facts that they have no idea of;

24    when in their papers they show the Court and they say

25    would you look at this, this is how CJI exhibited the

1    rimonim at issue, and they get the wrong rimonim.

2    They're actually referring to the Hays & Myers rimonim.

3    They never confronted a witness with it.  Of course,

4    they didn't call any of their own.  This is what you

5    get, lawyers giving bad testimony.

6          We dealt with this in our papers, but I think

7    the important point here is your Honor is going to have

8    to sift through the speculation on the one hand and the

9    facts on the other, but I still think that there are

10   enough facts.  But Mr. Bazarsky and Ms. Ross telling

11   your Honor that, well, gee, the bases were switched,

12   isn't fact.

13         And we called an expert, and your Honor needed

14   an expert for it.  And if the Court finds that these

15   bases weren't switched, all right, then we know that

16   the principal reason they say they have any right to

17   rimon 2 -- that's the rimon that couldn't have the word

18   "Newport" on it -- is because, well, somehow CYI had

19   it.  There's no evidence that CYI ever had a rimon that

20   doesn't have the word "Newport" on it.  They have

21   absolutely no basis, their claim of ownership of that.

22         Your Honor identified these in a question, and I

23   take these only as questions.  As sacred objects we

24   agree that CJI does not know what the word "sacred"

25   means, which is what Ms. Ross said to me, is itself

1  sufficiently disturbing.  I think it explains a lot of
2  what they were doing.
3       The idea that the rimonim at any point in time
4  were the most valuable object in the synagogue is
5  completely wrong.  They are sacred objects, and they
6  adorn the most holy object, and they adorn the Torah.
7  They adorn the five books of Moses.
8       And it's not surprising that people would have
9  spoken categorically about things in the synagogue in
10  the late 19th century and the early 20th century.  The
11  evidence is actually that these parties were not the
12  only ones to speak categorically about it, and you
13  wouldn't have listed the rimonim.  It doesn't surprise
14  me about that.
15       These particular rimonim, and the reason why I
16  believe the first question that your Honor asked is an
17  important one, and Mr. Naftalis is wrong, is that even
18  supposing that the Court were to find that CJI owns
19  rimon 2 and rimon 4, which that's their claim in this
20  case, even were the Court to find that, they have no
21  right to sell them.  They have no right to sell them
22  because they are covered by the lease.  They have no
23  right to sell them because they had made
24  representations to the government, in order to get
25  funding, that these are integral part of the Touro

1    Synagogue.  They have no right to sell them because

2    whether or not the representations had been made to the

3    government, they've held these out.

4              Okay.  This is their picture, and it's a lousy

5    picture, but you will see the rimonim in the center,

6    the focal point; sort of the DaVinci focal point of

7    this whole picture is the rimonim.

8              This is Touro Synagogue, and the irony that the

9    New Yorkers are trying to keep the rimonim here in

10   Rhode Island is actually not an irony at all, because

11   in fact in Longfellow's, he said, Gone are the living

12   but the dead remain, but yet it's green because some

13   unseen hand.  Okay?  Shearith Israel is one of the

14   unseen hands, and Shearith Israel feels that it has an

15   obligation to maintain the Touro Synagogue, including

16   its paraphernalia.  And it may be that that modern

17   day -- I mean, I've gotten used to the word.  It

18   doesn't seem odd to me.  When we first saw it I said

19   isn't paraphernalia sort of drug stuff, okay?  But it

20   feels comfortable, all right?  When you see enough of

21   the documents it feels comfortable.

22             And so even if CJI is determined by the Court to

23   own rimon 2 and 4, they should stay in Rhode Island.

24   They cannot sell them.  Now --

25             THE COURT:  And the legal basis for this Court

1    to determine that is the lease.

2             MR. SOLOMON:  It is.  They're covered by the

3    lease.  They did exactly bargain away their right.

4             On that scenario, which we obviously don't agree

5    with, but on that scenario what I guess what the Court

6    would be finding is we threw in the property, they

7    threw in the personalty, and together it was going to

8    be the congregation that was going to be steward to

9    this place of worship, and there it shall remain.

10            Here are the reasons that Dr. Mann concluded

11   that we owned the rimonim.  Here is this clarion act,

12   this very clear act of ownership, and that is the

13   switching, okay?  How did you --

14            THE COURT:  Let me ask you about Dr. Mann in

15   this regard, and I don't want to get into the parts

16   we've argued already about them.

17            But why shouldn't this Court assume that

18   everyone believed that the rimonim were owned by CJI

19   until Dr. Mann -- including CSI in its papers filed

20   with this Court and with the New York court -- that

21   they were the -- I'm sorry -- that CYI was the original

22   possessor of the rimonim, until Dr. Mann came around

23   later on after the filing of the pleadings and through

24   expertise and review of the documents concluded that in

25   fact that wasn't the case?

1          Why isn't that a reasonable assumption for the

2    Court to take?

3          MR. SOLOMON:  If the Court is asking about

4    Yeshuat Israel, not --

5          THE COURT:  That's what I meant to ask about,

6    CYI.

7          MR. SOLOMON:  Your Honor, I think if the

8    question isn't what the state of the world was, but

9    what people were saying and the perception, okay, I

10   think what the Court said is reasonable.  Plain and

11   simple, it's reasonable.  And we got it wrong and

12   everybody else got it wrong, and information and belief

13   statements are not admissions, and people got it wrong,

14   and it wasn't until Dr. Mann actually looked at the

15   records.

16         But now your Honor has those records, and there

17   is no evidence that Yeshuat Israel ever possessed the

18   Myer Myers rimonim.

19         THE COURT:  Talk to me and remind me, I know

20   it's in the papers, but remind me about the repair, the

21   Myers repair entry.

22         MR. SOLOMON:  Sure.  So there are two things

23   that he made that masquerade as facts, so you actually

24   want to pick those out and actually address them.  So

25   that document exists.  That document exists, and

1    there's no sort of receipt or bill of sale from them --

2    Shearith Israel does have one -- does seem to me -- let

3    me answer your Honor's question.  We're in the realm of

4    speculation.  This is through the glass darkly.

5         I don't think your Honor has to decide the case

6    on that basis, but if we're going back to that period

7    of time, we have our ledger.  We have the payment.

8    It's not an artifact of pluses and minuses, as the

9    proof showed, Judge.  That was an amount owed to

10   Myer Myers.  The ledger doesn't say why, okay?

11        And this expert came and gave her expert opinion

12   for all sorts of reasons including the fact that

13   Yeshuat Israel didn't have the funds.  They didn't have

14   the funds at the time.  Lopez wasn't going to supply

15   the funds, as we showed your Honor in the actual

16   evidence.  He had staggering debt as of that moment in

17   time -- he was wealthy at some point in time -- that

18   staggering debt at the time he's supposed to be paying

19   for it.

20        So if we're in the, you'll pardon me if we're in

21   the speculation game, there is one --

22        THE COURT:  I would consider it reasonable

23   inferences from the evidence game, but --

24        MR. SOLOMON:  But on this one, with due respect,

25   I want to be as candid as I can with the Court, this

1    one I don't see as a reasonable inference.

2         THE COURT:  And I understand that.  But as I

3    said to Mr. Naftalis, I see this case as little bits

4    filling buckets and weighing the buckets, and the Court

5    considers all of the evidence as going into some

6    buckets or into the meaningless buckets, so it all fits

7    somewhere.

8         MR. SOLOMON:  And when your Honor sees that a

9    payment is made -- by the way, there's no evidence that

10   Myer Myers came to Rhode Island.  That's just sort of

11   the testimony of lawyers who didn't bother to call a

12   witness.

13        So there's a payment shown and the word Myer

14   Myers is there, and it doesn't say for his rimonim,

15   okay?  And I think if I were drawing inferences I would

16   wonder why it didn't.

17        And why are we -- why is CYI paying Myer Myers

18   if they were his rimonim?  He should have been

19   repairing them, especially if he were here, but of

20   course he wasn't here.  He was the only Jewish

21   silversmith.  And so even the rimonim that came from

22   London, and we know from Ezra Styles' diaries that

23   there was a set that came from London, right, they

24   weren't going to ship them back to London.  They were

25   going to send them to the only Jewish silversmith in

1    the colonial states, and so they sent it to him.

2           I can't draw more from it than that, and that's

3    why I tend to separate what we know and from what we

4    don't, including there is secondary evidence that when

5    Yeshuat Israel failed everything came to us.

6           The distortion that your Honor got about the

7    bailment is a document that before we get to the 1869

8    inventory I have to take on, and I need the slide

9    number for that, please.

10          But what we know is that rimonim 1, 2, 3 and 4

11   are identified as Shearith Israel property as of 1869.

12   So I'm skipping over the 1820s. I'm skipping over when

13   it's property owned by us. I'm skipping over the fact

14   that we had the keys and we were responsible for all of

15   the, right, but I'm skipping over their official

16   historian.

17          And if we want to talk about secondary evidence,

18   Mr. Kusinitz, their official historian and president

19   who writes that we became owners *de facto*, we, Shearith

20   Israel in the 1820s, and *de jure* became owners in 1894

21   with those deeds, we'll skip over the fact that their

22   historian and rabbi, Rabbi Gutstein, writes that it was

23   in the 1820s that we acquired ownership, uses title;

24   right?

25          THE COURT: How do you respond to --

1          MR. SOLOMON:  Not just to the property but to

2    the common property.  Excuse me, your Honor.

3          THE COURT:  It's okay.  You can interrupt me all

4    you want as long as I stop because then Denise can't

5    take it down.

6          How do you account for the fact that your expert

7    said that the 1833 missing document talked about them

8    going for safekeeping?  Doesn't that negate against

9    your ownership argument?

10          MR. SOLOMON:  With respect --

11          THE COURT:  Why wouldn't it be to return to its

12    rightful owner?

13          MR. SOLOMON:  With respect, your Honor, that's

14    not, I don't believe that that's what Dr. Mann

15    testified to, and I think your Honor does need to see

16    the evidence.  She was not talking about a document

17    that came from us.  False statement by counsel.  She

18    was talking about a document that she saw, all right,

19    and she read a lot that we didn't supply her with.  And

20    they could have had an expert to go and find whatever

21    they claimed exists.  I think that she made a mistake.

22          But one thing has to be very, very clear, Judge.

23    We do have Minutes and there are, they're excerpted

24    right here.  And let's put the line to this right now.

25    This is D20.  This is the 1833 Minutes.  This is what

1    we're talking about when we're talking about for

2    safekeeping.

3        Those Minutes have two different paragraphs.

4    So, first of all, neither paragraph speaks of rimonim.

5    Neither paragraph speaks of any of the silver.  And as

6    the testimony, the only person who actually could give

7    the Court testimony, Dr. Mann explained, yes, there are

8    respects in which you put them together and there are

9    respects in which they travel separately.  They

10   continue to travel separately; Torahs on the one hand

11   and the rimonim on the other.

12       So what CJI is doing now is taking a document

13   that relates exclusively to the Torahs and saying, Oh,

14   well, it must also relate to the rimonim; asking

15   rhetorically, well, of course, why would you treat them

16   differently.

17       You would treat them differently, Judge, because

18   there was a record at the time that some of the Torahs

19   were owned by us, loaned by us -- we have the loan

20   document -- and went up there, and some of the Torahs

21   were owned by Yeshuat Israel and not by us.

22       There's no evidence at all that the rimonim that

23   we're now talking about were ever, no direct primary

24   evidence that they were ever possessed by Yeshuat

25   Israel.  The word -- by 1869 there's a stamp of

1    "Newport" on it, and I believe what happened there, if

2    we're in the world of speculation, is that in the 1850s

3    when we started bringing stuff back up for the

4    occasional service, the occasional funeral, we needed

5    to see the ones that were going to go up there and the

6    ones that were not, and then they got switched, because

7    we owned all of them; and there was no question that we

8    owned, no question in the mindset of the people who

9    switched them that we owned all of them.

10    But this key critical document that talks about

11    safekeeping is talking explicitly about the Torahs that

12    belonged to Yeshuat Israel.

13    And in the very next paragraph of D20 it talks

14    about the fact that there were other sefardim that we

15    had loaned to them and if in the future there is a

16    congregation up there, nobody -- we all believed the

17    congregation that was going to be there was going to be

18    the, sort of, the Sephardic Jews that had come.  Nobody

19    knew about the waves of migration that were going to

20    happen 70 years later, okay?  What the Minutes say is

21    that we will again loan the same for the purpose of

22    being used in the synagogue.

23    So the entire bailment theory is based on a

24    misreading of one document that doesn't relate to

25    rimonim and cherry picking out of that document a

1    paragraph that relates to Torahs that were owned by

2    Yeshuat Israel and not material that was loaned by us.

3         If the Court finds it relevant and the Court

4    believes that by 1833 Shearith Israel, either because

5    we paid for them in the 18th century or because we got

6    them when we got everything in 1822, if the Court

7    believes that this is relevant, the bailment is

8    relevant, then it's far more likely that what's going

9    on here is that we believed we own the rimonim and we

10   would have treated them like the loan, we will again

11   loan them, not the safekeeping.

12        I also believe that this is irrelevant because

13   by the time we get to -- I'm sorry, I need to go back

14   to the inventory, okay, because your Honor is right,

15   this was very carefully prepared.

16        The proof at trial was that the board asked for

17   it to be done; they wanted a complete inventory of all

18   property belonging or in its keeping.  And that's why

19   we called an expert.  And that's why your Honor can

20   see, by looking at the document, that there's owned and

21   in keeping.  And it makes it very clear which is which.

22        We also adduced proof that with respect to at

23   least two other examples where in 1823, right, the

24   proof was that E. Hart had gifted or Shearith Israel

25   purchased a set of rimonim from Mr. E. Hart in 1823.

1    So in 1869 enough care is being taken so that what it

2    says is they're known as the Ephraim Hart bells.  It

3    doesn't say that they are his property.  It says

4    they're our property because of the way the inventory

5    is set up.  And that's an accurate statement.

6        Contrary-wise, in 1849, in 20 years before the

7    inventory, we are given for safekeeping deposited

8    mantles by Mr. Louis Cohen, okay, along with a set of

9    bells.  And in the 1869 inventory it says these are the

10   property of LI Cohen.  And so there is independent

11   verification that this was a carefully done document.

12       And then we get to the rimonim 1, 2, 3 and 4,

13   and there is no reference to being held, there is no

14   reference to formerly property of Newport; whereas we

15   see in one of the Torahs it actually says that.

16       So the negative implication is, as you would see

17   it here, it says, "Property of Kahal, in keeping of

18   Shamas."  And your Honor sees, and this is the

19   testimony of the expert, that the ditto marks continue,

20   "property of Kahal," Kahal meaning the congregation of

21   Shearith Israel, "in keeping of Shamas."  And by the

22   time you get to other rimonim that are being held for

23   others, that are the property of others, it says it

24   very clearly there.

25       And so we see 1869 as a very significant date.

1    We think it is evidence of ownership, and we think it

2    goes to our state of mind for when everybody, when Jews

3    start coming back.

4        When Jews start coming back, we get CJI saying,

5    well, they're a successor.  But, of course, as your

6    Honor saw from the proof, when we reconsecrated the

7    synagogue, it was 1883.  Services were being held on a

8    regular basis from 1881, and the documents there are

9    quite clear that we're sending material up on loan, to

10   be brought back to us.  This is 12 years before CJI

11   even exists.

12       So if there is going to be a successor to

13   Yeshuat Israel -- and I want to answer another of your

14   Honor's questions.  Yeshuat Israel was an

15   unincorporated association, all right?  So it didn't

16   own anything.  So if anybody there had ownership,

17   right, it was the congregants.  And those congregants,

18   as your Honor knows from the proof, become congregants

19   of Shearith Israel.  Those congregants didn't come back

20   up.  So if we want to just use the word in a sloppy way

21   that you would use outside of a courtroom, that they're

22   successors, so you want to put onto a plaque that has

23   obviously incorrect information, it says that they, who

24   didn't exist until 1894, existed more than a hundred

25   years earlier, that's not what this Court is going to

1    decide on the basis of.

2           And to be a successor there needs to be a

3    continuity of enterprise, or you need to have a

4    *de facto* merger, or you need to have a mere

5    continuation, okay?

6           And for each of these, in our view, Shearith

7    Israel is the successor, if we're going to play the

8    successor game.  Who is the former successor?  Who is

9    linked to the heirs?  Shearith Israel.  None at CJI.

10   The membership, Shearith Israel.  None at CSI (sic).

11   Control over the assets, Shearith Israel.  None at CJI.

12          Continuation of the business, well, when we came

13   back in 1881, reconsecrated the synagogue in 1883, a

14   full 10 years before CJI ever came into existence, that

15   is the successorship.

16          Now, this is rabbi historian Gutstein, right;

17   this is not our witness.  This is their admissions,

18   okay?  The Seixases, the Levys, the Lopezes, the Judah

19   families, some of them are congregants still.  They

20   became members of Shearith Israel, which is exactly why

21   CJI continues to this day to show on its website that

22   we had legal control, legal oversight of the building

23   and its contents.

24          I asked Mr. Bazarsky whether he was aware of any

25   documents subsequent to the 1820s where anybody else

1     was getting legal oversight.  He said no.  Any other

2     fact by which legal oversight was transferred to

3     anybody?  He said no.  And so we take possession.  And

4     then enter CJI.  All of that happens.  The successors

5     are already back.  The synagogue is running.

6          Enter CJI, and the first thing it does, this is

7     their first document, all right, and they -- this is

8     actually their second document.  This is their first

9     letter to us.  The first document is their

10    incorporation document where they also say that they

11    want to ask us for a loan.  And the first thing they

12    say to us, CJI, is unequivocally disclaiming; certainly

13    we do not claim any ownership in the property.  We do

14    not claim ownership in the property or appurtenances.

15         I have tried to say to your Honor that I believe

16    that any time you're going to be using categorical

17    words, they're going to take on a meaning, that you

18    need some help, contextual help to define.  And I

19    believe that even the word "fixtures" when used by

20    non-lawyers can have different meanings.  Certainly the

21    word "appurtenance" does, and certainly the word

22    "paraphernalia" did.  And your Honor does need the

23    context.

24         But CJI at the time disclaiming is what bursts

25    the possession presumption.  It --

1          THE COURT:  Only if you buy that property and

2     appurtenances include personal property.

3          MR. SOLOMON:  Certainly if you buy that, or if

4     you buy that this was a turnkey operation and you need

5     the rimonim, as Professor Fisher testified to, you need

6     them as part of the service and everybody threw their

7     lot together.  And so with that I agree, your Honor,

8     okay.

9          They then challenge our rights.  We then get 57

10    of the decendents to say we have the rights.  They get

11    nobody to say that they have the rights.

12         THE COURT:  How should the Court consider that

13    evidence?  I mean, there's no evidence before me that

14    those are all of the legal; the people owning,

15    possessing legal rights to their ancestors'

16    possessions.  I mean, it's not majority rule when it

17    comes to property or bequests and wills.

18         MR. SOLOMON:  So the answer is as follows.

19    There's secondary evidence that these were the

20    descendents.  I do not think the Court -- in the

21    record.  I do not think the Court should place great

22    weight on that.

23         I think this is an expression of those people

24    who were the descendents, when they had a choice:  Is

25    it going to be Shearith Israel who was going to be

1    legal oversight, who is going to be the cultural

2    overseer of this?  The cultural trustee, I'm not afraid

3    to say the word; I just spell it with a lower-case "t,"

4    which we'll get to.  Or is it going to be CJI?  Here

5    they had a clear choice.  CJI already existed.  CJI got

6    nothing.

7         And I think they knew that they had nothing,

8    which is exactly why they needed to vie, they needed to

9    compromise, they needed to change their constitution to

10   a permanent constitution which gave Shearith Israel

11   rights on the board, and prohibited them from selling

12   absent Shearith Israel's approval, and also prohibited

13   them from changing it absent Shearith Israel's

14   approval.  And your Honor knows, and in the record

15   there's no evidence that they ever got approval to

16   change that.  All of that's happening during that

17   decade because Jeshuat Israel, CJI knows that it has

18   nothing, and it needs us for it.

19        We move through the decade and we have as many

20   citations from their witnesses, secondary evidence that

21   we own the property, that we own the personalty, and

22   I'll get to that in a moment, your Honor, that we own

23   the cemetery and the synagogue, all right, as they have

24   when they take Rabbi Angel and people who lived a

25   hundred years later, making statements.

1          I don't think the Court needs those statements

2    to -- statements of the 20th century are relevant for

3    one thing.  I think they're relevant to show that we

4    believed that we owned them and we acted consistently

5    with that.  And they say, well, we never demanded it.

6    They never tried to sell them.

7          THE COURT:  But is it consistent with an owner,

8    to follow Mr. Naftalis' argument, is it consistent with

9    an owner, when for a hundred years there's secondary

10   evidence that CJI held themselves out as the owners of

11   the rimonim, for an owner not to have -- there's no

12   where in the record for a hundred years, until the

13   current dispute where CSI came forward and said stop

14   calling them yours; they're not yours, they're ours.

15   There's nothing; there's silence.

16         MR. SOLOMON:  There's both not silence -- and

17   the evidence and the argument that counsel made to you

18   about what the evidence shows is totally incorrect, and

19   we try to go through that in our findings.

20         There's not silence, because in 1916 -- there's

21   actually a slide on this -- when they were worried that

22   the insides of the synagogue, the stuff inside the

23   synagogue was going to be given to the Jewish Museum or

24   the Jewish Theological Seminary, and they came to us,

25   and we said, Don't worry, we won't let anything happen

1    to that.

2         There is evidence that we thought in 1937 that

3    we were going to have to give them another pair of

4    rimonim because the Myer Myers rimonim, which we said

5    belonged to us, this is in our board Minutes from 1937,

6    if we thought that they weren't taking care of them

7    properly, there's clear evidence at that point.

8         The entire story of insurance is one where we

9    believed and said to them, and they understood, that we

10   owned the contents of the synagogue, and they put us on

11   the insurance policies.

12        Now, they didn't show any witnesses, the

13   catalogs, this suggestion that they have for a hundred

14   years held themselves out as owners.  I don't find a

15   single piece of evidence, Judge, not a single piece

16   where they say that.

17        Are the rimonim associated with the Touro

18   Synagogue?  Absolutely.  That's where they should stay.

19   They are associated with them.  But where in the

20   record -- can we jump forward to them, please, and then

21   we must come back to this. (Pause)  To the museums, the

22   museums.  Your Honor, during the testimony -- thank

23   you.

24        During the testimony the actual books to the

25   museums were actually never shown to the witnesses.

1    There was just a lot of statements by lawyers about

2    what they were, okay?  And we've gone through them.

3         And as your Honor understood from the only

4    expert, the only witness who had any expertise in the

5    subject, there is a difference between a museum catalog

6    and a raisonné -- what's it called, a museum raisonné,

7    right, a catalog raisonné, where if the entity that

8    owns the object gives a provenance report on it then,

9    as Dr. Mann said, you can rely on that to a greater

10   extent.

11        But if you're loaning material, which she said

12   is not inconsistent with ownership, loans happen all

13   the time, Judge, all right?  And the only evidence in

14   the record on that is that loans happen all the time,

15   and there was nothing untoward about loans, nor do we

16   object to them loaning.

17        There is a bit of a difference, like a huge

18   chasm, between loaning and getting back; loaning so

19   people of the United States and people who go to

20   museums can see the, sort of the active house of

21   worship that's still going on, on the one hand, and

22   selling so that the Jews of America will never again

23   have that, it becomes -- it's put into a museum.  Your

24   Honor, Jews have enough cemeteries.  We have enough

25   graveyards.  And we have enough museums.

1    But what we don't have are living institutions

2    that are continuing the American dream.  Touro is one

3    of them.  The old Newport synagogue, now called the

4    Touro Synagogue, is one of them.  The rimonim were a

5    vital part of that.  We don't mind if they get loaned.

6    And what's happening here is here the actual

7    catalogs, Judge, and I use the big list.  Now on the

8    second column, this is the credit for the Caroline

9    Cohen pair.  There's no question that the Caroline

10   Cohen pair are owned by us.  As your Honor sees from

11   the documents, we were actually gifted them, and we

12   have the letters; one in 1982 and 1893.

13   And this is the way the credits read, and they

14   read the same way for the rimonim, rimonim 2 and 4.

15   They read the same way, which comes to teach us, I

16   believe, that nobody is making ownership statements

17   here.  It says the Touro Congregation.  We agree.  It

18   says, Lent by Touro Synagogue; Touro Synagogue, Touro

19   Synagogue.  Lent by Congregation Jeshuat Israel,

20   Newport; fine.  Lent by Touro Synagogue.  This

21   statement that you're being -- I hope I'm not going

22   through these too quickly.  But at no point does it say

23   these are owned.

24   And, Judge, nobody ever said -- I asked

25   Mr. Bazarsky, well, did you ever tell anybody at

1   Shearith Israel you took the position you owned these

2   rimonim?  The answer was no.  Did you ever write that

3   to them?  The answer was no.

4         So this is not, I believe, a case that comes

5   close to any of the equitable defense cases that we're

6   talking about.

7         We gave them the right as a lessee to operate

8   the synagogue.  We gave them, and you have the author

9   of the document here, their former president who said

10  they've given us autonomy within the confines of the

11  lease.  And that's true.  And we weren't going to

12  interfere, and we were going to allow them to do that.

13        I think we are now seeing that they're not

14  capable of doing it, and we're going to have to deal

15  with that after your Honor makes findings.

16        But if they've lost the thread and they don't

17  have the strength anymore to keep this a living,

18  vibrant place, if they're going to tell us that they

19  don't know what sacred means and they don't even know

20  that the rimonim are sacred; if they're going to tell

21  us that they can sell those because they want to have a

22  vanity endowment for money that they don't need, since

23  they've made money every year in the last five years,

24  right, and they've made more than a million dollars

25  over the last 15, and that's the only time they've

1      given us their financial records.

2          If they're going to tell us that they kind of

3      want to weigh the, one of the few priceless objects

4      made by a Jewish silversmith, the first Jew to enter

5      the guild, that's been in active use in one

6      congregation or another for 250 years, all right, and

7      that's going to be treated the same way as a leaky

8      roof, okay, we've -- we're not on the same page, and we

9      will ultimately get on the same page.  But, please, I

10     can't -- I want -- I ask the Court, please, to took at

11     the evidence, before the Court accepts counsel's

12     statement that, Oh, they've been saying they own them

13     for a hundred years.  They haven't said it at all.

14         When they asked the government for money, they

15     say we're the lessee.  They don't say, Oh, we own the

16     rimonim.  They say --

17     THE COURT:  They asked the government for money

18     for the Touro Synagogue, which they concede they have

19     an equitable interest and not legal interest.

20     MR. SOLOMON:  And they say that the rimonim are

21     an integral part of that genius loci.  That's what they

22     say.  They're an integral part of what's going on

23     there.

24         I want to go back, if we could, to the

25     settlement agreement.

1    THE COURT:  Great.  That's just where I wanted

2    you to go.

3    MR. SOLOMON:  Because I do not agree that the

4    settlement agreement occupies the field.  I agree that

5    the settlement agreement is relevant, and I agree that

6    I think you had non-lawyers who were quickly drafting a

7    settlement agreement, and they used the word

8    "fixtures," and I think what happened after that is I

9    think they're all trying to mean the same thing.  There

10    had been --

11    THE COURT:  But let me stop you and walk you

12    through legally, because I -- it became painfully

13    obvious to me during the trial and certainly

14    subsequent.  I wear two hats, so I both have to decide

15    facts that are clearly in dispute, and I also then have

16    to figure out what the law is and -- actually three

17    hats -- and then I have to apply the law to the facts.

18    The operative -- the settlement agreement on its

19    face seems clear and unambiguous.  It says property and

20    fixtures or premises and fixtures -- "premises" and

21    "fixtures."  It says "premises" and "fixtures."

22    Why should the Court look at anything other than

23    that under the legal doctrine of, you know, it

24    speaks -- you only look to extrinsic evidence if

25    there's ambiguity in the document.

1          If the settlement agreement itself says

2     "premises" and "fixtures," and if the Court were to, as

3     I think I told Mr. Naftalis, think "fixtures," given

4     its ordinary meaning at the time included things

5     attached to real property, where does the Court look to

6     anything other than that settlement agreement to

7     determine what is involved in that?

8          MR. SOLOMON:  I believe --

9          THE COURT:  And why should I look to your

10    internal documents?  Why should I look to CJI's

11    resolution?  Why should I even look in terms of

12    ownership to the lease?

13         MR. SOLOMON:  For the following reasons:  This

14    is happening in 1903.  In 1893 the first document that

15    CJI, its own internal document, recognizes that it

16    needs to come to us and ask for the continued loan of

17    the material being used.

18         Could that be pulled up, please.  And so I do

19    actually have answers to your questions; I just need to

20    get to that document pretty quickly, please.  You'll do

21    it faster than I would.

22         This is the first action of CJI when they come

23    into existence.  They want to request the further

24    assistance, which they have in the past rendered, in

25    the loan of such property as has formerly been in use

1   in the services.  The parties clearly understand that

2   they're talking about personal property.

3            THE COURT:  Well, no, "the party."  This is a

4   CJI document.

5            MR. SOLOMON:  This is a CJI document.

6            THE COURT:  You said "the parties clearly" --

7            MR. SOLOMON:  I apologize, Judge.

8            THE COURT:  No, that's okay, because --

9            MR. SOLOMON:  Well, we do have both parties who,

10  I want to prove to the Court, understood that personal

11  property was included.  And here they're asking for the

12  loan of such property as has formerly been in use in

13  the services.  There's no question that that's what

14  they're talking about.

15           If your Honor wants to jump ahead then to the

16  settlement, what happened there is that settlement

17  agreement itself contemplates two other things

18  happening besides the settlement agreement.  The first

19  is that the premises are going to be surrendered.  And

20  we have the CJI admission, and there is evidence

21  independently that the rimonim at issue here, number 2

22  and 4, were in the synagogue, meaning they were in use

23  at the time.  There's a photograph from 1895.  There's

24  an admission in their answer that the rimonim were

25  there.

1          So the settlement agreement itself contemplates

2     two further acts:  One, an actual act of abject

3     surrender where they are on the outs, where they have

4     nothing; just like they had 10 years earlier where they

5     say we acknowledge we have nothing.  Ask your 10 year

6     old, But, honey, where did you get them?

7          We know where they got them.  They got them from

8     us, and they acknowledge that they had nothing

9     beforehand.

10          So the first thing the settlement agreement says

11     is there's going to be another act.  This is going to

12     be an act of surrender.  And the second thing they say

13     is that there's going to be a lease in a form

14     satisfactory to us.

15          So as a technical legal matter, that is not

16     integration.  This doesn't carve out any of the

17     extrinsic evidence.  This is a document that is

18     contemplating further action.

19          And the further action then happened, and in

20     both respects, both the act of submission, of

21     surrender, and the lease, which they gave us the right

22     to draft, in both of those cases it is pellucidly clear

23     that the personal property is also included.  So here

24     is their resolution --

25          THE COURT:  I wish I could agree with you that

1    anything in this case was so clear.

2         MR. SOLOMON:  Fair enough.  But it's our

3    position, Judge, that it was clear for the 20 years

4    before, including 10 years that they didn't -- that

5    these ritual objects only came up here, up to Rhode

6    Island because of Shearith Israel; that every time we

7    brought them up, there are those letters of what

8    they're calling limited authorization which make very

9    clear that these are on loan to you subject to our

10   sufferance.  So from 1869 there's a very clear line

11   that any time we sent ritual objects up here, it was

12   subject to our, to Shearith Israel's sufferance.  Then

13   there's the permanent constitution, which says the same

14   thing.

15        Your Honor will remember that we made a

16   stipulation with the city council that said we want to

17   make very clear here that this is open to all Jews,

18   that anybody who is going to use it, if the place is

19   going to be subject -- the use of both the building,

20   and it specifically talks about the ornaments,

21   specifically talks about the personal property.

22        And so all of the parties, as Professor Fisher,

23   I think, testified, and I think fairly and correctly,

24   that by 1903, once they lose the litigation -- and

25   whether they lost the litigation or didn't lose the

1    litigation, your Honor is going to decide, but they

2    should have thought they lost the litigation.  And CSI

3    sure thought we won the litigation because they were

4    directed by their own board to surrender possession of

5    the building, premises and paraphernalia belonging

6    thereto.

7         THE COURT:  But that occurred two days after the

8    signing of the settlement agreement which had different

9    language.  And my question still to you, Mr. Solomon,

10   is what legally -- forget the buckets that you all have

11   been filling today, to use my analogy.  Now I've got

12   the judge cap on.

13        What legal consequences are there to an

14   unambiguous settlement agreement between the parties;

15   the one document that they've agreed to as an agreement

16   that says "premises" and "fixtures"?  No word of

17   paraphernalia, no word of personal property.  It only

18   applies to premises and fixtures, by its terms.

19        MR. SOLOMON:  And my argument, and I don't mean

20   to belabor it, but I haven't been effective in

21   explaining at least what our position is, is that that

22   document is not integration.  It contemplates further

23   activity.  And then by definition the further activity

24   is to be looked at to inform the entire body of rights.

25        THE COURT:  The further activity can expand the

1    agreed to settlement agreement?

2         MR. SOLOMON:  It not only can, but I actually

3    don't think that it did because I think everybody

4    understood that when you say the synagogue, when you

5    say the premises, right, it means the stuff in the

6    premises also.  Remember, nobody thought they had

7    anything on their side.

8         THE COURT:  Obviously CSI didn't because it went

9    back and sort of panicked that "paraphernalia" wasn't

10   included and there was this uproar --

11        MR. SOLOMON:  Well, I don't think --

12        THE COURT:  Well, hold on.  There was this

13   uproar about ensuring that the word "paraphernalia" was

14   part of it.  CJI passed its resolution with the word

15   "paraphernalia" in it.  And then the lease agreements

16   have the word "paraphernalia" handwritten in and

17   notarized.

18        But what I'm asking is from a legal point of

19   view, isn't the only operative document here the

20   settlement agreement that controls?

21        MR. SOLOMON:  No, your Honor, it is not.  The

22   settlement agreement didn't end the litigation.  Other

23   things had to happen in order to end the litigation.

24   The settlement agreement itself said this is subject to

25   further action.  It's an action of surrender and it's

1     an action of entering into a lease.

2          THE COURT:  But the settlement agreement only

3     surrendered the premises and fixtures.  So what you're

4     wanting me to do, I think, is say that there are

5     subsequent contracts between the parties or legal

6     documents that bind them that determine that.  But what

7     I'm not getting off on is the legal doctrine that says

8     if a document is fully -- is non-ambiguous, that I can

9     look elsewhere for its determination of that agreement.

10    And that appears to be the only -- until we get to the

11    leases which, you know, you can't lease something you

12    don't own, if that were the case at that point, that

13    would have an effect.  And that's why I ask you about

14    the legal principle.

15         And I think you've given me your position, the

16    legal principle that gets you off of the four corners

17    of the settlement agreement.

18         MR. SOLOMON:  And our answer is that this

19    document is not an integration.  It admits a further

20    conduct and it admits further writings, and both the

21    conduct and the writings inform this document.

22         I don't think I share, and I have to tell your

23    Honor I don't think I share the premise that you can't

24    lease what you don't own.

25         THE COURT:  CSI doesn't concede anything, and to

1    be honest with you it's been very difficult because --

2    no, because it's been very difficult to follow the

3    arguments when everything is argued over as though it

4    were the Holy Grail, and so at times I have a difficult

5    time understanding when everything is at this level,

6    where we can move on on other levels.  So that's been

7    my difficulty in arguments from actually -- it's just

8    been my difficulty in finding the arguments, is to the

9    parties' failure to concede what appears sometimes to

10   this Court on some matters as the obvious.

11         MR. SOLOMON:  I have tried certainly today and

12   in our papers I've tried to concede when I thought it

13   was warranted, and so I do apologize for being --

14         THE COURT:  Don't apologize.  I mean, it's your

15   position.  You're welcome to it.  I'm just saying why

16   it's sometimes difficult for this Court to wade through

17   it, that's all.

18         MR. SOLOMON:  When the board of CJI directs the

19   surrender, I believe that is an independent act that

20   has independent legal significance, and so the CJI

21   board is directing the surrender of the building, the

22   premises and the paraphernalia so that --

23         THE COURT:  What record, what is in the record

24   that defines the word "paraphernalia" for the Court?

25   We had a lot of evidence on "appurtenances"

1  independently.  By my memory is, Mr. Solomon, that

2  there wasn't any independent evidence about the meaning

3  of the word "paraphernalia."

4           MR. SOLOMON:  I don't know -- I can go and I can

5  sit down for a few minutes and collect any others.

6           But I know that in connection with the drafting

7  of the very lease that's contemplated by the settlement

8  agreement, right, there is independent use, right,

9  interchangable use of "personal property" and

10  "paraphernalia," and that's the letter from 1903.  This

11  is on our side, right, from Napoleon Levy to the rabbi

12  at the time, right, Mr. Mendez, who was sort of the

13  rabbi for both.  But great care was taken to make sure

14  that there was going to be surrender of the building

15  and the personal property, that it was going to be

16  surrender of the possession of that made before

17  witnesses.  And that is very important.  I think that's

18  an independent act, your Honor, that goes to the

19  question of ownership or control, so that we rely on

20  the settlement agreement.

21           We rely on their own board resolution, which I

22  think has independent act.  We rely on the lease, which

23  is also signed by both parties, Judge.  We rely on the

24  lease from 1908, which is also signed by both parties,

25  okay?

1     And in drafting it -- and remember, your Honor,

2     that the lease was going to be drafted as we wanted it.

3     So whatever we thought we wanted, they thought we

4     wanted, and we could draft it any way we wanted.  And

5     we drafted it and we made sure that we got both the

6     building and the personal property.  That then became

7     the word I think both "appurtenances" and

8     "paraphernalia," I think as Professor Fisher testified,

9     given that CJI didn't have anything and knew that it

10    didn't have anything.  Nobody left these things out;

11    not because everybody knew the value of Myer Myers

12    rimonim, but because over a 20-year period Shearith

13    Israel had consistently shown that it wasn't sure who

14    was going to be taking over there.  It felt that it had

15    obligations to the Jews of Newport, past, present and

16    future and wasn't going to be giving away anything

17    because it didn't have to.

18         This public ceremony, which was picked up by the

19    press, was a real public ceremony.  When you handed the

20    keys, they were locked out.  At that moment in time the

21    rimonim are inside.  The doors are locked.  CJI has

22    nothing.  And I think that that is another moment in

23    time that has independent juridical significance.

24         THE COURT:  Am I wrong, Mr. Solomon, this isn't

25    a big point, but my impression at the time was this was

1    really a battle between two Newport congregations, as

2    opposed to a battle with CJI directly versus CSI in

3    that regard, that you had two competing -- I forget the

4    name of the second one.  The Touro Congregation?

5         MR. SOLOMON:  Touro Congregation.

6         THE COURT:  The Touro Congregation that actually

7    occupied it for a period of time, and it was in CJI and

8    CSI's interest to evict Touro Congregation from there.

9    And then CJI came to an agreement with CSI that it

10   would be the recognized congregation that could possess

11   the Touro Synagogue; yet almost seemed in many way like

12   CJI and CSI were on the same page in that period in its

13   opposition to the Touro Congregation.  This is my

14   impression.  I'm not sure how that affects it, but that

15   was my impression.

16        MR. SOLOMON:  In the first of the lawsuits --

17   there were four lawsuits, and in the first of the

18   lawsuits I think your Honor is completely correct, that

19   is what happened.

20        Then the Touro Synagogue and CJI did get

21   together, and it was CJI, not Touro, who sued to keep

22   us out and who sued in 1902 and in 1903.

23        And Shearith Israel was consistent throughout.

24   They weren't going to allow anybody to be a steward

25   there unless what it felt was the proper protections

1    were going to be given.  Those proper protections

2    included understanding that they were -- that by

3    constitution they couldn't sell without our approval,

4    and they couldn't change that. And that by lease, so

5    that we could actually get into court quickly, right,

6    everything in there -- and they had to quit the

7    premises, couldn't take anything with them; right?  So

8    that they had to quit the premises, and the lease was

9    an important part of that.  And until we got that

10   agreement, we got those commitments, we weren't, CSI

11   wasn't going to be making a deal with anyone.  So your

12   Honor is right with respect to the first lawsuit.

13        The replevin lawsuit is different.  That

14   involved a piece of personal property, the Torah

15   itself, and that's why we say everybody understood that

16   this was, if you will, a turnkey operation.  It was how

17   are we going to be able to have services, what do we

18   need for the services, what's in there.

19        When the press picks this up, your Honor, by the

20   way, they also don't use some obscure language; right?

21   It says, The local Jews agreed to lease from the New

22   Yorkers the synagogue and all its paraphernalia; okay?

23   And then synagogue and paraphernalia were going to be

24   rented.

25        I don't think that when the press was talking

1    about this they were talking about some obscure

2    property notion.  I think everybody had in mind and

3    understood that they were leasing the synagogue and

4    everything that was in the synagogue.

5         THE COURT:  There's no question that the lease

6    says that they rented the premises and the

7    paraphernalia.  I mean the press, as they always do,

8    got it right in that regard by using -- that was a

9    shameless little --

10        (Laughter)

11        THE COURT:  But that's just a repeating of what

12   the lease says.  I mean, the word "paraphernalia" got

13   added to the lease.  There's no question about that.

14   It was separately notarized.  It was included.

15        MR. SOLOMON:  And my only point is that it

16   wasn't talking about some obscure property concept

17   because the readers of the Boston Herald were going to

18   understand what "paraphernalia" was when it's all of

19   the paraphernalia for use in the synagogue.

20        It is argued nothing changed since 1903.

21   Nothing of substance has changed.  What's changed is

22   that CJI has changed quite recently, but not us.

23        Shearith Israel has been responsible for

24   maintaining the customs and the rituals and it has done

25   so.  This was not a financial lease.  It was a lease

1      about culture.  It was a lease about ritual.  It was a

2      lease about how they were going to comport themselves.

3            And as even Mr. Urofsky, their consultant on

4      their own website, published in his book, secondary

5      evidence to be sure, the lease has remained in effect

6      for over a hundred years.  They have paid rent for over

7      a hundred years.  We have approved their rabbis for

8      over a hundred years.  When they wanted to make changes

9      to the building, we have said no.  When they have

10     needed to make additions, including burglar alarms, and

11     they've needed to identify what is going on there, we

12     are the owners, and they have never differentiated

13     between -- oh, yeah, well, they own the four corners of

14     the property, but not any of the things that actually

15     make it a service.

16           On the contrary, they have said exactly the

17     opposite.  They have included what makes it a service.

18     They have said these things go back to colonial times.

19     They're part of this genius loci.  They're part of the

20     atmosphere of the place, and indeed they are.

21           And it would be a very different case if we from

22     New York were saying we own them, and we want them

23     back, thanks; okay?  I think we could do that.  But

24     we're not doing that because in fact we are one of

25     those unseen hands, and we are going to continue to be

1    so long as the Court will allow us.

2         If you'll allow me to look at my notes, Judge,

3    just to make sure I've addressed everything that I

4    thought your Honor was raising.

5         (Pause)

6         I have completed my argument, your Honor.

7         THE COURT:  Thanks, Mr. Solomon.  You get two

8    more minutes in the back end of your argument for

9    quitting early.

10        We're going to take a 15-minute break and come

11   back for the rebuttal part.

12        (Recess)

13        THE COURT:  Mr. Naftalis.

14        MR. NAFTALIS:  Good afternoon, your Honor --

15   good morning.

16        THE COURT:  Still.

17        MR. NAFTALIS:  Your Honor, let me respond

18   briefly to some of the arguments he made and also

19   obviously any questions you may have for me.

20        First, we agree with your Honor's view that the

21   settlement agreement controls; and what someone wrote

22   10 years before in some internal document doesn't

23   really have anything to do with it.  And also to have

24   any changes, you need a meeting of the minds, and we

25   still continue to urge the fact that the word "rimonim"

1    never appears anywhere.

2         THE COURT:  Can I try one more time,

3    Mr. Naftalis, and I understand that sometimes when

4    lawyers don't have an answer you have to avoid it, I

5    get that, but let me ask it one more time to make sure

6    I'm asking it correctly.

7         MR. NAFTALIS:  I'll admit it when I don't know.

8         THE COURT:  Okay.  If the word "paraphernalia"

9    in the 1903 lease doesn't refer to rimonim, what does

10   CJI believe that the word "paraphernalia" refers to?

11        MR. NAFTALIS:  First I'll start with the fact

12   that we really don't know, but we know that there's no

13   explication that it has to do with rimonim, number one.

14        Number two, we know from their own witnesses;

15   and Mr. Solomon, Oh, there's no evidence on that.

16   Well, we have a slide, and Dr. Mann said we don't call

17   rimonim paraphernalia.  Their own --

18        THE COURT:  And I get that.  But clearly two

19   days after the settlement agreement is entered into,

20   CSI is concerned that "paraphernalia" isn't included in

21   the settlement agreement.

22        That clearly meant something to CSI, something

23   did that they wanted added.  They wanted settlement

24   agreement plus, all right?  And they say we need to add

25   the word "paraphernalia."

1    And then CJI actually uses the word in its

2    resolution and then acquiesces in the lease to

3    inclusion of the word "paraphernalia."  I guess what

4    I'm trying to get at, it's clear, CSI's position is

5    clear about this.

6    But the question I have to CJI that's not clear

7    to me is the word has to have some meaning.  It had to

8    have meant something to CSI when they wanted it

9    included, and it must have meant something to CJI when

10   it agreed to include it.

11   What does it mean if it wouldn't otherwise

12   include rimonim?

13   MR. NAFTALIS:  Well, the answer to that is first

14   I think, I think that if you noticed that the

15   settlement agreement, which controls, had the word

16   "fixtures."  The word "fixtures" then drops out.  It's

17   not included in the final document.  "Paraphernalia" is

18   substituted for it.  So I think our argument would be

19   that it really is no broader than that.

20   Certainly remember the thing, your Honor, basic

21   principles:  One, you construe documents against the

22   drafters when they wrote it.  Two, they're lawyers.  I

23   mean, I think your Honor laughed about it once; every

24   president of Shearith Israel appears to be a lawyer.

25   Then, 1945, and now with our esteem opponent,

1    Mr. Solomon.  They're well represented.

2          And I think, frankly, given the fact that they

3    couldn't, and it's their burden, they really couldn't

4    produce any evidence on that, I think it's they're the

5    one who has to fail.

6          And then I think it leads us to the point about

7    why the presumption is really important in this case

8    because the relevant questions, which your Honor asks,

9    which because none of us were alive in 1903, we really

10   can't answer other than interpreting a document or

11   arguing from this.  That's why the presumption is

12   really meaningful here in this case.  This is a classic

13   case for the application of the presumption of

14   possession meaning ownership.  And then we've also got

15   to go to how the parties treated things over the last

16   120 years.

17         THE COURT:  You want to answer Mr. Solomon's

18   comment to me when I claimed that for a hundred years

19   you've claimed ownership and they said nothing, and he

20   pointed out to me that I was in fact incorrect, that

21   for a hundred years the evidence wasn't that you

22   claimed ownership, but that Touro Synagogue, at best,

23   claimed ownership.

24         Do you have a response to his that never once

25   did you publically, you, CJI, claim ownership to which

1    they didn't respond?

2         MR. NAFTALIS:  Well, I have two answers, one of

3    which is, two or three answers, one of which is

4    everybody, including our opponents, have equated Touro

5    Synagogue and Jeshuat Israel as being synonymous.

6    You know, in their Minutes when they started this fight

7    with us, the Minutes refer to us as the Touro

8    Synagogue.

9         THE COURT:  Right.  But what I was -- excuse me.

10   Hold on.  What I was forcefully arguing, not arguing,

11   but presenting to Mr. Solomon that he responded to well

12   was, I was forcefully saying, Look, for a hundred years

13   you knew that they were claiming ownership, and he

14   pointed out that that's not the case.

15        They would probably concede that the concept of

16   Touro Synagogue owns that, in fact, that's what they

17   say; we're the trustee over the entire ball here that

18   includes the rimonim, and therefore when the documents

19   and public statements said that Touro owned them, they

20   probably agree with that.  They're the trustee of

21   Touro, Touro owned them, and the rimonim are included

22   in the concept of Touro Synagogue when that was what

23   was publically stated.

24        I think practically speaking that's what they're

25   saying; we have no reason to object because we think

1    Touro as a concept did own them and we're the trustee

2    of it.

3             MR. NAFTALIS:  Well --

4             THE COURT:  Or the lessor or the owner.

5             MR. NAFTALIS:  When he went through the list he

6    omitted what happened at Yale, which I put up there.

7    Yale, Barquist's category, provenance, that's the

8    rimonim, is with Congregation Yeshuat Israel by about

9    1780, probably earlier.

10            Mr. Katz admitted he read that.  So he was --

11            THE COURT:  Well, they also had their own

12   rimonim on display at Yale.

13            MR. NAFTALIS:  Yes, but he admitted he read --.

14   So ours are there saying they belong to us.  Theirs are

15   there saying it belongs to them.

16            You saw the exhibit.  The provenance of Jeshuat

17   Israel is attributed to Congregation Jeshuat Israel.

18   Correct.  He's on explicit notice.  That's the one

19   thing he did there.

20            Jeanne Sloane, the woman who, you know, she

21   testified by deposition, from Christie's, (Reading)

22   Has been published many, many, many -- three many's --

23   times that this pair of rimonim is the property of

24   Touro Synagogue or the congregation.  At least since

25   the fifties it has been published as their property.

1      In fact, 1913 is the first I can remember was published

2      as their property, so I had no reason to do any sort of

3      question.  It appears they are owned by Jeshuat Israel

4      in all the literature.  It is next to every photograph.

5      The Yale catalog is just part of a history of

6      documentation that they were owned by the Touro.  They

7      were owned by Touro.

8           Then we have 2009 when the Jewish Daily *Forward*

9      article comes out.  I think we put in a big photo.  And

10     what does it say?  An interview of Ms. Ross and her

11     co-president:  So desperate is our financial condition

12     we're making inquiries about potentially selling some

13     of its assets, including two sets of rare silver

14     rimonim.  What could be more explicit?

15          And Katz admitted that he had a conversation

16     with Ms. Ross in which she discussed with him the

17     contents of what was in the Jewish Daily *Forward*

18     article.

19          Indeed, as a circumstantial evidence matter, she

20     testified he initiated the conversation saying -- not

21     saying, this is direct, but circumstantially it makes

22     sense.  He called her -- and he only called her two or

23     three times in all those years -- after reading the

24     article, to ask her about it.  And he didn't raise any

25     protest that we own it; how can you sell something that

1    doesn't belong to you?

2            In addition, Ms. Ross, and not only do you have

3    Ms. Ross' very credible testimony, and Katz more or

4    less admits it, I think more than quite; but it's

5    corroborated by, we put in deposition testimony of

6    Mr. Segal, who testified that contemporaneously

7    Ms. Ross told him that Mr. Katz had called him, yeah,

8    (Reading) Bea said she had received a call from Katz

9    about an article that we were selling the rimonim.

10            Ms. Ross had no reason to misrepresent that, no

11    reason to tell a colleague that she had this

12    conversation, indeed.  So they were on plenty of notice

13    about this.

14            And you know, again, as I said in the opening,

15    time stands still after 1903.  There's a hundred and

16    20 years.  They don't want the 20th or the 21st century

17    to exist.  They said -- you know, we had catalogs and

18    literature.  You know, they have a policy that if

19    something belongs to them, before it's lent out to a

20    museum they have to get board approval.  They never

21    sought board approval.  We never went to the board.

22    They never said we had to go to the board, I mean,

23    et cetera. I think the 20th century really makes a lot

24    of sense there.

25            Next they made this argument about were we --

1    about the bases, all right?  Well, the bases, one says

2    "Newport," one doesn't.  What difference does that

3    make?  If they made a mistake in switching them,

4    switching them, they shouldn't be profiting from their

5    mistake.  We've sat there 120 years with these.  We've

6    sat there for more than 120 years with these.  And by

7    the way, they are a -- and so it's of no legal

8    relevance.

9         Secondly, what's happened here is the rimonim

10   are the same.  The bases got switched by Shearith

11   Israel, because if you look at the difference on the

12   beading on Shearith Israel's rimonim and the difference

13   between the beading on ours, they're different.  You

14   can just see the difference between the beading on ours

15   versus the beading on theirs.  And so it's clear that

16   there was a screw-up in switching one of the bases.

17   But the rimonim itself, they are precisely the same.

18   And by the way, it doesn't matter in any event.

19        These are all, making these for the Court, these

20   are the photographs that are in evidence blown up as

21   demonstrative purposes.

22        They argue about are we the successor.  I

23   thought they lost that fight in 1894 when they went to

24   petition the Rhode Island General Assembly that we

25   shouldn't take on the same name and because we aren't

1    the same kind of Jews, that we come from eastern Europe

2    fleeing the pogroms, that doesn't make us as good as

3    the people from Spain or Portugal who started things,

4    and that we're of "lower social standing."

5        Even Mr. Katz conceded you don't have to be a

6    certain thing to be a member of a congregation; you can

7    be a member of a congregation as long as you practice

8    the faith.

9        In any event, until this litigation, for years

10    and years and years we acknowledged the continuation of

11    the successor.

12        They approved that plaque.  Their own rabbis

13    made statements about this.  There's never been any

14    dispute about it until now.

15        The Rhode Island General Assembly has anointed

16    us there in that position, giving us custody of the

17    Abraham Touro Funds and the Judah Touro Funds,

18    et cetera, et cetera, et cetera.  CSI's name never

19    appears in any of that stuff.

20        A word or two finally about experts.  You know,

21    without beating a dead horse, they weren't proper

22    experts.  They were just people.  Apart from the fact

23    it wasn't even their fields, because the people in

24    their fields would not have supported their position.

25    All they did was try -- it was as if they were lawyers;

```
 1    I think I agree with Mr. Solomon's point, yeah, we're
 2    lawyers, we're interpreting documents.  That's all they
 3    were doing.  They weren't bringing any expertise to
 4    bear.  None of them were experts on the subject.
 5         I think there's one expert in the courtroom:
 6    Your Honor.  On the interpretation of a document, the
 7    weight of the evidence, what weight you should account,
 8    what inference you should draw or not draw.  That's not
 9    the job of experts.  Lawyers, we can make those
10    arguments.  That's our job.  I can do that as well as,
11    and Mr. Solomon can do it as well as those two
12    so-called experts.
13         But your Honor is the real expert, the one who
14    can make the decision, and judges do all the time, read
15    documents and give weight to evidence and et cetera.
16         Let me see if I have anything else.
17         (Pause)
18         Again, just my final part, which is a little
19    redundant.  I think, again, as you think about the
20    points your Honor made, the questions you asked, the
21    buckets, this case cries out for why the presumption
22    makes sense in the law; not just because it was the
23    rule when I played stoop ball with kids.
24         But that's presumption from possession makes
25    sense, when you have to get in there; what did some guy
```

1    mean when he wrote to his friend in 1863.  I think this

2    is a case that cries out for it, and they, frankly,

3    haven't even come within a mile of rebutting it.

4            Thank you.

5            THE COURT:  Thank you, Mr. Naftalis.

6    Mr. Solomon.

7            MR. NAFTALIS:  I quit before the stop sign, your

8    Honor.

9            THE COURT:  Impressive, very impressive.

10           I have to tell you that if we hadn't put time

11   limits on this I would keep you folks here for days, if

12   not weeks, discussing this.

13           MR. SOLOMON:  Then let us come back, your Honor.

14           THE COURT:  No, no.  It must be very frustrating

15   to see something like this end when you've lived it for

16   so long.  But you have done an incredible job trying

17   this case collectively.  You've done an incredible job

18   briefing this case and presenting evidence to the

19   Court, and it's now time for me to decide.

20           MR. SOLOMON:  Fair enough, your Honor, and we

21   thank your Honor for that.  But your Honor, wanting to

22   save me a little time, asked the question that your

23   Honor knew I was going to ask when I stood up.

24           You were bombasted with a hundred years we've

25   been holding ourselves out as others.  Where is the

1    evidence?  Where is the evidence?

2          So your Honor was told one thing; right?  That I

3    didn't mention Yale, and it's in Yale.  They grabbed

4    Yale; right?  We ignore the fact that they, knowing

5    that we own the contents, insured us.  That's what the

6    documents show.  That was the part of the case that

7    blew up in their face because they said, Well, no,

8    insurance shows.  But the insurance shows that our

9    broker said we own the contents.  They understood that

10   we owned the contents, and they put us on the policies

11   for contents.  Put that aside.  Yale is it.  He said I

12   didn't mention Yale.

13         On the slide that I showed your Honor is the

14   Barquist-Yale catalog reference.  It's on the bottom of

15   this page, 107, which I showed your Honor before.  So

16   much for not showing your Honor.

17         It says:  Touro Synagogue, Touro Synagogue.

18   That's what it says.  As Dr. Mann said, (Reading)

19   Barquist declared that he had not done original

20   research on provenance.  He denied that there were any

21   records related to the production of silver by Myer

22   Myers.

23         That's what you get, what your Honor gets from

24   Barquist at Yale.

25         So with all of the hundred years there's, in

1    fact, nothing.  Our internal documents showed that we

2    believe we owned the rimonim.  Their internal documents

3    showed that we owned the contents.  That's what's

4    happened over the hundred years.

5         There was a hundred years of peace.  I do not

6    believe it is good public policy for this Court to

7    embrace the fact that congregations, which shouldn't be

8    in this court in the first place, as I said that in my

9    opening, have to act like dogs in the manger and not

10   give each other a little autonomy.

11        We believed that they were sister synagogues

12   until he deliberately, knowing that there were no

13   rimonim on the market, as Mr. Bazarsky said, he knew

14   there were none, and there won't be any others.  Why

15   does he know that?  He knows that because you don't

16   sell your ritual objects.  These are sacred.  And

17   that's what they knew.  And they deceived us.  They

18   were quiet about it.  They told their congregants not

19   to tell us.  They misled us.  They mislead their own

20   congregants.  They told their own congregants that

21   Christie's said we have good title.  The Christie's

22   person whom he quotes, it's actually in her testimony.

23   She's not offered as an expert, so her telling your

24   Honor, Well, everybody thought that they belonged to

25   the Touro Synagogue.  There is a respect in which they

1    do belong to the Touro Synagogue, as your Honor

2    observed.

3          Then we have more testifying by lawyers.  He

4    shows you this and he says, Well, you know, these were,

5    you know, only the bases that were switched.

6          There was no evidence on any of this, Judge.

7    This wasn't shown to a witness.  Nobody testified to

8    this.  This was put together by CJI's lawyers in their

9    post-trial brief.  And we cite your Honor to the case

10   that says I'm not going to accept this.  This is not

11   evidence.  And it's not evidence, and they don't have

12   any evidence.

13         And I want to try to get back to 1903 and try to

14   do a better job of answering the question about that

15   settlement, because I do think it's relevant, and then

16   I'll touch on the presumption.

17         As we move up to 1903, there's not a vacuum.  We

18   know that Shearith Israel told the city that unless

19   we're going to have protection that all Jews -- the

20   comment that Mr. Naftalis said, that we said they're

21   not good enough, has no basis in the record, and it was

22   inappropriate.

23         THE COURT:  Well, there was -- no, I think he

24   was quoting the letter that CSI sent to the Rhode

25   Island legislature at the time which does contain some

1    positions about people's feelings toward either of the

2    congregations.  I don't think he was referring to that

3    now.  I think he was quoting what was said back then,

4    not now.

5         MR. SOLOMON:  And what was said back then,

6    Judge, is that Shearith Israel insisted that that

7    synagogue be open to all Jews.  We were the ones who

8    insisted on it.  CJI wanted only their sect, and Touro

9    Congregation wanted only their sect.

10        And your Honor will remember that we had been

11   there at that point for about 12 years, from 1881 to

12   1893.  We had been keeping the peace.  We were the

13   successors.  We were the ones who were there.  So

14   having told the city council that we're not going to

15   allow any of this factionization to happen, we also

16   said to the city council that unless all of the

17   moveables remain under our control -- that's the word

18   that was used -- that we're not going to allow anybody

19   in.

20        They resisted.  They then capitulated.  They

21   capitulated in the permanent constitution and bylaws.

22   And they capitulated when they surrendered the

23   property.  And they capitulated in the lease.

24        So when we move up to that, the parties have a

25   history of using words:  Moveables, personal property,

1    appurtenances, which does make specific reference.

2    There are documents that use the word "appurtenances"

3    specifically to refer to the rimonim.

4            Sitting down there, your Honor, I could not

5    find, as I told your Honor I would, I could not find a

6    reference to "paraphernalia" earlier than 1903.  And so

7    we move, but we move into this period knowing that the

8    personalty, those moveables, the stuff that you need to

9    make this engine work aren't being forgotten, okay?

10   They're not, maybe they're not as important as the

11   building, but they are very important.

12           And so what we tried to do in our presentation

13   is to show the Court that although the parties

14   themselves use the term "paraphernalia" together in the

15   lease, which we think is sufficient, to get an

16   understanding of what each of them understands, you are

17   entitled to go into the extrinsic evidence, what did

18   they think, and they thought that "fixtures" wasn't

19   sufficient.  That's why they entered into -- that's why

20   they did their resolution, and we -- and they

21   understood that we were talking about property

22   belonging in the synagogue.  That's their admission.

23           When we were moving towards the settlement, the

24   way I want to try to say it, your Honor, is that the

25   settlement agreement itself isn't the surrender.  I

1    don't see any reason why that has to be the only

2    operative document.  I could see the Court saying to

3    interpret an unambiguous document I don't need to look

4    at extrinsic evidence, but that doesn't apply to

5    agreements and parties to the conduct after.

6          THE COURT:  Well, that's what I've tried to ask

7    Mr. Naftalis.  They all have certain operative natures

8    to them, and the lease is a lease.  That's an operative

9    document.  I don't want to imply otherwise.

10          I meant on the issue of ownership, that I was

11    trying to follow CJI's argument through, which they've

12    been the owner of the rimonim, and if that is in fact

13    the case, that they could have contracted away their

14    ownership, even if they owned it; and it's clear to me

15    that the settlement agreement, which could be an

16    operative document as to the ownership, operative

17    document as to the ownership only includes premises and

18    fixtures.

19          I understand your argument that --

20          MR. SOLOMON:  Right.  But --

21          THE COURT:  Then on operative -- and Vickie,

22    when I talked too long she tells me she's deducting it

23    from your time, so don't panic.

24          MR. SOLOMON:  No, no, please.

25          THE COURT:  I didn't know she was doing that.

1    Good for her for doing that.  She knows I can tend to

2    go on.

3         So the operative document on ownership could be

4    that, but their argument is it isn't because it doesn't

5    include it.

6         The issue of the lease, a lease doesn't

7    determine ownership.  It's not operative as to

8    ownership.  It may be an element of evidence toward

9    ownership, that is, you don't lease that which you

10   don't own; right?  But it's not operative as to

11   ownership.  It's operative as to the lease

12   relationship.

13        So I guess what I was trying to say by the

14   settlement agreement on the issue of operative

15   ownership may be the only one that applies.  I think

16   clearly all of these, including the lease and the

17   paraphernalia and the CSI comments about them and the

18   CJI resolution, are pieces that go into a bucket to

19   determine when the Court is trying to determine the

20   facts of ownership.

21        That's all I meant, Mr. Solomon, by I think that

22   document on the issue of ownership may be the operative

23   document.

24        MR. SOLOMON:  But I believe the conduct of the

25   parties during that period of time:  We say you have a

1    set of rimonim.  We want them back.  They send them

2    back; right?  That happened more than once.  It

3    happened with respect to the 1730 bells as well.  We

4    saw in the pictures that they returned them, even

5    though there are no documents on them.

6            THE COURT:  Right.

7            MR. SOLOMON:  So I do not believe that

8    ownership -- the 1869 inventory is as clear an

9    articulation of ownership as we think that we can find.

10   But when we moved after the settlement, I think that

11   that document wasn't intended to be the only document.

12           And these acts of surrender, Judge, have as much

13   to do with ownership as anything else.  Indeed, this

14   was a public act of surrender.  It was a public act of

15   removing themselves from the synagogue.  Inside is the

16   movables.  Inside is the personal property.  This was

17   all choreographed.

18           And whereas their state of mind comes from their

19   board resolution and from -- and if I could look at

20   Slide 85.  Just so that your Honor is familiar, the

21   evidence is that "paraphernalia" was used during this

22   time period in general contexts to include ritual

23   objects including bells.

24           And your Honor could infer, this is June 12 --

25   January 12 of 1883, right, paraphernalia from

1    A. Marcus, and your Honor will remember he was a

2    benevolent benefactor of the Touro Synagogue, as well

3    as Shearith Israel as well.  So it's not just Kingston,

4    Jamaica, okay, where the word "paraphernalia" is being

5    used to include the silver bells; 1889, the same,

6    "paraphernalia;" and 1925, the same, different elements

7    which compose the synagogue physically and spiritually

8    including the adornments.

9         So people did understand that that's what the

10   word meant.  And to get at their state of mind, we have

11   not only the board Minutes but we have the -- the board

12   resolution, pardon me, but we have the contemporaneous

13   understanding that was also testified to by Professor

14   Fisher from our, from Shearith Israel's point of view,

15   the state of mind is that we've been talking about

16   personalty for 20 years.

17        And in the documents leading up to this formal

18   dramatic event, this surrender which is picked up by

19   the press, what we say is, "Obtain surrenders of the

20   building and personal property," this is D151 and it's

21   my Slide 76, "Obtain surrenders of the building and

22   personal property."  It's the same document that says

23   make sure you insert the word "paraphernalia."  And so

24   they are being used interchangeably, which we say goes

25   to our state of mind.

1          And so focusing just on the issue of ownership I
2    don't think is an integrated document in the settlement
3    agreement.  I do think it contemplated the lease.
4          And with respect, Judge, I think you not only
5    can lease what you don't own, but you can give up
6    rights to act with respect to property.
7          THE COURT:  Well, I don't know that.
8          MR. SOLOMON:  And even if you do --
9          THE COURT:  I mean, I could lease to you this
10    courthouse and enter a signed lease for this
11    courthouse, and it has absolutely no operation in terms
12    of my ownership of the lease -- of the building or your
13    ownership of it.  And I guess that's what I was trying
14    to get at.
15          It may be evidence of ownership, but it's not,
16    it's not operative of the ownership.  And that's all;
17    that was my only point.  It's a minor point in that
18    regard.
19          And your point is well taken that when looking,
20    to continue my paradigm, when filling the buckets, that
21    these internal letters of CSI about what was intended
22    and whatnot all go toward that.
23          But in terms of a binding operative document on
24    this Court, I think that that settlement agreement is
25    what binds me.

1          MR. SOLOMON:  Let me try one more approach to

2     that, Judge.

3          THE COURT:  On that issue.

4          MR. SOLOMON:  Just on that issue, and that is

5     that there are many aspects of this case where CJI is

6     trying to be things it's not.  It's trying to be the

7     Attorney General, and it's trying to be a beneficiary

8     of the trust, and we're not going to talk about any

9     of --.

10          But as between the two parties, if you enter

11     into a lease with me which says that you are going to

12     be my lessee of this courthouse property -- and we're

13     both ridiculous, okay?  I don't own it, and you can't

14     take it, okay?  But as between the two of us, if you

15     then promise me in a written document that at the end

16     of that term you will vacate, which is what the lease

17     says, you will surrender the premises, then you as a

18     party, as a juridical entity, do not have any rights to

19     come in and then claim.  It may be that you don't have

20     any ownership, but as between the two of us, certainly

21     you have given up your right.

22          And when they, in 1903, and they, in 1908, and

23     repeatedly since, when they wrote to us in 2001, the

24     lease is in effect, that's what they wrote to us.  When

25     they write to the government that the lease remains in

1    effect, when they write in their history books that the

2    lease continued for a hundred years, what they are

3    saying is that.  And at the end of that they surrender

4    the premises and everything in it because everything

5    was in it when they took, and nothing will be theirs

6    when they leave.  And so I -- so that's the point that

7    I wanted to make.

8         In terms of the presumption of ownership, we had

9    the rimonim before they did.  So the one piece of

10   evidence that is certain, okay, which is not obscured

11   by the 18th century, who knows who had what, but in

12   1869 we had the rimonim.  We had the rimonim, but we

13   have a document that says it.

14        So if you want to actually play the presumption

15   game, okay, we have the presumption, and they don't.  I

16   do not think that's a proper application of the law for

17   either side.

18        The presumption is not a burden-shifting

19   exercise.  It is a burden of production exercise.  And

20   what the cases say is that once we come forward with

21   evidence, then the Court has to decide without any

22   evidence -- without any thumb on the presumption.

23   They've held this property pursuant to a lease.

24   There's no presumption that applies.

25        Thank you, your Honor.

1          THE COURT:  Thank you, Mr. Solomon.

2          I think Vickie told counsel we're going to take

3     a short 15-minute break now for staff, and we'll be

4     back, and we'll finish with the final hour and a half,

5     and I'll do my best to assure that everyone makes their

6     2:20 train.

7          (Recess)

8          THE COURT:  Continuing, Mr. Naftalis, or someone

9     else?

10         MR. NAFTALIS:  Good afternoon, Judge.  On this

11    one I think we'll do some division between myself and

12    my colleague, Mr. Snow.  I'm going to start, and

13    Mr. Snow is going to come in on some of the legal

14    stuff, and then I'm going to finish up on the reasons

15    why they ought to be removed, if that's --

16         THE COURT:  Sure.

17         MR. NAFTALIS:  Okay.  Our position is the Touro

18    Synagogue is held in trust.  Shearith Israel is plainly

19    the trustee.  We are the beneficiary.  And we think

20    that the proof at trial overwhelmingly supported that.

21         We also think that the proof at trial, as I said

22    in my opening, they were faithless fiduciaries by their

23    denial of the trust relationship, their attempt to

24    repudiate the trust, attempt to claim ownership of the

25    trust property, attempt to evict us from the synagogue,

1    and the fact they have been uninterested, uninvolved,

2    uncaring and unconcerned for more than a century, and

3    they should be removed.

4         Anyhow, let's start, and I'm going to quickly

5    run through the evidence, some of the evidence on the

6    trust and the beneficiary and then turn it over to

7    Mr. Snow.

8         The Attorney General, to whose views, your

9    Honor, I believe most respectfully there should be some

10   deference held, has indicated that the record

11   overwhelmingly supports the existence of a trust here

12   and that we are the beneficiaries of the trust.

13        THE COURT:  Mr. Naftalis, let me ask you right

14   from the very beginning, when Mr. Rodriguez Rivera

15   died, who held legal title to the Touro Synagogue at

16   that moment in time?

17        MR. NAFTALIS:  My guess is to the extent that

18   the heirs stood in his shoes, I guess they -- yes,

19   Steve?

20        MR. SNOW:  No.  Actually --

21        MR. NAFTALIS:  See, it comes earlier.

22        MR. SNOW:  Could I answer that one, your Honor?

23        MR. NAFTALIS:  You know, we're not talking about

24   Jacob Rodriguez Rivera.  We're talking about Mariano

25   Rivera.

1          (Laughter)

2          MR. SNOW:  The answer to the question is this

3   was an express trust.  It was an express trust created

4   by a declaration that was 26 years later in his will.

5   But by establishing that trust at the beginning,

6   although it was declared later, that meant that there

7   was a trust.  Now, who were the trustees after that?

8   Well, it's not clear.

9          What should have happened is they should have

10  gone to the Superior Court, who has equity

11  jurisdiction, and say we need successor trustees.

12  That's not what happened.

13         What happened was within a few years -- actually

14  he died in 1787, I believe it was.  Within a few years,

15  because this was post-Revolution and Newport was going

16  through a lot of turmoil and had lost most of its

17  Jewish population, and by the early 1790s there were no

18  longer services, and by 1822 the last Jew left Newport.

19         So by default Shearith Israel became the trustee

20  under that express trust that was created in 1759.  And

21  how do we know that?  We know it, first of all there's

22  a receipt that was just a few weeks after the purchase

23  of the land by Rivera, Rodriguez -- by Rivera, Hart and

24  Levy.  There's this receipt from the president of the

25  congregation, the parnas, Naphtali Hart, a relative of

1    Issac Harte, who was one of the original trustees.

2         The receipt is -- you can see it here -- it's

3    dated in New York.  So he obviously had gone to New

4    York and received a significant contribution from

5    Shearith Israel.  And who does he get it from?  None

6    other than Myer Myers, who at the time was the parnas

7    of Shearith Israel.  And Naphtali Hart says he promises

8    to deliver to Messrs. Jacob Rivera, Moses, Levy and

9    Issac Harte, trustees for the, for building the

10   synagogue.

11        So Shearith Israel knew at the time they were

12   making a significant contribution.  So were many

13   others:  People in Newport, the congregants themselves;

14   other congregations around the world made contributions

15   to the trustees to build the synagogue.  It was the

16   only way they could do it because, as my brother

17   rightly points out, an unincorporated religious

18   organization at the time couldn't own property.  This

19   is how you did it.

20        Now, they didn't document it very well in the

21   beginning, but they did document it, and they

22   documented it through the will of Rivera, which was

23   probated in Newport Probate Court.  Nobody questioned

24   it.  According to that will, Harte had given him -- his

25   one-third transferred back.  No one has questioned that

1    ever since.  And the only other trustee was Levy, who

2    died five years later.  And if you look at his will,

3    and that's in evidence as well, it mentions the

4    synagogue only in terms of him releasing any debt that

5    the synagogue owed him for what he had advanced.

6            THE COURT:  I hope they're still praying for

7    him.

8            MR. SNOW:  I hope they are, too.

9            But you had an express trust.  Shearith Israel

10   by default became the trustee, and everybody accepted

11   that.

12           THE COURT:  Charitable or private?

13           MR. SNOW:  Charitable trust.  Charitable trusts

14   are defined by statute in Rhode Island.  It means any,

15   and I'm looking at Rhode Island General Laws 18-9-4.

16   It means, "any fiduciary relationship with respect to

17   property arising as a result of a manifestation of an

18   intention to create it," we have that, "and subjecting

19   the person by whom the property is held to equitable

20   duties to deal with the property for charitable,

21   educational, or religious purposes."

22           THE COURT:  And let me jump ahead.  This may be

23   not in your portion of your argument.

24           But then what authority does this Court have to

25   entertain, if it were to even get there, removing a

1   trustee from a charitable trust?  Isn't that power

2   singularly with the Attorney General?

3       MR. SNOW:  No.  The Attorney General has the

4   power to bring an action.  And a beneficiary who has

5   standing to bring an action against a trustee has to

6   give notification to the Attorney General under Rhode

7   Island General Laws.

8       Now, I know Shearith Israel cited old cases that

9   say the Attorney General has to be a party.  The

10  problem with those cases is they were superseded.

11  Title 18 Chapter 9 of Rhode Island General Laws was

12  passed in 1950, after most of the cases that they

13  cited, and that only requires notification to the

14  Attorney General.  The Attorney General then decides

15  whether or not they want to get involved and to what

16  extent.  And, as we know, they did intervene in this

17  as an *amicus curiae* and have taken positions in this

18  case.

19      THE COURT:  But that statute, while it requires

20  notice to be given, doesn't authorize the

21  beneficiaries -- I mean, the old common law as

22  evidenced by the cases that CSI cited clearly require

23  charitable trusts to be brought by, in our case the

24  Attorney General, but the entity that's charged with

25  supervision and overview of charitable trusts.

1           There's more recent cases, and one could maybe
2      argue by implication that statute; but it doesn't
3      appear on the surface by statute, explicit statute,
4      that the authority rests with beneficiaries of a
5      charitable trust to bring it.
6           MR. SNOW:  I would agree not explicitly by
7      statute, but by equity and certainly by case law.  And,
8      I mean, beneficiaries bring suits against trustees all
9      the time.  There's nothing unique about a charitable
10     trust in that respect.
11          THE COURT:  Well, and I don't want to waste a
12     lot of time on this, but there is in a way.  I mean, a
13     charitable trust, the black letter law is, the old
14     standard is that there's actually charitable trusts for
15     society in general that may have identifiable people
16     that benefit.  So charitable trusts for widows and
17     orphans is a charitable trust for society because we as
18     a society believe we should be caring for widows and
19     orphans, while they may be the beneficiary nature of
20     that.  But it's society's interest, not the
21     beneficiary's, in what allows a charitable trust to
22     exist at common law.  And therefore we bestow the state
23     representative of the society with the power to deal
24     with charitable trusts, not individuals who may have
25     benefitted.  That's the theory behind it.

1          I have read and followed both arguments, well

2     briefed on that issue, but I just wanted to put out

3     there that that's the argument.

4          MR. SNOW:  That's true, and that's why the law

5     requires the Attorney General to be notified, which

6     they were, and they've taken a position.  And, you

7     know, if the Attorney General felt that the beneficiary

8     didn't have standing to bring this case, they certainly

9     would have said something, so --.  That's not the

10    position that they've taken in this.

11         THE COURT:  Can a trust exist without a trustee?

12         MR. SNOW:  It's not supposed to.

13         THE COURT:  Let me ask this way.  If the trustee

14    ceases to exist by death or legal incapacity, does the

15    trust continue, or does that negate the trust?

16         MR. SNOW:  Oh, it doesn't negate the trust.  And

17    what we have here is a situation where, after the

18    original trustees passed away, there were trustees of

19    the original congregation, Yeshuat Israel, which

20    existed into the 19th century.  And when the original

21    congregation no longer had sufficient members to

22    continue on, by default Shearith Israel took over.

23    Everybody agreed that they were the logical one.  There

24    were no other Jews in Newport.  Who else would they

25    turn to?  They turned to the sister congregation, the

1   same congregation that took the personal property for

2   safekeeping.

3        They also took over responsibilities, no, not

4   completely, because in 1822 something else happened.

5   You had -- Abraham Touro passed away, and he left

6   money.  If it wasn't for Abraham Touro, none of us

7   would be arguing this case today.  But there was that

8   fund left to the State of Rhode Island in trust.  And

9   then some years later his brother, Judah Touro, passed

10  away, left more money.

11        THE COURT:  In Newport that time; right?

12        MR. SNOW:  I'm sorry?

13        THE COURT:  Didn't he leave it to Newport?

14        MR. SNOW:  To the Newport town council for the

15  express purposes of hiring a minister or a rabbi.  That

16  was 1857, I believe.  But those funds were available.

17  So Shearith Israel didn't have to use its own funds

18  during that period of time.

19        Now, they talk about the great things that they

20  did during that period of time, and certainly they did

21  act as a caretaker in some sense, although there was

22  actually a caretaker appointed by the Town of Newport

23  on site to take care of the property, paid for out of

24  the Touro Funds.

25        I'm going to turn it back over to Mr. Naftalis,

1      but I just want to try to address one question you

2      asked earlier about "paraphernalia."

3              THE COURT:  Oh, sure.

4              MR. SNOW:  When the, when we had the resolution

5      and the lease after the settlement agreement in 1894,

6      the term "paraphernalia" did not replace "fixtures."  A

7      phrase replaced "fixtures," and the phrase was

8      "paraphernalia belonging thereto."  And if you look at

9      the whole section, "thereto" refers to the synagogue

10     building and premises.

11             So by any interpretation -- now, we don't know

12     what was in the minds of the party.  You have to

13     interpret it from the face of the document.  But just

14     like unincorporated religious organizations couldn't

15     own property, buildings don't own property either

16     unless they're affixed.

17             So I have to believe that the intent of the

18     parties was that "paraphernalia belonging thereto" had

19     the same meaning as "fixtures" in the settlement

20     agreement.  What did it include?  There were fixtures.

21     There's an ancient clock that's attached to that

22     building.  There are chandeliers that are attached to

23     the building.  Those are fixtures.  Those all would be

24     paraphernalia belonging thereto.  And I submit that is,

25     that is the proper interpretation.

1          THE COURT:  It's the "belonging thereto" phrase

2     that I left out in my questioning that you're drawing

3     my attention to.

4          MR. SNOW:  Right.

5          THE COURT:  Thanks, Mr. Snow.

6          Mr. Naftalis.

7          MR. NAFTALIS:  We just finished Mr. Snow's

8     point, and if you put up as part of the demonstrative

9     package first, which was based on Plaintiff's

10    Exhibit 314, you can see what things would be fixtures

11    or paraphernalia pertaining thereto:  The reading desk,

12    railing, the arc; but not the Torahs, the rimonim.

13    Things that are affixed, that's what a fixture is like,

14    which is, I think, anyhow.

15          Anyhow, your Honor, over the course, I'm going

16    to run through it quickly because I think the

17    Attorney General summarized the evidence reasonably

18    persuasively as to why the evidence is quite

19    overwhelming on the subject of the trust.

20          But what's interesting is there's admissions

21    after admissions after admissions by Shearith Israel

22    that their position was that of a trustee.  For

23    example, in 1894 their president, Napoleon Levy, who

24    signed the deeds, who signed the 1903 settlement

25    agreement and the 1903 lease wrote, on behalf of

1    Shearith Israel to the Rhode Island judiciary

2    committee, We hold the property in trust.  And I here

3    quote an excerpt from the Deeds of Trust under which we

4    hold the property.  I don't think there's much

5    equivocal about that.

6         They made the same admissions in the 1920, their

7    1920 Minutes.  The documents identify them, the lease,

8    the settlement agreement, all that as trustees.

9         THE COURT:  Can I ask you, Mr. Naftalis, this

10   may just be a foolish observation on my part, having

11   spent way too much time in the last two months in the

12   middle of these documents all over the place.

13        But a couple of the operative documents, I think

14   the lease in particular, and perhaps another one I'm

15   blanking on, two or three times when CJI and CSI enter

16   into an agreement, each time the agreement is in the

17   name of certain trustees as trustees of CSI and with

18   CJI, not the trustees of CJI.  I know the 1945

19   agreement, the lease and the 1945 agreement both are in

20   individuals' names as trustees of CSI, --

21        MR. NAFTALIS:  Yes.

22        THE COURT:  -- which is probably technically

23   true, you know, corporate law.

24        But then it's with CJI outright, and I wondered

25   if anyone besides me noted that, the distinction.  And

1    if you think, other than me being foolish, if you think

2    that distinction should be taken into account in terms

3    of how each party perceived themselves, so we had a

4    corporate entity and perhaps a CJI, but we had actually

5    the trustees acting in their trustee capacity by CSI

6    when they took those actions.

7              MR. NAFTALIS:  Well, I mean, they were trustees

8    of CSI, but they were also --

9              THE COURT:  Even though I agree with you, you

10   can tell me I'm foolish in my analogy.

11             MR. NAFTALIS:  You're never foolish, no, but I

12   think that the obligations that were imposed upon the

13   trust, not only on -- not on Shearith Israel, but

14   imposed on their trustees as the trustees of the

15   synagogue, and that's the representation.  There was no

16   question that's the representation they made to the

17   Rhode Island legislature.

18             But the reference not once, but twice, but they

19   overwhelmingly in document after document indicate that

20   they are trusts, they hold the property in trust.  I

21   mean, to jump down to the, lest there be any doubt at

22   all, to the 1945 agreement, we reaffirm the trust, and

23   it indicates, Trustees under a deed of trust of the

24   Touro Synagogue.  And then they use, you know, a

25   shorthand, Hereinafter the Shearith Israel trustees.

1           And then if you look in the '45 agreement,

2     Whereas the Shearith Israel trustees, the holder of fee

3     simple title upon certain trusts in the Touro

4     Synagogue.  Pretty clear.

5           THE COURT:  A small "t" trust.

6           MR. NAFTALIS:  As your Honor said, there's no

7     issue they don't fight us on.

8           You know, it's interesting when they put up all

9     their slides and all their things, they kind of remove

10    that language, similar to what Dr. Mann did.  They

11    deleted the bold language:  Subject to the covenant set

12    forth above in recorded deeds and declarations of

13    trust.  They say that in, we found four different

14    filings, including the rebuttal findings.  You know, if

15    you don't like something in a document, just don't

16    delete it; it's there.  I mean, it is clear as a bell.

17          And lest there be any doubt about it, when they

18    gave a report in their own Minutes in 1945, they noted,

19    their own president, who happened to be a lawyer,

20    reported to the board, We hold -- the individual

21    trustees who hold the property in trust.

22          That was their understanding.  Not only was it

23    explicit in the documents, but that was their

24    understanding of what their own position is.  I mean,

25    that's a pretty strong admission of what it all means.

1          And we also know, and I'll run through it

2     quickly from MacLeod, the lawyer's opinion letter, how

3     certain language got in there; because he wanted to be

4     sure that it reaffirmed that there was a trust, that

5     they held it under a deed to trust, it was for the

6     benefit of the Jewish society of Newport, and that CJI

7     was the current incarnation of it.  He puts that all in

8     a letter, which legal opinion is shared with CSI and

9     therefore recommends you have to add a provision, I

10    think it's 1-F should be added to the --.  And they all

11    agreed to do it.

12         And this is how he ends it:  I feel that this

13    revision of Article 1 Subsection F, that Congregation

14    Jeshuat Israel will not be prevented from presenting in

15    any future legal action the full story of the trust

16    originally established for the Jewish society of

17    Newport.  What could be clearer?  And CSI went along

18    with his revisions, and then in their Minutes they

19    indicated that they were signing as trustees.  I think

20    the MacLeod is pretty important documents.

21         Are we the beneficiary?  I think we have a slide

22    there.  The Attorney General concluded that the

23    beneficiary is the Jewish society of Newport.  We are

24    the current incarnation of the Jewish society of

25    Newport.  We list 14, 16, 27 reasons why we are the

1    current incarnation.  They were all on the slides.

2          You know, we're the only Jewish congregation in

3    Newport.  We're the Jewish congregation in Newport that

4    worships in the Touro Synagogue.  We're the only Jewish

5    congregation that worships in the Touro Synagogue.

6    We've done it exclusively for 120 years.  The names are

7    used interchangeably.

8          The Attorney General said there's no other

9    possible trust beneficiary besides us.  Who do they

10   have liaisons with?  Only us.  They don't even know

11   anybody else up there.  They have no contacts with

12   anybody else.  Why would you lease to us if we weren't

13   the beneficiary?

14         Rhode Island law recognizes it repeatedly by

15   giving us control, I think as my colleague, Steve Snow,

16   said of the Abraham Touro Fund, the Judah Touro Fund,

17   named us specifically.  We're named specifically in

18   there.

19         Indeed, in 1932 they made it clear as a bell.

20   They passed a law that states that the property's held

21   in trust for the benefit of Congregation Jeshuat

22   Israel.  I mean, what could be clearer than that?  As I

23   say, I don't think anyone has ever really challenged

24   that before this litigation.

25         Look, I think Steve answered your Honor's

1    questions about the legal authority to remove them.

2    Let me talk about the factual reasons why they should

3    be removed.

4         I think they just haven't acted the way a

5    trustee is supposed to act.  They have been faithless

6    fiduciaries, and this has been on forever, it seems,

7    for decades and decades and decades.  And there have

8    been acts of comission and acts of omission.

9         I mean, when you start with a breach of a duty

10    of loyalty, I mean, the notion of a trustee trying to

11    claim ownership of the trust corpus for himself, I

12    mean, that's as big a violation of duty of loyalty as

13    you can get.  Secondly, making decisions based on your

14    own interests.  Well, they have admitted they've done

15    that, repudiating the trust.  They've repudiated the

16    trust and they continue to repudiate the trust,

17    claiming to own things outright.

18         They -- wanting to remove us, throw the -- thank

19    you; I'll talk faster -- to throw the beneficiaries

20    out?  You know, with all the dancing about, they still

21    want to get rid of Jeshuat Israel, the only people who

22    actually care about the place, the only people who've

23    devoted their blood, sweat, and tears to the Touro

24    Synagogue, while these people sat in Central Park West

25    doing nothing for a hundred years.

1    That's why they want the clock to stop in 1903,

2    because they have been missing in action since 1903 or

3    1905 or 1908.  And, indeed, their total lack of care

4    about it.

5    You know, Mr. Katz, their only witness up there,

6    he says, Oh, the '45 agreement, the terms there about

7    us protecting, maintaining, having any concern, that's

8    meaningless, doesn't impose any obligations.  He

9    couldn't even answer the question.  I thought -- may I?

10    I mean, I felt like Clarence Darrow, but I didn't think

11    I was that good when I said, Well, you don't want the

12    congregation to die?  It seems like it took two

13    minutes, it probably was a 15-second pause before he

14    could even bring himself to answer the question.  And

15    he gave some -- You really don't want the congregation,

16    Jeshuat Israel, the beneficiary of the trust, to die,

17    do you?  Beneficiary of trust is in there.  Pause.  And

18    then you get this mumbled answer:  Well, there'll be a

19    congregation there regardless of what happens to the

20    present community; I don't want the community; I don't

21    want --.  Then I said, Come on, answer it.  My question

22    is do you really want them to die?  I do not.  Well, he

23    doesn't.

24    They paid no attention to us.  He was the

25    liaison.  He went there once to participate in a letter

1      reading ceremony on a weekend and never returned.  The

2      other so-called liaison went there twice.  Three

3      people, the three most important officers, the other

4      vice-president, Lustig, he visited Touro Synagogue as a

5      kid.  He's never been there since.  They have paid no

6      attention whatsoever in terms of care.

7          David Bazarsky testified in 1996 he went to them

8      and said, How can you help us?  We need help.  He was

9      basically told, You're on your own.

10         In 2004 it was reported by Mr. Groopman, their

11     liaison, that the people are trying to deal with the

12     difficulties.  The synagogue is falling apart.  They're

13     trying to raise money and so on; they need some help.

14     No help was forthcoming.  Indeed, that's when their

15     president, Mr. Neustadter, made that grievous

16     admission:  I guess we're getting a free ride here.

17     Yes, they've had a free ride a long time.  They've done

18     nothing.

19         And then Mr. Aidin -- Ms. Pedrick came and

20     testified.  She and this distinguished lawyer from New

21     York, Bernie Aidinoff, who is a member of Touro and

22     Jeshuat Israel, came and made a whole presentation with

23     all the fancy graphics and everything about please help

24     us.  Again they were rebuffed.

25         And in 2009, when we get to the famous

1    conversation between Ms. Ross and Mr. Katz about the

2    *Forward* article, we were talking about having to sell

3    the object, you know, it's an object.  They don't want

4    to sell it.  You know, it's ornamental, according to

5    their own witness.  But they don't want to sell it.  If

6    they had no other -- that's the -- they don't do any

7    other alternatives.  They want to preserve it.  The

8    trust says to preserve it as a place of public worship

9    forever.  That's what it's trying to be preserved for.

10           When he reads that, talks to her about it,

11   what's his concern?  His concern isn't who owns the

12   rimonim, because that's a newly-minted claim that they

13   just came up with for this litigation.  But his concern

14   is, Don't ask us for any money, don't ask us for help;

15   you're on your own.  And that's all he was concerned

16   about.  And he reported that conversation about the

17   desperate situation of Jeshuat Israel and the Touro

18   Synagogue to the board.  They didn't lift a finger

19   either.  You know, can I have just one second.

20           You know -- it seems to me that there really

21   were only two times in history where they ever really

22   showed any interest in the Touro Synagogue after the

23   beginning times.  One, the 1890-1900 period when they

24   were scurrying around trying to get some rights.  And

25   then they went missing in action until June, the summer

1    of 2012, when all of a sudden they got real interested

2    for 7,400,000 reasons.

3              Thank you.

4              THE COURT:  Thank you, Mr. Naftalis.

5              MR. SOLOMON:  Thank you, your Honor.  Any

6    demonstratives are at the back of the book that I used,

7    but I'm going to try to point the Court to the specific

8    pages.

9              Once again with Mr. Naftalis, it's my trying to

10   figure out, okay, is there anything in the briefs that

11   doesn't correct the distortions and the misstatements.

12             Talk about a newly-minted claim.  Did your Honor

13   see in the evidence a single piece of paper from them

14   that complained about our trusteeship?  Not one.  Well,

15   how about evidence of an oral complaint?  Not one.

16   Their witnesses admitted that they didn't complain.

17             This is minted by the lawyers who are looking

18   for a claim.  I submit that your Honor has enough to do

19   with the rimonim.  I do not believe that there is

20   jurisdiction in this court to address and decided this

21   issue.  I think even if there is jurisdiction, I think

22   your Honor should exercise discretion in not because it

23   is not necessary for anything that your Honor has to

24   decide, and that's what I, what I want to show.

25             There's -- I wanted to offer the Court a

1   Rube Goldberg cartoon because it was only he who could
2   sort of have this contraption that had all these pieces
3   that fit together, and by the end you actually get
4   something that doesn't have anything to do with what
5   you start with.  My team, who is in charge, said who is
6   Rube Goldberg?  So I decided not to do it.  But here's
7   about what we do here, okay?
8        So, CJI is mentioned in exactly zero of the
9   operative documents as being the beneficiary of
10  anything.  They're mentioned in the lease as the
11  lessee.  Their rights and obligations are set forth in
12  the lease as lessee; not a word about being the
13  beneficiary.
14       Prior to the time that they existed, of course,
15  no mention of them.  In the 1945 agreement, a whole
16  painstaking effort, having nothing to do with what
17  counsel complained about the MacLeod opinion, was made
18  to exercise, to insert the proper use, the condition on
19  which this property was to be used, and a very clear
20  distinction is made between Congregation Jeshuat Israel
21  on the one hand, which is mentioned no place in that
22  paragraph, and the Jewish society of Newport, that is.
23       So we start with CJI, which is a stranger to any
24  trust issues.  They operate as lessee.  If they breach
25  the lease or they overstay, then they have to

1    surrender.  So we start with they have no say here with

2    respect to a trust issue.

3         But I'm weak and I acknowledge too many things,

4    so maybe, well, are they a beneficiary of this

5    relationship that I'm going to call trust, in a lower

6    case "t," because I will try to make clear what our

7    position is.  Well, are they a beneficiary?  Well, no,

8    they're actually not a beneficiary.

9         This is a relationship that has to do with

10   people and congregants, and not CJI, who happens to

11   exist in a moment in time, even if it's a 120-year

12   moment in time.  But, all right, maybe call them a

13   beneficiary because maybe they represent some people.

14        So then what CJI says, Okay, well, we'll be a

15   beneficiary; no, no, no, we'll be the beneficiary;

16   forgetting what comes before, forgetting what comes

17   after, forgetting what comes geographically, forgetting

18   that there are other Jews that are not CJI.  We'll be

19   the beneficiary.

20        THE COURT:  What evidence is there before the

21   Court that there is any other beneficiary at this given

22   moment in time?  Isn't the evidence that it's the only

23   worshipping congregation, Jewish congregation in

24   Newport right now?

25        MR. SOLOMON:  The Jewish society of Newport,

1    your Honor, is not limited in time and it is not

2    limited in space.  And they may be the people who are

3    worshipping in the synagogue now, but I think the

4    evidence in the case is overwhelming that no one

5    expected the Jewish society of Newport to be those

6    people.

7         It was said specifically to the legislature in

8    the 1890s that CJI may be there now; there may be

9    others; the original families may come back.

10        There are a thousand Jews in Newport.  They

11   speak for at most 300, and there are 30 actually who go

12   to their meetings, and even they don't speak for them

13   because they've been mislead as to what to vote for and

14   what not to vote for.  But you're talking about a

15   preponderance of Jews living in Newport that don't have

16   anything to do with Congregation Jeshuat Israel.  Now,

17   my only point here is --

18        THE COURT:  They're not publically worshipping,

19   which is the other part of the trust.

20        MR. SOLOMON:  Well, they are publically

21   worshipping and they're worshipping elsewhere, and just

22   like people drive to Congregation Jeshuat Israel --

23        THE COURT:  What evidence is there that there's

24   other Jews in Newport publically worshipping, other

25   than those that are doing it through CJI?  I think the

```
1    evidence is the opposite, that there aren't.

2         MR. SOLOMON:  I believe that there are two other

3    places of worship.  One is a house, a chabad house or a

4    communal house, and the other is in the city that is

5    right next door.  That is the evidence, and by the time

6    I stand back up I will have the page in the transcript

7    for it.

8         But, Judge, even were that accurate, they are

9    not the Jewish society of Newport.  The Jewish society

10   of Newport is a concept.  The Jewish society of Newport

11   is something that lasts over time.  And if the only

12   damage that they were trying to do to the relationship

13   between this congregation, this edifice, these ritual

14   objects, okay, was just calling themselves the people

15   there, then that would be bad enough.

16        But the Rube Goldberg continues because they are

17   not the beneficiary, but as a beneficiary they say, Oh,

18   by the way, we have the right to control the trust

19   corpus.  No beneficiary ever has the right to control

20   the trust corpus.  That's why you have trustees.

21        But they then go on and they say not only do we

22   have the right to control the trust corpus, but we can

23   actually control, we can actually sell some of the

24   corpus.  And, again, no case ever does that.

25        THE COURT:  Well, they don't actually say that,
```

1    Mr. Solomon. You want them to say that, but that's not

2    what they say.

3        They don't claim the rimonim are part of the

4    trust. They claim they have outright ownership in

5    them. In the alternative they've argued the trust, but

6    we didn't hear that argument this morning. It's their

7    secondary argument, but --

8        MR. SOLOMON: It's only the secondary argument

9    I'm addressing, your Honor, and the reason is because

10   if the rimonim are not part of the trust, then how

11   could our objection to the sale of the rimonim be a

12   breach of the trust.

13       THE COURT: Because what their argument is, is

14   that as the trustee over this corpus, the Touro

15   Synagogue itself, you have claimed actual ownership

16   over it in your legal papers. You say there is no --

17   you're not arguing it this morning, but in your papers

18   you say you outright own the Touro Synagogue. And

19   their argument is that because you've taken that

20   position -- it would be like me, as a trustee over

21   money for the benefit of widows and orphans, all of a

22   sudden saying that money is mine.

23       And that's what -- I'm only saying what their

24   argument is, Mr. Solomon, and that's what their

25   argument is, that by taking that legal position of

1    actual ownership over what they allege is the trust

2    corpus, you have breached your ultimate duty, which is

3    to protect that corpus for the benefit of beneficiaries

4    in that paradigm.  That's what they're saying.

5         MR. SOLOMON:  And I thought I read and heard,

6    but not today, your Honor is correct, that they took

7    the position that Shearith Israel's position with

8    respect to the rimonim constituted a breach of the

9    trust.  If we want to turn to the fact that you're

10   going to remove a trustee because the trustee takes a

11   position in a legal proceeding, I think that is bad

12   public policy.  There's no case that has ever done

13   that.  Now, what I'm --

14        THE COURT:  I'm not taking any positions, by the

15   way.

16        MR. SOLOMON:  But that is the position that they

17   are taking, that somehow we have claimed -- we've been

18   very clear about this, Judge.  Shearith Israel owns the

19   property.  That is not sufficient to throw us out as

20   trustee, because we have also said that we have

21   obligations of trust with respect to this; that we defy

22   anyone actually looking at the record, rather than

23   misstating it and ignoring it, but looking at the

24   record and seeing what Shearith Israel has done for

25   250 years, to suggest that we haven't carried out our

1    obligations.

2              Our obligations as trustee, and the cases are

3    clear on this, if it's a charitable trust we have no

4    financial obligation.  We have cultural, religious

5    oversight, and we have exercised that oversight.  And

6    there's no suggestion that we haven't exercised that

7    oversight, so there's no possible claim that we

8    breached an obligation that we have, but we are --

9              THE COURT:  They would argue that the 1945

10   agreement is an independent obligation to preserve and

11   protect that you entered into that you breached.  But

12   that's not in relationship to your trustee; that would

13   be in your relationship to the agreement itself, I

14   suppose.

15             MR. SOLOMON:  Can't be in relation to the

16   alleged trusteeship or the capital "T" trusteeship.

17   The 1945 agreement is terminable on one year's notice.

18   That agreement didn't create any trust.  It created a

19   relationship.  The words I think are before the Court,

20   and we can go over them if you want.

21             There is nothing in the agreement that changes

22   the responsibilities that Shearith Israel has to act as

23   landlord.  It specifically says that the rights and

24   obligations of the parties are as defined in the

25   lessor-lessee relationship.  We believe we have

1    obligations as lessor to deliver the title or acquire

2    title.  We believe we have done that.

3        And as lessor we have an obligation to ensure

4    that at the ritual that's practiced there is an

5    appropriate one.  There's no issue before your Honor

6    that the ritual that is practiced there has not

7    breached any lease of any kind.

8        But as much as they don't want to talk about

9    that, that ritual, the relationship that we have, and

10   it is consistent in the 1894 deeds, the 1903 lease, the

11   1908 lease, the 1945 agreement all say it in the same

12   way, and that is that what we are responsible for is

13   the oversight of the customs, the rites, and the

14   rituals of what goes on there.  And they are to

15   practice in the way that we practice, and that's what

16   it says.  This does not get the Court into any First

17   Amendment issue at all, but it -- because it's not a

18   question of religion that your Honor is asking.

19       The question is how do we act at Shearith

20   Israel?  We don't sell our ritual objects.  It's part

21   of our custom never to sell the ritual objects.  As

22   trustee of this edifice, we object to them selling

23   ritual objects, and I think that your Honor can address

24   it in that context, but let me try to be a little bit

25   more systematic.

1    We believe that the Court does not have

2    jurisdiction over this case when they belatedly told us

3    that it was a charitable trust, they did just before

4    trial, and then even in their trial brief they had both

5    that they argued, okay?  This case, for all practical

6    purposes on this issue, was over; never having asked us

7    in writing or orally, right, for a financial

8    contribution.

9        Your Honor heard the testimony of Mr. Bazarsky's

10   trip in 1996 when he, on direct, said a lot of things.

11   And it was only on cross that we actually saw the

12   Minutes when he said they never asked us for any money;

13   right?  Even if they asked us for money, where is the

14   letter saying this is how much you need, and this you

15   didn't give us.

16       And where is the trust relationship that

17   requires us to do it?  That's not the relationship that

18   we have with them.  It doesn't mean that we've been

19   strangers.  I think the record is replete with efforts

20   by Shearith Israel, including with respect to the Touro

21   Synagogue Foundation.

22       THE COURT:  What is your obligation to maintain

23   the corpus?

24       MR. SOLOMON:  To maintain the corpus.

25       THE COURT:  Of the trust, the synagogue then.

1   If you have no financial obligation to it, could you as

2   trustee allow it to run into the ground?

3          MR. SOLOMON:  I think that we as trustee, we

4   cannot allow it to run into the ground.  We have never

5   allowed it to run into the ground.  And we will not

6   allow it to run into the ground, okay.

7          That issue isn't presented here, your Honor,

8   because they're not running into the ground, no.  But

9   to ask the hypothetical, the abstract question, just so

10  that your Honor --

11         THE COURT:  Because what I asked you explicitly

12  is what is the obligation of the trustee?  To ensure

13  protection of the corpus.

14         MR. SOLOMON:  To ensure that for as long as we

15  are able, that Touro Synagogue, including what's in it,

16  is used as an open place of worship for Jews in

17  accordance with rites, rituals and customs that are

18  authentic to that place, that were followed by the

19  founders of that place, and that we inherited and that

20  we continued to have.  That is our obligation.

21         If that obligation requires that we find another

22  caretaker who is going to do that, I believe, I agree

23  with the Attorney General, I believe that is our

24  obligation, okay, that we have to do that.

25         THE COURT:  Who did Shearith Israel find to

1    fulfill that obligation?  Are you claiming the Touro

2    Synagogue Foundation is the entity that performs that

3    duty?

4         MR. SOLOMON:  The financial fundraising has been

5    the Touro Synagogue Foundation, which we have had as

6    much of a role as CJI.  It was the Touro Synagogue

7    Foundation that borrowed the million dollars and repaid

8    the million dollars.  It was the Touro Synagogue

9    Foundation made the deal with the -- the $10 million or

10   $12 million deal with Ambassador Loeb.  They are the

11   ones who are responsible.  They're not the only ones

12   who are responsible.  But by not putting on CJI's

13   books' the million dollars, right, by giving CJI rent

14   at a dollar a year, Shearith Israel is carrying out its

15   obligation and its responsibilities.  But we do not

16   agree that we have to spend our own money, nor do the

17   cases require it, if we are the trustee of a charitable

18   trust.

19        THE COURT:  And shouldn't you resign as trustee

20   if you don't have the ability to maintain the corpus?

21        MR. SOLOMON:  No, with respect, your Honor, we

22   absolutely should not.  Our need as trustee has never

23   been more clear, in my judgment, I think, based on the

24   evidence; no.

25        They don't need the money, Judge.  They're

1    operating at a profit.  They're operating in the black.

2    Every year in the last five they have made their ends

3    meet, except for one year because of the funds for the

4    litigation, which is not a recurring event.  And so,

5    they have money.  They have made an agreement with the

6    Loeb Center that throws off cash.

7          I believe that this entire financial existential

8    crisis is a fabrication.  We asked, Well, what do you

9    expect to spend in the future?  Oh, a lot of money.

10   Well, do you have actually a piece of paper that shows

11   that?  No.

12         So when they need money, they've gotten money,

13   including from us.  When they needed to build a Hebrew

14   school, it happens to be a long time ago, but what

15   difference does that make?  It was in the 20-century.

16   They came to us.  We had a special fundraising, and we

17   helped get the money to build the Hebrew school.  When

18   they ran out of funds to build the building in the

19   first place, as Urofsky says, and it's in evidence,

20   they came to us a second time, and we were the only

21   ones that stepped up the second time.  I think we have

22   shown -- yes, there's been the Touro money, but there's

23   also been Shearith Israel money.

24         When people needed to be buried, and there were

25   Jewish religious questions that needed to be answered,

1    the city council couldn't answer those questions.  It

2    was the oversight that we provided.  But I don't -- and

3    I say all of that, and we're not going to stop doing

4    all of that.

5            But the founders and the Rivera, Rodriguez, and

6    a hundred years later with all of the descendents who

7    issued those deeds, and in 1903 and 1908, and even in

8    1945 there is something else we have been tasked with,

9    and that is cultural ritual oversight.  And we embrace

10   that.  We have not shirked that.  There's never been an

11   argument that we have breached it.

12           THE COURT:  Mr. Solomon, remind me, the only

13   place in the tradition of the Spanish and Portuguese

14   tradition exists, or the first place it exists in terms

15   of obligation, isn't that -- is that in the lease?

16           MR. SOLOMON:  The first place that those words

17   are used are in the deeds, your Honor, in the 1894, and

18   only a third of those use the language of trust.

19   Two-thirds do not use the language of trust.  And then

20   it is reincorporated into the two leases, and then in

21   the 1945 agreement.

22           THE COURT:  But prior to the deeds, let's say,

23   prior to that time none of the Rivera will, just

24   mentioned, for the benefit of the Jewish society, or at

25   the introduction of the style of worship, if I can use

1  that term, occurred in the mid 19th century at the

2  earliest, and then later most up front in the lease.

3      MR. SOLOMON:  I believe that is what the

4  evidence shows, Judge.  When the will -- which did not

5  create a trust; we don't agree with that.  There are

6  formalities that have to be undertaken to create a

7  trust.  I don't think you get to create a trust just by

8  -- a Franken-trust is what we called it, but just by

9  putting a lot of different pieces of paper together.

10 A trust is a serious thing.

11     But when the will talked about being a place of

12 worship for the Jewish society forever, the only Jewish

13 society that there was there was our ritual, so I want

14 to say that *in haec verba*, Shearith Israel is referred

15 to for the first time in the late 19th century, but it

16 was known for a hundred years earlier that that was the

17 mode of ritual.  Remember, Judge, there weren't other

18 Jews then that were here in America.  It's the only

19 thing anybody knew.

20     But once they say that this is a charitable

21 trust, we do insist, we maintain and ask the Court to

22 consider that these issues were resolved in the prior

23 litigation.  And we have tried to narrow, because of

24 the comment that your Honor made, what we're saying is

25 *res judicata*.

1    But they claimed that they were beneficiaries of

2    a trust and their case was dismissed, and they claimed

3    that it was on the basis of the same documents that

4    they're claiming now, and their case was dismissed.

5    And not only -- and, see, this is inhibition of the

6    party.  This is why CJI has --

7        (Interruption)

8        MR. SOLOMON:  That's very distracting.

9        That's why CJI has no role here.  Okay.  There

10   may be an issue.  The Attorney General, and we called

11   the Attorney General when we got their brief, and we

12   said, Listen, we don't agree on the law here, but we've

13   never acted in any other way, and if you have an issue

14   about how we are acting as stewards for this, talk to

15   us.

16       And we're not running away from that.  We don't

17   think that that's a trust with a capital "T."  All I'm

18   saying, your Honor, is that your Honor doesn't have the

19   proper parties in this case to answer that question.

20   They lack standing.

21       Only the Attorney General has the right to

22   petition the Court to remove a trustee.  The law didn't

23   change and stop in 1950.  In our brief on Page 43 we

24   cite your Honor to the Rhode Island Supreme Court case

25   of 1977, it's *Israel versus National Board of Young*

1     *Men's Christian Association*, 369 A.2d 646, that the

2     Attorney General is an indispensable party to a lawsuit

3     involving charitable trust construction *a fortiori* the

4     removal of a trustee.

5         The inconsistent judgments that Shearith Israel

6     would be exposed to, were the Court not to apply the

7     Supreme Court of Rhode Island and Supreme Court of the

8     United States law in a consistent way, and require that

9     the AG be a party, is obvious, because we would have

10     one claim beneficiary who says that we didn't do this,

11     one claim beneficiary that says by doing that you

12     breached another trust.  That's why you need the AG

13     here.  So not only is the AG an indispensable party,

14     but CJI also  lacks standing.

15         THE COURT:  Well, why wouldn't the statute,

16     which supersedes many of those cases, control here, at

17     least if by implication, as I suggested to Mr. Snow?

18     That is, if the parties and a beneficiary to a

19     charitable trust is required to give notice to the

20     Attorney General, why isn't it reasonable to assume

21     that the legislature made a decision that notice

22     sufficiently was all that was required?  Why wouldn't

23     they say they had to be a party if that's, in fact,

24     what they meant when they passed the charitable trust

25     statute?

1      MR. SOLOMON:  Because there are many cases that

2  might touch upon charitable trusts that don't involve

3  removal of the trustee, and then the Attorney General

4  then can see what's happening in a case.  But it's a

5  big onus to put on the Attorney General.  It was CJI

6  who was required to tell the Attorney General in order

7  for us to get any relief here, you need to be a party.

8      THE COURT:  A big onus is on requiring, I would

9  think, if big onus matters in determining who has

10  powers, but it would be big onus to put on the

11  Attorney General to require every charitable trust to

12  require him to come in to intervene.  If there's a

13  charitable trust for the, you know, the orphans who

14  live on a certain section of town and whatnot, to

15  require the Attorney General in each and every one of

16  those narrowly-drawn beneficial trusts, to require him

17  or her to come forward would be the onerous burden, not

18  on the parties who might have an interest in it.  I

19  mean, that's how our system works.

20      MR. SOLOMON:  Well, if those --

21      THE COURT:  And I don't think who has the onus

22  of burden matters, but I just --

23      MR. SOLOMON:  Given that this is, we now

24  understand their claim that it's a public charitable

25  trust, I don't believe there has been a change in the

1        law.  I do believe that the Attorney General is an

2        indispensable party, and I don't think the burden on

3        them -- well, if the burden on them is great, I agree

4        with your Honor, burden on them is then great.

5              But as your Honor is sitting with the case now,

6        you have a party that is not the proper party because

7        they are -- if it's a charitable trust, it can't have

8        identifiable beneficiaries, and your Honor, in one of

9        your questions, understood this better than I, so I can

10       pass that point.

11             But by definition you can't have identifiable

12       beneficiaries because you're going to get yourself into

13       exactly the problem that we have now.

14             But this identifiable beneficiary thinks that it

15       can make decisions for the trustee about what happens

16       to the corpus of the trust, and that's their own

17       self-dealing.  It's the trustee who has the very broad

18       discretion to act, and it's the trustee who in this

19       case has not been identified to have done anything

20       wrong except, where it comes to rites, rituals and

21       customs, objecting to the sale of the rimonim, which

22       20 minutes ago I think we set aside.

23             I wanted to make a comment about the brief of

24       the Attorney General.  In here we cite the cases that

25       question why when amicus, amici, come in to sort of

1    give views about the weight of the evidence.  It's not

2    really the role of an amicus, and we welcome the AG,

3    we're happy they're here, but I think your Honor should

4    look more at what they're saying about the trust issues

5    than their weighing of the evidence.  They didn't even

6    see all of the evidence.  They didn't read all of the

7    evidence.  It's not their job.

8            But what they do say is -- and an errant slide

9    was put up suggesting that the Attorney General said

10   that the beneficiary of the trust is CJI.  What they

11   say on Page 10 is the beneficiary is the Jewish society

12   of Newport.  That's correct.  They say that CJI is not

13   the exclusive beneficiary, which ends the case, in our

14   view, with respect to whether the Court has any

15   authority to change -- the Court has the proper parties

16   before it.  But they do go on to say that CJI is not

17   exclusive and that CJI has to conduct religious

18   services in accordance with the rites, rituals and

19   customs of Shearith Israel.  We agree with that.

20           They do not urge our removal.  They say that in

21   the first footnote in the first page of their brief.

22   They say that we acted as trustees since the 1820s and

23   we complied with the purpose of the trust by leasing

24   Touro to CJI.  We agree with all of that.

25           They then go on to say that Shearith Israel will

1    be responsible for ensuring that Touro Synagogue

2    remains a place of public worship for the Jewish

3    society of Newport, even if CJI is not the lessee.  And

4    your Honor, we agree with that.

5         And so it does become something of a semantic

6    issue, which is what we shouldn't have and we wouldn't

7    have if we had the proper parties here, and that is

8    that Shearith Israel does not deny that it has the

9    obligations that I identified, including what the AG

10    says.  So we are on the same page with the AG on this.

11    And I believe that if they were parties, there wouldn't

12    be any question that we were -- there would be no

13    question of removal.  At least your Honor would be able

14    to hear from the proper party who was supposed to be

15    here.

16         What we don't want is the application of trust

17    law, which then gets distorted, that the beneficiary,

18    who is not entitled to have any say in a charitable

19    trust, not only has say but the exclusive say.

20         You were told that the legislature has

21    identified them as the Jewish society or as the

22    beneficiary.  But what the legislature actually says is

23    that they make the statement that they can have access

24    to the funds, which we've never objected to, but that

25    nothing in what the legislature is doing will interrupt

1    the possession, control and management with respect to

2    the proprietors of said synagogue and premises.  And

3    there the legislature is quite clearly saying that they

4    are not going to interfere with private contract, nor

5    could they interfere with private contract under the

6    contract clause.

7         The 1945 agreement and the 1903 lease, and your

8    Honor said it, and it's not a trivial question at all,

9    it's dispositive; speaks of the Shearith Israel

10   trustees as trustees of Shearith Israel.  But I don't

11   want that to mean that we don't take seriously our

12   obligations to the Touro Synagogue, because we do.

13        There is confusion of the evidence of a trust

14   and the trust, and we go through in our papers, and I

15   think unless your Honor has questions, we will rest on

16   the fact that as a formal matter trusts were not

17   created.  But that's not to say that we are not -- we

18   are the unseen hand who is going to be here

19   irrespective of whether CJI is here, and we will

20   continue to do that.

21        THE COURT:  Well, let me ask you just so we're

22   clear between capital "T" and lower "t".  Do you own

23   equitable and legal title to Touro Synagogue?  What's

24   the --

25        MR. SOLOMON:  Our position, your Honor, is that

```
1    Shearith Israel owns equitable and legal title, and the
2    title is subject to a condition.  So there is title.
3    It's subject to a condition.  And that's what the
4    cases, the cases acknowledge that.  And when we
5    obtained title, it was with the understanding that
6    there was going to be a public place of Jewish worship
7    in accordance with the specific kind of ritual forever.
8    That is how we hold it.  We will have breached -- I'm
9    not sure who can enforce it at that point -- but we
10   will have breached it if we ever tried, if we turned it
11   into a bowling alley or a bingo alley (sic).  So there
12   is plenty that we have the right to do.
13        THE COURT:  Well, under your theory that you own
14   both legal and equitable trust, no one could enforce
15   that.  You could turn it into a bowling alley tomorrow.
16        MR. SOLOMON:  No, your Honor.  I think the --
17        THE COURT:  What could stop you?
18        MR. SOLOMON:  First of all, I think the
19   descendents can.  I think the Attorney General can.
20        THE COURT:  What role would the Attorney General
21   have if there's no trust?
22        MR. SOLOMON:  Because the fiduciary obligations
23   that the statute defines are ones that we do embrace,
24   but they're fiduciary, not financial.  They're
25   clearly -- in our judgment they are fiduciary because
```

1   we need to make sure that there is an active place of

2   worship in accordance with rites, rituals and customs

3   forever.

4          And we've never not done that, Judge.  There's

5   not a shred of evidence before your Honor that we have

6   ever not done that.

7          What we have is the fabrication of counsel that

8   says, well, we didn't give them enough money, when they

9   didn't need any money, and I think that's off point.

10  There is no evidence that we didn't exercise the ritual

11  cultural oversight that we have and we have embraced,

12  and we will continue to do so.

13         THE COURT:  Thanks.

14         MR. SOLOMON:  Thank you, Judge.

15         THE COURT:  Mr. Snow.

16         MR. SNOW:  Your Honor, I'd like to start with

17  the issue of the Attorney General, who has intervened

18  in the case.  It was not just a matter of filing an

19  amicus brief.  Now, they did intervene as an *amicus*

20  *curiae*, which is a particular role that they chose to

21  play which gave them the right not only to brief, but

22  actually to participate in the trial if they chose to

23  do so.  They chose not to.

24         But the mere fact that the Attorney General

25  chose to take a more limited role does not deprive the

1    beneficiary of standing to complain about the breach of

2    trust on the part of the trustee, which is what we have

3    here.  But they are playing a role.  They have

4    submitted briefs.  They've taken positions.  And they

5    did so because the Attorney General acts as the

6    administrator of charitable trusts, so it was perfectly

7    appropriate for the administrator of charitable trusts

8    to weigh the evidence that they heard during the trial,

9    just as the Court is going to do.  And that's what they

10   did, and they came to the conclusion that the

11   overwhelming record at trial points to the existence of

12   a charitable trust.  That was their conclusion.  They

13   also concluded that the beneficiary of the trust was

14   the Jewish society of Newport.

15        And the current incarnation of that society is

16   Congregation Jeshuat Israel.  Now, it's true, it may

17   not be forever.  It could be sometime in the future

18   Congregation Jeshuat Israel may not exist, and if that

19   happens then hopefully some other congregation will

20   replace it and pray at Touro Synagogue.  They would

21   then be the current incarnation.  But right now, today,

22   there is only one incarnation of the Jewish society of

23   Newport, and it is the Plaintiff in this case,

24   Congregation Jeshuat Israel.

25        I'd like to briefly address the 1903 decision of

1    Judge Brown, a somewhat confusing decision, but I think

2    ultimately it's quite clear that there can be no

3    *res judicata* of that decision.  What Judge Brown found

4    is, he made rulings on jurisdiction.  He found that the

5    Plaintiffs in that case, which included Congregation

6    Jeshuat Israel and a number of individual congregants,

7    could not come into a court of equity because they had

8    unclean hands because they obtained possession of the

9    synagogue through a forcible entry and detainer.

10        THE COURT:  Did not seem to like the method of

11   possession that the congregants took.

12        MR. SNOW:  I would agree with that, although

13   they did do it under legal advice by a person who later

14   became a judge and wrote an article about it, which is

15   in evidence; quite interesting story.  But they didn't

16   do it on their own, but they did it, and Judge Brown

17   found that they had unclean hands; therefore, he

18   granted the demurrer which is essentially, you know,

19   the forerunner of our motion to dismiss.  That's

20   jurisdictional.  That doesn't go to *res judicata*.

21        And the other holding that he came up with was a

22   lack of standing, and he did that because of the

23   peculiar common law rules of pleading that were in

24   place at the time, which fortunately Congress got away

25   with in the 1930s.

1      In that case the Plaintiffs took the same

2  position that Congregation Shearith Israel is taking

3  here, that the beneficiary -- that the Jewish society

4  isn't Jewish society of Newport; it's the Jews of

5  Newport, which is a term that they used during trial.

6  And that's what the Plaintiffs there used.  They argued

7  that the beneficiary of the trust under the Rivera will

8  were the Jews of Newport, and CJI was a representative

9  of the Jews of Newport.

10      And Judge Brown said, no, if there is a trust --

11  and he didn't decide whether or not there was a

12  trust -- but he did look to the will of Rivera and he

13  said there may be a trust based upon that.  But the

14  beneficiaries, the Jewish society of Newport, and you

15  pled as the Jews of Newport, that's different, so your

16  pleading was in error, therefore the demurrer is

17  granted.

18      And he also found that the Congregation Jeshuat

19  Israel was a corporate entity; therefore, could not be

20  a Jew of Newport or anyplace else and therefore there

21  was another common law pleading, irregularity.  But

22  that's all that he found, and that's all that the case

23  stands for.  It was jurisdictional and does not have

24  preclusive effect on anything.

25      The only case that CSI cited after 1950, which

1    is when the statute was amended, is the 1977 case

2    against Attorney General Israel.  But that case was

3    whether the Attorney General had authority where the

4    trustee was out of state and the corpus was out of

5    state, and so it's totally distinguishable from any

6    situation here.

7         I would suggest that it's quite clear that what

8    the legislature decided in 1950 was, as your Honor

9    suggested in your questionings earlier, that it didn't

10   want to put a burden on the Attorney General as

11   administrator to have to intervene in all cases, so

12   that's not required, simply notice, and then the

13   Attorney General decides whether or not to intervene.

14        THE COURT:  In other states that seems to be

15   called the more modern view of charitable trust.

16        MR. SNOW:  Thank you.

17        MR. NAFTALIS:  The middle reliever is coming in

18   now.

19        I just want to respond to a handful of the

20   things Mr. Solomon raised.  First of all he said

21   there's nothing in Rhode Island law which makes us the

22   beneficiary of the trust.  Well, we and have the slides

23   here.  The 1932 Rhode Island law is explicit as

24   explicit could be.  The property on the corner of Touro

25   and Division Streets in the City of Newport is held in

1    trust for the benefit of Congregation Jeshuat Israel.

2         Also, Mr. Solomon said that, Gee, it's a new

3    argument that we only made somehow right now at trial

4    that this was a charitable trust.  It's in our

5    Complaint, paragraphs three and paragraphs 35.  It's in

6    our pretrial brief, Pages 4 and Pages 38.  We've always

7    said it's a charitable trust.  That's been the theory

8    from the go.  We never said anything about being a

9    private trust here.

10        As I listened to Mr. Solomon's arguments, with

11   all the passion and eloquence he brings to them, the

12   more I listened to him the more I felt that his own

13   arguments show why they need to be removed.  I haven't

14   heard one good reason why these people -- who have

15   breached their fiduciary duties by acts of omission for

16   more than a century -- they haven't paid the slightest

17   degree of heed to the Touro Synagogue, the corpus of

18   the trust, or us as the beneficiary, for a century.

19   They need a GPS to find the Touro Synagogue.  Or, by

20   their acts of comission -- you know, I'm not a great

21   expert on trust law, but I know simple things:  A

22   trustee is not supposed to make decisions in

23   furtherance of his or her own interest.  That's

24   breaching the duty of loyalty.  A trustee is supposed

25   to make decisions solely for the benefit and taking

1    into account the interest of the beneficiary.

2         THE COURT:  But there's nothing in this record

3    that this Court could say that CSI has attempted to act

4    in its own personal interest.  It has been clear from

5    the get-go, at least to this Court, that CSI is

6    motivated by their firmly-held belief that they owe an

7    obligation to ensure that the Touro Synagogue remains a

8    public worship consistent with the traditions of the

9    Spanish and Portuguese traditions as they practice, and

10   there's no evidence before the Court that they have

11   done anything to feather their own cap or to inure to

12   it.  You may disagree with that.  You may disagree with

13   how they pulled it out.  But please don't, not that you

14   were, but please don't let anyone think that there's

15   anything in this record that would show that they acted

16   in their own self-interest in that regard that I've

17   seen.

18         MR. NAFTALIS:  I would respectfully submit if

19   you look at the testimony, both of Mr. Katz and of

20   their 30(b)(6) witness, Mr. Lustig, who was their

21   30(b)(6) witness on the ownership of the reasons for

22   why they scuttled the deal on the rimonim, the only

23   reason he gave had nothing to do with any of these

24   other reasons.  It was because we owned them, period.

25   That is looking out for your own interest.  He also

1    testified in his deposition, which is also part of the

2    record in the case.  We make our decisions about what

3    is in our own best interest.

4         And that doesn't make them criminals, that

5    doesn't make them anything, but it does mean that

6    they're not following, most respectfully, the fiduciary

7    interests of acting solely for the benefit of the

8    beneficiary.

9         They deny we're the beneficiaries.  They take

10   positions and arguments, and they're entitled to take

11   positions and arguments; I'm not saying they can't.

12   But they say we don't have financial needs?  That's,

13   you know, we're obviously not repairing the broken

14   stoop because for litigation purposes?  We can't.  We

15   don't have the funds to heat the community center

16   during the winter so we have to shut it down, oh, but

17   we're doing just fine, according to them?

18        Their view is -- they've been missing in action

19   about caring one whit about the Touro Synagogue and

20   about us as beneficiaries.  To this minute they're

21   denying it.  Jewish society of Newport, "society" means

22   congregation.  That's what it means.  Indeed, Professor

23   Fisher, in interpreting one of the documents which

24   talked about the society of New York, that means the

25   Congregation Shearith Israel.  It was a different

1    context to this.  It's a common way of talking about

2    congregation, so it's not talking about some ephemeral

3    thing in the sky.

4         Congregation Jeshuat Israel, of which we are the

5    continuation and successor, was the Jewish society of

6    Newport.  They were the Jewish congregation that prayed

7    in the Touro Synagogue.  We picked up the mantle.  And

8    everybody has believed it, no one ever challenged it.

9    The Rhode Island legislature has affirmed it.  It's not

10   some ephemeral -- there is no other --.  I heard him

11   talk about some chabad.  There's no evidence of any

12   other congregation in Newport.  We're the only

13   congregation in Newport, and we're assuredly the only

14   orthodox congregation in the whole county.  There's a

15   conservative congregation, there's one other synagogue

16   in Middletown which is a conservative, but they have

17   their own synagogue and their own way of practicing the

18   religion.

19        So, they are not looking out for us.  And, look,

20   they have a good faith belief that the rules ought to

21   be that they are and they own the -- but the cases say

22   even if it's a good-faith belief, if you violate your

23   duty of loyalty, you're out, and you should be out.  I

24   mean, if you think about it, other than old times'

25   sake, what is the reason for them continuing as the

1    trustee?  They have no real interest in this synagogue.

2            You know, under the '45 agreement -- even though

3    their own witness Katz said it's meaningless, I mean, I

4    guess you sign agreements with the government and

5    they're meaningless -- they're supposed to preserve,

6    protect, maintain, restore.  Well, heck, the synagogue

7    was falling apart physically.  You remember the

8    testimony about the --.  And we went out and needed

9    three million bucks, and we were able to raise two

10   million, and there are limits as to --.

11           And they, according to the testimony, they

12   haven't been involved with the Touro Synagogue

13   Foundation for years.  They haven't done anything in

14   years.  But they're limited; they can't do things for

15   religious purposes.  They've got to be secular, the

16   Touro Synagogue Foundation, because it's

17   nondenominational and the like.  They wouldn't help.

18   They wouldn't help in any way, shape or form.

19           And the 1945 agreement means something.  You

20   make agreements with the United States government, it

21   means something, and you can't act solely in your

22   interest.

23           And I think there's a case, was it the Brandt

24   case -- the *Brault* case.  Told you Toby is always

25   better on the law than I.  The *Brault* case which we

1    cite in our papers, if a trustee sues for trust

2    property in litigation, he's breaching a duty of

3    loyalty.  That's a ground for removal.

4              And by the way, our position is exactly as your

5    Honor stated.  We don't -- we agree with the

6    Attorney General and your Honor that the rimonim are

7    private property that belongs to us.  We don't say the

8    part of the trust.

9              THE COURT:  I haven't ruled any such thing yet.

10             MR. NAFTALIS:  No, but we agree with your

11   Honor's statement of our position.  That's what I

12   meant.

13             Thank you, your Honor.  Thanks for hearing me.

14             THE COURT:  Thanks, Mr. Naftalis.

15             Mr. Solomon.

16             MR. SOLOMON:  Thank you.  There's not much to

17   respond to, so let me go --

18             THE COURT:  I forgot to ask you, and I meant to

19   ask you before about it.  Can you respond to the 1932

20   statute that actually says that the beneficiary is CJI.

21             MR. SOLOMON:  Yes.  We, of course, had no notice

22   of that and there are no legislative findings that are

23   made by the legislature, and the legislature didn't

24   have the authority to interfere with the private

25   contract between Shearith Israel as lessor and CJI as

1    lessee.

2         But more important, Judge, there is a savings

3    clause not only in -- this is 1929, but it's in several

4    other of the Rhode Island statutes which specifically

5    says that they're not doing anything that would

6    interrupt the possession, control and management with

7    the proprietors of said synagogue and premises.  And I

8    think that is a clear indication that they were not

9    trying to change the status quo.  They were saying that

10   we're not interrupting the management or control or the

11   possession of the proprietors of the synagogue by doing

12   that.

13        And so I think right on the face of it there is

14   a carve out.  What they wanted to do is allow CJI to

15   have tax exempt status, and so they did that.  But I

16   don't think they did more.  We certainly didn't have

17   notice that they did more.  They didn't make findings

18   that they did more.  There were no hearings that they

19   did more; and I think that's the answer that we would

20   give to your Honor.

21        On Page 75 of the transcript of day two, it's

22   with Mr. Bazarsky who says that of the thousand Jews,

23   they have only 300; a hundred families, 300 people of

24   the thousand, and then that there's a hundred of them,

25   he says families, meaning another 300 people belong to

1    Temple Shalom in Middletown, which is where people also

2    go for services.  And Page 186 of day three is Ms. Ross

3    that says there are other synagogues or Jewish

4    congregations in the city of Newport, but there's one,

5    which she says, "Answer:  No.  Well, there's one group,

6    the Newport Havurah, an informal group of people that

7    meets in each other's homes called the Newport

8    Havurah."

9         These are more Jews who are praying, not unlike

10   how Yeshuat Israel prayed for the first hundred years.

11   But I do think that that misses the point.

12        Why are we needed as trustee?  With respect,

13   this case shows why we're needed as trustee, because

14   Jeshuat Israel took upon themselves to decide by

15   speaking only to themselves, that was the evidence,

16   they all talked together and didn't talk to anybody

17   else, came to the view that they owned the rimonim.

18   And then they were going to sell them, knowing that

19   there were none other on the market, knowing that there

20   wouldn't be any other on the market, without any

21   sensitivity to the fact that these are sacred ritual

22   objects, because they, in fact, deny that they are

23   sacred.  They deny it in their answer, that these are

24   sacred objects.  And on the stand Ms. Ross said, I

25   don't know what you mean by sacred.

1          And so they then decide that they're going to

2     sell it.  They're going to sell the crown jewel, the

3     birthright.  It's not the only thing that's precious in

4     that edifice, but it is precious and, in fact, you do

5     need a trustee.

6          During the time during the 19th century when it

7     was completely closed, it needed a trustee because it

8     needed somebody to keep the cemetery a fit one, that

9     Jews could be buried there.  It needed ritual oversight

10    of the synagogue itself.  That's when it was empty.

11    How much more so do you need the oversight?

12         There's no getting away from the fact, with

13    respect, your Honor, that as your Honor says it's from

14    the 19th century on.  But even if you go back to the

15    18th century, that edifice is supposed to be used in a

16    way that only Shearith Israel understands.  It's the

17    rites, rituals and customs of Congregation Shearith

18    Israel.  There's no better trustee.

19         Now, if we aren't a great trustee, okay, we're

20    not a bad trustee.  They haven't asked us to do

21    anything.  And now that we've proven that there's a

22    real important reason why we need to be a trustee, why

23    you need oversight there, I wouldn't expect the

24    Attorney General to be able to understand what the

25    rites, rituals and customs are of Shearith Israel.  I,

1    by the way, would probably expect he would pick up the

2    phone and ask us what they were, and we could then tell

3    him.  But let's not have his role be trivial here.

4         It was mentioned in paragraph three and 35 of

5    their Complaint, give us notice that they're asserting

6    a charitable trust.  Please, your Honor, please read

7    paragraph three and 35, and then your Honor will see

8    what we are talking about.  We didn't have notice, but

9    it hardly matters at this point.

10        There are two different problems.  One is the

11   Attorney General is not a party.  They're not going to

12   be bound; they're an amicus.  They're not even going to

13   be bound by a ruling that your Honor makes, so we can't

14   even use it in any other case, nor will it be

15   *res judicata* against anyone else.  So that's the first

16   problem.

17        The second problem is that as a purported

18   beneficiary, CJI doesn't have the right to come in and

19   tell the trustee how the trustee should exercise its

20   discretion, because they're going to say they want it

21   exercised for them, to help them.  So they, CJI, spend

22   50, $75,000 a year, as your Honor saw from the

23   evidence, on things other than the synagogue.  That's

24   their right; okay?  If we can be blamed for anything

25   here, Judge, it's because we've been too benevolent.

1    We've stepped in when we've needed to, and the list is

2    a very long one, that when they've tried to put

3    additions on the synagogue, we said no.  And when they

4    tried to -- when there were some structural changes

5    that they wanted to make to the synagogue and we said

6    no; all right?  We had to step in from time to time.

7         But generally speaking, we have been benevolent,

8    and generally speaking, within the bounds of the lease,

9    we have wanted to make sure that the ritual is right.

10   We have wanted to make sure that the rabbis are as

11   approved.  We have wanted to make sure that they

12   continued to pay rent, so that every year we remind

13   ourselves that they are caretakers; they are lessees.

14   We haven't done more than that.

15        And if we're now being blamed for being absent,

16   where were the requests?  Were are they?  Your Honor

17   doesn't even have credible evidence that there were any

18   requests.  Certainty none in writing.  They can produce

19   none.

20        So it's sort of, you know, no good deed goes

21   unpunished, that there we are trying to let them, sort

22   of, have their own destiny.  We're not absent.  We have

23   liaison there.  Where is the testimony that they once

24   said to liaison, by the way, this is what we need from

25   you.  They did it in 1928, and we had the fundraiser to

1    build their Hebrew school.  And this was money from our

2    congregants that otherwise would not have, because

3    1928 -- that's the date, correct?  Let's get the

4    exhibit for the judge, please.

5            MS. CHAING:  1926.

6            MR. SOLOMON:  Close enough.  When they needed

7    the money to build their Hebrew school, and we

8    petitioned our -- we had a whole fundraising campaign

9    with our congregants and got them the $5,000 that they

10   needed to build their Hebrew school.

11           And when they have needed us to act as owners

12   and sign on their behalf that we are title owners, we

13   have done that for them.  No evidence that we've ever

14   refused to do that.  No evidence we've withheld our

15   consent from anything that they wanted to do.  So it

16   does matter that they haven't needed the money.

17           If you're going to make a case that you're going

18   to sell a priceless object, it has to be a good reason

19   under our rites, rituals and customs.  Leave religion

20   aside, but under our rites, rituals and customs there

21   has to be a very good reason.  And your Honor heard the

22   testimony, and it's unrebutted, and there's no ransom

23   being paid here; and there's no Jewish lives at stake,

24   and there are no non-Jewish lives also has to be taken

25   into account.  None of that happens here.

1          And we then said no, all right; and then they,

2    then they said, Well, why don't we take the rimonim and

3    then we're going to sue them on this trust anyway.

4    That's how this all happened.  And it has everything to

5    do with their belief that they own the rimonim, not

6    some broader issue, which I think they've now turned it

7    into because they see what the evidence has been about

8    the rimonim.

9          If they are a beneficiary, the last thing this

10   Court should allow them to do is to decide what happens

11   to the asylum.  They are not the right people to do

12   that.  And that's not just because they don't represent

13   everyone geographically.  It's because they don't

14   represent everyone through time.  And if they fail,

15   we're going to get somebody else in there who is going

16   to run the place.  That can be reviewed.

17         And your Honor's oversight -- you know, I was

18   sitting there thinking, okay, so we don't want to

19   burden the Attorney General, even though the cases say

20   that you have to, but instead we're going to burden the

21   Court.  So that now your Honor is going to have to

22   figure out what's the proper charitable purpose for all

23   of these, rather than actually having the help of the

24   statutorily empowered, sort of, entity to do that.  It

25   doesn't seem to be the right way to go down that road.

1    The idea that we haven't paid the slightest

2    attention is gross misstatement of the record.  That we

3    have allowed them more leeway than they think they

4    should have had, maybe that is true, but we can't be

5    faulted for that.

6    The fact is never in 120 years have they tried

7    to act inconsistently with the rites, rituals and

8    customs until right now.  And the distortion, the nose

9    has grown about what Michael Katz said in 2009, when he

10   never even saw the article.  Your Honor has the

11   testimony, and your Honor has the findings, your Honor

12   will read, and you don't need any of that from us.

13   The last point I wanted to make is that the word

14   "paraphernalia" as interlineated, I do not think it

15   modifies the premises.  It modifies the appurtenances.

16   And both of those words together are an expansion of

17   what the parties were trying to accomplish.  At the

18   time I think there was no question.  Imagine that a

19   week later when all of this happened, they close the

20   door, they were locked out.  They finally made peace

21   with us and they paid the rent, and they turned around

22   and said, By the way, the rimonim are ours.  Given the

23   history that went on between the parties, I think the

24   point would have been ludicrous.

25   Yet nothing has changed in terms of the rights

1    of the parties.  You don't extinguish your property

2    rights because of the passage of time.  You don't

3    extinguish your contract rights, because every year

4    they renew the lease, and they reaffirm.  And so if the

5    mind can't even -- if the mind boggles thinking about

6    what would have happened a week after, if they said, by

7    the way, we own them, we're going to sell them, and we

8    would have said no, you're bound by the permanent

9    constitution; no, you're bound by the lease.  That's

10   ridiculous.  And, of course, they never tried to do

11   that.  If your Honor can't fathom that then, then I

12   believe the Court should not fathom it now.

13           Thank you.

14           THE COURT:  Thanks, Mr. Solomon.

15           Counsel and all, thank you.  It will be a while.

16   We stand adjourned.

17           (Adjourned)

18

19

20

21

22

23

24

25

1          <u>C E R T I F I C A T I O N</u>

2

3

4

5

6          I, Denise P. Veitch, RPR, do hereby certify

7     that the foregoing pages are a true and accurate

8     transcription of my stenographic notes in the

9     above-entitled case.

10

11

12                    /s/ Denise P. Veitch
                 _____
13                    Denise P. Veitch, RPR

14

15
                      October 21, 2015
16               _____
                         Date
17

18

19

20

21

22

23

24

25