# United States Court of Appeals
## For the First Circuit

———————————

No. 16-1756

CONGREGATION JESHUAT ISRAEL,

Plaintiff, Appellee,

v.

CONGREGATION SHEARITH ISRAEL,

Defendant, Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

———————————

Before

Lynch, Circuit Judge,
Souter, Associate Justice,*
and Baldock, Circuit Judge.**

———————————

Louis M. Solomon, with whom Colin A. Underwood, Nancy L. Savitt, John F. Farraher, Jr., Greenberg Traurig, LLP, Deming E. Sherman, and Locke Lord LLP were on brief, for appellant.
Gary P. Naftalis, with whom Jonathan M. Wagner, Tobias B. Jacoby, Daniel P. Schumeister, Kramer Levin Naftalis & Frankel LLP, Steven E. Snow, and Partridge Snow & Hahn LLP were on brief, for appellee.

———————————

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

** Hon. Bobby R. Baldock, Circuit Judge of the United States Court of Appeals for the Tenth Circuit, sitting by designation.

August 2, 2017

        **SOUTER**, **Associate Justice**.  This case began as an action for declaratory judgment brought by Congregation Jeshuat Israel ("CJI"), which was followed by counterclaims on behalf of the defendant, Congregation Shearith Israel ("CSI").  The district court held that CJI was owner of rimonim used in its worship in the Touro Synagogue and that CSI was owner of the building and real estate subject to a trust for CJI as representing the practitioners of Judaism in Newport, Rhode Island.  We reverse on the basis of the parties' own agreements determining property rights by instruments customarily considered by civil courts.  We hold that the only reasonable conclusions to be drawn from them are that CSI owns both the rimonim and the real property free of any civilly cognizable trust obligations to CJI.

**I.**

        The district court made extensive findings of fact, of which the following, limited synopsis presents the background of this litigation.  In the latter part of the 17th century, the Jewish population of Newport, Rhode Island, made up principally of immigrants from Europe, associated for religious observances and in the course of the following century became known as Congregation Yeshuat Israel, which worshiped largely according to the Sephardic (Spanish and Portuguese) Jewish tradition.  In the mid-18th century, these observant Jews acquired land in Newport on which the building now known as Touro Synagogue was built.  Self-

assessments on the congregants funded the land acquisition, and the Synagogue was erected through donations. The members chose three men to serve in a trusteeship capacity over the Synagogue and its lands, though it is not clear that these individuals would have been recognized as trustees by the civil law in the mid-18th century.

Close in time to the construction of the Synagogue, silversmith Myer Myers created the rimonim at issue here, a pair of finials with attached bells made of silver and gold and designed to surmount the shafts around which the Torah scrolls were rolled. The rimonim were used in worship by Congregation Yeshuat Israel in Touro Synagogue.

In the course of the period running from the Revolutionary War through the War of 1812, the Jewish population in Newport virtually vanished. As it dwindled, movable personal property, including the rimonim, was transferred to CSI, a Sephardic congregation in New York. In the ensuing years, and for the better part of the 19th century, various individuals took it upon themselves to maintain the fabric of the Newport Synagogue, and CSI, too, helped care for the building, which it controlled and made available for occasional funerals. In the latter part of the 19th century, out of a new infusion of immigrants, a Jewish population grew again in Newport. To a significant degree, its religious character was of the Ashkenazic (central and eastern

- 4 -

European) tradition, and its worshippers became known as Congregation Jeshuat Israel, though its name represented no formal connection with its predecessor.  When the community was large enough to support a rabbi, Touro Synagogue was reopened, and CSI returned the rimonim to Newport.

Around the turn of the 20th century, the relationship between CJI and CSI soured to a point in 1901 when CSI closed the Synagogue.  After a year of closure, a group of the Newport Jews broke in and engaged in a limited occupation that lasted for another year, whereupon CJI and several individuals brought suit in equity against CSI in a Rhode Island court, claiming a right to the Synagogue and its lands.  CSI removed the case to federal district court, which in January 1903 sustained CSI's demurrer and dismissed the case.  See David v. Levy, 119 F. 799 (D.R.I. 1903).

The effect that the judgment standing alone might have today, if any, is not a matter of concern to us, owing to a series of contracts that we mention here and describe in greater detail below.  In 1903, CJI and CSI made an agreement to settle their competing claims of interest in the real property, followed in the same year by a five-year lease of the Synagogue from CSI to CJI, which dealt with personal property as well as the real estate. The lease was renewed for another five years in 1908.  Thereafter CJI continued to hold services in the building and in 1945 recognized its own status as lessee when it joined an agreement

- 5 -

that the two congregations made with the Department of the
Interior, and it again recited its lessee status in a further
contract made in 2001 by CJI and a supporting organization with
the National Trust for Historic Preservation.  Although the
leasehold relationship was thus acknowledged, CJI was a holdover
tenant under the 1908 lease, and for much of the parties' recent
history each took a relaxed view of CJI's nominal rent obligation,
the district court having found only one annual payment since 1987.

In the recent period of their relationship, a want of
cordiality, if not acrimony, was brought to a pitch in 2011 by
CJI's efforts to raise an endowment to provide reliable income to
support its activity at the Synagogue.  In that year it received
an offer from the Museum of Fine Arts in Boston to purchase the
rimonim for over seven million dollars, and it prepared to sell
them.  CSI objected, claiming ownership of the objects, and
charging CSI with violation of the lease obligation to conform to
CSI's version of Sephardic practice, which forbade disposition of
such ritual objects.

The standoff between the two congregations precipitated
the present litigation, begun by CJI, which filed suit against CSI
in Rhode Island Superior Court in 2012.  It sought an order
declaring it to be the lawful owner of the rimonim and restraining
CSI from interfering with the proposed sale to the museum.  As a
fallback, CJI asked for a judgment declaring that CSI owned the

rimonim in trust for the benefit of CJI and authorizing the sale as being in CJI's best interests. CJI further requested that CSI be removed as trustee, to be replaced in a trust capacity by CJI's own board of trustees.

CSI promptly removed the action to federal court, based on diversity of citizenship, 28 U.S.C. § 1332(a), and then answered the complaint and counterclaimed. The counterclaims asked the district court to declare that CSI owns and has full legal and equitable rights to the rimonim. CSI sought a declaration that the sale of the rimonim would be contrary to the Sephardic tradition as maintained by CSI and thus unlawful under the governing instruments, and requested an injunction barring the sale to the Museum and ordering physical transfer of the rimonim to CSI, unless CSI should agree otherwise.[1]  As to the real property, CSI requested a declaration that CSI owned and had full legal and equitable rights to the Synagogue and its lands. CSI also asked for a declaration that CJI had breached the terms of the lease with CSI and the 1945 agreement with the Department of the Interior by, among other things, attempting to sell CSI's

---

[1] After trial but before the district court issued its decision, CSI amended its counterclaims to state that, rather than request the return of the rimonim to New York, it would stipulate to a long-term loan of the rimonim to any congregation worshipping at the Newport Synagogue in accordance with the conditions of the lease and subject to other terms satisfactory to CSI.

- 7 -

property and attempting to treat the Synagogue as its own by installing an unauthorized plaque. CSI requested that CJI therefore be removed as lessee of the Synagogue and the related real and personal property. CSI went on to request that the district court direct CJI to honor its "obligations and duties under the contractual and long-standing obligations and protocols," including an obligation not to alter its bylaws. Finally, CSI sought an award of damages to be determined at trial, along with attorney's fees and costs.[2]

After a nine-day bench trial, the district court concluded that CJI was the rightful owner of the rimonim, with full power to sell them. It further found that the Touro Synagogue and its lands were owned in a charitable trust for the purpose of Jewish worship in Newport, with CSI as trustee. After determining that CSI had failed in its trusteeship duties, the district court ordered CSI removed as trustee and CJI appointed in its stead.

**II.**

The district court approached the competing claims for control of the rimonim and the Touro Synagogue's land and buildings

---

[2] CSI also alleged that CJI had breached a "standstill agreement" between the two parties by filing suit. CSI sought damages from the breach in an amount to be ascertained at trial. But the district court considered this claim waived on account of CSI's failure to argue it at trial, and CSI does not dispute that determination on appeal.

by a conscientious and exhaustive historical analysis. It concluded that CSI's authority as owner of the Synagogue had evolved to that of trustee for the benefit of CJI as beneficiary standing for those who engage in Jewish worship in Newport. The court's findings traced a long path through the history of Newport Judaism, beginning in Rhode Island's founding century and passing through periods of historical obscurity, the most notable of which followed the decline of Newport's Jewish population beginning at the time of the Revolution and its disappearance after the War of 1812. The court confronted conflicting claims of bailment and trusteeship in the course of describing a basic sequence of events depending substantially on information found in the synagogues' respective records and correspondence.

Much of that history reflected, albeit without directly addressing, the doctrinal tensions between the CSI congregation, committed to preserving Sephardic practice at Touro, and the later Newport congregation that emerged from the 19th century immigration, which included a significant Ashkenazic element. The district court was scrupulous in avoiding any overt reliance on doctrinal precepts, as forbidden by the Supreme Court's case law applying the religion clauses of the First Amendment. See, e.g., Jones v. Wolf, 443 U.S. 595, 602 (1979); Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich, 426 U.S. 696, 709-10 (1976); Presbyterian Church in the U.S. v. Mary Elizabeth Blue

- 9 -

Hull Mem'l Presbyterian Church, 393 U.S. 440, 449 (1969).
Nonetheless, the court's historical investigation was unavoidably
an immersion in the tensions between two congregations that were
not doctrinally identical, one of which clearly insisted that the
other conform to some extent with a practice of Spanish and
Portuguese Judaism as a condition of favorable treatment. In fact,
CSI's insistence that its standard of religious practice forbade
the sale of the ritual objects was offered as the basis for
pressing its claim of ownership and authority to block the sale,
which eventuated in this case.

　　　　These are circumstances in which we think that the First
Amendment calls for a more circumscribed consideration of evidence
than the trial court's plenary enquiry into centuries of the
parties' conduct by examining their internal documentation that
had been generated without resort to the formalities of the civil
law. In implementing the religion clauses of the First Amendment,
the Supreme Court has established a regime of limits on judicial
involvement in adjudicating disputes between religious entities
situated like the parties before us, when competing property claims
reflect doctrinal cleavages. What the Court has approved as merely
"marginal judicial involvement" by the civil courts in such
circumstances, Presbyterian Church, 393 U.S. at 450, is aimed at
avoiding, or at least minimizing, the twin risks presupposed
respectively by the Constitution's Free Exercise and Establishment

Clauses: compromising the degree of religious autonomy guaranteed by the former, and placing government in the position of seeming to endorse the religious positions of the winners, forbidden by the latter. See Presbyterian Church, 393 U.S. at 449 ("If civil courts undertake to resolve [church property disputes triggered by religious doctrine and practice] . . . the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern."). These objectives are summed up in another of the Court's aspirational phrases, urging resort to a methodology that allows courts, to the extent possible, to decide in ways that avoid "entangl[ing them] in matters of religious controversy," Jones, 443 U.S. at 608, by relying instead upon the application of "neutral principles of law, developed for use in all property disputes," Presbyterian Church, 393 U.S. at 449; accord Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 41-42 (1st Cir. 2012).

Although there is no simple template for locating the line of limited involvement when property disputes defy resolution by religious contenders themselves, the Court has made a point of instructing religious bodies on actions open to them in advance of controversy, to keep judicial intrusion within bounds. As examples, the Court has mentioned including provisions in deeds and corporate charters spelling out reversionary rights or express

- 11 -

trust benefits, options available to religious organizations as
readily as to their secular counterparts. <u>Jones</u>, 443 U.S. at 606.
And there can be no doubt that contractual arrangements between
the contending parties deserve the same preference as secular
grounds for judgment. <u>See</u> <u>id.</u> at 603 n.3 (characterizing <u>Watson</u>
v. <u>Jones</u>, 80 U.S. (13 Wall.) 679 (1871), as establishing that
"regardless of the form of church government, it would be the
'obvious duty' of a civil tribunal to enforce the 'express terms'
of a deed, will, or other instrument of church property ownership"
(quoting <u>id.</u> at 722-23)).   It is, after all, these common
instruments for establishing ownership and control that most
readily enable a court to apply the required, neutral principles
in evaluating disputed property claims.

      When such provisions of deeds, charters, contracts, and
the like are available and to the point, then, they should be the
lodestones of adjudication in these cases.  And they are available
here: three contracts entered into by the two congregations that
establish ownership of the Synagogue and the rimonim, and a fourth
agreement to which CJI is a party, which confirms the continuing
vitality of the conclusions reached in the prior three.

      The first of them is a settlement agreement made in the
aftermath of the dismissal of the earlier action brought by CJI,
<u>David</u>, 119 F. 799.  On January 30, 1903, a committee of CJI executed

an agreement with the trustees of CSI containing these principal provisions:

> The Congregation, Jeshuat Israel, agrees to admit and recognize without qualification the title and ownership of L. Napoleon Levy and acting trustees [of CSI] to the synagogue building, premises and fixtures.

> . . . L. Napoleon Levy and acting trustees upon receiving the absolute surrender of said premises agrees [sic] to make a lease thereof to the Congregation Jeshuat Israel for five years from February 1, 1903, at the nominal rent of one dollar yearly; said lease shall be in form satisfactory to the landlord and shall contain such clauses as will obviate the necessity of any legal proceedings, so far as possible, by either party to enforce its rights thereunder.

While the signatories on behalf of CSI are designated "trustees," there is no indication that they were understood to be trustees for the benefit of any entity but their own congregation, and a reasonable reading shows it to be highly unlikely that they were understood to have trust obligations to CJI. CJI accepted "without qualification" the CSI trustees' title to the Touro Synagogue land, building, and fixtures. The contract contemplates CJI's "absolute surrender" of the premises, after which the CSI trustees agree to lease them to CJI for five years at a dollar a year, "in form satisfactory to the landlord." Acceptance without qualification of the title of trustees of an independent entity, to which absolute surrender is made in anticipation of a lease satisfactory to the landlord (without any reference to preference of the lessee) is operative language without a hint of possible trust terms or trust obligations running from the lessor landlord to the lessee.

- 13 -

The contemplated lease was expeditiously signed, on February 2, 1903, by a committee acting on behalf of CJI and by the CSI trustees. Its maximum term was five years, at the trifling annual rent specified in the preceding settlement. The nominal rent of course, expresses a hopeful, if not kindly, disposition on the landlord's part, but is not an acknowledgement of any obligation of legally recognized trusteeship. For that matter, the generosity was apparently offset by a duty on the lessee's part to maintain the premises; there was no provision obligating CSI to pay for their upkeep, whereas CJI was obligated to surrender them in as good condition as when received, save only for reasonable wear and damage by the "elements." Nor was property maintenance CJI's only obligation. Even within the rented synagogue it had no discretion but to conduct "the usual and stated religious services according to the ritual rites and customs of the [Sephardic] Jews as at this time practiced" in CSI's own synagogue in New York.[3] And it was required to obtain CSI's advance

---

[3] The condition to follow Sephardic practice does not disentitle the lease to consideration as an essentially secular document to be interpreted under neutral principles in determining the parties' respective property rights. Some adversion to matters of doctrine or practice animating the relationship of two religious parties in controversy is probably inevitable, even on the restrictive concept of legal acts preferred as bases for determining the terms of ownership and control of property for religious purposes under the cited case law. In this instance citation to religious practice is of no significance. The reference to Sephardic practice in this customary instrument of a leasing transaction does not require a court to determine what

- 14 -

approval of "any Minister" who might "officiate" on the premises. For failure by CJI to pay the rent or for breach of conditions CSI was entitled to "oust" CJI from the premises.

In this litigation, two features of the lease are particularly notable. First, neither in stating the lessee's obligations and restrictions, nor in setting out the lessor's duty to provide quiet possession was there any mention of a trust obligation underlying or complementing the terms set out. Just as in any normal instance of a rental transaction, there was no indication that the relationship of the parties was to be governed by anything but the terms of the contract. Second, an interlineation in the typed text of the lease provided that it covered not only the real estate described, together with its appurtenances, but also "paraphernalia belonging thereto." The notary for the signers on behalf of CJI attested that the interlineation had been added before they signed. We read "paraphernalia" to cover the rimonim, given the evidence that they were in use in Touro Synagogue at the time, as well as CJI's argument here that they should be regarded as property historically associated with Jewish worship in that Synagogue.

---

that practice should be. The lease refers to Sephardic ritual and custom observed by CSI as of the time of the lease: that could require only a determination of practice in fact, not a resolution of contending views about what practice is or was "true."

Although the district court declined to read
"paraphernalia" as encompassing rimonim, owing to a lack of
affirmative evidence that the CJI signatories understood the term
"paraphernalia" this way, we think no such specific evidence is
necessary.  Contracts are generally construed in accordance with
the common understanding of their terms at the time of the
agreement, and the common understanding in 1903 would have covered
the rimonim associated with Touro under the term "paraphernalia."
See Paraphernalia, The Century Dictionary and Cyclopedia (1903)
("Personal ornaments or accessories of attire; trappings;
equipments, especially such as are used on parade, or for
ostentatious display, as the symbolic garments, ornaments,
weapons, etc., used by freemasons or the like."); Paraphernalia,
Webster's International Dictionary of the English Language (1900)
("Appendages; ornaments; finery; equipments."); Paraphernalia, A
Standard Dictionary of the English Language (1894) ("Miscellaneous
articles of equipment or adornment; appendages; belongings;
finery.").

The third of the significant documents subject to
judicial consideration is a 1945 agreement among three parties,
CJI, CSI, and the Secretary of the Interior, for the care and
preservation of the Synagogue as a National Historic Site.  As in
1903, CJI acted by a committee and CSI by its trustees.  Under the
contract's terms, public access to the premises was to be

- 16 -

consistent with the Synagogue as a place of worship by CJI, and CSI and CJI agreed that in honoring the contract they would act "in accordance with and subject to their respective rights and obligations as lessor and lessee as heretofore established . . . ."

In one respect, however, this contract is unlike the preceding ones in imputing trust obligations (unspecified) to CSI. Their supposed source was identified as "a [recorded] Deed of Trust dated April 27, 1894" said to have created "certain trusts in the Touro Synagogue."  A subsequent provision referred to "recorded deeds and declarations of Trusts," (although the only document specifically identified was the one first cited).

The consequence of this language is, however, less than meets the eye.  The agreement included no explanation aside from the deed cited (and deeds alluded to) for speaking of CSI as being under a trust obligation to CJI, and that cited source failed to support any finding that it created a trust relationship.  As the district court explained [Add 38, 86], CSI obtained the deed in question at its own behest, from an heir of one of the three original trustees of the pre-Revolutionary Congregation Yeshuat Israel.  The deed purported to convey any interest that might have passed to the trustee's descendants unbeknownst to them or to anyone else in the interim.  The district court referred to eight additional comparably indeterminate deeds from other Congregation Yeshuat Israel trustee descendants, two of which the court

- 17 -

described as purporting to convey their uncertain interests
subject to a trust obligation.  Like the district court, we
conclude that the deeds lack any significance for this case.

        To begin with, they contained no language that could
include the rimonim.  But even as to the real estate alone, we
have no indication that the grantors had anything to convey to
which a trust obligation could attach by the acts of the minority
of grantors who mentioned trust at all.  At best, the deeds may
collectively have had some rhetorical value for CSI in dealing
with the tensions between it and the new congregation of CJI; as
the district court noted, the deeds contained the first statements
of what later became the lease condition that worship at Touro
conform to Sephardic practice as observed by CSI.  The upshot is
that the record fails to show that the references to a trust
obligation on CSI's part to the worshipers at Touro were anything
more than terms of empty conveyances.  They are, moreover,
unsupported by evidence of the sort preferred in applying neutral
principles meant to keep a court from entanglement.  Accordingly,
we treat the trust reference in the tripartite agreement as having
no legal significance in determining ownership of or authority
over either the rimonim or the Synagogue.[4]

_____

        [4] The district court found significance in CJI's favor in
another item of legal character undoubtedly entitled to
consideration as a matter of course under the Supreme Court's model
for dealing with religious property disputes.  In 1932 the Rhode

This conclusion is supported by a fourth contract open
to consideration in harmony with <u>Jones</u>, 443 U.S. 595.  In 2001,
another agreement was made among three parties: CJI, a supportive
organization known as the Society of Friends of Touro Synagogue,
and the National Trust for Historic Preservation.  Its stated
durational term was fifty years, and its objects were preservation
of the Synagogue and provision of education for public visitors.
CJI was described as having "possession of the site through a lease
with Congregation Shearith Israel as owner."  That recitation was
not qualified by anything referring to a trusteeship duty on the
part of CSI, nor did any provision in the agreement raise any
implication of such a relationship.  It simply confirmed that the
two congregations were bound as lessor and lessee and thus
indicated that, however erratic the rent payments had become, CJI
had no legal claim beyond that of a holdover tenant under the terms
of the 1903 lease, as formally renewed in 1908.  Although there
was an allusion to personal property in CJI'S obligations to the
other two parties to protect and conserve "the related collections
in its ownership, possession or control," no object was mentioned

---

Island General Assembly enacted a statute exempting the Synagogue
from property taxation.  1932 R.I. Acts & Resolves 427.  The
premises were described as "held in trust."  <u>Id.</u>  The statute does
not, however, reveal whether the trustees were those of CSI or CJI
itself, let alone what difference it would make in this litigation.

as being within any of the three categories, and nothing can be inferred from this provision about the ownership of the rimonim.

## III.

We think the only reasonable conclusions about property title, ownership, and control that can be drawn from the foregoing evidence are that, as between the parties in this case,

(a) CSI is fee owner of the Touro Synagogue building, appurtenances, fixtures, and associated land as described in the 1903 lease;

(b) likewise CSI is owner of the rimonim in issue here;

(c) in each case CSI's ownership is free of any trust or other obligation to CJI except as lessor to CJI as holdover lessee;[5]

(d) CJI's interest in the Synagogue building and related real property mentioned above is solely that of holdover lessee.

We accordingly **reverse** the judgment of the district court and **remand** the case for entry of judgment consistent with the conclusions set out above.

---

[5] CSI's prayer for relief seeks a judgment that it owns the Touro Synagogue and its ritual contents "as charitable trustee." But CSI's counsel responded to a request from the court for clarification by subsequently filing a letter under Federal Rule of Appellate Procedure 28(j) stating that it stands by its claim of ownership free of any legally cognizable trust obligation.

- 20 -

       We recognize that the order of remand leaves a number of the counterclaim requests for relief without resolution.  But owing both to the obvious consequences of the judgment outlined above, and to the phrasing of CSI's request for relief at the conclusion of its brief, we are uncertain of any present need for judicial action on the issues raised but not formally resolved here.  The judgment we order will therefore be without prejudice to CSI to bring claims raised by it but not resolved here in a new action.  CSI's request for counsel fees and costs, however, shall be heard by the district court on remand.  Any new action, as well as the motion for fees and costs, shall be heard by a judge not already fatigued by this litigation.

       Each party shall bear its own costs.